## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Larry Klayman,<br>540 Brickell Key Drive<br>Miami, FL 33131; | : | |
| | : | |
| | : | |
| Louise Benson,<br>5779 Rolling Road<br>Woodland Hills, CA  91367 | : | |
| | : | |
| | : | |
| *Plaintiffs,* | : | Civil Action No. |
| | : | |
| v. | : | |
| | : | |
| Judicial Watch, Inc.<br>501 School Street, S.W.<br>Suite 500<br>Washington, D.C.  20024; | : | |
| | : | |
| | : | **Jury Trial Demanded.** |
| Thomas J. Fitton<br>5245 42nd Street N.W.<br>Washington, D.C. 20015 | : | |
| | : | |
| *Defendants.* | : | |

### AMENDED COMPLAINT

Plaintiffs, Larry Klayman ("Klayman"), and Louise Benson ("Benson"), complain against

the Defendants as follows:

### Introduction

1.    This is an action by the founder and former Chairman of Judicial Watch, and a high

value donor and volunteer to Judicial Watch to remedy defendants' breach of various agreements

and laws, and to ultimately restore ethics and honesty to Judicial Watch.  Since Klayman left

Judicial Watch to run for the United States Senate, Judicial Watch has failed to honor its

commitments to Klayman, Benson and other donors.  Moreover, Judicial Watch, at the direction

of its President, Thomas J. Fitton, has failed to respect its severance agreement with Klayman by

engaging in a pattern of fraud, disparagement, defamation, false advertising and other egregious

acts against Klayman.  Regrettably this complaint was filed because the defendants failed to correct

their conduct and remedy the damage, despite repeated demands.

2.    In 1994, Klayman conceived of, incorporated and founded Judicial Watch to restore

and promote ethics in the government and in the legal profession and he was the first to use the

trademark "Judicial Watch" in commerce. The mark has a double meaning, as Judicial Watch was

not only intended to help ensure that the court system acts ethically and correctly, but also to use

the judiciary to oversee and police the executive and legislative branches of government.

3.    Klayman conceived of Judicial Watch to serve as a private Justice Department for

the people, in effect a "True Independent Counsel," free from the influences of politics he had seen

as a trial attorney at the U.S. Justice Department. It was a novel concept to form an innovative

group to advocate on behalf of its members and the public through concrete and forceful legal

actions and educational endeavors, including but not limited to the use of the courts and the media.

4.    During the approximately ten (10) years since Klayman founded and lead Judicial

Watch, the organization grew from one office with a volunteer staff to, by the year 2000, a $28

million dollar plus, per annum, foundation with headquarters in Washington, D.C. and regional

offices in Los Angeles, California; Chicago, Illinois; Dallas, Texas; Miami, Florida; and Norfolk,

Virginia. By the year 2003, Judicial Watch had about 50 employees with plans to expand not only

domestically, but also internationally.  It also had nationally syndicated radio and television shows

called "The Judicial Watch Report," expanding the group's prestige and influence.  Moreover,

262521-1                                     2

under Klayman's leadership, Judicial Watch achieved many notable successful verdicts or findings in courts throughout the United States.

5.    In 2003, a seat in the United States Senate (the "Senate") opened in Klayman's home state of Florida. After representing many Florida citizens in legal matters, Klayman decided that he could be even more effective in his fight against corruption by being elected to the Senate.

6.    Though Judicial Watch had become a substantial organization, Klayman believed that the most effective way to effectuate a non-partisan "clean-up" of government was to transition Judicial Watch to a suitable successor while he was elected to the Senate. Klayman intended to take his "Judicial Watch" style of advocacy inside the government, while Judicial Watch continued its work as an independent non-profit organization.

7.    Accordingly, Klayman decided to enter into severance negotiations with Thomas J. Fitton, then President of Judicial Watch ("Fitton") and the Judicial Watch board members to begin the transition of leadership. Ultimately, Klayman entered into a detailed severance agreement (the "Severance Agreement").

8.    Shortly before Klayman left Judicial Watch, he discovered that, contrary to Fitton's representations he made when Klayman hired him, Fitton had not obtained his undergraduate degree. Klayman pressed, and Fitton agreed (a) to obtain his college degree, and (b) to continue the process to find a qualified individual with a legal background to lead Judicial Watch, particularly in light of Fitton's lack of qualifications.

9.    Before departing Klayman discussed the position with and interviewed highly respected and qualified candidates to become Chairman of Judicial Watch.

10.    As a condition to his signing the Severance Agreement and stepping down from

Judicial Watch, Klayman insisted, and Fitton agreed, to have Judicial Watch hire a qualified person to become Chairman. Klayman discussed with Fitton possible candidates that were suitable to lead Judicial Watch.

11.    Instead of taking the steps he promised to find a distinguished and qualified Chairman to run Judicial Watch, Fitton has solely acted to entrench himself as head of Judicial Watch.

12.    Even today there is no Chairman, and Fitton controls Judicial Watch.

13.    Fitton mislead Klayman and others to promote his personal agenda, interests, and political ideology to the detriment of Judicial Watch, Klayman, and Judicial Watch's donors and supporters.

14.    From the time Klayman stepped down from his posts at Judicial Watch, Fitton, directly and through other agents of Judicial Watch defamed, disparaged and cast Klayman in a false light to denigrate Klayman, and in an effort to undermine Klayman's ability to return to the helm of Judicial Watch or compete with Judicial Watch in the future.

15.    As plead more fully below, Judicial Watch, through Fitton and other agents and representatives breached the Severance Agreement and have mislead donors, including but not limited to Louise Benson, the media, and the public with their false advertisements, and other publicity, and solicitations and their continued defamation and disparagement of Klayman.

