IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
|
LARRY KLAYMAN, *ET AL.*                             |
|
              Plaintiffs,                            |
|
v.                                                  |        Civil Action No. 1:06-CV-00670
|        Honorable Colleen Kollar-Kotelly
JUDICIAL WATCH, INC., *ET AL.*                      |
|
              Defendants.                            |
_____|

### MEMORANDUM IN SUPPORT OF DEFENDANTS'
### MOTION TO DISMISS SECOND AMENDED COMPLAINT

Defendants Judicial Watch, Inc. ("Judicial Watch") and Thomas J. Fitton ("Fitton"), by

undersigned counsel, hereby submit the following Memorandum in Support of their Motion to

Dismiss the Second Amended Complaint:

### INTRODUCTION

This lawsuit consists of two separate actions that do not arise from the same nucleus of

operative facts and should be severed into two separate actions.[1]

In one action, Klayman seeks to rewrite history and undo his termination from Judicial

Watch.  The vehicle for accomplishing this objective is to pursue various claims, including

rescission, against Judicial Watch and its President for alleged breaches of a September 19, 2003,

Severance Agreement that terminated his employment with Judicial Watch.  Klayman also seeks

damages for alleged defamation, misappropriation of image and other related claims.  Rather than

acknowledge that he was asked to resign for conduct that was not consistent with Judicial Watch's

---

[1]       Pursuant to Rule 20 of the Federal Rules of Civil Procedure, Defendants will file a Motion to
Sever the claims of Plaintiff Klayman from those of Plaintiff Benson as the matters do not arise from

values and principles, Klayman seeks to return to Judicial Watch by engaging in a smear campaign consisting of this litigation, his website and letters to Judicial Watch donors soliciting funds to support the litigation.

The Second Amended Complaint evidences a strategy to destroy Defendants' reputations in an effort to achieve the ultimate goal of restoring Klayman to his former position with the organization. Further, faced with an outstanding debt to Judicial Watch in the approximate amount of $250,000, Klayman has taken the offensive in an effort to avoid liability for this obligation.

In the other action, which has no relationship to Klayman's claims, Benson seeks recovery of donations in the amount of $15,000 made to Judicial Watch's building fund and more than $65,000 in compensation for volunteer services she provided to Judicial Watch with the "expectation that Fitton and others would act honestly and ethically toward her and to the public generally". Benson maintains that she is entitled to be paid for the value of her services because Judicial Watch is now a "partisan organization".

## <u>ARGUMENT</u>

As a matter of law, allegations in the Second Amended Complaint fail to state claims for fraudulent misrepresentation, breach of contract and unjust enrichment. Likewise, the Second Amended Complaint fails to state a claim for violation of § 43(a) of the Lanham Act, violation of Florida Statutes § 540.08, rescission and defamation.

A Court should grant dismissal under Rule 12(b)(6) where, taking the material allegations of the complaint as admitted, the plaintiff has failed to allege all material elements of the cause of action. <u>Weyrich v. New Republic, Inc.</u>, 235 F.3d 617, 623 (D.C. Cir. 2001). When considering a

---

the same nucleus of operative facts.

motion to dismiss, the Court need not accept unsupported inferences or legal conclusions in the Second Amended Complaint. Kowal v. MCI Communications Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994); see also Volpone v. Caldera, 190 F.R.D. 177, 180 (E.D. Va. 1999) (finding that a Court need not accept unsupported, conclusory allegations).

I.    **BENSON'S SECOND AMENDED COMPLAINT MUST BE DISMISSED FOR FAILURE TO STATE A CLAIM ON WHICH RELIEF MAY BE GRANTED**.

Benson alleges that she contributed $15,000 to Judicial Watch, and pledged an additional $50,000. Second Amended Complaint ¶¶ 51, 82.[2]  In addition, she is alleged to have voluntarily provided services valued at $65,000. ¶ 95. Such donations on Benson's part did not come with any obligations on the part of Judicial Watch to purchase a particular building, to purchase a building by a date certain, or to compensate her for the benefit provided. To the extent that the organization invited donors to contribute to the organization's building fund, it was soliciting gifts toward a goal, not guaranteeing the desired result, and certainly not by a certain time. The precarious nature of a deal to purchase a headquarters building by December 31, 2002 was abundantly clear in the solicitation letter sent to Benson by Klayman. See Exhibit B.[3] Benson did not have a reasonable expectation that the building was certain to be secured. The sum of money needed to make the requisite deposit on the building was significant, and the deadline for raising the funds was quite short.

Acquisition of a commercial office building is not a simple transaction, especially for a non-profit like Judicial Watch. The achievement of this goal was not subject to any deadline. Moreover,

---

2        All references to the Second Amended Complaint will be designated by "¶ __".
3        It is perplexing that Benson chose to pursue claims in this litigation against Judicial Watch and Fitton when the promises she relied on in making her donations were made by her Co-Plaintiff, Klayman. See ¶¶ 50-52 and Exhibit B at p. 40.

3

the departure of Klayman impacted Judicial Watch's timetable for completion.  In light of Benson's decision not to contribute the total amount of her pledge, his departure obviously had an impact on her thinking as well.  Judicial Watch has now invested four years of sustained effort toward amassing sufficient funds to make its purchase.  Benson's mere dissatisfaction with Judicial Watch's timing for this major investment can not support her claims for fraudulent misrepresentation, breach of contract or unjust enrichment.

A.    BENSON    CANNOT    STATE    A    CLAIM    FOR    FRAUDULENT MISREPRESNTATION

Count One of the Second Amended Complaint fails because Benson did not detrimentally rely on any misrepresentation by Judicial Watch.  Among the elements to establish the tort of fraudulent misrepresentation is the requirement that Benson take action in reliance on the misrepresentation.  Hercules & Co. v. Shama Restaurant Corp., 613 A.2d 916, 923 (D.C. 1992) (stating that in the circumstance of a contract, the reliance must be reasonable); see also Howard v. The Riggs National Bank, 432 A.2d 701, 706 (D.C. 1981) (stating that essential elements of fraudulent misrepresentation include action taken in reliance).  In this case, the allegations demonstrate that all action taken by Benson was in reliance on solicitations made by Klayman in Exhibit B, and not on any representations made after June of 2003.

