## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

| | | |
|---|---|---|
| Larry Klayman, *et al.* | : | |
| *Plaintiffs,* | : | Civil Action No. 1:06-CV-00670 |
| | : | |
| v. | : | Honorable Colleen Kollar-Kotelly |
| | : | |
| Judicial Watch, Inc., *et al.* | : | |
| *Defendants.* | : | |
| | : | **Jury Trial Demanded.** |

---

### PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT
### OF ITS OPPOSITION TO DEFENDANTS' MOTION TO
### DISMISS COUNTS I, II, III, IV, V, VI and IX  OF THE COMPLAINT

Plaintiffs, Larry Klayman and Louise Benson by counsel, Daniel J. Dugan, Esquire of

Spector Gadon & Rosen, P.C., hereby submit this memorandum of law in opposition to the

Motion to Dismiss Counts I, II, III, IV, V, VI and IX of the Second Amended Complaint (the

"Motion") filed by defendants, and states as follows:

## I.    INTRODUCTION

### A.    Statement of the Case

This action arises from a series of events that took place after Larry Klayman left Judicial

Watch, Inc. ("Judicial Watch") in the hands of Thomas Fitton ("Fitton").  What ensued after the

parties entered into the Severance Agreement has amounted to a pattern of fraud and misconduct

focused against Klayman and the organization that he founded, Judicial Watch.  But for

Klayman's desire to run for the United States Senate Klayman still would be involved in Judicial

Watch's affairs and the organization would be an active participant in today's political

landscape.  Second Amended Complaint ¶¶ 1-7.  The acts perpetuated against Klayman, in

breach of the Severance Agreement, are part of a larger pattern of misconduct that includes acts against Judicial Watch donors, like Louise Benson, who was defrauded by deliberately false statements concerning the future of Judicial Watch after Klayman departed. This case is not about "rewriting history" as Defendants so eagerly trumpet in their Motions, but rather is about concrete actions taken by Judicial Watch and its Board of Directors to wrongfully remove Klayman as a competitive force and prevent him from protecting the donors and the organization that he created. Plaintiffs' Second Amended Complaint was carefully drafted to recount the pattern of misconduct that ensued when Klayman left the organization – misconduct that has harmed Klayman, Benson and others who were supportive of Klayman.

###### B.    Statement of Relevant Facts

In 2003, a seat in the United States Senate (the "Senate") opened in Klayman's home state of Florida. After representing many Florida citizens in legal matters, Klayman decided that he could be even more effective in his fight against corruption by being elected to the Senate. Though Judicial Watch had become a substantial organization, Klayman believed that the most effective way to effectuate a non-partisan "clean-up" of government was to transition Judicial Watch to a suitable successor while Klayman was elected to the Senate. Klayman intended to take his "Judicial Watch" style of advocacy inside the government, while Judicial Watch continued its work as an independent non-profit organization. Second Amended Complaint ¶¶ 5-7. Accordingly, Klayman decided to enter into severance negotiations with Fitton, then President of Judicial Watch, and the Judicial Watch board members, including Paul Orfanedes ("Orfanedes"), to begin the transition of leadership. Ultimately, Klayman entered into an agreement to depart from Judicial Watch and begin his Senate campaign. (the "Severance

2

Agreement"). Second Amended Complaint ¶7

Shortly before Klayman left Judicial Watch, he discovered that, contrary to representations Fitton made when Klayman hired Fitton, Fitton never obtained his undergraduate degree. Klayman pressed the issue, and Fitton agreed (a) to obtain his college degree and (b) to continue the process to find a qualified individual with a legal background to lead Judicial Watch, particularly in light of Fitton's lack of qualifications. Second Amended Complaint ¶8. Before leaving the organization, Klayman discussed the position with, and interviewed, highly respected and qualified candidates to become Chairman of Judicial Watch. Second Amended Complaint ¶9. As a condition to his signing the Severance Agreement and stepping down from Judicial Watch, Klayman insisted, and Fitton agreed, to have Judicial Watch hire a qualified person to become Chairman. Klayman discussed with Fitton possible candidates that were suitable to lead Judicial Watch. Instead of taking the steps that he promised to find a distinguished and qualified Chairman to run Judicial Watch, Fitton has solely acted to entrench himself as head of Judicial Watch. Even today there is no Chairman, and Fitton controls Judicial Watch with the approval of Orfanedes and Farrell. Fitton mislead Klayman and others to promote his personal agenda, interests, and political ideology to the detriment of Judicial Watch, Klayman, and Judicial Watch's donors and supporters. Indeed, Fitton viewed Klayman's departure as an opportunity to take complete control of the organization to the detriment of Judicial Watch's donors, such as Louise Benson, and employees, including many attorneys and staff that were hired by Klayman. Second Amended Complaint ¶¶ 10-14. Since Klayman's departure, Fitton has mismanaged Judicial Watch and closed regional offices or eliminated the staff of the regional offices to the point that the remaining offices are shells that perform virtually

no service.  On information and belief, many of the employees were wrongfully terminated by Fitton, for reasons that include age, sex and national origin discrimination. Second Amended Complaint ¶14.

From the time that Klayman stepped down from his posts at Judicial Watch, Fitton, Orfanedes and Farrell, directly and through other agents of Judicial Watch defamed, disparaged and cast Klayman in a false light to denigrate Klayman, and in an effort to undermine Klayman's ability to return to the helm of Judicial Watch or compete with Judicial Watch in the future. Second Amended Complaint ¶16.  Judicial Watch, through Fitton, Orfanedes and Farrell and other agents and representatives engaged in a pattern of misconduct that breached the Severance Agreement and mislead donors, including but not limited to Louise Benson, and the public with their false advertisements, and solicitations and their continued defamation and disparagement of Klayman.  The continued pattern of misconduct is central to the claims asserted on behalf of Klayman and Benson as set forth in the Second Amended Complaint.

