IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

———————————————————— |
LARRY KLAYMAN, *ET AL.*          |
                                 |
        Plaintiffs,              |
                                 |
v.                               |          Civil Action No. 1:06-CV-00670
                                 |          Honorable Colleen Kollar-Kotelly
JUDICIAL WATCH, INC., *ET AL.*   |
                                 |
        Defendants.              |
———————————————————— |

**DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT
ON PLAINTIFF KLAYMAN'S BREACH OF CONTRACT CLAIMS**

Defendants, Judicial Watch, Inc., Thomas J. Fitton, Paul J. Orfanedes and Christopher J. Farrell, by counsel and pursuant to Rule 56 of the Federal Rules of Civil Procedure, hereby move for partial summary judgment on the breach of contract claims in Plaintiff Larry Klayman's Second Amended Complaint ("SAC") as set forth in Counts VI, VII and VII. The grounds for this Motion are more fully set forth in Defendants' Memorandum of Law in Support of their Motion for Partial Summary Judgment.

WHEREFORE, for all of the forgoing reasons, and for those set forth in the accompanying Memorandum of Law, Defendants respectfully requests that the Court GRANT this Motion and enter summary judgment in their favor on Plaintiff Klayman's Counts VI, VII and VIII.

Respectfully submitted,

//s// *Richard W. Driscoll*

_____

Richard W. Driscoll (436471)
DRISCOLL & SELTZER, PLLC
600 Cameron Street
Alexandria, Virginia 22314
703.340.1625 Telephone
703.997.4892 Facsimile
Email: rdriscoll@driscollseltzer.com

*Counsel for Defendants Judicial Watch, Inc.,*
*Thomas J. Fitton, Paul J. Orfanedes and*
*Christopher J. Farrell*

Dated: December 26, 2006

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 26th day of December 2006, a copy of the foregoing Motion for Partial Summary Judgment, Memorandum of Law, Statement of Material Facts and proposed Order were served by electronic filing upon counsel listed on the Notice of Electronic Filing.

//s// *Richard W. Driscoll*

_____

Richard W. Driscoll

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
|
LARRY KLAYMAN, *ET AL.* |
|
Plaintiffs, |
|
v. | Civil Action No. 1:06-CV-00670
| Honorable Colleen Kollar-Kotelly
JUDICIAL WATCH, INC., *ET AL.* |
|
Defendants. |
_____|

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT
OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT
ON PLAINTIFF KLAYMAN'S BREACH OF CONTRACT CLAIMS**

Defendants, Judicial Watch, Inc., Thomas J. Fitton, Paul J. Orfanedes and Christopher J.

Farrell, by counsel and pursuant to Rule 56 of the Federal Rules of Civil Procedure, hereby submit

this Memorandum of Law in support of their Motion for Partial Summary Judgment on the breach of

contract claims in Plaintiff Larry Klayman's Second Amended Complaint ("SAC"), which are set

forth in Counts VI, VII and VII.

**MEMORANDUM OF LAW**

I.    **Introduction.**

In this action, Plaintiff Larry Klayman ("Klayman") asserts three causes of action against

Defendant Judicial Watch, Inc. ("Judicial Watch") arising from a September 19, 2003 severance

agreement by which Klayman, the former Chairman, General Counsel, and Treasurer of Judicial

Watch, resigned from the organization.  In Count VI, Klayman seeks rescission of the severance

agreement.  In Count VII, Klayman seeks damages for alleged breaches of the severance agreement.

 In Count VIII, Klayman seeks specific performance of the severance agreement.    Because there

–1–

can be no genuine disputes of material fact about all but one limited aspect of these claims,[1] and because Judicial Watch is entitled to judgment on these claims as a matter of law, partial summary judgment should be entered in Judicial Watch's favor on Counts VI, VII, and VIII.

## II.    <u>Summary Judgment Standard.</u>

A party is entitled to summary judgment if the pleadings, depositions, and affidavits demonstrate that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994). Under the summary judgment standard, the moving party bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The non-moving party must "go beyond the pleadings and by its own affidavits, or depositions, answers to interrogatories, and admissions on file, 'designate' specific facts showing that there is a genuine issue for trial." *Id*. at 324 (internal citations omitted).

Although a court should draw all inferences from the supporting records submitted by the non-moving party, the mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 1986). To be material, the factual

---

[1]    Klayman alleges that Judicial Watch misrepresented the reasons for his departure from the organization and otherwise created the false impression that he was forced to leave, thereby breaching the Severance Agreement's non-disparagement clause. SAC at paras. 37, 122-23. The parties clearly dispute the facts and circumstances that gave rise to Klayman's departure, and, as a result, this one aspect of Klayman's breach of contract claim will have to be the subject of further litigation.

assertion must be capable of affecting the substantive outcome of the litigation; to be genuine, the issue must be supported by sufficient admissible evidence that a reasonable trier-of-fact could find for the non-moving party. *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987); *Liberty Lobby*, 477 U.S. at 251 (the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law"). "If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50 (internal citations omitted). "Mere allegations or denials in the adverse party's pleadings are insufficient to defeat an otherwise proper motion for summary judgment." *Williams v. Callaghan*, 938 F. Supp. 46, 49 (D.D.C. 1996). The adverse party must do more than simply "show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, while the movant bears the initial responsibility of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact, the burden shifts to the non-movant to "come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Id.* at 587 (citing Fed. R. Civ. P. 56(e)) (emphasis in original).

## III.    Count VI - Breach of Contract - Rescission.

In Count VI, Klayman seeks "rescission" based on a theory of fraudulent inducement. *See Dean v. Garland*, 779 A.2d 911 (D.C. 2001). Klayman alleges:

> 131.    Fitton deliberately misrepresented that he would take steps to find a suitable successor for Klayman as Chairman to induce Klayman to enter into the Severance Agreement. Fitton persuaded Klayman that Fitton would actively

work to find a legal/public figure to succeed Klayman and run Judicial Watch.

