IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

—————————————————————
|
LARRY KLAYMAN, *ET AL.*                      |
|
       Plaintiffs,                          |
|
v.                                           |    Civil Action No. 1:06-CV-00670
|    Honorable Colleen Kollar-Kotelly
JUDICIAL WATCH, INC., *ET AL.*               |
|
       Defendants.                          |
|
—————————————————————|

**STATEMENT OF MATERIAL FACTS NOT IN DISPUTE IN SUPPORT
OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

      Defendants, Judicial Watch, Inc. ("Judicial Watch"), Thomas J. Fitton, Paul J. Orfanedes and

Christopher J. Farrell, by counsel and pursuant to Rule 56 of the Federal Rules of Civil Procedure

and Local Rule 7(h), hereby submit this Statement of Material Facts, as to which there is no genuine

dispute, in support of their Motion for Partial Summary Judgment on Plaintiff Larry Klayman's

breach of contract claims, which are set forth in Counts VI, VII and VIII of the Second Amended

Complaint ("SAC").

      <u>**Klayman's Employment by Judicial Watch**</u>

      1.      From 1998 to 2003, Larry Klayman was Chairman, General Counsel and Treasurer of

Judicial Watch.  Declaration of Susan E. Prytherch ("Prytherch Decl.") at ¶ 5, 16.

      2.      In September 2003, Klayman's employment by Judicial Watch ended.  Declaration of

Thomas J. Fitton ("Fitton Decl.") at ¶ 5.

**The September 19, 2006 Severance Agreement**

3.      Klayman, through counsel, helped negotiate the terms of, and voluntarily signed, his Severance Agreement with Judicial Watch.  Fitton Decl. at ¶ 3.

4.      The Severance Agreement was negotiated for several months prior to the contract's execution.  *Id.*

5.      At all relevant times during the Severance Agreement negotiations, Klayman was a licensed attorney.  SAC at ¶¶ 2-4, 26-27.

6.      During the course of the settlement negotiations, Klayman was represented by David P. Durbin, Esq. of the law firm of Jordan, Coyne & Savits, L.L.P. in Washington, D.C.  Fitton Decl. at ¶ 4.

7.      During the course of the settlement negotiations, Klayman was represented by Herbert N. Beller, Esq., of the law firm of Sutherland, Asbill & Brennan, L.L.P. in Washington, D.C. and Atlanta, Georgia.  Fitton Decl. at ¶ 4.

**Klayman's Final Paycheck**

8.      Via wire transfer on September 23, 2003, Judicial Watch paid Klayman a lump severance payment of $400,000, and an additional $200,000, less applicable taxes and payroll withholdings.  Fitton Decl. at ¶ 6 and Exhibit C.

9.      Klayman received his last regular paycheck on Monday, September 15, 2003 and his departure from the organization was effective Friday, September 19, 2003, the same day Klayman signed the Severance Agreement.  *Id.* at ¶ 5 and Exhibit A.

**Judicial Watch's "Good Faith" Effort to remove Klayman as Guarantor of the Headquarters Building**

10.     The Severance Agreement requires Judicial Watch to "continue to work in good faith to remove Klayman as guarantor" of its lease for its Washington, D.C. headquarters. Fitton Decl. at ¶ 7 and Exhibit A (Severance Agreement at ¶ 9(B)).

11.     The Severance Agreement contains no clause mandating that Judicial Watch attain actual success in removing Klayman as guarantor. *See* Fitton Decl., Exhibit A (Severance Agreement.

12.     Shortly after Klayman's September 19, 2003 departure, Fitton contacted the agent of Judicial Watch's landlord, Vanguard Realty Group, to discuss possible ways of removing Klayman as personal guarantor of the lease. Fitton Decl at ¶ 7.

13.     After a series of conversations in September and October 2003, the landlord proposed, through his agent, that Judicial Watch obtain a letter of credit from a bank in an amount equal to three (3) years of rent, or approximately $1.8 million, in lieu of Klayman continuing to serve as a guarantor. *Id*.

14.     Judicial Watch determined that the cost of such an approach was not commercially acceptable, and on or about October 20, 2003, Fitton sent a letter to the landlord's agent asking the landlord to reconsider. *Id*.

15.     Neither the landlord nor his agent responded or otherwise indicated that the landlord would reconsider his demand for a three-year letter of credit. Exhibit D. *Id*.

