IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|                                          |   |
|------------------------------------------|---|
| LARRY KLAYMAN, *ET AL.*                  | \| |
|                                          | \| |
| Plaintiffs,                              | \| |
|                                          | \| |
| v.                                       | \| |
|                                          | \| |
| JUDICIAL WATCH, INC., *ET AL.*           | \| |
|                                          | \| |
| Defendants.                              | \| |

Civil Action No. 1:06-CV-00670
Honorable Colleen Kollar-Kotelly

## <u>DECLARATION OF SUSAN E. PRYTHERCH</u>

I, Susan E. Prytherch, declare as follows:

1.     My name is Susan E. Prytherch.  I am over the age of eighteen and have personal knowledge of the facts set forth below.

2.     I am the Chief of Staff for Judicial Watch, Inc. ("JW").  I was hired to serve in this capacity in October 2002 and have remained in this position since that time.

3.     Before joining JW in October 2002, I had twenty-five years of work experience, which included ten years as a management consultant with Touche Ross (now Deloitte Touche), five years as executive director of a sixty attorney law firm, and five years as executive vice president in charge of claims operations for the Manville Personal Injury Settlement Trust.  My consulting practice focused on operations improvement and organizational restructuring.  I have a bachelor's degree in mathematics from the Massachusetts Institute of Technology ("MIT") and a master's degree in management from the Sloan School of Management at MIT.

4.     As Chief of Staff for JW, I oversee the organization's financial and administrative operations, including finance, accounting, human resources, systems, facilities, storage, and business and professional insurance.  The finance and accounting operations I oversee for JW

encompass such typical functions as maintaining financial records, accounts payable, accounts receivable, payroll, preparation of monthly financial statements, monthly review and reporting of financial positions, *etc.* In addition, I work directly with JW's outside accountants and auditors, general counsel, and tax counsel to prepare and complete the organization's annual financial audit, financial statement, and tax returns.

5.      On September 19, 2003, JW entered into a severance agreement with its then-Chairman, General Counsel, and Treasurer, Larry Klayman. As Chief of Staff, I assisted with various aspects of Klayman's departure from JW.

6.      Several weeks before Klayman's departure, two of Klayman's associates, Sandra Cobas and Jose Paredes, spent approximately two days at JW's Washington D.C. office organizing, packing, and segregating Klayman's personal belongings and property belonging to K&A. At the time, I was not aware that Klayman would be leaving JW.

7.      On or about October 1, 2003, Klayman notified me that he would be coming to JW's Washington, D.C. office the following day to pick up his personal belongings and some, if not all, of the K&A files and materials.

8.      On October 2, 2003, Klayman and an assistant, Lissette Tortora, arrived at JW's Washington, D.C. office and were allowed full and unfettered access to the office to identify, organize, pack, and make arrangements to remove any remaining personal items belonging to Klayman and any files and materials belonging to K&A. Klayman and Ms. Tortora spent at least four (4) hours at JW's office that day.

9.      In addition, I asked my assistant at the time, Hillary Jenkins, to prepare an inventory of the contents of Klayman's former office and to note all items identified and

removed by Klayman and/or his assistant.  A true and correct copy of Ms. Jenkin's inventory is attached hereto as Exhibit A.

      10.    While Klayman was given every opportunity to identify, organize, box, and remove any and all of his personal property and any and all K&A files and materials from JW's office on October 2, 2003, he requested that JW make one of its employees, Kristinn Taylor, available the following day, October 3, 2003, to finish organizing, boxing, and preparing these items to be removed from the office.  When I told Klayman that JW would have to bill him for Mr. Taylor's time and related expenses, including supplies, Klayman stated that he understood and agreed to this arrangement.

      11.    On October 3, 2003, Mr. Taylor spent five (5) hours organizing, boxing, and preparing Klayman's and K&A's property to be moved.  Klayman arranged for movers to pick up the boxes of Klayman's and K&A's property prepared by Mr. Taylor on October 6, 2003.  On that date, Mr. Taylor spent an additional three (3) hours supervising and helping Klayman's movers move the boxes.  Klayman chose not to be present when Mr. Taylor finished organizing, boxing, and preparing Klayman's and K&A's property to be moved, or when Klayman's movers moved the boxes from office.  When JW subsequently sent Klayman an invoice for Mr. Taylor's time and packing supplies, Klayman refused to pay it.  True and correct copies of an invoice sent to Klayman for Mr. Taylor's time, as well as Mr. Taylor's time slips documenting his work and a receipt for packing supplies are attached hereto as Exhibit B.

      12.    I also advised Klayman to contact JW personnel in Miami, Florida to make arrangements to pick up, at his convenience, any personal property he had in JW's Miami office.  It is my understanding from Irene Garcia, who works in JW's Miami office, that Klayman did so.

