IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

———————————————————
|
LARRY KLAYMAN, *ET AL.*                              |
|
Plaintiffs,                     |
|
v.                                                   |        Civil Action No. 1:06-CV-00670
|        Honorable Colleen Kollar-Kotelly
JUDICIAL WATCH, INC., *ET AL.*                      |
|
Defendants.                     |
———————————————————|

**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF THEIR
MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO
PLAINTIFF KLAYMAN'S BREACH OF CONTRACT CLAIMS**

Defendants Judicial Watch, Inc., Thomas J. Fitton, Paul J. Orfanedes and
Christopher J. Farrell, by undersigned counsel, respectfully submit this Reply
Memorandum in further support of their motions for summary judgment, requesting this
Court to dismiss Counts Six, Seven and Eight of Plaintiff's Second Amended Complaint.

**ARGUMENT**

**I.    DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT IS
APPROPRIATE**

Ignoring Rule 56, Plaintiff Larry Klayman ("Klayman") argues that Defendants'
motion for partial summary judgment should be denied because he was not afforded
adequate time for discovery.  However, Rule 56(b) expressly provides that a party against
whom a claim is asserted may move for summary judgment *at any time*. Fed. R. Civ. P.
56(b) (emphasis added).   "Even if the parties have not commenced discovery, if the
plaintiff has failed to present any genuine issues of material facts, then the defendant's
motion for summary judgment may be granted." *Barry v. United States Capitol Guide
Bd.*, 2005 U.S. Dist. LEXIS 8381 (citing *Raymond v. United States Capitol Police Bd.*,

157 F. Supp. 2d 50, 55 (D.D.C. 2001)).    This case presents just such an instance. Klayman's failure to establish any genuine issues of material fact entitles Defendants to summary judgment.

Contrary to Klayman's protests, he has had ample opportunity to conduct discovery.  Upon the filing of Defendants' Answers, Klayman was entitled to proceed with discovery, but no discovery efforts were initiated.  Instead, Klayman devoted his time and effort to fundraising activities touting the need for funds to prosecute this lawsuit.  However, Klayman's counsel was fully aware of the ability to proceed with discovery and on November 30, 2006, initially contacted the undersigned to schedule a Rule 26(f) conference.  See November 30, 2006, email from Daniel J. Dugan, attached hereto as Exhibit A.  By agreement, the conference was set for December 15, 2006, but Klayman's counsel encountered scheduling difficulties and requested new dates, which were provided to Plaintiff on December 15, 2006.  Due to scheduling difficulties, Plaintiff requested that the conference be postponed until after January 15, 2007 due to holidays and intervening vacations.  Klayman did not raise the issue of a Rule 26(f) conference again until February 21, 2007.

Plaintiff's argument that the motion for partial summary judgment is premature is disingenuous because Klayman has been dilatory in initiating the process.  If discovery was so vital to the present matter, Plaintiff would have been more diligent in its pursuit. Klayman has, after all, made considerable time for publicizing the case and using it as a fundraising vehicle.  See January 2, 2007, Klayman Fundraising letter, attached hereto as Exhibit B.

II.     **THE COURT SHOULD GRANT SUMMARY JUDGMENT AS TO COUNT SIX**

This Court's January 17, 2007, Memorandum Opinion and Order regarding Count VI for rescission was, pursuant to Rule 12(b)(6), limited to consideration of the allegations in a light most favorable to Klayman.   Therefore, the Court was only permitted to rule that the allegations as framed by Klayman stated a cause of action for rescission based solely on the four corners of Klayman's pleading.   Evidence and materials outside the four corners of the pleading, such as the Severance Agreement, were not considered by the Court.[1]   Defendants' motion for partial summary judgment now places the Severance Agreement squarely before the Court to demonstrate that Klayman, a self-described legal expert, signed the document without any reference to the alleged representations that he now contends justify rescission.

A summary judgment motion places the issue of Count VI before the Court in an entirely different procedural posture.   The Severance Agreement is now before the Court, which may consider the merger language.   Klayman does not, as a factual matter, dispute that the Severance Agreement is what Defendants say it is.   *See* Declaration of Larry Klayman, ¶ 10.   As a result, the only issue raised by Defendants' summary judgment motion with respect to Count VI is a purely legal issue:  whether the incorporation clause contained in the Severance Agreement prevents Klayman from alleging that he was falsely induced into signing the agreement, thereby barring his fraud in the inducement/rescission claim as a matter of law.   Severance Agreement at ¶ 26. Defendants submit that it does, and neither Klayman's legal arguments nor his purported need for discovery detract from this obvious conclusion.

---

[1]     Defendants suspect that the failure to attach the Severance Agreement to Klayman's many iterations of the Complaint was not a mistake.

