IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

———————————————————|
                                                              |
LARRY KLAYMAN, *ET AL.*                      |
                                                              |
            Plaintiffs,                                  |
                                                              |
v.                                                            |            Civil Action No. 1:06-CV-00670
                                                              |            Honorable Colleen Kollar-Kotelly
JUDICIAL WATCH, INC., *ET AL.*               |
                                                              |
            Defendants.                               |
———————————————————|

### AMENDED COUNTERCLAIM OF
### JUDICIAL WATCH, INC. AND THOMAS J. FITTON

Defendants/Counter-Claimants Judicial Watch, Inc. ("Judicial Watch") and Thomas J. Fitton ("Fitton"), by counsel, hereby counterclaim against Plaintiff/Counter-Defendant Larry E. Klayman ("Klayman") as follows:

### Parties

1.       Judicial Watch is a non-profit, educational organization incorporated under the laws of the District of Columbia and having its principal place of business at 501 School Street, S.W., Suite 500, Washington, DC 20024.  Judicial Watch's purpose and focus is to promote accountability and integrity in government, politics and the law.

2.       Fitton is an individual citizen and resident of the District of Columbia.  Fitton is president of Judicial Watch.

3.       Klayman is an individual citizen and resident of the State of Florida.  Klayman was the Chairman and General Counsel of Judicial Watch until his separation with the organization pursuant to a Severance Agreement dated September 19, 2003.  He was also the sole shareholder and officer of Klayman & Associates, P.C. ("K&A"), a law firm whose

registration has since been revoked by the District of Columbia. Upon information and belief, K&A is no longer in business anywhere.

4.     The claims asserted against Klayman arises out of the same facts, circumstances and occurrences as the subject matter of Klayman's Second Amended Complaint and therefore, constitute compulsory counterclaims under Rule 13(a) of the Federal Rules of Civil Procedure.

## Jurisdiction

5.     Jurisdiction arises under 28 U.S.C. § 1331, as Judicial Watch's claims against Klayman arise under the laws of the United States, specifically, section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

6.     Jurisdiction also arises under 28 U.S.C. § 1332(a) because of the parties' diversity of citizenship and because the amount in controversy, exclusive of interests and costs, exceeds $75,000.

## Venue

7.     Venue is proper in this Court district pursuant to 28 U.S.C. § 1391 because Klayman availed himself of this forum when he filed his Second Amended Complaint, which is now pending in this Court. In addition, Klayman consented to venue in this Court pursuant to ¶ 23 of the Severance Agreement.

## Facts

8.     Judicial Watch was founded in 1994 as a not-for profit, tax exempt educational organization. The organization seeks to promote transparency, integrity, and accountability in government, politics, and public life, as well as respect for the rule of law. It also seeks to promote conservative, pro-family values. Due to the hard work and dedication of a great many

employees and volunteers, as well as the contributions of hundreds of thousands of supporters, Judicial Watch has enjoyed substantial success since its inception in 1994.

9.     In May 2003, Klayman was the Treasurer and General Counsel of Judicial Watch. He also was an employee and member of the organization's Board of Directors. While Klayman referred to himself as the "Chairman" of Judicial Watch, the designation carried no legal authority, but, rather, was merely an honorarium.

### Klayman's Forced Resignation for Acknowledged Misconduct

10.     On or about May 6, 2003, Klayman, a married father of two small children, informed Thomas J. Fitton, Judicial Watch's president, and Paul J. Orfanedes, the organization's corporate secretary, that his wife, a former Judicial Watch employee, had commenced divorce proceedings against him. Klayman informed both Fitton and Orfanedes that, in her petition for divorce, Klayman's wife alleged that Klayman had had an inappropriate relationship with a Judicial Watch employee with whom he had been in love. Klayman also informed Fitton and Orfanedes that Mrs. Klayman alleged Klayman had assaulted her physically.

11.     While Klayman denied having a sexual relationship with the employee, who was a married mother of small children, Klayman acknowledged to Fitton and Orfanedes that he had been in love with the employee. He also acknowledged that he had purchased gifts for the employee and had kissed her. In addition, Klayman acknowledged an incident with his wife that clearly provided the basis for his wife's allegation of physical assault.

12.     Klayman's revelations caused Fitton and Orfanedes substantial concern. Klayman's acknowledged behavior was entirely inconsistent with that of a leader of a conservative, pro-family organization that promotes transparency, integrity and accountability in public life. It also was inconsistent with Klayman's fiduciary duties to the organization and had

placed the organization in potential legal jeopardy.  Because Klayman and the employee had traveled together frequently, Fitton and Orfanedes were also concerned that Klayman may have misused Judicial Watch's resources to further Klayman's acknowledged, inappropriate relationship with the employee.

13.    Klayman's acknowledged conduct was a breach of his fiduciary duties to Judicial Watch and an abuse of his positions as aboard member, treasurer, chairman and general counsel.

14.    Based on the revelations and potential harm to Judicial Watch, Fitton requested that Klayman resign.  Fitton and Orfanedes also insisted that Judicial Watch undertake an internal investigation into Klayman's conduct, including an audit to determine whether Klayman had misused the organization's resources for improper, personal reasons.  Klayman offered to resign rather than face such an inquiry.

15.    Judicial Watch and Klayman thereafter commenced what became a long and extremely contentious series of negotiations.

16.    During the course of these investigations, Judicial Watch learned that Klayman had begun another relationship with a former Judicial Watch employee and potentially misused the organization's resources to further that relationship.

17.    The negotiations came to a head in late August 2003 when Klayman threatened to fire Fitton and Orfanedes, although he had no authority to do so.  Fitton prepared to terminate Klayman's employment.  In addition, Fitton and Orfanedes prepared to call a meeting of the Board of Directors to remove Klayman as an officer and director of the organization.

18.    Ultimately, the parties were able to reach a compromise, and, on September 19, 2003, Judicial Watch and Klayman entered into a severance agreement by which Klayman agreed to resign from the organization in exchange for payment of $400,000 in severance.

4

Klayman also agreed not to compete with Judicial Watch for a period of two years in exchange for payment of $200,000. The agreement, entitled a "Confidential Severance Agreement," expressly noted that the severance paid by Judicial Watch to Klayman was intended to amicably resolve "differences between the Parties."

19. Following his forced separation from Judicial Watch, Klayman unsuccessfully ran for the Republican nomination for the U.S. Senate in the State of Florida.

20. Although Klayman would later represent that the reason for his separation from Judicial Watch was to run for the U.S. Senate from Florida, the truth is that Klayman was forced to leave Judicial Watch because of his acknowledged, inappropriate, personal conduct. His candidacy for the U.S. Senate was merely cover for the embarrassing circumstances for his forced resignation.

### The Severance Agreement

21. The Severance Agreement is a valid and enforceable contract. A true copy of the September 19, 2003, Severance Agreement is attached as Exhibit A. Judicial Watch has performed all of its obligations under the Severance Agreement, including payment of substantial compensation to Klayman. However, Klayman has not complied with the provisions setting forth his obligations.

22. Among the duties imposed on Klayman by the Severance Agreement is ¶ 4, which relates to confidential information and reads, in relevant part:

> A. Confidential Information. Klayman agrees that all non-public information and materials . . . concerning Judicial Watch, its operations, plans, programs, relationships, donors, prospective donors, clients, prospective clients, past or current employees, contracts, financial affairs or legal affairs (collectively, "Confidential Information") are confidential and shall be the exclusive property of Judicial Watch to which Klayman has no

5

right, title or interest. . . .   Confidential Information includes matters not generally known outside Judicial Watch, such as . . . donor lists, . . . contacts at or knowledge of . . . donors or prospective . . . donors . . . .   Klayman agrees that after the Separation Date, he shall not . . . use Confidential Information for any purpose without written approval by an officer of Judicial Watch, unless and until such Confidential Information has become public knowledge through no fault or conduct by Klayman.

