

Select '**Print**' in your browser menu to print this document.

©2007 Legal Times Online
Page printed from: http://www.legaltimes.com

Back to Article

---

## Client Accuses Judicial Watch Of Misconduct

Emma Schwartz

04-16-2007

They've gone after the Clintons, Dick Cheney, and even Tom DeLay, all in the pursuit of good government. But now the leaders of Judicial Watch are facing their own set of ethical questions from a former client who helped the conservative watchdog group make headlines.

The allegations are outlined in a lawsuit filed in D.C. federal court by one-time Hollywood entrepreneur (and four-time felon) Peter F. Paul, who claims that Judicial Watch violated its ethical obligations during its representation of him and then misled donors about its work.

"Everything they have accused the Clintons of, they are themselves guilty of in spades," Paul says.

The dispute stems from an unusual agreement between Judicial Watch and Paul. In 2001, the organization agreed to represent Paul in his public battle against the 2000 Senate campaign of Hillary Clinton, while at the same time defending him from a series of criminal securities-fraud charges.

The 58-year-old Paul, who spent nearly three years in prisons in Brazil and New York, alleges that Judicial Watch's dual role created an inherent conflict that hurt his criminal defense and prolonged his detention. He also says the group used his fight against the Clintons for fund-raising, even after it dropped out of his case.

Last week, Paul filed a complaint with D.C. Bar Counsel against Judicial Watch lawyer Paul Orfanedes, contending that he allowed Judicial Watch President Tom Fitton, who is not a lawyer, to interfere in the legal strategy of his case. Paul is seeking more than $1 million in damages and fees.

Richard Driscoll, who represents Judicial Watch, says Paul's allegations have no merit but would not elaborate. In a March 16 motion to dismiss, Driscoll wrote, "Factually, Paul's hyperbolic allegations fail to disclose much of what actually occurred." Judge Royce Lamberth hasn't ruled on the motion.

The story of how Judicial Watch's relationship with Paul fell apart highlights the complex alliances and practices behind the group's politically charged litigation.

Paul was once a *cause célèbre* for Judicial Watch. His claims eventually led the Federal Election Commission to levy a $35,000 fine against Hillary Clinton's 2000 Senate campaign. They also served as the basis of a failed criminal prosecution of Clinton's campaign treasurer, David Rosen.

Paul was not the first client Judicial Watch had aided in criminal cases. The group also represented Democratic donor Johnny Chung, a California businessman who pleaded guilty to campaign finance violations in connection with

President Bill Clinton's 1996 re-election campaign. Judicial Watch assisted Chung in filing Freedom of Information Act lawsuits while at the same time advising in his criminal case.

Paul's suit against Judicial Watch, filed in February in the U.S. District Court for the District of Columbia, is just the latest challenge the group is facing. It is also defending a civil action filed by Larry Klayman, its founder and former director. Klayman claims that the organization defamed him and failed to uphold his severance agreement when he left in 2003 to run for a Florida Senate seat. Earlier this month, Judge Colleen Kollar-Kotelly ruled that most of Klayman's claims can go forward.

In January, Louise Benson, a former Judicial Watch donor, also sued in a Florida state court over money she gave for a new building that the organization never built.

Klayman says the lawsuits are fighting "a pattern and practice by Tom Fitton and other directors to mislead donors."

Both Klayman and Paul are using the same lawyer, Daniel Dugan of Spector Gadon & Rosen, but maintain that they are not coordinating their litigation.

Fitton declined to discuss the cases, but he calls them a "nuisance." He says: "It's unfortunate that we have to be distracted in some part as a result of these lawsuits."

**THE CLINTONS AND SPIDEY, 'NUFF SAID**

The story of Paul, the Clintons, and Judicial Watch began in August 2000 at a Hollywood fund-raiser for Hillary Clinton's Senate bid.

