# The Nation.

Click here to return to the browser-optimized version of this page.

This article can be found on the web at
http://www.thenation.com/doc/20040329/corn

## Klayman Watch

by DAVID CORN

[from the March 29, 2004 issue]

Did Larry Klayman, the conservative lawyer/provocateur who spent much of the 1990s suing Clinton-related targets via his Judicial Watch and accusing the Bill-and-Hillary crowd of vast corruptions, recently try to skirt campaign-finance law to obtain an illegal million-dollar boost for his back-of-the-pack US Senate campaign in Florida? Klayman is litigious. *Newsweek* reported in 1998 that he had even sued his mother during a family spat. So let's just lay out the facts, and readers can reach their own conclusions.

Some background: Klayman started Judicial Watch in 1994 and became famous--in a cable TV sort of way--by filing what seemed like thousands of lawsuits against Clintonites. His work (some might call it shenanigans) was partly underwritten by Richard Mellon Scaife, the right-wing millionaire. And Richard Viguerie, the direct-mail titan of the right, raised money for Judicial Watch. Klayman also represented the Miami relatives of Elián González in a lawsuit against the Justice Department, and he involved himself in the Florida recount mess. In recent years he expanded his hit list. Judicial Watch joined the Sierra Club in suing Vice President Cheney for records of Cheney's energy task force, and it launched a lawsuit against Cheney and Halliburton for alleged accounting fraud (a federal court dismissed the case). But Klayman also stuck to his bread and butter, representing Gennifer Flowers, who filed a suit claiming Hillary Clinton had tried to destroy her, and supporting a businessman charged with stock and bank fraud who claimed he secretly made illegal campaign contributions to Hillary Clinton.

On September 23, Klayman left Judicial Watch, which issued a terse three-sentence statement that could be read as a sign that the parting had not been amicable. That day, Klayman announced he was running for the US Senate from Florida and that he intended to be Hillary Clinton's "worst nightmare." He joined a large field of Republicans seeking this seat, a group that now includes former Housing Secretary Mel Martinez, former US Representative Bill McCollum, Florida House speaker Johnnie Byrd, former US Senator Bob Smith, State Senator Daniel Webster and businessman Doug Gallagher. In a recent poll, Klayman was at 4 percent.

In the first three months of Klayman's campaign, he raised $610,555, mostly through direct-mail fundraising conducted by Viguerie's American Target Advertising, according to Federal Election Commission records. In this period Klayman paid ATA $577,358. That is, the revenue barely covered the direct-mail cost--not good news for any campaign. And a report prepared in late January by ATA noted that the Klayman campaign had sent out slightly more than 1 million pieces at a cost of $730,315 and brought in $703,155.

Viguerie was using an assortment of conservative mailing lists, yet Klayman was scoring reasonably well mainly with those from Judicial Watch, according to ATA records. These Judicial Watch lists, though, were several years old, and mailing lists tend to deteriorate quickly. Klayman's direct-mail program could not rely on the older lists. One obvious answer was to rent Judicial Watch's up-to-date lists. Sources familiar with the campaign say

Klayman told campaign workers he had tried that, unsuccessfully. (Tom Fitton, Judicial Watch's current president, denies Klayman made such a request.) But in search of a productive mailing list, Klayman, according to a lawsuit filed against him by a former campaign employee, also came up with an unorthodox remedy.

In December Paul Jensen, that former campaign aide, sued Klayman, charging him with slander. In his complaint, Jensen says that he quit the campaign because Klayman would not pay him and that after he threatened to sue Klayman for back pay, Klayman paid him but then told others Jensen had stolen from the campaign. The complaint also maintains that Klayman--who has called himself a Jew who believes in Christ--told a *Palm Beach Post* reporter he was Jewish but informed prominent Christian conservatives he was a Christian, and that Klayman instructed Jensen "to lie, if the subject came up, about the fact that Klayman had recently been divorced from his wife." Another person close to the campaign says Klayman told campaign aides to avoid mentioning his divorce and that campaign workers discussed among themselves Klayman's practice of offering different descriptions of his religious beliefs.

