IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LARRY KLAYMAN, et al., <br><br> Plaintiffs, <br><br> v. <br><br> JUDICIAL WATCH, INC., et al., <br><br> Defendants. | Civil Action No. 1:06-CV-00670 <br> Judge Kolar Kotelly <br> Magistrate Judge Kay |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO COMPEL PLAINTIFF'S RESPONSES TO DEFENDANTS' SUPPLEMENTAL REQUEST FOR PRODUCTION OF DOCUMENTS AND CROSS MOTION FOR PROTECTIVE ORDER AND RECONSIDERATION**

**I.  INTRODUCTION AND BACKGROUND.**

**This is a lawsuit which never should have been necessary!**

In the Spring of 2003, Larry Klayman, the founder, chairman and general counsel of Judicial Watch, about ten years after the creation of the organization, decided to step down to return to his home in Florida to run for the U.S. Senate. During this period, Mr. Klayman was separated from his then wife and undergoing a divorce, and he felt that it was a good time to do something new and different, taking advantage of his considerable experience in government and fighting government corruption. Trying to use Mr. Klayman's divorce to his advantage, the president of Judicial Watch, Tom Fitton, tried to negotiate ridiculous terms for

1

Mr. Klayman's severance, but in the end the parties agreed voluntarily to sufficient compensation and that Mr. Klayman's departure was voluntary and on good terms; "to pursue other endeavors." Judicial Watch issued a press release praising Mr. Klayman for founding Judicial Watch and building it into the major "watchdog" organization in the United States. See also, National Journal article of June, 2002 **(Exhibit 1)**. Importantly, the National Journal, the prestigious legal and political publication, in and around this time, after conducting many interviews in the non-profit and related communities, called Mr. Klayman a major force in Washington and the number one public interest litigator at the time – making a special point of praising him for his non-partisanship.

Just prior to leaving Judicial Watch, Mr. Klayman learned from a major donor that Mr. Fitton, contrary to his representations when Mr. Klayman hired him, and later in written biographies, had never graduated from college. As a result, Mr. Klayman left Judicial Watch on the oral condition and with a gentlemen's agreement that Mr. Fitton and the other directors fill Mr. Klayman's chairmanship with an experienced and well respected lawyer, such as then former Congressman Bob Barr. This was crucial, because Judicial Watch earned its reputation by filing hard hitting public interest lawsuits, not just holding seminars and publishing materials on websites. A non-lawyer, much less a college graduate, was not equipped to successfully lead the organization into the future. Indeed, the Washington Post observed in April of last year, after Mr. Fitton and the other directors had failed and refused for four years to fill the chairmanship position with an experienced and respected lawyer, that:

"Judicial Watch earned its reputation in the 1990s for lawsuits..... But it's largely been out of the news since Klayman left Judicial Watch — and filed a lawsuit against it."

Washington Post, April 6, 2007

When Mr. Klayman executed his Severance Agreement with Judicial Watch, Mr. Fitton and one other director on September 19, 2003, he thought that all parties would pursue their respective endeavors in peace. But obviously fearing that Mr. Klayman might not win his Senate race and may one day try to return to Judicial Watch, Mr. Fitton, the dominant director remaining at Judicial Watch, set out to destroy Mr. Klayman and his family, to weaken him to such an extent that he could never pose a threat to this non-lawyer, non-college graduate ever relinquishing control of the organization Mr. Klayman conceived of and founded. Much like Brutus to Caesar, the betrayal, even in the hard and cold world of Washington, D.C., was unprecedented.

First, to harm Mr. Klayman, knowing that he was in the public spotlight by virtue of his Senate run, Mr. Fitton ordered the comptroller of Judicial Watch, Susan Pretherich, to create phony, after the fact invoices, claiming that Mr. Klayman owed the organization large sums of money – obviously as a clever means to try to recoup some of the severance payment. In trying to extort this money, Mr. Fitton threatened to sue Mr. Klayman at the height of his Senate campaign to generate negative publicity, but Plaintiff would not give in to this attempted extortion. But when Klayman refused to be extorted and give in, Mr. Fitton published false notes on Judicial Watch's public income tax returns, displayed widely on the internet, misleadingly suggesting that Mr. Klayman had

3

somehow misappropriated monies from Judicial Watch, and conspicuously failing to list the considerable monies and other property which Judicial Watch owed to Mr. Klayman.

