# EXHIBIT 1

Case 1:05-cv-00670-CKK-AK   Document 125-9   Filed 03/27/2008   Page 2 of 7

June 29, 2002  Number 26

# National Journal

THE WEEKLY
ON POLITICS AND
GOVERNMENT

## Our Porous Ports

Security experts warn that the most glaring gap in America's defenses may be its seaports. Is enough being done to protect them?   BY JAMES KITFIELD

LEGAL AFFAIRS



**CLINTON CRITIC:**
During the 1990s, Larry Klayman's Judicial Watch filed a blizzard of lawsuits against members of the administration.

# Turning the Tables

BY LOUIS JACOBSON

**LARRY KLAYMAN, ONCE LABELED A RIGHT-WING OPERATIVE, HAS BEEN SUING REPUBLICANS, RAISING MONEY, AND PRYING OPEN SOME GOVERNMENT SECRETS.**

Walk into the offices of Judicial Watch—located on two floors of a building that is squeezed amid the hulking bureaucratic fortresses of Southwest Washington—and you enter a universe in disarray. The elevator opens onto a workspace undergoing major renovation; wires dangle from the ceiling, bunched-up carpets lie limply on the floor, fat bags of fiberglass await installation, and various types of piping bulge from half-built walls.

The setting, as it happens, is uncannily appropriate. Judicial Watch—an aggressively litigious watchdog group founded in 1994 by onetime international-trade lawyer Larry Klayman—is itself something of a work in progress. With a staff of 50 and a budget of roughly $15 million, Judicial Watch recently announced the opening of a Chicago office, adding to those already operating in Washington, Dallas, Los Angeles, and Miami. More outposts, both domestic and foreign, are on the drawing board.

And it's not just the office that's being renovated. Until recently, the public image of Klayman, the group's chairman, was that of a Clinton-hating zealot—a charter member, as it were, of the "vast right-wing conspiracy." Klayman and Judicial Watch came to public attention in the 1990s for filing a blizzard of lawsuits against members of the Clinton administration. Almost everyone who was anyone in the administration—and almost anyone who had a grudge against Clinton and his team—became a party to a Judicial Watch lawsuit, on one side or the other.

Klayman found a cooperative partner in U.S. District Court Judge Royce Lamberth, a jurist noted for his irascible,

no-nonsense approach to government oversight, who happened to be assigned a number of Judicial Watch's Clinton-era lawsuits. Some of the group's suits bore fruit, often in the release of documents embarrassing for the administration. But each case, regardless of outcome, has affected the lives of Washington officials, as measured in depositions taken and billable hours charged by their attorneys.

The president's backers ripped Klayman as a man with an insatiable desire for harassing public officials with legal fishing expeditions. And many did not mince words. Clinton strategist James Carville once called Klayman "a little twerp," a slur that only prompted more legal challenges by Klayman.

Klayman consistently denied any partisan motivation and argued that he just wanted to root out government dishonesty. But Judicial Watch's lopsided ratio of Democratic-to-Republican targets throughout the 1990s made its opponents' claims plausible. Many anti-Clinton conservatives gleefully supported Judicial Watch's efforts, at least from a distance. And now, David Schippers, who headed the House Judiciary Committee's Republican inquiry into President Clinton's impeachment, will join the group's new Chicago office.

But these days, Klayman seems to be proving out his long-held claim of nonpartisanship. Beginning in 2001, he filed complaints against the National Republican Congressional Committee and House Majority Whip Tom DeLay, R-Texas, alleging that they had given big donors special access. He demanded that the Senate probe for links between President Bush's then-nominee for Labor secretary, Elaine Chao, and controversial Clinton fundraiser John Huang. Klayman also joined the legal maelstrom over the Enron bankruptcy, calling the company that was once close to GOP leaders a "gargantuan fraud." He filed an ethics complaint against former Whitewater Independent Counsel Robert Ray, a Republican, for allegedly laying the groundwork for a Senate run while still serving as special prosecutor. (Many of these actions are still pending.)

Most notably, Judicial Watch filed suit—parallel to actions filed by environmental groups and the General Accounting Office—to force access to the records of Vice President Cheney's energy task force. On May 23, Klayman and the other plaintiffs won a major victory when a federal judge refused to dismiss the suit and ruled that Cheney must turn over relevant documents for discovery.

