

STATES COURT OF AP[...]LS
FOR DISTRICT OF COLUMBIA CIRCUIT

JUL 2 4 2008

RECEIVED

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

LARRY KLAYMAN,

Petitioner,

v.

JUDICIAL WATCH, INC. a
Florida non-profit organization and
THOMAS J. FITTON, an
individual, PAUL J. ORFANEDES
an individual, CHRISTOPHER J.
FARRELL, an individual
Respondents.

D.C. Appeals Civil Action No.:



Lower Civil Action No. 06-670
(CKK)(AK)

*ORIGINAL*

## PETITION FOR WRIT OF MANDAMUS

1.      Pursuant to 28 U.S.C. §1651 and Rule 21 of Federal Rules of Appellate Procedure, Petitioner, Larry Klayman (hereinafter referred to as "Klayman") hereby petitions this Court for extraordinary relief in the nature of a Writ of Mandamus directed to Respondents, Judicial Watch, Inc. (hereinafter referred to as "Judicial Watch"),Thomas J. Fitton (hereinafter referred to as "Fitton") Paul J. Orfanedes, (hereinafter referred to as "Orfanedes") and Christopher J. Farrell (hereinafter referred to as "Farrell") (Judicial Watch, Fitton, Orfanedes and Farrell collectively hereinafter referred to as "Respondents). This action seeks to compel the preservation and prevention of the production of certain documents and depositions requested by the Respondents and ordered to be produced and deposed by Judge Colleen Kollar-Kotelly.

### I.
### PARTIES

2.     The Petitioner, Larry Klayman, is an individual citizen and resident of the State of Florida.

3.     The Respondent, Judicial Watch is 501(c )(3) is a non-profit organization formed under the laws of the District of Columbia with its headquarters in the District of Columbia. Klayman founded Judicial Watch a public interest government watchdog to investigate and prosecute government corruption and abuse.

4.     The Respondent, Fitton, is the president of Judicial Watch, Inc. and at all times material controlled Judicial Watch, Inc.

5.     The Respondent, Orfanedes, is a director, secretary and head of litigation of Judicial Watch. Orfanedes acted in concert with Judicial Watch, Fitton and Farrell to commit the actions alleged in this Writ.

6.     The Respondent, Farrell, is a director of Judicial Watch. Farrell acted in concert with Judicial Watch, Fitton and Orfanedes to commit the actions alleged in this Writ.

## II.
## JURISDICTION

7.     This Court has jurisdiction under 42 U.S.C §1332 because this matter is between citizens of different states and the amount in controversy is in excess of $75,000.00. exclusive of cost and interest. This Court has further jurisdiction on Federal Rules of Appellate Procedure 21.

## III.
## INTRODUCTION

8.    This Writ of Mandamus is necessary to prevent violations of Klayman's constitutional rights and the rights of donors to Mr. Klayman's organizations including, his and their right to privacy, freedom of association and freedom of speech through the disclosure of information protected by constitutional privacy rights, attorney client privilege, work product and trade secrets. Through the use of a variety of questionable discovery tactics, the Respondents have obtained and are continuing to obtain volumes and volumes of constitutionally protected and privileged information from Klayman and third parties possessing information belonging to Klayman, while the Lower Court has not properly exercised its powers, and has acted arbitrarily and capriciously and contrary to law,  to not reasonably limit discovery to that which is necessary, relevant and not overbroad, invasive and harassing.

9.    The rationale used by the Lower Court to attempt to circumvent Klayman's constitutional protections throughout this matter has been to liberally require the production of documents and testimony, because a protective order is in place to protect the information, such as donor names, etc., from becoming public.  This rationale has been repeatedly cited by  Respondents as well. Respondents have confirmed that the protective order in place protects the use of information and documents in pubic pleadings. However, despite this uncontroverted admission by Respondents that the protective order protects information from being filed and made public on the internet in public pleadings, in recent pleadings, not filed under seal as is required, they have used confidential financial information and documents and appended them to public pleadings which are then available to anyone.

10.    The severity of the violations that Respondents have caused, which the Lower Court has sanctioned, raises doubt to the fairness of the judicial process and creates a terrible precedent for all public interest and similar groups in this country, whereby they do not have any protections over confidential donor lists, member lists and supporter information. Most donors do not want that their names publicized or disclosed regarding their charity and their contributions. The snowball effect of these rulings by the Lower Court will make donors, members and supporters refuse to donate, support or become part of certain public interest and related groups that they would have participated with if their information would be protected. The financial consequences of the Lower Court's actions in this matter creates a mind numbing precedence to all public interest and related groups. Charity itself is its greatest gift. However, the Lower Court's actions bring into serious doubt this long recognized truism.

## IV.
## FACTUAL BACKGROUND

11.    Petitioner Klayman is the former Chairman and General Counsel of Judicial Watch, a nonprofit organization that he conceived if and founded "in 1994 as a public interest watchdog to investigate and prosecute government corruption and abuse." (See Exhibit "1")(Second Am. Compl. [12] ¶¶ 2, 7, 20.) Klayman left Judicial Watch in 2003 to run for the Florida Senate. (*Id.* ¶ 28.) In anticipation of his departure, the parties entered into a Confidential Severance Agreement on September 19, 2003. See Exhibit "2")(Am. Countercl., [86-2].) Judicial Watch agreed, *inter alia*, to pay Klayman a lump sum of $400,000 as severance pay and continue his family health insurance coverage for a period of one year (*Id.* ¶¶ 2, 3.) The Severance Agreement contained a "Non-

4

Disparagement" clause; Klayman and Judicial Watch each agreed not to "directly or indirectly, disseminate or publish, or cause or encourage anyone else to disseminate or publish, in any manner, disparaging, defamatory or negative remarks or comments about" the other party. (*Id.* ¶17).