### Parties

16.    Larry Klayman ("Klayman") is an individual citizen and resident of the State of Florida. Klayman practices law and bases his legal practice in Florida.

17.    Louise Benson ("Benson") is an individual citizen of California and was at all times

material to the allegations made in the complaint a supporter and donor to Judicial Watch.

18.    Judicial Watch, Inc. ("Judicial Watch") is a 501(c) (3) organization formed under laws of the District of Columbia with its headquarters in the District of Columbia. Klayman founded Judicial Watch in 1994 as a public interest government watchdog to investigate and prosecute government corruption and abuse. He not only conceived of and was the first to use the trademark, "Judicial Watch" in commerce, but Klayman also gave Judicial Watch the motto "Because No One is Above the Law!"

19.    Thomas J. Fitton ("Fitton") is President of Judicial Watch. At all times material to the allegations made in this complaint, Judicial Watch was controlled by Fitton.

## Jurisdiction And Venue

20.    The court has jurisdiction under 42 U.S.C. § 1332 because the matter is between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs. Jurisdiction is also proper pursuant to 15 U.S.C. §§ 1125(a), *et. seq.* and 18 U.S.C. §§ 1962, *et. seq.* This court has supplemental jurisdiction over the claims in this complaint that arise under state law, because the state law claims are so related to the federal claims that they form part of the same case or controversy and derive from the same operative facts.

21.    Venue is proper pursuant to 28 U.S.C. § 1391. The actions occurred in whole or in part in this jurisdiction, and Klayman and Judicial Watch have agreed venue is appropriate in this jurisdiction.

## Statement of Facts

22.    Klayman is an honors graduate of Duke University, and Emory University School of Law, former U.S. Justice Department prosecutor and civil trial attorney. Klayman was the founder

and former Chairman and General Counsel of Judicial Watch and in 2004 he was a candidate for the Senate from Florida.

23.    Judicial Watch has acted in a variety of matters ranging from challenges to the President and Mrs. Clinton's Legal Defense Fund, he is credited with uncovering "Chinagate" or campaign finance scandal with John Huang, a suspected Chinese agent; lawsuits over the theft of nuclear codes at Los Alamos Nuclear Laboratories;  political misuse of the Internal Revenue Service; fraud and/or corruption at the United Nations, the pre- and post September 11 cover-up of incompetence and other misconduct at the Federal Bureau of Investigation and a number of government agencies; the resignation of House Speaker Newt Gingrich when he admitted to having brought disgrace on the House of Representatives; various ethics complaints; a lawsuit to open Vice-President Cheney's Energy Task Force – a suit that was ultimately heard by the United States Supreme Court; and complaints against former House Majority Leader Tom Delay and other Republican Congressmen and Senators for selling access to government.  The prestigious "National Journal" has called Klayman a "major force in Washington" and "the major public interest litigator at this time." National Journal, June 24, 2002.

A.    Klayman's Departure from Judicial Watch and the Severance Agreement

24.    In 2003, Klayman decided to step down from Judicial Watch and run for the Senate from Florida as long as a suitable replacement could be found for him as Chairman of Judicial Watch.  Accordingly, Klayman decided to enter into severance negotiations with Fitton and the Judicial Watch board members to begin the transition of leadership.  Ultimately, Klayman entered into a detailed severance agreement (the "Severance Agreement").

25.    During the severance negotiations, Klayman discovered that Fitton had not obtained

his undergraduate degree. Shocked that Fitton had misrepresented his educational background to Klayman when he was hired years earlier, Klayman pressed and Fitton agreed (a) to obtain his college degree, and (b) to continue the process to find a qualified individual, with a legal background to lead Judicial Watch, particularly in light of Fitton's lack of qualifications.

26.    Fitton also deliberately misrepresented that he would find a suitable successor for Klayman as Chairman. Instead of taking steps that he promised, to find a successor to run Judicial Watch, Fitton has acted to entrench himself in control of Judicial Watch and run it as his own partisan operation for his own personal gain.

27.    During the negotiation of the severance agreement, Fitton and two other directors of Judicial Watch acted in secret to remove persons loyal to Klayman from Judicial Watch in order to take over and completely change the nature of Judicial Watch after his departure.

28.    The Severance Agreement was signed on September 19, 2003. The Severance Agreement provides, in pertinent part, as follows:

A.    Judicial Watch would pay Klayman, *inter alia*: (i) all compensation due to him through his last day of work, (ii) a severance payment, (iii) compensation for agreeing not to compete with Judicial Watch for two (2) years; (iv) health insurance benefits for himself and his family, for one (1) year; and (v) the monies Klayman had expended for or on behalf of Judicial Watch.

B.    Klayman would have continued access to Judicial Watch documents and information in the event that he ever needed it to defend himself against accusations or legal actions;

C.    Judicial Watch would advise and permit Klayman to comment in advance

concerning any information about him that Judicial Watch intended to submit to the Internal

Revenue Service.

       D.     Judicial Watch would return Klayman's personal property and assets to him,

including those belonging to Klayman and Associates, his law firm;

       E.     Judicial Watch would work in good faith to remove Klayman as a personal

guarantor of the multi-million dollar lease of the headquarters space at 501 School Street, S.W.,

Washington D.C.;

       F.     Judicial Watch and its officers and directors would not, in any way,

disparage, denigrate or defame Klayman;

       G.     On or before September 27, 2003, Judicial Watch was to issue a press

release announcing Klayman's departure that was to state as follows:

> Judicial Watch announced today that Larry Klayman has
> stepped down as Chairman and General Counsel of Judicial
> Watch, to pursue other endeavors. Tom Fitton, who is
> President of Judicial Watch, said:
>
> Larry conceived, founded and helped build Judicial Watch to
> the organization it is today, and we will miss his day to day
> involvement. Judicial Watch now has a very strong presence
> and has become the leading non-partisan, public interest
> watchdog seeking to promote and ensure ethics in
> government, and Larry leaves us well positioned to continue
> our important work."