Benson is a supporter and donor to Judicial Watch.  ¶¶ 1 and 19.  In 2002, Benson received a solicitation from Klayman on behalf of Judicial Watch.  ¶ 50 and Exhibit B.  In reliance on this solicitation, Benson made a pledge for $50,000 and donated $15,000.  ¶ 51.  According to the list of her donation amounts and dates, Benson's donation of $15,000 was made on or before July 24, 2003.  Exhibit B, p. 40.  Indeed, Benson's total donation of $15,000 to the building fund was made before Klayman left Judicial Watch.  ¶¶ 51 and 69.  At all times since making her donation, Judicial Watch

has maintained that it intends to use the funds for purchase of a headquarters building. ¶¶ 55-57, 61, 70, 72, Exhibit C and Exhibit D.

Factually, the allegations do not support the position that Benson relied on misrepresentations by Judicial Watch, Fitton and Mr. Mills when Benson did not donate any funds to Judicial Watch after Klayman left in September of 2003. In fact, her final donation was several months prior to that time. Exhibit B, p. 40. Benson never donated, or explained why she did not donate, the remaining $35,000 of her pledge. In light of these facts, Benson could not have detrimentally relied on any alleged misrepresentation by Judicial Watch after the departure of Klayman because she never made a donation in reliance on such alleged misrepresentations.

The lack of a deadline for performance by Judicial Watch also demonstrates that Benson cannot plead the element of detrimental reliance. The Second Amended Complaint is completely silent as to a deadline by which Judicial Watch must purchase a headquarters building. The lack of a deadline is not surprising in the context of donations made to a non-profit organization for the purpose of purchasing costly commercial real estate. There was no deadline by which Judicial Watch was to accomplish the task. Even the solicitations authored by Klayman do not set a deadline for performance. See Exhibit B. Instead, they acknowledge the need to raise $7,600,000 by December 31, 2002 to exercise a right of first refusal. However, this amount was never raised.

Benson's position is not supported by the facts as plead, or by the facts as they actually exist. Therefore, Count One must be dismissed.

B.    BENSON CANNOT STATE A CLAIM FOR BREACH OF CONTRACT

Count Two of the Second Amended Complaint fails because donations paid to Judicial Watch are charitable gifts that were complete upon delivery. However, to the extent that a contract

may exist,[4] Benson may not sue for breach because she failed to substantially perform and Judicial Watch did not breach the agreement to purchase a headquarters building at some time in the future.

      1.    <u>Benson's Payments to Judicial Watch Constitute Gifts that Do No Require Return</u>

In the District of Columbia, a valid gift *inter vivos* requires delivery, intention on the part of the donor to make a gift, and absolute disposition of the gift. <u>Murray v. Gadsden</u>, 91 U.S. App. D.C. 38, 49, 197 F.2d 194, 205 (1952). Therefore, Benson's payments to Judicial Watch do not support a claim for breach of contract because title to charitable gifts vest in the donee upon absolute delivery.

Benson's contributions to Judicial Watch were charitable donations. As alleged, Benson relied on solicitations by Judicial Watch in Exhibit B and pledged $50,000. ¶¶ 50-51. Consistent with her pledge, Benson delivered funds to Judicial Watch in the amount of $15,000. ¶ 51. Upon delivery of cash or its equivalent in the form of a check to Judicial Watch, Benson absolutely disposed of the gift and vested title solely in Judicial Watch. Having done so, she may not now ask for a return of the donation merely because she disagrees with the organization's role as a non-profit.

      2.    <u>Benson's Failure to Make Payments to Judicial Watch as Pledged Constitutes a Breach of Contract that Bars Her from Enforcing the Terms</u>

To the extent that a contract may exist between the parties, one precondition is performance of Benson's pledge to pay $50,000 to the Judicial Watch building fund. ¶¶ 51 and 52. However, Benson only donated $15,000 of that amount and did not make any further payment to the Judicial Watch building fund since Klayman left Judicial Watch in September of 2003. Exhibit B, p. 40. Therefore, Benson is in material breach of her alleged contract with Judicial Watch and may not

---

4      Defendants deny the existence of any contract with Benson. However, in the context of a motion pursuant to Fed. R. Civ. Pro. 12(b), allegations in the Second Amended Complaint are taken as true.

enforce the terms.

Where there is a material breach of contract, the non-breaching party may elect either to terminate the contract or to sue for damages on the contract. George Washington University v. Weintraub, 458 A.2d 43, 47 (D.C. 1983). The allegations of the Second Amended Complaint provide that Benson agreed to contribute $50,000 to the Judicial Watch building fund in exchange for naming rights to the President's Office. ¶¶ 81-83. As admitted in the Second Amended Complaint, Benson failed to fully perform a duty owed under the contract. Failure to fully perform a contractual duty constitutes a breach entitling the non-breaching party to damages. Fowler v. A&A Company, 262 A.2d 344, 347 (D.C. 1970). Having failed to perform 70% of her obligation to pay $50,000 to the Judicial Watch building fund, Benson breached the alleged contract and is barred from enforcing its terms.

### 3.    Benson's Allegations Do Not Plead a Breach by Judicial Watch

Benson alleges that her contract with Judicial Watch permits her to name the President's Office after the purchase of the building. ¶ 83. However, the alleged contract does not include a date certain by which Judicial Watch must purchase a building or confer the naming right on her. Indeed, there is no deadline at all specifying the time for Judicial Watch to purchase a headquarters building. The absence of this requirement is fatal to Benson's claim for breach of contract.

There is no deadline by which Judicial Watch is obligated to purchase a headquarters building. Benson's Second Amended Complaint does not allege any deadline for Judicial Watch to perform this task. Even Klayman did not set a deadline for performance of this difficult obligation. *See* Exhibit B. Instead, Klayman states that if Judicial Watch was unable to raise the lofty sum of $7.6 million by December 31, 2002 (a mere six weeks after the solicitation letter was mailed), it

would lose the right of first refusal, the price of the building may go up, and the landlord would extend to other potential purchasers the invitation to buy the building. Exhibit B, pg. 9. There is no allegation that such an amount was raised or that the right of first refusal was acquired. Following Klayman's departure, Defendants attempted to bring momentum to the building purchase plan. Exhibit G, pg. 8. Judicial Watch's Vice President of Development, Rick Ventura, was tasked with spearheading the fundraising efforts. Exhibit C. In addition, Judicial Watch endeavored to regularly update contributors on the status of the building fund. Exhibits C and D.