Not surprisingly, defendants dispute the allegations in the Second Amended Complaint and assert that they did nothing wrong.  In the Motion, defendants selectively and presumptively present portions of the Second Amended Complaint and attempt to introduce new facts and make conclusory legal statements to this Court in support of the Motion, despite the well-settled standard for a motion to dismiss for failure to state a claim under Fed .R. Civ. P. 12(b)(6).

As set forth below, the allegations of the Second Amended Complaint properly stated claims under Counts I, II, III, IV, V, VI and IX and, therefore, the Motion must be denied.

280166-3

II.    **LEGAL ARGUMENT**

Defendants erroneously assert this motion to dismiss Counts I through IV and IX of

Plaintiffs' Second Amended Complaint for failure to state a claim.  Contrary to the applicable

case law, defendants essentially request the Court to interpret the allegations in the Second

Amended Complaint in their favor despite the applicable standard under a motion to dismiss

and therefore, the Motion must be denied.

A.    **Applicable Legal  Standards**

The purpose of a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) is strictly limited

to a test of the sufficiency of the plaintiff's complaint.  See Edwards v. City of Goldsboro, 178

F.3d 231, 243 (4th Cir. 1999).  Accordingly, "a 12(b)(6) motion ought not be granted unless it

appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which

would entitle him to relief."  Dowley v. Dewey Ballantine, LLP, 2006 U.S. Dist. LEXIS 23304,

*6 (D.C. 2006)(citing Conley v. Gibson, 355 U.S. 41, 45-46 (1957).  "[A] plaintiff's complaint

need only satisfy the simplified pleading standard of Rule 8(a)."  Id.; Swierkiewicz v. Sorema

N.A., 534 U.S. 506, 513 (2002), that requires a "short and plain statement of the claim showing

that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).

In its determination, the district court must consider all well-pled allegations in a

complaint as true, Albright v. Oliver, 510 U.S. 266, 268 (1994), and must construe all factual

allegations in the light most favorable to the plaintiff.  Jordan Keys v. St. Paul Fire and Marine

Ins. Co., 870 A.2d 58 (D.C. 2005); Harrison v. Westinghouse Savannah River Co., 176 F.3d 776,

783 (4th Cir. 1999).  Further, "[T]he court must disregard the contrary allegations of the

opposing party," Jordan v. Alternative Res. Corp., 2005 U.S. Dist. LEXIS 2759 at *7, and

280166-3

"[w]hen presented with a motion to dismiss for failure to state a claim, the court's function is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." Perry v. Vanteon Corp., 192 F.Supp.2d 93, 97 (W.D.N.Y. 2002).

In the context of these standards, it is clear that Plaintiffs have satisfied the pleading requirements under the Rules in Counts I, II and III by alleging that Judicial Watch continuously and repeatedly misrepresented its use and misuse of donated building funds by lying about its activities in connection with purchase of property upon which Benson relied, (Second Amended Complaint ¶¶ 53-62), breached an express agreement to provide Benson naming rights in its facility as consideration for payment, (Second Amended Complaint ¶¶ 81-88), and that as a result of its fraudulent receipt of donations and, in addition, by work Benson performed on its behalf, defendants were unjustly enriched.

Moreover, defendants' Motion to dismiss Counts IV, V, VI and IX for failure to state a claim must be denied because the allegations contend that defendants egregiously usurped Klayman without his consent, to his detriment and to defendants benefit (Count IV and V), defamed and disparaged Klayman to the public in general and to Klayman's associations in particular (Count IX), and taken in context and as a whole, entitling Klayman to restoration of his position (Count VI).

In accordance with the controlling legal precepts set forth above, all of the factual allegations contained in the Second Amended Complaint must be considered in the light most favorable to Plaintiffs. Pivotal to the resolution of defendants Motion to dismiss for failure to

state a claim, this Court simply must disregard all of defendants' factual allegations, interpretations and conclusions brought forth in the Motion.

**B.**    **The Motion To Dismiss Counts I, II and III For Failure To State A Claim Must Be Denied**

Applying the above legal principles to the facts of this case, defendants' Motion to Dismiss Counts I, II and III of the Second Amended Complaint for failure to state a claim must be denied because:  (1) the issue of detrimental reliance as part of Benson's claim in Count I for fraudulent misrepresentation is a question of fact and, therefore, not disposable under the Motion; (2) Benson's claim in Count II for breach of contract was sufficiently pled; and (3) the claims for unjust enrichment in Count III are, therefore, sufficiently pled.

**1.**    **Benson Sufficiently Pled Claims For Fraudulent Misrepresentation**

To survive a motion to dismiss claims for fraudulent misrepresentation, a plaintiff need only allege "(1) a false representation (2) made in reference to a material fact, (3) with knowledge of its falsity, (4) with the intent to deceive, and (5) an action that is taken in reliance upon the representation."  Chedick v. Nash, 151 F.3d 1077 (D.C. Cir. 1998).

Defendants concede, as they must for purposes of this Motion under Rule 12(b)(6), that the allegations in the Compliant state that defendants falsely represented to Benson and other similarly situated donors that their funds were being used by Judicial Watch to actively pursue the Building envisioned in the solicitation, while at the same time, as alleged, Fitton and Judicial Watch had ceased its pursuit of any property, (Second Amended Complaint, ¶¶ 52, 53, 54) and commingled the donated building funds with general operating funds.  (Second Amended Complaint, ¶¶ 52, 53, 54).