132.    Fitton never intended to find a suitable successor for Klayman, and instead always intended to take over Judicial Watch for his own personal gain. Without a law degree, let alone a college degree, Fitton was not equipped to run a non-profit legal organization.

133.    Fitton's deliberate misrepresentations materially induced Klayman to enter into the Severance Agreement.

134.    Klayman relied on Fitton's fraudulent misrepresentations to his detriment and to the detriment of Judicial Watch.

SAC at ¶¶ 131-134.

Fitton and Judicial Watch deny ever making any such representations to Klayman. Nonetheless, Klayman is barred from asserting any such fraud in the inducement by both the parol evidence rule and the Severance Agreement itself, which not only does not include any term requiring Judicial Watch to "find a legal/public figure to succeed Klayman and run Judicial Watch," but also contains an integration clause that expressly states the following:

26.    **Entire Agreement.**  This Agreement constitutes the entire agreement and understanding between the parties and among the Parties with respect to the subject matter hereof and supersedes all prior and contemporaneous written or oral agreements and understandings between the Parties with respect to the subject matter of this Agreement.  **Each of the Parties agrees and acknowledges that in deciding to enter into this Agreement he or it is not**

**relying on any statements, representations, understanding or promises other than those contained herein**.  This Agreement shall be interpreted and enforced in all respects based on its express terms and without regard to who drafted the Agreement or any particular provision of the Agreement.  **Neither the negotiations preceding this Agreement or any draft, term sheet, outline, note, or statement, assertion, representation, or understanding prior to or contemporaneous with the execution of this Agreement shall be used to interpret, change, or restrict the express terms and provisions of this Agreement**.

Severance Agreement at ¶ 26 (emphasis added), attached as Exhibit A to the Declaration of Thomas J. Fitton ("Fitton Decl.").  Klayman's allegations directly contradict the express language of the integration clause, which was drafted in collaboration with his legal counsel.

It is well-settled that a completely integrated contract like the Severance Agreement may not be supplemented with prior alleged representations not included a written agreement.  *Hercules & Co. v. Shama Restaurant Corp.*, 613 A.2d 916, 928 (D.C. 1992).  Under the parol evidence rule, "when parties to a contract have reduced their entire agreement to writing, the court will disregard and treat as legally inoperative parol evidence of the prior [alleged] negotiations and oral agreements."  *Id.*  In addressing this precise issue in *One-O-One Enters. v. Caruso*, 848 F.2d 1283 (D.C. Cir. 1988) (Ginsberg, Ruth B., J.), the court held:

Were we to permit plaintiffs' use of the defendants' prior representations . . . to defeat the clear words and purpose of the Final Agreement's integration clause, contracts would not be worth the

–5–

paper on which they are written . . . Plaintiffs cannot overcome the

written instrument here, and, particularly, the integration clause, by

invoking the fraud-in-the-inducement exception to the parol evidence

rule. The exception for a party who has been induced by a fraudulent

misrepresentation to enter the contract, must not be stretched or

inflated in a way that would severely undermine the policy of the

parol evidence rule, which is grounded in the inherent reliability of a

writing as opposed to the memories of contracting parties.

*One-O-One Enters.*, 848 F.2d at 1287 (internal quotations and citations omitted).

Klayman was represented by competent counsel throughout the negotiation of the Severance

Agreement (Fitton Decl. at ¶ 4), and Klayman, who is an attorney himself, touts his legal abilities

throughout the complaint. *See*, *e.g.*, SAC at ¶¶ 2-4, 26-27. Klayman does not claim that the

Severance Agreement was not an arms-length transaction negotiated on a level playing field or that

it was executed under any emergency circumstances or other conditions indicating duress. Nor does

he claim that his signature on the agreement was obtained by trick or artifice. As a result, Klayman

clearly had both the capacity and the opportunity to read and understand the Severance Agreement.

*One-O-One Enters.*, 848 F.2d at 1287; *Hercules & Co.*, 613 A.2d at 932-33.

Because of the parol evidence rule and the Severance Agreement's integration clause,

Klayman is prohibited from presenting any evidence to support his claim that he was fraudulently

induced to enter into the Severance Agreement based on alleged promises and representations that

do not appear anywhere in the agreement. Because Klayman is unable to introduce any such

evidence, he cannot prevail as a matter of law on his rescission claim.  Consequently, summary judgment should be granted in Judicial Watch's favor on Count VI.

## IV.  <u>Count Seven - Breach of Contract - Damages</u>.

Klayman brings a "shot gun" approach to his claim for damages under the Severance Agreement, alleging no less than eleven (11) categories of purported breaches.  For the reasons set forth below, Judicial Watch is entitled to summary judgment on each of them.

### A.  <u>Alleged Failure to Pay Klayman His Last Paycheck</u>.

Klayman alleges that Judicial Watch breached the Severance agreement by failing to pay him his last paycheck.  SAC at paras. 66(D), 126, 142.  The Severance Agreement required Judicial Watch to pay Klayman a lump sum severance payment of $400,000 and an additional $200,000 for an agreement not to compete with Judicial Watch for a period of two (2) years.  Fitton Decl., Exhibit A (Severance Agreement at ¶¶ 2 and 6).  Judicial Watch undisputedly paid these sums to Klayman, net of all taxes and payroll withholdings, by wire transfer on September 23, 2003.  Fitton Decl. at ¶ 6.  It also is cannot be disputed that Klayman received his last regular paycheck on Monday, September 15, 2003 and that his departure from the organization was effective Friday, September 19, 2003, the same day Klayman signed the Severance Agreement.  *Id.* at ¶ 5 and Exhibit A (Severance Agreement at ¶ 1).  Klayman apparently claims that he also should have been paid for the four (4) day period from September 15, 2003 to September 19, 2003, an amount which, based on his annual salary at the time, totals approximately $3,194, before taxes and payroll withholdings.

The Severance Agreement unambiguously states:

> The Severance Pay and other consideration being provided to Klayman pursuant to this Agreement is also intended to, and does, **fully satisfy all amounts, if any, owed**

**to Klayman by Judicial Watch**, including but not limited to, any amounts owed to
him for accrued but unused vacation and sick leave.