16.     Each month since September 2003, Judicial Watch has continued to pay its monthly rent and otherwise satisfy its obligations to the landlord. Fitton Decl. at ¶ 7.

17.     The September 19, 2003 Severance Agreement contains no provision requiring Judicial Watch to take affirmative steps to purchase its headquarters building in Washington, D.C., following Klayman's departure.  *See* Fitton Decl., Exhibit A (Severance Agreement).

**Removal of Personal Property from Judicial Watch's Washington, D.C. Office by Klayman and Klayman & Associates ("K&A")**

18.     With respect to Klayman's personal property, the Severance Agreement contains the following clause: "Upon reasonable advance notice to Judicial Watch, Klayman shall be permitted to remove his personal effects (e.g., family photos and other similar personal property that he purchased with his personal funds), as well as a copy of his electronic 'Rolodex,' from Judicial Watch's offices."  Fitton Decl., Exhibit A (Severance Agreement at ¶ 4(B)).

19.     With respect to K&A property, the Severance Agreement contains the following clause, "Klayman agrees to remove all K&A files and boxes from Judicial Watch's premises at Klayman's expense before the Separation Date or within a reasonable time thereafter, at his expense.  Should Klayman not remove such files and boxes within sixty (60) days of the Separation Date, Judicial Watch may destroy them.  Fitton Decl., Exhibit A (Severance Agreement at ¶ 11(B)).

20.     Several weeks before Klayman's departure from Judicial Watch, two of Klayman's associates, Sandra Cobas and Jose Paredes, spent approximately two days at Judicial Watch's Washington D.C. office organizing, packing, and segregating Klayman's personal belongings and property belonging to K&A.  Prytherch Decl. at ¶ 6.

21.     On October 2, 2003, a date selected by Klayman, he and an assistant, Lissette Tortora, were provided full and unfettered access to Judicial Watch's Washington, D.C. headquarters to identify, organize, pack, and make arrangements to remove any remaining personal

items belonging to Klayman and any files and materials belonging to K&A.  Prytherch Decl. at ¶¶ 7-8.

22.    Klayman and Ms. Tortora spent at least four (4) hours at Judicial Watch's headquarters office on October 2, 2003.  Prytherch Decl. at ¶¶ 7-8.

23.    Klayman chose not to remove all personal and K&A items from the Judicial Watch office on October 2, 2006.  Instead, Klayman requested that a Judicial Watch associate complete the sorting, packing and removal of his personal and K&A effects.  Prytherch Decl. at ¶ 10.

24.    Judicial Watch informed Klayman, and Klayman agreed, that he would be billed for the expense of having a Judicial Watch associate sort, pack and remove his personal effects.  *Id.*

25.    On October 3, 2003, Judicial Watch associate Kristinn Taylor completed the sorting and packing Klayman's and K&A's personal effects, and arranged to have movers take them to Klayman on October 6, 2003.  Prytherch Decl. at ¶ 11.

26.    Klayman elected not to be present while his items were packed and moved.  *Id.*

**Removal of Personal Property from Judicial Watch's Miami, Fla. Office by Klayman and K&A**

27.    Judicial Watch's Chief of Staff Susan Prytherch advised Klayman to make arrangements to pick up his personal articles and all K&A articles from Judicial Watch's Miami, Fla. office.  Prytherch Decl. at ¶ 12.

28.    Judicial Watch personnel in Miami prepared an inventory of items in Klayman's former office in Miami, Fla.  Declaration of Irene Garcia ("Garcia Decl.") at ¶ 3.

29.    On October 3, 2003, Klayman had his representative come to the Miami, Fla. Office and identify his personal items.  Garcia Decl. at ¶ 4.

30.     At its own expense, Judicial Watch personnel packed the items Klayman's representative identified as belonging to Klayman.  Garcia Decl. at ¶¶ 3 and 4.

31.     Items of personal property, which were identified by Klayman's representative as belonging to him, were packed by Judicial Watch's Miami staff and picked up by a Klayman representative a few days after packing.  Garcia Decl. at ¶ 4.

**The Miami, Fla. Office Artwork**

32.     On September 22, 2002, Klayman used Judicial Watch's corporate American Express card to purchase the artwork for the Miami, Fla. Office from the Kennedy Gallery in Miami Beach, Fla.  Prytherch Decl. at ¶ 13.