13.     I understand that Klayman claims certain artwork in JW's Miami office is his personal property. Judicial Watch's corporate credit card records show that Klayman charged the artwork at issue to JW's corporate American Express card on September 22, 2002 at the Kennedy Gallery in Miami Beach, Florida. In October 2002, the artwork was added to JW's general ledger as a fixed asset of the organization. It has remained on JW's general ledger at all times since then, including a period of approximately eleven months while Klayman was still employed by the organization, and it also is included on JW's fixed asset inventory. When Klayman claimed that he owned the artwork, I researched the matter and determined that JW has no records indicating that Klayman ever reimbursed the organization for the artwork or that he ever purchased the artwork from JW. Nor has Klayman ever provided any documentation to this effect. True and correct copies of JW's American Express statement for the period covering September 22, 2002 and JW's general ledger entry identifying the artwork as a JW fixed asset as of October 22, 2002 are attached hereto as Exhibit C.

14.     While Klayman was employed by JW, the organization paid for Klayman's individual health insurance coverage. In addition, JW also paid Klayman's individual health insurance coverage for a twelve month period following his departure from the organization. JW did not pay for health insurance coverage for Klayman's family during this same twelve month period, however.

15.     As part of its standard compensation package, JW pays the premium for individual health insurance coverage for employees who work at least thirty (30) hours per week. A JW employee also may elect to purchase family coverage under JW's health insurance policy, in which case the employee pays the difference between the cost of individual coverage and the

additional cost of family coverage. This typically is done by a payroll deduction from the employee's semi-monthly paychecks. On occasion, JW has paid the additional cost of family coverage for some employees, but, in the limited number of instances in which this has occurred, it was negotiated when the employee was hired and is documented in the employee's offer letter.

16.     According to JW's payroll records, Klayman began drawing a salary from JW on or about June 15, 1998. According to JW's records, at that time JW did not provide health insurance coverage to its employees directly. Rather, coverage was provided by a Blue Cross Blue Shield policy in K&A's name, and both K&A and JW paid a portion of the policy premium.

17.     JW's records show that Klayman elected to have his family covered under the K&A policy, and, as a result, Klayman paid the additional cost of covering his family under the K&A health insurance policy by writing a check each month made payable directly to the carrier. As Klayman's wife, Stephanie Luck Klayman, was a K&A employee, she also was entitled to individual health insurance coverage. Consequently, JW's records show that Klayman paid the difference between the cost of individual health insurance coverage for himself and his wife and the additional cost of family health insurance coverage for the period from June 1998 until July 1999. JW has no record of payment by the Klaymans in August 1999. True and correct copies of Klayman's checks to Blue Cross Blue Shield of the National Capital Area ("BCBSNC") for the period from June 1998 to July 1999 are attached hereto as Exhibit D.

18.     According to JW's payroll records, in September 1999, Klayman's wife began drawing a salary from JW, although this was later made retroactive to May 15, 1999. Also in September 1999, the Klaymans began paying the additional cost of family health insurance

coverage through a payroll deduction from Mrs. Klayman's semi-monthly paycheck rather than by check payable to the carrier. A true and correct copy of an August 16, 1999 memorandum to Mrs. Klayman's payroll file to this effect is attached hereto as Exhibit E.

19.    According to JW's records, in May 2000, Judicial Watch began providing health insurance coverage to its employees directly through a policy in its own name rather than through a policy in K&A's name. Mrs. Klayman's payroll records show that she continued to pay the additional cost of family health insurance coverage through a payroll deduction from her semi-monthly paycheck until on or about September 15, 2002, when she went on extended, unpaid leave. She subsequently resigned from Judicial Watch without ever returning to work. The increasing amounts of the deductions from Mrs. Klayman's semi-monthly payroll checks reflect increases in the cost of the premium over time. True and correct copies of Mrs. Klayman's payroll stubs for the period from September 15, 1999 through September 15, 2002, each of which shows a deduction for "HEALTH," are attached hereto as Exhibit F.

20.    After Mrs. Klayman went on extended, unpaid leave in September 2002, she was no longer eligible for individual health insurance coverage paid by JW, nor was she eligible to purchase family health insurance coverage for her family under JW's health insurance policy. As a JW employee, however, Klayman was entitled to purchase such coverage, and, as a result, the Klaymans' family health insurance coverage was transferred from Mrs. Klayman's name to Klayman's name. Due to an administrative oversight, however, no corresponding payroll deduction was made from Klayman semi-monthly paycheck to pay the additional cost of family health insurance coverage. This oversight continued until Klayman's resignation on September 19, 2003, a period of approximately one year.