Klayman's assertion that he was fraudulently induced to enter into the Severance Agreement by Defendants' alleged representations that "they would install a fitting and competent successor" is not only at odds with the undisputed fact that the agreement, which he claims to have "so carefully negotiated" to "advance Judicial Watch's interest," contains no such provision, but it also is at odds with any plain reading of the agreement's incorporation clause.[2] *Compare* Plaintiffs' (sic) Memorandum of Points and Authorities in Opposition to Defendants' Motion for Partial Summary Judgment ("Plf.'s Opp.") at 8-9, *with* Severance Agreement at ¶ 26.  No amount of discovery could change this indisputable legal conclusion.

Klayman argues that Defendants' reliance on *One-to-One Enterprises, Inc. v. Caruso*, 848 F.2d 1283 (D.C. Cir. 1983) is misplaced and offers a contradictory case, *Betz Laboratories, Inc. v. Hines*, 647 F.2d 402 (3d Cir. 1981).[3]  In *One-to-One*, the Court was presented with a case of "a party with the capacity and opportunity to read a written contract, who [has] execute[d] it, not under any emergency, and whose signature was not obtained by trick or artifice; such a party, if the parol evidence rule is to retain vitality, cannot later claim fraud in the inducement." *One-to-One Enterprises* 848 F.2d at 1287 (internal citations omitted).  In the present matter, Klayman, a self-describe legal expert (Second Amended Complaint at ¶¶ 4, 15, 18, 26, 27, 38, 39), was represented by counsel throughout the negotiation of the Severance Agreement (Declaration of Thomas J. Fitton ("Fitton Decl.") at ¶ 4; Plaintiff's Statement of Genuine Facts Materially in Dispute

---

[2]    Klayman's factual assertions are also internally inconsistent.  Klayman asserts that he was "materially induced" to leave Judicial Watch to focus on his senate campaign.  Decl. of L. Klayman at ¶ 11.  However, Klayman could not have remained at Judicial Watch, a non-partisan organization and simultaneously run as a Republican for the U.S. Senate.

[3]    Defendants note that *Betz Laboratories* is founded on Pennsylvania law, while *One-to-One Enterprises* is controlling law in the District of Columbia, which governs the parties' relationship under the Severance Agreement.

("Plaintiff's Statement") at ¶¶ 6 & 7) and makes no allegation that he was not provided with ample opportunity to read the contract or that his signature was obtained by trick or artifice. Defendants' reliance on *One-to-One* is obvious and well-placed.

It is Klayman's reliance on *Betz* that is suspect. *Betz* is a Third Circuit case from a time when Pennsylvania law was unclear as to the applicability of the parol evidence rule to a claim of fraudulent inducement. However, since 1995, "under Pennsylvania law, the parol evidence rule bars a claim of fraudulent inducement based on a prior representation if that representation is not reflected in the fully-integrated written agreement entered into by the claimant." *N. Am. Roofing & Sheet Metal Co., Inc., et al. v. Bldg. & Constr. Trades Council*, 2000 U.S. Dist. LEXIS 2040 (citing *1726 Cherry Street Partnership v. Bell Atl. Properties, Inc.*, 653 A.2d 663 (Pa. Super. Ct. 1995). Clearly, Klayman's reliance of the continued validity of *Betz* is misplaced. As a matter of law, the Court should grant summary judgment as to this particular claim.

## III.     THE COURT SHOULD GRANT SUMMARY JUDGMENT AS TO COUNT SEVEN

Klayman fails to meet the standards set forth in Rule 56(e) and Rule 56(f) of the Federal Rules of Civil Procedure. Under Rule 56(e), "[m]ere allegations or denials of the adverse party's pleading are not enough to prevent the issuance of summary judgment. The adverse party's response to the summary judgment motion must 'set forth *specific facts* showing that there is a genuine issue for trial.'" *Hunter v. Christopher*, 923 F. Supp. 5, 6 (D.D.C. 1996) (citing Fed. R. Civ. Pro. 56(e)) (emphasis added). Further, the information provided in the adverse party's affidavit must be made on personal knowledge and present facts that would be admissible in evidence at trial. Fed. R. Civ. Pro. 56(e). "While it is generally understood that when considering a motion for

summary judgment a court must draw all justifiable inferences in the non-moving party's favor and accept the nonmoving party's evidence as true, the non-moving party must establish more that 'the mere existence of a scintilla of evidence in support of the plaintiff's position'". *Simpkins v. United States*, 253 F. Supp. 2d 4, 6 (D.D.C. 2003) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  The non-moving party is "required to provide evidence that would permit a reasonable jury to find" in his favor. *Hunter* 923 F. Supp. at 6 (citing *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242 (D.C.C.1987)).

In support of his opposition, Klayman offers only his own Declaration.[4] Klayman's affidavit is almost completely void of specific facts and simply mirrors the vague denials and general allegations found in the Second Amended Complaint.  What little specificity it does offer is rooted in inadmissible hearsay.  In light of the absence of specific, admissible facts illustrating any genuine issues, it is appropriate for this Court to grant summary judgment in this matter.