\*    \*    \*    \*

D.    <u>Client and Donor Information</u>. . . .   Klayman expressly agrees and acknowledges that, following the Separation Date, he shall not retain or have access to any Judicial Watch donor . . . lists or donor . . . data.

23.    During his employment at Judicial Watch, Klayman obtained confidential information regarding it operations, plans, programs, relationships, donors, prospective donors, clients, prospective clients, past and current employees, contracts, financial affairs and legal affairs.

24.    Pursuant to ¶ 10 of the Severance Agreement, Klayman agreed to reimburse Judicial Watch for personal expenses that were charged to Judicial Watch.  Paragraph 10 reads, in relevant part:

Klayman further agrees to reimburse Judicial Watch for personal costs or expenses incurred by him during his employment, if any, that Judicial Watch may determine in good faith were mistakenly charged or allocated as costs or expenses of Judicial Watch, as well as any additional expenses that Klayman has billed to Judicial Watch or charged to a Judicial Watch credit card that Judicial Watch determines in good faith are personal expenses of Klayman. Klayman shall reimburse Judicial Watch for any such amounts within seven (7) days of being notified by Judicial Watch and being presented with supporting documentation of the amount, date and category of cost or expense items for which reimbursement is sought.

25.     Pursuant to ¶ 11 of the Severance Agreement, Klayman agreed to reimburse Judicial Watch for Klayman & Associates, P.C.'s portion of shared expenses.  Paragraph 11(A) reads, in relevant part:

> Klayman, and by its signature below, Klayman & Associates, P.C. ("K&A") re-affirm and acknowledge the debt of K&A to Judicial Watch, which was in the amount of $78,810 as of December 31, 2002, and agree that K&A shall pay the then full outstanding balance of the debt (including additional amounts allocated to K&A by Judicial Watch's accountants in accordance with their customary practice regarding this debt), without offset or deduction, together with accrued interest of 8% per annum, on or before May 15, 2004 . . . .  Klayman and K&A expressly acknowledge that Judicial Watch is not indebted to K&A.

26.     In addition to acknowledging the debt of K&A to Judicial Watch, Klayman agreed to indemnify Judicial Watch for any damages that arise from a breach of the Severance Agreement by K&A.  Paragraph 19(B) of the Severance Agreement reads, in relevant part:

> Klayman agrees to . . . indemnify and hold harmless Judicial Watch . . . from any and all . . . damages . . . which Judicial Watch . . . may incur . . . that arise . . . out of K&A's breach of its obligations under this Agreement.

27.     Without regard to the provisions of the Severance Agreement, or his professed affection for Judicial Watch, Klayman has significantly harmed Judicial Watch by failing to repay amounts owed for his personal expenses and for expenses that were fairly allocated to K&A.

28.     Pursuant to ¶ 17 of the Severance Agreement, Klayman expressly agreed:

> that he will not, directly or indirectly, disseminate or publish, or cause or encourage anyone else to disseminate or publish, in any manner, disparaging, defamatory or negative remarks or comments about Judicial Watch or its present or past directors, officers, or employees. . . .  Nothing in this paragraph is intended to, nor shall be deemed to, limit either party from making fair commentary on the positions or activities of the other . . . .

7

29.     Klayman's smear campaign against Judicial Watch and Fitton is in violation of the commitments he assumed under the Severance Agreement.

**Klayman's Smear Campaign of Distortion, Misrepresentation and Lies**

30.     Initially, Klayman engaged in a smear campaign against Judicial Watch and Fitton to divert attention away from his failure to repay Judicial Watch for debts he confirmed in the Severance Agreement.

31.     Because Klayman has not enjoyed success, either financially or professionally, after being forced to leave Judicial Watch due to his own improper conduct, his purpose now appears to be an attempt to reclaim his position at Judicial Watch where he experienced public attention and frequently appeared in print and electronic media.  Klayman apparently views his own misconduct, attempting to carry on an affair with one Judicial Watch employee and one former Judicial Watch employee, as having no impact on his qualifications to lead an organization that seeks to promote transparency, integrity, and accountability in government, politics, and public life, as well as respect for the rule of law.  In an ironic twist, Klayman's conduct is eerily similar to the conduct for which he assailed the former President Clinton.

32.     On April 12, 2006, Klayman initiated a lawsuit against Judicial Watch and Fitton alleging breach of the Confidential Severance Agreement, violations of the Lanham Act and a Florida statute, and various claims of defamation.  Klayman amended his lawsuit to include additional allegations of defamation arising from statements allegedly made by Fitton in response to the filing of Klayman's original complaint.  He also subsequently named Orfanedes and Christopher J. Farrell (who joined Judicial Watch's Board of Directors after Klayman's departure in September 2003) as defendants.  In addition to seeking monetary compensation, Klayman seeks to have the Severance Agreement rescinded.

8

33.    In an effort to fund his smear campaign, Klayman has misappropriated non-public Confidential Information belonging to Judicial Watch in the form of donor lists, information about direct mail solicitation operations, the identity of third-parties who assisted with direct mail solicitation operations and the terms on which such programs and operations were conducted.  Klayman has used this Confidential Information, without seeking or obtaining written approval of Judicial Watch, to solicit funding for this litigation in violation of the Severance Agreement.

34.    Almost immediately upon filing his lawsuit, Klayman launched a website, savingjudicialwatch.org, and commenced a fundraising campaign aimed directly at Judicial Watch's supporters.  This fundraising campaign purportedly seeks to finance Klayman's efforts to restore himself to his former positions with the organization and to "save" Judicial Watch.  In addition, Klayman, individually and doing business as "Saving Judicial Watch," has mailed, on information and belief, at least tens of thousands of direct mail solicitations to Judicial Watch supporters around the United States and has taken out advertisements in at least two national publications seeking donations.  The solicitations and advertisements are based largely on intentionally false, misleading and/or disparaging statements that have caused and continue to cause substantial harm to the very organization Klayman purports to be trying to "save."

35.    On or about April 13, 2006, Klayman issued a press release, which is now posted on the Web site savingjudicialwatch.org, which makes the following false, misleading and/or disparaging statements: "After Klayman left Judicial Watch in the fall of 2003, the current president Tom Fitton set out to hijack the group to further his own personal interests."

36.    Klayman makes the following false, misleading and/or disparaging statements on his Web site, savingjudicialwatch.org:

·   After I left Judicial Watch, we were betrayed by those who
we had trusted to lead the organization. . . .  [T]hey lied to
donors and supporters, misused their monies, failed to
honor their agreement with me, and disparaged my name
and reputation, all in a selfish power grab.

·   Not only have the donors and supporters of Judicial Watch
been served badly, but the financial condition of Judicial
Watch has worsened to the point where, if this keeps up,
there will be no Judicial Watch in two or four years.  The
current leadership is effectively writing checks to itself,
until the considerable monies which we previously raised to
clean up corruption run dry.

·   We have too many good things to accomplish together, in
bringing our country back to honest and decent
government, to let Judicial Watch be killed by those who
would use it for their own personal agenda.

·   Without any real successes or initiatives, other than self
promotion, it's no wonder Judicial Watch is in jeopardy of
going out of business. . . .

37.    In a fundraising letter dated May 9, 2006, which Klayman mailed to Judicial
Watch supporters across the United States, Klayman knowingly made the following intentionally
false, misleading and/or disparaging statements, among others:

10

· In the fall of 2003, I left Judicial Watch to take the fight for ethical government inside the government . . .

· In 2003, I decided to run for a U.S. Senate seat in my home state of Florida.  My idea was to set up a Judicial Watch right inside our government . . . So, with a lot of thought, I stepped down as chairman and general counsel . . .