At the time, Paul was a co-owner of a successful Internet venture that he began with Spider-Man creator Stan Lee. The company — called Stan Lee Media — aimed to popularize superheroes on the Internet, as Lee had once done with Spider-Man, the Incredible Hulk, and other Marvel comic-book heroes. Paul was looking for big names to join the board. Someone like soon-to-be-ex-President Clinton seemed a perfect prospect.

To grease the wheels, Paul says he underwrote more than $1 million for Hillary Clinton's fund-raising gala in Los Angeles, where he rubbed shoulders with the former president.

But Paul's support did little to get Clinton on board with the venture. Paul says he felt betrayed and adds that he soon learned that the campaign had not reported his donation to the FEC. He thought he smelled a fraud.

Paul, of course, was no stranger to fraudulent schemes.

He first made a name for himself as an attorney and civic leader in Miami. But in 1979, he was convicted on one count of conspiracy to commit wire fraud and one count of cocaine possession. Paul says the charges stemmed from a sting operation he was involved in against Cuban President Fidel Castro.

After spending 30 months behind bars, Paul headed to California, where his staunch anti-Castro views quickly won him favor with then-President Ronald Reagan. Paul won an appointment to the committee organizing the bicentennial commemoration of the Constitution, where he says he worked closely with then-Chief Justice Warren Burger. While still on parole, however, Paul lied about his identity to a customs official on his way to Canada. He was charged and pleaded guilty to another felony.

Despite that setback, throughout the '80s and '90s, Paul made his mark in Hollywood, both professionally and financially. He marketed biographies for Muhammad Ali and Tony Curtis and developed the media image for the model Fabio.

Paul knew his decision to take on the Clintons would be difficult. In fact, few lawyers were willing to do so.

**BATTLING IT OUT IN BRAZIL**

In 2000, Judicial Watch was at something of a crossroads. The 30-person group was only five years old, but it had quickly made a name for itself by attacking the Clinton White House.

With Klayman's fiery attitude and aggressive litigation tactics, Judicial Watch had won the right to depose a number of key figures, including Democratic fund-raiser John Huang, Pentagon spokesman Ken Bacon, and Nolanda Hill, a former business partner of the late Commerce Secretary Ronald Brown. And the organization's FOIA litigation sometimes won sanctions against government agencies.

Although many of its suits were ultimately dismissed, Judicial Watch used its notoriety — and limited successes — to raise money. In 1998, billionaire Richard Mellon Scaife — owner of the *Pittsburgh Tribune-Review* — gave the group $550,000.

With a Republican administration in office, Judicial Watch had less fodder to motivate its mostly conservative donors. So when Paul approached the group with allegations that again would allow it to target the Clintons, Klayman was easily won over.

But Paul had other legal matters he needed help with. The dot-com bust had sent Stan Lee Media belly-up, and the Justice Department was investigating Paul's role in alleged stock manipulations with the company. The bankruptcy of his company had also wiped out most of Paul's savings. Judicial Watch agreed to foot Paul's legal bill and organize his criminal defense.

Paul's claims made a big splash when Judicial Watch filed two lawsuits in the summer of 2001 against the Clintons, one in a California court and the other with the FEC. But as Paul's political attack generated attention, his criminal case heated up.

In July 2001, he was indicted for securities fraud in the Eastern District of New York. The Securities and Exchange Commission also filed civil charges in California.

A few months earlier, Paul had gone to Brazil, where he had long run a business selling software that teaches English. The feds saw the move as an attempt to evade indictment. So they had Paul arrested in Sao Paulo in August and taken to a local prison.

Judicial Watch retained criminal-defense attorney Michael Dowd. Dowd is a well-known New York lawyer who had once been suspended from practicing law for his involvement in a kickback scheme in the 1980s. But he later made a name for himself by representing battered women and people abused by clergy.

Paul was not an easy client, Dowd says, but he doesn't recall anything amiss about Paul's relationship with Judicial Watch. "It seemed that they were genuinely interested in him," he says.

At first, Paul and his lawyers tried to negotiate some sort of immunity: Paul would dish about his company and the Clintons in exchange for an end to the criminal charges.