In his complaint, Jensen claims that in September he went with Klayman to a conference in Colorado Springs of the Council for National Policy, an organization of prominent conservatives. According to Jensen, four wealthy conservatives--William Ball Jr., Stuart Epperson, Dick Bott and Rich Bott--were attending the conference, and Klayman "was prevailing upon [them] to loan one million dollars each to American Target Advertising for its use to fund a direct-mail campaign to benefit Klayman's candidacy."

Jensen declines to talk about the loan or anything Klayman-connected, citing his ongoing case against Klayman, who has asked a federal court to dismiss Jensen's lawsuit. But with $1 million or more, Viguerie could test-mail various right-wing lists and craft a more effective list for the Klayman campaign.

I called Ball, an Indianapolis-based businessman and board member of the Center for Scientific Creation, and asked if Klayman had urged him to lend $1 million to Viguerie for use in developing a direct-mail list for Klayman's campaign. Ball replied, "Yeah." He said he discussed this with Klayman at the Council for National Policy meeting. He added, "I've known Richard [Viguerie] for many years. If I had the funds, I would do it. I'm still hoping I can do it." But, Ball said, a recent dispute with a bank had left him short of funds. He noted he'd sent Klayman a check for $600. "It's the best I can do at the time," he said. I also reached Dick Bott, founder and president of a Christian radio network. Did Klayman ask him to kick in $1 million? "I cannot confirm or deny that," he said. "I've talked to Larry Klayman several times, and I think he may have, but I'm involved in my other projects."

In an October 2 letter to Richard Scaife--written days after Klayman had lunch with him--Klayman referred to a loan idea. First he laid out his master plan. "As a senator," he wrote, "I will have considerable powers that I did not have at Judicial Watch, including the ability to investigate and prosecute in the Senate Hillary Clinton much like Richard Nixon did with the communist spy Alger Hiss.... if I am someday to run for president, I need the credentials to do so; being a senator will provide me with this. If not this year, Hillary Clinton obviously will run for the presidency in 2008. I plan to oppose her, God be willing." Then he made a pitch: "Dick, once again I need your help to achieve this goal. As explained, I left Judicial Watch without resources and must rely on direct mail to raise the monies to challenge my millionaire opponents. If you know of someone or some entity that can finance the direct mail firm, by providing a loan with an 18 percent return on investment, I would be most grateful." A Scaife spokesperson maintains that Scaife never received this letter. "He has not given one dime to Mr. Klayman's campaign," she adds, "and in fact he discouraged him from running."

Would it be legal for a Senate candidate to solicit a loan for his or her direct-mail house? I called several lawyers who specialize in campaign law and described the situation to them without mentioning Klayman's name or the identities or political affiliations of anyone involved. Joseph Sandler, a former general counsel to the Democratic Party, said, "I think that it is clearly illegal." A Senate candidate, he explained, is allowed to borrow money only from a bank or from him- or herself. If a candidate solicits a loan of this sort specifically to help his campaign, Sandler said, that would violate federal campaign law. Contributors can only donate up to $2,000 to a primary campaign. Providing $1 million in working capital to a vendor for a campaign could be seen as an in-kind donation that far exceeds the $2,000 limit. Two other lawyers specializing in election law--both of whom asked

not to be named--shared Sandler's legal opinion. "This seems like a way to get around the rules," one said. "It seems like a violation to me."

How does it seem to Klayman and Viguerie? Did they nab a million-dollar loan? Neither man responded to multiple requests for comment. And by the way, Klayman, as of this writing, had not filed his personal financial-disclosure form with the Senate, as candidates must do within thirty days of entering a Senate race. Failure to submit this form can result in an $11,000 penalty. The Judicial Watch motto is "Because no one is above the law!" Is that the watchword of Klayman's campaign?