Second, Mr. Fitton, while improperly using, without authorization, Mr. Klayman's, name and signature in fundraising long after Mr. Klayman left to generate large contributions, he disparaged Mr. Klayman with the media, in an attempt to keep him off television and radio, the life blood of a public interest law and policy. **See Exhibit 2.**

Third, employees of Judicial Watch were told not to communicate or help Mr. Klayman in any way, which was their constitutional right under freedom of association and freedom of speech.

Fourth, Mr. Fitton also dishonored the terms of the Severance Agreement by cutting off Mr. Klayman's children, then five and three years old, from medical insurance.

Fifth, Mr. Fitton failed, as required under Judicial Watch's multimillion dollar lease, to remove Mr. Klayman as the personal guarantor, while at the same time reneging with donors on Judicial Watch's commitment to buy the building they were renting. Judicial Watch had raised money to buy this building with the donors' contributions. By honoring this commitment to the donors and buying the building at 501 School Street, S.W., Fitton would have mooted out the need to remove Mr. Klayman as a guarantor of the lease. Despite not buying the building – obviously to hoard this money to guarantee Fitton the other defendants' large salaries well into the future - Fitton, in newsletters and otherwise, gave donors the false impression that the building had been purchased and even published a phony plaque "showing" the naming rights donors had thought they had

purchased in the building. Incredibly, to minimize the embarrassment of having been later sued by Mr. Klayman, Fitton has told donors and others that Mr. Klayman was only an "employee" of Judicial Watch, so they should not give much consideration to his lawsuit and the fact that he was no longer with Judicial Watch. **See Exhibit 3**. What he cleverly failed to mention is that "employees" don't guarantee multimillion dollar leases, particularly when Fitton and the director at the time, Paul Orfanedes, refused to do so.

Sixth, after Mr. Klayman lost his Senate bid, and even well before, Mr. Fitton instructed Judicial Watch employees, including the receptionist, to not tell callers where Mr. Klayman could be located, denying him business and other opportunities – not to mention harming the interests of Judicial Watch clients and supporters who wanted to speak with Mr. Klayman. To make matters worse, when callers would ask why Mr. Klayman left, Mr. Fitton instructed the Judicial Watch employees to tell them that "Judicial Watch could not discuss the reasons Mr. Klayman left; that they were confidential," thereby creating false innuendo harming Mr. Klayman's reputation. And, after Mr. Fitton and company were sued, they told callers that Mr. Klayman sued them to avoid income tax issues.

Seventh, the harm to Mr. Klayman continued even after the intitial and amended complaints were filed in this case. Long after the case began, Mr. Fitton caused to be published in <u>LegalTimes</u> a story concerning Mr.Klayman's family and ex wife, from information, long since discredited and retracted, that had been placed under court seal in his divorce case. Mr. Fitton did this without regard to Mr. Klayman's children or innocent third parties, all the while claiming that the reason Mr. Klayman left was because he had no regard for so called family values. Ironically, over the years there had

been comments about Mr. Fitton's life style, which Mr. Klayman never used for advantage against him. Recently, Mr. Fitton and the other defendants have again published false information on Judicial Watch's public tax returns, suggesting the Mr. Klayman made off with a lot of money, but failed to even note the multiple lawsuits against them for the considerable monies and damage owed to Mr. Klayman. Recently, during a period just days after the death of Mr. Klayman's mother on January 24, 2008, Mr. Fitton has even attempted to use the District of Columbia Bar to harass Mr. Klayman, claiming that he did not have the right to protect former employees who were fired after Mr. Klayman left for their allegiance to him and donors and supporters and clients who have been defrauded and harmed through misleading fundraising, abandonment and other tortious acts. **See Exhibit 4** – D.C. Bar Complaint Letter. To top it all off, Mr. Fitton and the other defendants have recently tortiously interfered in Mr. Klayman's claim to be covered by Judicial Watch's "Directors and Officer's Policy" for the non-mertitorious counterclaim they filed against him. And, when Mr. Klayman and his co-counsel asked for the policy name, company and policy number many, many weeks ago, Mr. Fitton, the defendants and their counsel provided false information about the carrier and policy at issue, instead providing the wrong carrier and policy intentionally. This has harmed Mr. Klayman and delayed his right to get the same coverage which is handsomely paying for defendants" defense in this case. **See Exhibit 5.** Yet, Mr. Fitton complains and cries when Mr. Klayman has attempted to raise monies from the public through advertising to support returning Judicial Watch to an ethical foundation. The hypocrisy and misconduct of Fitton and the directors, Mr. Orfanedes and Mr. Farrell, are all harmful not only to Mr. Klayman and his family, but the donors and supporters of Judicial Watch and the