Such recent cases against Republican targets have forced partisans to hastily rejigger their views of Klayman to fit their current political needs. "Larry Klayman believes the government is accountable not to the people but to Judicial Watch," griped one Republican who has been threatened with a lawsuit. In an interview with *National Journal*, Grover G. Norquist, who heads Americans for Tax Reform, echoed the feelings expressed by many of his conservative peers. "Before, if he'd called me, I would have accepted lunch, and I would have been interested in what he was doing," Norquist said. "I don't think I'd take that call today."

Not surprisingly, a few liberals and Democrats have warmed to Klayman recently. "I felt he was a Republican



**LARRY KLAYMAN:** "I don't care what people think, because most of them are not up to the standards of what I believe in."

stooge all these years," said one lawyer who has faced off against Klayman on behalf of Democratic clients. "Now I think maybe he's onto something."

"He's helpful to us," added one Democrat. "Our guys in the Senate are loath to go after documents the way the Republicans did. Klayman actually ends up getting some real work done for us. He's able to pry the information out."

Some politicos go further, suggesting that Klayman is now making a tangible impact in Washington. At a time when the executive branch seems especially interested in keeping secrets from the public, activists in the small community of Freedom of Information Act experts say that Klayman has become a leading, albeit maverick, figure in challenging secrecy rules. "He appears to be the major public-interest litigator at this time," said Harry Hammitt, editor and publisher of *Access Reports*, an FOIA newsletter based in Lynchburg, Va.

Indeed, one recurring theme emerged from the two dozen interviews conducted for this story: The main reason Larry Klayman is exasperating to many people across the political spectrum is that he ignores the rules of partisan combat that define Washington. Many political operatives have come to realize that Klayman is impossible to sway, because he seeks no Establishment credentials, and has none to protect.

"At the end of the day, it's like devoting your life to the eradication of a mosquito," said one Republican. "Klayman is proof positive that in this country, you can sue anyone for any reason any day of the week."

Without prompting, former Clinton spokesman Joe Lockhart used a similar metaphor in referring to Klayman. "I guess there's a place for annoying insects in every system," Lockhart said. "It's not worth the effort to squash him."

### DIFFICULT TO DEAL WITH

In a town that cheers self-made men and women, Larry Klayman, 50, is about as self-made as they come. Born in Philadelphia and educated at Duke University and Emory School of Law, he served from 1979 to 1981 as an attorney in the Justice Department's Antitrust Division, then founded his own firm, Klayman & Associates, in 1983, to practice international trade law. When Klayman established Judicial

Watch in Washington in July 1994, few people in the nation's capital had ever heard of him.

Klayman said he came up with the name because "Judicial Watch" has a double meaning: The group would be a watchdog over judicial practices *and* use the judiciary as a watchdog over the rest of government. After 17 years in the legal profession, "I'd seen a lot of dishonesty among lawyers," Klayman said in an interview. "Judges' decisions were made not on the merits but because of what kind of special interest you represented. I saw that in government, too."

Monitoring judges is still one of Judicial Watch's main activities. In Los Angeles, for instance, the group watches and reports on judges in action, "to praise the good ones and criticize the bad ones," Klayman said. But what got Klayman's adrenaline rushing—and drew the most media attention—was the chance to battle the big names.

Klayman's operating style is widely considered sui generis. Several judges have sanctioned him for filing frivolous motions or for other misconduct; one barred Klayman from his courtroom permanently. In legal proceedings, said one lawyer who has dealt with him, Klayman "is utterly humorless and without the normal give-and-take. It's not even a question of whether you'd want to go have drinks with him after a court appearance. It's that if you tell him your daughter has a ballet rehearsal in two days and you want to postpone a deposition, he'll probably say no."

Klayman admits he's "guilty" of the charge that he's difficult. "I don't put up with dissembling, and lying, and forgetting when people should be able to remember," he said. "Like when [Clinton adviser] Harold Ickes came in, and I asked what school he had gone to. He said, 'I don't remember.'"

This humorlessness is one cornerstone of the antagonism toward Klayman. Critics also tend to bring up the story that he once sued his mother, though Klayman insists that the episode has been grossly misunderstood. "My grandmother was the closest person in my life," he said, motioning to her photograph in his office. "She raised me. My stepdad induced her to turn over her life savings. When my grandmother broke her hip and was on her deathbed, she needed money to care for herself. I brought the case to get her money back, as any good son would have done. I love my mother [but] she was suffering from dementia. She was controlled by my stepfather. The money was in her name, so I technically had to sue her."

Interestingly, Klayman doesn't appear to mind the confusion spawned by the more popular version of the story. "I think people thought if I would sue my mother, I would sue anybody, and that may have had a deterrent effect," he said.