12.     On April 12, 2006, Klayman brought suit against Judicial Watch and its President, Tom Fitton. Klayman later amended his Complaint to name directors and officers Orfanedes and Farrell as defendants.(See Exhibit "3") (Second Am. Compl.) In Counts Six, Seven and Eight of the Second Amended Complaint, Klayman alleges that Judicial Watch breached various obligations owed to him under the Severance Agreement and in Count Nine he alleged that Judicial Watch defamed him by disseminating allegedly false statements to Judicial Watch employees and the media. (*Id.* ¶¶ 66, 115-162.) In Count Four, Klayman also brings a claim under Section 43(a) the Lanham Act, which provides:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act. 15 U.S.C. § 1125(a)(1)(A)-(B).

13.     Respondents have asserted counterclaims against Klayman. (See Exhibit "2")(*See* Am. Countercl.)

# V.
## ARGUMENT

14.    A Writ of Mandamus is an "extraordinary remedy." *Adams v. Georgia Gulf Corp.*,

237 F.3d 538, 542 (5th Cir.2001). The court will grant a writ of mandamus "if the

petitioner can show its right to the writ is clear and indisputable. Mandamus is

appropriate when the trial court has exceeded its jurisdiction or has declined to exercise

it, or when the trial court has so clearly and indisputably abused its discretion as to

compel prompt intervention by the appellate court." *In re Dresser Industries, Inc.*, 972

F.2d 540, 542-43 (5th Cir.1992) (citations omitted).

15.    An appellate court will grant a writ of mandamus "if the petitioner can show its

right to the writ is clear and indisputable. Mandamus is appropriate when the trial court

has exceeded its jurisdiction <u>or has declined to exercise it</u>, or when the trial court has so

clearly and indisputably abused its discretion as to compel prompt intervention by the

appellate court." <u>In re Dresser Indus., Inc.</u>, 972 F.2d 540, 542-43 (5th Cir. 1992)

(emphasis added).

**A.    April 2, 2008 Order Affirming both the Magistrate Judge's January 8, 2008 Memorandum Order and the Magistrate Judge's January 16, 2008 Memorandum Order.**

16.    Magistrate Judge Kay's January 8 and 16, 2008 Memorandum Orders relate to the

discovery that is currently ongoing in the Lower Court action. On October 24, 2007,

Respondents served subpoenas *duces tecum* on American Target Advertising, Inc.

("ATA"), Chester Mailing List Consultants, Inc. ("Chester"), and Response Unlimited

("Response"). (See Composite Exhibit "4"). Respondents served a similar subpoena

*duces tecum* on Diener Consultants, Inc. ("Diener") on October 29, 2007. *Id.* All four of

these entities were "hired by Klayman to manage advertising and financial efforts related,

in part, to funding for his Senate race, this litigation and other public interest matters on behalf of Klayman's clients. *Id.*

17.     Respondents' subpoenas seek, *inter alia*, production of "agreements between Klayman and the subpoenaed entities; communications between Klayman and the subpoenaed entities; and information as to the list selects/order through which Klayman was able to obtain names, addresses, and other proprietary information about Judicial Watch donors." The time frame of the subpoenas' "request is from 2003 to the present.". On November 5, 2007, Klayman filed a Motion to Quash Subpoenas, or Alternatively for Protective Order. (See Exhibit "5"). Respondents filed an Opposition to Klayman's Motion (See Exhibit "6"), Klayman filed a Reply Memorandum (See Exhibit "7"), and Respondents filed a Surreply (See Exhibit "8"). The Magistrate Judge overruled the Klayman's objections in his January 8, 2008 Memorandum Order.(See Exhibit "9") Klayman filed his Objections to that Memorandum Order on January 23, 2008, (See Exhibit "10") Respondents filed their Opposition to Klayman's Objections on February 4, 2008, (See Exhibit "11") and Klayman filed his Reply on February 12, 2008. (See Exhibit "12") Finally, through the Court's April 2, 2008 Order,(See Exhibit "13") the Court Affirmed the Magistrate's Memorandum Order of January 8, 2008. The central problem with these requests is that they seek to invade the traditional confidentiality of donor names and related information, and are overly broad. The information sought can be obtained in a number of different, less invasive and privacy protected ways - - as was represented to the Lower Court in the exhibits attached hereto.

18.     On June 13, 2007, Judicial Watch served its first set of interrogatories, (See Exhibit "14") and all Respondents served their Request for Production of Documents, on

Klayman. (See Exhibit "15") Klayman's responded to both sets of discovery requests on July 23, 2007. See Exhibit "16" and "17"). On October 30, 2007, Respondents sent a letter to Klayman's counsel detailing what they perceived as the deficiencies in Klayman's responses. (See Exhibit "18"). Klayman served supplemental responses to Judicial Watch's interrogatories on November 9, 2007, (See Composite Exhibit "19"). Respondents deemed Klayman's supplemental interrogatory answers non-responsive, and on December 12, 2007, filed separate Motions to Compel Klayman's Answers to Interrogatories (See Exhibit "20") and to Compel Klayman's Responses to Respondents' Request for Production of Documents (See Exhibit "21"). Klayman filed an Opposition to each Motion, (See Composite Exhibit "22") and Respondents filed a Reply in support of each Motion (See Composite Exhibit "23"), each of which Magistrate Judge Kay addressed his January 16, 2008 Memorandum Order. Klayman filed his Objections to that Memorandum Order on January 31, 2008, (See Exhibit "24"). Respondents filed their Opposition to Klayman's Objections on February 11, 2008, (See Exhibit "25") and Klayman filed his Reply on February 22, 2008. (See Exhibit "26") Finally, through the Court's April 2, 2008 Order, (See Exhibit "13") the Court Affirmed the Magistrate's Memorandum Order of January 16, 2008. (See Exhibit "27")