       H.     Judicial Watch agreed that Klayman shall be permitted to use, publish and

otherwise disseminate to third parties the following additional statement of Judicial Watch:

> Larry was the creator and founder of Judicial Watch, and
> helped build it to be a stable, successful and widely respected
> organization. We thank him for his service.

I.     Judicial Watch agreed that Klayman would be permitted to comment on Judicial Watch activities after the separation date;

J.     Judicial Watch and Klayman agreed to limit any statements to third parties regarding Klayman's leaving Judicial Watch to be consistent with the Press Release and statements set forth above in subparagraphs G and H.

B.     Breach of the Severance Agreement – The Disparagement and Portrayal of Klayman in a False Light

29.    Commencing almost immediately upon Klayman's departure, Fitton caused Judicial Watch to breach the Severance Agreement, to further Fitton's efforts to entrench himself in power at Judicial Watch to pursue his own personal interests, as well as to take Judicial Watch in a direction wholly inconsistent with Judicial Watch's non-partisan mission -- and to harm Klayman.

30.    Fitton breached the Severance Agreement to promote his personal agenda and political ideology.

31.    After Klayman announced his candidacy for the Senate from Florida on September 19, 2003, Fitton, in concert with two other directors of Judicial Watch, orchestrated a campaign to disparage, defame and cast a false light on Klayman.

32.    Among other things, in breach of the Severance Agreement, Fitton and Judicial Watch employees and agents concealed from and misrepresented Klayman's location from people that called asking for Klayman.

33.    Furthermore, they affirmatively told callers they could not discuss the "reasons" why Klayman left Judicial Watch, contrary to the express provisions in the Severance Agreement, in order to create the erroneous impression that Klayman was forced to leave Judicial Watch. Moreover, they told callers that they did not know where Klayman could be contacted. This course

of conduct has continued up to the present.

34.    Fitton ordered employees in Judicial Watch's headquarters and regional offices not to speak with or contact Klayman.

35.    Shortly after Klayman's announcement that he was a candidate for the Senate, Fitton, in conjunction with Judicial Watch's outside counsel, David Barmak, Esquire, made a frivolous demand on Klayman, purporting to prohibit Klayman from ever mentioning that he was the founder of Judicial Watch and threatening to take legal action against Klayman if he failed to comply with the demand.

36.    Fitton and others caused Judicial Watch to orchestrate an effort to cause media outlets, including radio and television stations and broadcast and cable networks, to shun Klayman and persuade them not to discuss matters of public concern with Klayman.

37.    On information and belief, Fitton and others on behalf of Judicial Watch represented, *inter alia*, that Judicial Watch could and would take legal action against the media outlets if they permitted Klayman to appear and truthfully state he was the founder and former Chairman of Judicial Watch. Such threats, however unfounded, were sufficient to cause the media to shun Klayman and refrain from inviting him to appear or comment to them.

38.    Throughout his tenure at Judicial Watch, Klayman had established a strong relationship with the media. Klayman, already a well-known lawyer, became a regular guest on many television network, cable and radio programs. Klayman was so well known and widely recognized that a semi-fictional character, based on Klayman, was created for the television show "West Wing." Klayman enjoyed celebrity status within the non-profit legal/political community. In fact, by working under Klayman, Fitton learned that the most powerful tool for finding clients

262521-1                                        10

and raising his stature in the legal community was through the media outlets. During his years at Judicial Watch, Klayman was regularly called to comment on legal or political affairs as Judicial Watch's founder and Chairman.

39.    While at Judicial Watch Klayman was synonymous with Judicial Watch, and his media presence resulted in numerous clients contacting Judicial Watch for legal counsel.

40.    By threatening the media, and directing media outlets that they could no longer refer to Klayman as Judicial Watch's founder and former Chairman, or ever discuss anything that concerned or related to Judicial Watch, Fitton and others breached the Severance Agreement and disparaged, defamed and portrayed Klayman in a false light.

41.    The actions of Fitton and other Judicial Watch employees and agents had the desired effect of chilling the media. Without the ability to freely refer to Klayman as Judicial Watch's founder and former Chairman, or to comment on Judicial Watch's activities, the media would not be able to identify Klayman to its viewers. Instead of calling on Klayman to comment on political and legal affairs -- and have to confront Judicial Watch's threats of retaliation in doing so -- the media sought to avoid injecting themselves into any disputes between Judicial Watch and Klayman by ignoring Klayman and seeking other commentators.

42.    Fitton and Judicial Watch engaged in this pattern of disparagement and portrayal of Klayman in a false light to ensure that Klayman could never compete with Judicial Watch or Fitton himself.

43.    Fitton's improper acts were done to further his own agenda to marginalize Klayman and promote Fitton's status within the media and elsewhere.

C.    Breach of the Severance Agreement – Fraudulent Mailings, Misrepresentation False Advertising and Portrayal of Klayman in a False Light

44.    Over one month after Klayman stepped down as Chairman and General Counsel of Judicial Watch, Fitton caused Judicial Watch to send fund raising letter solicitations through the U.S. Mail that falsely represented that Klayman was Chairman and General Counsel of Judicial Watch. This mailing used Klayman's name and image without permission. A sample copy of this fraudulent direct mail piece is attached hereto as Exhibit "A."

45.    This fraudulent fundraising practice created confusion among donors, and they mistakenly sent donations to Judicial Watch believing that Klayman was still there running the organization and using their donations for proper purposes.