The inability to purchase a headquarters building pursuant to a timeline arbitrarily imposed by Benson does not constitute a breach of contract. Indeed, to the extent that a claim for breach of contract could ever be plead under these circumstances, Benson's claim is not ripe as Judicial Watch has not completed the purchase. Further, Benson has yet to vest her right by donating the pledged amount. Accordingly, Count Two must be dismissed.

C.    PLAINTIFF BENSON FAILS TO STATE A CLAIM FOR UNJUST ENRICHMENT

To properly plead a claim for unjust enrichment, Plaintiff Benson must allege that: 1) she performed valuable services for Judicial Watch; 2) Judicial Watch accepted, used and enjoyed her services; and 3) the circumstances reasonably put Judicial Watch on notice that Benson expected to be paid for her services. Vereen v. Clayborne, 623 A.2d 1190, 1193 (D.C. 1993). With regard to the circumstances necessary to place a party on notice of the expectation for payment, the District of Columbia Court of Appeals instructs:

> Unless a recipient of services is put on notice by unambiguous circumstances that the party providing those services is working for the recipient with the expectation of compensation from the recipient, the recipient cannot be held liable for a commission even if the recipient makes use of those services

H.G. Smithy Co. v. Washington Medical Ctr., 374 A.2d 891, 894 (D.C. 1977).  With regard to the donations, Benson must allege that Judicial Watch was unjustly enriched at her expense, and that the circumstances were such that Judicial Watch should make restitution.  Vereen v. Clayborne, 623 A.2d 1190, 1194 (D.C. 1993).

As demonstrated by the allegations in the Second Amended Complaint, the circumstances of Benson's volunteer services and donations did not unambiguously place Judicial Watch on notice that Benson expected compensation for her services or the return of her donation if a building was not purchased by May 2006.

1.     Benson's Donations and Volunteer Services Were Not Provided with the Expectation of Compensation

Benson's contributions of time, money and services to Judicial Watch were voluntary, unsolicited, and provided under circumstances that did not evidence an expectation of compensation.  ¶¶ 1, 51, 52, 69 and 90.  This Court should not permit Benson to unconditionally donate money and offer services free of charge to a non-profit organization, only to later claim that the organization was unjustly enriched and demand compensation.

In News World Communications, Inc. v. Thompsen, 878 A.2d 1218 (D.C. 2005), the District of Columbia Court of Appeals affirmed the principle that a voluntary benefit for which no compensation has been promised cannot sustain a claim of unjust enrichment.  In News World, the plaintiff proposed a new family magazine for *The Washington Times*, which then entered into bi-lateral discussions regarding a compensation scheme, both for the idea and for work as a consultant to develop the idea.  *The Washington Times* later reneged on its agreement to compensate the plaintiff, but used the idea anyway.  The decision distinguishes the situation where a benefit is conferred after mutual discussions, negotiations and agreement from a situation where one party

9

conveys an unsolicited benefit on another:

> The doctrine of unjust enrichment does not give leave to every self-styled inventor or "idea person" to send his or her proposals to newspapers or other organizations and then claim unjust enrichment if the purported beneficiary of his or her inventiveness declines to pay.

Id. at 1225-26.

Similar to the plaintiff in News World, Benson gratuitously conveyed a benefit to Judicial Watch in the form of services for which no compensation (in the form of specific actions, or otherwise) was negotiated or contemplated. Her only expectation was that "Fitton and others would act honestly and ethically toward her and to the public generally". ¶ 95. The circumstances alleged to provide grounds for her entitlement to compensation are set forth in ¶ 96: "Because Fitton and Judicial Watch have not acted properly by deliberately misleading donors and improperly converting Judicial Watch into a partisan organization . . . ."

Likewise, Benson's monetary donations were made solely with the expectation that Judicial Watch would purchase a building at some time in the future and provide her with naming rights to the President's Office. ¶ 92. Other than the donation of $15,000 to the Judicial Watch building fund, Judicial Watch derived no benefit from the pledge that Benson made, but never fulfilled. Further, the donations were made for the express purpose of assisting Judicial Watch with its efforts to find a headquarters building. ¶ 92. The Second Amended Complaint lacks any allegation regarding unambiguous circumstances in which Benson donated the funds with an expectation of return if the building was not purchased by a date certain.

As a matter of law, the circumstances of Benson's donations and services are insufficient to support a cause of action for unjust enrichment. Indeed, the doctrine of unjust enrichment cannot be used to subject one party to a "forced exchange," whereby the party receiving a benefit gratuitously

conveyed to them is subsequently forced to provide an advantage in return. <u>News World</u>, 878 A.2d at 1226.

## II.    KLAYMAN'S SECOND AMENDED COMPLAINT FAILS TO STATE A CLAIM ON WHICH RELIEF MAY BE GRANTED FOR VIOLATION OF THE LANHAM ACT OR UNAUTHORIZED PUBLICATION OF NAME

Standing is a "threshold issue in every federal case, determining the power of the court to entertain the suit." <u>Warth v, Seldin</u>, 422 U.S. 490, 498, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975)). It is well settled that standing cannot be "inferred argumentatively from averments in the pleadings," <u>Grace v. Am. Cent. Ins. Co.</u>, 109 U.S. 278, 284, 27 L.Ed. 932, 3 S.Ct. 207 (1883), but rather "must affirmatively appear in the record." <u>Mansfield, C. & L.M.R. Co. v. Swan</u>, 111 U.S. 379, 382, 28 L.Ed.462, 4 S.Ct. 510 (1884). Additionally, the burden of establishing standing remains at all times with the party invoking federal jurisdiction. <u>Warth</u>, 422 U.S. at 518 ("It is the responsibility of the complainant clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers.").