280166-3

However, in the Motion, defendants incorrectly assert that their interpretation and selective recitation of factual allegation precludes any detrimental reliance by Benson. Contrary to defendants' argument, the statements relied on by Benson occurred after Klayman separated from Judicial Watch and caused Benson and others to not seek return of the building donations (Second Amended Complaint ¶¶ 74, 77). Moreover, the Second Amended Complaint alleges that Benson continued to support and in fact worked for Judicial Watch. (Second Amended Complaint, ¶ 95). As alleged, but for the misrepresentations of Fitton, Mills and Judicial Watch, Benson would have sought return of her $15,000 donation and would not have supported Judicial Watch.

The Motion also wrongly, and without support, asserts that the lack of a deadline for performance by Judicial Watch somehow precludes pleading detrimental reliance. Essentially, defendants would have the Court sanction conduct permitting a non-profit corporation to seek donations for a specific purpose, such as to buy a particular property, fail to pursue that purpose, absorb the donated funds, and preclude any attempt at recovery by the donors. This proposition would invite even more deception and fraud and must not be allowed by the Court.

Thus, Benson has sufficiently pled the elements of a claim for fraudulent misrepresentation and, therefore, the Motion as to Count I must be denied.

**2.    Benson Sufficiently Pled Claims For Breach of Contract**

First, the solicitation and subsequent agreement between Benson and other similarly situated donors for Judicial Watch to purchase the Building is not a gift because the agreement, as alleged, is a contract which contemplates promises by the donee to the donor in exchange for the non-profit contribution.

280166-3

In the D.C. Circuit, an *inter vivos* gift is defined by delivery, intention on the part of the donor to make a gift, and absolute disposition of the subject of the gift. Murray v. Gadson, 197 F.2d 194, 205 (D.C. Cir. 1952). In Murray, the issue was whether a decedent made a gift by depositing funds into a joint bank account constituted a gift to the joint holder of the account. The court held that unqualified declarations of a gift from the joint tenant were not memorials of gifts, but were intended to set an arrangement for the convenience of the decedent. Murray, 197 F.2d at 206. Thus, unless the gift is made without condition, it is not a gift.

Here, taking the allegations in the Second Amended Complaint as true for the purposes of the Motion, Benson did not intend to make an absolute and unconditional gift to Judicial Watch. To the contrary, Judicial Watch solicited the donations specifically to fund the Building. (Second Amended Complaint, ¶ 50). Benson and other donors responded to the solicitation with contributions and with the expectation that its use was limited to the purpose proposed in the solicitation. (Second Amended Complaint, ¶ 51). Moreover, Benson was specifically promised naming rights as further consideration for her contribution. (Second Amended Complaint, ¶ 51). Like *Murray*, the solicitation and contribution for the limited purposes in this case do not constitute a gift, but rather express a contract.

Next, it is well established under District of Columbia contract law that "in the event of **total** breach, a party may elect to terminate the contract or, in the alternative, use the contract to sue for damages." George Washington Univ. v. Weintraub, 458 A.2d 43, 47 (D.C. 1983)(*citing* 11 WILLISTON ON CONTRACTS § 1292 (3d ed. 1968))(emphasis added). Contrary to the assertions in the Motion, the Second Amended Complaint alleges that Benson was the only performing party and that Judicial Watch and Fitton breached their obligation to pursue the

Building.  The solicitation sought "donation[s] of $50,000 or whatever you can afford…"

(Second Amended Complaint, Ex. B, p.12).  Benson paid $15,000 to Judicial Watch further to

the solicitation and agreement for naming rights.  (Second Amended Complaint, ¶ 51).  The

Second Amended Complaint further alleges that despite repeated assurances to the contrary,

Judicial Watch ceased pursuit of the Building and commingled the donated funds with general

operating funds in breach of the contract.  (Second Amended Complaint, ¶¶ 53, 56).

Lastly, the Motion erroneously states that because no date certain for the purchase of a

national headquarters building was included in the contract, no claim for breach of contract could

have occurred, and thereby precluding any breach by defendants.  The Second Amended

Complaint does not allege that Judicial Watch's pursuit of a national headquarters should have

occurred on a particular date.  It does, however, allege that at relevant times, Judicial Watch and

Fitton breached their obligations by knowingly ceasing pursuit of a national headquarters despite

assurances to donors to the contrary.

Moreover, the Motion attempts to advise the Court of new facts regarding steps allegedly

undertaken to purchase the Building.  (Motion, at p.8).  The Second Amended Complaint alleges

that no reasonable attempts were made to acquire a national headquarters following Klayman's

separation from Judicial Watch.  (Second Amended Complaint, ¶ 54).  Under the applicable

standard for a motion to dismiss for failure to state a claim, the Court must accept as true the

allegations in the Second Amended Complaint and simply disregard defendants' allegations.

Thus, the Second Amended Complaint alleges that Benson performed her essential

obligations under the agreement for a donation of "$50,000 or whatever she could afford" by

paying $15,000, while Judicial Watch and Fitton, as alleged, materially breached their

280166-3

obligations under the agreement by misrepresenting the use, and by diverting Benson's donated funds to purposes other than that for which the funds were expressly donated. Therefore, the Motion as to Count II must be denied.