Fitton Decl., Exhibit A (Severance Agreement at ¶ 2 (emphasis added)).  While the Severance
Agreement also states that Klayman "acknowledges that he is not legally entitled to the Severance
Pay or other consideration beyond payment of compensation through his last day of work . . . ," this
provision clearly constitutes an acknowledgment of the consideration being paid to Klayman, not an
obligation on the part of Judicial Watch to pay Klayman any additional compensation.  *Id.*  To make
this point even more clear, Klayman also acknowledged in the agreement that:

> . . . the Severance Pay and other consideration being provided to him pursuant to this
> Agreement is intended as, and is consideration for his execution of this Agreement
> and in order to amicably resolve, on the terms set forth in this Agreement,
> differences between the Parties and in recognition of Klayman's leadership and
> contribution to the founding and development of Judicial Watch in a way
> commensurate with similar arrangements for principal executives of comparable
> organizations.

*Id.*

As demonstrated by the Declaration of Thomas Fitton and the exhibits attached thereto, there
is no genuine dispute of material fact that Judicial Watch paid Klayman all compensation to which
he was entitled.  Therefore, Judicial Watch should be granted summary judgment on this particular
claim.

**B.      Alleged Failure to Take Affirmative Steps to Purchase Building or Remove
Klayman as Guarantor of Judicial Watch Lease.**

Klayman alleges that Judicial Watch breached the Severance agreement "by failing to take affirmative steps to purchase" its Washington, D.C. headquarters and by failing to make a good faith effort to "remove Klayman as a personal guarantor of the lease" for its headquarters. SAC at ¶¶ 66(F), 127, 145.

Nowhere does the Severance Agreement require Judicial Watch to "take affirmative steps to purchase" its headquarters. *See* Severance Agreement. Therefore, pursuant to the integration clause of the Severance Agreement and the parol eviden rule, Judicial Watch is entitled to summary judgment on this particular claim as a matter of law.

With respect to Klayman's guaranty of the lease, the Severance Agreement states, in relevant part: "Judicial Watch agrees to continue to work in good faith to remove Klayman as guarantor of its lease for its Washington, D.C. headquarters located at 501 School Street, S.W., Suite 500, Washington, DC 20024." Fitton Decl., Exhibit A (Severance Agreement at 9(B)). The Severance Agreement does not require that Klayman be removed as guarantor; all it required was that Judicial Watch make a good faith effort to do so. There can be no genuine dispute of material fact that Judicial Watch satisfied this obligation.

Within days of Klayman's departure on September 19, 2003, Judicial Watch contacted its landlord, through its agent, to discuss possible ways of removing Klayman as personal guarantor of the lease. Fitton Decl. at ¶ 7. After a series of conversations in September and October 2003, the landlord, through his agent, proposed that Judicial Watch obtain a letter of credit from a bank in an amount equal to three (3) years of rent, or approximately $1.8 million, in lieu of Klayman continuing to serve as a guarantor. *Id.* Judicial Watch determined that the cost of such an approach was not commercially acceptable and, on or about October 17, 2003, asked the landlord to reconsider. *Id.*

Neither the landlord nor his agent responded or otherwise indicated that the landlord would reconsider his demand for a three-year letter of credit. *Id.* Because the agreement only required Judicial Watch to "continue to work in good faith" to remove Klayman as personal guarantor, Judicial Watch was clearly entitled to determine that the landlord's proposals were not commercially acceptable. Therefore, Judicial Watch satisfied its obligation and is entitled to summary judgment on this particular claim.

Moreover, Judicial Watch's inability to convince the landlord to release Klayman under commercially reasonable circumstances has not caused any damage whatsoever to Klayman. Judicial Watch continues to pay its monthly rent and otherwise satisfy its obligations to the landlord. Fitton Decl. at ¶ 7. Indeed, unless some event occurs by which Judicial Watch's landlord seeks to invoke Klayman's personal guaranty -- an event that has not transpired -- Klayman will not suffer any damages by reason of an alleged failure on the part of Judicial Watch to try in good faith to have him removed as guarantor. Therefore, Judicial Watch is entitled to summary judgment on these particular claims.

### C.    Alleged Failure to Return Klayman's and Klayman & Associates, P.C.'s Property.

Klayman alleges that Judicial Watch breached the Severance Agreement by converting and/or failing to return "Klayman's personal property and assets, as well as those of Klayman's law firm, Klayman & Associates." SAC at ¶¶ 66(E), 126, 143. Other than a general reference to "artwork" in Judicial Watch's Miami, Florida office, Klayman fails to specify what "personal property and assets" Judicial Watch allegedly converted and/or failed to return. *Id.* at ¶ 143. Nonetheless, the Severance Agreement is clear on how such items were to be handled; the burden of removing them was squarely on Klayman. Because there can be no genuine dispute of material fact

–10–

that Judicial Watch gave Klayman ample opportunity to remove any such items from its offices shortly after his departure, summary judgment should be granted in Judicial Watch's favor.

With respect to Klayman's personal property, the Severance Agreement states: "Upon reasonable advance notice to Judicial Watch, Klayman shall be permitted to remove his personal effects (e.g., family photos and other similar personal property that he purchased with his personal funds), as well as a copy of his electronic 'Rolodex,' from Judicial Watch's offices." Fitton Decl., Exhibit A (Severance Agreement at ¶ 4(B)). With respect to items belonging to Klayman's private law firm, Klayman & Associates, P.C. ("K&A"), the Severance Agreement states:

> Klayman agrees to remove all K&A files and boxes from Judicial Watch's premises at Klayman's expense before the Separation Date or within a reasonable time thereafter, at his expense. Should Klayman not remove such files and boxes within sixty (60) days of the Separation Date, Judicial Watch may destroy them.

*Id.* (Severance Agreement at ¶ 11(B)).