33.     In October 2002, the Miami, Fla. Office artwork was added to Judicial Watch's general ledger as a fixed asset of the organization, and remained on Judicial Watch's general ledger at all times since.  *Id*.  The artwork is also included on Judicial Watch's fixed asset inventory.  *Id*.

34.     No records indicate that Klayman ever reimbursed the organization for the artwork or that he ever purchased the artwork from Judicial Watch and Klayman never provided any documentation to this effect.  *Id.*

**Health Insurance Premiums for Klayman/Klayman's Family**

35.     The Severance Agreement contains the following provision,

> **Health Insurance.**  In the event Klayman properly and timely elects to continue his family health insurance coverage following the termination of his employment in accordance with the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), Judicial Watch shall pay the cost of such insurance, to the same extent it paid Klayman's family health insurance coverage during his employment, for a

–6–

period of twelve (12) months following the Separation Date.  Nothing herein shall

limit Klayman's right, consistent with the term of the insurance plan and COBRA, to

continue to maintain the health insurance coverage beyond the twelve (12) month

period at his own expense.

Fitton Decl., Exhibit A (Severance Agreement at ¶ 3(A)).

36.     In addition to having paid for Klayman's health insurance during his employment,

Judicial Watch paid Klayman's health insurance coverage for the twelve month period following his

departure from the organization, as required by the Severance Agreement.  Prytherch Decl. at ¶ 14.

37.     Judicial Watch did not pay for the Klayman family's heath insurance during the

twelve-month period following Klayman's departure from Judicial Watch.  *Id*.

38.     Judicial Watch's standard compensation package includes the payment of health

insurance premiums for employees working 30 hours per week or more.  Prytherch Decl. at ¶ 15.

39.     If an employee wishes to include his/her family members on the Judicial Watch

health plan, the employee must pay the additional cost, generally via payroll deduction (unless a

different arrangement is made with the individual employee during the hiring process.  *Id*.

40.     When Klayman began drawing a salary from Judicial Watch on or about June 15,

1998, Judicial Watch did not provide health insurance coverage directly to its employees.  Instead,

coverage was provided by a Blue Cross Blue Shield policy in K&A's name, and both K&A and

Judicial Watch paid a portion of the policy premium.  Prytherch Decl. at ¶ 16.

41.     During her employment with Judicial Watch or K&A, the health insurance premium

for Klayman's wife, Stephanie Luck Klayman ("Mrs. Klayman"), was paid by the relevant

employer.  Prytherch Decl. at ¶¶17 and 18.

42.    Between June 1998 and July 1999 (while Mrs. Klayman received a paycheck from K&A), Klayman paid the health insurance premium for the remainder of his family directly to the insurance provider.  Prytherch Decl. at ¶ 17.

43.    Payroll records indicate that Mrs. Klayman became an employee of Judicial Watch in September of 1999 (although this date was later made retroactive to May 15, 1999).  Prytherch Decl. at ¶ 18.  Between September 1999 and September 2002, the health insurance premium for the remainder of the Klayman family was paid through a payroll deduction from Mrs. Klayman's semi-monthly paycheck.  *Id.*

44.    Payroll records indicate that Mrs. Klayman paid for the additional cost of family health insurance coverage until on or about September 15, 2002, when she went on extended, unpaid leave, without ever returning to work.  Prytherch Decl. at ¶ 20.  When Mrs. Klayman commenced extended leave, she was no longer eligible to have her health insurance premiums paid by Judicial Watch.  *Id.*

45.    The Klayman family policy was transferred to Klayman's name at the onset of Mrs. Klayman's extended leave.  *Id.*

46.    Due to an administrative oversight, no payroll deductions for the family's health insurance premium were made from Klayman's paycheck when the family's policy was transferred to Klayman's name.  *Id.*

47.    At all relevant times, Klayman was Judicial Watch's Treasurer in addition to being its Chairman, General Counsel, and a member of its Board of Directors.  Prytherch Decl. at ¶ 21.  As a result, Klayman bore direct fiduciary responsibility for the organization's finances and had a clear obligation to identify and correct the health insurance premium oversight.  *Id.*  Despite this

obligation, Klayman never notified Judicial Watch of its oversight in failing to deduct the health insurance premiums for his family members (excluding himself) from his paycheck. *Id*.