21.      During this time period, Klayman was JW's Treasurer in addition to being its

Chairman, General Counsel, and a member of its Board of Directors. Klayman bore direct

fiduciary responsibility for the organization's finances and had a clear obligation to identify and

correct this oversight. Nonetheless, I can find no record that Klayman took any steps to remedy

this oversight.

22.      In addition, compensation of JW's officers has historically been approved by the

organization's Board of Directors and reflected in the organization's corporate minutes. The

organization also has historically treated payment of additional benefits above and beyond those

to which all employees are entitled, such as payment of family health insurance coverage, as

additional compensation. Consequently, if JW intended to pay for Klayman's family heath

insurance coverage, this additional compensation would have been reflected in the organization's

corporate minutes.

23.      I have reviewed JW's corporate minutes for the period from September 2002

through September 2003, and there are no corporate minutes demonstrating that the

organization's Board of Directors ever authorized or approved payment of family health

insurance coverage for Klayman. In addition, there is no record of the subject ever being raised

by Klayman. I also researched and reviewed the relevant files where such records would likely

be kept, and I can find no other documentation demonstrating that JW ever authorized or

approved payment of family health insurance coverage for Klayman.

24.      Moreover, I am generally familiar with Internal Revenue Service regulations

governing compensation of officers, directors, and other highly compensated employees, which

included Klayman at the time he was employed at JW, and it is my understanding that, under

these regulations, Klayman was considered a "disqualified" employee. It also is my understanding that, as a result of Klayman being considered a "disqualified" employee, any non-standard benefits or other special compensation arrangement received by Klayman had to be documented and approved by the Board of Directors. Again, after researching the matter, I was not able to find any documentation demonstrating that JW's Board of Directors ever approved payment of family health insurance coverage for Klayman.

25.    In the few limited instances in which JW has paid for an employee's family health insurance coverage, this additional, negotiated coverage was treated as a taxable benefit to the employee and was reflected in both the employee's payroll withholdings and his or her W-2 statements. In Klayman's case, Klayman's payroll records do not evidence that any additional taxes were withheld for family health insurance coverage, nor was the coverage reflected on any of Klayman's W-2 statements.

26.    At the time of Klayman's departure from JW, Klayman had served as guarantor of JW's corporate American Express card. Klayman did not serve as the guarantor of any other JW credit card. On October 15, 2003, JW replaced Klayman as guarantor of its American Express card with the organization's president, Thomas J. Fitton. A letter and confirming documentation to this effect was sent to Klayman, care of his counsel, David P. Durbin, Esq., on October 17, 2003. A true and correct copy of the October 17, 2003 letter and confirming documentation is attached hereto as Exhibit G.

I HEREBY DECLARE under penalty of perjury that the foregoing is true and correct. Executed on this 14 day of December, 2006 in Washington, D.C.

Susan E. Prytherch

## EXHIBIT A

October 1, 2003

<u>List of Items in Larry's Office</u>

| # | ITEM DESCRIPTION | TAKEN |
|---|---|---|
| 1 | Lg. Black Leather Couch | |
| 3 | Hanging, Framed pictures of Larry with Kids by Dan Smith | ✓ |
| 1 | Luminaire glass and metal bookshelf with doors | |
| 2 | Fake flowers in vases (lavender phalenopsis) | |
| 3 | Fake flowers in vases (red/orange gerbera) | |
| 1 | Shiny white bottle | |
| 4 | Federal Reporter reference books | ✓ |
| 3 | Light Spring vases (org-blue-pink) | |
| 1 | Emory alumni directory | ✓ |
| 9 | Various political/current event books | ✓ |
| 1 | Small framed photo of the kids | ✓ |
| 1 | Tall purple vase | |
| 9 | Various political/current event books | ✓ |
| 1 | Large blue vase | |
| 2 | Hanging, framed pictures of Isabelle | ✓ |
| 1 | Large Duke picture book | ✓ |
| 1 | Large Miami picture book | ✓ |
| 1 | "Gods and Generals" book | ✓ |
| 1 | Small, purple LSA glass accent | |
| 1 | Dried brown floral arrangement with vase | ✓ |
| 8 | Long stemmed fake flowers | |
| 1 | Large purple LSA glass accent | |
| 1 | Luminaire umbrella stand | |
| 1 | Toshiba TV/DVD/VCR combination system w/remote | |
| 1 | Echostar Dish w/remote | |
| 1 | Talis wall clock | |
| 5 | Black Leather guest chairs | |
| 1 | Red, White and Blue floor rug | |
| 1 | Large Luminaire desk and workspace | |
| 1 | Lexon stapler | |
| 1 | Helit Rolodex box | |
| 1 | Helit medium box | |
| 1 | Helit small box | |
| 1 | Box stationary | ✓ |
| 1 | Helit trash can | |
| 2 | Helit square pen holders | |
| 1 | Lexon envelope opener | |
| 1 | Lexon pair of scissors | |
| 1 | Lexon ruler | |