Furthermore, under Rule 56(f), the non-moving party "must state by affidavit the reasons why he is unable to present the necessary opposing material."  *Bancoult v. McNamara*, 217 F.R.D. 280, 283 (D.D.C. 2003) (quoting *Cloverleaf Standardbred Owners Ass'n, Inc. v. Nat'l Bank of Washington*, 699 F.2d 1274, 1278 n.6 (D.C. Cir. 1983)).  The non-moving party bears the burden of identifying the facts to be discovered that would create a triable issue and the reasons why the party cannot produce those facts in opposition to the motion.  *Id.*, (citing *Byrd v. Envtl. Prot. Agency*, 174 F.3d 239, 248 n. 8 (D.C. Cir. 1999)).  The non-moving party must show a reasonable basis to suggest that

---

[4] Klayman also attaches the Severance Agreement (Exhibit A) and Judical Watch's Motion to Strike Larry E. Klayman's May 20, 2004 Notice of Appearance on Behalf of Plaintiff, Sandra Cobas (Exhibit B).  These Exhibits, however, go to questions of law, not fact.

discovery would reveal triable issues of fact. *Id.* "It is well settled that conclusory allegations unsupported by factual data will not create a triable issue of fact." *Id.* (quoting *Byrd*, 174 F.3d at 248 n.8). Klayman's affidavit fails to identify any discoverable facts that would create a triable issue, much less provide reasons why he cannot produce those facts in his opposition. Moreover, one would assume (or perhaps hope) that Klayman embarked on this litigation with more than just his own suspicions to support the allegations of the Second Amended Complaint.

### A.     Alleged Failure to Pay Klayman his Final Paycheck

With the Severance Agreement now properly before the Court, Klayman's "final paycheck" claim, like his fraud in the inducement/rescission claim, also presents a purely legal issue for the Court to decide. Again, Klayman does not, as a factual matter, dispute that the Severance Agreement is what Defendants say it is. Nor does Klayman even attempt to dispute that he received the full amount of the severance pay or the $200,000 non-competition payment set forth in the agreement. Klayman's Statement at ¶ 8. Thus, the only issue for the Court to decide with respect to this particular claim is whether ¶ 2 of the Severance Agreement created a legal obligation on the part of Judicial Watch to pay Klayman for his last four (4) days of employment. Judicial Watch submits that it clearly did not.

In this regard, Klayman's assertion that, in the Severance Agreement "Judicial Watch expressly promised to make 'payment [to Klaymen (sic)] for compensation through his last day of work'" is false. Plf's Opp. at 9; Declaration of Larry Klayman ("Klayman Decl.") at para. 12. This quote does not appear anywhere in the Severance Agreement. Rather, the true quote, which Defendants set forth in their motion, reads as follows: "Klayman acknowledges that he is not legally entitled to the Severance Pay or

other consideration beyond payment of compensation through his last day of work, and that the Severance Pay and other consideration being provided to him pursuant to this agreement is intended as, and is, consideration for his execution of this Agreement . . . ." Severance Agreement at ¶ 2.  It continues, "The Severance Pay and other consideration being provided to Klayman pursuant to this Agreement **is also intended to, and does, fully satisfy all amounts, if any, owed to Klayman by Judicial Watch**. . . ."  *Id*. (emphasis added).  At the beginning of this same paragraph, the Severance Agreement states, "Subject to paragraph 15 and 22, below, Judicial Watch shall pay Klayman as severance a lump sum payment equal to $400,000, from which shall be deducted all customary and legally required federal, state, and local tax and other withholdings (the 'Severance Pay')."  *Id.*  Clearly, the section of the Severance Agreement misquoted by Klayman is nothing more than an acknowledgment of the consideration paid to Klayman by Judicial Watch for his execution of the agreement.  It did not, by any plain reading, create any additional obligation on the part of Judicial Watch to pay Klayman yet more monies.

Not only does ¶ 2 expressly state that the severance pay undisputedly paid to Klayman "is intended to and does, fully satisfy all amounts, if any, owed to Klayman pursuant to this Agreement", but the conclusion that Judicial Watch does not owe Klayman any payment for his last four days of work is further confirmed by the fact that, in signing the Severance Agreement on September 19, 2003, four (4) days after Klayman undisputedly received his last regular paycheck from Judicial Watch, Klayman expressly released Judicial Watch "from any and all claims, actions, suits, damages, liabilities, losses or expense of whatever kind and nature which exist as of the date of this

Agreement, whether such claims, actions, suits, damages, liabilities, losses or expenses are known or unknown, including but not limited to any claim based on or arising under . . . any common law contract or tort claims not or hereafter recognized." Severance Agreement at ¶ 14(A). Having released Judicial Watch from any and all claims on September 19, 2003, Klayman cannot now be heard to assert that he is owed any additional salary for the period September 15-19, 2003. Again, no amount of discovery could change the outcome of this purely legal issue.