· While I tried to be supportive of my former colleagues after I left, regrettably one of them in particular, Tom Fitton, Judicial Watch's current president, feared my possible return and has used every dirty trick to block it.

· Not just asleep, the guard dog has deserted its post!  No longer is there any bite to Judicial Watch, Inc. . . .

· During the three years since I left, Judicial Watch sadly has weakened, ethically and otherwise. . . .

· My colleagues that I left behind at Judicial Watch promised me they would bring in someone to take over as chairman.  But this did not happen.  Instead, they seized control of Judicial Watch for their own interests.

· More than lying to donors and misusing their donations, Fitton did everything he could to harm both my U.S. Senate campaign and the wellbeing of my family and me.

·      When people asked why I had left, frequently they were told the reasons were confidential.  That created the false impression I left for some other reason than to run for the U.S. Senate, thus casting a negative light on me.

·      But after I left, Fitton and company did not buy the [Washington, D.C. office building in which Judicial Watch, Inc. has its headquarters], instead keeping the money for some other purpose.

·      Because Fitton and company failed to replace me with a knowledgeable general counsel or hire experienced lawyers, the group has lost nearly every case I filed.

·      But nearly three years later, Judicial Watch is mostly just a bunch of empty shell offices eating up monies but doing little work.

·      . . . Judicial Watch's finances have been harmed.  I estimate that the more than $16 million dollars I left the organization in assets is now down to about half that amount . . . it's no wonder that Judicial Watch is in jeopardy of going out of business.  At this rate, it could have to shut its doors in three years.

·      In effect, Judicial Watch became Fitton's own little toy . . . .

·      Last but not least, Fitton and company have tried to harm me and my family. . . .

·      In effect, Fitton tried to bring me to my financial knees so I'd be too weak to ever come back.  He obviously feared losing control over the organization and felt he needed to destroy me to assure his position.

12

The solicitation requested the recipients mail a "large contribution" to help Klayman "retake Judicial Watch and prevent it from being destroyed." A copy of Klayman's May 9, 2006 solicitation is attached as Exhibit B and is incorporated herein by reference.

38.     Klayman made these same false and/or misleading statements in nearly identical fundraising letter dated June 16, 2006, which he also mailed to Judicial Watch supporters across the United States. In addition, Klayman made the following intentionally false, misleading and/or disparaging representations, among others:

·     . . . the current president of Judicial Watch, someone I trusted much like Ceasar trusted Brutus, has driven Judicial Watch to the verge of financial ruin, squandering and misusing hard earned donor monies . . . .

The solicitation requested the recipients mail a "generous financial gift" to "clean up the mess at Judicial Watch and be rid of Fitton and his minions." A copy of Klayman's June 16, 2006 solicitation is attached as Exhibit C and is incorporated herein by reference.

39.     In a fundraising letter dated November 20, 2006, which Klayman again mailed to Judicial Watch supporters across the United States, Klayman made the same, intentionally false, misleading and/or disparaging statements that were contained in his May 9, 2006, fundraising letter. The solicitation again requested the recipients mail a "large contribution" to help Klayman "retake Judicial Watch and prevent it from being destroyed." A copy of November 20, 2006 solicitation is attached as Exhibit D and is incorporated herein by reference.

40.     Klayman also caused advertisements to be placed in the December 11, 2006 and December 25, 2006 editions of the *Washington Times National Weekly Edition*, a nationwide publication read by Judicial Watch supporters and in which Judicial Watch itself has advertised.

In his advertisement, Klayman made the following intentionally false, misleading and/or disparaging statements, among others:

·   When Attorney Larry Klayman left his position as chairman and general counsel of Judicial Watch in 2003 to pursue a U.S. Senate seat from his native Florida . . .

·   When Klayman left, he was assured by his former associates that a new and competent chairman and general counsel would be brought on board.

·   Fearing the return of Larry Klayman, Fitton, under the auspices of Judicial Watch, proceeded to sabotage both Larry Klayman's Senatorial campaign . . . .

·   . . . callers to Judicial Watch asking why Klayman left the organization were frequently told the reasons were confidential.  By creating the false impression that Klayman left for some reason other than to run for the Senate, Fitton effectively placed him in a distinctly disparaging light.

·   . . . Judicial Watch coffers held over $16 million in assets, with more in the pipeline when Klayman left for his Senate run in 2003.

·   Under [Fitton's] management, Judicial Watch has lost nearly EVERY case it has been involved with since Klayman's departure.

·   [Judicial Watch, Inc.'s current leadership] allowed finances and the organization to deteriorate so much that it has been estimated that in the three years since Larry Klayman's departure, the original $16 million has been cut approximately in half.

·   We need to save Judicial Watch before all of the assets are gone forever.

14

The advertisements included a request to "[p]lease send your gift to Larry Klayman dba Saving Judicial Watch" by check or credit card.  Copies of Klayman's December 2006 advertisements in *The Washington Times National Weekly Edition* are attached as Exhibit E and are incorporated by reference herein.

41.     In a fundraising letter dated January 2, 2007, which Klayman mailed to Judicial Watch, Inc. supporters across the United States, Klayman made the following intentionally false, misleading and/or disparaging statements:

· So to set up a "Judicial Watch" right inside our government, I ran for the U.S. Senate in 2003.  To clean up the corruption that lets wrongdoers off the hook, I had to step down as chairman and general counsel.

· Fitton, Judicial Watch's current president, feared my possible return . . .

· You also know how Fitton disparaged me and sought to hurt my reputation, creating the false impression that I left for some reason other than to run for the Senate.

· Three years later, it's mostly a bunch of empty offices.  Without a knowledgeable general counsel or experienced lawyers, Judicial Watch has lost nearly every case I filed.

· Worst of all, it appears that the assets have dwindled from more than $16 million on hand when I left to about half that.  Judicial Watch is now in jeopardy of going under.

This time, the solicitation again requested the recipients mail a "large gift" to help Klayman "retake Judicial Watch and prevent it from being destroyed."  A copy of Klayman's January 2, 2007 solicitation is attached as Exhibit F and is incorporated herein by reference.

42.     Klayman also caused the same intentionally false, misleading and/or disparaging advertisement that he placed in the December 2006 *Washington Times National Weekly Edition* to be placed in the January 22, 2007, edition of *Human Events*, a nationwide publication read by Judicial Watch supporters and in which Judicial Watch itself has advertised.   Again, the advertisement included a request to "[p]lease send your gift to Larry Klayman dba Saving Judicial Watch" by check or credit card.  A copy of Klayman's January 22, 2007, advertisement in *Human Events* is attached as Exhibit G and is incorporated herein by reference.

43.     In a fundraising letter dated January 29, 2007, which Klayman mailed and e-mailed to prominent members of the conservative movement across the United States, Klayman again made the same, intentionally false, misleading and/or disparaging statements that were contained in his May 9, 2006, fundraising letter.  Recipients of the fundraising letter and email include major financial contributors to conservative causes.   For years, Judicial Watch has included many of these prominent conservatives among its many supporters and donors.   The solicitation requested the recipients donate online or mail a "large contribution" to help Klayman "retake Judicial Watch and prevent it from being destroyed."   Copies of Klayman's January 29, 2007 solicitations are attached as Exhibit H and are incorporated herein by reference.

44.     Klayman caused a second advertisement to be placed in the January 29, 2007 edition of *Human Events* in which he made the following intentionally false, misleading and/or disparaging statements, among others:

·      [Fitton] has also misused donor monies and squandered Judicial Watch's considerable resources to the point that if we do not step in now, the organization will likely case to exist in a few years.

·      . . . shortly before I left Judicial Watch to run for the U.S. Senate . . .