Discussions eventually broke down and Paul began fighting extradition — a battle that lasted until September 2003, when he was finally brought back to America and held at a Brooklyn jail.

During Paul's first hearing in New York, he fired Dowd on the spot. According to the ethics complaint Paul filed against Judicial Watch's Orfanedes, Dowd told the court that he was not familiar with the 2001 indictment. (Dowd declined to comment on his departure.)

Paul then approached James Neville, a local criminal-defense lawyer sitting in the courtroom that day. "I grabbed him, and I said, 'How would you like to represent me?'" Paul says.

The hire didn't sit well with Judicial Watch, so Fitton, who by this point had taken over for Klayman, brought in another lawyer, Robert Sticht from Beverly Hills.

Sticht and Neville immediately fought over strategy. Paul wanted to file a habeas corpus petition challenging the extradition process in Brazil. Sticht disagreed. Neville thought the petition was a long shot but says "it certainly was a rational tactic to take." (Sticht could not be reached for comment.)

Neville felt that Judicial Watch's opposition to the filing conflicted with his obligation to zealously represent his client. He also felt the group was short-shrifting him on payment. (He eventually got $40,000, he says.)

Fitton responded by firing him. He then hired two new lawyers, Boris Orlov from Sticht's firm and Scott Black from Kostelanetz & Fink.

But the relationship between Paul and Judicial Watch was already wearing thin. Paul complained that his Judicial Watch-paid attorneys were unwilling to visit him in jail. What's more, he felt that Fitton was giving Orfanedes and Sticht legal advice, even though he is not a lawyer.

Even an outsider could sense problems. "The evidence in the case was really overwhelming," says Steve Zissou, who represented a co-defendant in the case. "You really have to say to the client, 'You have to get out of the case, you're a dead duck.'"

Instead, Paul claims that his new defense team "proceeded to file numerous motions designed to anger the court, but with little hope of success."

One of these motions brought both sides to a head during an August 2004 hearing before Judge Leonard Wexler. Prosecutors claimed in a sealed filing that Judicial Watch had created a conflict of interest by filing the motion to dismiss the indictment for outrageous government conduct, which they believed could only be proven if Paul admitted to potentially criminal behavior.

Wexler was concerned, as well. "Let me ask you one question," he told Sticht, according to the transcript. "Who is paying you? You keep flying in. You keep making all this paperwork."

Sticht did not see a problem, but Wexler offered to appoint an outside counsel for Paul to consult with. Paul, however, refused, and wound up retaining Joseph Conway, a recently departed prosecutor from the U.S. Attorney's Office in Long Island.

Within days, Conway had essentially reversed Judicial Watch's legal strategy. He dismissed the three appeals on Paul's bail and withdrew the motion over the government's conduct, indicating that Paul would plead guilty in the New York case as well as to the SEC charges in California.

Left without many options, Sticht asked Wexler to let him withdraw from the representation — but not before making accusations of his own. In a November 2004 court filing, Sticht accused Conway of a conflict of interest because he had just left the U.S. Attorney's Office that was prosecuting Paul. (Conway said at the time that he'd never been involved with the case.)

In January 2005, Paul pleaded guilty to one count of securities fraud and was released on bail. In plea documents, Paul states that he takes medicine for a bipolar disorder. Two years later, he has yet to be sentenced and is currently living with his family in Asheville, N.C.

But there was still the problem of Judicial Watch's pledge to cover Paul's legal bills. In 2005, Fitton tried to get Paul to waive that commitment in exchange for $75,000. Paul declined and grew increasingly incensed that Judicial Watch continued to trumpet him in its fund-raising — as it did when the FEC fined the Clinton campaign that December.

Fitton is not concerned that the attacks will hurt Judicial Watch's bottom line. He says the group has branched out to new issues, such as immigration. Of course, it hasn't forgotten about the Clintons. The group recently released a "poll" focused on Hillary Clinton's bid for the White House. The results: 45 percent of voters were concerned her administration would be corrupt.

*Emma Schwartz can be contacted at **eschwartz@alm.com**.*

©2007