organization itself, which Plaintiff conceived of, created, seeded with his own money and resources, hired key personnel after starting with a group of volunteer lawyers, and then put ten years of "blood, sweat and tears" into. During this period, Mr. Klayman and the organization became so prominent, that the NBC hit drama "West Wing" created a character after him, "Harry Klaypool of Freedom Watch."

Not to let this rest, when Mr. Klayman created a new public interest group, "Freedom Watch" and trademarked the name, Mr. Fitton and the other defendants interfered with the Internal Revenue Serive, opened Mr. Klayman's mail accidentally sent to Judicial Watch for Freedom Watch, and assisted infringers of the trademark Freedom Watch in defending a lawsuit that Mr.Klayman filed against an imposter Republican-Bush administration front group, "Freedom's Watch," which sprung up last summer in time not only to defend General Patreous' Congressional testimony in support of the failed Iraq War, but also in time for the 2008 elections as a so called conservative adversary to the Democrat oriented Moveon.org.

In a show of incredible "chutzpah" and intellectual legal dishonesty, Mr. Fitton and the other defendants, notwithstanding their assisting Republican infringers of the trademark "Freedom Watch," had early on threatened to sue Mr. Klayman as the height of his 2004 Senate campaign, for making any mention of his having founded Judicial Watch – themselves falsely claiming trademark infringement for Plaintiff's even discussing his legal background – fearing that the Senate campaign would compete with the greed of Fitton and the other defendants for monetary contributions. **See Exhibit 6.**

7

The said irony and truth is that at all times, Mr. Klayman had tried to resolve these matters with Mr. Fitton and the other defendants, not wanting to harm the "baby" he had birthed; Judicial Watch, even using a prominent mediator in Washington, D.C. But Fitton and the other defendants did not want to settle, preferring to use their tens of millions of dollars in resources which Mr. Klayman had left behind with Judicial Watch to continue to harm Plaintiff and his family – in order to keep Mr. Klayman "down" and preoccupied so he could never lift his head up and reestablish himself prominently after he lost the Senate bid. But when the abuse and illegality by Fitton and the other defendants grew so rampant, and threatened to destroy Judicial Watch due to Mr. Fitton's fraudulent acts toward clients, donors and others, Mr. Klayman was left no choice but to file suit. In effect, Judicial Watch had been taken hostage and it was time to not recuperate and remedy the damage counsel to Mr. Klayman, his children and his family, but to also reclaim Judicial Watch for the benefit donors who had and were supporting it.

It is in this context that one must view most of Defendants' Supplemental Requests for Production of Documents, which, if not limited and reined in, are intended to be another means to harass, harm and damage Mr. Klayman and his family.

## II. Defendants' Supplemental Document Requests.

At the outset, Plaintiff, Mr. Klayman, does not object to providing relevant documents that fall within the scope of this lawsuit. [1]His responses to defendants' supplemental document requests bear this out. To the contrary, Mr. Klayman has only

---

[1] Contrary to Defendants' claims, Plaintiff's counsel did not waive his objections. In any event, this issue arose before the Magistrate issued his earlier ruling cited in Defendants' motion to compel, so the Magistrate's order was not flouted.