Klayman also disagrees with critics who dismiss him as a headline hound. He calls the media "the most powerful entity in the world"—considering it such an important tool that he not only cultivates media sources but also airs his own television and radio shows. Yet he adds that he has taken steps to lower his own profile in favor of Thomas J. Fitton,



**BILL ALLISON:** Klayman is "consistent in trying to force government agencies to release information."

the group's president, noting that 95 percent of respondents in a recent Judicial Watch survey said they'd continue to support the group even without Klayman. "I don't care what people think, because most of them are not up to the standards of what I believe in."

So what does Klayman believe in? He describes his group's orientation as "fiercely nonpartisan, but conservative. We have a healthy skepticism about government. Unless it's watched and scrutinized, it becomes corrupt."

What Klayman calls ethical watchdogging his critics deride as conspiracy-mongering. In 1997, Judicial Watch helped the conservative group Accuracy in Media file lawsuits seeking documents related to the suicide of Vince Foster, Clinton's deputy White House counsel. Last March, Klayman filed a suit on behalf of more than a dozen survivors of the Oklahoma City bombing, claiming that Iraq was behind the attack. Judicial Watch even filed one case in the mid-1990s that asked the Armed Forces Institute of Pathology to investigate whether Clinton Commerce Secretary Ron Brown had been shot in the head before his plane crashed, killing all aboard.

To be sure, some of Klayman's other efforts have generated more mainstream support. One was a bid to extract information from the Commerce Department about how companies were tapped to take part in Brown's foreign-trade missions. Even *The Washington Post*—whose columnists have repeatedly, and gleefully, ridiculed Klayman's litigation excesses—conceded in a 1999 editorial that Klayman had a point with this suit. While the editorial called Klayman's litigation habits "distasteful," it added that such behavior "does not make him less entitled to information from the government under FOIA. The irony is that in so badly mishandling his FOIA requests, the Commerce Department has given Mr. Klayman a legitimate issue."

Some observers—even those with no ties to the conservative movement—say that Klayman's Clinton-era suits were a public service. Bill Allison, the managing editor of the Center for Public Integrity, a government watchdog group that has taken on both Republicans and Democrats, calls Klayman "consistent in trying to force government agencies to release information, and for that, I have to take my hat off to him."

Experts in FOIA law credit Klayman with finding a previously empty niche. "My impression is that he is one of the first people with an avowedly conservative point of view who has really jumped into using FOIA in a big way," Hammitt said. "Beforehand, most of the usual FOIA suspects were people on the left." In the years since Klayman showed the way, the GOP and conservative groups have used information derived from FOIA with growing frequency, said David Burnham, co-director of the Transactional Records Access Clearinghouse, a nonpartisan FOIA research operation at Syracuse University.

"Probably the worst decision the Bush Administration made was to make Klayman an outcast," added Mark Zaid, a lawyer who represents both whistle-blowers and media outlets and who heads the nonprofit James Madison Project. "I commend Larry's tenacity in standing up for what he believes is the right thing."

The most important single break for Klayman and Judicial

Watch may have been the chance assignment of Lamberth to one of his Clinton-era cases—an assignment that caused other, related cases to be assigned to Lamberth as well. By all accounts, Lamberth is exactly the kind of judge who would be open to Klayman's arguments—iconoclastic and devoted to rigorous government oversight. Although legal experts say that Lamberth has not given Judicial Watch free rein, they agree that he has lent Klayman an unusually sympathetic ear. "In almost any other place in the world, he probably would have been long since put out of business," said a lawyer who has faced off against Klayman.

Still, some say that Klayman's results have come more from good fortune—and sheer exertion—than from legal brilliance. One lawyer who has battled Klayman called him "a terrible lawyer—someone whose skills at cross-examination and brief-writing are, on any objective basis, well below average." Suing the federal government, this lawyer added, "offers endless possibilities even for lousy lawyers to be onto something."

Klayman defends his legal skills, but concedes that the quality of Judicial Watch's filings might improve if it chose to pursue fewer cases. Still, he said, that's unlikely to happen anytime soon. "Because a lot of cases are dismissed by judges appointed by politicians, we try to be a little like a [multiwarhead] missile. Not a lot of our efforts will get through."

### WHO ARE THE FUNDERS?

Over the years, Klayman has taken pride in his record of building his organization from scratch.

In creating Judicial Watch, Klayman said, he emulated consumer advocate Ralph Nader. "I talked with Nader's people" when setting up Judicial Watch, Klayman said. "I wanted to see how they were structured. They were nice. They showed me some of their corporate documents." (Nader—someone else who has inspired plenty of angst in the political establishment in recent years—said he didn't know enough about Klayman to comment.)