19.     As it relates to the April 2, 2008 Order, Respondents' argue that no harm can come to Klayman, as they have throughout this case, by Klayman producing privileged and other confidential business and personal information, without even the chance to claim privileges, etc., prior to third party production, because there is a protective order (See Exhibit "28") in place. They represent at page 4 of their opposition that,

> "The Court, however, denied Klayman's motion to quash on
> January 8, 2008, which was subsequently affirmed by Judge

Kotelly, after Klayman filed Objections on April 2, 2008. (See Exhibit "9" Court Mem. Op. of January 8, 2008. The Court specifically found that, "even if the Subpoenas seek proprietary, trade secret or confidential information, however, this Court need not grant the Motion to Quash because a mechanism already exists in this case for protecting sensitive material." (See Exhibit "28" at p. 6 citing Protective Order issued by Court on December 3, 2007))…"

20.    Rule 26(b) provides in pertinent part:

Parties may obtain discovery regarding any matter, not privileged, that is *relevant* to the claim or defense of any party.... Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party.... Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.  All discovery is subject to the limitations imposed by Rule 26(b)(2)(i), (ii), and (iii).

Fed. R. Civ. P. 26(b)(1)(emphasis added).  In all circumstances, only demonstrably relevant information is discoverable.

21.    Federal Courts are authorized to restrict discovery that is annoying, embarrassing, oppressive, unduly burdensome and/or expensive. *See* Fed. R. Civ. P. 26(c).  Further, Rule 26(c) provides in pertinent part:

Upon motion by a party or by the person from whom discovery is sought, accompanied by a certification that the movant has in good faith conferred or attempted to confer with other affected parties in an effort to resolve the dispute without court action, and for good cause shown, the court in which the action is pending or alternatively, on matters relating to a deposition, the court in the district where the deposition is to be taken may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following:

(1) that the disclosure or discovery not be had;

***

9

(3) that the discovery may be had only by a method of discovery other than that selected by the party seeking discovery;

(4) that certain matters not be inquired into, or that the scope of the disclosure or discovery be limited to certain matters

\*\*\*

(7) that a trade secret or other confidential research, development, or commercial information **not be revealed** or be revealed only in a designated way

Fed. R. Civ. P. 26(c)(emphasis added).

22.    Moreover, a party has standing to challenge a subpoena issued where the party asserts claims of privilege, proprietary interest, or personal interest in the subpoenaed matter. *United States v. Nachamie*, 91 F. Supp. 2d 552, 559 (S.D.N.Y. 2000) (citations omitted); *Chiperas v. Rubin*, 1998 U.S. Dist. LEXIS 23578, at *2 (D.D.C. Nov. 3, 1998) (citations omitted).

23.    Rule 45(c) provides for protection of persons subject to subpoenas in pertinent part:

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

\*\*\*

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it...

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B) If a subpoena

> (i) requires disclosure of a trade secret or other confidential research, development, or commercial information,...

the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

Fed. R. Civ. P. 45(c)(emphasis added).

24.    A motion to quash or modify under Fed. R. Civ. P. 45(c)(3) requires a court to quash or modify a subpoena if it "requires disclosure of privileged or other protected matter and no exception or waiver applies" or subjects a person to undue burden. Fed. R. Civ. P. 45(c)(3)(A)(iii), (iv).    A facially overbroad subpoena is unduly burdensome. *Linder v. Calero-Portcarrero*, 180 F.R.D. 168, 174 (D.D.C. 1998)(*citing Williams v. City of Dallas*, 178 F.R.D. 103, 109 (N.D. Tex. 1998).

25.    Further, if a subpoena "requires disclosure of a trade secret or other confidential research, development, or commercial information," and the party seeking discovery "shows a substantial need for the ... material that cannot otherwise be met without undue hardship ..., the court may order ... production only upon specified conditions." Fed. R. Civ. P. 45(c)(3)(B).    The court must balance the need for discovery by the requesting party and the relevance of the discovery to the case against the harm, prejudice or burden to the other party. *Truswal Systems Corp. v. Hydro-Air Engineering, Inc.*, 813 F.2d 1207, 1210 (Fed. Cir. 1987).

26.    In addition, trade secrets or other traditional "proprietary" information, confidentiality concerns may also arise in the context of personal privacy. In this regard, freedom of association such as donor information, for the purpose of advancing ideas and

11

airing grievances is a fundamental liberty guaranteed by the First Amendment. *NAACP v. Alabama*, 357 U.S. 449, 460 (1958). Compelled disclosure of the identities of an organization's members or contributors may have a chilling effect on the organization's contributors as well as on the organization's own activity. *See Buckley v. Valeo*, 424 U.S. 1, 66-68 (1976). (Importantly, Defendants in the instant case have redacted donor names from their document production). For this reason, the First Amendment requires that a compelling state interest be shown before a court may order disclosure of membership in an organization engaged in the advocacy of particular beliefs. That is, the Constitutional guarantee of freedom of association creates a privilege protected by privacy interests that protect individuals from having their private memberships and/or affiliations disclosed without prior consent.