D.    Fraud on Louise Benson and the other Building Fund Donors

46.    In November 2002, while Klayman was Chairman and General Counsel of Judicial Watch, Judicial Watch began a campaign to raise funds from the supporters of Judicial Watch to purchase the building that housed their headquarters office space at 501 School Street, S.W., in Washington, D.C (the "Building"). Judicial Watch sent appeals to potential donors, including but not limited to Benson, seeking funds solely for the purpose of purchasing the Building and no other reason. A copy of the solicitation sent to Benson is attached hereto as Exhibit "B."

47.    Benson relied on the representations made by Judicial Watch in the solicitation in making a pledge for $50,000. She would not have made the pledge, and paid $15,000 up front to purchase Fitton's office space at Judicial Watch, but for the representation in Judicial Watch's solicitation that the money would be used to purchase the Building and provide her with naming rights.

48.    Benson made her pledge solely on the condition that Judicial Watch was and would

continue to actively pursue the purchase of the Building, as Judicial Watch represented in its solicitation.

49.   After Klayman's departure from Judicial Watch, Fitton caused Judicial Watch to cease actively pursuing the purchase of the Building, but concealed that fact from Benson and other similarly situated donors and supporters of Judicial Watch.

50.   Fitton and Judicial Watch never contacted the landlord, Robert Wolpe, and owner of the headquarters building to negotiate the purchase of the Building.

51.   Fitton caused Judicial Watch to publish a newsletter in February 2005 which concealed the truth and led Benson and other donors to believe Judicial Watch was actively pursuing the sale, and had been consistently maintaining donations from Benson and 3,686 others in a segregated, interest bearing account.  A copy of the newsletter is attached as Exhibit "C."

52.   On information and belief, the truth was, however, that Fitton caused Judicial Watch to commingle with Judicial Watch's operating funds, or misuse in other ways, the approximately $1.4 million raised from Benson and others.

53.   Fitton caused Judicial Watch to continue to mislead Benson and other donors in a newsletter dated September 2005, which falsely states:

> This fund has been one of the most comprehensive
> fundraising efforts in Judicial Watch history. The
> long term goal of the fund is to provide financial
> stability for Judicial Watch through the ownership of
> an office building.

A copy of the newsletter is attached as Exhibit "D."

54.   The truth is that after Fitton took control when Klayman left, he caused Judicial Watch to take little or no action to increase the fund, failed to communicate with donors at all

about the Building until Klayman pressed more and threatened to go to appropriate government authorities and the donors themselves.

55.    At all material times Judicial Watch had sufficient resources to purchase the Building. Fitton however, chose to deceive donors by failing to even communicate with the owner of the Building.

56.    Moreover, when Benson questioned Judicial Watch about the status of her donation and the attempts to purchase the Building, Gregg Mills, Judicial Watch fundraiser, deliberately misrepresented that Judicial Watch was actively attempting to purchase the Building.

57.    Robert G. Mills, a/k/a, Gregg Mills, is the high-dollar fundraiser for Judicial Watch. He deliberately mislead Benson to believe that Judicial Watch was engaged in efforts to purchase the Building.

58.    Fitton continued to employ Mills on behalf of Judicial Watch even though he knew or should have known that Mills' prior actions exposed Judicial Watch's reputation for non-partisan integrity to injury. For example Fitton knew, and or should have known that:

(a)    Mills had been president of U.S. Family Network, found by the Federal Election Commission to have funneled corporate money into attack advertisements against Democrats;

(b)    Mills led a nonprofit group that received millions of dollars from clients of former lobbyist Jack Abramoff;

(c)    Prosecutors recently subpoenaed Mills in connection with the investigation into Congressman Tom DeLay's alleged money laundering and campaign finance scandal case in Texas; and

(d)    Mills' refusal to take a polygraph exam in 2003 after allegations surfaced that he allegedly stole funds from another organization, which he admittedly repaid.

59.    Benson detrimentally relied on Mills', Fitton's, and Judicial Watch's fraudulent misrepresentations.

E.    Defamation, Disparagement of Klayman and Misrepresentation

60.    During the period of Fitton's leadership, Judicial Watch's assets have been reduced almost fifty-percent (50%) percent, based on Judicial Watch's annual submissions to the IRS.  On information and belief, Judicial Watch's assets now are between $8 and 9 million dollars - down from almost about $16 million in actual booked assets as of September 19, 2003, when Klayman left. And, if inheritances and prospective attorneys' fees awards had been booked at that time, Judicial Watch's assets would have been in the $20 million dollar range.

61.    Fitton has caused Judicial Watch to disparage, and defame Klayman in violation of the Severance Agreement by putting false statements on its website in which references in press quotations originally made about Klayman are doctored to refer to Judicial Watch instead.  The effect is to denigrate Klayman by rewriting history, a la the novel 1984, by George Orwell.  Some examples of the "rewrites" Fitton caused Judicial Watch to make are as follows:

> compare
>
> **Fitton's Judicial Watch Quote:** "Judicial Watch appears to be the main public interest litigator at this time, no small feat." *National Journal*, June 24, 2002.
>
> with
>
> **Real Quote:** "He (Klayman) appears to be the major public litigator at this time." *National Journal*, June 24, 2002
>
> compare

**Fitton's Judicial Watch Quote:** "Thanks, in part, to its aggressive litigation, Judicial Watch was recently named one of the top ten most effective government watchdog organizations by *The Hill* newspaper and a force in Washington by the *National Journal.*"

with

**Real Quote:** "...through his challenge of secrecy rules, Klayman has become a major force in Washington." *National Journal*, June 24, 2002.

A copy of the Judicial Watch's website, with the false quotations, as well as the reprints from published articles containing the correct quotations attributing Judicial Watch success to Klayman are attached hereto collectively as Exhibit "E."