Klayman appears to allege that Fitton, Orfanedes, Farrell and Judicial Watch violated § 43(a) of the Lanham Act by using Klayman's name to raise funds for Judicial Watch after Klayman's employment ended. While Count Four is confusing and difficult to follow, it apparently seeks to assert a "false endorsement" claim arising from an allegedly unauthorized use of Klayman's name and likeness on a newsletter postmarked "October, 2003." Exhibit A at p. 1. Defendants note that the mailing of the letter was within days of Klayman's departure from Judicial Watch.

In order to have standing to assert a false endorsement claim, a plaintiff must have an economic interest akin to that of a trademark holder in controlling the commercial exploitation of his or her identity. <u>Kournikova v. General Media Communications, Inc.</u>, 278 F. Supp.2d 1111, 1119-

11

1120 (C.D. Calif. 2003) (citing Waits v. Frito-Lay, Inc., 978 F.2d 1093, 1110 (9th Cir. 1992), *cert. denied* 506 U.S. 1080, 122 L. Ed.2d 355, 13 S.Ct. 1047 (1993)).  One court has compared this interest to a "property interest" in a name or likeness.  Parks v. Laface Records, 329 F.3d 437, 447 (6th Cir. 2003).  Another court has likened it to the commercial "drawing power" of a name.  Allen v. Nat'l Video, Inc., 610 F. Supp. 612 (S.D.N.Y. 1985).

Klayman maintains that he is a "celebrity within the non-profit legal/political community" and is "widely recognized, both nationally and internationally, as a leading figure in the world of government and judicial oversight and public 'watchdog' groups."  ¶¶ 42, 101.  He also maintains that "[t]hroughout his tenure at Judicial Watch, Klayman had established a strong relationship with the media" and "became a regular guest on many television network, cable and radio programs.  Id. at 42.  What Klayman does not claim, however, is that his name and likeness have any uniquely exploitable commercial or economic value.  He does not allege, for example, that at the time of the alleged misuse, there was any particularly unique good will or drawing power associated with his name or likeness that he exploited for some economic benefit or pecuniary gain.[5]

Klayman's allegations stand in stark contrast to other cases in which celebrities were found to have standing to assert a false endorsement claim based on a commercially exploitable interest in their names or likenesses.  In Kournikova, professional tennis player Anna Kournikova was found to have standing to assert a false endorsement claim where, in addition to being an internationally known tennis player, she also had pursued a "(possibly more successful) career as a model and sex

---

[5]      Klayman also fails to even try to explain the glaring inconsistency between his allegation that Judicial Watch tried to usurp his name and likeness in its fundraising material while also disparaging and defaming him by removing his name from quotations published on its website in an effort to "rewrite history" "al la the novel 1984, by George Orwell."  ¶ 65.

symbol and likewise market[ed] videos and calendars."  278 F. Supp.2d 1118-20.  In <u>Parks</u>, the parties had stipulated that civil rights icon Rosa Parks, in addition to enjoying international fame, also had authorized television programs and books before the alleged misuse at issue, leading the Court to conclude, "We find Parks' prior commercial activities and international recognition as a symbol of the civil rights movement endow her with a trademark interest in her name the same as if she were a famous actor or musician."  <u>Parks</u>, 329 F.3d at 447.  In <u>Allen</u>, the name and likeness of film director, writer, actor, and comedian Woody Allen similarly was found to have "significant, exploitable commercial value" in light of Allen's critical success as an artist, international celebrity, and commercial endeavors.  610 F. Supp. at 617.

Klayman also claims that, while at Judicial Watch, his name was "synonymous with Judicial Watch."  ¶ 42.  However, "[t[he essence of a trademark is a designation in the form of a distinguishing name, symbol, or device which is used to identify a person's goods and distinguish them from the goods of another."  <u>ETW Corp. v. Jireh Publishing, Inc.</u>, 332 F.3d 915, 921 (6th Cir. 2003).  "Not every word, name, symbol or device qualifies as a protectable mark; rather, it must be proven that it performs the job of identification, *i.e.*, to identify one source and to distinguish it from other sources.  If it does not do this, then it is not protectable as a trademark."  <u>Id</u>. at 922.  If, as Klayman alleges, his name was synonymous with Judicial Watch while he was employed with the organization, then his allegations fail to demonstrate how, within days of his departure, his name and likeness developed a unique and separate identity such that the public identified his name and likeness with some source other than Judicial Watch.

Simply put, it is not enough for Klayman to allege that he is a celebrity to maintain a false endorsement claim under the Lanham Act.  He also must demonstrate that, at the time of the alleged

false endorsement in October 2003, his name had some significant and unique exploitable

commercial or economic value separate and distinct from Judicial Watch.  Because he has failed to

include such an allegation – despite having two opportunities to amend his complaint already – the

claim must fail.

### III.     KLAYMAN'S SECOND AMENDED COMPLAINT FAILS TO STATE A CLAIM ON WHICH RELIEF MAY BE GRANTED FOR VIOLATION OF FLORIDA STATUTE 540.08 BECAUSE THE STATUTE OF LIMITATIONS PREVIOUSLY EXPIRED

In Count Five, Klayman seeks recovery under Florida Statutes § 540.08, which provides that,

without consent:

> No person shall publish, print, display or otherwise publicly use for
> purposes of trade or for any commercial or advertising purpose the
> name, portrait, photograph, or other likeness of any natural person . . .

As grounds for this claim, Klayman alleges that Defendants used his image and name in solicitations

misrepresenting Klayman as the Chairman and General Counsel for Judicial Watch.  ¶ 105.  Such

actions are alleged to have occurred nationally and internationally.  *Id.*  Application of the District of

Columbia's choice of law principles to the facts of this case demonstrate that the law of the District

of Columbia governs the relationship between the parties, including the conduct that is the subject of

Count Five.

### A.     THE LAW OF THE DISTRICT OF COLUMBIA APPLIES TO THIS DISPUTE.

This case presents the issue of what law applies to Klayman's assertion that Judicial Watch

was not authorized to use him name and image in an October 2003 newsletter.  This Court, sitting by

diversity, must apply the District of Columbia's choice of law rules.  Geico v. Tetisoff, 958 F.2d

1137, 1141 (D.C. Cir. 1992).  Where the parties have executed an agreement that contains a

contractual choice-of-law provision, the District of Columbia honors the agreement.  Milanovich v.