### 3.    Benson Sufficiently Pled Claims For Unjust Enrichment

Under the applicable law, a claim for unjust enrichment is based on a theory of a "quasi-contractual duty requiring compensation for services rendered." Vereen v. Clayborne, 623 A.2d 1190, 1193 (D.C. 1993). "The modern law of unjust enrichment and restitution has its roots in the common law concept of quasi-contract." Jordan Keys v. St. Paul Fire and Marine Ins. Co., 870 A.2d 58, 63 (D.C. 2005). "At common law there were cases in which the courts, in the absence of an actual contract, nevertheless imposed 'a duty . . . under certain conditions upon one party to requite another in order to avoid the former's unjust enrichment.'" Id. (citing Bloomgarden v. Coyer, 479 F.2d 201, 208 (D.C. Cir. 1973). "To achieve this result, the courts devised "a legal obligation closely akin to a duty to make restitution, which they called a quasi-contract. From the beginning a quasi-contract has been openly acknowledged to be a 'legal fiction' invented by common law courts to permit recovery by contractual remedy in cases where, in fact, there is no contract, but where circumstances are such that justice warrants a recovery as though there had been a promise. . . ." Id. "It is . . . founded on considerations of justice and equity, and on [the] doctrine of unjust enrichment." BLACK'S LAW DICTIONARY 324 (6th ed. 1990). A plaintiff must simply allege that the defendant was unjustly enriched at plaintiff's expense and that the circumstances were such that in good conscience, defendant should make restitution. Vereen, 623 A.2d at 1194.

In <u>News World Communications, Inc. v. Thompson</u>, 878 A.2d 1218 (D.C. 2005), the District of Columbia Court of Appeals held that a claim for unjust enrichment, not otherwise time-barred, would be sustained given that the plaintiff had conferred a benefit on the defendant, with the encouragement of defendant's personnel, and that defendant's enrichment was unjust. <u>Id</u>. at 1225. The only issue decided in <u>News World</u> was that under New Jersey law, plaintiff's claim was time-barred. <u>Id</u>. at 1226. <u>News World</u> in fact suggests that when a defendant encourages others to confer a benefit without compensation based on its representations, then misrepresentations would be unjust and entitle plaintiffs to restitution based on equitable principles. <u>See id</u>. at 1225-26.

Here, Benson alleges that she provided services by working at Judicial Watch's San Marino, California office, and through the services she provided to Judicial Watch's Judicial Monitoring Project. (Second Amended Complaint, ¶ 95). Benson devoted her time and services based upon the representations of Judicial Watch and Fitton would act honestly and ethically toward her and to the general public. <u>Id</u>. The allegations of the Second Amended Complaint state that Judicial Watch and Fitton misrepresented Judicial Watch's mission and deliberately mislead its donors. (Second Amended Complaint, ¶ 96). Thus, the services performed by Benson were under false pretenses and as such, equity demands restitution.

Therefore, as demonstrated by the allegations in the Second Amended Complaint, the circumstances behind the support services rendered by Benson and retained by Judicial Watch together with defendants' repeated misrepresentations about which Benson relied in the provision of support and services support Plaintiffs' claim for unjust enrichment.

C.    **The Motion To Dismiss Count IV (Lanham Act) For Failure To State A Claim Must Be Denied**

Section 43(a) of the Lanham Act, 15 U.S.C. s. 1125(a), creates a federal cause of action

for unfair competition as provides in pertinent part:

> False designations of origin, false descriptions, and dilution forbidden
>
> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
>> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>>
>> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).  The Act has been held to apply to situations that would not qualify

formally as trademark infringement, but that involve unfair competitive practices resulting in

actual or potential deception."  Allen v. National Video, Inc., 610 F.Supp. 612 (S.D.N.Y. 1985).

To make out a cause of action under the Act, a plaintiff must establish (1) involvement of goods

or services, (2) effect on interstate commerce, and (3) a false designation of origin or false

description of the goods or services."  Id. at 625.  "The scope of § 43(a) extends beyond disputes

between producers of commercial products and their competitors.  It also permits celebrities to

vindicate property rights in their identities against allegedly misleading commercial use by

13

others." <u>Parks v. LaFace Records</u>, 329 F.3d 437, 445 (6th Cir. 2003). A celebrity is defined as "a celebrated or widely known person: one popularly honored for some signal achievement." <u>Id</u>. at 447. In <u>Parks</u>, a viable claim existed under § 43(a) where consumers falsely believed that Rosa Parks had sponsored or approved the product, or was somehow affiliated with the product. Courts have also held that "liability attached not just for descriptions that are literally false, but for those that create a 'false impression'." <u>Allen</u>, 610 F.Supp. at 626. In such cases, as in Parks and Allen, "a showing of the likelihood of consumer confusion is sufficient to make out a claim." <u>Id</u>. at 626.

Here, Klayman has alleged sufficient facts to establish a claim for a violation under § 43(a). The Second Amended Complaint alleges that Klayman is a celebrity within the non-profit legal and political community. (Second Amended Complaint, ¶ 101). It also alleges that Klayman, already a well-known lawyer, became a regular guest on many television network, cable and radio programs. Klayman was so well known and widely recognized that a semi-fictional character, based on Klayman, was created for the television show "West Wing," and that Klayman was regularly called to comment on legal or political affairs. (Second Amended Complaint, ¶ 42). Following the reasoning in <u>Parks</u>, Klayman attained a level of celebrity within the non-profit legal and political community and within the media capable of identifying the source of goods and services with his name and likeness.

Moreover, the allegations state that Klayman left Judicial Watch in order to pursue a political career, (Second Amended Complaint, ¶¶ 28, 35), and that Judicial Watch and Fitton agreed in writing to announce that Klayman had stepped down as Chairman of Judicial Watch to pursue other endeavors. (Second Amended Complaint, ¶ 32). Despite the agreement, defendants

280166-3

never made the announcement, and instead, surreptitiously smeared Klayman in response to inquiries about Klayman's role at Judicial Watch.  (Second Amended Complaint, ¶¶ 36-40).  As alleged, defendants violated the Act when they deliberately issued fundraising solicitations using Klayman's name and image without his consent, one month after his departure, and despite the smear campaign waged against him by defendants.  (Second Amended Complaint, ¶ 98).