Several weeks before Klayman's departure from Judicial Watch, two of Klayman's associates, Sandra Cobas and Jose Paredes, spent approximately two days at Judicial Watch's Washington D.C. office organizing, packing, and segregating Klayman's personal belongings and property belonging to K&A. Declaration of Susan E. Prytherch ("Prytherch Decl.") at ¶ 6. On October 2, 2003, a date of Klayman's choosing, Klayman and an assistant, Lissette Tortora, were given full and unfettered access to Judicial Watch's Washington, D.C. headquarters to identify, organize, pack, and make arrangements to remove any remaining personal items belonging to Klayman and any files and materials belonging to K&A. *Id.* at ¶¶ 7-8. Klayman and Ms. Tortora spent at least four (4) hours at Judicial Watch's office that day. *Id.* In addition, an inventory of all

of the contents of Klayman's former office was prepared, and any items identified as Klayman's personal property and taken by Klayman and/or his assistant were checked off by a Judicial Watch employee. *Id.* at ¶ 9.

While Klayman was given every opportunity to identify, organize, box, and remove any and all of his personal property and any and all K&A files and materials from Judicial Watch's office on October 2, 2003, he instead requested that Judicial Watch make one of its employees, Kristinn Taylor, available the following day, October 3, 2003, to finish organizing, boxing, and preparing these items to be removed from the office. *Id.* at ¶¶ 10-11. When Klayman was informed that JW would have to bill him for Mr. Taylor's time and related expenses, including supplies, Klayman stated that he understood and agreed to this arrangement. *Id.*

On October 3, 2003, Mr. Taylor spent five (5) hours organizing, boxing, and preparing Klayman's and K&A's property to be moved. *Id.* When Mr. Taylor had finished, Klayman arranged for movers to pick the boxes of Klayman's and K&A's property prepared by Mr. Taylor. *Id.* On October 6, 2003, Mr. Taylor spent an addition three (3) hours supervising and helping Klayman's movers move the boxes.[2] *Id.* Klayman chose not to be present when Mr. Taylor finished organizing, boxing, and preparing Klayman's and K&A's property to be moved, or when Klayman's movers moved the boxes from office. *Id.*

With respect to the Miami office, Klayman was advised to contact Judicial Watch personnel in Miami to make arrangements to pick up any personal property he had in Judicial Watch's Miami office at his convenience. *Id.* Klayman made arrangements to have a representative come by

---

[2]     When Judicial Watch subsequently sent Klayman an invoice for Mr. Taylor's time and packing supplies, Klayman refused to pay it. Prytherch Decl. at ¶ 11.

Judicial Watch's Miami office on October 3, 2003. Judicial Watch personnel in Miami prepared an inventory of items in Klayman's former office in Miami. Declaration of Irene Garcia ("Garcia Decl.") at ¶ 3. On October 3, 2003, Klayman's representative appeared at Judicial Watch's Miami Office and identified various items belonging to Klayman. *Id*. at ¶ 4. The representative checked off various items on the inventory list to identify them as belonging to Klayman and initialed the list. *Id.* At Judicial Watch's expense, Judicial Watch personnel in the Miami office packed the items identified by Klayman's representative in boxes. *Id.* Klayman had the boxes picked up a few days later. *Id.*

With respect to the artwork referenced in Klayman's pleadings (*see* SAC at ¶ 143), there can be no genuine dispute of material fact that the artwork in question is Judicial Watch's property, not Klayman's property. Prytherch Decl. at ¶ 13. Judicial Watch's corporate credit card records show that Klayman charged the artwork to Judicial Watch's corporate American Express card on September 22, 2002 at the Kennedy Gallery in Miami Beach, Florida. *Id.* In October 2002, the artwork was added to Judicial Watch's general ledger as a fixed asset of the organization. *Id.* It has remained on Judicial Watch's general ledger at all times since then, including a period of approximately eleven months when Klayman was still employed by the organization, and it also is included on Judicial Watch's fixed asset inventory. *Id.* Judicial Watch has no records indicating that Klayman ever reimbursed the organization for the artwork or that he ever purchased the artwork from Judicial Watch. *Id.* Nor has Klayman ever provided any documentation to this effect. *Id.* Finally, Klayman made no objection following the delivery of his personal items from the Miami office. In light of the absence of any genuine disputes of material fact regarding Klayman's claims

–13–

that Judicial Watch failed to return his personal property or that of K&A, Judicial Watch is entitled to summary judgment on these claims.

        **D.**    <u>**Alleged Failure to Pay Klayman's and Klayman's Family's Health Insurance**</u>.

Klayman alleges that Judicial Watch breached the Severance Agreement by "fail[ing] to pay Klayman and his family for health care insurance." SAC at ¶ 66(C). The Severance Agreement states, in relevant part:

> **A.** <u>**Health Insurance.**</u> In the event Klayman properly and timely elects to continue his family health insurance coverage following the termination of his employment in accordance with the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), Judicial Watch shall pay the cost of such insurance, to the same extent it paid Klayman's family health insurance coverage during his employment, for a period of twelve (12) months following the Separation Date. Nothing herein shall limit Klayman's right, consistent with the term of the insurance plan and COBRA, to continue to maintain the health insurance coverage beyond the twelve (12) month period at his own expense.

Fitton Decl., Exhibit A (Severance Agreement at ¶ 3(A)). Pursuant to the Severance Agreement, Judicial Watch paid Klayman's health insurance coverage for twelve month period following his departure from the organization. Prytherch Decl. at ¶ 14. Judicial Watch did not pay for Klayman's family coverage during this same twelve month period, as it had no obligation to do so. *Id.*

As part of its standard compensation package, Judicial Watch pays the premium for individual health insurance coverage for employees who work at least thirty (30) hours per week. *Id.* at ¶ 15. A Judicial Watch employee also may elect to purchase family coverage under Judicial

Watch's health insurance policy, in which case the employee pays the difference between the cost of individual coverage and the additional cost of family coverage. *Id.* This typically is done by a payroll deduction from the employee's semi-monthly paychecks. *Id.* Although there are circumstances where Judicial Watch has paid the additional cost of family health insurance coverage for certain employees, in those limited number of instances, the payment of family health insurance was negotiated when the employee was hired and documented in the employee's offer letter. *Id.*

Klayman began drawing a salary from Judicial Watch on or about June 1, 1998. At that time, Judicial Watch did not provide health insurance coverage to its employee directly. *Id.* at ¶ 16. Rather, coverage was provided by a Blue Cross Blue Shield policy in K&A's name, and both K&A and Judicial Watch paid a share of the policy premium. *Id.* Klayman elected to have his family covered under the K&A health insurance policy, and, as a result, Klayman paid the additional cost of covering his family under the K&A health insurance policy by writing a check each month made payable directly to the carrier.[3] *Id.* at ¶ 17.