48.    Klayman is considered a "disqualified" employee under Internal Revenue Service regulations. Prytherch Decl. at ¶ 24. Judicial Watch treats payment of additional benefits above and beyond those to which all employees are entitled, such as payment of family health insurance coverage, as additional compensation. Prytherch Decl. at ¶ 22. Corporate minutes for the period September 2002 through September 2003 demonstrate that the Board of Directors did not authorize payment of health insurance coverage for the Klayman family to be a portion of compensation for Klayman. Prytherch Decl. at ¶ 23.

### Klayman's Right of Access to Judicial Watch Documents

49.    On or about January 12, 2006, Klayman sent an e-mail to Judicial Watch's counsel, David Barmak, Esq. (cc'ing Paul J. Orfanedes), demanding documents regarding an article written by former Judicial Watch client Peter F. Paul ("Paul"). Fitton Decl. at ¶ 8; Declaration of Paul J. Orfanedes ("Orfanedes Decl.") at ¶ 3 and Exhibit A.

50.    An attorney-client relationship had existed between Judicial Watch and Paul from approximately February 2001 to approximately April 2005, including a period of more than eighteen (18) months after Klayman had left Judicial Watch. *Id*.

51.    To my knowledge, Paul has not initiated any legal action against Judicial Watch, nor to my knowledge has Paul initiated any action legal against Klayman. *Id*.

52.    Judicial Watch had represented Paul on multiple matters for more than four years; therefore, Klayman's demand would have required Judicial Watch to search through years worth of case files, correspondence, and other records. *Id*.

53.     The documents demanded by Klayman encompassed records protected by the attorney-client privilege and the attorney work product doctrine, and, not only did Klayman fail to indicate that he would or could take any steps to protect the confidentiality of these documents, but Orfanedes was concerned that, without there being any kind of formal claim or lawsuit against Klayman, the attorney-client privilege and rules of professional conduct prohibited Judicial Watch from providing these documents to Klayman. *Id*.

54.     Klayman did not offer to provide a precise description of the documents to which he sought access or to reimburse Judicial Watch for its search and photocopying expenses. *Id*.

**Removal of Klayman as Judicial Watch's Credit Card Guarantor**

55.     At the time of Klayman's departure from Judicial Watch, Klayman was the guarantor of Judicial Watch's corporate American Express card.  Prytherch Decl. at ¶ 26.

56.     Klayman did not serve as the guarantor of any other Judicial Watch credit card. *Id*.

57.     On October 15, 2003, Judicial Watch replaced Klayman as guarantor of its American Express card with the organization's president, Thomas J. Fitton. *Id*.

58.     A letter and confirming documentation to this effect was sent to Klayman, care of his counsel, David P. Durbin, Esq., on October 17, 2003. *Id*. and Exhibit G.

**Legal Pleadings Filed by Judicial Watch in the Florida Litigation**

59.     Klayman was required by the Severance Agreement to withdraw as counsel of record from all legal proceedings in which Judicial Watch was involved as a party or as counsel for any person or entity.  Orfanedes Decl. at ¶ 4; Fitton Decl., Exhibit A (Severance Agreement at ¶ 12).

60.     After his departure from Judicial Watch, Klayman failed to take any action to withdraw from the numerous pending actions in which he had served as counsel while at Judicial

Watch.   Among these actions was *Dalrymple, et al. v. United States*, Case No. 1:03cv20588 (S.D. Fla.) ("*Dalrymple*"), a lawsuit involving the April 22, 2000 raid that forcibly removed six-year old Cuban shipwreck survivor Elian Gonzalez from the custody of his relatives in Miami, Florida. *Id.*

61.     In the spring of 2004, Klayman tried to inject himself into the *Dalrymple* matter by seeking to continue to represent one of the plaintiffs in that lawsuit, Ms. Sandra Cobas.  *Id.*

62.     Judicial Watch filed a motion to strike Klayman's appearance, citing a provision in the Severance Agreement between Judicial Watch and Klayman that required Klayman's withdrawal.  Orfanedes Decl. at ¶ 4 and Exhibit B.

Respectfully submitted,

//s// *Richard W. Driscoll*

_____

Richard W. Driscoll (436471)
DRISCOLL & SELTZER, PLLC
600 Cameron Street
Alexandria, Virginia 22314
703.340.1625 Telephone
703.997.4892 Facsimile
Email: rdriscoll@driscollseltzer.com

*Counsel for Defendants*

Dated: December 26, 2006

−11−