| | | |
|---|---|---|
| 1 | Metal tray with calculator and tape | |
| 1 | Cross pen | ✓ |
| 1 | Deck of Hillary cards | ✓ |
| 2 | Helit paper organizer tiers | |
| 1 | HP printer | |
| 1 | Black Leather office chair | |
| 1 | Clear Plastic chair mat | |
| 1 | Black Plastic Trashcan | |
| 1 | Black Lap Top Case | |
| 1 | Large Luminaire bookcase and shelves | |
| 1 | Sony CD player with remote | |
| 1 | White fake flower arrangement with vase | |
| 1 | Red LSA glass accent vase | |
| 1 | Framed photograph of Larry dancing | ✓ |
| 3 | Purple LSA glass accent vases | |
| 3 | Blue LSA glass accent vases | |
| 1 | Framed, small photograph of Larry and kids | ✓ |
| 1 | USS Reagan hat | ✓ |
| 1 | Deluxe "American duck" | ✓ |
| 1 | Iittala serving tray | |
| 2 | Iittala glass cups on tray | |
| 1 | Glass water pitcher on tray | |
| 2 | Small glass cups on tray | |
| 1 | Luminaire coat rack | |
| 1 | Lacquered American Flag w/ certificate | |
| 1 | Luminaire glass table | |
| 2 | Judicial Watch black coasters | |
| 1 | Fake purple tulips and vase | |
| 2 | Religious books | ✓ |

#17 10/3/03

**EXHIBIT B**



# Judicial Watch
### *Because no one is above the law!*

## INVOICE #001

To:     Larry Klayman
        c/o  David P. Durbin
        Jordan Coyne & Savits, L.L.P
        1100 Connecticut Avenue, N.W.
        Washington, DC 20036

**Re:  Assisting LEK in his office move**

Since he would not be in DC when the movers arrived, LEK requested JW staff support
to tape boxes and supervise movers.  In addition, LEK asked for supplies.

| | | |
|---|---|---|
| K. Taylor – Prepare boxes for movers | 5 Hours | $105.00 |
| K. Taylor – Assist movers – supervision, doors and elevators | 3 Hours | 63.00 |
| Packing Materials | | $29.49 |

**Total  Due to  Judicial Watch, Inc.**                                   **$197.49**

10/5/22

CLIENT __001 - LEK Posters/K&A__ MATTER: _____

FILE NO. _____

TIME __11am__ PHONE NO. _____
FROM __6pm__ 5hrs.
TOTAL _____

REMARKS

Preparing Boxes for Movers

HOURS

☐ TELEPHONE    $ _____
☐ INTERVIEW    $ _____
☐ DICTATION    $ _____
☐ CONSULTATION    $ _____
☐ CONFERENCE    $ _____
☐ RESEARCH    $ _____
☐ APPEARANCE    $ _____
☐ CLERICAL    $ _____
☐ TRAVEL    $ _____

DISBURSEMENTS    TOTAL $ _____

BY: __K. Tyler__    BILL ☐    $ _____

---

10/6/22

CLIENT __001 - LEK Posters/K&A__ MATTER: _____

FILE NO. _____

TIME __11am__ 2pm  3hrs PHONE NO. _____
FROM _____
TO _____
TOTAL _____

REMARKS

Supervised/helped movers w/ boxes

HOURS

☐ TELEPHONE    $ _____
☐ INTERVIEW    $ _____
☐ DICTATION    $ _____
☐ CONSULTATION    $ _____
☐ CONFERENCE    $ _____
☐ RESEARCH    $ _____
☐ APPEARANCE    $ _____
☐ CLERICAL    $ _____
☐ TRAVEL    $ _____
☐    $ _____

DISBURSEMENTS    TOTAL $ _____

BY: __K. Tyler__    BILL ☐    $ _____

# Joe Ragan's Coffee

BLUE: CUSTOMER
CANARY, PINK: OFFIC

ACCOUNT:  JUDICIAL
DATE: 10/07/03
TIME: 11:00:26

**BOS** Beverley Office Supply

**COS** Colonial Office Supply

CHARGE    INVOIC
OP  617162-
PAGE:

PHONE: (800) 368-0808 • FAX: (703) 569-7634



SOLD TO: JUDICIAL WATCH
ATTN:  KEVIN
501 SCHOOL ST. SW  5TH FL
WASHINGTON        DC 20024

SHIP TO: ****CREDIT CARD
***NO SUBS ON PAPER****

WASHINGTON        DC 20024

### SUBJECT TO TERMS AND CONDITIONS ON REVERSE SIDE

| TERMS | P.O. NUMBER | DEPARTMENT | REQ DATE | ORDER TAKER |
|---|---|---|---|---|
| NET 30 DAYS | NONE | | 10/07/03 | CT1 |

| JM | SHIPPING INSTRUCTIONS | PHONE NUMBER | ROUTE |
|---|---|---|---|
| JOE MAZZELLO | DELIVERIES 9AM-6PM | 202-646-5172 | MON |

| ENTRY | ITEM NUMBER/ DESCRIPTION | BIN | UOM | ORDERED | SHIPPED | BACK ORDERED |
|---|---|---|---|---|---|---|
| | 5TH FLOOR | | | | | |
| | Who Called : JM/D | | | | | |
| 4 | 4    (RL)  3750260CR | | | N  S | 5.033 | 20.13 |
| | TAPE,BOX SEAL,2X55YD,CR | | | | | |
| | MFG: MMM | | | | | |
| 12 | 12   (EA)  35668 | | | N  S | .780 | 9.36 |
| | NOTE,STICK-IT,3X3,YW1C/PD | | | | | |
| | MFG: UNV | | | | | |

*LEK - Personal*

*-moving supplies*

*PACKING SLIP*

SPO.
SPO.

Alfred
Alfred

Sam
Sam

Total Invoice Discount Off List Price Is $        9.83

SUB-TOTAL        29.

DATE SHIPPED: _____        SHIPPED BY: _____        DELIVERED  SALES TAX
**TOTAL        29.

DATE RECEIVED: _____        RECEIVED BY: _____        # PKGS:

**EXHIBIT C**

AMERICAN
EXPRESS

Prepared For
LARRY KLAYMAN
JUDICIAL WATCH INC

Account Number    Page 3 of 62

Closing Date
October 17, 2002

## Transactions Continued

Amount $

**September 20, 2002**                                                        228.50    6
MACNAIR TRAVEL MGMT  WASHINGTON  DC
MIDWEST EXPRESS AIRLINES
From:                To:                    Carrier:    Class:
KANSAS CITY MO-INT   SAN ANTONIO TX         YX          WA
Ticket Number: 45373042318343        Date of Departure: 09/26
Passenger Name: DALY/J
Document Type: PASSENGER TICKET

**September 20, 2002**                                                         22.73    7
UREST @ SKYLINE   MIAMI    FL
FOOD/BEV
Reference: 028427909

**September 22, 2002**                                                      1,700.00    8
KENNEDY GALLERY    MIAMI BEACH    FL
PHOTO/SUPPLIES
Reference: 310113097

**September 23, 2002**                                                         53.16    9
INDIGO RSTRNT INTERC305-5771000    FL
LODGING
FOOD/BEV                        53.16
Reference: 400112084

**September 25, 2002**                                                        171.50    10
JETBLUE AIRWAYS SALT LAKE CITY UT  269
AIRLINE CHARGE
From:                To:                    Carrier:    Class:
DULLES ARPT DC       FORT LAUDERDALE FL     B6          R1
                     DULLES ARPT DC
Ticket Number: 99900060188990        Date of Departure: 10/01
Passenger Name: KLAYMAN/LARRY
Document Type: PASSENGER TICKET

**September 26, 2002**                                                         35.00    11
MACNAIR TRAVEL MGMT  WASHINGTON  DC
TRAVEL AGENCY SERVICE FEE
Routing Details Not Available
Ticket Number: 89050561684335
Passenger Name: DALY/J
Document Type: MISC CHARGE ORDER/PREPAID TICKET AUTHORITY

**September 26, 2002**                                                        505.11    12
MACNAIR TRAVEL MGMT  WASHINGTON  DC
AMERICAN AIRLINES
From:                To:                    Carrier:    Class:
KANSAS CITY MO-INT   DALLAS/FT WORTH TX     AA          Y2
                     SAN ANTONIO TX         AA          Y2
Ticket Number: 00173054227894        Date of Departure: 09/26
Passenger Name: DALY/J
Document Type: PASSENGER TICKET

**September 26, 2002**                                                         32.95    13
HOUSTON'S RESTAURANTCORAL GABLES    FL
FOOD/BEVERAGE
FOOD/BEV                        27.95
TIP                              5.00
Reference:    39

**September 26, 2002**                                                          2.00    14
SMARTE CARTE IADAL  WASHINGTON     DC
PARKING LOT/GARAGE
Reference: 269010007   Roc Number: 000269

**September 26, 2002**                                                          5.46    15
FT LAUD/HOLLYWD INTLFT LAUDERDALE    FL
FOOD/BEV
Reference: 027166976

**September 27, 2002**                                                        118.65    16
WYNDHAM HOTEL F/B  OVERLAND PARK    KS
FOOD/BEV
Reference: 027159563    Roc Number: 189872