Finally, as an ancillary matter, Klayman argues that "Defendants *admit* that they still owe Klayman wages for his employment during his tenure as Chairman of Judicial Watch (Def. Br. at 7)" and that "Defendants owe an amount in excess of the $3,194.00 as *conceded* in the Motion (Def. Br. at 7)." Pl.'s Br. at 9-10 (emphasis added). To be clear, restating an allegation is not the same thing as making an admission. Such statements by Klayman are misleading and press the bounds of ethical behavior.

**B.    Alleged Failure to Take Affirmative Steps to Purchase Building or Remove Klayman as Guarantor of Judicial Watch Lease**

In their motion for summary judgment, Defendants present sworn, admissible evidence, in the form of an affidavit from Judicial Watch President Thomas J. Fitton, outlining the organization's efforts to try to have Klayman removed as personal guarantor of Judicial Watch's lease. Specifically, Fitton testified that he contacted the landlord's agent, Vanguard Realty Group ("Vanguard"), in September 2003 to discuss possible ways of removing Klayman as personal guarantor; that after a series of conversations in September and October 2003, the landlord, through Vanguard, proposed that Judicial Watch obtain a letter of credit in an amount equal to three (3) years of rent; that Judicial Watch determined that this was not commercially reasonable; and that, on October 20,

2003, he sent a letter to Vanguard asking the landlord to reconsider. Fitton Decl. at ¶ 7 and Exhibit D. Fitton also testifies that he received no response from either the landlord or Vanguard. *Id.*

Klayman does not attempt to refute any of these facts, much less do so with sworn evidence that would be admissible at trial. Rather, Klayman asserts that the landlord told him no one from Judicial Watch ever contacted the landlord. Klayman Decl. at ¶ 13. Not only would Klayman's recitation of his purported conversation with the landlord not be admissible at trial – as it constitutes classic hearsay – but it does not refute Fitton's testimony that Fitton contacted Vanguard, the landlord's management company and agent, on several occasions in September and October 2003, in an attempt to have Klayman removed as personal guarantor of the lease. Fitton never testified that he contacted the landlord directly, and Fitton's sworn testimony thus remains undisputed.

Based on his hearsay assertion, Klayman apparently has ready access to the landlord. Nevertheless, Klayman fails to explain why he could not obtain a sworn statement from the landlord with respect to the purported conversation, or that he even attempted to do so. Again, however, even a sworn declaration from the landlord stating that no one from Judicial Watch ever contacted him personally would not controvert Fitton's sworn testimony about his communications with Vanguard or the documentary evidence concerning the same. The Severance Agreement does not require Judicial Watch to contact the landlord personally, and it certainly was not unreasonable for Judicial Watch to approach the landlord's management company to discuss removing Klayman as personal guarantor of the lease.

The Court is thus faced with yet another clear issue of law. Judicial Watch described its efforts to try to remove Klayman as personal guarantor of its lease, and Klayman neither disputes Judicial Watch's sworn testimony nor presents any evidence as to why he could not do so. The only question before the Court is whether Judicial Watch's efforts satisfied its obligation to "continue to work in good faith to Klayman as guarantor." Severance Agreement at ¶ 9(B). Judicial Watch submits that it does. "Although the issue of good faith is normally one to be decided as a factual issue, it is a question of law where only one inference is possible from the evidence." *Quinto v. Legal Times of Washington, Inc.*, 506 F. Supp. 554, 564 (D.D.C. 1981) (internal citations omitted). In response to the evidence proffered by Judicial Watch, Klayman offers nothing to support this claim other than hearsay and a recitation of his prior allegations.

In addition, Klayman does not controvert Fitton's sworn testimony that Judicial Watch has continued to satisfy its lease obligations to the landlord. Fitton Decl. at ¶ 7. Therefore, Klayman has not suffered any proper measure of damages. In fact, Klayman presents no evidence of actual damages at all. He does not swear under penalty of perjury that either the landlord or Vanguard came to him seeking payment of rent left unpaid by Judicial Watch. He does not swear under penalty of perjury that he has been denied credit or some other economic opportunity because of the lease guaranty or that his credit score is any worse than it was before September 19, 2003. He does not even submit a credit report indicating that the obligation shows up. Instead, he relies on a hyperbolic assertion that the "sword of Damocles" is hanging over him and his family (Plf's Opp. at 11; Klayman Decl. at ¶ 16), a claim that is devoid of any evidence that would entitle recovery on his breach of contract claim, as subjective fear of some

hypothetical, contingent, future liability is not a proper measure of damages for any breach of contract claim. *See*, *e.g.*, *Pfeffer v. Ernst*, 82 A.2d 763, 764 (D.C. 1951) (noting well-established rule that damages for mental anguish or anxiety are not recoverable on a breach of contract claim). Nor could it be said that any such damage, if it ever were to arise, resulted from a purported breach of the Severance Agreement, as Klayman himself freely agreed to personally guarantee the lease long before there was ever a Severance Agreement. Any sword hanging over Klayman is because he agreed to serve as a personal guarantor long ago, not because of anything that Judicial Watch allegedly did or did not do. While Judicial Watch agreed that it would make a good faith effort to try to remove Klayman as personal guarantor of the lease; it did not, and could not, guarantee that it would succeed. Severance Agreement at ¶ 9(B). Consequently, the Court, as a matter of law, should grant Defendants motion for summary judgment as to this particular claim.