16

· . . . under Fitton, Judicial Watch has been run into the ground . . .

· In the three years after I left Judicial Watch has become little more than a website which boasts frequently of the many appeals it has to file thanks to having lost the cases which I left for it to pursue.

Again, the advertisement included a request to "[p]lease send your gift to Larry Klayman dba Saving Judicial Watch" by check or credit card.  A copy of Klayman's January 29, 2007, advertisement in *Human Events* is attached as Exhibit I and is incorporated herein by reference.

45.     In a fundraising letter dated January 30, 2007, which Klayman e-mailed to prominent members of the conservative movement across the United States, Klayman made the following intentionally false, misleading and/or disparaging statements, among others:

· [Fitton] also misused donor monies and squandered Judicial Watch's considerable resources to the point that if we do not step in now, the organization will likely case to exist in a few years.

· When people asked why I had left, frequently they were told the reasons were confidential.  That created the false impression that I left for some reason other than to run for the U.S. Senate, thus casting a negative light on me.

The solicitation also touted a purported victory over Judicial Watch in Klayman's lawsuit, although it intentionally failed to disclosed the fact that all of the claims of Klayman's co-plaintiff were dismissed, together with the majority of Klayman's defamation claims.  The solicitation concluded by again requesting a financial contribution, "Let's make sure we win and win big by having the financial resources to now go for the 'knock out punch."  A copy of

Klayman's January 30, 2007 e-mail solicitation is attached as Exhibit J and is incorporated herein by reference.

46.     In a fundraising letter dated February 7, 2007, which Klayman mailed to Judicial Watch supporters across the United States, Klayman made the following intentionally false, misleading and/or disparaging statements:

> ·     [Judicial Watch and Fitton] misused donor monies and squandered Judicial Watch's considerable resources to the point that if we do not step in now, the organization will likely cease to exist in a few years.

> ·     . . . the court ruled against Tom Fitton in our favor! . . . the court ruled that if we win . . . I will be able to reassume control of Judicial Watch as its Chairman and General Counsel.

> ·     Judicial Watch has been run into the ground through [Fitton's] unethical fundraising practices.

> ·     Fitton and company did not buy the building for which I raised $1.2 million, instead keeping the money for some other purpose.

> ·     Fitton gave supporters and donors the impression in monthly newsletters that a building had been purchased . . . .

The solicitation requested that the recipients mail a contribution to help Klayman "move forward to restoring Judicial Watch." A copy of February 7, 2007, solicitation is attached as Exhibit K and is incorporated herein by reference.

47.     In a fundraising letter dated February 9, 2007, which Klayman mailed to Judicial Watch supporters across the United States, Klayman made the same, intentionally false, misleading and/or disparaging statements that were contained in his May 9, 2006, fundraising

letter.  The solicitation again requested the recipients mail a "large contribution" to help Klayman "retake Judicial Watch and prevent it from being destroyed."  A copy of the February 9, 2007, solicitation is attached as Exhibit L and is incorporated herein by reference.

48.    Klayman also caused an advertisement to be placed in the March 5, 2007, edition of the *Washington Times National Weekly Edition*, a nationwide publication read by Judicial Watch supporters and in which Judicial Watch itself has advertised.  In his advertisement, Klayman made the following intentionally false, misleading and/or disparaging statements, among others:

> ·  When Attorney Larry Klayman left his position as chairman and general counsel of Judicial Watch in 2003 to pursue a U.S. Senate seat from his native Florida . . .

> ·  . . . Judicial Watch coffers held over $16 million in assets, with more in the pipeline when Klayman left for his Senate run in 2003.

> ·  Under [Fitton's] management, Judicial Watch has lost nearly EVERY case it has been involved with since Klayman's departure.

> ·  [Judicial Watch's current leadership] allowed finances and the organization to deteriorate so much that it has been estimated that in the three years since Larry Klayman's departure, the original $16 million has been cut approximately in half.

> ·  We need to save Judicial Watch before all of the assets are gone forever.

> ·  In the 48-page decision, the court finds that if Mr. Klayman is successful in his suit, he can regain control of Judicial Watch.

The advertisement included a request to "[p]lease send your gift to Larry Klayman dba Saving Judicial Watch" by check or credit card.  A copy of Klayman's March 5, 2007, advertisement in *The Washington Times National Weekly Edition* is attached as Exhibit M and incorporated by reference herein.

49.     Klayman also caused an advertisement to be placed in the April 23, 2007, edition of the *Washington Times National Weekly Edition*, a nationwide publication read by Judicial Watch supporters and in which Judicial Watch itself has advertised.  In his advertisement, Klayman made the following intentionally false, misleading and/or disparaging statements, among others:

·       Mr. Fitton and his team squandered the resources and prestige which had been established . . . .

·       Today, Judicial Watch has been reduced to little more than a web site and a few pictures.

The advertisement included a request to "[p]lease send your gift to Larry Klayman dba Saving Judicial Watch" by check or credit card.  A copy of Klayman's April 23, 2007, advertisement in *The Washington Times National Weekly Edition* is attached as Exhibit N and incorporated by reference herein.

50.     In a fundraising letter dated April 30, 2007, which Klayman mailed to Judicial Watch supporters across the United States, Klayman made the following intentionally false, misleading and/or disparaging statements:

·       [Klayman] left Judicial Watch to run for the U.S. Senate from Florida . . . .

·       Fitton and company [have] misrepresented that it had bought a building from donor funds, squandered and misused other donor monies, failed to

aggressively pursue the cases [Klayman] had left it to prosecute against the Clintons and other corrupt politicians and judges, and turned the organization into little more than a web site that boasts about the appeals it is forced to take after it loses most of its cases.

· Judicial Watch . . . is in jeopardy of dying unless I reassume control and reassert adult leadership that actually fights for hones government rather than engaging in empty public relations gimmicks.

· The U.S. District Court for the District of Columbia ruled that I may regain control of Judicial Watch and fire Fitton and his comrades should I be successful in my lawsuit.

· Louise Benson, a major donor who was ripped off by Fitton by being induced to make donations to buy the building Judicial Watch occupies . . . .

· [Sandra Cobas] was smeared by Fitton over her Latin heritage.

· [T]he directors of Judicial Watch's other regional offices in Los Angeles, Chicago, and Dallas were also let go or fired – merely because they were loyal to [Klayman].

· Fitton, a cocky, self-aggrandizing and albeit dishonest kid who doesn't have a clue how to run Judicial Watch, feared someday I might return.

· [Peter Paul's Complaint] reads like a criminal indictment.

· [W]hen I left Judicial Watch, Fitton and his comrades promised to fill my position as Chairman, but instead kept control for their own ends . . . .

· Judicial Watch abandoned Peter Paul's case when he demanded they hire competent counsel to represent him.

· Fitton and company violated their duties and responsibilities toward Paul. Yet even after they quit, they gave the false impression to donors that Judicial Watch was still representing him!

· [Klayman regained] control of Judicial Watch.

The April 30, 2007, solicitation requested recipients to thank Klayman "for regaining control of Judicial Watch and asked for a contribution to finish the job of "restoring Judicial Watch to its greatness." A copy of April 30, 2007, solicitation is attached as Exhibit O and is incorporated herein by reference.

51. In a fundraising email dated May 7, 2007, which Klayman sent to prominent members of the conservative movement across the United States, Klayman made the following intentionally false, misleading and/or disparaging statements, among others:

· Judicial Watch, under the leadership of Tom Fitton, has become a mere shell of the once proud organization . . . .

· Mr. Fitton and his team squandered the resources and prestige which had been established . . . .

· Today, Judicial Watch has been reduced to little more than a web site and a few pictures.

· [T]oday's Judicial Watch appears to be primarily interested in fundraising and little else.