8

objected where the requests are burdensome, overly broad and irrelevant, and calculated only to conduct a fishing investigation of his personal life and finances – matters off limits in any reasonable discovery endeavor. Given Mr. Fitton's and the other defendants' documented history of harming Mr. Klayman, his children and his family, it is obvious that these documents, which are unnecessary in the context of this litigation, would be used to damage Plaintiff further.

For example, Mr. Fitton's and the other defendants supplemental requests numbers 13, 15, 23, 24, 25, 26, 27, 28, 29, and 30 seek to effectively clean out all of the financial records of Saving Judicial Watch, Freedom Watch and Larry Klayman personally, including his highly personal credit reports, which have no bearing on this lawsuit. Despite general requests that Plaintiff has posed to Mr. Fitton and the other defendants, they have not produced such records to Mr. Klayman, obviously because they are not relevant to the issues at hand, and are highly invasive. Assuming that Mr. Fitton and the other defendants have any claim for damages for Plaintiff's direct mail and advertising supporting this litigation– which they do not – these figures can be derived by an independent certified public accountant, and submitted to the Court under seal, without having to literally dump out all of Plaintiff's financial files and personal information. Moreover, Mr. Klayman is the counterdefendant in this case, not Saving Judicial Watch or Freedom Watch, so the requests are not relevant in any event. Plaintiff, Mr. Klayman, suggests the same procedure with financial information to be submitted by Mr. Fitton and the other defendants with regard to his damage claims – documents and information which has conspicuously not been produced and which will, if not resolved shortly, will be subject to motion practice. This approach is reasonable and appropriate, and will

9

produce the relevant damage information without invading privacy and other rights – rights which have already been violated by Mr. Fitton and the other defendants to harm Mr. Klayman, his children and his family.

To add insult to injury, and coupled with the fishing expedition concerning Mr. Klayman's financial matters, Mr. Fitton and the other defendants want to also muck around in his prior divorce from his prior wife Stephanie Luck Klayman. Specifically, at supplemental request 17 Mr. Fitton and the other defendants demand "Any and all documents filed in your divorce proceeding with Stephanie Luck Klayman, regardless of jurisdiction."

Notwithstanding the outrageous and transparent motive for this request – to harass Mr. Klayman, violate his and his children's and family's privacy, and to use the information for more press articles in publications like LegalTimes – all of which is apparent given their prior conduct smearing him in LegalTimes, a trade magazine concerning his profession – the supplemental request is not even relevant. In this regard, the Severance Agreement states plainly, by agreement of Mr. Fitton and the other defendants – that Mr. Klayman left Judicial Watch voluntarily, to pursue other endeavors and also contains the text of a public statement, later issued as a Judicial Watch press release, praising Mr. Klayman for his founding and serving as chairman of Judicial Watch. The smear campaign waged by Mr. Fitton and the other defendants is not only irrelevant, it defies the "parol evidence rule." Indeed, when Plaintiff sought to bring in issues involving Mr. Fitton and the other defendants oral promise to hire a chairman of legal stature, after Mr. Klayman left, outside of the written terms of the Severance Agreement, this court dismissed these claims. What is good for the goose is good for the

gander and in the unlikely event this supplemental request, or the supplemental requests concerning Denise Underberg Golden (#11) and Rebecca L. Eddy (#12) – two persons Mr.Fitton and the other defendants insinuate Mr. Klayman had some sort of personal relationship with are at issue, Plaintiff moves for reconsideration. This is simply not relevant in the context of this litigation and defies the parol evidence rule, and the Severance Agreement which the parties agreed to and made it clear that the reasons Mr. Klayman was leaving Judicial Watch was to pursue other endeavors, i.e., running as a candidate for the U.S. Senate. And, if Mr. Klayman had had affairs with these persons while married, would he have been so stupid to then run for the U.S. Senate? The insinuation is not only revolting, but not relevant and calculated only to harm Mr. Klayman and his family and to try to extort a settlement in this case, if not ruin Mr. Klayman's reputation so he cannot compete with the current Judicial Watch, run by persons who are milking it dry to the detriment of the donors and supporters, not to mention the harm to Plaintiff, his children and his family.