In the early years, Klayman often subsidized Judicial Watch's operations out of his own pocket, but he no longer needs to. The organization's most recent public tax documents, filed for 2000, list revenues of $26.5 million and expenses of $21.2 million, including $250,000 in compensation for Klayman. Revenues have since fallen to around $15 million, Klayman said, but even that is equal to or more than the revenues reported by the American Civil Liberties Union, the American Israel Public Affairs Committee, the Brady Campaign to Prevent Gun Violence, Common Cause, and the NAACP Legal Defense & Educational Fund.

The IRS does not require nonprofit groups to divulge the names of major contributors, and Klayman says today—as he has in the past—that the source of Judicial Watch's funding "is mainly small donations from the public." Judicial Watch, which claims 300,000 "supporters," collects contributions through direct-mail appeals and "contribute" buttons on his Web site. The group's 2000 IRS form lists $1.8 million in payments to American Target Advertising in Manassas, Va., for direct-mail services. Calls to Judicial Watch's toll-free line—the only number for the Washington office listed on the Web site—are answered by an operator located elsewhere, whose first question is whether the caller would like to make a contribution.

The only large contributor that Klayman would confirm was Richard Mellon Scaife, the Pittsburgh industrial heir who has funded myriad conservative institutions. To Klayman's critics, Scaife's backing seems to suggest a smoking-gun link to the vast right-wing conspiracy. On the other hand, Scaife's political orientation has always been considered one of the quirkiest of any conservative funder. He has been widely reported to take a special interest in topics that make other conservatives squirm, such as probing the circumstances of Vince Foster's death.



**GROVER NORQUIST:** "I don't know anyone who hates him, because I don't know anyone who cares enough to hate him."

Klayman said he's "very proud" of Scaife's funding—and adds that Scaife approves of Judicial Watch's suits against Republicans. "He has been unfairly demonized," Klayman said. "He is a fine man."

Judicial Watch's silence about its other big-ticket contributors troubles many outsiders—even those who praise its work. "We put our donors' names on our Web site, in part because we don't see how we can avoid it if we're also screaming and hollering about the government keeping things out of the public eye," said Allison of the Center for Public Integrity. "He's right that government should be more transparent than the private sector. But the flip side is that it's hard to take seriously someone who doesn't reveal" fuller details about his own group's funding patterns.

### COURTING CONSERVATIVES

Klayman is usually up front about his conservatism, but he faults some journalists for not recognizing the difference between ideology and partisanship. Klayman notes that he was one of the first to call for then-House Speaker Newt Gingrich, R-Ga., to resign, and he also pursued then-Mayor Rudolph W. Giuliani, of New York City, for such matters as improper use of public parking spaces. "But nobody ever wanted to give us any credit for it, because it's a better story if we were some right-wing group," he said.

Klayman acknowledges that his docket was a bit one-sided during the 1990s, but justifies it by noting that Congress, which was controlled by the GOP for the last half-decade, typically exempts itself from scrutiny when it passes laws. By contrast, the executive branch offers wide opportunity for public oversight—and to Judicial Watch, the prevailing ethical standards within the Clinton administration offered endless grist for lawsuits. "The term 'anti-Clinton' should not be pejorative," said Judicial Watch President Fitton. "He was the most corrupt person ever to sit in that office. We didn't file *enough* against him!"

Despite Klayman's claims of evenhandedness, he did court conservatives during the Clinton years, and they eagerly returned the interest. Klayman was invited to appear at conferences of the Leadership Institute and other conservative groups. He addressed a rally of pro-gun women that countered the anti-gun Million Mom March in 2000. And he joined the Council for National Policy, a low-profile, mem-

bers-only conservative club modeled on the Council on Foreign Relations. Klayman's link to CNP wasn't just for show, conservatives say; it also helped him raise money. "At the height of the Monica situation, people were throwing money at him" at CNP events, said one conservative who was there.

Even so, the alliance between Klayman and the conservative movement seems to have been much more arm's-length than his critics assumed at the time. Indeed, if you talk to veteran conservatives, many will say they barely know Klayman. "I never saw him at someone's surprise 40th birthday party," a conservative activist said. "Larry Klayman's always had better relationships with the bookers at *Rivera Live* than with the players in the conservative movement."

Norquist—who for years has hosted a weekly strategy meeting for conservatives—said he doesn't remember having been in a room with Klayman. "I don't know anyone who hates him, because I don't know anyone who cares enough to hate him," Norquist said.