27.     Neither the Magistrate's January 8, 2008 Memorandum Order, January 15, 2008 Memorandum Order nor the Lower Court's April 2, 2008 Order address these issues. Respondents and the Lower Court have operated as if these issues are non-existent and have failed to recognize Klayman's constitutional, attorney client privilege, work product and the consequences of their action on public interest groups throughout the country.

      i.    **The Subpoenas Should Have Been Quashed Because the Documents Requested Are Overbroad And Not Relevant to Claims In This Litigation**

28.     Respondents' Subpoenas to ATA, Chester, Response, Phillip Sheldon and Diener (See Composite Exhibit "4") are overbroad and seek information which is irrelevant to any of the claims in this case, and is therefore not discoverable.  Each and every item requested in the Subpoenas includes overbroad and irrelevant catchall language and purportedly relates to any "entity or organization associated or affiliated with Klayman

concerning or relating to any direct mail campaign or fundraising campaigns" for the time frame from 2003 to the present. (*See* Exhibit "4")(Definitions and Instruction No. 8). Moreover, each Subpoena incredibly demands "any and all other documents concerning or relating to any direct mail or fundraising campaign conducted for Larry Klayman." (*See* Exhibit "4")(Request No. 11). Instead of limiting the requests to documents related to any of the claims in this litigation, Respondents broadly embark on a fishing expedition for irrelevant information seeking all documents related to Klayman "from 2003 to the present" for no rational reason other than to harass, annoy or embarrass Klayman, as well as to acquire improper access to trade secrets, private commercial information and proprietary information and documentation. Thus, the Subpoenas are overbroad and irrelevant on their face, and must be quashed. To have done so the Lower Court acted arbitrarily and capriciously, as well as contrary to law. *See Linder*, 180 F.R.D. at 174.

29.    In addition to being overbroad as to time and scope, the document requests in each of the Subpoenas impermissibly seek detailed information not relevant to any of the claims in this litigation. The only salient claims possibly implicated by the information in the Subpoenas are the claims of non-disparagement, infringement or non-competition. For these claims, Respondents needed only the content of Klayman's mailings, which they already have as demonstrated in the Exhibits to their various motions. The details and records of non-parties hired by Klayman in his marketing efforts are wholly irrelevant to this case. Moreover, only aggregate data relating to the numbers of recipients and respondents, and aggregate amounts of funds received as a result – all of which can be verified by a court master and/or independent certified public accountant,

are palpably necessary to show the quantum of damages at this stage of the litigation. *See United States CFTC v. Whitney*, 441 F.Supp.2d 61 (D.D.C. 2006)(ordering redaction of data while permitting true aggregate price for calculation of damages). To require more – by having Plaintiff literally dump out all of its files and those of its third party suppliers -- the Lower Court acted arbitrarily and capriciously.

30.    Request Nos. 1 and 2 in each of the Subpoenas (See Exhibit "4") sought any agreements and communications between the subpoenaed entity and Klayman. None of these communications are relevant or necessary to claims of non-disparagement, non-competition or infringement. Such communications can not shed any light on the content of Klayman's mailing, or the aggregate numbers of recipients, donors or amounts received. Further, disclosure of such communications in the context of Klayman's marketing efforts for this and other litigations implicate privacy rights and are arguably protected under the work product doctrine, as information prepared in anticipation of litigation. *See* Fed. R. Civ. P. 26(b)(3); *see also Willingham v. Ashcroft*, 223 F.R.D. 1, 4 (D.D.C. 2005). At a minimum, Klayman should have been permitted the opportunity to review the documents of the subpoenaed entities prior to disclosure for appropriate privileges. The Lower Court denied, arbitrarily and capriciously, Petitioner's right of prior review to assert any privileges, trade secrets and to prepare a privilege log.

31.    Request Nos. 3 and 4 in each of the Subpoenas related to internal communications and communications between the subpoenaed entity and third parties are not rationally related to any of the claims in this litigation. The ensuing document requests appended to each Subpoena are also irrelevant to any of the claims in this case. Respondents seek every mailing list, all master lists, documents related to selection criteria, data analyses

and any other document related to Klayman's marketing efforts resident with the subpoenaed entities. (*See* Exhibit "4")(Request Nos. 6-11) and (Request Nos. 5-11). Disclosure of this information to Respondents, which includes private information about third parties, data and detailed analyses of Klayman's efforts to raise funds, is also irrelevant and not rationally related to any of the claims in this litigation.

32.    In this case, Klayman claims, *inter alia,* that Respondents breached the provisions in the Severance Agreement by a campaign to disparage, defame and cast Klayman in a disparaging false light. In their Counterclaim, Respondents claim that Klayman breached the Severance Agreement provisions of non-disparagement, misappropriation of confidential information, and non-competition. In addition, Respondents claim Klayman infringed a trademark. While the content of Klayman's marketing efforts mailed to the public are arguably relevant to claims of infringement, non-disparagement and non-competition, internal, trade secret and proprietary communications and communications between the subpoenaed entities and third parties are not. Further, while aggregate amounts and numbers of respondents may be arguably relevant to claims of infringement and non-competition, Klayman's marketing and fundraising selection criteria, master and specific lists containing private information about direct mail respondents, and bills and invoices are not. The information implicated in the Subpoenas in the aggregate, to the extent it is arguably necessary for this case, is available from and more appropriately addressed as discovery directed to the parties. Respondents failed to seek this information previously.