62.    Fitton also caused Judicial Watch to harm and damage Klayman, in order that they could continue to control and misuse the organization. To further their means and ends, assisted by Barmak, they engaged in the following additional conduct in breach of the Severance Agreement:

A.    Judicial Watch illegally and systematically opened mail sent to Klayman at Judicial Watch and tortiously interfered with another entity funded by Klayman, Freedom Watch, Inc., which is a 501 (c) (3) founded to promote freedom domestically and around the world;

B.    Judicial Watch made false statements on IRS Form 990s, and then published them on Judicial Watch's website, claiming that Klayman owned certain monies to Judicial Watch. Fitton signed the 2003 and 2004 Judicial Watch tax returns and made these false statements under oath, in violation of 18 U.S.C. §1001. These fraudulent statements were intended to harm and defame Klayman. Despite Klayman's repeated requests for corrections and retraction, Judicial Watch refused and continued to publish these falsehoods throughout November and December, 2005 and continuing until at least August 2005 and beyond;

C.    Judicial Watch failed to pay Klayman and his family for health care

insurance.

      D.     Judicial Watch failed to pay Klayman his last paycheck while employed by Judicial Watch;

      E.     Judicial Watch converted Klayman's personal property and assets, as well as those of Klayman's law firm Klayman & Associates;

      F.     Judicial Watch failed to make a good faith effort to remove Klayman as a personal guarantor from the lease for Judicial Watch's headquarters at 501 School Street, S.W., Washington D.C.;

      G.     Judicial Watch filed false and frivolous legal pleadings to attempt to have Klayman removed as counsel for Sandra Cobas in the Miami Elian Gonzalez litigation concerning the alleged use of excessive force during the Easter, 2000 raid on his uncle's house, fraudulently representing to the court that Klayman was legally barred from representing her;

      H.     Fitton and Judicial Watch failed to forward telephone messages and mail to Klayman, and opened mail that was not addressed to or did not pertain to Judicial Watch;

      J.     On information and belief, Judicial Watch interfered with Klayman's relationships with Klayman's former clients who had offered to help Klayman in his Senate campaign, by disparaging, defaming, holding in a false light and providing false and misleading information to them to cause them to sever their relationships with Klayman; and

      I.     Fitton and Judicial Watch defamed Klayman among the media outlets and the general public.

      63.     Defendants' deliberate wrongful conduct is part of a pattern of abuse that is intended to mislead the public and harm Klayman, Judicial Watch and its donors.

## COUNT ONE – FRAUDULENT MISREPRESENTATION

<u>Louise Benson v. Judicial Watch and Thomas Fitton</u>

64.    Plaintiffs incorporate by reference the allegations of paragraphs 1 through 63 as if fully set forth herein:

65.    As alleged above Benson contributed funds to Judicial Watch in reliance on the specific representations made by Judicial Watch that it intended to use them to purchase the Building located at 501 School Street, S.W., Washington, D.C. (the "Building").

66.    Since Benson pledged her money, and made her $15,000 payment, Fitton and Judicial Watch have continued to misrepresent that it intends to use her money, and those of other similarly situated donors, to purchase the Building or another property.

67.    Upon information and belief, since Fitton has taken over Judicial Watch, Fitton and Judicial Watch have not intended to, taken no steps to and is not, now, because of the dissipation of Judicial Watch assets, in a position to purchase the Building.

68.    Greg Mills, fundraiser for Judicial Watch, deliberately mislead Benson by fraudulently representing that the funds were being used to purchase the Building.

69.    Benson justifiably relied to her detriment on the misrepresentations of Fitton, Mills and Judicial Watch.

70.    These misrepresentations were calculated to placate Benson and stop her and other similarly situated donors from filing suit and/or seeking a return of the donations.

71.    Defendants' representations since October 2003 are false and fraudulent, and Fitton and others who caused those representations to be made in, inter alia, Judicial Watch newsletters sent to Benson and others in February and September 2005, knew they were false at the time they

were made.

72.    Judicial Watch, Fitton, and Mills made those misrepresentations to induce Benson and the other 3,864 donors who gave money to buy the Building to refrain from demanding a refund of their donations so Judicial Watch could retain the benefit of their donations.

73.    The fraud and deceit of Judicial Watch, Fitton, and Mills was knowing and intentional and has damaged Benson.

74.    The actions of Judicial Watch in retaining Benson's money under false pretense is so outrageous as to shock the conscience, thereby entitling Benson to an award of punitive damages.

## COUNT TWO – BREACH OF CONTRACT

### Louise Benson v. Judicial Watch

75.    Plaintiffs incorporate by reference the allegations of paragraphs 1 through 74 as if fully set forth herein.

76.    As alleged above Benson contributed funds to Judicial Watch in response to a direct solicitation and in reliance on the specific representations made by Judicial Watch that it intended to use her contribution to purchase the Building located at 501 School Street, S.W., Washington, D.C. (the "Building").

77.    Benson entered into a contract with Judicial Watch to obtain the naming rights to a particular space in the Building, specifically the office of Fitton.

78.    Specifically, Benson was induced to pledge $50,000 and pay $15,000 in return for the naming rights of the either Chairman's Office, the President's Office, Guest Reception Area, or the Lounge and Key Witness Room.

79.    As consideration for her $50,000 pledge, and $15,000, payment Judicial Watch agreed

to name the President's (Fitton's) Office after Louise Benson. Judicial Watch agreed that after purchasing the Building it would recognize her generous pledge by placing a plaque on the President's Office.

80.    Since Benson pledged her money, Judicial Watch has continued to misrepresent that it intends to use her money, and those of other similarly situated donors, to purchase the Building or another property.

81.    Since Fitton has taken over Judicial Watch, Judicial Watch has not intended to, taken no steps to, and is not now, due to the dissipation of Judicial Watch assets, in a position to purchase the Building.