Costa Crociere, S.P.A., 954 F.2d 763, 767 (D.C. Cir. 1992) (citing Restatement (Second) of Conflict of Laws § 187 (1971)).  Even where the choice-of-law clause is contained in a contract of adhesion, courts continue to apply the chosen law.  *Id*.

In this case, the parties executed a Severance Agreement on September 19, 2003 that contains a choice of law provision designating the laws of the District of Columbia as governing the relationship of the parties.  To assist the Court with its choice of law analysis, a copy of the Severance Agreement is attached hereto as Exhibit 1.  The Choice of Law provision reads, in relevant part:

> This Agreement shall be governed by and construed in accordance with the laws of the District of Columbia, without regard to its conflict of laws principles.

Severance Agreement, ¶ 23.  As such, District of Columbia law applies to Klayman's allegations of invasion of privacy because determination of the claim will necessarily involve the rights of the parties as set forth in the Severance Agreement.

B.     UNDER THE LAW OF THE DISTRICT OF COLUMBIA, THE STATUTE OF LIMITATIONS IS ONE YEAR.

Under § 12-301 of the D.C. Code, the statute of limitations for actions involving libel and slander is 1 year.  The conduct alleged in Count Five of the Second Amended Complaint is analogous to a claim of libel and slander in the District of Columbia.  Such claims are governed by the 1 year statute of limitations.  Mittleman v. United States, 104 F.3d 410, 415 (D.C. Cir. 1997) (finding claim of false light invasion of privacy to be governed by one year limitation period); Grunseth v. Marriott Corp., 872 F. Supp. 1069, 1074 (D.D.C. 1995) (applying one-year defamation statute to invasion of privacy claim as "essentially a type of defamation").

In essence, Klayman alleges that Defendants misrepresented his status at Judicial Watch and

falsely portrayed to the public that he was associated with the organization.  This claim is closely related to a cause of action for defamation.  Careful review of the first page of Exhibit A to the Second Amended Complaint reveals that the publication alleged to cause harm to Klayman was postmarked October ___, 2003.  As such, the limitations period expired, at the latest, on November 1, 2004.  Because this action was not filed until April 13, 2006, Klayman missed the deadline to file by more than 17 months.  Accordingly, this claim must be dismissed.

## IV.    KLAYMAN'S SECOND AMENDED COMPLAINT FAILS TO STATE A CLAIM ON WHICH RELIEF MAY BE GRANTED FOR DEFAMATION

In Count Nine, Klayman sues each Defendant for defamation.  To state a claim for defamation, Klayman must allege statements that are: 1) defamatory; 2) capable of being proven true or false; 3) "of and concerning" him; 4) false and 5) made with the requisite degree of intent or fault.[6]  *See* New York Times Co. v. Sullivan, 376 U.S. 254, 288, 84 S. Ct. 710, ___ (1964); Fleming v. AT&T Information Servs., Inc., 279 U.S. App. D.C. 15, 878 F.2d 1472 (D.C. Cir. 1989); *see also* D.C Civil Jury Instruction § 17-3 (defamation elements for public figures).

In the Second Amended Complaint, Klayman alleges that Defendants defamed him by:

- Publishing media quotes on the Judicial Watch website that describe Judicial Watch where such quotes were originally meant to describe Klayman (¶ 65);

- Publishing statements in Judicial Watch's IRS Form 990s, which describe debts in the amount of at least $223,000 that are owed to Judicial Watch by Klayman and his law firm, Klayman & Associates, P.C. (¶ 66(B));

---

6    The applicable standard for defamation is that of a public person.  As Klayman alleges, he regularly appears in the media, enjoys "celebrity status" and is widely recognized, "both nationally and internationally".  ¶¶ 42 and 101.  As such, he cannot be considered a private individual.

- Publishing a copy of each IRS Form 990 on the Judicial Watch website (¶ 66(B));

- Stating to Judicial Watch employees that "Klayman filed his lawsuit because he owed Judicial Watch a significant sum of money" (¶ 154);

- Publishing a press release regarding this litigation, which opined that Klayman filed his lawsuit as a "tactical maneuver to distract attention away from the fact that Klayman owes more than a quarter of a million dollars to Judicial Watch" (¶¶ 156-157); and

- Making unspecified threats to media outlets that Judicial Watch would sue them if Klayman was permitted to represent that he was the founder and former chairman of the organization (¶¶39-45, 66(I)).

A.     KLAYMAN'S DEFMATION CLAIM MUST BE DISMISSED BECAUSE STATEMENTS CONTAINED IN A NON-PROFIT ENTITY'S IRS FORM 990 ARE ABSOLUTELY PRIVILEGED.

Klayman alleges that Judicial Watch defamed him by publishing false and misleading statements in the organization's 2003 and 2004 Form 990 IRS Returns ("990s"). The allegedly false information can only refer to the notation of a receivable due from Klayman and his law firm, Klayman & Associates, P.C. However, Judicial Watch and its officers/directors are shielded from any claim of defamation to the extent that it is based on the Form 990s. As a matter of law and of public policy, statements contained in mandatory governmental filings are absolutely privileged against claims for defamation, regardless of the existence or absence of actual malice.

It is axiomatic that "One who is required by law to publish defamatory matter is absolutely

privileged to publish it." Restatement (Second) of Torts § 592A.[7] This privilege is: "based upon a policy which regards the ends to be gained by permitting such statements as outweighing the harm which may be done to the reputation of others." Weber v. Cueto, 209 Ill. App. 3d 936, 942, 568 N.E.2d 513, 516 (1991) (citing Restatement of Torts, Introductory Note to Tit. B, Ch. 25). In this case, the absolute privilege must apply because Judicial Watch was merely complying with the government mandated act of filing tax returns. This act of social importance exceeds any protection that Klayman may be entitled to under the common law.