Thus, taken as true for purposes of the Motion, defendants false representations about Klayman's involvement with Judicial Watch, and the unauthorized use of his name and image in solicitations to donors after his departure and without his consent were deceptive violated § 43(a) of the Lanham Act.  Therefore, the Motion as to Count IV of the Second Amended Complaint must be denied.

### D.    The Motion To Dismiss Count V (Florida Statutory Law) For Failure To State A Claim Must Be Denied

Count V of the Second Amended Complaint states a valid claim for violation of Florida Statute 540.08 (Unauthorized Publication of Name or Likeness) because the claims do not arise from the contract between the parties.  Moreover, even if applicable, under the District of Columbia choice of law principles, a false conflict is present based on the circumstances alleged because Florida Statute at issue has no parallel in the District of Columbia.  Also, even if a true conflict arises, the same principles dictate application of the Florida Statute in this case.

"In diversity cases, a federal court must follow the choice of law rules of the forum state in which it is sitting to determine which state's law to apply."  Raflo v. United States, 157 F.Supp.2d 1, 4-5 (D.D.C. 2001) (citing Klaxon Co. v. Stentor Electric MFG. Co., Inc., 313 U.S. 487, 496-97 (1941)).  "In determining which state's substantive law to apply to a tort case, the District of Columbia's choice of law rules require this Court to use the "governmental interests"

15

analysis approach." <u>Raflo</u>, 157 F.Supp.2d at 5.  "This approach adheres to a two-step inquiry: 1) identifying the governmental policies underlying the applicable laws; and 2) determining which state's policy would be most advanced by having its law applied to the facts of this case." <u>Id</u>.  To evaluate which state has the stronger interest, the four factors enumerated in the Restatement (Second) of Conflict of Laws §  145 are also considered: 1) the place where the injury occurred; 2) the place where the conduct causing the injury occurred; 3) the domicile, residence, nationality, place of incorporation and place of business of the parties; and 4) the place where the relationship is centered." <u>Id</u>.  Thus, courts of the District of Columbia are "not bound to decide all issues under the law of a single jurisdiction; choice of law involves examination of the various jurisdictional interests as applied to the various distinct issues to be adjudicated." <u>District of Columbia v. Coleman</u>, 667 A.2d 811 (D.C. 1995).

"When the policy of 'State A' would be advanced by application of its own State A law, and the policy of the other state, 'State B,' would not be advanced by application of State B's law, a so-called 'false conflict' appears and the law of the interested state, State A, prevails." <u>Raflo</u>, 157 F.Supp.2d at 6.  "In contrast, when both states have a genuine interest in applying their own laws, a "true conflict" exists and the court must weigh the competing interests in order to determine which state has the stronger interest." <u>Id</u>; <u>See Coleman</u>, 667 A.2d at 816 (Where a true conflict exists, "the forum law will be applied unless the foreign [state] has a greater interest in the controversy").

Here, the allegations contained in the Second Amended Complaint do not arise from the Severance Agreement between the parties, but instead arise from the unauthorized publication by defendants' solicitations to donors made more than a month after Klayman left Judicial Watch.

16

(Second Amended Complaint, ¶¶ 48, 108).  As alleged, Klayman at all relevant times to this claim, was a resident of the State of Florida.  (Second Amended Complaint, ¶ 18).  Moreover, Plaintiffs do not allege that this violation arises under or is governed by the provisions of the Severance Agreement.  Thus, the Second Amended Complaint properly pled a cognizable claim for violation of the Florida statute, separate and apart from the other claims.  See F.R.C.P. 8(a).

Even assuming, arguendo, that the Severance Agreement provision regarding District of Columbia law applies to this claim, which it does not, the District of Columbia's conflicts of law rules mandate that Florida law must prevail.  Florida statute 540.08 provides remedies "in addition to and not in limitation of the remedies and rights of any person under the common law against the invasion of her or his privacy."  Fla. Stat. 540.08(6).  Specifically, the statute provides in pertinent part:

> No person shall publish, print, display or otherwise publicly use for purposes of trade or for any commercial or advertising purpose the name, portrait, photograph, or other likeness of any natural person without the express written or oral consent to such use given by… [s]uch person.

Fla. Stat. 540.08(1)(a).  The Florida statutory limitations period is four years.  Fla. Stat. 95.11(3)(f).  By contrast, The District of Columbia, affords no such statutory remedy to plaintiffs aggrieved by such conduct, but instead limits plaintiff to the common law tort of invasion of privacy.  Applying the District of Columbia conflicts of law rules to the instant matter reveals a false conflict exists.  The Florida statute would advance the desired policy by affording its citizen and resident, Klayman, relief for defendants' unauthorized usurpation of Klayman's likeness and name, apart from and in addition to any civil common law remedies for invasion of privacy to which Klayman would be otherwise entitled.  The District of Columbia common law of invasion of privacy is neither advanced, nor even disturbed, by application of Florida's statutory remedy.

17

Thus, a false conflict is apparent under these circumstances requiring application of Florida law to this claim.

Further assuming, *arguendo,* that a true conflict is found, Florida clearly identified and exercised a stronger interest in protecting its citizens and residents, like Klayman, against unauthorized publication and use of names and likenesses by enacting § 540.08 and, thereby, expanded the remedies available to victims of misappropriation under the common law invasion of privacy. The District of Columbia has not enacted a similar statute expanding common law remedies, and thus demonstrates Florida's unique concern and stronger interest in application of its law in this case. Also, the injury alleged in the Second Amended Complaint was to Klayman's activities in his state of residency, Florida.