In September 1999, Klayman's wife began drawing a salary from Judicial Watch, although this was later made retroactive to May 15, 1999. *Id.* at ¶ 18. Also in September 1999, the Klaymans began paying the additional cost of family health insurance coverage through a payroll deduction from Mrs. Klayman's semi-monthly paycheck rather than by check payable to the carrier.[4] *Id.* In May 2000, Judicial Watch began providing health insurance coverage to its employees directly

---

[3]     Klayman's wife was a K&A employee as well and thus was entitled to individual health insurance coverage. Consequently, Klayman paid the difference between the cost of individual health insurance coverage for himself and his wife and the additional cost of family health insurance coverage for the period from June 1998 until July 1999. Prytherch Decl. at ¶ 16.

[4]     Judicial Watch has no records showing whether any payment was made by the Klaymans in August 1999. Prytherch Decl. at ¶ ___.

through a policy in its own name rather than through a policy in K&A's name. *Id*. at ¶ 19. Mrs. Klayman's payroll records show that she continued to pay the additional cost of family health insurance coverage through a payroll deduction from her semi-monthly paycheck.[5] *Id*.

Mrs. Klayman's payroll records show that, she went on extended, unpaid leave on or about September 15, 2002. *Id*. She subsequently resigned from Judicial Watch without ever returning to work. *Id*. Nonetheless, it cannot reasonably be disputed that, from the date Klayman went on Judicial Watch's payroll until his wife went on unpaid leave on or about September 15, 2002, the Klaymans paid the additional cost of family health insurance coverage either directly by check payable to the carrier or by a payroll deduction from Mrs. Klayman's semi-monthly paycheck.

After Mrs. Klayman went on extended, unpaid leave, she was no longer eligible for individual health insurance coverage paid by Judicial Watch, nor was she eligible to purchase family health insurance coverage for her family under Judicial Watch's health insurance policy. *Id.* at ¶ 20. As a Judicial Watch employee, however, Klayman was entitled to purchase such coverage, and, as a result, the Klayman's family health insurance coverage was transferred from Mrs. Klayman's name to Klayman's name. *Id*. Due to an administrative oversight, however, no corresponding payroll deduction was made from Klayman's semi-monthly paycheck to pay the additional cost of family health insurance coverage. *Id*. The oversight continued until Klayman's departure from the organization on September 19, 2003, a period of approximately one year. *Id*.

During the period that Klayman was provided health insurance without withholding for the premium, Klayman was the Treasurer of Judicial Watch, in addition to being its Chairman, General

---

[5]    The differing amounts reflect increases in the cost of the premium over time. Prytherch Decl. at ¶ 19.

Counsel and a member of its Board of Directors. *Id.* at ¶ 21. In general, as the Chairman, General Counsel and member of the Board of Directors, and more particularly, as the Treasurer of Judicial Watch, Klayman bore direct fiduciary responsibility for the organizations finances and had a clear obligation to identify and correct this oversight.[6] *Id.* Whether intentional or by mistake, this Court should not permit Klayman to benefit from a failure to fulfill his fiduciary responsibility to Judicial Watch. Such failure should not now inure to his benefit.

Historically, compensation of Judicial Watch's officers is approved by the organization's Board of Directors and reflected in the organization's corporate minutes. *Id.* at ¶ 22. The organization also has historically treated payment of additional benefits above and beyond those to which all employees are entitled, such as payment of family health insurance coverage, as additional compensation. *Id.* Therefore, if Judicial Watch had intended to pay the health insurance premium for the entire Klayman family, the decision to confer this additional compensation would be reflected in the organization's corporate minutes. *Id.* However, there are no corporate minutes or any other documentation demonstrating that the organization's Board of Directors (including Klayman) ever authorized or approved payment of family health insurance coverage for the Klaymans. *Id.* at ¶ 23.

During his tenure at Judicial Watch, Klayman was an officer, director, and the organization's most highly compensated employee. As such Klayman is deemed to be a "disqualified" employee under Internal Revenue Service regulations. *Id.* at ¶ 24; *see*, *e.g.*, 26 C.F.R. §§ 53.4958-3 and 53.4958-4(c). As a result, any non-standard benefits or other special compensation arrangement

---

[6]     As Mrs. Klayman's spouse, Klayman must have known his wife was paying for the family's health insurance coverage through a payroll deduction.

received by Klayman had to be documented and approved by the Board of Directors. *Id.* Again, there is no documentation demonstrating that the Board of Directors ever approved payment of family health insurance coverage for Klayman. *Id.*

Finally, in the few limited instances in which Judicial Watch paid for an employee's family health insurance coverage, this additional, negotiated coverage was treated as a taxable benefit to the employee and was reflected in both the employee's payroll withholdings and his or her W-2 statements. *Id.* at ¶ 25. In Klayman's case, no additional taxes were withheld for family health insurance coverage, nor was the coverage reflected on Klayman's W-2 statements. *Id.*

Regardless, there can be no genuine dispute of material fact that, from the time Klayman became a Judicial Watch employee on June 1, 1998 until Mrs. Klayman's last paycheck on September 15, 2002, the organization did not pay the additional cost of family health insurance coverage for the Klaymans. Rather, the Klaymans paid this additional cost either directly by check or by a payroll deduction from Mrs. Klayman's semi-monthly paycheck. The failure to deduct the additional cost of family health insurance coverage from Klayman's paycheck after his wife resigned from the organization was an inadvertent, administrative oversight that Klayman, as Chairman and Treasurer of the organization, should have identified and taken steps to remedy. Because the Severance Agreement only required Judicial Watch to pay Klayman's family health insurance coverage "to the same extent it paid Klayman's family health insurance coverage during his employment," it was under no obligation to make any such payments for the twelve month period following Klayman's departure, and Judicial Watch is entitled to summary judgment on this particular claim.