*Continued on reverse* ⇨

Date: Monday, December 04, 2006
Time: 12:45PM
User: TGRAY

Page: 1 of 2
Report: 01620.rpt
Company: JW

# Judicial Watch
## Detail General Ledger - Standard
Periods: 09-02 Through 12-02 As of: 12/4/2006 Ledger ID:    ACTUAL

**Acct: 1430    Furniture & Fixtures**

| Jrnl Type | Tran Type | Bat Nbr | Per Ent | Reference Nbr | Tran Date | Tran Description | Beginning Balance | Debit Amount | Credit Amount | Ending Balance |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | **Sub:  01-0-000** | | Balance Sheet - DC | | |
| ^ AP | VO | 004020 | 08-02 | 006738 | 10/9/2002 | AMER34002 Miami Office Furnitur | | 10,378.50 | 0.00 | |
| AP | VO | 004333 | 09-02 | 007236 | 9/17/2002 | AMER34002 Glass Logo-DC Off-Se | | 1,700.00 | 0.00 | |
| AP | VO | 004333 | 09-02 | 007236 | 9/17/2002 | AMER34002 Glass Logo-FL Off-Se | | 937.50 | 0.00 | |
| | | | | | | **Period  09-02    Total** | **319,669.79** | **13,016.00** | **0.00** | **332,685.79** |
| ^ AP | AD | 004021 | 08-02 | 006747 | 10/9/2002 | CHASE adj ref #006726 | | 0.00 | 10,378.50 | |
| ^ AP | AD | 004021 | 08-02 | 006747 | 10/9/2002 | CHASE adj ref #006726 | | 0.00 | 13,159.50 | |
| ^ GJ | GL | 000669 | 12-02 | AMX-RCLS | 10/31/2002 | DG-LUMINAIRE CORAL GABLES | | 646.36 | 0.00 | |
| GJ | GL | 000669 | 12-02 | AMX-RCLS | 10/31/2002 | LK-HERTZ FURNITURE SYSTMA | | 1,638.00 | 0.00 | |
| ^ AP | VO | 004016 | 08-02 | 006726 | 10/9/2002 | CHASE Office Funiture (Luminar | | 10,378.50 | 0.00 | |
| ^ AP | VO | 004016 | 08-02 | 006726 | 10/9/2002 | CHASE Office Funiture (M2L In | | 13,159.50 | 0.00 | |
| ^ AP | AD | 004021 | 08-02 | 006741 | 10/9/2002 | AMER34002 Office Furniture (M2 | | 13,159.50 | 0.00 | |
| ^ AP | VO | 004537 | 10-02 | 007514 | 10/25/2002 | AMER34002 Kennedy Gallery-9/22 | | 1,700.00 | 0.00 | |
| | | | | | | **Period  10-02    Total** | **332,685.79** | **40,681.86** | **23,538.00** | **349,829.65** |
| ^ GJ | GL | 000670 | 12-02 | AMX-RCLS | 11/30/2002 | DG-LUMINAIRE CORAL GABLES | | 614.00 | 0.00 | |
| ^ GJ | GL | 000670 | 12-02 | AMX-RCLS | 11/30/2002 | DG-M2L INC NEW YORK NY-03 | | 912.50 | 0.00 | |
| ^ GJ | GL | 000670 | 12-02 | AMX-RCLS | 11/30/2002 | SC-CASA MANOLO INC MIAMI | | 1,550.00 | 0.00 | |
| ^ AP | VO | 004254 | 09-02 | 007091 | 11/11/2002 | M2L 8 Duna Chairs (7 red & 1 b | | 3,949.50 | 0.00 | |
| | | | | | | **Period  11-02    Total** | **349,829.65** | **7,026.00** | **0.00** | **356,855.65** |
| GJ | GL | 000671 | 12-02 | AMX-RCLS | 12/31/2002 | DG-M2L INC NEW YORK NY-03 | | 3,037.00 | 0.00 | |
| GJ | GL | 000671 | 12-02 | AMX-RCLS | 12/31/2002 | SC-LUMINAIRE CORAL GABLES | | 2,364.00 | 0.00 | |
| GJ | GL | 000671 | 12-02 | AMX-RCLS | 12/31/2002 | SC-LUMINAIRE CORAL GABLES | | 10,378.50 | 0.00 | |
| | | | | | | **Period  12-02    Total** | **356,855.65** | **15,779.50** | **0.00** | **372,635.15** |
| | | | | | | **Sub  01-0-000      Total** | **319,669.79** | **76,503.36** | **23,538.00** | **372,635.15** |
| | | | | | | **Sub:  01-6-818** | | Administrative-General & Admin | | |
| | | | | | | **Period  09-02    Total** | **0.00** | **0.00** | **0.00** | **0.00** |
| | | | | | | **Period  10-02    Total** | **0.00** | **0.00** | **0.00** | **0.00** |
| ^ AP | VO | 004355 | 09-02 | 007264 | 11/25/2002 | AMER34002 Furnishings/Accessor | | 24,923.00 | 0.00 | |
| | | | | | | **Period  11-02    Total** | **0.00** | **24,923.00** | **0.00** | **24,923.00** |
| AP | VO | 004677 | 12-02 | 007790 | 1/17/2003 | AMER34002 Furniture | | 26,449.50 | 0.00 | |
| | | | | | | **Period  12-02    Total** | **24,923.00** | **26,449.50** | **0.00** | **51,372.50** |
| | | | | | | **Sub  01-6-818      Total** | **0.00** | **51,372.50** | **0.00** | **51,372.50** |