### C.    Alleged Failure to Remove Klayman as Guarantor for All Credit Card Accounts

Defendants' motion for partial summary judgment presents sworn testimony that Klayman was removed as guarantor of Judicial Watch's American Express card and did not serve as guarantor for any other Judicial Watch credit card. Declaration of Susan E. Prytherch ("Prytherch Decl.") at ¶ 26. Klayman could not, and did not, controvert Defendants' sworn testimony that he had been removed as guarantor of the American Express card and merely asserts, "on information and belief," that he also served as guarantor for other Judicial Watch credit cards. Klayman Decl. at ¶ 17. Without question, evidence submitted "on information and belief" is not based upon personal knowledge and is not inadmissible at trial. Consequently, Klayman failed to controvert

Defendants' sworn testimony that he did not serve as guarantor for any other Judicial Watch credit cards. As a result, there can be no genuine dispute of material fact on this point.

Klayman also fails to make any effort to demonstrate the existence of facts to be discovered that would create a genuine issue for trial about whether he served as a personal guarantor for a Judicial Watch Visa or Mastercard credit card, what efforts he made to obtain such evidence, and why he was not successful. Surely it is not unreasonable to expect that, if Klayman had brought a good faith breach of contract action against Judicial Watch for allegedly failing to remove him as personal guarantor of a Visa and/or Mastercard credit card, he would be able to identify where evidence of his alleged personal guaranty of such cards could be found, if not testify in a manner admissible at trial that he actually had guaranteed such cards personally. In addition, if Klayman had been damaged in any way, such as if a credit card company had approached him demanding payment for an unpaid credit card bill of Judicial Watch, then such information should be readily available to him. Furthermore, if such liabilities existed, Klayman could have readily demonstrated them by pulling a copy of his credit report; a document that is readily available through the internet.

Absent any admissible evidence, this claim also falls into the category of theoretical speculation. As previously discussed, Klayman cannot recover damages on a breach of contract claim that is based on a subjective fear of some hypothetical, contingent, future liability.

**D.      Alleged Failure to Return Klayman's Property**

Instead of a dispute of fact, this claim presents a classic example of a non-moving party failing to satisfy its burden on summary judgment by relying solely on generic, conclusory denials unsupported by any factual data.

As a preliminary matter, it must be noted that, contrary to Klayman's legal argument, the Severance Agreement placed the burden of removing K&A's files squarely on Klayman: "Klayman agrees to remove all K&A files and boxes from Judicial Watch's premises at Klayman's expense before the separation date or within a reasonable time thereafter, at his expense."  Severance Agreement at ¶ 11(B).  If Klayman failed to remove the K&A materials, Judicial Watch was entitled to destroy them.  *Id.*  Therefore, the obligation to remove these materials from Judicial Watch's offices was Klayman's; Judicial Watch was not obligated to provide them to Klayman.

Klayman fails to controvert the detailed, sworn testimony provided by Judicial Watch demonstrating that he was afforded ample opportunity to remove both K&A files and any of his personal property from Judicial Watch's offices.  Specifically, the sworn affidavits of Susan Prytherch and Irene Garcia set forth the dates, times, and places that Klayman was given access to Judicial Watch's offices to remove these files and property, as well as the identities of Judicial Watch staff who assisted Klayman with their removal. Prytherch Decl. at ¶¶ 6-12; Declaration of Irene Garcia ("Garcia Decl.") at ¶¶ 3-5.  In response, Klayman could not muster anything more than a conclusory, generic denial. Generic, conclusory denials, unsupported by any factual data, are legally insufficient to establish the existence of a genuine dispute of material fact.  *Byrd*, 174 F.3d at 248 n. 8.

Moreover, if the artwork in Judicial Watch's Miami office were Klayman's personal property – and Klayman failed to present any controverting evidence

demonstrating that he ever paid for the artwork or that he ever provided proof of payment to Judicial Watch to support his claims of ownership – he certainly had the opportunity to remove any personal artwork on October 3, 2003, the date he arranged to have his assistant pick up his personal items from the Miami office.  Prytherch Decl. at ¶ 13; Garcia Decl. at ¶¶ 3-5.  Klayman fails to provide any sworn testimony as to why he failed to remove any such personal artwork at that time.  The obvious conclusion, especially in light of the compelling, sworn evidence of ownership presented by Judicial Watch and Klayman's utter failure to controvert that evidence, is that Klayman did not own the artwork.  It was not his to remove.