· Saving Judicial Watch was formed by a concerned group of citizens . . . .

22

·      . . . Tom Fitton and his collaborators who have all but destroyed Judicial
       Watch.

·      And without your help, Judicial Watch will continue to die a slow death.

The email solicitation concluded by requesting a financial contribution.  A copy of Klayman's

May 7, 2007, e-mail solicitation is attached as Exhibit P and is incorporated herein by reference.

52.     In perhaps one of the more egregious examples of his smear campaign, Klayman

caused an advertisement to be placed in the May 14, 2007, edition of the *Washington Times*

*National Weekly Edition*, a nationwide publication read by Judicial Watch supporters and in

which Judicial Watch itself has advertised.  This advertisement can only be characterized as an

intentional and malicious assembly of lies and misrepresentations of fact.  Among the multitude

of intentionally false, misleading and/or disparaging statements regarding Judicial Watch, Fitton

and others are the following:

·      Specifically, Fitton and his other two directors, Paul Orfanedes and
       Christopher Farrell have misled donors, misused their monies, abandoned
       key anti Clinton clients like Peter Paul, . . . and disparaged and harm
       Klayman and his family to try to prevent Klayman from returning to
       Judicial Watch.

·      Misled donors and did not purchase the building they promised to buy
       with their donations.

·      Used Klayman's name to raise money for Judicial Watch after Klayman
       left Judicial Watch to run for the Senate while disparaging Klayman with
       the media and others.

· Judicial Watch staff have lost virtually every major case, including those against Bill and Hillary Clinton since Klayman left to run for the Senate.

· Turned Judicial Watch into little more than a website and group that gives seminars on CSPAN, rather than a hard-hitting people's Justice Department that files and prosecutes government corruption, such as practiced by the Clintons.

· Disparaged Klayman with media outlets, trying to keep Klayman off the air. In addition, . . . [Judicial Watch] has become instead a promotional enterprise for Fitton's own self-aggrandizement.

The advertisement included a request to "[p]lease send your gift to Larry Klayman dba Saving Judicial Watch" by check or credit card. A copy of Klayman's May 14, 2007, advertisement in *The Washington Times National Weekly Edition* is attached as Exhibit Q and incorporated by reference herein.

## The Judicial Watch Trademarks

53.    Judicial Watch has used and continues to use the trademarks JUDICIAL WATCH and BECAUSE NO ONE IS ABOVE THE LAW, with and without additional terms, to identify its organization, as well as its related products and services. Judicial Watch has expended significant financial resources and man hours to develop its trademarked identity and associated goodwill. This process has been a continuing effort lasting several years at a significant cost.

54.    Judicial Watch is the owner of the trademarks JUDICIAL WATCH and BECAUSE NO ONE IS ABOVE THE LAW, and owns several federal registrations for such marks, including the following: a) JUDICIAL WATCH WASHINGTON D.C.", Registration No. 2896707; b) JUDICIAL WATCH WASHINGTON D.C., Registration No. 2892714; c)

24

JUDICIAL WATCH, Registration No. 2819145;  d)  BECAUSE NO ONE IS ABOVE THE LAW!, Registration No. 2797234; and   e) BECAUSE NO ONE IS ABOVE THE LAW!, Registration No. 2857425.  Judicial Watch filed applications for such registrations with the U.S. Patent and Trademark Office prior to Klayman's separation from Judicial Watch.  At all relevant times, Klayman had actual knowledge of Judicial Watch's ownership of such marks, as well as the existence of such trademark registrations.

55.    Klayman has and continues to use, without Judicial Watch's consent or authorization, trademarks belonging to Judicial Watch, with the intent of causing harm and injury to Judicial Watch.

56.    On or about July 16, 1997, Judicial Watch registered the domain judicialwatch.org in anticipation of operating a website relating to the organizational goals of promoting accountability and integrity in government, politics and the law.  Judicial Watch continues to operate its website relating to the organizational goals of promoting accountability and integrity in government, politics and the law using the domain judicialwatch.org.

57.    The website for Klayman d/b/a Saving Judicial Watch is accessed via savingjudicialwatch.org. The content of this site relates to services that are highly similar, if not identical, to Judicial Watch's, and which falsely indicate that Saving Judicial Watch has some association with or relationship to Judicial Watch.

58.    On or about March 1, 2006, Klayman registered the domain savingjudicialwatch.org with Go Daddy Software, Inc. using that registrar's privacy division, Domains By Proxy, Inc., so as to hide Klayman as the identifiable registrant of record.

59.    Domains by Proxy is operated on the world wide web at domainsbyproxy.com. Among the services offered is the ability to shield a domain owner's identity by listing Domains

By Proxy as the registrant of record for a particular domain name.  This allows the domain holder to hide his/her true identity and contact information.  Upon information and belief, the purpose of Klayman's use of Domains by Proxy is and was to complicate and frustrate Judicial Watch's enforcement of its trademark rights against the infringing domain.  In addition, Klayman utilizes Domains by Proxy to secret the ownership identity of his website savingjudicialwatch.org and create a false association with Judicial Watch.

60.    At all times relevant, Klayman knew that Judicial Watch possessed trademark rights in the term JUDICIAL WATCH, but consciously determined to use that mark in his domain in an intentional effort to divert clients from Judicial Watch's website to his website.

61.    Klayman's continued use of the savingjudicialwatch.com domain in commerce demonstrates his bad faith intent to divert donors from Judicial Watch's online locations to Saving Judicial Watch's site for commercial gain, which harms the goodwill represented by Judicial Watch's mark.

62.    Klayman has used and continues to use in commerce, without Judicial Watch's consent or authorization, trademarks belonging to Judicial Watch, in a manner that is likely to cause consumer confusion, and with the intent of fund raising and promotion of his organization (Saving Judicial Watch) and intentionally diverting Judicial Watch supporters and donors to his organization and away from Judicial Watch.

63.    Klayman has used, and will continue to use, Judicial Watch's trademarked name, JUDICIAL WATCH, in commerce to advertise and promote himself and his organization Saving Judicial Watch, in a manner that infringes Judicial Watch's trademark rights and which is false and misleading, and likely to cause confusion, mistake and deception among Judicial Watch supporters and donors.  Currently known uses include the following:

26

- The Saving Judicial Watch website

- April 13, 2006 Press Release

- May 9, 2006, fundraising letter

- June 16, 2006, fundraising letter

- November 20, 2006, fundraising letter

- December 12, 2006, fundraising letter

- January 2, 2007, fundraising letter

- January 29, 2007, fundraising letter

- January 29, 2007, fundraising email

- January 30, 2007, fundraising email

- February 7, 2007, fundraising letter

- February 9, 2007, fundraising letter

- March 23, 2007, fundraising letter

- April 30, 2007, fundraising letter

- May 7, 2007, fundraising email

- December 2006, advertisement

- January 22, 2007, advertisement

- January 29, 2007, advertisement

- March 5, 2007, advertisement

- April 23, 2007, advertisement

- May 14, 2007, advertisement

64.     Klayman has used, and will continue to use, Judicial Watch's trademark, BECAUSE NO ONE IS ABOVE THE LAW, in commerce to advertise and promote himself and his organization Saving Judicial Watch, in a manner that infringes Judicial Watch's trademark rights and which is false and misleading, and likely to cause confusion, mistake and deception among Judicial Watch supporters and donors.  Currently known uses include the following:

- The Saving Judicial Watch Website

- May 9, 2006, fundraising letter

- June 16, 2006, fundraising letter

65.     Moreover, the envelope for the May 9, 2006, fundraising letter, Klayman used in commerce the following return address:  JUDICIAL WATCH, P.O. BOX 131567, Houston, TX 77219-1567, to advertise and promote himself, in a manner that infringes Judicial Watch's trademark rights and which is false and misleading, and likely to cause confusion, mistake and deception among Judicial Watch supporters and donors.