Then there are Mr. Fitton's and the other defendants' supplemental requests asking for "all" repeat "all documents, no matter what, concerning direct mail fundraising, his prior Senate campaign, Saving Judicial Watch, Freedom Watch and only God knows what else. See supplemental requests 2,3,4,7,8,9,10,13 19,23 24,25, 26,27,28,29, and 30. This is clearly overly broad and not relevant or calculated to lead to relevant evidence, notwithstanding the other legitimate issues and objections raised above.

Mr. Fitton and the other defendants also demand all documents that refer or relate in any way to former employees Sandra Cobas (#34), Russ Verney (#39), Mike

11

Pendleton (#40), Jane Chastain (#41), John Vincent (#42), Connie Ruffley (#43), and employee Janice Rorup (#45). Not only is this highly invasive of their privacy rights, but there is no showing of any relevancy to the request whatsoever and they are clearly overly broad. When Mr. Klayman sought to negotiate a reasonable limit to these and other supplemental requests, he was met with a repeated mantra by Mr. Fitton's and the other defendants' counsel that the requests were fine, without explanation. The same is true of the requests concerning Mrs. Louise Benson (#38) and Mr. Peter Paul (#37). Mrs. Benson is like a mother to Mr. Klayman and indeed has corresponded with Mr. Klayman and his children on personal matters. Mr.Paul is a former client of Mr.Fitton and the other defendants and has been forced to sue them – a lawsuit which is going forward before the Honorable Royce C. Lamberth in this court, for defendants having abandoned him, violated his contract, and other tortious acts. These issues are not involved in the instant litigation, except for the pattern and practice of Mr. Fitton and the other defendants making false representations to donors and supporters about representing Mr. Paul to raise money, when indeed they had already abandoned Mr. Paul. Thus, the supplemental requests are overly broad, largely irrelevant and objectionable.

### III. CONCLUSION.

Mr. Fitton's and the other defendants' supplemental document requests are largely designed to harass Mr. Klayman, innocent third parties and anyone else who has any past or present association with Plaintiff, including his former wife and his children. The defendants and their counsel have already demonstrated their intent to smear Mr. Klayman, increase the cost of litigation with bogus filings, and keep him down – a sole

practitioner – in any way that will curtail his professional career and personal interests. Mr. Klayman wishes that he never would have had to file this and other lawsuits that are pending before the courts, after Mr. Fitton's and the other defendants' unsuccessful attempts to have them dismissed. For five years, the disputes with Mr. Fitton and the other defendants have caused great damage and prevented Mr. Klayman from being as effective public advocate as he could otherwise be.

Plaintiff, Mr. Klayman, therefore respectfully requests that this honorable court reign in the abusive and unnecessary and harassing supplemental document requests of Mr. Fitton and the other defendants and if necessary issue a protective order. Plaintiff, Mr. Klayman, also requests a ruling that Mr. Klayman's children, family and prior divorce are not relevant to the causes of action in this case, as they are barred by the parol evidence rule, rights of privacy and common decency.

WHEREFORE, Plaintiff, Mr. Klayman, respectfully requests that Mr. Fitton and the other defendants' motion to compel be denied and that Plaintiffs' cross motions be granted.

Respectfully submitted,

s/Larry Klayman
Larry Klayman, Esq.
D.C. Bar No.: 334581

3415 SW 24th Street
Miami, FL 33145
Tel: 305-447-1091
Fax: 305-447-1548

Daniel J. Dugan, Esquire

Spector Gadon & Rosen, P.C.
1635 Market Street 7th Floor
Philadelphia, PA 19103
Tel: 215-241-8872
Fax: 215.241.8844

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 3rd day of March 2008, a true copy of the foregoing Motion to Compel Plaintiffs' Response to Defendants' Supplemental request for Production of Documents and Cross Motion for Protective Order and Reconsideration was served via electronic means to:

Richard W. Driscoll, Esquire
Driscoll & Seltzer, PLLC
600 Cameron Street
Alexandria, VA 22314

By: s/Larry Klayman
Larry Klayman, Esq.
D.C. Bar No.: 334581

3415 SW 24th Street
Miami, FL 33145
Tel: 305-447-1091
Fax: 305-447-1548