Klayman also appears to have worked independently of the Republican investigatory machinery on Capitol Hill. "It's true that a lot of what he's been involved in, we've been involved in too, because they are important issues," said one source on the House Government Reform Committee, chaired by Rep. Dan Burton, R-Ind. "But there was absolutely no coordination between us."

To some observers, Klayman's attacks on the Bush administration suggest an element of self-preservation. "Necessity is the mother of invention," said Stanley M. Brand, a Washington lawyer who has faced off against Klayman. "You can pursue the Democrats in one house of Congress, or you can transition into a more nonpartisan organization."

Klayman, however, insists that such explanations are wrong. To him, Bush abandoned his campaign pledge to run a more ethical administration even before he took office. And Klayman expresses irritation at what he considers a brush-off by Attorney General John D. Ashcroft, who declined to meet with him in early 2001. A series of letters got Klayman no more satisfaction, leading him to conclude that while the personnel had changed, the attitude toward government ethics had not. "The same people are litigating, and the same positions are being held," he said.

Klayman says that his grassroots supporters approve of the decision to target Bush, Cheney, and other Republicans and that "we've gotten very, very few e-mails questioning our activities." The membership survey showed that "92 percent liked George W. Bush, but only 16 percent were happy with his performance," Klayman explained. "That means that 84 percent were unhappy with the Bush administration. We fill a void for them."

## STILL ALOOF

Feelings on the left are substantially more mixed. "I'm sure there are some Democrats who take some secret pleasure in watching what he's doing now," said Joel Johnson, a former strategist in the Clinton White House. "But this all seems to be more about Larry Klayman than anything else. In my opinion, the enemy of my enemy is still a jerk."

Former White House Counsel Lanny Davis—who once sat through a Klayman deposition only to see him pass a tape of it, within hours, to television host Geraldo Rivera—agrees. "Regardless of whether his target is the Clinton White House, the Bush White House, or anybody else, Mr. Klayman has demonstrated a willingness to abuse the judicial process," Davis said. "I take little comfort from the fact that he's now directing his abusive tactics toward Republicans rather than Democrats."

But such reactions are not universal. Some groups that are generally characterized as liberal have begun cooperating with Judicial Watch, at least loosely. The most obvious example involves the multifront effort to force open the records of the Cheney energy task force to public scrutiny. The Natural Resources Defense Council, the Sierra Club, and Judicial Watch have all filed suits. NRDC senior attorney Sharon Buccino said that while her suit and Judicial Watch's are "proceeding separately," the two organizations have been "cordial" and have "tried to keep each other apprised" of developments. Given Klayman's past lawsuits against Clinton—a pro-environment president—Buccino acknowledged that the tandem suits make for "an interesting marriage. We're glad to see that Larry's on the right side of this issue."

Operationally, though, Klayman tends to run things independently of his co-plaintiffs. And Zaid added that Judicial Watch has remained aloof from the rest of the small community of FOIA litigators. "I've invited them to events, but for whatever reason, they haven't decided to participate," he said.

Stephen Hess, a senior fellow at the Brookings Institution, said that Judicial Watch's actions against the Bush administration have convinced him that Klayman is "an honorable guy" rather than "a bug-eyed conservative Republican stalking-horse." But, Hess adds, Klayman also deserves criticism for worsening government in certain ways, even as he has sought to improve it.

Klayman's litigiousness, Hess said, has helped create an environment in which public servants must constantly defend themselves from lawsuits, often at their own expense, thus discouraging many from serving in the first place. Klayman's legal assault on the Clinton White House, he added, also helped force judges to draw firm boundaries on such government prerogatives as executive privilege. Such rulings tend to "eat away at some of the ambiguity and flexibility that really help the system and the Constitution work," Hess said.

Klayman, naturally, disagrees, and as he relishes Judicial Watch's new momentum from the Cheney task force decision, he's also turning to new horizons. He intends to open more offices across the country so that Judicial Watch can introduce its brand of justice at the state and local level—operating much as the American Civil Liberties Union does today. From there, Klayman says, it's on to "Judicial Watch Europe, Latin America, Asia, and maybe Judicial Watch Africa."

Looking notably fitter and a bit grayer than in his Clinton-era file photos, Klayman offers a vision. "Government corruption is vast and growing," he says. "It's a growth industry."

*Louis Jacobson can be reached at ljacobson@nationaljournal.com.*

**STEPHEN HESS:** Rulings on Klayman's suits tend to "eat away at some of the ambiguity and flexibility" that the political system needs.