33.    Because the Subpoenas are overbroad and seek information not relevant to the instant litigation, the Lower Court should have granted Klayman's Motion and quash the

subpoenas in their entirety. However, the Lower Court failed to do this at the prejudice of Klayman and public interest groups throughout the country, by violating their Constitutional rights of freedom of association and freedom of speech.

      ii.    **The Subpoenas Must Be Quashed, Or Alternatively A Real Protective Order Must Be Entered, Because They Requires Disclosure of a Trade Secret or Other Confidential Research, Development, or Commercial Information**

34.    In addition to being overly broad in time and scope, Klayman, as well as ATA, Response, Chester and Phillip Sheldon and Diener, have a direct protectable, proprietary and personal interest in the subject documents related to mailing lists, communications, data and analyses in connection with Klayman's marketing activities. To the extent that any relevant information can be gleaned from the overbroad Requests appended to the Subpoenas, the need for such information is outweighed by the availability of aggregate information from Klayman, and the proprietary and commercial nature of the information.

35.    As established above, the information sought in Request Nos. 5, 6, 8 and 10 in the Response, Chester and Phillip Sheldon and Diener Subpoenas, and Request Nos. 6-10 in the ATA Subpoena are not relevant to any of the claims raised by the parties, and are thus not discoverable.

36.    The list selection criteria sought by Request No. 5 in the Response, Chester and Phillip Sheldon and Diener Subpoenas are not only irrelevant to any of the claims in this case, but should be protected as proprietary or trade secret information. The criteria provided by the Subpoenaed entities in consultation with Klayman to select the recipient's direct mail is private commercial information, subject to confidentiality

between Klayman and the entities. The selection criteria are developed over time, the protection of which has commercial value to Klayman as well as the entity.

37.    The master lists sought in Request Nos. 6 in the Response, Chester and Phillip Sheldon and Diener Subpoenas, and in Request No. 7 in the ATA Subpoena are proprietary and constitute trade secrets subject to protection from disclosure. The lists were rented by Klayman from Response and ATA, and tailored pursuant to Klayman's direction. Master lists are the property of the Subpoenaed entities. Aside from being irrelevant to any claim of misappropriation, disclosure of these master lists would create a windfall for Respondents and constitutes an abuse of the subpoena power of the Lower Court. These lists are maintained at great expense and value and are critical fundraising tools for direct mailing within the conservative public interest community. Accordingly, the master lists, broadly sought in the Subpoenas, are subject to protection under Fed. R. Civ. P. 45(c). At a minimum, Klayman should have been permitted to first review the materials for any appropriate privileges and trade secrets, and confidential donors information.

38.    Moreover, the analyses, reports and detailed accountings of data compiled and generated further to Klayman's marketing efforts sought in Request Nos. 8 and 10 in the Response, Chester and Diener Subpoenas, and in Request Nos. 8-10 in the ATA Subpoena are protected trade secrets and highly confidential commercial information. Klayman engaged the entities to perform services in connection with marketing efforts. As part of the services performed on behalf of Klayman, the entities collected, compiled and reported financial and other data further to direct mail and advertising efforts. Such broad and detailed is information constitutes proprietary, commercial information, and

should not be disclosed. To the extent such information is arguably relevant to this litigation, it is more appropriately addressed in discovery directed to the parties.

39.    In conversations between counsel, shortly after the protective order was issued, counsel confirmed that the filing of any documents marked with a confidential stamp as under the protective order would be filed under seal. This is consistent with the admissions, above, of the Respondents that the protective order was meant to protect the public disclosure on Pacer, court files, the internet or otherwise of confidential and privileged information. Indeed, this has been the rationale used by the Court to permit "liberal" discovery of this information, of which Klayman, knowing the Respondents all too well, from past experience, felt constrained to object. In this regard, even donor information, which is covered by constitutional privileges of <u>freedom of association</u> and <u>free speech,</u> could be published for access by the public.

40.    Respondents have already, at the Lower Court level in two of their latest pleadings, published confidential information marked as subject to protective order in public pleadings accessible to the public. Before doing so, they did not even bother to file the documents or information under seal, or even contact Klayman and/or the Court in advance of doing so.

41.    The following list of Pleadings filed with the Lower Court contains confidential information that is subject to the protective Order.

1.    Memorandum in Opposition to Motion for Extension of Time to Complete Discovery,

2.    Memorandum in Opposition to Stay (Expedited) of Proceedings Pending Expedited Mediation or in the Alternative Motion for Short Extension of

Discovery Deadline to Allow Mediation to Proceed and for Klayman to Obtain

Insurance Defense Counsel Motion to Stay (Expedited) of Proceedings Pending

Expedited Mediation or in the Alternative Motion for Short Extension of

Discovery Deadline to Allow Mediation to Proceed and for Klayman to Obtain

Insurance Defense Counsel filed by Christopher Farrell, Paul Orfanedes, Judicial

Watch, Inc., Thomas J. Fitton. (Attachments: # 1 Exhibit 1a, # 2 Exhibit 1b, # 3

Exhibit 2, # 4 Text of Proposed Order) (Driscoll, Richard) (Entered: 05/05/2008)

3.      Memorandum in Opposition to Motion to Quash filed by Christopher

Farrell, Paul Orfanedes, Judicial Watch, Inc., Thomas J. Fitton. (Attachments: # 1

Exhibit One, # 2 Exhibit Two, # 3 Exhibit Three, # 4 Exhibit Four, # 5 Exhibit

Five, # 6 Exhibit Six, # 7 Exhibit Seven)(Haller Simonyi, Juli) (Entered:

04/29/2008)).