82.    Greg Mills, fundraiser for Judicial Watch, deliberately mislead Benson by fraudulently representing that the funds were being used to purchase the Building.

83.    Benson relied to her detriment on the misrepresentations of Fitton, Mills and Judicial Watch.

84.    Judicial Watch has not purchased the Building and is in breach of the agreement that offered Benson the naming rights to the President's Office in consideration for her pledge and contribution.

## COUNT THREE – UNJUST ENRICHMENT

### Louise Benson v. Judicial Watch

85.    Plaintiffs incorporate by reference the allegations of paragraphs 1 through 84 as if fully set forth herein:

86.    As alleged above Benson contributed funds to Judicial Watch in response to a direct solicitation and in reliance on the specific representations made by Judicial Watch that it intended

to use her contribution to purchase the Building located at 501 School Street, S.W., Washington, D.C. (the "Building").

87.    As set forth herein, the Judicial Watch accepted, used and enjoyed the benefits of Benson's $15,000 payment made in the belief that Judicial Watch would purchase the Building and provide her naming rights.

88.    As set forth herein, Benson conferred a valuable benefit upon Judicial Watch by pledging $50,000 and making payment of $15,000 in consideration of Judicial Watch's promise to purchase the Building and provide Benson naming rights for the President's Office.

89.    Judicial Watch has not purchased the Building and is misusing Benson's payment.

90.    As set forth herein, because of the relationship between the parties, Benson is entitled to receive the reasonable value of the benefits conferred upon Judicial Watch, which is $15,000 plus interest.

91.    In addition, Benson conferred a substantial benefit upon Judicial Watch in an amount in excess of $65,000 through the services that she provided by working at Judicial Watch's San Marino, CA office, and through the services she provided to Judicial Watch's "Judicial Monitoring Project," with the expectation that Fitton and others would act honestly and ethically toward her and to the public generally.

92.    Because Fitton and Judicial Watch have not acted properly by deliberately misleading donors and improperly converting Judicial Watch into a partisan organization, Benson is entitled to receive the value of the services she provided.

**COUNT FOUR – Violation of Section 43(a) of the Lanham Act**

Klayman v. Judicial Watch and Thomas Fitton

93.    Plaintiffs Klayman incorporates by reference paragraphs the allegations of paragraphs 1 to 92 as if fully stated herein.

94.    By placing in the U.S. mails and on the Internet letters, newsletters and other solicitations that misrepresented that Klayman was the Chairman and General Counsel of Judicial Watch, and using these published misrepresentations to raise money for Judicial Watch, Judicial Watch engaged in false designation of origin, false and misleading descriptions, false and misleading representations, false and misleading advertising and other illegal acts of unfair competition which are likely and did cause confusion, mistake, and/or deception and misrepresented the nature, characteristics and qualities of plaintiffs' products, services, and activities in violation of 15 U.S.C. §1125(a)(1)(A) and (B). These illegal acts were perpetrated and occurred both nationally and internationally.

95.    Defendant deliberately misrepresented and falsely advertised that Klayman was Chairman and General Counsel of Judicial Watch after he left Judicial Watch to run for the Senate.

96.    The misuse of Klayman's name and likeness were calculated to confuse donors into believing that Klayman was soliciting their donations and that he was still running Judicial Watch.

97.    Klayman is a celebrity within the non-profit legal/political community.  Klayman is widely recognized, both nationally and internationally, as the leading figure in the world of government and judicial oversight and pubic "watchdog" groups.

98.    Fitton and Judicial Watch knew that donors that received the misleading fundraising publications would be confused by the publication and use of Klayman's name and likeness.

99.   Fitton and Judicial Watch deliberately used Klayman's image and name to confuse donors into thinking that Klayman was still affiliated with Judicial Watch.

100.   Fitton's and Judicial Watch's false portrayal of Klayman was used to misrepresent the status of Judicial Watch to entice donors to continue giving donations to Judicial Watch.

101.   As a result of the foregoing, plaintiffs have been damaged in an amount that will be ascertained at trial. In addition to plaintiffs' actual damages, they are entitled to receive Defendants' profits pursuant to 15 U.S.C. § 1117(a). These damages and profits should be enhanced to achieve justice pursuant to 15 U.S.C. § 1117(a) and/or trebled pursuant to 15 U.S.C. § 1117(b) because defendants conduct was willful.

102.   The activities of defendants have caused and will cause irreparable harm to Plaintiffs' personal and business relationships and good will for which it has no adequate remedy at law.

## COUNT FIVE

### Violation of Florida Statute 540.08 – Unauthorized Publication of Name or Likeness

Klayman v. Judicial Watch and Thomas Fitton

103.   Plaintiffs Klayman incorporates by reference paragraphs the allegations of paragraphs 1 to 102 as if fully stated herein.

104.   By placing in the U.S. mails and on the Internet letters, newsletters and other solicitations that used his image and name, and misrepresented that Klayman was the Chairman and General Counsel of Judicial Watch, where such published misrepresentations sought to raise money for Judicial Watch, Judicial Watch engaged in unauthorized use of the name, portrait, photograph, other likeness of Klayman without the express written or oral consent of Klayman to such use of his name or likeness. These illegal acts were perpetrated and occurred both nationally

and internationally and were in violation of Florida Statute 540.08.

105. Defendant deliberately misrepresented and falsely advertised that Klayman was

Chairman and General Counsel of Judicial Watch after he left Judicial Watch to run for the Senate.

106. The misuse of Klayman's name and likeness were calculated to confuse donors into

believing that Klayman was soliciting their donations.

107. Fitton and Judicial Watch knew that donors that received the misleading fundraising

publications would be confused by the publication and use of Klayman's name and likeness.