As a 501(c)(3) nonprofit organization, Judicial Watch is required to annually file a Form 990 with the Internal Revenue Service ("IRS"), and to make the form publicly available. In addition, regulations expressly provide that "a tax-exempt organization . . . *shall* make its annual information returns . . . available for public inspection." 26 C.F.R. § 301.6104(d)-1(a) (emphasis added). Tax-exempt organizations, like Judicial Watch, must publish their Form 990s to comply with the law. Id. at 26 C.F.R. § 301.6104(d)-1(b)(4). The publication requirement is express and specific. A nonprofit entity must either provide photocopies of its annual returns on demand, or make the returns "widely available" to members of the public. 26 C.F.R. § 301.6104(d)-2(a). Among the expressly accepted methods for satisfying the requirement to make the returns "widely available" is the option to post the filing on the nonprofit organization's website. Id. at 301.6104(d)-2(b)(2).

When Judicial Watch posted its Forms 990 on its website, it did so not on its own initiative, but in order to ensure compliance with the law. The law mandates that nonprofit entities such as Judicial Watch not only publish their 990s to the IRS, but also that they widely and publicly disseminate the information, such as on the organization's website. The privilege for this type of

---

7        "District of Columbia defamation law relies heavily on the *Restatement (Second) of Torts.*"

compulsory publication is — and, as a matter of publicly policy, must be — absolute. Neither Judicial Watch nor any other entity can be held liable for publishing information it is legally compelled to publish.

In Goggins v. Hoddes, 265 A.2d 302, 303 (D.C. 1970), the District of Columbia Court of Appeals addressed a situation analogous to the case at bar. Where the Goggins employer was statutorily required to report to the District Unemployment Compensation Board the conditions of its former employee's separation from the company, and such disclosure resulted in the employee's disqualification from unemployment benefits, the court found that the employer's disclosures were "absolutely privileged and [could] not form the basis of an action for libel." Goggins v. Hoddes, 265 A.2d 302, 303 (D.C. 1970).

Goggins is entirely consistent with the absolute privilege conferred by Restatement of Torts 2d, § 592A. The commentary to § 592A provides that the absolute privilege "will apply whenever the one who publishes the defamatory matter acts under legal compulsion in so doing." Restatement (Second) of Torts § 592A, Comment at 258. Under similar circumstances, other courts have found that where the party publishing the allegedly defamatory statement is required to do so, the absolute privilege applies. See Newman v. Legal Services Corp., 628 F. Supp. 535, 543 (D.D.C. 1986) (statements made pursuant to the Freedom of Information Act are absolutely privileged).

Due to the absolute nature of the privilege for government mandated submissions in the District of Columbia, the truth or falsity of disputed statements is not relevant, once the privilege is determined to apply. Judicial Watch's annual, federally mandated IRS 990 filings fall within the absolute privilege extended to publications required by law. Further, the publication on Judicial

---

Marsh v. Hollander, 339 F. Supp. 2d 1, 5, n.5 (D.D.C. 2004).

Watch's website is likewise absolutely privileged because doing so is not only permitted, but required by regulatory law governing public access to tax returns of tax-exempt entities. Therefore, Klayman's defamation claim must be dismissed.

      B.      **KLAYMAN'S DEFMATION CLAIM MUST BE DISMISSED BECAUSE STATEMENTS MADE TO EMPLOYEES AND THE PRESS CONSITUTE FAIR COMMENT ON A MATTER OF PUBLIC CONCERN.**

In the District of Columbia, Defendants may avail themselves of the fair comment privilege "even if the facts upon which it [the opinion] is based are not included along with the opinion." Fisher v. Washington Post Co., 212 A.2d 335, 338 (D.C. 1965) (citation omitted). Similarly, the Supreme Court recognizes that a statement of opinion relating to matters of public concern, which does not contain a provably false factual connotation, is entitled to full constitutional protection. See Milkovich v. Lorain Journal Co., 497 U.S. 1, 20, 110 S. Ct. 2695, 2707-08 (1990) (stating that First Amendment provides protection for "statements that cannot reasonably [be] interpreted as stating actual facts about an individual"); Sigal Construction Corp. v. Stanbury, 586 A.2d 1204, 1210 (D.C. 1991) (stating that allowance must be made for "'imaginative expression' or the 'rhetorical hyperbole' which has traditionally added much to the discourse of our Nation").

In deciding whether a reasonable factfinder could conclude that a statement expressed or implied a verifiably false fact the plaintiff, a court must consider the statement in context. Weyrich v. New Republic, Inc., 235 F.3d 617, 624 (D.C. Cir. 2001). The relevant inquiry is whether a person made an assertion of opinion that can reasonably be understood as implying provable facts. "The test is intended to protect the use of 'loose, figurative or hyperbolic language' which would preclude an impression that the author was seriously maintaining a provable fact." White v. Fraternal Order of Police, 909 F.2d 512, 522 (D.C. Cir. 1990).

The question of verifiability is a critical threshold question for a Rule 12(b)(6) motion. Weyrich, 235 F.3d at 624; see also Washington v. Smith, 80 F.3d 555, 556-57 (D.C. Cir. 1996) (stating that "[t]o insure room for 'imaginative expression' and 'rhetorical hyperbole', however, a statement of opinion is actionable only if it has an explicit or implicit factual foundation and is therefore 'objectively verifiable'"). Therefore, the Supreme Court recognizes that to protect the freedom of expression in opinions, assertions of opinion having no provably false factual connotation are entitled to full constitutional protection.

Statements regarding the perceived motive for Plaintiffs' lawsuit are not actionable. Such statements are mere expressions of opinion regarding a matter of public concern, namely the dispute between a well-known public watchdog group and its former chairman.[8] The public nature of this dispute was created, in part, by Klayman himself. For example, a copy of each complaint filed in this action has been posted on Klayman's own website (www.savingjudicialwatch.org) contemporaneously with its filing. In addition, Klayman's website contains a Home Page entitled "Cleaning Up Corruption From Within My 'Own' Organization" and a press release outlining his putative purpose for filing the action. As such, the underlying facts are readily available to the public.