Thus, the Motion as to Count V of the Second Amended Complaint for violation of Florida Statute 540.08 must be denied.

### E. The Motion To Dismiss Count IX (Defamation) For Failure To State A Claim Must Be Denied

The allegations in Count IX of the Second Amended Complaint state a valid claim for defamation. To make a prima facie case for defamation under Florida law[1], a party must allege "the unprivileged publication (to a third party) of a false and defamatory statement concerning another, with fault amounting to at least negligence on behalf of the publisher, with damage ensuing." <u>Thomas v. Jacksonville Television, Inc.</u>, 699 So.2d 800 (Fla. 1st DCA 1997). As set

---

[1] Assuming the District of Columbia law applies to this intentional tort the required elements for a claim are the same as those required under Florida law. To assert a claim for defamation In the District of Columbia, a plaintiff must allege facts showing (1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement is actionable as a matter of law irrespective of special harm, or that its publication caused the plaintiff special harm. <u>Coates v. Law Sch. Admission Council</u>, 2005 U.S. Dist. LEXIS 35217 (D.D.C. 2005).

forth below, the statements alleged in the Second Amended Complaint state valid claims for defamation.

### 1. Defamatory Statements Gratuitously Incorporated In Tax Documents and Published Without Redaction Are Not Privileged.

Defendants erroneously contend that publication of Judicial Watch's annual information return on its website is absolutely privileged. In fact, it is not. Under the applicable regulations, "a tax-exempt organization shall make its annual information returns available for public inspection without charge in the same offices during regular business hours." 26 C.F.R. § 301.6104(d)-1(a). The entity may elect, instead, make the document widely available by posting the return on its website. 26 C.F.R. § 301.6104(d)-2(a). In any case "[a]n organization that makes its application for tax exemption and/or annual information return widely available must nevertheless make the document available for public inspection as required under § 301.6104(d)-1(a), as applicable." 26 C.F.R. § 301.6104(d)-2(a). Thus, the only relevant mandatory requirement is to make an annual information return available for inspection, not to publish it by posting it on the internet. In Goggins v. Hoddes, 265 A.2d 302 (D.C. 1970), an absolute privilege attached to statements in an unemployment board's separation report submitted by the employer further to the determination of benefits. Because the board's rules required that such reports were necessary to its determinations and were to be kept confidential, any statements contained therein were deemed privileged.

Here, the annual information returns posted on Judicial Watch's website are not privileged because its publication was voluntary and broad. Judicial Watch could have simply maintained copies of its returns for public inspection. Goggins is distinguishable because the alleged libelous document was a mandatory report to the governmental agency entitled to

19

confidentiality, was never published to outside parties, let alone broadcast over the internet, and was thus privileged. Here, the Judicial Watch annual information return was voluntarily published over the internet, was not confidential, and thus not privileged. Even assuming that a privilege somehow applied to this document, which it does not, any such privilege was waived by Judicial Watch when it chose to voluntarily post the annual information return on its website.

Moreover, public policy cannot extend any privilege to false and defamatory gratuitous statements in tax returns made available for public inspection and voluntarily made widely available over the internet. There is, of course, no privilege known to the common law of defamation protecting the intentional publication of false material. 53 C.J.S. Libel and Slander §104 (May 2006)(citing Mutafis v. Erie Ins. Exchange, 174 W.Va. 660, 328 S.E.2d 675 (W.Va.,1985)). However, where "privilege" exists, in the context of political officers, Courts have explained that "given the great potential for harm, the privilege must be limited to those statements and actions which are in fact 'closely related' to the performance of those official duties." Id., quoting McCormick v. Specter, 220 Pa.Super. 19, 275 A.2d 688, 689 (Pa.Super.Ct.1971). Thus, political officers' conduct is not immune from attack where their statements are not "closely related" to their duties. Moreover, even the "litigation" privilege is not absolute;defamatory matter contained in pleadings,such as in a complaint,is absolutely privileged if filed according to law in a court having jurisdiction, and if relevant and pertinent to the issues in the case. On the other hand, if it clearly appears that allegations in a pleading are not pertinent, material, or relevant to the controversy in litigation, they are not privileged and may serve as a basis for a libel suit. Travelers Indem. Co. of Illinois v. United Food & Commercial Workers, 770 A.2d 978 D.C. App,2001); See also McKesson & Robbins, Inc., v. Newsome, 206

S.C. 269, 33 S.E.2d 585, 587 (S.C.1945) (Holding that "[l]ibelous or defamatory statements in

pleading, when pertinent or material or relevant to real issues involved, are privileged.")

Allowing an entity to graft false, misleading defamatory statements onto an otherwise

privileged document would provide a sword and shield to potential defamers.  Here, the Second

Amended Complaint alleges that Judicial Watch made false and misleading statements about

facts surrounding an alleged debt owed by Klayman to Judicial Watch.  (Second Amended

Complaint ¶¶ 66, 149-160).  Taken as true for purposes of the Motion, the defamatory statements

made by defendants ancillary to the Judicial Watch annual information returns posted on its

website cannot be privileged on the one hand, and continue to defame Klayman, on the other.

Thus, the Second Amended Complaint states valid a claim for defamation, and therefore, the

Motion as to Count VI must be denied.