**E.    <u>Alleged Failure to Provide Klayman Access to Documents</u>.**

Klayman alleges that Judicial Watch breached the Severance Agreement by failing to "provide Klayman access to documents as required under the Severance Agreement." SAC at ¶ 146. The Severance Agreement states, in pertinent part:

> F.    Limited Access to Certain Confidential Information. . . . subject to Judicial Watch's consent, which consent shall not unreasonably withheld, Klayman shall be afforded access to such Confidential Information as he may reasonably require in order to defend or respond to any accusation, action, or threat of action against him arising out of or relating to his tenure at Judicial Watch. Such access shall include an opportunity on reasonable notice to examine and copy, at his cost, Confidential Information related to such accusation, action, or threat, provided that such Confidential Information shall be used or disclosed by him solely in connection with such defense or response and provided, further, that he shall take reasonable steps to protect such Confidential Information from any use or disclosure by others other than in connection with such defense or response (e.g., by Protective Order or Confidentiality Agreement).

Fitton Decl., Exhibit A (Severance Agreement at ¶ 4(F)). The Severance Agreement defines Confidential Information as follows:

> <u>Confidential Information</u>. Klayman agrees that all non-public information and materials, whether or not in writing concerning Judicial Watch, its operations, programs, plans, relationships, donors, prospective donors, clients, prospective clients, past or current employees, contracts, financial affairs, or legal affairs

(collectively, "Confidential Information") are confidential and shall be the exclusive

property of Judicial Watch to which Klayman has no right, title, or interest.

Fitton Decl., Exhibit A (Severance Agreement at ¶ 4(A)).

While Klayman does not allege what documents Judicial Watch allegedly failed to provide him or when Judicial Watch allegedly failed to provide these documents to him, Judicial Watch is aware of only one instance in which Klayman demanded documents from Judicial Watch, and there can be no genuine dispute of material fact regarding this one limited instance.

On or about January 12, 2006, Klayman sent an e-mail to Judicial Watch's counsel demanding documents regarding an article written by former Judicial Watch client Peter F. Paul. Fitton Decl. at ¶ 8; Declaration of Paul J. Orfanedes ("Orfanedes Decl.") at ¶ 3.  In the e-mail, Klayman asserted that Paul's article had defamed him.  Klayman wrote:

> . . . in the interim, would you please send me immediately any an [sic] all correspondence by or on behalf of Peter Paul and Judicial Watch with regard to the matters set forth in the next paragraph.
>
> As we discussed at the mediation session in December, using sworn statements about me in the false Judicial Watch IRS Form 990 for 2003, which was later modified for 2004 (albeit incorrectly and in a misleading fashion), I have learned recently that Peter Paul wrote and published an equally false and defamatory article, which appeared not just on his website but was posted on the Free Republic website, which stated that I was fired by Judicial Watch because of the expense issue, among other libelous statements. *I have been severely*

–20–

*damaged as a result*.  At the end of the article, Paul states that he is bringing suit against Judicial Watch, its current officers and me, as well as filing other complaints.

Accordingly, false and defamatory information contained in the 2003 JW Form 990 was used and published by Paul and he states that litigation and other complaints will result.  Under the Confidential Severance Agreement, I am entitled to receive any and all documents to and from Paul and I hereby make this demand.  Please provide this on an expedited basis.

Further, please advise me whether, as is required, Paul's forecast legal actions have been reported to Judicial Watch's professional liability and directors and officers insurance carriers, as well as my past enumerated [sic] claims against Judicial Watch and its current officers and directors.

Thank you for your immediate response and for providing this information and documentation right away.

*Id.*  (Emphasis original).  Judicial Watch quite reasonably declined to produce the requested records to Klayman.  Fitton Decl. at ¶ 8; Orfanedes Decl. at ¶ 3.

The provision in the Severance Agreement allowing Klayman limited access to confidential information does not require Judicial Watch to provide Klayman with documents so he can respond to casual or obscure threats or pursue defamation actions against its former clients.  Rather, the plain and ordinary meaning of this provision is to allow former employees limited access to information or

documentation they might need in order to defend themselves against formal damages claims or lawsuits arising from matters that occur during their employment. Judicial Watch interpreted the provision at issue in this reasonable manner. The publication on a website of statements that Klayman considers defamatory or threatening did not, in Judicial Watch's quite reasonable view, trigger the application of the provision, which expressly allows Judicial Watch to exercise its discretion in determining whether to allow Klayman access to its Confidential Information.

In addition, the provision clearly puts the burden on Klayman to make appropriate arrangements to examine and copy, at his expense, the documents to which he seeks access. Klayman' request attempted to reverse this burden by requiring Judicial Watch to identify and photocopy, at its own expense, "all documents to and from Paul." As Judicial Watch represented Paul on multiple matters from approximately February 2001 to approximately April 2005, Klayman's demand would have required Judicial Watch to search through years worth of case files, correspondence, and other records. Fitton Decl. at ¶ 8; Orfanedes Decl. at ¶ 3. Klayman never offered to provide a more precise description of the documents to which he sought access or to reimburse Judicial Watch for its search costs or photocopying expenses.[7] *Id.* He simply demanded that Judicial Watch provide him with a large volume of materials "right away." *Id.*

Even if Klayman had offered to make appropriate arrangements to examine and copy, at his own expense, the documents to which he sought access, his request for "all documents to and from Paul" far exceeded any documents he "may reasonably require in order to defend or respond to any accusation, action, or threat of action" by Mr. Paul.