**Acct: 1430    Furniture & Fixtures**

Date: Monday, December 04, 2006
Time: 12:45PM
User: TGRAY

Page: 2 of 2
Report: 01620.rpt
Company: JW

# Judicial Watch
## Detail General Ledger - Standard
Periods: 09-02 Through 12-02 As of: 12/4/2006 Ledger ID:    ACTUAL

| Jrnl Type | Tran Type | Bat Nbr | Per Ent | Reference Nbr | Tran Date | Tran Description | Beginning Balance | Debit Amount | Credit Amount | Ending Balance |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Acct  1430 | | | | | |
| | | | | | | Total | 319,669.79 | 127,875.86 | 23,538.00 | 424,007.65 |
| | | | | | | Assets | | | | |
| | | | | | | Total | 319,669.79 | 127,875.86 | 23,538.00 | 424,007.65 |

< Indicates the period entered is different from the period posted.
* Indicates there are no GL transactions to support summarized AcctHist period activity.
** Indicates the calculated period ending balance does not match the YTD balance on AcctHist.
*** Indicates the calculated account balance does not match the account balance on AcctHist.
# Indicates Assets do not match Liabilities or Net Income does not equal the YTD Net Income account.

**JUDICIAL WATCH, INC.**
**Detail FIXED ASSETS & Depreciation Expense**

| Type | Year | Date | Num | Memo | Life | Amount | 1997 1997 DEPR | YE 1997 YE 97 BASIS | 1998 1998 DEPR | YE 1998 YE 98 BASIS | 1999 1999 DEPR | YE 1999 YE 99 BASIS | 2000 2000 DEPR | YE 2000 YE 00 BASIS | 2001 2001 DEPR | YE 2001 YE 01 BASIS | 2002 2002 DEPR | YE 2002 YE 02 BASIS | 2003 2003 DEPR | YE 2003 YE 03 BASIS | 2004 2004 DEPR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FFE | 2002 | 10/25/2002 | | Kennedy Gallery | 5 | 1,700.00 | | | | | | | | | | | 56.67 | 1,643.33 | 340.00 | 1,303.33 | 340.00 |

12/4/2006 12:29 PM

**JUDICIAL WATCH, INC.**
Detail FIXED ASSETS & Depreciation Expense

| Type Year | Date | Num | Memo | | Life | YE 2004 YE '04 BASIS | 2005 2005 DEPR | YE 2005 YE '05 BASIS | 2006 2006 DEPR | YE 2006 YE '06 BASIS | 2007 2007 DEPR | YE 2007 YE '07 BASIS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FRE  2002 | 10/25/2002 | | Kennedy Gallery | 5 | | 963.33 | 340.00 | 623.33 | 340.00 | 283.33 | 283.33 | |

**<u>EXHIBIT D</u>**

**LARRY KLAYMAN**

1410

15-120/540
3011

June 18, 19 98

Pay to
the order of   BC BS NCA                    $ 122.00

One hundred twenty two dollars + 00/100   Dollars

**NationsBank** | U S A
Official Sponsor 1994/1996 U.S. Olympic Teams

NationsBank, N.A.
Washington, D.C.

For   CKO 20100

⑆054001204⑆ ⑈0006510337⑈   1410

1428

**LARRY KLAYMAN**

15-120/540
3011

7/16 19 98

Pay to
the order of _____ BCBSNCA _____ | $ 122.00

One hundred twenty two + 00/100 _____ Dollars

**NationsBank** | U S A ⚬⚬⚬⚬⚬

Official Sponsor 1994/1996 U.S. Olympic Teams

NationsBank, N.A.
Washington, D.C.

For _____ CC020100

⑆054001204⑆ 0006510337⑈ 1428

©Clarke American

LARRY KLAYMAN

1451

15-120/540
3011

8/20 19 98

Pay to
the order of   BCBS                                    $ 122.00

One hundred twenty two dollars + 00/100   Dollars

**NationsBank** | U.S.A
Official Sponsor 1994/1996 U.S. Olympic Teams

NationsBank, N.A.
Washington, D.C.