### E.    Alleged Failure to Pay Klayman's Family Health Insurance Coverage

Klayman does not even attempt to dispute Judicial Watch's compelling, sworn testimony and documentary evidence demonstrating that, for four of the five years he was a Judicial Watch employee, the organization did not pay for Klayman's family's health insurance coverage.  Prytherch Decl. at ¶¶ 14-20.  Even if the Court were to find a genuine dispute of material fact about the payment of Klayman's family's health insurance coverage during his last year of employment, there is no genuine dispute of material fact that Klayman, not Judicial Watch, paid for his family's health care coverage from June 1998 through September 2002.

The Severance Agreement provides that Judicial Watch shall pay Klayman's family's health insurance coverage for a period of twelve (12) months following his separation only "to the same extent it paid Klayman's family's health insurance coverage during his employment."[5]  Severance Agreement at ¶ 3(A).  There is no genuine dispute

---

[5]    It is unclear from Klayman's Second Amended Complaint whether he is claiming that Judicial Watch breached the severance agreement by failing to pay his health insurance for the twelve (12) month

of material fact that, for the overwhelming majority of Klayman's employment, Judicial Watch did not pay for his family's health insurance coverage. Therefore, it had no obligation to do so after Klayman's resignation.

### F. Alleged Failure to Provide Klayman with Access to Documents

Klayman's Second Amended Complaint is silent as to precisely how he claims Judicial Watch purportedly failed to provide him with access to its confidential documents.[6] However, it now appears that he is asserting two (2) such claims: (1) the alleged failure to provide him with backup documentation regarding expenses Judicial Watch claims Klayman owes it; and (2) an acknowledged refusal to provide him with "any and all documents to and from [former Judicial Watch client Peter F. Paul]."

With respect to the expense issue, Judicial Watch respectfully submits that the provision in the Severance Agreement regarding limited access to certain confidential information – when Judicial Watch consents to such access – does not even apply. The expense issue is addressed in a separate provision of the Severance Agreement and has its own documentation requirement. Severance Agreement at ¶ 10 ("Klayman shall reimburse Judicial Watch for any such amounts within seven (7) days of being notified by Judicial Watch and presented with supporting documentation of the amount, date and category of cost or expense item for which reimbursement is sought.").[7] That provision,

---

period following his resignation from the organization. Nonetheless, Judicial Watch presented sworn testimony that it did pay Klayman's health insurance during this period (Prytherch Decl. at ¶ 14). Klayman did not even attempt to controvert Judicial Watch's sworn testimony. Consequently, to the extent that Klayman's Second Amended Complaint could be construed as making such a claim, Judicial Watch is entitled to summary judgment.

[6]     Klayman's Second Amended Complaint alleged only that "Judicial Watch failed to provide [him] access to documents as required under the Severance Agreement," without providing any specificity as to what documents Judicial Watch allegedly failed to provide him. Second Amended Complaint at ¶ 146.

[7]     Without questions, Klayman is indebted to Judicial Watch in an amount of at least $78,810, plus interest, as he agreed to indemnify Judicial Watch for Klayman & Associates, P.C.'s breach of the Severance Agreement, which included an obligation to pay this amount plus interest on or before May 15,

not the provision regarding access to confidential information, governs the expense issue. Klayman's legal argument regarding this issue seeks to fit a square peg into a round hole.

In addition, Klayman's factual argument with respect to the expense issue is internally inconsistent, if not self-defeating. Klayman himself admits that Judicial Watch provided him with documentation in support of its expense claim, but asserts that this documentation is "fictitious." Klayman Declaration at ¶ 25. Like his other factual assertions, Klayman provides no evidence to support this conclusory allegation. Nonetheless, implicit in Klayman's assertion that the expense documentation provided by Judicial Watch is "ficititious" – an assertion that Judicial Watch obviously rejects – is an admission by Klayman that Judicial Watch did, in fact, provide him with documentation regarding its expense claim. Far from demonstrating the existence of a genuine dispute of material fact that would prevent summary judgment from being entered in Judicial Watch's favor on this particular claim, Klayman actually defeats his own argument.

Looking at this claim another way, it would appear that Klayman is suing Judicial Watch for allegedly failing to provide him with the "real" documents supporting Judicial Watch's expense claim against him, the very same expense claim for which Judicial Watch has a counterclaim against Klayman. Not only is such a claim by Klayman curious, to say the least, but, in his answer to Judicial Watch's counterclaim, Klayman denied any liability to Judicial Watch for these expenses, a denial that undermines his present claim that there are "real" documents supporting the expense claim that Judicial Watch failed to provide him. Moreover, it is unclear how Klayman could suffer any damages by reason of a purported failure by Judicial Watch to provide him with

---

2004. Severance Agreement, ¶¶ 11 (A) and 19(B). Pursuant to the Severance Agreement, this amount is undisputed, but remains unpaid by either Klayman or his law firm.

documents supporting its expense claim because this very same expense issue is presently before the Court and has yet to be adjudicated. The entire claim does not withstand a moment's worth of scrutiny.