66.     Judicial Watch received telephone calls and letters from vendors and donors that demonstrate actual consumer confusion as a result of Klayman's unauthorized and deceptive use of Judicial Watch's name and trademarks in commerce to promote his organization and its services.  Klayman's advertisements, solicitations and mailings, have used and are using Judicial Watch's trademarks in commerce in a manner that is likely to cause consumer confusion, and as such, constitutes an infringement of Judicial Watch's marks, as well as causing consumers to falsely believe that Klayman and his organization "Saving Judicial Watch" are in association with and/or sponsored by Judicial Watch.

28

67.     Klayman's acts have and will continue to cause Judicial Watch to suffer damage and injury to its business, reputation and goodwill, as well as a loss of funding raising revenues.

## COUNT I – BREACH OF CONTRACT
### Asserted by Judicial Watch
### <u>(Breach of ¶ 10 of the Severance Agreement by Klayman)</u>

68.     The allegations made in the foregoing and subsequent paragraphs are incorporated as if fully set forth herein.

69.     As provided in the Severance Agreement, Judicial Watch promptly paid Klayman substantial severance and other consideration, none of which is at issue in this action.

70.     Pursuant to ¶ 10 of the Severance Agreement, Klayman promised to reimburse Judicial Watch for personal costs and expenses he incurred during his employment.

71.     Pursuant to ¶ 10 of the Severance Agreement, Judicial Watch reviewed its records and made a good faith identification of the personal expenses Klayman had incurred but not reimbursed to Judicial Watch.  Between November 20, 2003, and December 16, 2003, Judicial Watch sent 48 itemized invoices, to Klayman, totaling nearly $75,000, specifically identifying each item of personal expense and providing supporting documentation.  Pursuant to ¶ 10, Klayman was obligated to pay each of those invoices within 7 days of receipt.  To date, he has paid only $4,572.68 of the total amount due.

72.     On or about May 31, 2004, Judicial Watch provided Klayman four more invoices, and with adjustments, his personal expense debt to Judicial Watch stood at $76,683.17.

73.     To date, he has not paid the outstanding balance of this debt, and it remains due and owing to Judicial Watch.  With accrued interest through March 31, 2007, the debt currently stands at $80,741.16.

## COUNT II – BREACH OF CONTRACT

**Asserted by Judicial Watch**
**(Breach of ¶ 11 of the Severance Agreement by Klayman)**

74.    The allegations made in the foregoing and subsequent paragraphs are incorporated as if fully set forth herein.

75.    At all times relevant, Klayman was the sole shareholder and officer of K&A.

76.    Pursuant to ¶ 11(A) of the Severance Agreement, Klayman re-affirmed and acknowledged K&A's debt to Judicial Watch in the amount of $78,810 as of December 31, 2002.

77.    On May 10, 2004, Judicial Watch notified Klayman that as a result of Judicial Watch's 2003 audit performed by its accountant, the K&A debt then stood at $134,119.

78.    Although Klayman had agreed in ¶11 of the Severance Agreement that K&A would "pay the *then full outstanding balance of the debt (including additional amounts allocated to K&A by Judicial Watch's accountants in accordance with their customary practice regarding this debt)*, without offset or deduction, together with accrued interest of 8% per annum, on or before May 15, 2004" (emphasis added), no portion of that debt has been paid.

79.    With accrued interest through March 31, 2007, the debt currently stands at $173,792.98.

**COUNT III – INDEMNIFICATION**
**Asserted by Judicial Watch**
**(Indemnification by Klayman for K&A's Non-Payment)**

80.    The allegations made in the foregoing and subsequent paragraphs are incorporated as if fully set forth herein.

81.    In ¶ 19(B) of the Severance Agreement, Klayman agreed to indemnify Judicial Watch for any and all claims, liabilities, costs, damages or judgments of any and every kind

30

(including, without limitation, attorneys' fees and costs) that arise from a breach of the Severance Agreement by Klayman or K&A.

82.    As delineated in Count II of this Counterclaim, K&A has failed to make prompt payment to Judicial Watch in accordance with ¶ 11 of the Severance Agreement.  On account of this failure, Judicial Watch has suffered damages, through May 31, 2006, in the amount of $162,620.52, which loss Klayman is obligated to indemnify.  In addition, Judicial Watch has incurred other damages for which Klayman must indemnify Judicial Watch, which damages are estimated to exceed $100,000.00.

83.    Despite repeated demands, Klayman refuses to comply with his obligation to indemnify Judicial Watch, as required by the Severance Agreement.

## COUNT IV – TRADEMARK INFRINGEMENT
### Asserted by Judicial Watch
### (Lanham Act -- 15 U.S.C. § 1114(1)(a))

84.    The allegations made in the foregoing and subsequent paragraphs are incorporated as if fully set forth herein.

85.    Klayman has and is engaged in acts of trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1114(1)(a) and the common law.

86.    Klayman has used and is using in commerce Judicial Watch's registered trademarks, JUDICIAL WATCH and BECAUSE NO ONE IS ABOVE THE LAW, without its consent or authorization, in connection with the solicitation of donations and support, and advertising for himself and Saving Judicial Watch in such a manner that is likely to cause and has actually caused confusion, mistake and deception among consumers.

87.    Klayman had knowledge of Judicial Watch's rights in the JUDICIAL WATCH and BECAUSE NO ONE IS ABOVE THE LAW trademarks when he began using a confusingly

31

similar names and slogans, and continues to have knowledge of Judicial Watch's rights in its marks.  Thus, Klayman has and continues to knowingly and willfully conduct the aforesaid acts with the intent to cause confusion, mistake and deception among consumers.

88.    Klayman's acts have and will continue to cause Judicial Watch to suffer damage and injury to its reputation and goodwill, together with a loss of fund raising revenues.

89.    Unless enjoined by this Court, Klayman will continue the acts mentioned herein and cause said damages and injury, all to the immediate and irreparable harm of Judicial Watch.

90.    Klayman's infringing conduct has caused and will continue to cause Judicial Watch substantial and irreparable injury in an amount not capable of determination and unless restrained, will cause further irreparable injury leaving Judicial Watch no adequate remedy at law.

**COUNT V – UNFAIR COMPETITION**
**Asserted by Judicial Watch**
**<u>(Lanham Act -- 15 U.S.C. § 1125(a))</u>**

91.    The allegations made in the foregoing and subsequent paragraphs are incorporated as if fully set forth herein.

92.    Klayman has and is engaged in acts of unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a), and the common law.

93.    Klayman has made false and/or misleading statements that have actually deceived and/or had the tendency to deceive a substantial segment of the receiving audience

94.    Klayman's false and/or misleading statements misrepresent the nature, characteristics, qualities or geographic origin of Klayman and/or Klayman d/b/a/ Saving Judicial Watch's goods or services, as well as those of Judicial Watch.

32

95.     Klayman's false and/or misleading statements are material in that they are and/or were likely to mislead and influence supporters' decisions to provide support and/or donate to Saving Judicial Watch instead of Judicial Watch.

96.     Klayman's false and/or misleading statements were made in interstate commerce.

97.     Judicial Watch has been and will continue to be injured by Klayman's materially false and/or misleading statements.  These injuries include, but are not limited to, the loss of donations, the diversion of donations from Judicial Watch to Klayman and/or Klayman d/b/a/ Saving Judicial Watch, and/or the lessening the good will Judicial Watch has enjoyed among its supporters.

### COUNT VI – UNFAIR COMPETITION
### Asserted by Judicial Watch
### (Lanham Act -- 15 U.S.C. § 1125(a))

98.     The allegations made in the foregoing and subsequent paragraphs are incorporated as if fully set forth herein.

99.     Klayman has and is engaged in acts of unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a), and the common law.