42.    While Klayman has a motion for sanctions pending concerning this brazen

flouting of the protective order, upon which Respondents have steadfastly told the Lower

Court would protect privileged and confidential information, these incidents point out and

underscore the need for Klayman to be accorded an opportunity to review third party

production before it is produced to claim privilege and other legitimate rights. (Already,

as pointed out in previous pleadings at the trial court, such as Klayman's Motion for

Sanctions, Respondents' counsel obtained documents surreptitiously from third party

deponents, such as Response Unlimited, even while motions to quash were pending.)

That was and remains the basis for Klayman's Motion to Permit Inspection (See Exhibit

29) and shows why it should have been respectfully granted. Klayman also has a right to

inspect the documents prior to the production to Respondents to claim his privileges and other legitimate doctrines, such as the work product doctrine, where applicable.

**B.    May 12, 2008 Order affirming the Magistrates March 12, 2008 Memorandum Order and Judicial Watch and Fittons' Misuse of the Judicial System and the Lower Court's Failure to Prevent the Misuse.**

43.    On November 2, 2007, Respondents served on Klayman their Supplemental Requests for Production of Documents. (See Exhibit "30") During this period of time, Klayman went through a difficult period and within the last six (6) months; his mother died a slow death, his wife's grandmother fell ill and moved in with him and his wife, and he has been fighting for his children in a custody case in the Midwest. Lastly, his wife fell seriously ill. (See Exhibit 37) Indeed, Respondents concede that they are "cooperating" with Klayman's former wife, obviously in a strategic attempt to put more pressure on him. It was his former wife's false allegations which Mr. Fitton and the other Respondents have tried to use against Mr. Klayman in this case, even having published a story in LegalTimes about this, despite information having been placed under seal by the Fairfax Family Court. Klayman has not tried to delay this case, just tend to and protect his and his family's rights (he has two young children age 8 and 10) during this difficult period. Logistics have proved difficult, as Plaintiff lives and resides in Miami and is a sole practitioner.

    **i.    Issue a Protective Order the Deposition of Stephanie DeLuca.**

44.    Obviously seeing an "opportunity," Respondents wanted to depose Klayman's former wife, despite the fact that she is not relevant or necessary as a witness in this case. Issues involving Klayman's children and his family are not relevant, other than to try to harass the Klayman family. And, as for the reasons Klayman left Judicial Watch that is

clear from the Severance Agreement itself. Bringing Mrs. DeLuca into this regrettable fight is only for tactical gain, not because it is necessary for Respondents' case. The sad fact is that Mr. Fitton and his co-Respondents have tried to exploit Klayman's unfortunate divorce and family issues from the get go, and this is just a continuation of this tactical effort.

45.    Ms. DeLuca is the former wife of Klayman, Klayman, and she are currently engaged in a custody case which Klayman was compelled to initiate when his young son, Lance, seven years old, was nearly fatally injured when he was left at a public pool without adult supervision and fell eight feet off of a high diving board and Klayman could not get information about his medical condition and the physicians who were treating him.

46.    Thereafter, when Klayman filed for custody, he was cut off from nearly all contact with his children, despite a court order to the contrary.  Mr. Klayman was prevented from seeing his children even on this Father's Day. Accordingly, and sadly, Klayman and Mrs. DeLuca are currently engaged in custody proceedings which are heading towards trial.

47.    Respondents, and in particular Fitton, have used the marriage difficulties of Klayman as a way to try to harm him. They even had published in Legal Times an article about Klayman's divorce, releasing information from sealed pleadings from the Virginia divorce court, which have no relevance to this suit, but only to harm him and his family.

48.    Respondents would like to do so again in this case and as a result have first subpoenaed Mrs. DeLuca for deposition, (See Exhibit "31"), the same day as Mr. Klayman's anniversary of marriage to his wife Diana. This is no coincidence.

Importantly, Mrs. DeLuca, while listed on the initial disclosures as a possible witness to the considerable reimbursable expenses which Respondents owe Klayman, is no longer a witness which Klayman intends to call for this purpose. Discovery has and will alleviate this potential witness.

49.    Respondents sought every document in Klayman's original divorce and custody proceedings and Magistrate Judge Kaye agreed with Klayman's objection, and in this one instance quashed the document request, finding that this bore no relevance to the case.

50.    The subpoena to Mrs. DeLuca is intended to harass Klayman at a time that he is regrettably fighting for his children and Respondents, their counsel, and Mrs. DeLuca's counsel are collaborating with each other, for strategic purposes.

51.    The Severance Agreement that is the subject of this case provides, because it is the truth -- and Respondents agreed to this -- that Klayman left Judicial Watch not because of marital problems but to pursue other endeavors, such as running for the U.S. Senate.

52.    The Severance Agreement praises Klayman and provided for the issuance of a press release praising him. Klayman was paid $600,000 in severance, an amount that would and should not have been paid if he had been found to have done something wrong. At the time of severance negotiations, Respondents even wanted Klayman to continue to work with them as a consultant. That Klayman's wife, in a fault divorce state, made certain false and then retraced allegations about fidelity that were untrue, and which were withdrawn, should not be the subject of this case, as it debases this process and turns it into a bad version of the television show "Divorce Court." Having raised so called "family values issues," Respondents open a Pandora's box into their own conduct and

what those "standards" are at Judicial Watch. This is unnecessary and counterproductive to the resolution and decorum of this case.

53.    Klayman has set forth how Defendant Fitton in particular has harmed Klayman and his family to try to prevent his return to Judicial Watch, or competing with it in any other way. This is part of that continuing effort.