108. As a result of the foregoing, Klayman has been damaged in an amount that will be

ascertained at trial. In addition to Klayman's actual damages, he is entitled to recover damages for

an amount which would have been a reasonable royalty, and punitive or exemplary damages.

109. Plaintiffs are entitled to punitive damages because defendants conduct was willful.

110. The activities of defendants have caused and will cause irreparable harm to Plaintiffs'

personal and business relationships and good will for which it has no adequate remedy at law.

### COUNT SIX - Breach of Contract – Rescission

<u>Klayman v. Judicial Watch</u>

111. Klayman incorporates by reference the allegations of paragraphs 1 through 110 as if

fully stated herein.

112. As alleged above, Judicial Watch breached the Severance Agreement as set forth in

above in Paragraph 62.

113. Fitton's deliberate and calculating steps to breach the Severance Agreement were

egregious and were taken to further his personal gain to the detriment of Klayman, Judicial Watch

and the public.

114.   By disparaging, defaming, and casting Klayman in a false light to the public and media, Fitton and Judicial Watch breached the Severance Agreement with the malicious intent to eliminate Klayman as a competitive force.

115.   By disparaging, defaming and casting Klayman in a false light to the public and media, Fitton breached the Severance Agreement to ensure that Judicial Watch would no longer be a non-partisan organization and instead become an organization that promoted Fitton's own interests and agenda without regard for the public interest at large.

116.   By filing false statements on its Form 990s, and then posting them on the Judicial Watch website, Fitton and Judicial Watch defamed Klayman—a direct breach of the Severance Agreement.

117.   The false statements on Judicial Watch's IRS Form 990s were intended to and had the effect of suggesting that Klayman defrauded Judicial Watch or improperly withheld certain monies from Judicial Watch.

118.   By actively misrepresenting the reasons for Klayman's departure from Judicial Watch, Fitton and Judicial Watch disparaged Klayman by creating the false impression that Klayman was forced to leave Judicial Watch.  This pattern of disparagement is a direct violation of the terms of the Severance Agreement.

119.   Judicial Watch, through Fitton and other agents and representatives, contrary the expressly negotiated terms of the Severance Agreement, falsely stated that they could not discuss the reasons that Klayman left Judicial Watch.

120.   Judicial Watch, through Fitton and other agents and representatives, falsely instructed the television, cable and the written media that Klayman could not speak on the air about Judicial

Watch cases or public events.

121.  On information and belief, Judicial Watch, through Fitton and other agents and representatives, falsely instructed the television, cable, and the written media that Klayman could not be referred to as the "Founder and former Chairman of Judicial Watch."

122.  By failing to pay Klayman the full amount due under the Severance Agreement, and in failing to return all of Klayman's property, Fitton and Judicial Watch breached the Severance Agreement.

123.  By failing to take affirmative steps to purchase the Building and remove Klayman as a guarantor for the Judicial Watch lease, Fitton and Judicial Watch have breached the Severance Agreement.

124.  After Klayman discovered that Fitton had not obtained a college degree, Klayman insisted that Fitton obtain a college degree, and that he find a suitable candidate, one who was distinguished and qualified, to fill the position of Chairman of Judicial Watch.

125.  Fitton assured Klayman that the Chairman position would be filled.

126.  In fact, just prior to Klayman's departure, Klayman had been discussing and consulting with highly qualified and distinguished candidates to lead Judicial Watch.

127.  Fitton deliberately misrepresented that he would take steps to find a suitable successor for Klayman as Chairman to induce Klayman to enter into the Severance Agreement.  Fitton persuaded Klayman that Fitton would actively work to find a legal/public figure to succeed Klayman and run Judicial Watch.

128.  Fitton never intended to find a suitable successor for Klayman, and instead always intended to take over Judicial Watch for his own personal gain.  Without a law degree, let alone a

college degree, Fitton was not equipped to run a non-profit legal organization.

129.  Fitton's deliberate misrepresentations materially induced Klayman to enter into the Severance Agreement.

130.  Klayman relied on Fitton's fraudulent misrepresentations to his detriment and the detriment of Judicial Watch.

131.  Fitton's and Judicial Watch's breaches of the Severance Agreement are so pervasive and widespread that monetary damages would be inadequate.  The Severance Agreement must be rescinded, and the parties must be returned to the status quo anta.  Klayman should be restored to his position as Chairman of Judicial Watch.

132.  Without rescission of the Severance Agreement, Klayman and Judicial Watch will continue to be harmed.

133.  If this Court rescinds the Severance Agreement, Klayman will be restored to his position as Chairman and General Counsel of Judicial Watch.

### COUNT SEVEN - Breach of Contract – Damages

#### Klayman v. Judicial Watch

134.  Klayman incorporates by reference the allegations of paragraphs 1 through 133 as if fully stated herein.

135.  As alleged above, Judicial Watch breached the Severance Agreement as set forth in above in Paragraph 62.

136.  Fitton's deliberate and calculating steps to breach the Severance Agreement were egregious and were taken to further his personal gain to the detriment of Klayman, Judicial Watch and the public.

262521-1                                    27

**COUNT EIGHT -  Breach of Contract – Specific Performance**

Klayman v. Judicial Watch

137.   Klayman incorporates by reference the allegations of paragraphs 1 through 136 as if fully stated herein.

138.   Judicial Watch has failed to pay Klayman and owes him amounts due Klayman under the Severance Agreement.

139.   Judicial Watch has failed to return Klayman's personal items property, and artwork, and Klayman & Associates, P.C., property as required by the Severance Agreement.

140.   Judicial Watch has failed to remove Klayman as a guarantor for all credit card accounts as required by the Severance Agreement.

141.   Judicial Watch has failed to remove Klayman as a guarantor for the Building as required by the Severance Agreement.