Public concern regarding this dispute was invited and created, in part, by Klayman's appetite for media attention. His website went live in time to publish his press release, dated April 13, 2006. In addition, articles appeared in the Washington Post on April 19, 2006 and in the Washington Times on April 14, 2006. The obvious source of information for these articles was Klayman

---

8    The existence of public concern is demonstrated by the media attention regarding this lawsuit. *See*, A. Kamen, *Was It Inevitable? Klayman Sues Judicial Watch* (Washington Post, April 19, 2006); J. Seper, *Judicial Watch ex-head sues over 'power grab'* (Washington Times, April 14,

himself.  Having published false and scandalous assertions regarding the Defendants, Klayman cannot object when Defendants engage the public interest, that was created by Klayman, through expressions of opinion regarding his motives.  Considering the reasons for Klayman's termination from Judicial Watch, Defendants' have exhibited noble and dignified restraint in the face of outright lies and distortion.  Indeed, an accurate description of the facts would have a devastating effect on Klayman's reputation.  In these circumstances, the public is free to draw its own conclusions regarding Klayman's motives after viewing his website and the Second Amended Complaint, which have both been made available by Klayman from the beginning.

The Court is faced with circumstances in which statements on websites, to the media and to others must be evaluated in context.  In Klayman v. Segal, 783 A.2d 607 (D.C. App. 2001), the District of Columbia Court of Appeals directed that in determining whether a statement is defamatory, the Court must examine the entire context in which it is made:

> In order to determine whether the challenged article about Mr. Klayman, which appeared in The Washington Post, is capable of defamatory meaning, we focus now on the legal principle that, "the publication must be considered as a whole, in the sense it would be understood by the readers to whom it was addressed."  This legal principle embodies certain critical legal concepts: (1) context, (2) plain or fair and natural meaning of the words used, and (3) average or common mind or ordinary and common acceptance. "Context" is a critical legal concept for determining whether, as a matter of law, a statement is reasonably capable or susceptible of a defamatory meaning.  "Context" serves as a constant reminder that a statement in an article may not be isolated and then pronounced defamatory, or deemed capable of a defamatory meaning. Rather, any single statement or statements must be examined within the context of the entire article.  As the Supreme Judicial Court of Massachusetts has stated, the concept of context "requires that the court examine the statement in its totality in the context in which it was uttered or published. The court must consider all the words used, not merely a

---

2006); and *Larry Klayman Sues Judicial Watch* (WorldNetDaily.com, April 14, 2006).

particular phrase or sentence."

Id. at 614 (citations omitted). Here, the parties are engaged in a hotly disputed lawsuit in which each make strong assertions regarding the other. Each party's viewpoint is clear to the relevant audience. In such a circumstance, both parties' statements are merely opinion that is not actionable.

Defendants' statements regarding their perception of Klayman's motives are not objectively verifiable and constitute nothing more than expressions of pure opinion. These statements fall within the protected realm of "imaginative expression" and "rhetorical hyperbole". Such statements merely express a view of Klayman's motive that can be neither proved nor disproved. As such, the statements are fair comment on Klayman's lawsuit and must be privileged from any claim of defamation.

C.    KLAYMAN'S DEFMATION CLAIM MUST BE DISMISSED BECAUSE THE ALLEGED PUBLICATION OF QUOTATIONS ON JUDICIAL WATCH'S WEBSITE NEITHER DEFAME NOR CONCERN KLAYMAN.

Klayman apparently alleges that he was defamed by Judicial Watch's publication on its website of complimentary quotations taken from newspapers, which praise should have been attributed to him. ¶ 65. On its face, this portion of Count Nine must be dismissed because it is not defamatory and does not concern Klayman.

The offensive statements are set out in ¶ 65 of the Second Amended Complaint and in Exhibit E.[9] From an undated screen shot from the Judicial Watch website, Klayman refers to the following statements as defamatory:

> "Judicial Watch appears to be the main public interest litigator at this time, no small feat." - National Journal, June 24, 2002.

_____

9    Although the Second Amended Complaint states that "articles containing the correct quotations attributing Judicial Watch success to Klayman are attached," Exhibit E does not contain any such articles.

> Thanks, in part, to its aggressive litigation, Judicial Watch was recently named as one of the top ten most effective government watchdog organizations by The Hill newspaper, and "a force in Washington" by the National Journal.

Exhibit E, p. 9. The foregoing statements do not defame or concern Klayman.

1.    The Website Quotations are not Defamatory.

As a threshold matter, the Court must examine the alleged statement to determine whether it can be construed as defamatory. For a claim of defamation to lie, the objectionable statement must tend to injure the plaintiff in his or her trade, profession or community standing, or lower him or her in the estimation of the community. Moss v. Stockard, 580 A.2d 1011, 1023 (D.C. 1993). To qualify as defamatory, the alleged statement must be more than unpleasant or offensive. The language "must make the plaintiffs appear 'odious, infamous, or ridiculous.'" Howard University v. Best, 484 A.2d 958, 989 (D.C. App. 1984) (quoting Johnson v. Johnson Publishing Co., 271 A.2d 696, 697 (D.C. 1970)). Further, the statement must be considered in context and taken as a whole, rather than dissected to isolate potentially offensive speech. Klayman v. Segal, 783 A.2d at 614 (stating that a court "must consider all the words used, not merely a particular phrase or sentence"). Defendants submit that there is no interpretation of the statements that can be construed as defamatory toward Klayman.

As a matter of law, the context in which the quotations were published does not injure Klayman in his trade, profession or community standing, nor do the statements lower him in the estimation of the community. If anything, the quotations can be construed as complimenting the organization prior to the September 19, 2003, termination of Klayman's employment. If, as Klayman alleges, his name is synonymous with Judicial Watch, then no negative construction is possible. See ¶ 43. In context, the quotations are taken from a section of the website that provides

information to donors and members of the public at large regarding ongoing litigation supported by Judicial Watch. There is no mention of Klayman in this section of the website. Further, Klayman is not relevant to the current activities of Judicial Watch.

To these Defendants, it appears that the crux of the defamation claim is that Judicial Watch is not crediting Klayman for the current success of Judicial Watch. Failure to give credit, especially where it is not due, can never form the basis of a defamation claim. Attribution of success to Judicial Watch as an organization is not defamation. There is a threshold that must be met for a statement to be potentially defamatory. However, that threshold is not met in this case.