> **2.    Statements to Media and Judicial Watch Employees Were Patently False Representations of Facts and Not Fair Comment on a Matter of Public Concern.**

"Statements of opinion can be actionable if they imply a provably false fact, or rely upon

stated facts that are provably false." Milkovich v. Lorain Journal Co., 497 U.S. 1, 19-20 (1990).

Dismissal under Rule 12(b)(6) is improper when, taking the material allegations of the complaint

as admitted, and construing them in plaintiff's favor, the court finds that the plaintiff has alleged

all the material elements of his cause of action.  Weyrich v. New Republic, Inc., 235 F.3d 617

(D.C. 2001).  "In undertaking this review, the court must assume, as the complaint alleges, the

falsity of any express or implied factual statements made in the [statements]." Id. 235 F.3d at

623.  Additionally, the court must "also assume that such statements were made by [defendants]

with knowledge of their falsity or reckless disregard for their truth." Id.  The court must then

decide "whether the disputed statement (1) contains express or implied verifiably false statements of fact, which (2) are reasonably capable of defamatory meaning or otherwise place appellant in an offensive false light." Id.; See also Moldea v. New York Times Co., 15 F.3d 1137 (D.C. 1994). A statement is actionable in defamation under District of Columbia law if it is both false and defamatory. Moldea 15 F.3d at 1142. Moreover, a statement is defamatory "if it tends to injure plaintiff in his trade, profession or community standing, or lower him in the estimation of the community." Weyrich, 235 F.3d at 627.

Here, the Second Amended Complaint alleges that Judicial Watch made numerous false and misleading statements about Klayman. Defendants made statements to third parties to create the erroneous impression that Klayman was forced to leave Judicial Watch, (Second Amended Complaint, ¶ 37), made disparaging and misleading remarks to Klayman's former clients who had offered to help Klayman in his Senate campaign, (Second Amended Complaint, ¶ 66 J.), made false statements to all Judicial Watch employees that Klayman owed Judicial Watch a significant sum of money, (Second Amended Complaint, ¶ 154), and made false statements to reporters that Klayman owed Judicial Watch more than a quarter of a million dollars. (Second Amended Complaint, ¶ 157). Taking these statements as true for the purposes of this Motion, each contain verifiably false statements of facts which contain reasonable defamatory meaning. Klayman's was not forced out of Judicial Watch and the separation is memorialized in the Severance Agreement which states "Klayman's separation shall be treated for all purposes as a voluntary resignation." (Second Amended Complaint, Ex. A. ¶ 1). False statements to third parties, including Klayman's supporters and former clients that Klayman was fired from his own company, over Klayman's assertions to the contrary, implicate Klayman's propriety and conduct

22

at Judicial Watch, thus causing injury to his profession as an attorney and public figure.  Further,

disparaging false statements about money owed by Klayman to Judicial Watch raise the specter

of impropriety regarding Klayman's handling of funds, impacted directly on his ability to

conduct himself as an attorney and as a public figure attempting to fundraise for legitimate

causes.

These statements, along with others in the Second Amended Complaint relate to

objectively verifiable facts and not opinions or hyperbole, as cherry-picked by defendants in the

Motion.  Taken together, in context and as true, the statements alleged in the Second Amended

Complaint constitute misleading and false defamatory statements calculated to injure Klayman in

his trade, profession and community standing, and lower him in the estimation of the

community.  Thus, the Second Amended Complaint states valid a claim for defamation

### 3. Statements Published on Judicial Watch's Website Concerned and Defamed Klayman

As a threshold matter, the court must determine whether a statement can be construed as

defamatory.  A statement is "defamatory" if it tends to injure the plaintiff in his trade, profession

or community standing, or lower him in the estimation of the community.  Moss v. Stockard, 580

A.2d 1011, 1023 (D.C. 1993).  To qualify as defamation, a statement must cause the plaintiff to

appear odious, infamous, or ridiculous."  Poullard v. Smithkline Beecham Corp., 2005 U.S. Dist.

LEXIS 35182 (D.D.C. 2005).  The publication must be considered "as a whole, and in the sense

in which it would be understood by the readers to whom it was addressed.  Benic v. Reuters Am.,

Inc., 357 F. Supp. 2d 216  (D.D.C. 2004).  If it appears that the statements are at least capable of

a defamatory meaning, whether they were defamatory and false are questions of fact to be

resolved by the jury.  Olinger v. American Savings & Loan Ass'n, 409 F.2d 142, 144 (1969).

23

Here, Count IX of the Second Amended Complaint, Klayman alleges that based on a series of misrepresentations and disparagements against him by Judicial Watch, Klayman was defamed and his reputation in his trade and profession was injured.  In the Motion, defendants seek dismissal of Count IX based on website statements recited in paragraph 65 of the Second Amended Complaint that, allegedly, falsely represent media quotations in an attempt to disparage Klayman.  Although not specifically referenced as part of the allegations in Count IX of the Second Amended Complaint, the statements referred to by defendants in the Motion are defamatory when considered in context and taken as a whole.  The effect of these statements on Judicial Watch's intended audience is to undermine Klayman's ability to advocate as an attorney, represent and fundraise as a public figure.  In effect, the inaccurate media quotations demonstrate defendants' attempts to erase Klayman from any association with Judicial Watch's previously successful history, while at the same time, in the context of other statements, raise the impression that Klayman misused his position all along, improperly appropriated funds and refused to pay it back, and was terminated as a result.  Additionally, and without provocation, defendants imply that Klayman frivolously and recklessly conducted himself in his chosen profession as a public figure.  (Second Amended Complaint, ¶¶ 150, 154, 157 and 159).