---

7     In light of Klayman's past promises to reimburse Judicial Watch, which he breached in whole, it would be unreasonable to expect Judicial Watch to incur further expense on Klayman's behalf.

Moreover, the Severance Agreement provision required Klayman to take reasonable steps to protect Judicial Watch's records from any use or disclosure unrelated to the claim or lawsuit for which the records are sought. The provision specifically references obtaining a protective order or confidentiality agreement. Protecting the confidentiality of documents "to and from Paul" was particularly important in this instance because an attorney-client relationship had existed between Judicial Watch and Paul for more than four years, including a period of more than eighteen (18) months after Klayman had left Judicial Watch. Fitton Decl. at ¶ 8; Orfanedes Decl. at ¶ 3. The documents demanded by Klayman clearly encompassed records protected by the attorney-client privilege and the attorney work product doctrine. Not only did Klayman fail to indicate that he would or could take any steps to protect the confidentiality of these documents, but, without there being any kind of formal claim or lawsuit against Klayman, the attorney-client privilege and rules of professional conduct prohibited Judicial Watch from providing these documents to Klayman. Orfanedes Decl. at ¶ 3; D.C. Rule of Professional Conduct Rule 1.6(d)(3) (allowing an attorney to disclose confidential client information only "to the extent reasonably necessary to establish a defense to a . . . civil claim, formally instituted against the lawyer."). Under all of these the circumstances, it was entirely reasonable and entirely within Judicial Watch's rights under the Severance Agreement for Judicial Watch to reject Klayman's demand for the documents.

Finally, Klayman did not suffer any damages by reason of any purported breach of this provision. Paul has not initiated any action legal against Judicial Watch, and, to Judicial Watch's knowledge, Paul has not initiated any legal action against Klayman. Fitton Decl. at ¶ 8; Orfanedes Decl. at ¶ 3. Judicial Watch is entitled to summary judgment on this particular claim.

**F.     Alleged Failure to Remove Klayman as Guarantor for All Credit Card Accounts.**

Klayman alleges that Judicial Watch breached the Severance agreement by failing to "remove Klayman as guarantor for all credit card accounts as required by the Severance Agreement." SAC at ¶ 144. The Severance Agreement states: "Judicial Watch shall remove Klayman as guarantor of all credit cards issued to Judicial Watch, including without limitation Judicial Watch's American Express card, within thirty (30) days of the Separation Date." Fitton Decl., Exhibit A (Severance Agreement at ¶ 9(A)).

At the time of the Severance Agreement, Klayman served as guarantor of Judicial Watch's American Express card. Prytherch Decl. at ¶ 26. Klayman did not serve as the guarantor of any other Judicial Watch credit card. *Id.* On October 15, 2003, Judicial Watch replaced Klayman as guarantor of its American Express card with its president, Thomas J. Fitton. *Id.* A letter and confirming documentation to this effect was sent to Klayman, care of his counsel, David P. Durbin, Esq., on October 17, 2003. *Id*. at Exhibit G. Klayman's allegation to the contrary simply has no basis in fact, nor can there be any genuine dispute of material fact about this really very minor matter. Therefore, Judicial Watch is entitled to summary judgment on this particular claim.

### G.    Alleged Failure to Forward Telephone Messages and Mail and Opening of Klayman's Mail.

Klayman alleges that Judicial Watch breached the Severance Agreement by "illegally and systematically" opening his mail and "failed to forward telephone messages." SAC at ¶¶ 66(A), 66(H). The Severance Agreement does not contain any terms or provisions regarding the handling of mail or telephone messages. Consequently, there can be no breach of the Severance Agreement arising from any such allegations, and Judicial Watch is entitled to summary judgment on this particular claim as a matter of law.

### H.    Alleged Tortious Interference with "Freedom Watch."

Klayman alleges that Judicial Watch breached the Severance Agreement by "tortiously interferr[ing] with another entity funded by Klayman, Freedom Watch, Inc., which is a 501(c)(3) founded to promote freedom domestically and around the world." SAC at ¶ 66(A). As with Klayman's allegations regarding mail and telephone messages, the Severance Agreement does not contain any terms or provisions regarding "Freedom Watch, Inc." Consequently, there can be no breach of the Severance Agreement arising from any such alleged "tortious interference." Judicial Watch is entitled to summary judgment on this particular claim as a matter of law.

## I.     Alleged False and Frivolous Legal Pleading in Florida Litigation.

Klayman alleges that Judicial Watch breached the Severance Agreement by filing "false and frivolous legal pleadings to attempt to have Klayman removed as counsel for Sandra Cobas in the Miami Elian Gonzalez litigation . . . fraudulently representing to the court that Klayman was legally barred from representing her." SAC at ¶ 66(G). There are no terms or provisions in the Severance Agreements that purport to govern or otherwise limit the nature or substance of any motions or pleadings that Judicial Watch might file in the course of its legal work. As a result, Judicial Watch is entitled to summary judgment on this particular claim as a matter of law.

Nonetheless, there can be no genuine dispute of material fact about Judicial Watch's filing of a motion to strike Klayman's appearance in the Miami litigation. Klayman was required by the Severance Agreement to withdraw as counsel of record from all legal proceedings in which Judicial Watch was involved as a party or as counsel for any person or entity.[8] Orfanedes Decl. at ¶ 4; Fitton Decl., Exhibit A (Severance Agreement at ¶ 12). The Severance Agreement states, in relevant part:

---

[8]     Judicial Watch files numerous lawsuits in its own name, mostly under the Freedom of Information Act.

      12.   **Withdrawal of Appearance in Judicial Watch Litigation.**  Except as otherwise agreed by Judicial Watch, and consistent with the applicable rules of court, Klayman's appearance as counsel shall be withdrawn in all legal proceedings in which Judicial Watch currently is involved as a party or as counsel for any person or entity.