For  CK020100

⑈054004204⑈ 000650337⑈  1451

1473

9/18 19 98

15-120/540
3011

Pay to
the order of ___BCBSNCA___ $ _122.00_

_One hundred twenty two dollars_ 00/100 Dollars

**NationsBank** | U S A ☉☉☉

Official Sponsor 1994/1996 U.S. Olympic Teams

NationsBank, N.A.
Washington, D.C.

For ___Group CK02010)___

⑆054001204⑆ 000651033 7⑈ / 1473

©Clarke American

LARRY KLAYMAN

1494

15-120/540
3011

10/21 19 98

Pay to
the order of _Blue Cross Blue Shield ANCA_ | $ 122.00

_One hundred twenty-two dollars + 00/100_ Dollars

**NationsBank** U S A
Official Sponsor 1994/1996 U.S. Olympic Teams
NationsBank, N.A.
Washington, D.C.

For _____

⑈054001204⑈ 000651033 7⑈ / 1494

©Clarke American

Case 1:06-cv-00670-CKK-AK Document 98-8 Filed 06/20/2008 Page 29 of 36

**LARRY KLAYMAN**

DATE 12/18/98

15-120/540 DC
0011

Pay to the
Order of   Blue Cross Blue Shield of MD   $ 360.05

Three hundred sixty dollars + 05/100   Dollars

**NationsBank**
NationsBank, N.A.

ACH R/T 054001204

For   CK02D100

⑈054001204⑈ 00000651033 7⑈ 1545

© Clarke American

**LARRY KLAYMAN**

1570

DATE 1/26/99

15-120/540 DC
0011

Pay to the
Order of *BCBSNCA*

$ 132.00

One hundred twenty two 00/001 _____ Dollars

**NationsBank**

NationsBank, N.A.

ACH R/T 054001204

For _____

©Clarke American

⑈054001204⑈ 000006510337⑈ 4570

MP

DATE 3/1/99

15—

RRY KLAYMAN

$ 122.0

Pay to the
Order of *BCBNA*

*hundred twey-two 00/00/* _____ Dollars

**NationsBank**
NationsBank, N.A.

ACH R/T 054001204

For *Klayman*

1:054001204: 0000065103371: 1587

© Clarke American

1602

**LARRY KLAYMAN**

DATE 3/17/99

15-120/540 DC
0011

Pay to the
Order of    BCBSNCA    $ 122.00

One hundred twenty two + 00/100 Dollars

**NationsBank**
NationsBank, N.A.
ACH R/T 054001204

For _____

⑆054001204⑆ 000006510337⑈ 1602

©Clarke American

LARRY KLAYMAN

1621

DATE 4/12/99

15-120/540 DC
0011

Pay to the
Order of _BCBDNCA_____ $ 147.00

One hundred forty seven + co/100 Dollars

**NationsBank®**
NationsBank, N.A.

ACH R/T 054001204

For health insurance

⑆054001204⑆ 0000065103371⑈ 1621

**LARRY E. KLAYMAN**
1080 WISCONSIN AVE. NW.
APT. 501
WASHINGTON, DC 20007

630

15-122/540
00224

5/21 19 99

PAY TO THE
ORDER OF Blue Cross                    $ 147.00

One hundred forty seven 00/100                    DOLLARS

First Union National Bank
of Washington, D.C.
Washington, D.C.

**FIRST UNION**

**BENEFIT BANKING**

FOR Klayman Ins. CK28101

⑆054001220⑆ 1030000154802⑈ 0630

© Clarke American W

1743

**LARRY KLAYMAN**

DATE 6/20/99

15-120/540 DC
0011

Pay to the
Order of _____ BCBJNCA _____ $ 147.00

One Hundred Forty Seven & 00/100 _____ Dollars

Security features
are included.
Details on back.

**NationsBank**

NationsBank, N.A.
ACH R/T 054001204    Klayman Ins.
For CKO20100

MP

1:054001204: 00000651033 7" /1743

©Clarke American

**LARRY E. KLAYMAN**
1080 WISCONSIN AVE. NW.
APT. 501
WASHINGTON, DC 20007

633

15-122/540
00224

7/14 19 99

PAY TO THE ORDER OF _BCBSNCA_ $ 147.00

_One hundred forty seven + 00/100_ ———— DOLLARS

**First Union National Bank** of Washington, D.C.
Washington, D.C.

**FIRST UNION**

**BENEFIT BANKING**

FOR _CKO2010 August_

⑈054001220⑈ ⑈03000015480 2⑈ 0633

© Clarke American W