With respect to Klayman's demand for "any and all documents to and from [former Judicial Watch client Peter F. Paul], Klayman does not even attempt to rebut Judicial Watch's quite reasonable legal argument that the provision at issue did not require Judicial Watch to consent to providing him with documents so he could respond to casual or obscure threats or pursue defamation actions against Judicial Watch's former clients. Nor does he attempt to controvert Judicial Watch's sworn testimony that he never offered to provide a more precise description of the documents to which he sought access or to reimburse Judicial Watch for its search costs or photocopying expenses, as the provision expressly requires. Declaration of Paul J. Orfanedes ("Orfanedes Decl.") at ¶ 3. Similarly, Klayman does not dispute Judicial Watch's sworn testimony that he failed to indicate that he would or could take steps to protect the confidentiality of the documents at issue in light of Judicial Watch's quite legitimate concerns about attorney-client privilege and the attorney work-product doctrine. *Id.*

Klayman's sole factual assertion with respect to his demand for "any and all documents to and from Paul" – that the documents at issue were readily available on Judicial Watch President Tom Fitton's computer – does not constitute admissible evidence because it is not based on Klayman's personal knowledge. Klayman Decl. at ¶ 26. Judicial Watch presented sworn testimony that it represented Paul on multiple matters from February 2001 to approximately April 2005, including a period of approximately eighteen (18) months after Klayman's September 19, 2003 resignation.

Orfanedes Decl. at ¶ 3.  Clearly, Klayman has no personal knowledge of Judicial Watch's representation of Paul after Klayman left the organization.  Thus, he cannot and does not have personal knowledge about the location or volume of materials responsive to his demand.  Judicial Watch's factual assertions about the location and volume of the documents to which Klayman demanded access remain uncontroverted.

While Klayman tries to dismiss as "red herrings" Judicial Watch's quite legitimate concerns about producing documents protected by the attorney-client privilege and attorney work-product (Plf's Opp. at 15 n. 11), he fails to provide any evidentiary support for his flippant, conclusory claim.  Judicial Watch's sworn testimony that the records are protected by the attorney-client privilege and the attorney work-product doctrine thus remain uncontroverted as well.  Orfanedes Decl. at ¶ 3.  Nonetheless, the relevant inquiry is not whether any or some of the documents responsive to Klayman's request are or are not protected by the attorney-client privilege or the attorney work-product doctrine – and Judicial Watch submits they quite obviously are – but whether, based on the totality of the circumstances presented by Judicial Watch in its undisputed affidavits, the organization unreasonably withheld its consent to allow Klayman unfettered access to these documents.  The obvious conclusion is no.

### G.  Alleged Disparagement/ Attempts to Limit Klayman's Ability to Represent Clients

In its January 17, 2007, Memorandum Opinion and Order regarding Defendants' motion to dismiss Klayman's various defamation claims, the Court found that several of the statements and/or actions alleged by Klayman to be defamatory were not actionable. These include the following:

-    Statements contained in Judicial Watch's 2003 and 2004 IRS Form 990 Information Returns;

- Statements allegedly made to callers that Judicial Watch could not discuss the reasons why Klayman left Judicial Watch; and

- The removal of Klayman's Name from Statements on Judicial Watch's website.

*See* January 17, 2007 Memorandum Opinion at 32-36, 38 n.12, and 40-42. For the same reasons the Court found these alleged statements and/or actions were not actionable as defamation, Judicial Watch respectfully submits they are not actionable as disparagement either.

In addition, it appears from Klayman's opposition that he now seeks to recast as "disparagement" many of the allegations he previously asserted were direct breaches of the Severance Agreement. See Opposition at 15; Klayman Decl. at ¶ 29. There simply is nothing "disparaging" about allegedly opening mail or failing to forward telephone messages, nor does Klayman identify anything that remotely appears to be disparaging. Klayman Decl. at ¶ 29 (citing Second Amended Complaint at ¶¶ 66(A) and (H)). Similarly, Klayman's bald assertions about "tortious interference" with "Freedom Watch" fail to set forth anything that comes close to constituting disparagement. *Id.* (citing Second Amended Complaint at ¶ 66(A)).