100.    Klayman has made false and/or misleading statements that have actually deceived and/or had the tendency to deceive a substantial segment of the receiving audience

101.    Klayman's false and/or misleading statements and representations are likely to cause the public and consumers to believe that Saving Judicial Watch is associated with, affiliated with, and/or sponsored or approved by Judicial Watch.

102.    Klayman's false and/or misleading statements are material in that they are and/or were likely to mislead and influence supporters' decisions to provide support and/or donate to Saving Judicial Watch instead of Judicial Watch.

33

103.     Klayman's false and/or misleading statements were made in interstate commerce.

104.     Klayman and/or Klayman d/b/a/ Saving Judicial Watch has knowingly and willfully conducted these acts with the intent to create a false affiliation, connection and association of Klayman and/or Klayman d/b/a Saving Judicial Watch with Judicial Watch.

105.     Judicial Watch has been and will continue to be injured by Klayman's materially false and/or misleading statements.  These injuries include, but are not limited to, the loss of donations, the diversion of donations from Judicial Watch to Klayman and/or Klayman d/b/a/ Saving Judicial Watch, and/or the lessening the good will Judicial Watch has enjoyed among its supporters.

## COUNT VII - CYBERSQUATTING
### Asserted by Judicial Watch
### (Lanham Act (15 U.S.C. § 1125(d))

106.     The allegations made in the foregoing and subsequent paragraphs are incorporated as if fully set forth herein.

107.     Klayman's    unauthorized    registration    and    use    of    the    domain savingjudicialwatch.org constitutes cybersquatting under the Lanham Act, 15 U.S.C. § 1125(d).

108.     Klayman's domain name savingjudicialwatch.org is confusingly similar to Plaintiff's distinctive JUDICIAL WATCH marks.

109.     Klayman does not have prior trademark or other intellectual property rights in the JUDICIAL WATCH mark, or any other similar term or name.

110.     Klayman made no prior use of the name prior to becoming acquainted with Plaintiff's JUDICIAL WATCH trademark.

111.     Klayman registered, used and continues to use the savingjudicialwatch.org domain name with bad faith intent to divert supporters and donors from Judicial Watch's

34

websites to the websites previously and currently accessible at savingjudicialwatch.org for Klayman's commercial gain and for purposes of promoting Klayman d/b/a Saving Judicial watch. Although Klayman's website may sporadically be inaccessible or evolving in content, there is no assurance that it will not be accessible in the future in a manner that continues to be unlawful and harmful to Plaintiff under the Lanham Act, 15 U.S.C. § 1125(d).

112. Klayman intentionally and purposefully concealed his Registrant contact information for the domain name savingjudicialwatch.org, by substituting his personal contact information with Domains by Proxy as the registrant of record for the domain name. Such measures constitute an intentional failure to maintain accurate contact information for the domain name and a willful intent to conceal his association with the involved domain names.

113. Klayman's actions have harmed, and will continue to harm, the goodwill represented by Judicial Watch's JUDICIAL WATCH mark, including seeking commercial gain to the detriment of Judicial Watch, by creating a likelihood of confusion as to the source, sponsorship, affiliation and endorsement of the site accessible at the domain name savingjudicialwatch.org.

114. By its unauthorized registration and use of the infringing domain name, Klayman intentionally targets Judicial Watch's supporters and donors for commercial gain based upon Judicial Watch's distinctive mark.

115. Klayman's acts have caused Judicial Watch to suffer and continue to suffer damage and injury to its reputation and goodwill, as well as a loss of fund raising revenues.

116. Klayman's harmful conduct has caused and will continue to cause Plaintiff substantial and irreparable injury in an amount not capable of determination and unless restrained, will cause further irreparable injury leaving Judicial Watch no adequate remedy at

law.

## COUNT VIII – BREACH OF CONTRACT
### Asserted by Judicial Watch
### (Breach of ¶ 17 of the Severance Agreement by Klayman)

117.    The allegations made in the foregoing and subsequent paragraphs are incorporated as if fully set forth herein.

118.    Paragraph 17 of the Severance Agreement requires that Klayman will not disparage, defame or utter negative remarks about Judicial Watch or its present and past directors, officers and employees.

119.    Klayman's statements on his website, in press releases, solicitation letters and emails, individually and collectively, disparage Judicial Watch within the meaning of ¶ 17 of the Severance Agreement and do not constitute "fair comment" on the positions or activities of Judicial Watch within the meaning of ¶ 17 of the Severance Agreement.

120.    Judicial Watch has suffered substantial damages as a result of the foregoing statements.

## COUNT IX – BREACH OF CONTRACT
### Asserted by Fitton
### (Breach of  17 of the Severance Agreement by Klayman)

121.    The allegations made in the foregoing and subsequent paragraphs are incorporated as if fully set forth herein.

122.    Paragraph 17 of the Severance Agreement requires that Klayman will not disparage, defame or utter negative remarks about Judicial Watch or its present and past directors, officers and employees.

123.    Klayman's statements on his website, in press releases, solicitation letters and emails, individually and collectively, disparage Fitton within the meaning of ¶ 17 of the Severance Agreement.

124.    Fitton has suffered substantial damages as a result of the foregoing statements.

**COUNT X – BREACH OF CONTRACT**
**Asserted by Judicial Watch**
**<u>(Breach of ¶ 4 of the Severance Agreement by Klayman)</u>**

125.    The allegations made in the foregoing and subsequent paragraphs are incorporated as if fully set forth herein.

126.    During his employment at Judicial Watch, Klayman obtained confidential information regarding it operations, plans, programs, relationships, donors, prospective donors, clients, prospective clients, past and current employees, contracts, financial affairs and legal affairs.

127.    Subsequent to the Separation Date, Klayman used non-public Confidential Information, including but not limited to, information about direct mail solicitation operations, the identity of third-parties who assisted with direct mail solicitation operations and the terms on which such programs and operations were conducted.  Klayman used this Confidential Information without seeking or obtaining written approval of an officer of Judicial Watch, and Klayman has used such information for purposes not authorized by Judicial Watch.

128.    Subsequent to the Separation Date, Klayman also used non-public Confidential Information, including but not limited to, Judicial Watch donor lists, without written approval by an officer of Judicial Watch.  Likewise, subsequent to the Separation Date, Klayman has retained or had access to Judicial Watch donor lists and/or donor data.  Specifically, after the Separation Date, Klayman obtained and/or retained, and therefore had access to, a Judicial Watch donor list

or lists from a third party or parties without written approval of an officer of Judicial Watch, and

Klayman has used such list(s) for purposes not authorized by Judicial Watch.

129.    Klayman has also misappropriated confidential information in the form of

proprietary knowledge about Judicial Watch's operations, programs and relationships, as well as

donor lists and donor data to solicit funding for various causes in violation of the Severance

Agreement.

130.    Klayman's conduct constitutes a breach of his obligations under ¶ 4 of the

Severance Agreement.

131.    Judicial Watch has suffered substantial damages as a result of the foregoing

conduct.

**COUNT XI – BREACH OF CONTRACT**
**Asserted by Judicial Watch**
**<u>(Breach of ¶ 5 of the Severance Agreement by Klayman)</u>**

132.    The allegations made in the foregoing and subsequent paragraphs are incorporated

as if fully set forth herein.

133.    As part of the Severance Agreement, Judicial Watch paid Klayman "$200,000 in

consideration of his agreement not to compete or solicit, as set forth in paragraph 5 . . . ."

(Severance Agreement ¶ 6.)