54.    The rights to privacy between family members are of utmost protection to preserve the familial institution. Respondents have no interest in the preservation of Klayman's family and seek to disrupt Klayman's family for tactical reasons. As stated above, this deposition should not take place and should not be reset at any time in order to preserve Klayman's rights of privacy.   To allow the deposition to go forward is arbitrary and capricious.

### ii. Quash the Subpoenas Duces Tecum to Lawyers for Larry Klayman who Assisted in Negotiation of the Severance Agreement

55.    Any and all Subpoenas served on the lawyers, David Durbin of Jordan, Coyne and Savits and Herbert Beller, of Sutherland, Asbill and Brennan (Collectively "Counsel"), who assisted and counseled Klayman in the negotiation of the Severance Agreement which is the subject of this case must be quashed. (See Composite Exhibit "32").

56.    Klayman filed objections to these subpoenas on grounds of attorney client privilege and work product. (See Composite Exhibit "33"). The  Severance  Agreement (See Exhibit "34") provides, upon agreement of the parties, that Klayman stepped down as Chairman, Treasurer and General Counsel of Judicial Watch to pursue other endeavors, such as running as a candidate for the U.S. Senate, and also provides for the

issuance of public statements praising Klayman's founding and stewardship of Judicial Watch. E.g., see Paragraphs 1, 2 and 18 of Severance Agreement. The Judicial Watch released for example, sent out to the public after Mr. Klayman left, provides:

> Judicial Watch announced today Larry Klayman has stepped down as Chairman and General Counsel of Judicial Watch, to pursue other endeavors. Tom Fitton, who is President of Judicial Watch, said: "Larry conceived, founded and helped build Judicial Watch to the organization it is today, and we will miss his day to day involvement. Judicial Watch now has become the leading non-partisan, public interest watchdog seeking to promote well positioned to continue our important work." Id at Paragraph 18. (Emphasis added)

57.    Respondents want to take discovery to purportedly confirm their after the fact, created version of the "real reasons" Klayman left Judicial Watch. Not only is this contrary to the parole evidence rule, as the Severance Agreement governs the agreed reasons Klayman left Judicial Watch to run for the U.S. Senate, but discovery of Klayman's counsel would violate attorney client and work product privileges.

58.    The Lower Court previously ruled that the parole evidence rule would prohibit Klayman from alleging that he had an oral agreement with the current directors and officers of Judicial Watch to hire a distinguished Chairman and General Counsel after Klayman left Judicial Watch, as the current President, Tom Fitton, is neither a lawyer and was not a college graduate at the time. The gravamen of this ruling was that the written Severance Agreement did not provide for and made no mention of this, and that Klayman's allegations could not go beyond the four corners of the Severance Agreement. The parole evidence rule provides:

> "The parole evidence rule enacts a principle of the common law of contracts that presumes that a written contract embodies the complete agreement between the parties involved; the document is the sole repository of the terms of the contract (*Jacobs v. Batavia*

& *General Plantations Trust Ltd* [1924] 1 Ch 287). The rule
therefore generally forbids the introduction of extrinsic evidence
(i.e., evidence of communications between the parties which is not
contained in the language of the contract itself) which would add
or change terms of a later written contract."

59.    The Court should reach a similar conclusion here for these reasons, and to protect

the sacred attorney client privilege, and work product doctrine, quash the subject

subpoenas, and reconsider and/or clarify any rulings which Respondents purport to rely

on that would allegedly give them the right to depose and force production of documents

from Klayman's counsel seeking to go behind the written terms of the Severance

Agreement.

### iii. Issuance of a Protective Order on the Deposition of Maureen Otis

60.    Maureen Otis, Esq. is an attorney licensed to practice law in the state of Texas

and she had been serving as Klayman's counsel in various matters related to and set forth

in the subpoena duces tecum served on her. (See Exhibit "35") In this regard, she has

billed for these services, which include services provided by American Caging

(Attachment to Exhibit "35" Subpoena Duces Tecum) (Memo confirming legal

relationship) (See Exhibit "36").

61.    Klayman moved to quash the subpoena served on Maureen Otis, Esq. based on

the law, which sets a very high standard for a party's attorney to be deposed. This Court,

like federal district courts in other jurisdictions, go by the standard that "good cause"

presumptively exists to enter a protective order or to quash when a party seeks to

preclude its own attorney's deposition testimony. West Peninsular Title Co. v.Palm

Beach County, 132 F.R.D. 301, 302 (S.D. Fl.1990); accord Dunkin' Donuts,

Inc.v.Mandoricao, Inc., 181 F.R.D. 208, 210 (D. Puerto Rico 1998); Niagara Mohawk

PowerCorp. v. Stone and Webster Engineering Corp., 125 F.R.D. 578, 594 (N.D.N.Y.1989); N.F.A. Corp.v. Riverview Narrow Fabrics, Inc., 117 F.R.D. 83,85 (M.D.N.C. 1987); In re Arthur Treacher's Franchises Litigation, 92 F.R.D.429, 437-39 (E.D. Pa. 1981). In West Peninsular, the Court held: Federal courts ...have held that depositions of attorneys inherently constitute an invitation to harass the attorney and parties, and to disrupt and delay the case. Moreover, costs are added to the litigation, burdens are placed upon attorneys, and the attorney client relationship is threatened. These presumptions may constitute good cause for obtaining a protective order under Rule 26(a) (sic). 132 F.R.D. at 302 (internal citations omitted).

62.    It would be virtually impossible to parse testimony that does not relate to the attorney client and work product privileges in this case. The information which Respondents seek, however, overbroad and irrelevant, can be obtained from other sources. To have ruled these attorney depositions should go forward, with the production of documents was clearly arbitrary and capricious.