142.   Judicial Watch has failed to provide Klayman access to documents as required under the Severance Agreement.

143.   Despite repeated demands to adhere to and honor the terms of the Severance Agreement, Judicial Watch remains in breach of the agreement and it must be ordered to specifically perform its obligations.

**COUNT NINE - Defamation**

Klayman v. Judicial Watch and Thomas Fitton

144.   Klayman incorporates by reference the allegations of paragraphs 1 through 143 as if fully stated herein.

145.   Judicial Watch, through Fitton and other agents and representatives, including but not

limited to Barmak, have defamed Klayman, by publishing false statements to various persons and entities as alleged above.

146.   Judicial Watch, through Fitton and other agents and representatives, published false and misleading statements in Judicial Watch's 2003 and 2004 Form 990 IRS Returns.  These false statements were prominently published on Judicial Watch's website and falsely stated unequivocally that Klayman owed a certain amount of monies to Judicial Watch.

147.   The false and defamatory publications on the Form 990s and the Judicial Watch website were used by others to attack Klayman.  For example, Peter Paul, a former Judicial Watch client republished the defamatory statements on his website and attacked Klayman based, in part, on the false statements published in the Form 990s.

148.   Fitton's and Judicial Watch's defamatory publications and statements about Klayman harmed Klayman's business reputation and are damaging per se.

149.   Fitton's and Judicial Watch's defamation of Klayman is continuous and ongoing.

150.   In response to the filing of the original Complaint, Fitton and Judicial Watch knowingly sent a false statement to all Judicial Watch employees, which stated that Klayman filed his lawsuit because he owed Judicial Watch a significant sum of money.

151.   Fitton and Judicial Watch knew that Klayman did not, individually, owe Judicial Watch any money when they published the false and misleading statement.

152.   Additionally, beginning on April 13, 2006, Fitton and Judicial Watch published knowingly false statements in the following media outlets: 1) The Washington Post (April 19, 2006); 2) The Washington Times (April 14, 2006); 3) World NetDaily.com (April 13, 2006); 4) Slate.com (April 28, 2006); and elsewhere.

153.   With wanton disregard for the truth, Fitton and Judicial Watch falsely told reporters that Klayman filed his suit as a "tactical maneuver designed to distract attention away from the fact that Klayman owes **more than a quarter of a million dollars to Judicial Watch**."

154.   When Fitton and Judicial Watch published their defamatory statements they did so with knowledge that 1) Klayman does not owe Judicial Watch any money; and 2) Klayman has a genuine dispute with Judicial Watch that has yet to be resolved.

155.   Fitton and Judicial Watch deliberately lied to sully Klayman's name and to imply that, among other things, Klayman filed a frivolous lawsuit.

156.   Fitton's and Judicial Watch's defamation of Klayman is part of Fitton's continuing effort to lower Klayman's esteem in the media and public's eye.

157.   Fitton and Judicial Watch uttered and published false statements about Klayman and they harmed Klayman's reputation in his trade, and profession and had the effect of lowering him in the estimation of the community.

158.   As a result of Defendants' malicious conduct, Klayman was damaged in an amount to be determined at trial.

**WHEREFORE**, Plaintiffs request the Court grant judgment in their favor and:

A.   **On Counts One, Two and Three** award Louise Benson a sum in excess of seventy-five thousand dollars ($75,000) plus interest, against the defendants jointly and severally;

B.   **On Count Three** award Louise Benson an amount of punitive damages to be determined at trial against the defendants, jointly and severally;

C.   **On Counts Four and Five** award Larry Klayman a sum in excess of one million five-hundred thousand dollars ($1,500,000) plus interest, a reasonable royalty, and an amount of

punitive damages to be determined at trial against the defendants, jointly and severally;

D.    **On Count Six** Larry Klayman respectfully prays that this Honorable Court enter a Judgment against Judicial Watch, rescinding the Severance Agreement to preserve the interests of justice and provide such other relief as is just and equitable;

E.    **Alternatively, on Count Seven** award Larry Klayman a sum in excess of five-hundred thousand dollars ($500,000), plus interest, against the defendants, jointly and severally;

F.    **Alternatively, on Count Eight** Larry Klayman respectfully prays that this Honorable Court enter a Judgment against Judicial Watch and order Judicial Watch to specifically perform the terms of the Severance Agreement by: paying Klayman the remaining amounts due under the Severance Agreement, including reimbursing Klayman for business expenses; returning Klayman's personal items, property and artwork; returning the property of Klayman & Associates, P.C.; removing Klayman as a guarantor of all credit card accounts; removing Klayman as a guarantor for the Building; providing Klayman access to documents; and otherwise complying with the Severance Agreement as plead herein;

G.    **On Count Nine** award Larry Klayman a sum in excess of one million five-hundred thousand dollars ($1,500,000), plus interest, and an amount of punitive damages to be determined at trial against the defendants, jointly and severally;

H.    Award Plaintiffs the costs of the action, including attorneys' fees; and

I.    Award Plaintiffs such further relief as is just and equitable.

### Jury Trial Demanded

Plaintiffs hereby demand a trial by jury for all issues so triable.

Respectfully submitted,

**SPECTOR GADON & ROSEN, P.C.**

By: *Daniel J. Dugan* (DD 1339)
Daniel J. Dugan, Esquire
1635 Market Street, 7th floor
Philadelphia, PA  19103
215.241.8872
215.241.8844 *fax*
email: ddugan@lawsgr.com

May 1, 2006                    *Attorneys for Plaintiffs Larry Klayman and*
                               *Louise Benson*

Of Counsel:

**SPECTOR GADON & ROSEN, P.C.**
Jason B. Schaeffer, Esquire
1635 Market Street, 7th Floor
Philadelphia, PA 19103
215.241.8887
215.241.8844 *fax*
Email: jschaeffer@lawsgr.com

262521-1                    32