2.     <u>The Website Quotations do not Concern Klayman.</u>

Among the elements necessary to plead a cause of action for defamation is the "of and concerning" requirement. To satisfy this element, the statements at issue must lead the audience to conclude that "the speaker is referring to the plaintiff by description, even if the plaintiff is never named or is misnamed". <u>Croixland Properties Ltd. Partnership v. Corcoran</u>, 174 F.3d 213, 215-216 (D.C. Cir. 1999). The statements do not name or refer to Klayman. Moreover, Klayman has no connection to the statements as set forth on the Website. There is no relationship whatsoever. As such, the statements do not meet the "of and concerning" element.

D.     <u>KLAYMAN'S DEFMATION CLAIM MUST BE DISMISSED BECAUSE THE ALLEGED THREATS TO MEDIA ARE CONCLUSORY AND DO NOT SPECIFY ANY DEFAMATORY STATEMENTS.</u>

As previously explained, a threshold matter for the Court is to examine the alleged statement and determine if it may reasonably be construed as defamatory. Klayman alleges that Defendants threatened the media in such a manner that it no longer sought Klayman out for comments on issues of public concern. ¶¶ 40 – 41, 44 – 45, 66(I). Initially, Defendants note that Klayman's allegations

25

consist of unsupported inferences and legal conclusions that should not be relied upon to evaluate a claim. *Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). In addition, Klayman's allegations fail to meet the threshold allegations for a claim of defamation.

Besides being absurd, Klayman's allegation that Defendants threatened legal action against the media does not plead a false statement that tends to injure his trade, profession or community standing, or lower him in the estimation of the community. Moss v. Stockard, 580 A.2d 1011, 1023 (D.C. 1993). Nor do such allegations contain statements that make Klayman appear "odious, infamous, or ridiculous". Howard University v. Best, 484 A.2d 958, 989 (D.C. App. 1984) (quoting Johnson v. Johnson Publishing Co., 271 A.2d 696, 697 (D.C. 1970)). The conclusory allegations lack any reference to a defamatory statement, capable of being proven true or false, "of and concerning" him that was made with the requisite degree of intent or fault. As such, the claim for defamation must be dismissed to the extent that it relies on these allegations.

## IV.    KLAYMAN'S SECOND AMENDED COMPLAINT FAILS TO STATE A CLAIM ON WHICH RELIEF MAY BE GRANTED FOR RESCISSION

Rescission is an equitable remedy that requires the normal prerequisites for entitlement. Among the requirements is that a plaintiff lack an adequate remedy at law. In addition, the party availing itself of rescission must return the other party to its pre-contract position. Because Klayman has an adequate remedy at law and cannot return Judicial Watch to its pre-contract position, the claim of rescission must be dismissed.

### A.    KLAYMAN IS NOT ENTITLED TO SEEK RESCISSION BECAUSE HE HAS A COMPLETE AND ADEQUATE REMEDY AT LAW

Klaymand disagrees with the manner in which Judicial Watch is currently being operated. ¶ 1. Rather than limit his potential recovery to money damages, Klayman essentially asks this Court

to give him his old job back as Chairman and General Counsel. However, rescission is a form of equitable relief. In the District of Columbia, it is "axiomatic" that Klayman is not entitled to equitable relief where he has a "complete and adequate remedy at law". <u>Kakaes v. George Washington Univ.</u>, 790 A.2d 581, 583 (D.C. 2002). Even accepting Klayman's claim for breach of contract in the context of this Motion, monetary damages are a complete and adequate remedy for Klayman.

<u>Kakaes</u> also involved a plaintiff who had made an employment transition he ultimately regretted. In <u>Kakaes</u>, George Washington University refused to grant tenure to a professor, even though he was on the "tenure track". <em>Id</em>. at 583. Although the court found that the contract was breached, the professor was not entitled to specific performance because his remedy at law was adequate. <em>Id</em>. at 584. In particular, the court noted that in the absence of a contractual provision specifying the equitable relief, there was no reason why damages would not provide the plaintiff with full and complete relief. <em>Id</em>. Further, the court noted that it would be improper to force an educational institution to award tenure to a professor that the university did not wish to employ. <em>Id</em>.

Like <u>Kakaes</u>, Klayman is not entitled to rescission because there is no contractual provision authorizing it as a remedy. As such, it would be a disservice to a non-profit educational organization like Judicial Watch, and to public policy in general, to compel the employment of an individual that the organization does not wish to employ in the first place. The fact that Klayman is no longer satisfied with his agreement to resign does not justify equitable relief when legal remedies are available and sufficient. Klayman's entitlement to damages, if at all, should be limited to an action at law, not to rescission of a Severance Agreement.

     B.    <u>KLAYMAN IS NOT ENTITLED TO RESCISSION BECAUSE HE CANNOT RESTORE JUDICIAL WATCH TO ITS PRE-SEVERANCE POSITION</u>

A pre-requisite for granting rescission of a contract is that the requesting party must be able to restore the party from whom it seeks rescission to its pre-contract position. <u>Dean v. Garland</u>, 779 A.2d 911 (D.C. 2001). As a matter of law, Klayman is not able to restore Judicial Watch to its pre-contract position. Klayman received $600,000 pursuant to the Severance Agreement. Since his separation from Judicial Watch, nearly three years have passed together with significant changes. At no time has Klayman tendered the benefit he received from Judicial Watch. Moreover, there is no way that Klayman can return Judicial Watch to its pre-contract state in light of the many personnel, management and other decisions that were made in his absence. These circumstances cannot be undone.

<u>CONCLUSION</u>

WHEREFORE, for all of the forgoing reasons, Defendants Judicial Watch, Inc. and Thomas J. Fitton respectfully request that the Court GRANT this Motion and dismiss Counts One through Six and Nine or of the Second Amended Complaint with prejudice.

Respectfully submitted,

//s// *Richard W. Driscoll*

_____
Richard W. Driscoll (436471)
DRISCOLL & SELTZER, PLLC
600 Cameron Street
Alexandria, Virginia 22314
703.340.1625 Telephone
703.997.4892 Facsimile
Email: rdriscoll@driscollseltzer.com
*Counsel for Defendants Judicial Watch, Inc. and Thomas J. Fitton*

Dated: June 28, 2006