Moreover, the statements concerned Klayman directly because, taken in context of the allegations set forth in the Second Amended Complaint, statements that intentionally altered media quotes to minimize and obfuscate Klayman's role at Judicial Watch prior to separation, by definition, concern Klayman.  Thus, the statements are reasonably capable of having defamatory meaning, and, therefore, the Motion as to Count IX must be denied.

### 4.      Statements to Media Were Defamatory

24

As indicated above, defendants misstate the allegations Count IX of the Second Amended Compliant and attribute paragraphs 40-41, 44-45, 66(I) to this count only to argue that, taken in isolation, these allegations are not defamatory.  Count IX does not specifically refer to these allegations, but instead includes, as described above, the defamatory statement to media outlets that Klayman essentially misused funds and admitted owing Judicial Watch over a quarter of a million dollars, which, according to the allegation in the Second Amended Complaint, were false and made intentionally to disparage and defame Klayman.  (Second Amended Complaint, ¶¶ 156, 157).  Thus, the Motion as to Count IX of the Second Amended Complaint for failure to state a claim must be denied.

**F.      The Motion To Dismiss Count VI (Breach of Contract - Rescission) For Failure To State A Claim Must Be Denied**

The purpose of rescission is to return contracting parties to their pre-contract position.  However, an exact or literal return to the status quo is not necessary.  Rescission can arise under two circumstances: (1) it may be effected by mutual agreement and (2) it may be granted unilaterally because of fraud, illegality, mutual mistake or a contract provision providing for rescission.  Deckard v. General Motors Corp., 307 F.3d 556 (7th Cir. 2002).  Complete restoration is not necessary for rescission of an agreement if the party that is not fully restored was actually at fault.  17A Am Jur 2d CONTRACTS § 577.  Accordingly, the party who seeks to rescind a contract need not offer to restore where the defrauding party has made restoration impossible.  Kobatake v. E.I. DuPont De Nemours and Co., 162 F.3d 619 (11th Cir. 1998).  "Where plaintiffs have alleged that they were fraudulently induced to execute releases, the releases are voidable" availing to the plaintiffs an election of remedies; they may (1) rescind the contract, thereby restoring to defendants the benefits they received as a result of the settlement,

25

and sue in tort for damages resulting from the alleged fraud or (2) affirm the contract, thereby retaining the benefits received under the contract, and sue for damages." Id. at 625.

Here, the Motion seeks to dismiss this count based on a presentation of new facts not part of the pleadings. The Motion contends that significant changes to Judicial Watch occurred in Klayman's absence, including "personnel, management and other decisions made in his absence" and that such changes preclude rescission. (Motion, p.28). Defendants proffer premature and unsubstantiated assertions of facts and indicate how defendants would exercise this Honorable Court's discretion in applying equitable remedies. Such assertions are extraneous to the instant Motion under the standard for dismissal under F.R.C.P. 12(b)(6) for failure to state a claim and must be disregarded by the Court.

Moreover, Count VI of the Second Amended Complaint seeks the equitable remedy of contract rescission based on allegations that defendants intentionally, continuously and materially breached the Severance Agreement and, in fact, never intended to abide by its terms. (Second Amended Complaint, ¶¶ 66, 117-133). As alleged, defendants' deliberate and material misrepresentations induced Klayman to enter into the Severance Agreement. Such inducement, taken as true for purposes of the Motion, is grounds for equitable rescission of the Severance Agreement and thus, the allegations, as alternatively pled in the Second Amended Complaint, properly state a claim for rescission. Therefore, the Motion to dismiss Count VI for failure to state a claim must be denied.

280166-3

III.    **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that Defendants' Motion to

Dismiss Counts I, II, III, IV, V, VI and IX of the Second Amended Complaint be denied in its

entirety.

Respectfully submitted,

**SPECTOR GADON & ROSEN, P.C.**

By: _____//s// *Daniel J. Dugan*_____(DD 1339)
    Daniel J. Dugan, Esquire
    1635 Market Street, Seventh Floor
    Philadelphia, PA  19103

August 7, 2006          215.241.8872/215.241.8844(Fax)
    ddugan@lawsgr.com
    *Attorneys for Plaintiffs, Larry Klayman and*
    *Louise Benson*

Of Counsel:

**SPECTOR GADON & ROSEN, P.C.**
Jason B. Schaeffer, Esquire
1635 Market Street, 7th Floor
Philadelphia, PA 19103
215.241.8887
215.241.8844 *fax*
Email: jschaeffer@lawsgr.com

27

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 7th day of August, 2006, a true and correct copy of Plaintiffs'

Opposition to defendants' Motion To Dismiss was served via electronic filing on the following:


Richard W. Driscoll, Esquire
Driscoll & Seltzer, PLLC
600 Cameron Street
Alexandria, Virginia 22314

Counsel for Defendants



By: _____ *//s// Daniel J. Dugan*
Daniel J. Dugan, Esquire

280166-3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

| | | |
|---|---|---|
| Larry Klayman, *et al.* | : | |
| *Plaintiffs,* | : | Civil Action No. 1:06-CV-00670 |
| | : | |
| v. | : | Honorable Colleen Kollar-Kotelly |
| | : | |
| Judicial Watch, Inc., *et al.* | : | |
| *Defendants.* | : | |
| | : | **Jury Trial Demanded.** |

---

## <u>ORDER</u>

Upon consideration of the Defendants' Motion to Dismiss Counts I, II, III, IV, V, VI and IX of the Second Amended Complaint the Plaintiffs' opposition thereto, it is hereby

ORDERED that the Motion to Dismiss Counts I, II, III, IV, V, VI and IX is denied in its entirety.

Entered this        day of               , 2006.


_____
Honorable Colleen Kollar-Kotelly

280166-3