Fitton Decl., Exhibit A (Severance Agreement at ¶ 12)

      Despite this clear provision, Klayman failed to take any action to withdraw from the numerous pending actions in which he had served as counsel while at Judicial Watch. Orfanedes Decl. at ¶ 4. Among these actions was *Dalrymple, et al. v. United States*, Case No. 1:03cv20588 (S.D. Fla.) ("*Dalrymple*"), a lawsuit involving the April 22, 2000 raid that forcibly removed six-year old Cuban shipwreck survivor Elian Gonzalez from the custody of his relatives in Miami, Florida. *Id.* In the Spring of 2004, Klayman tried to inject himself into the *Dalrymple* matter by seeking to continue to represent one of the plaintiffs in that lawsuit, Ms. Sandra Cobas. *Id.* Judicial Watch filed a motion to strike Klayman's appearance, citing paragraph 12 of the Severance Agreement. *Id.* While the motion ultimately was denied, there was nothing false, frivolous, or fraudulent about it. *Id.* Nonetheless, because the Severance Agreement does not contain any terms or provisions purporting to govern or limit what motions or pleadings Judicial Watch might file in a lawsuit, Judicial Watch is entitled to summary judgment on this particular claim.

      Moreover, Judicial Watch also is entitled to summary judgment on this particular claim because the motion to strike and the statements made therein are absolutely privileged under the judicial proceedings privilege, as they clearly were made during the course of a judicial proceeding in which Judicial Watch served as counsel and they clearly had "some relation" to the proceeding.

*Messina v. Krakower*, 439 F.3d 755, 760 (D.C. Cir. 2006); *Finkelstein, Thompson & Loughran v.*

*Hemispherx Biopharma, Inc.*, 774 A.2d 322, 338 (D.C. 2001).

     **J.**     **Alleged Interference with "Klayman's" Former Clients.**

     Klayman alleges that Judicial Watch breached the Severance Agreement by "interfer[ing]

with Klayman's relationships with Klayman's former clients (sic) who had offered to help Klayman

in his Senate campaign." SAC at ¶ 66(J). As with Klayman's claims regarding the handling of mail

and telephone messages, "Freedom Watch, Inc.," and the filing of pleadings, the Severance

Agreement does not contain any terms or provisions that purport to govern or limit Judicial Watch's

interaction with its own clients and former clients.[9] Consequently, Judicial Watch is entitled to

summary judgment on this particular claim as a matter of law.

     **K.**     **Alleged Disparagement/Defamation.**

     Klayman alleges that Judicial Watch breached the Severance Agreement by disparaging

him on several occasions. These appear to include the following:

- Threatening the media and directing media outlets that they could no longer refer to Klayman as Judicial Watch's founder and former Chairman, or ever discuss anything that concerned or related to Judicial Watch. SAC at ¶¶ 39-45, 66(I), 124-25.

- Publishing media quotes on the Judicial Watch website that praise Judicial Watch's work when the quotes originally were meant to praise Klayman's work while he was still at Judicial Watch. SAC at ¶ 65

---

[9]     Klayman erroneously characterizes these clients and former clients as being his. Any such persons or entities were Judicial Watch's clients, not Klayman's personal clients.

- Publishing statements in Judicial Watch's IRS Form 990's describing debts in the amount of at least $223,000 that are owed to Judicial Watch by Klayman and K&A.  SAC at ¶¶ 66(B), 120-21.

- "Actively misrepresenting" the reasons for Klayman's departure from Judicial Watch by creating the false impression that Klayman was forced to leave the organization and representing that Judicial Watch could not discuss the "reasons" for Klayman's departure from the organization. SAC at ¶¶ 37, 122-23.

The Severance Agreement reads, in pertinent part:

**17.    Non-Disparagement.**  . . . Judicial Watch expressly agrees that its present directors and officers namely Paul Orfanedes and Thomas Fitton, will not, directly or indirectly disseminate or publish, or cause or encourage anyone else to disseminate or publish, in any manner, disparaging, defamatory or negative remarks or comments about Klayman.  Nothing in this paragraph is intended to, nor shall be deemed to, limit either party from making fair commentary on the positions or activities of the other following the separation date.

As a matter of law, Judicial Watch is entitled to summary judgment on Klayman's "disparagement" claim for the same reasons Judicial Watch is entitled to the dismissal of Klayman's defamation claims.  *See* Memorandum in Support of Defendants' Motion to Dismiss Second Amended Complaint, filed June 28, 2006, at 16-26.  Klayman's allegations are not actionable as defamation or as breaches of the Severance Agreement's non-disparagement clause, and, with the single exception of Klayman's allegations that Judicial Watch "actively misrepresented" the reasons

–28–

for his departure or otherwise created the allegedly false impression that he was forced to leave the organization,[10] summary judgment should be granted in Judicial Watch's favor on this claim as well.

## V.    Count VIII - Breach of Contract - Specific Performance.

Klayman does not assert any independent factual bases for his claim for specific performance. *Compare* SAC at ¶¶ 66 and 139 *with* SAC at ¶¶ 138-40. Consequently, for the reasons Judicial Watch is entitled to summary judgment on Klayman's Breach of Contract - Damages claim, Judicial Watch also is entitled to summary judgment on Klayman's Breach of Contract - Specific Performance claim.

## VI.    Conclusion.

For the foregoing reasons, Judicial Watch respectfully requests that summary judgment be granted in its favor on the following claims by Klayman:

1.    Count VI;

2.    All aspects of Count VII except for Klayman's "disparagement" claim arising from the allegation that Judicial Watch actively misrepresented the reasons for his departure or otherwise created the allegedly false impression that he was forced to leave the organization; and

3.    Count VIII.

Respectfully submitted,

//s// *Richard W. Driscoll*

_____

Richard W. Driscoll (436471)

---

[10]    It is unclear whether Klayman's defamation claim including this particular set of allegations as , and, as a result, Judicial Watch, Inc. did not move to dismiss them when it sought dismissal of the remainder of Klayman's defamation claims.

–29–

DRISCOLL & SELTZER, PLLC
600 Cameron Street
Alexandria, Virginia 22314
703.340.1625 Telephone
703.997.4892 Facsimile
Email: rdriscoll@driscollseltzer.com

*Counsel for Defendants*

Dated: December 26, 2006