Klayman also now appears to claim that Judicial Watch's efforts to enforce the Severance Agreement's requirement that Klayman withdraw his appearance as counsel "in all legal proceedings in which Judicial Watch currently is involved as a party or as counsel for any person or entity" (Severance Agreement at ¶ 12) somehow breached the non-disparagement provision of the same agreement. In moving for summary judgment on this particular matter, Judicial Watch presented the Court with copies of all of the relevant pleadings regarding this matter, including Klayman's transparently disingenuous submission in which, in one single document filed more than eight (8) months after he

signed the Severance Agreement, he withdrew his appearance on behalf of all of Judicial Watch's clients in the *Dalrymple* matter and re-entered his appearance on behalf of former Judicial Watch client Sandra Cobas.   Orfanedes Decl. at ¶ 4 and Exhibit B. Judicial Watch obviously did not view this charade as compliance with either the spirit or the letter of the Severance Agreement and moved to strike Klayman's appearance on June 25, 2004.  In order to protect the confidentiality of the Severance Agreement, which at the time had not been made public, Judicial Watch filed its motion under seal.  *Id.*  In this regard, even a cursory review of the document attached to Klayman's affidavit reveals that the motion was file-stamped June 24, 2004 and unsealed on September 24, 2004.  Klayman's assertion that the document was not filed until September 28, 2004 is patently false.  Klayman Decl. at ¶ 34.  Nonetheless, there was nothing disparaging about Judicial Watch's efforts to enforce the Severance Agreement's withdrawal provision, nor does Klayman even attempt to rebut Judicial Watch's clearly correct assertion that its filing was absolutely privileged under the judicial proceeding privilege.  *Messina v. Krakower*, 439 F.3d 755, 760 (D.C. Cir. 2006); *Finkelstein, Thompson & Loughran v. Hemisperhx Biopharam, Inc.*, 774 A.2d 322, 338 (D.C. 2001).

Likewise, Klayman now appears to claim that his allegations with respect to purported interference with his relationships with Judicial Watch clients constitute a breach of the Severance Agreement's non-disparagement clause.  Klayman provides only one alleged instance of this purported interference – a conversation with Genifer Flowers. Klayman claims that Judicial Watch President Thomas J. Fitton told Flowers, in response to an alleged request by Flowers to have Klayman represent Flowers along with Judicial Watch attorneys in certain litigation, that this "would not be a good idea."   Klayman

Decl. at ¶ 38.  Klayman's recitation of this conversation, which Klayman claims Flowers related to him personally, is yet another example of improper reliance on inadmissible hearsay to attempt to oppose summary judgment.  More importantly, Klayman did not attempt to explain why he could not obtain a declaration from Flowers, to whom he obviously has ready access.  Nonetheless, even if Klayman had submitted a declaration from Flowers describing her conversation with Fitton, there is nothing disparaging about Fitton opining – in ominous, severe, or "scary" tones – that it would not be a good idea for Klayman to work with Judicial Watch's attorneys on Flowers' case.  The purported statement, even if presented in a proper, admissible form, does not disparage Klayman, it merely expresses the sentiment of the declarant.

Nor is there anything disparaging about what Klayman alleges were statements by Judicial Watch to unidentified members of the media about Klayman not speaking on the air about Judicial Watch cases or public events and/or being referred to as the "Founder and former Chairman of Judicial Watch."  Second Amended Complaint at para. 29 (citing Second Amended Complaint at paras. 124-25).  Such statements, even if supported by properly admissible evidence, do not constitute violations of the non-disparagement provision.

### H.    Klayman's Telephone Messages, Mail Opening, "Freedom Watch" and Interference with Former Clients Claims

Klayman failed to respond to Defendants' argument and evidence regarding his claims with respect to Judicial Watch's alleged failure to forward his telephone messages, alleged opening of his mail, alleged "tortuous interference" with "Freedom Watch," and alleged interference with former clients, at least insofar as he asserts that these claims constitute direct breaches of the severance agreement.   Accordingly, Klayman has

abandoned any such claims, and Judicial Watch is entitled to summary judgment on them as well.

IV.    **THE COURT SHOULD GRANT SUMMARY JUDGMENT AS TO COUNT EIGHT**

Klayman does not assert any independent factual bases for his claim for specific performance.  Consequently, for the reasons Judicial Watch is entitled to summary judgment on Klayman's Breach of Contract - Damages claim, Judicial Watch also is entitled to summary judgment on Klayman's Breach of Contract - Specific Performance claim.

<u>**CONCLUSION**</u>

For all of the foregoing reasons, Judicial Watch respectfully requests that summary judgment be granted in its favor on Counts VI, VII, and VIII.

Respectfully submitted,

//s// *Richard W. Driscoll*

_____
Richard W. Driscoll (436471)
DRISCOLL & SELTZER, PLLC
600 Cameron Street
Alexandria, Virginia 22314
703.340.1625 Telephone
703.997.4892 Facsimile
Email: rdriscoll@driscollseltzer.com

*Counsel for Defendants*

Dated: March 1, 2007

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 1st day of March 2007, a copy of the foregoing Reply Memorandum was served by electronic filing upon counsel listed on the Notice of Electronic Filing.

//s// *Richard W. Driscoll*

_____

Richard W. Driscoll