134.    In relevant part, ¶ 5(B) of the Severance Agreement states:

> B.      <u>Covenant Not to Compete or Solicit</u>.  Klayman agrees that,
> in order to enable Judicial Watch to preserve and protect Judicial
> Watch's valuable and legitimate business interests, . . . and in
> exchange for the additional consideration referred to in paragraph
> 6 . . . (which the parties acknowledge to be separately bargained
> for), Klayman shall not, for a period of two (2) years following the
> Separation Date [September 19, 2003], directly or indirectly:

38

> (i)      work or render advice as an individual or sole proprietor in Competition with Judicial Watch or work or render advice as an employee, agent, independent contractor, consultant or representative of any person, firm or legal entity which is engaged in or has plans to enter into Competition with Judicial Watch.  For purposes of this Agreement, the term "Competition" means directly or indirectly engaging in the work or advancing the mission of any ethics, anti-corruption, public integrity and government accountability watchdog or similar public interest or educational organization, or engaging in any other activities the purpose or effect of which would be to provide information, programs, publications, services or products that Judicial Watch offers, develops or sells or has plans to offer, develop or sell, as of the Separation Date . . . .

135.     On June 3, 2004, Klayman issued a press release stating that on "behalf of the American public" he had filed a lawsuit in the United States District Court for the Southern District of Florida concerning the United Nations' "Oil-for-Food" program.   According to Klayman's press release, the lawsuit was a demand under the Freedom of Information Act that the State Department "release all documents related to the scandal."  The press release continued, "'The Oil-for-Food scandal has reached every aspect of the United Nations,' said Klayman. 'American taxpayer money has been supporting this corrupt program that rewards our enemies and enriches United Nations officials and their families.  This practice must end.'"

136.     In October/November 2004, an organization called RightMarch.com ran a national newspaper advertisement touting that it had retained Klayman in its effort "to ensure the integrity of the vote over and against the Democrats' attempts at voter fraud" in the then upcoming 2004 Presidential election.  The advertisement stated:

> ·      RightMarch.com is not sitting idly by.  We have retained THE TOP EXPERT in fighting the liberals' attempt to steal this election.  His name is Larry Klayman -- and he's going

39

          to prepare at least one STRONG lawsuit for OUR side, demanding that election officials use all possible means to insure that fraudulent voting does not occur!  This is the SAME Larry Klayman who, while running the conservative legal foundation "Judicial Watch" . . . , succeeded in going to court to open the ballots in Florida's 2000 presidential election, and later PROVED that George W. Bush had WON the election, fair and square.  Now, Larry is in private practice and his firm, "The Klayman Law Firm," is well positioned to assist RightMarch.com in preventing a repeat of the 2000 election mess.

·     [O]ur expert attorney Klayman will be ALL OVER the news, in the papers, on television and radio, explaining all of our strategies to help insure an ACCURATE vote count in the presidential election.

137.    In March/April 2005, Klayman sent a fundraising solicitation out to Judicial Watch clients and/or donors advising that he and an individual named Paul Rodriguez had founded an organization called "Freedom Watch."  The cover letter of the solicitation stated, "[I]n the style I perfected at Judicial Watch, Freedom Watch will not just talk, but with a no holds barred approach act, forcefully, to preserve the rich liberties that our founding fathers bequeathed to us."  In an attached letter that describes Freedom Watch further, Klayman stated:

·     Utilizing a broad but targeted set of unique task forces, Freedom Watch will target key areas of concerns among

supporters . . . .  Every one of these task forces will respond with actions -- not mere words.  This is how Klayman and Rodriguez worked in the past to expose corruption, fraud and abuses that undermine American liberties.  And this is how they are getting the job done now! . . .

·     America's involvement in the U.N. cannot continue under present circumstances and Freedom Watch will be the catalyst for change. . . . Freedom Watch will push to reform the corrupt group, and we will bring legal and other actions to force Secretary General Kofi Annan to step down. Furthermore, we will demand that the rule of law the U.N. seeks to impose upon others is applied to the U.N. itself!

·     We have a Constitutional right to express our faith, and we will not accept any restrictions amongst God-loving people to practice our religions in peace.  Freedom Watch will take the fight to all those whose work threatens to extinguish our religious rights and freedoms. . . .

·     Furthermore, we will work to shut down groups that use taxpayers' funds to promote acts that many consider deplorable.

·     Protecting those from government intrusion will be a top priority for Freedom Watch, and we will stop at nothing to

> break down the wall of government "secrecy" that threatens us all.

· Using all available legal means, Freedom Watch will work to protect our borders from those that trample our country's laws. Freedom Watch will defend against those seeking to undermine our fundamental liberties.

· Freedom Watch also will, once and for all, light the fuse that will end in the abolishment of the IRS. No longer will individuals or groups be audited for political or improper purposes!

· Freedom Watch will not only **_act forcefully_** to protect your liberties, it will educate the American public through websites, publications, media appearances, seminars and conferences.

138. These and other actions, individually and collectively, engaged in by Klayman violate ¶ 5 of the Severance Agreement.

### Prayer for Relief

WHEREFORE, Judicial Watch and Fitton ask that the Court enter an Order against Klayman as follows:

A. One Count I, that Judicial Watch be awarded judgment in its favor in the amount of $77,399.45, plus pre- and post-judgment interest;

B. On Count II, that Judicial Watch be awarded judgment in its favor in the amount of $162,620.52, plus additional pre- and post-judgment interest;

C.     On Count III, that Judicial Watch be awarded judgment in its favor in the amount of $162,620.52, other damages that are estimated to exceed $100,000.00, plus additional pre- and post-judgment interest;

D.     On Counts IV-VI, that Judicial Watch be awarded judgment in its favor in an amount to be determined at the trial of this matter pursuant to 15 U.S.C. § 1117(a), and that such amount be trebled pursuant to 15 U.S.C. § 1117(a), and that Judicial Watch be awarded the costs of the action and reasonable attorney fees pursuant to 15 U.S.C. § 1117(a);

E.     On Counts IV-VI, that Judicial Watch be awarded injunctive relief pursuant to 15 U.S.C. § 1116;

F.     On Count VII, that Judicial Watch be awarded injunctive relief and forfeiture or cancellation of the domain name or the transfer of the domain name to Judicial Watch.

G.     On Count VIII, that Judicial Watch be awarded judgment in its favor in an amount to be determined at the trial of this matter;

H.     On Count IX, that Fitton be awarded judgment in his favor in an amount to be determined at the trial of this matter;

H.     On Count X, that Fitton be awarded judgment in his favor in an amount to be determined at the trial of this matter;

I.     On Count XI, that Judicial Watch be awarded judgment in its favor in an amount to be determined at the trial of this matter;

J.     That Judicial Watch and Fitton, respectively, be awarded attorney's fees, court costs, and other expenses in accordance with ¶¶ 19(B-C) of the Severance Agreement.

K.     That the Court award such other and further relief as the Court may deem just and equitable in the circumstances.

43

### Demand for Jury Trial

Judicial Watch demands a jury trial on all issues so triable.

Respectfully submitted,

/s/ *Richard W. Driscoll*

_____

Richard W. Driscoll (436471)
Terence J. Everett (492139)
DRISCOLL & SELTZER, PLLC
600 Cameron Street
Alexandria, Virginia 22314
703.340.1625 Telephone
703.997.4892 Facsimile
Email: rdriscoll@driscollseltzer.com

*Counsel for Defendants Judicial Watch, Inc.,
Thomas J. Fitton, Paul Orfanedes, and Christopher
Farrell*

Dated: May 25, 2007

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 25th day of May 2007, a copy of the foregoing Amended Counterclaims of Judicial Watch, Inc. and Thomas J. Fitton was served by electronic filing upon counsel listed on the Notice of Electronic Filing.

/s/ *Richard W. Driscoll*

_____

Richard W. Driscoll

44