**C.    Lower Court's Improper Rationale Throughout.**

63.    The rationale of the Magistrate Judge throughout has been to liberally require the production of documents and testimony, because a protective order is in place to protect the information, such as donor names, etc., from becoming public. The Magistrate Judge's rulings, affirmed by the trial judge,  have been violated by Respondents. Respondents have confirmed that the protective order in place protects the use of information and documents in pubic pleadings. However, despite this uncontroverted admission by Respondents that the protective order protects information from being filed and made public on the internet in public pleadings, in recent pleadings, not filed under

seal as is required or which is implicit in the protective order and the related rulings, they have used confidential financial information and documents and appended them to public pleadings which are then available to anyone. See the following:

    1.    Memorandum in Opposition to Motion for Extension of Time to Complete Discovery,

    2.    Memorandum in Opposition to Stay (Expedited) of Proceedings Pending Expedited Mediation or in the Alternative Motion for Short Extension of Discovery Deadline to Allow Mediation to Proceed and for Klayman to Obtain Insurance Defense Counsel Motion to Stay (Expedited) of Proceedings Pending Expedited Mediation or in the Alternative Motion for Short Extension of Discovery Deadline to Allow Mediation to Proceed and for Klayman to Obtain Insurance Defense Counsel filed by Christopher Farrell, Paul Orfanedes, Judicial Watch, Inc., Thomas J. Fitton. (Attachments: # 1 Exhibit 1a, # 2 Exhibit 1b, # 3 Exhibit 2, # 4 Text of Proposed Order) (Driscoll, Richard) (Entered: 05/05/2008)

    3.    Memorandum in Opposition to Motion to Quash filed by Christopher Farrell, Paul Orfanedes, Judicial Watch, Inc., Thomas J. Fitton. (Attachments: # 1 Exhibit One, # 2 Exhibit Two, # 3 Exhibit Three, # 4 Exhibit Four, # 5 Exhibit Five, # 6 Exhibit Six, # 7 Exhibit Seven)(Haller Simonyi, Juli) (Entered: 04/29/2008)).

64.    Even the existence of a protective order, and even if Respondents had adhered to it by filing confidential documents under seal, would not protect the unauthorized disclosure of attorney client and work product information and documentation. In the past, Respondents' counsel has surreptitiously induced subpoenaed parties to produce

documents even while motions to quash were still pending. In Respondents' possession are attorney client and work product materials that they have already reviewed and these privileges and doctrines are being violated.

## VI.
## PETITIONER HAS NO OTHER ADEQUATE REMEDY

65.    Mandamus is proper if "there is no other adequate remedy available to the Klayman." _Northern States Power Co. v. DOE_, 128 F.3d 754, 758 (D.C. Cir. 997)(citation omitted). Because the Lower Court has continuously and consistently acted arbitrarily and failed to adhere to the law regarding the protection of information, Petitioners' only avenue for relief is to seek a writ of mandamus. This is an extraordinary situation that requires an extraordinary remedy.  The effect of the Lower Court's rulings throughout is that all requested documents should be produced, and all depositions taken, no matter what privacy or constitutional concerns exists, because a protective order - - which the Lower Court now says does not protect information by being filed publicly -- exists. This is arbitrary and contrary to law and creates an arbitrary and capricious catch twenty two in effect.

## VII.
## CONCLUSION

66.    For the reasons set forth above, Petitioners respectfully request that this Court intervene in this matter and prevent the arbitrary and capricious and unlawful use of our judicial system through the constant and consistent violation of Klayman's and his donors right to privacy, freedom of association, freedom of speech, attorney client privilege, work product and trade secrets. A Writ of

Mandamus reversing the Lower Court orders will further preserve public interest and related groups ability to obtain and maintain donors, supporters and members in this country. If the Lower Court's rulings are not overturned, including the wholesale ordered production of highly confidential and invasive and irrelevant financial records of Mr. Klayman and his organizations (See Exhibit 37), public interests groups in this country will suffer tremendously to a point were their financial feasibility and operation would outweigh their ability to provide for themselves. In light of the foregoing, Klayman respectfully requests that this Court preserve his constitutionally protected rights and other rights stated above and issue a Writ of Mandamus requiring the issuance of a Protective Order over the production sought by the Respondents, reversing the Lower Court's Orders along with return of the highly invasive, overly broad, irrelevant and constitutionally protected documentation that is aleady in the possession of the Respondents - - having obtained this documentation through the above-mentioned subpoenas.

Finally, Petitioner respectfully requests that the Lower Courts' ruling requiring him to dump out all of his and his groups' financial records (which would include checks that he wrote for even underwear purchases, to be somewhat tongue in cheek) - - when aggregate information would be adequate to determine alleged damages, as certified by an independent certified public accountant - - also should be overturned.  (See Exhibit 37). **Petitioner respectfully requests oral argument and that discovery be stayed**

during the pendency of this proceeding given the important constitutional and other

rights at issue.

Respectfully submitted,

By: _____
Larry Klayman, Esq.
D.C. Bar No.: 334581
3415 SW 24th Street
Miami, FL 33145
Tel: 305-447-1091
Fax: 305-447-1548

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 17th day of June 2008, a true copy of the

foregoing was served via hand to:

Richard W. Driscoll, Esquire
Driscoll & Seltzer, PLLC
600 Cameron Street
Alexandria, VA 22314

By: _____
Larry Klayman, Esq.
D.C. Bar No.: 334581
3415 SW 24th Street
Miami, FL 33145
Tel: 305-447-1091
Fax: 305-447-1548