## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LARRY KLAYMAN,

    Plaintiff,

    v.

JUDICIAL WATCH, INC., *et al.*,

    Defendants.

Civil Action No. 06-670 (CKK)

## MEMORANDUM OPINION
(June 25, 2009)

Plaintiff Larry Klayman brought this action against Defendants—Judicial Watch, Inc. (hereinafter "JW" or the "organization"), a non-profit public interest government watchdog organization; Thomas J. Fitton, President of JW; Paul J. Orfanedes, Secretary and a Director of JW; and Christopher J. Farrell, a Director of JW ("Individual Defendants," together with JW, "Defendants")—alleging a variety of claims, including, *inter alia*, breach of contract, violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A) and (B), and defamation.   Presently before the Court are a number of motions, including: (1) Klayman's motion for partial summary judgment as to Count Six of his Second Amended Complaint; (2) JW's motion for partial summary judgment as to Counts Four, Six, Seven, Eight, and Nine of the Second Amended Complaint; (3) Fitton's motion for partial summary judgment as to Counts Four, Six, and Nine of the Second Amended Complaint; (4) Orfanedes' motion for partial summary judgment as to Counts Four, Six, and Nine of the Second Amended Complaint; (5) Farrell's motion for partial summary judgment as to Counts Four, Six, and Nine of the Second Amended Complaint; and (6) JW's motion for partial summary judgment as to Counts One, Two, Three and Ten of its Amended Counterclaim.

Upon a searching consideration of the filings currently before the Court on these motions, the attached exhibits, and the relevant statutes and case law, with respect to Klayman's Second Amended Complaint, the Court shall: (1) grant Defendants' motions for summary judgment as to Count Four; (2) deny Klayman's partial motion for summary judgment as to Count Six and shall grant Defendants' cross-motions for partial summary judgment as to Count Six; (3) deny-in-part and grant-in-part JW's motion for partial summary judgment as to Counts Seven and Eight; and (4) grant Defendants' motions for partial summary judgment as to Count Nine.  With respect to the Amended Counterclaim, the Court shall: (1) grant JW's motion for partial summary judgment as to Count One as to liability, but hold in abeyance as to damages; and (2) deny JW's motion for partial summary judgment as to Counts Two, Three and Four.

In light of the Court's decision herein, the following claims and counterclaims remain at issue.  First, as to Klayman's Second Amended Complaint, the following allegations of breach of contract asserted in Counts Seven and Eight remain viable as to JW: (1) JW's alleged failure to make a good faith effort to remove Klayman as guarantor of the building's lease; (2) JW's failure to pay health insurance for Klayman's children; (3) JW's filing a motion to strike Klayman's appearance in Florida litigation; (4) JW's failure to provide Klayman with access to documents regarding Mr. Paul; and (5) JW's alleged disparagement of Klayman and misrepresentations of the reasons for his departure from the organization.  Second, with respect to JW and Fitton's Amended Counterclaim, Count One remains at issue as to damages only and Counts Two through Eleven remain at issue in their entirety.

# I: BACKGROUND

A.    *Factual Background*

The Court shall assume familiarity with the its January 17, 2007 and April 3, 2007

Memorandum Opinions, which each set forth in detail the factual background of this case.  *See*

*Klayman v. Judicial Watch, Inc.*, Civil Action No. 06-670, 2007 WL 140978 (D.D.C. Jan. 17,

2007) (hereinafter "*1/17/09 Klayman*"); *Klayman v. Judicial Watch*, Civil Action No. 06-670,

2007 WL 1034937 (D.D.C. Apr. 3, 2007) ("*4/3/07 Klayman*").  The Court shall therefore only

briefly address herein such facts as are necessary for resolution of the motions currently before

the Court.  Moreover, given the numerous issues raised by the parties, most of which implicate a

discrete set of facts, the Court at this point provides only a short introduction to the facts of this

case, with a more detailed discussion to follow below as is necessary for evaluation of a

particular claim.

As previously established, Defendant Judicial Watch, Inc. ("JW" or the "organization") is

a 501(c)(3) organization formed under the laws of the District of Columbia and headquartered in

the District of Columbia.  *4/3/07 Klayman*, 2007 WL 1034937, at * 2.  Defendant Fitton is

President of Judicial Watch, Defendant Orfanedes is the Secretary and a Director of Judicial

Watch, and Defendant Farrell is a Director of Judicial Watch (together, "Individual Defendants")

(collectively with "JW," "Defendants").  *Id.*  Plaintiff Larry Klayman ("Klayman") is the self-

described founder and former Chairman, General Counsel and Treasurer of Judicial Watch, who

resides in and practices law in the State of Florida.  *Id.*  From 1998 to 2003, Klayman was

Chairman, General Counsel and Treasurer of JW, as well as an employee and member of the

organization's Board of Directors.  Defs.' Stmt. ¶ 1.  On September 19, 2003, Klayman entered

into a detailed Severance Agreement, signed by Klayman and Fitton, on behalf of JW, and

attested to by Orfanedes, as Corporate Secretary of Judicial Watch.  *4/3/07 Klayman*, 2007 WL

1034937, at * 2; Defs.' Stmt. ¶¶ 3-11 & Ex. A (9/19/03 Severance Agreement).[1]  Klayman signed

the Severance Agreement both as an individual and in his capacity as President of his law firm,

Klayman & Associates, P.C. ("K&A").  Defs.' Stmt. ¶ 6; *see also* Severance Agreement at p. 12.

The parties negotiated the terms of the Severance Agreement over the course of several months

prior to its execution.  *4/3/07 Klayman*, 2007 WL 1034937, at * 2; Defs.' Stmt. ¶¶ 3-9.

Throughout the course of those negotiations, Klayman was himself a licensed attorney, and was

represented by attorneys from two different law firms.  *4/3/07 Klayman*, 2007 WL 1034937, at *

2; Defs.' Stmt. ¶¶ 7-9.

      B.    *Procedural Background*

      On April 12, 2006, Klayman filed the instant lawsuit.  Shortly thereafter, Klayman filed

his Second Amended Complaint, in which he alleges six causes of action against various

combinations of Defendants, relating to his separation from JW.  *See* Second Amended

Complaint, Docket No. [12], (hereinafter, "SAC").[2]  By a Memorandum Opinion and Order

---

[1] Although both parties include copies of the Severance Agreement in their filings, the Court shall cite only to the copy attached to the Defendants' joint statement of material facts, for ease of reference.

[2] In addition, the Second Amended Complaint in this action included three claims (Counts One through Three) brought by Louise Benson, a resident of California who had been a supporter of and donor to Judicial Watch.  Slip Op. at 3.  In its January 17, 2007 Memorandum Opinion, the Court determined that Benson's claims were limited to $15,000 that she allegedly donated to Judicial Watch.  Slip Op. at 12-17.  The Court concluded that Benson's claims therefore did not meet the amount-in-controversy requirement of 28 U.S.C. § 1332(a), and declined to exercise supplemental jurisdiction over Benson's claims.  *Id.* at 17-20.  As such, the Court dismissed without prejudice Counts One, Two and Three of the Second Amended Complaint for lack of subject matter jurisdiction.  *Id.* at 20.

dated January 17, 2007, the Court dismissed Count Nine of the SAC, which alleges a claim of

defamation, insofar as it relates to allegedly defamatory statements made in JW's Form 990 tax

returns and allegedly doctored press quotations posted on JW's website.  *See 1/17/07 Klayman*,

2007 WL 140978, at * 1.  On April 3, 2007, the Court dismissed Count Five of the SAC, which

alleged violation of Florida state law, *see Klayman v. Judicial Watch*, Civ. Action No. 06-670,

2007 WL 1034936, *1 (D.D.C. Apr. 3, 2007), and granted Defendants summary judgment as to

parts of: (1) Count Six, which alleges breach of contract, in so far as it relates to claims that JW

fraudulently induced Klayman to enter into the Severance Agreement; and (2) Counts Seven and

Eight, which allege breach of contract, in so far as they relate to allegations that JW failed to pay

Klayman for the period of time between September 15 through September 19, 2003, *see 4/3/07*

*Klayman*, 2007 WL 1034937, at * 6.  Accordingly, Klayman's remaining claims consist of:

- Count Four: alleging violations of Section 43(a) of the Lanham Act, 15 U.S.C.
  §1125(a)(1)(A) and (B) against all Defendants, SAC  ¶¶ 97-106;

- Count Six: alleging breach of contract (rescission) against JW, excluding claims of
  fraudulent inducement;

- Count Seven: alleging breach of contract (damages) against JW, excluding allegations
  that JW failed to pay Klayman for the period between September 15 and 19, 2003;

- Count Eight: alleging breach of contract (specific performance) against JW, excluding
  allegations that JW failed to pay Klayman for the period between September 15 and 19,
  2003;

- Count Nine: alleging defamation as against all Defendants, but only based on claims that
  Defendants made defamatory statements to JW's employees and the media.

In addition, Defendants JW and Fitton have filed a Counterclaim against Klayman, which

was amended on December 3, 2007.  *See* Am. Counterclaim, Docket No. [86].  In their Amended

Counterclaim, Defendants JW and Fitton assert 11 causes of action against Klayman, including

5

for breach of contract, indemnification, trademark infringement, unfair competition, and cybersquatting.  *See id.* ¶¶ 68-138.

C.       *The Instant Motions for Summary Judgment*

Currently pending before the Court are the parties' various motions for partial summary judgment.  First, Klayman filed a motion for partial summary judgment as to Count Six (breach of contract - rescission) of his Second Amended Complaint, which asserts a breach of contract claim based on alleged breaches of the Severance Agreement and seeks an order granting the equitable remedy of rescission.  *See* Pl.'s MSJ, Docket No. [275]; Pl.'s Stmt., Docket No. [276]. Notably, despite the Court's repeated admonishments that the parties must comply with Local Civil Rule 7(h) and 56.1,[3] Klayman's statement of material facts filed in support of his motion failed to include references to the parts of the record relied on to support the statement, as required.  The Court therefore struck Klayman's motion for partial summary judgment and the related statement in their entirety, but in its discretion, gave Klayman another opportunity to file a motion for partial summary judgment with a properly prepared statement.  *See* 12/1/08 Min. Order.  Klayman subsequently filed his revised motion and statement on December 3, 2008, with citations to the record as required.  *See* Pl.'s MSJ, Docket No. [275]; Pl.'s Stmt., Docket No. [276].  Defendants thereafter filed a timely opposition and response statement.  *See* Defs.' Opp'n,

_____

[3] Indeed, Klayman is well aware of this requirement, as the Court previously struck his opposition to Defendants' first motion for partial summary judgment, filed on January 30, 2007, for failure to comply with the local rules.  *See* 2/2/07 Order, Docket No. [39].  Accordingly, the Court—once again—advised Klayman that it "strictly adheres to the dictates of Local Civil Rules 7(h) and 56.1 and may strike pleadings not in conformity with these rules."  *Id.* at 1.

Docket No. [289]; Defs.' Resp. Stmt., Docket No. [290].[4]  As such, pursuant to Local Civil Rules

56.1 and 7(h), in resolving Klayman's partial summary judgment motion, this Court "assumes

that facts identified by the moving party in the statement of material facts are admitted, unless

such a fact is controverted in the statement of genuine issues filed in opposition to the motion."

LCvR 56.1; 7(h).

Second, Defendants have each filed a motion for partial summary as to Klayman's

Second Amended Complaint, and Defendant JW filed a motion for partial summary judgment as

to the Amended Counterclaim.  Specifically, the Individual Defendants each move for summary

judgment as to Count Four (Lanham Act) and Count Nine (defamation) of the Second Amended

Complaint, as asserted against them personally.  *See* Farrell MSJ, Docket No. [266]; Fitton MSJ,

Docket No. [267]; Orfanedes MSJ, Docket No. [268].  JW moves for summary judgment as to

Counts Four (Lanham Act) and Nine (defamation) in their entirety and as to Counts Six (breach

---

[4] In their opposition, Defendants argue that the affidavits attached to Klayman's statement of facts in support of his motion for partial summary judgment are inadmissable because: (a) they are not properly dated and sworn to under penalty of perjury; and (b) they largely consist of inadmissable hearsay evidence, reputation and character evidence, and impermissible legal conclusions.  *See* Defs.' Opp'n at 2-4.  The Court notes that Klayman, in his reply in support of his motion for partial summary judgment, re-filed amended versions of the affidavits at issue, which are properly sworn to and dated.  *See* Pl.'s Reply, Docket No. [296], Atts. 1-4.  The substance of the affidavits, however, has not been altered, and Defendants' concerns regarding the inadmissible nature of the evidence thus remain extant.  Defendants are correct that Rule 56(e) of the Federal Rules of Civil Procedure requires that "[s]upporting or opposing affidavits must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify as to the matters stated therein."  Fed. R. Civ. P. 56(e).  The Court, however, finds that it need not strike Klayman's supporting affidavits in their entirety, given Klayman's submission of amended versions.  Rather, the Court shall evaluate the admissibility of the statements contained in the affidavits, in light of Defendants' objections, on a case-by-case basis as may be necessary in evaluating the motions now before the Court.  Finally, the Court notes that references to affidavits filed in support of Klayman's motion for partial summary judgment are to the amended versions provided with Klayman's reply, unless otherwise noted.

of contract - rescission), Seven (breach of contract - damages) and Eight (breach of contract - specific performance), except for Klayman's "disparagement" claim arising from the allegation that JW actively misrepresented the reasons for Klayman's departure.[5]  *See* JW MSJ-SAC, Docket No. [269].  Finally, JW also moves for summary judgment as to Counts One (breach of contract), Two (breach of contract), Three (indemnification), and Ten (breach of contract) of its Amended Counterclaim.  *See* JW MSJ-CC, Docket No. [270].  Defendants filed a joint statement of material facts not in dispute in support of their motions for summary judgment.  *See* Defs.' Stmt., Docket No. [265].

Klayman, however, failed to timely file an opposition and response statement in violation of this Court's Scheduling Order.  *See* 9/16/08 Order, Docket No. [239], as amended by the Court's 10/22/08 and 11/18/08 Min. Orders.  The Court had previously advised Klayman that "he must respond to Defendants' Motions [for summary judgment] by December 24, 2008," or "the Court shall consider the Motions for Summary Judgment conceded."  12/1/08 Order, Docket No. [274] at 2.[6]  In addition, the Court had repeatedly denied Klayman's request for an extension of

---

[5] Although JW's motion appears to indicate that it has moved for summary judgment as to Counts Six and Eight in their entirety, *see* JW's MSJ at 38, it is clear that JW has moved only for partial summary judgment as to those counts.  JW moves for summary judgment as to Count Seven, which alleges breach of contract (damages), as to all allegations except Klayman's "disparagement" claim.  *Id.*  Because JW moves for summary judgment as to Count Six and Count Eight for the same reasons, *see id.* at 28, the Court understands that JW moves on Counts Six through Eight as to all allegations, except for Klayman's "disparagement" claim.

[6] Although Klayman is representing himself *pro se* in the instant litigation, he is an experienced, licensed attorney.  As an officer of the court, Klayman should therefore be well aware of his obligations to timely respond to dispositive motions.  Nonetheless, in an abundance of caution, the Court issued an order advising Klayman of Defendants' motions for summary judgment and informing him of the consequences of a failure to respond, pursuant to the D.C. Circuit's decisions in *Fox v. Strickland*, 837 F.2d 507 (D.C. Cir. 1988) and *Neal v. Kelly*, 963 F.2d 453 (D.C. Cir. 1992) requiring lower courts to notify plaintiffs representing themselves of

time for failure to show good cause.  *See* 12/18/08 Min. Order; 12/23/08; 12/30/08 Order, Docket No. [293]; 1/7/09 Min. Order.  Klayman was thus well aware that the Court had not granted him an extension of time in which to file his consolidated opposition and response statement and that failure to timely submit the filings might result in the Court considering the motions as conceded. Klayman nonetheless failed to timely file his consolidated opposition and response statement. *See* Docket Nos. [291], [292].  The Court therefore struck Klayman's untimely opposition and response statement—as it had previously warned Klayman it would do—for failure to comply with the Court's Scheduling Order, as amended.  *See* 12/30/08 Order, Docket No. [293]. Klayman did, however, timely file several exhibits, including the substantive Second Declaration of Larry Klayman (hereinafter, "Second Klayman Declaration"), which remain on the record. *See* Docket Nos. [284], [285], [286], [288].  Defendants' thereafter filed a consolidated reply in support of their motions for summary judgment.

Nevertheless, the Court emphasizes that it does not treat Defendants' motions for summary judgment as conceded.  Rather, the Court has, as it must, scrutinized the record of the case as a whole as well as the relevant case law to address Defendants' motions for summary judgment on the merits.  *Cf. St. Paul Mercury Ins. Co. v. Capitol Sprinkler Inspection, Inc.*, 573 F. Supp. 2d 152, 177 (D.D.C. 2008) (finding that the court must "scrutinize the record [and] applicable case law" to address merits of summary judgment motion, despite the fact that the court struck the opposing party's opposition as untimely); *Duffy v. Verizon Communs., Inc.*, No. 05-2005, 2007 WL 2506445, at *1 (D.D.C. Aug. 27, 2007) (granting motion as conceded under LCvR 7(b) and dismissing case with prejudice only after reviewing the pleadings, relevant case

---

the consequences of failing to respond to an opposing party's dispositive motion.

law, and the entire record in the case).  Only where Defendants' factual assertions are properly

supported by the record, as confirmed by the Court's own independent review, shall the Court

treat such facts as admitted.

Moreover, the Court has, in the interests of justice, reviewed Klayman's stricken

opposition and response statement, and notes that the arguments and assertions set forth in the

untimely filings are largely, if not entirely, duplicative of arguments and assertions set forth in

the Second Klayman Affidavit.  *Compare* Pl.'s Stricken Opp'n, Docket No. [291] and Pl.'s

Stricken Resp. Stmt., Docket No. [292], *with* Second Klayman Decl.[7]  As explained above, the

Second Klayman Declaration, as well as the other exhibits submitted by Klayman in opposition

to Defendants' motions for summary judgment, have not been struck and remain on the record in

this case.  Although the Court does not consider the stricken opposition and response statement,

the Court shall consider Klayman's arguments as contained in the Second Klayman Affidavit,

which are virtually identical to those included in the untimely filings.

Indeed, even if the Court had not stricken Klayman's opposition and response statement

for failure to comply with the Court's scheduling orders, it is easily apparent upon review of

those filings that they would have provided the Court with no additional argument or assistance

beyond that provided in the Second Klayman Affidavit.  As to Klayman's stricken opposition, it

is almost entirely devoid of any citations to supporting case law or legal authority.  Indeed,

Klayman's untimely opposition includes only one ***single*** case citation.  *See* Pl.'s Stricken Opp'n

---

[7] Klayman has attached identical copies of the Second Klayman Declaration to various filings submitted to this Court.  *See, e.g.,* Docket No. [288]; Docket No. [296-2].  For convenience, the Court shall refer and cite solely to the version submitted with Plaintiff's reply in support of his motion for partial summary judgment.  *See* Pl.'s Reply, Att. 3 (Second Klayman Aff.).

at 18.  Similarly, Klayman's response statement, although numbering 198 pages in total, is

largely repetitious and consists almost wholly of block quotes taken from the Second Klayman

Affidavit.  *See* Pl.'s Stricken Resp. Stmt.  For example, Klayman's responses to paragraphs 12

through 28, which discuss facts surrounding JW's October 2003 newsletter, are each identical

and consist solely of verbatim quotes from the Second Klayman Affidavit.  *See id.* ¶¶ 12-28.  In

addition to being untimely filed, Klayman's stricken response statement is also clearly in

violation of the local rules, which require "a separate, concise statement of genuine issues setting

forth all material facts as to which it is contended that there exists a genuine issue necessary to be

litigated [and] which shall include references to parts of the record relied on to support the

statement."  LCvR 7(h).  Thus, as a practical matter, the Court has reviewed and considered

Klayman's substantive arguments in opposition to Defendants' motions, despite the Court's

ruling striking his untimely opposition and response statement.

Finally, the Court notes that after the parties had each filed their respective motions for

summary judgment, Magistrate Judge Kay issued a [301] Memorandum Opinion and [302] Order

granting Defendants' [218] motion for sanctions and prohibiting Klayman from testifying to or

introducing into evidence any documents in support of his damages claims or in support of his

defenses to Defendants' counterclaims.  The Court has, by separate order this day, overruled

Klayman's objections to that decision and affirmed Magistrate Judge Kay's memorandum

opinion and order in their entirety.  As discussed in those opinions, Klayman has repeatedly

failed to timely produce the evidence at issue, with the result that now, nearly a year after the

close of discovery, Klayman has not produced any documents in support of his damages claims

or in support of his defenses to Defendants' counterclaims.  The Court pauses to raise this issue

11

only to note that, as a practical matter, the discovery sanctions therefore have had no effect on the instant Memorandum Opinion as they merely serve to preclude Klayman from relying on evidence that he has never produced.  Accordingly, the Court emphasizes that its decision provided herein is based on all evidence that has actually been ***produced*** in this case and is in the record now before the Court.

## II:  LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 56, a party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  *See also Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994).  Under the summary judgment standard, the moving party bears the "initial responsibility of informing the district court of the basis for [its] motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits which [it] believe[s] demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  In response, the non-moving party must "go beyond the pleadings and by [its] own affidavits, or depositions, answers to interrogatories, and admissions on file, 'designate' specific facts showing that there is a genuine issue for trial."  *Id.* at 324 (internal citations omitted).

Although a court should draw all inferences from the supporting records submitted by the nonmoving party, the mere existence of a factual dispute, by itself, is insufficient to bar summary judgment.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  To be material, the factual assertion must be capable of affecting the substantive outcome of the litigation; to be

genuine, the issue must be supported by sufficient admissible evidence that a reasonable trier-of-fact could find for the nonmoving party. *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987); *Liberty Lobby*, 477 U.S. at 251 (the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law"). "If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50 (internal citations omitted). "Mere allegations or denials in the adverse party's pleadings are insufficient to defeat an otherwise proper motion for summary judgment." *Williams v. Callaghan*, 938 F. Supp. 46, 49 (D.D.C. 1996). The adverse party must do more than simply "show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, while the movant bears the initial responsibility of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact, the burden shifts to the non-movant to "come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Id.* at 587 (citing Fed. R. Civ. P. 56(e)) (emphasis in original).

### III: DISCUSSION

A.   *The Parties' Motions for Summary Judgment as to Klayman's Breach of Contract Claims in Count Six, Seven and Eight of the Second Amended Complaint*

Klayman, in Counts Six through Eight of the Second Amended Complaint, asserts nearly identical breach of contract claims against JW based on a variety of allegations, and seeks the remedies of rescission (Count Six), damages (Count Seven), and specific performance (Count Eight). SAC ¶¶ 115-147. The Court turns first to the parties' cross-motions for summary

13

judgment filed as to Count Six (rescission) before then turning to Defendants' motions for summary judgment as to Count Seven (damages) and Count Eight (specific performance).

      1.      <u>The Parties' Cross-Motions as to Count Six of the Second Amended Complaint - Breach of Contract (Rescission)</u>

Although Klayman may set forth alternative claims for relief in his Second Amended Complaint, *see* Fed. R. Civ. P. 8(e)(2), and proceed on each claim past a motion to dismiss, under D.C. law, he cannot ultimately receive double redress for a single wrong. *Id.* at 916 (citing *Giordano v. Interdonato*, 586 A.2d 714, 717 (D.C. 1991)). That is, Klayman "may either affirm the contract and sue for damages, or repudiate the contract and recover that with which he or she has parted." *Dean v. Garland*, 779 A.2d 911, 915 (D.C. 2001) (citing *Dresser*, 465 A.2d at 840). But he may not "rescind for breach of contract and at the same time recover damages for the breach." *Id.* (citations omitted). Klayman, in apparent recognition that he must choose between the remedies asserted in his Second Amended Complaint, has moved for summary judgment only as to his claim for rescission set forth in Count Six. *See generally* Pl.'s MSJ. Specifically, Klayman alleges that he is entitled to rescission based on five alleged breaches of the Severance Agreement by Defendants: (1) Defendants' alleged failure to pay the cost of his and his family's health care insurance; (2) Defendants' alleged failure to provide him with copies of certain press materials and artist renderings; (3) Defendants' alleged failure to provide him backup expense documentation; (4) Defendants' alleged failure to make good faith efforts to remove him as guarantor of JW's lease; and (5) Defendants' dissemination of derogatory information about him to various media entities. *Id.* at 1-4. According to Klayman, these alleged "breaches of the Severance Agreement are material and require . . . that the Severance Agreement be ruled null

and void and rescinded." *Id.* at 4. Defendants oppose Klayman's motion on the basis that he cannot establish a right to rescission as a matter of law, *see generally* Defs.' Opp'n, and have moved for cross-summary judgment as to Count Six of the Second Amended Complaint, *see* JW's MSJ at 28; Farrell's MSJ at 27; Orfanedes MSJ at 25; Fitton's MSJ at 23. For the reasons set forth below, the Court agrees with Defendants that Klayman, as a matter of law, is not entitled to rescission.

Under District of Columbia law,[8] "[n]ot every breach of an agreement or failure by one party exactly to perform entitles the other to rescind or avoid performance." *Travis v. Travis*, 203 A.2d 173, 176 (D.C. 1964) (citing *Cooper v. Cooper*, 35 A.2d 921, 924 (D.C. 1944)). Rather, it is "only where the breach is material—that is, receiving something substantially less or different from that for which he bargained—is one able to elect the alternative rights and the remedies available to him." *Fowler v. A&A Co.*, 262 A.2d 344, 347 (D.C. 1970) (internal quotation marks and citations omitted). As the District of Columbia Court of Appeals has explained:

> [T]he act upon which the person bases his right to no longer be bound by the contract must involve an unqualified refusal by the other party to perform, and should, in its legal effect, amount to a determination not to be bound by, or perform, the contract in the future. A mere dispute as to the manner of the performance, a misunderstanding as to the manner in which it shall be performed, not persisted in, does not justify a rescission by the other party.

---

[8] The Court shall apply District of Columbia law to Klayman's claims for breach of contract. Although neither party has specifically raised the issue in the motions now before the Court, the Court notes that the express terms of the Severance Agreement provide that the "Agreement shall be governed by and construed in accordance with the laws of the District of Columbia." Severance Agreement, ¶ 23. Moreover, Defendants have relied upon District of Columbia contract law in their motions for summary judgment, and Klayman has not disputed that District of Columbia law should apply.

*Travis*, 203 A.2d at 176 (internal quotation marks omitted).  Moreover, rescission is unavailable

if the party seeking rescission has failed to seek rescission within a reasonable time.  *Mariner*

*Water Renaturalizer of Washington, Inc. v. Aqua Purification Sys., Inc.*, 665 F.2d 1006, 1069

(D.C. Cir. 1981).  Finally, "[i]t is 'axiomatic' that equitable relief [such as rescission] will not be

granted where the plaintiff has a complete and adequate remedy at law."  *Kakaes v. George*

*Washington Univ.*, 790 A.2d 581, 583 (D.C. 2002).

The Court concludes that Klayman is not entitled to rescission as a matter of law.  First,

the alleged breaches, even if proven, do not justify rescission of the Severance Agreement.  As

set out above, Klayman contends that he is entitled to rescission based on five alleged breaches

of contract by Defendants.  However, two of these five alleged breaches are not included in

Count Six of the Second Amended Complaint and are therefore not proper grounds for

Klayman's rescission claim.  Specifically, the Second Amended Complaint contains no

allegation whatsoever that Defendants failed to provide him with copies of press materials and

artist renderings pursuant to paragraph 4.E of the Severance Agreement.  *See generally* Second

Amended Complaint.  Additionally, although the Second Amended Complaint does broadly

allege that Defendants failed to provide Klayman with documents—an allegation that may be

broadly read to encompass Klayman's claim that Defendants failed to provide him with back-up

expense documentation—that allegation is not included as a basis for Count Six of the Second

Amended Complaint.  *See id.* ¶¶ 115-137.  Rather, Klayman has asserted this claim only under

Count Eight (specific performance).  *See id.* ¶ 146.  Klayman himself concedes that these are

"new" breaches of the Severance Agreement not previously alleged in Count Six of his Second

Amended Complaint.  *See* Pl.'s Reply at 1.  He nonetheless contends, without case law or legal

support, that these new allegations are somehow "subsumed" into the Second Amended

Complaint and that he therefore "moves not just for summary judgment on 'old' breaches, but

the new ones as well." *Id.*  Klayman is clearly wrong as a matter of law; he has not sought leave

of this Court to amend his Second Amended Complaint to include these allegations in Count Six.

*See* Fed. R. Civ. P. 15(a)(2) (stating a party may amend its pleading "by leave of court").

        Accordingly, the only alleged breaches of contract asserted by Klayman that may be

considered by the Court in evaluating his claim for rescission are: (1) Defendants' alleged failure

to pay the cost of his and his family's health care insurance; (2) Defendants' alleged failure to

make good faith efforts to remove him as guarantor of JW's lease; and (3) Defendants'

dissemination of derogatory information about him to various media entities.  *Id.* at 1-4.  These

alleged breaches, even if true, are merely a "dispute as to the manner of the performance," and

therefore do "not justify a rescission by the other party."  *Travis*, 203 A.2d at 176 (internal

quotation marks omitted).  To support his claim for rescission, however, Klayman must show

conduct by Defendants that involves "an unqualified refusal . . . to perform."  *Travis*, 203 A.2d at

176 (internal quotation marks omitted).  Klayman has failed to do so.  Rather, as Defendants

emphasize, JW has already performed its key obligation under the Severance

Agreement—paying Klayman a lump sum of $600,000 as severance and consideration for his

agreement not to compete.  Defs.' Stmt. ¶ 12; *see also* Severance Agreement ¶ 2.  Klayman does

not dispute that JW has satisfied its obligation under the Severance Agreement to pay him more

than a half million dollars in consideration for his voluntary resignation and agreement not to

compete with JW.  Accordingly, it is evident from the record that JW has not demonstrated an

"an unqualified refusal . . . to perform," as is necessary to justify rescission of the contract by

Klayman.  *Travis*, 203 A.2d at 176 (internal quotation marks omitted).

Second, the Court finds that Klayman has failed to move for rescission within a reasonable time after discovering facts justifying such a claim.  As stated above, "one who seeks to rescind a contract must act within a reasonable time after discovery of the facts justifying rescission." *Mariner Water*, 665 F.2d at 1069.  Although "[w]hat constitutes a reasonable time is ordinarily a question of fact, [] where the facts are clear and support but one inference, the question is one of law." *Cambpell Music Co. v. Singer*, 97 A.2d 340, 341 (D.C. 1953) (finding that "as a matter of law fifteen months was an unreasonable length of time" to delay before seeking rescission).  Correspondence submitted by Klayman himself shows that he has been aware, as early as April of 2004, of each of the alleged breaches of the Severance Agreement asserted in his motion for summary judgment.  *See, e.g.,* Docket No. [285-4 at pp. 13-26] (Letter from Klayman to counsel for JW dated April 26, 2004 listing alleged breaches of Severance Agreement).  Klayman did not file suit for rescission until April 12, 2006, almost a full two years after the record evidence shows he was aware of the underlying facts allegedly justifying rescission.  Klayman has made no efforts to refute JW's assertion that the delay is unreasonable. *See* Pl.'s Reply.  Moreover, the Court notes that under D.C. law, "one who seeks rescission must 'indicate to the other party at least the intent to restore the parties to the relative positions they would have occupied if no such contract had ever been made, and this as soon as the disenchanted party learns of the facts." *Brown v. Hornstein*, 669 A.2d 139, 143 (D.C. 1996). Although the Court has previously advised Klayman that he would "be required to return to Judicial Watch the $600,000 he received under the Severance Agreement," in order to succeed on his rescission claim,  *1/17/07 Klayman*, 2007 WL 140978, at *15, Klayman does not indicate

18

anywhere in the record that he is willing to do so.  Accordingly, the Court finds that Klayman

failed to seek rescission within a reasonable time as a matter of law.

Third and finally, Klayman "has not shown why damages would not provide him with

full and complete relief." *Kakaes*, 790 A.2d at 583.  Indeed, Klayman has sought damages in the

alternative and makes no argument as to why such damages would provide him less than

complete relief.  Equitable relief, such as rescission, is not appropriate where there is "a complete

and adequate remedy at law." *Id.*  This is particularly so here, where Klayman's request for

rescission is at heart a request for specific performance—*i.e.*, that "Klayman [] be restored to his

position as Chairman and General Counsel of Judicial Watch."  SAC ¶ 137.  However, "[i]t is

true that in common law contract cases the courts have hesitated to compel persons to work

together or to enforce other ongoing human relationships." *Hopkins v. Price Waterhouse*, 920

F.2d 967, 980 (D.C. Cir. 1990).  Klayman offers no case law or legal authority supporting award

of such an unusual remedy in these circumstances, and, in the absence of any argument to the

contrary, the Court concludes that Klayman has failed to show that he is entitled to reinstatement

at JW as a matter of law.

Indeed, Klayman has failed to provide ***any*** case law or legal authority in support of his

claim for rescission—both his motion for partial summary judgment and reply are entirely devoid

of any legal citations.  *See* Pl.'s MSJ; Pl.'s Reply.  Rather, Klayman bases his entire argument on

the mistaken belief that the Court has previously ruled that he is entitled to rescission in this case.

*See* Pl.'s Reply at 2 (stating that Defendants "now seek to reargue this Court's prior ruling that a

breach of the Confidential Severance Agreement will give rise to Plaintiff's right to elect

rescission of the Agreement").  Such a conclusion, however, is plainly incorrect.  Although the

Court previously denied Defendants' motion to dismiss Klayman's claim for rescission, the Court did *not* address the merits of the rescission claim in that decision and certainly did not hold that Klayman is entitled to such relief. *See 1/17/07 Klayman*, 2007 WL 140978, at * 15. Accordingly, the Court finds that Klayman is not entitled to rescission as a matter of law, and therefore DENIES Klayman's [275] motion for summary judgment and GRANTS JW's [269] motion for summary judgment insofar as it relates to Count Six of Klayman's Second Amended Complaint.

Having disposed of Klayman's motion for partial summary judgment, all that remains are Defendants motions for summary judgment, to which the remainder of this Memorandum Opinion is directed.

> 2.    Defendants' Motions as to Count Seven of the Second Amended Complaint - Breach of Contract (Damages)

The Court now turns to JW's motion for summary judgment as to Count Seven of Klayman's Second Amended Complaint, which seeks monetary damages for various breaches of the Severance Agreement as enumerated above. Specifically, JW has moved for summary judgment as to allegations in Count Seven that JW breached the Severance Agreement by, *inter alia*: (1) failing to take affirmative steps to purchase the headquarters building and to remove Klayman as guarantor of the building's lease, SAC ¶¶ 66(F), 127, 145; (2) failing to return Klayman's personal property and assets as well as property and assets belonging to his law firm, Klayman & Associates, P.C. ("K&A"), *id.* ¶¶ 66(E), 126, 143; (3) failing to pay Klayman and his family for health care insurance, *id.* ¶ 66(C); (4) opening mail sent to Klayman at JW and failing to forward mail and telephone messages to Klayman, *id.* ¶¶ 66(A) & (H); (5) tortiously

interfering with Klayman's new organization, Freedom Watch, Inc. ("Freedom Watch"), *id.* ¶ 66(A); (6) filing false and frivolous legal pleadings in proceedings in Florida, *id.* ¶ 66(G); (7) interfering with Klayman's former clients who had offered to assist with his Senate campaign, *id.* ¶ 66(J); and (8) instructing media outlets not to speak to Klayman and not to refer to him as Founder and former Chairman of JW, *id.* ¶¶ 124, 125.[9]

At the outset, Defendants note that it is somewhat unclear as against which of the Defendants Klayman intended to assert Count Seven.  Although Count Seven explicitly names only JW as a defendant, *see* SAC at p. 25, Klayman's prayer for relief as to that count asks the Court to award him damages "against the defendants, jointly and severally," *id.* at pp. 32.  In an abundance of caution, the Individual Defendants have therefore moved for summary judgment as to Count Seven.  Specifically, the Individual Defendants assert that, to the extent Klayman intended to assert a breach of contract claim against them, such a claim must fail because the Individual Defendants—as agents of JW—are not personally liable for the Severance Agreement, which was executed on behalf of JW.  *See* Farrell MSJ at 27-28; Fitton MSJ at 23-24; Orfanedes MSJ at 25-26.  "It is a general principle of corporation law that the officers and employees of a corporate entity are its agents."  *Paul v. Judicial Watch, Inc.*, 543 F. Supp. 2d 1, 5 (D.D.C. 2008).  "Under the law of the District of Columbia, an agent is not personally liable on a contract it executes on behalf of a principal so long as it identifies the principal and discloses the agency relationship."  *Id.*; *see also Resnick v. Abner B. Cohen Advertising, Inc.*, 104 A.2d  254, 255

---

[9] As previously explained, Klayman also alleges that JW breached the Severance Agreement by disparaging him to the media and actively misrepresenting the reasons for his departure from JW.  SAC ¶¶ 122, 123.  Defendants admit that factual disputes exist as to this allegation and therefore have not moved for summary judgment on this question.  *See supra* p. 8, n. 5.

(D.C. 1954).   Further, "[w]here a principal is disclosed, no liability will fall upon the agent for acts committed by the principal unless he binds himself for same by definite words or stipulation."   *Rittenberg v. Donohoe Construction Co., Inc.*, 426 A.2d 338, 341 (D.C. 1981). "Nor does liability attach to an agent of a disclosed principal for his act within the scope of the agency unless he binds himself by definite words or stipulation."   *Id.*

The Severance Agreement is clearly between JW and Klayman.  Farrell did not sign the Severance Agreement at all, so it is entirely unclear to the Court on what basis Klayman would allege that Farrell may be held personally liable.   *See generally* Severance Agreement. Moreover, although Fitton and Orfanedes signed the Severance Agreement, they did so in their respective capacities as President and Corporate Secretary of Judicial Watch.   *See id.* at p. 12. Nonetheless, Klayman broadly claims that the Individual Defendants "are liable individually as well as on behalf of JW" and that "[a] review of all of the affidavits and documents in the record show that [Fitton] in particular is liable individually."  Second Klayman Aff. ¶ 29.  Klayman, however, fails to provide any legal or factual support for this claim.  Although he alleges that "documents in the record" support his claim, he has not actually included any citations to record evidence or otherwise directed the Court to such alleged evidence.  *See id*.  Moreover, the Court, upon its own independent review of the record, finds that the record is devoid of any evidence that Fitton or Orfanedes personally obligated themselves to the terms of the Severance Agreement or otherwise gave their consent to be personally bound.   Accordingly, to the extent Klayman sought to allege Count Seven as against the Individual Defendants, the Court GRANTS summary judgment to Farrell, Fitton, and Orfanedes as to Klayman's breach of contract claim for monetary damages.

The Court therefore moves next to the merits of Klayman's breach of contract claim for damages against JW.  As explained above, JW has moved for summary judgment on eight of the alleged breaches of contract asserted by Klayman in Count Seven of his Second Amended Complaint.  The Court shall examine each in turn.

        a.     JW's alleged failure to take affirmative steps to purchase the headquarters building and to make a good faith effort to remove Klayman as guarantor of the building's lease.

JW first moves for summary judgment as to Klayman's allegations that the organization breached the Severance Agreement by failing to take affirmative steps to purchase the headquarters building and by failing to remove Klayman as guarantor of the building's lease, SAC ¶¶ 66(F), 127, 145.  As to the first part of this allegation, JW asserts that the Severance Agreement contains no language obligating it to purchase, or attempt to purchase, its headquarters building.  JW's SAC-MSJ at 10.  Reference to the Severance Agreement confirms that the contract does not require JW to "take affirmative steps" to purchase the headquarters.  *See generally* Severance Agreement.   It is a basic principle of contract law that there can be no breach of an agreement where there is no agreement.  *See New Economy Capital, LLC v. New Markets Capital Group*, 881 A.2d 1087, 1094 (D.C. 2005) (Under District of Columbia law, "the party seeking to enforce a contract must prove that a contract exists by demonstrating: '(1) agreement as to all material terms; and (2) intention of the parties to be bound.'") (quoting *Jack Bauer, Inc. v. Office Space Dev. Corp.*, 664 A.2d 1236, 1238 (D.C. 1985)).  As there is no provision in the Severance Agreement requiring JW to purchase (or attempt to purchase) the headquarters building, the failure to do so is not a breach of the Severance Agreement.  Accordingly, the Court GRANTS JW's motion for summary judgment insofar as Klayman

alleges that JW breached the Severance Agreement by failing to take affirmative steps to purchase the headquarters building.

With respect to the latter part of Klayman's allegation—that JW breached the Severance Agreement by failing to remove Klayman as guarantor of the lease—JW admits that it agreed in the contract to make a good faith effort to remove Klayman as guarantor.  JW's SAC-MSJ at 11. Specifically, the Severance Agreement provides in relevant part that:

> Judicial Watch agrees to continue to work in good faith to remove Klayman as guarantor of its lease for its Washington, D.C. headquarters . . . .  Klayman acknowledges and agrees that he shall not receive any additional compensation from Judicial Watch above and beyond the Severance Pay and other benefits provided in this Agreement for his guarantying the lease.

Severance Agreement ¶ 9.B.  JW argues, however, that it has satisfied its contractual obligation to make a good faith effort to remove Klayman as guarantor of the lease.  JW's SAC-MSJ at 10- 11.  According to JW, shortly after Klayman's departure on September 19, 2003, Fitton contacted an agent for JW's landlord to discuss possible ways of removing Klayman as guarantor of the lease.  Defs.' Stmt. ¶ 34.  After a series of conversations in September and October 2003, the landlord proposed that Judicial Watch obtain a letter of credit from a bank in an amount equal to three years rent, or approximately $1.8 million, in lieu of Klayman continuing to serve as guarantor.  *Id.* ¶ 35.  JW determined that the cost of such an approach was not commercially acceptable and therefore sent a letter to the landlord's agent asking the landlord to reconsider.  *Id.* ¶ 36.  Neither the landlord or his agent responded.  *Id.* ¶ 37.  Based on these facts, JW asserts that it is entitled to judgment as a matter of law that it made a good faith effort to remove Klayman as a guarantor, despite the fact that such efforts ultimately proved unsuccessful.  JW's SAC-MSJ at 10-12.

24

As an initial matter, JW has not addressed what legal standard the Court should apply in determining whether it met its obligation to exert a "good faith" effort.  Rather, JW simply asserts that—whatever the standard may be—JW has clearly satisfied it as a matter of law.  The Court does not agree.   Whether a party to a contract has exerted a good faith effort is generally a question of fact.  *Cf.* 23 Williston on Contracts § 63:22 (4th ed. 2006) ("Thus, whether particular conduct violates or is consistent with the duty of good faith and fair dealing necessarily depends upon the facts of the particular case, and is ordinarily a question of fact to be determined by the jury or other finder of fact.").  Here, the Court cannot say as a matter of law that JW's efforts satisfied its obligation under the Severance Agreement, particularly where the evidence shows that JW, after rejecting the landlord's first offer, made little effort to follow-up with the landlord or his agent after receiving no response to their request for reconsideration.

JW also argues that, even if it breached the Severance Agreement by failing to make a good faith effort to remove Klayman as guarantor, it is nonetheless entitled to summary judgment because Klayman has not suffered damages as a matter of law nor can he articulate any actual damages.  JW's SAC-MSJ at 12.  Although it is true that Klayman has failed to produce any documentary evidence of actual damages in this case, and will therefore be unable to prove actual damages at trial, under District of Columbia law, "where a plaintiff proves a breach of a contractual duty . . . [but] offers no proof of actual damages or when the proof is vague and speculative, he is entitled to . . . nominal damages." *Cahn v. Antioch Univ.*, 482 A.2d 120, 130 (D.C. 1984); *Bedell v. Inver Housing, Inc.*, 506 A.2d 202, 205 (D.C. 1986) (same).  Accordingly, the Court DENIES JW's motion insofar as it moves for summary judgment as to Klayman's allegation that JW breached its obligation to make good faith efforts to remove him as lease

25

guarantor.

                          b.        JW's alleged failure to forward Klayman's telephone messages and mail.

JW next moves for summary judgment as to Klayman's allegation that the organization breached the Severance Agreement by opening mail sent to Klayman at JW and by failing to forward mail and telephone messages to him.   SAC ¶¶ 66(A) & (H).  JW argues that the Severance Agreement does not contain any language concerning the manner in which Klayman's telephone messages and mail should be handled, and that Klayman's breach of contract claim based on such alleged conduct must fail.  JW's SAC-MSJ at 25.  Reference to the Severance Agreement confirms that the contract does not contain any agreement as to the handling of Klayman's telephone messages or mail.  *See generally* Severance Agreement.   As explained above, it is a basic principle of contract law that there can be no breach of an agreement where there is no agreement*.  See New Economy Capital*, 881 A.2d at 1094.  As there is no provision in the Severance Agreement that Klayman points to requiring JW to forward his mail and his telephone messages, the failure to do so is not a breach of the Severance Agreement.[10] Accordingly, the Court GRANTS JW's motion for summary judgment insofar as Klayman alleges that JW breached the Severance Agreement by failing to forward his mail and telephone messages and by opening his mail without his permission.[11]

---

[10] The Court notes that Klayman has not made any argument that this conduct—although perhaps not in violation of a particular provision of the Severance Agreement—was in breach of the covenant of good faith and fair dealing.  *See generally* Second Klayman Aff. ¶¶ 23.  Indeed, the Court emphasizes that Klayman has not asserted any claim based on an alleged breached of the covenant of good faith and fair dealing.  *See generally* Second Amended Complaint.

[11] The Court notes that it has, in an abundance of caution, reviewed Klayman's stricken opposition to JW's motion for summary judgment.  The only relevant argument asserted in the

c.   JW's alleged tortious interference with Freedom Watch.

JW next moves for summary judgment on Klayman's allegation that the organization breached the Severance Agreement by "tortiously interfer[ring] with another entity funded by Klayman, Freedom Watch, Inc."  SAC ¶ 66A.  Once again, JW points out that the Severance Agreement does not reference Freedom Watch, an organization that did not exist at the time the Agreement was drafted, nor does it impose any obligations on JW with regards to any future entities that may be funded by Klayman.  JW's SAC-MSJ at 25-26.  Reference to the Severance Agreement confirms that the contract does not contain any reference to Freedom Watch or any future entities created and/or funded by Klayman.  *See generally* Severance Agreement.  As explained above, it is a basic principle of contract law that there can be no breach of an agreement where there is no agreement.  *See New Economy Capital*, 881 A.2d at 1094.  Klayman's allegation that JW breached the Severance Agreement by tortiously interfering with Freedom Watch thus fails.[12]

---

stricken opposition that is not also asserted in the Second Klayman Affidavit considered by the Court is Klayman's argument that the Severance Agreement implicitly obligates JW to forward his mail.  Specifically, Klayman argues that, "[i]mplicit in the Confidential Severance Agreement, much like the right to privacy is woven into the U.S. Constitution, is the agreed right to confidentiality and the common practice, based on the law, of not opening someone else's mail."  Pl.'s Opp'n at 8.  Not surprisingly, Klayman offers no case law or other legal authority for this novel assertion.  *See id.*  Thus, the Court finds that even if it were to consider this argument, Klayman's unsupported argument is wholly without merit.

In addition, Klayman has failed to produce any record evidence from which a reasonable jury could conclude that JW in fact opened his mail and/or failed to forward his mail and telephone messages to him.  Although he claims that "Defendants did open my mail . . . from the Internal Revenue Service," and that "a cover letter from [Fitton] effectively admits that it was opened," Klayman provides no citation to any evidence, such as a deposition transcript or copy of the cover letter he references, to support his claim.  *See* Second Klayman Aff. ¶ 23.

[12] The Court emphasizes that Klayman asserts this claim only in support of his breach of contract claim and does not assert any independent tort claim based on JW's alleged interference

In addition, Klayman has failed to provide any record evidence from which a reasonable jury could conclude that JW in fact "tortiously interfered" with Freedom Watch.  Klayman asserts only one example of allegedly tortious behavior by JW: that the organization opened mail from the IRS to Klayman concerning Freedom Watch.  Second Klayman Aff. ¶ 23.  As discussed above, however, Klayman has not provided any evidence to support this allegation, *see supra* p. 26, and Klayman's self-serving, unsupported assertion is insufficient as a matter of law to defeat summary judgment.  *See Hinson*, 579 F. Supp. 2d at 103 n. 5.[13]  Accordingly, the Court GRANTS JW's motion for summary judgment insofar as Klayman alleges that JW breached the Severance Agreement by failing to forward his mail and telephone messages and by opening his mail without his permission.

        d.      JW's alleged interference with Klayman's Senate campaign.

JW next moves for summary judgment as to Klayman's allegations that the organization breached the Severance Agreement by "interefer[ring] with Klayman's relationship with Klayman's former clients who had offered to help Klayman in his Senate campaign."  SAC ¶ 66J.  As an initial matter, it is entirely unclear whether Klayman, in referring to his "former clients," intended to refer to clients he worked with while employed at Judicial Watch or clients that he had previously worked with in a private capacity.  The Second Amended Complaint does

---

with Freedom Watch.  *See generally* Second Amended Complaint.

    [13] In an abundance of caution, the Court reviewed Klayman's stricken opposition to JW's motion for summary judgment.  In addition to claiming tortious interference with Freedom Watch based on the organization's alleged opening of mail from the IRS, Klayman also broadly claims that "oral testimony of Klayman, Paul Rodriguez and others at trial will buttress this prima facie showing of tortious interference with Freedom Watch."  Pl.'s Opp'n at 9.  This purported evidence, however, is not in the record, and Klayman's speculation that witnesses may be helpful to prove his case is of entirely no value at the summary judgment stage.

not specify these individuals by name nor is there any evidence in the record identifying these

alleged individuals.  JW, in moving for summary judgment, has assumed that Klayman is in fact

referring to clients he worked with while employed at Judicial Watch and argues that the

Severance Agreement does not contain any terms or provisions purporting to govern or limit

JW's own interaction with its own clients and former clients.  JW's SAC-MSJ at 27-28.

Significantly, Klayman does not dispute that his allegations refer to former clients he worked

with while at JW nor does he dispute that the Severance Agreement contains no relevant terms or

provisions regulating JW's interaction with its own former and current clients.  Indeed, Klayman

has entirely failed to address JW's arguments on this point.  *See* Second Klayman Aff.[14]  He has

therefore conceded that this claim is without merit.  *See Franklin v. Potter*, 600 F. Supp. 2d 38,

60 (D.D.C. 2009) (treating defendant's argument in motion for summary judgment as conceded

where plaintiff failed to address in his response); *Hopkins v. Women's Div., General Bd. of

Global Ministries,* 284 F. Supp. 2d 15, 25 (D.D.C. 2003) ("It is well understood in this Circuit

that when a plaintiff files an opposition to a dispositive motion and addresses only certain

arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to

address as conceded."), *aff'd* 98 Fed. Appx. 8 (D.C. Cir. 2004).

In addition, the Court notes that Klayman has failed to provide any evidence that JW in

fact interfered with former clients who offered to help him with his Senate campaign.  As stated

above, Klayman has not briefed this point in the submissions now before the Court nor has he

ever identified any specific individuals who were allegedly precluded from assisting with his

---

[14]  In an abundance of caution, the Court reviewed Klayman's stricken opposition to JW's motion for summary judgment, which also fails to include any response on this point.  *See generally* Pl.'s Opp'n.

Senate campaign.  Morever, the Court, upon its own review of the record, finds no evidence to support this allegation.  Accordingly, Klayman has not shown that there is any agreement between the parties that was breached or that any offending conduct actually occurred.  The Court therefore GRANTS JW's motion for summary judgment insofar as Klayman alleges that JW breached the Severance Agreement by interfering with his Senate campaign.

> e.  JW's alleged failure to return property belonging to Klayman and his law firm, K&A.

JW moves for summary judgment as to Klayman's allegations that the organization breached the Severance Agreement by failing to return Klayman's personal property and assets as well as property and assets belonging to his law firm, K&A.  SAC ¶¶ 66(E), 126, 143.  As JW acknowledges, the organization agreed, pursuant to paragraph 4.B of the Severance Agreement, that, "[u]pon reasonable advance notice to Judicial Watch, Klayman shall be permitted to remove his personal effects (*e.g.*, family photos and other personal property that he purchased with his personal funds)."  Although the Second Amended Complaint does not specify the property or assets at issue, at deposition, Klayman identified four pieces of artwork that he claims JW failed to return to him, consisting of three pieces of artwork purchased at the Kennedy Gallery in Miami Beach and one piece purchased from a vendor at the Miami Art Deco Festival.  Defs.' Stmt., Ex. 10 (Excerpts of Deposition of Larry Klayman) ("Klayman Dep.") at 244:4 - 246:21.  Further, in discussing this allegation in his supporting materials, Klayman points only to the piece of artwork purchased from Art Deco and does not identify any other "personal property" or "assets" that he contends have been impermissibly retained by JW.  Second Klayman Aff. ¶ 20 ("Defendants have not returned artwork which I purchased at the Miami Deco Arts festival.").

The Court therefore proceeds with the understanding that this allegation is based solely on JW's alleged failure to return the four pieces of artwork identified above.

According to JW, no reasonable jury could find, on the evidence now in the record, that the four pieces of artwork at issue are owned by Klayman, and not JW—that is, that Klayman either purchased the items with his own funds or reimbursed JW for the purchases if made on a corporate credit.  JW's SAC-MSJ at 13-16.  The Court agrees.  First, as to the three pieces of artwork purchased at the Kennedy Gallery, the undisputed evidence in the record demonstrates that the items were charged by Klayman to JW's corporate American Express card on September 22, 2002.  Defs.' Stmt. ¶ 54; First Prytherch Decl. ¶ 13 & Ex. C.[15]  Shortly thereafter, in October of 2002, the artwork was added to JW's general ledger as a fixed asset of the organization. Defs.' Stmt. ¶ 55; First Prytherch Decl. ¶ 13 & Ex. C.  According to Ms. Prytherch, the artwork has remained on JW's general ledger at all times since then, and is also included on JW's fixed asset inventory.  First Prytherch Decl. ¶ 13.  Furthermore, when Klayman advised JW that he believed he owned the artwork, Ms. Prytherch "researched the matter and determined that JW has no records indicating that Klayman ever reimbursed the organization for the artwork or that he ever purchased the artwork from JW." *Id.*  Klayman has not proffered any evidence to the contrary.  Indeed, as mentioned above, Klayman appears to have abandoned his claim as to the pieces of artwork purchased from the Kennedy Gallery, as he contests only JW's failure to return the artwork obtained from the Miami Art Deco Festival without mention of these three pieces at

---

[15] Although Klayman testified at his deposition that he purchased the items on his "personal credit card," Klayman Dep. 245:13, he has not produced any evidentiary support for this claim.  Moreover, as discussed above, Klayman now appears to have abandoned this claim, limiting his opposition to a discussion only of the artwork purchased at the Miami Art Deco Festival.  *See* Second Klayman Aff. ¶ 20.

issue. *See* Second Klayman Aff. ¶ 20.[16]

Second, as to the fourth piece of artwork allegedly purchased from a vendor at the Miami Art Deco Festival, there is no evidence in the record demonstrating that Klayman purchased this piece of artwork with his personal funds—*i.e.*, that it is his property and not JW's.  At deposition, Klayman testified that he "[p]robably" purchased the piece with "a check, but I'm not sure."  Klayman Dep. 246:21.  Klayman, however, has never produced a copy of that check, a receipt, or any other evidence demonstrating that he purchased the artwork with his personal funds.  In addition, when Klayman's representative visited JW's office in Miami, Florida in October of 2003 to identify those personal items that were to be turned over to Klayman, the representative evidently did not designate the artwork as belonging to Klayman.  *See* Defs.' Stmt. ¶¶ 49-53.

Moreover, the evidence Klayman submits in support of this claim consists solely of conclusory statements that do not defeat JW's motion for summary judgment.  Specifically, Klayman, in his second affidavit, cites to his own statement, and a statement by a third-party, Ms. Cobas, for support for his claim that he purchased the artwork.  *See* Second Klayman Aff., ¶ 20. Neither of those statements, however, provides demonstrable support for Klayman's claim. Klayman's own statement simply restates his allegations in his complaint, without any evidentiary support.   *See* Pl.'s MSJ, Ex. 2 (Affidavit of Larry Klayman) ("First Klayman Aff.), ¶ 6 (averring without support that "Judicial Watch has [not] returned art work which I bought for Judicial Watch").  Ms. Cobas' statement is equally conclusory and unsupported.  *See id.,* Ex. 3

---

[16]  In an abundance of caution, the Court reviewed Klayman's stricken opposition to JW's motion for summary judgment, which also fails to include any response regarding the three pieces purchased from the Kennedy Gallery.  *See generally* Pl.'s Opp'n.

(Affidavit of Sandra Cobas) ("Cobas Aff."), ¶ 9 (purporting to have "personal knowledge that Judicial Watch has not returned all of Mr. Klayman's property, such as artwork in the Miami office which Mr. Klayman paid for personally, as I was with him when he purchased the artwork and paid for it himself at the South Beach art fair").  In addition, although Ms. Cobas purports to have personal knowledge based on her presence at the scene of the purchases, she does not explain how she came to personally know that Klayman paid for the artwork purchased at the Miami Art Deco Festival with his own funds rather than with corporate funds nor does she explain how she has came to have personal knowledge that Klayman's property has not be returned to him in full.  *See id.*  Her affidavit is therefore insufficient to oppose JW's motion. *See* Fed. R. Civ. P. 56(e) (an opposing affidavit "must be made on personal knowledge" and must "show that the affiant is competent to testify on the matters stated").  The failure to provide any demonstrable evidence to support these conclusory statements is particularly noteworthy given the relative ease with which Klayman could likely obtain evidence supporting his claim (*e.g.*, a cancelled check or credit card bill).[17]

Discovery in this matter is now closed, and, despite 16 months of discovery, Klayman has not produced any evidence in the record to support his claim that he purchased the artwork with his personal funds.  Accordingly, the Court finds that Klayman has introduced no evidence from which a reasonable jury could conclude—other than by impermissible speculation—that he used personal funds to purchase artwork currently in JW's possession.   The Court therefore GRANTS

---

[17]   In an abundance of caution, the Court has reviewed Klayman's stricken opposition to JW's motion for summary judgment, and notes that it advances no new argument or factual claims in opposition to Defendants' arguments relating to the alleged failure to return Klayman's personal property.  *See generally* Pl.'s Opp'n.

JW's motion for summary judgment insofar as Klayman alleges that JW breached the Severance

Agreement by failing to return Klayman's personal property and assets as well as property and

assets belonging to his law firm.

> f.    JW's alleged failure to pay the health insurance premiums for
>        Klayman and his family

JW next moves for summary judgment on Klayman's allegation that it breached the

Severance Agreement by "fail[ing] to pay Klayman and his family for health care insurance."

SAC ¶ 66(C).  As JW acknowledges, the parties agreed pursuant to paragraph 3 of the Severance

Agreement that:

> In the event Klayman properly and timely elects to continue his family health
> insurance coverage following the termination of his employment in accordance with
> the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), Judicial
> Watch shall pay the cost of such insurance, to the same extent that it paid Klayman's
> family health insurance coverage during his employment, for a period of twelve (12)
> months following the Separation Date.

Severance Agreement, ¶ 3.

JW avers that it paid for Klayman's own health insurance during the 12 months following

his separation, but admits that it did not pay for health insurance coverage for Klayman's family

during this same time.  Defs.' Stmt. ¶ 59; First Prytherch Decl. ¶ 14.  Klayman, for his part, does

not appear to dispute that JW paid his own health insurance and offers no evidence to the

contrary.[18]  Accordingly, the Court GRANTS JW's motion for summary judgment insofar as it

---

[18] Although Klayman contends that JW initially cancelled his health care coverage, he
does not dispute or challenge JW's statement that the organization ultimately paid the premiums
for Klayman's individual health insurance in the 12 months immediately after separation.
*See* First Klayman Aff. ¶ 2; Second Klayman Aff. ¶ 21.  Moreover, as support for the claim that
JW initially cancelled his health insurance, Klayman points only to: (1) an undated memorandum
that purports to request Klayman's insurance be cancelled effective his date of separation; and (2)
the testimony of Ms. Cobas that Klayman "was told by the hospital that his COBRA coverage

relates to Klayman's assertion that JW breached its obligation to pay his COBRA insurance for

12 months following his separation.  It is undisputed, however, that JW did not pay the health

insurance coverage for Klayman's family following his separation from JW.  Accordingly, the

Court must determine whether JW was obligated to do so under the Severance Agreement.

JW argues that the Severance Agreement did not require the organization to pay the

additional cost of health insurance for Klayman's children.  JW explains that, pursuant to its

general policy, an employee of the organization may elect to purchase family coverage under

JW's health insurance policy, but is then generally responsible for paying the cost associated with

the additional coverage.  Defs.' Stmt. ¶ 60.  This is typically done through a payroll deduction.

First Prytherch Decl. ¶ 15.  Per the usual policy, Klayman or his wife—and not JW—paid the

additional cost for his family's health insurance for most of Klayman's tenure with the

organization.  Initially, Klayman paid his family's health insurance premium directly to the

insurance provider.  Defs.' Stmt. ¶ 62.  Beginning in September of 1999, Klayman's former

_____

had been terminated by JW" and that he was therefore required to "use his own credit card to pay
for back treatment."  *See* Docket No. [275-4] at p. 5 (e-mail bates-stamped DEF 0002354
indicating a request by JW to terminate coverage for Klayman's health insurance); *see* Cobras
Aff. ¶ 5.  Neither the undated memorandum or Ms. Cobas' statements are sufficient to create a
material issue of disputed fact.  First, it is entirely unclear from the undated memorandum if
Klayman's coverage was, in fact, terminated; rather, the document only shows that a request to
terminate his coverage was made at one time—whether that occurred is unknown.  Second, Ms.
Cobas does not explain how she has personal knowledge to testify that Klayman's COBRA
coverage was terminated and that he paid for his own medical treatment by credit card.  *See* Fed.
R. Civ. P. 56(e) (an opposing affidavit "must be made on personal knowledge" and must "show
that the affiant is competent to testify on the matters stated").  Moreover, she does not state when
this alleged incident occurred—*i.e.*, whether it occurred before or after the 12 month period for
which JW agreed to pay Klayman's health insurance premiums.  Finally, the Court notes that
Klayman has not produced any credit card or other receipts indicating that he personally paid for
health care treatment in the 12 months immediately after his separation from JW due to a
cancellation of his COBRA coverage.

35

spouse began working as an employee of JW and from that time through September 2002, the

health insurance premium for Klayman's family was paid through a payroll deduction from Mrs.

Klayman's paycheck, per the normal policy.  *Id.* ¶ 64.  Thereafter, in September of 2002, Mrs.

Klayman went on an extended unpaid leave of absence and was no longer eligible to have JW

pay her health insurance premiums, and the Klayman family policy was transferred to Klayman's

name.  *Id.* ¶¶ 65-66.  At that point, however, as a result of what JW calls an "administrative

error,"  no payroll deductions for the additional cost of the family's health insurance premium

were made from Klayman's paycheck.  *Id.* ¶ 67.  Accordingly, from September 2002 through

Klayman's resignation in September 2003, JW paid the cost of Klayman's health insurance

premium for his family.  *See* First Prytherch Decl. ¶ 20 (stating that the "oversight" continued

until Klayman's resignation).

JW argues that it is nonetheless under no obligation to continue to pay for Klayman's

family health insurance because it did so in the first place only because of an administrative error.

According to JW, the Severance Agreement obligates JW to pay for Klayman's health insurance

only to the extent that Klayman was entitled to payment during his employment and because

Klayman was never "entitled" to have JW pay his children's health insurance policy, he is not

entitled to such payments under the Severance Agreement.  *See* JW's SAC-MSJ at 16-20.  The

plain language of the Severance Agreement, however, does not support JW's interpretation.

Rather, the Severance Agreement provides that JW agreed to pay Klayman's insurance "to the

same extent that it ***paid*** Klayman's family health insurance coverage during his employment."

Severance Agreement, ¶ 3.A (emphasis added).  It does not provide, as JW urges, that the

organization is obligated to pay only what Klayman was entitled to under the organization's

general policy.  Rather, as demonstrated by the plain language of the parties' agreement, JW's

obligation to pay Klayman's health insurance turns on how much it ***paid*** him during his

employment.

That inquiry, however, is not a straight-forward one, given that the extent to which JW

paid the health insurance coverage for Klayman's family varied throughout his employment.  As

discussed above, Klayman himself paid the additional cost of his family's health insurance in the

first several years of his employment with JW, while JW paid for the additional cost during the

last year of Klayman's employment.  Consequently, the terms of the Severance Agreement, as

applied to the facts of this case, are ambiguous, and under the law of the District of Columbia,

the meaning of ambiguous contract language "must be evinced from extrinsic evidence on the

intent of the parties—a factual determination."  *District of Columbia v. District of Columbia*

*Public Serv. Comm'n,* 963 A.2d 1144, 1155 (D.C. 2009).  The Court therefore DENIES JW's

motion for summary judgment insofar as it relates to Klayman's assertion that JW breached its

obligation to pay his family's health insurance for 12 months following his separation.

> g.   JW's alleged filing of a false and frivolous legal pleading in Florida
>       litigation.

JW next moves for summary judgment as to Klayman's allegation that the organization

breached the Severance Agreement by filing "false and frivolous legal pleadings to attempt to

have Klayman removed as counsel for Sandra Cobas in the Miami Elian Gonzalez litigation . . .

fraudulently representing to the court that Klayman was legally barred from representing her."

SAC ¶ 66(G).  As presented by the parties, this claim refers to a lawsuit initiated by Judicial

Watch in the Southern District of Florida captioned *Dalrymple v. United States*, Case No.

1:03cv20588 (S.D. Fla.).  Defs.' Stmt. ¶ 84.  JW admits that it filed a motion to strike Klayman's

appearance as counsel for Ms. Cobas in that proceeding.  *See* JW's MSJ at 26-27.  Accordingly,

the only question is whether its doing so was in breach of the Severance Agreement.

JW contends it was not a breach.  First, JW argues that Klayman was required under

paragraph 12 of the Severance Agreement to withdraw as counsel of record "in all legal

proceedings in which JW is currently involved as a party or as counsel for any person or entity."

Severance Agreement ¶ 12.  According to JW, Klayman himself breached the Severance

Agreement by attempting to "inject himself into the *Dalyrmple* matter by seeking to continue to

represent one of the plaintiffs in that lawsuit, Ms. Sandra Cobas."  Defs.' Stmt. ¶ 85; JW's SAC-

MSJ at 26-27.  JW therefore contends that it filed the motion to strike his appearance in an effort

to enforce Klayman's compliance with the Severance Agreement and that doing so was not in

breach of the parties' contract.  JW's SAC-MSJ at 26-27.

Klayman counters that he was entitled to represent Ms. Cobas pursuant to paragraph

5.B(iii) of the Severance Agreement.  Second Klayman Aff. ¶ 24.  That provision of the

Severance Agreement provides that "Klayman shall not be precluded from providing legal

representation to any client, if requested by that client, in his capacity as a lawyer in private

practice."  Severance Agreement, ¶ 5.B(iii).  JW, however, does not address or acknowledge

paragraph 5.B(iii) of the Severance Agreement in its instant motion for summary judgment.  *See*

JW's SAC-MSJ at 26-27.  If Klayman was in fact seeking to represent Ms. Cobas in his personal

capacity—a fact that is not clear on the record now before the Court—the Court then must

determine how paragraphs 5.B.(iii) and 12 of the Severance Agreement should be interpreted

when Klayman seeks to represent a client in an action in which JW is involved.  However, as JW

has not briefed this issue, the question cannot be resolved in the instant Memorandum Opinion.

In the alternative, JW argues that it is entitled to summary judgment because "the motion to strike [filed by JW in the Florida litigation] and the statements made therein are absolutely privileged under the judicial proceedings privilege." JW's SAC-MSJ at 27. In support of this assertion, JW cites to two cases, *Messina v. Krakower*, 439 F.3d 755 (D.C. Cir. 2006) and *Finkelstein, Thompson & Loughran v. Hemphispherx Biopharma, Inc.*, 774 A.2d 332 (D.C. 2001). These cases, however, involve claims for defamation based on statements made in a judicial filing and hold only that an attorney is protected from liability for a defamatory statement if the statement was made in the course of a judicial proceeding and related in some way to the underlying proceeding. *Messina*, 439 F.3d at 760; *Finkelstein*, 774 A.2d at 338-39. Klayman is not alleging a claim of defamation against JW based on its filings, and JW provides no case law or legal authority applying the judicial proceedings privilege to a breach of contract claim where the substance of the judicial statements is not specifically at issue. Accordingly, based on the arguments and case law now before it, the Court finds that JW has not shown that it is shielded from liability for breach of contract by the judicial proceeding privilege. The Court therefore DENIES JW's motion for summary judgment insofar as it relates to Klayman's allegation that JW breached the Severance Agreement by attempting to remove Klayman as counsel for Ms. Cobas in the Florida litigation.

#### h.   JW's alleged interference with media outlets.

JW moves for summary judgment as to Klayman's allegation that JW breached the Severance Agreement by instructing media outlets that they could not speak with Klayman about JW's cases or public events, and that Klayman could not be referred to as the "Founder and

former Chairman of Judicial Watch." SAC ¶¶ 124-25.  Although neither party specifies, it appears that Klayman claims that such conduct is in violation of paragraph 17 of the Severance Agreement, which provides that neither party is limited "from making fair commentary on the positions or activities of the others following the Separation Date."  Severance Agreement, ¶ 17. JW argues that it is entitled to summary judgment on these claims because there is no evidence in the record that JW engaged in any such conduct.  JW's SAC-MSJ at 28.  The Court agrees.

First, Klayman has made no effort to provide any evidence that JW instructed any news media outlet not to refer to Klayman as "Founder and former Chairman of Judicial Watch."  *See generally* Second Klayman Aff.  Accordingly, the Court easily GRANTS JW's motion for summary judgment insofar as it relates to Klayman's allegations that the organization breached the Severance Agreement by engaging in such conduct.

Second, although Klayman has directed the Court to various documents and materials that he claims demonstrate that JW asked certain media outlets not to schedule him as a guest, none of this material contains admissible evidence that affirmatively supports his claim that such conduct ever occurred.  Specifically, Klayman directs the Court to the following materials: (1) exhibits 9 and 10 to Fitton's August 18, 2008 deposition, Second Klayman Aff. ¶ 26; (2) paragraph 7 of the First Klayman Affidavit, *id.*; (3) the Cobas Affidavit, First Klayman Aff. ¶ 7; (4) the Pendleton Affidavit, *id.*; and (5) various documents attached to the First Klayman Affidavit, *id.*  None of these is sufficient to create a disputed statement of material fact.

For example, although Klayman directs the Court to exhibits 9 and 10 to Fitton's August 18, 2008 deposition, he has not provided those exhibits to the Court.  Second Klayman Aff. ¶ 26. That is, although Klayman has provided a copy of the deposition, none of the deposition exhibits

are attached.  *See* Docket No. [285-2]; Docket No. [286-2].  Having failed to provide such

evidence, the Court is obviously unable to consider it.

Klayman also directs the Court to paragraph 7 of the First Klayman Affidavit, filed in

support of his motion for partial summary judgment, and the attached exhibits.  *See* Second

Klayman Aff. ¶ 26.[19]  The First Klayman Affidavit, however, provides no independent evidence

in support of Klayman's allegations, but instead refers the Court to the Cobas Affidavit, the

Pendleton Affidavit, and various attached documents.  *See* First Klayman Aff. ¶ 7.  Mr.

Pendleton, however, makes no mention of CNN or any media outlets in his affidavit and thus

offers no support for Klayman's allegations.  *See* Pl.'s Reply, Ex. 4 (Affidavit of Michael

Pendleton) ("Pendleton Aff.").  Although the remaining material—that is, Ms. Cobas' affidavit

and the documents attached to the First Klayman Affidavit—purport to address statements made

by JW to the news media, the materials do not contain any admissible evidence that is sufficient

to create a disputed issue of material fact.

Specifically, Ms. Cobas attests in her affidavit that:

> I have personal knowledge that Judicial Watch and Tom Fitton told CNN not to let
> Mr. Klayman comment on the Cheney Energy Task Force Case, as I was in the
> Senate campaign office that day when Mr. Klayman was asked by CNN to go on
> television but later learned through discussions with David Johnson, the campaign's
> campaign manager, and an e-mail from CNN itself, that Mr. Klayman would not be
> invited because Tom Fitton of Judicial Watch had told the network not to put Mr.
> Klayman on television.

---

[19] As explained previously, Klayman submitted amended versions of the affidavits he
submitted in support of his motion for partial summary judgment—including an amended First
Klayman Affidavit—in response to Defendants' complaints that the original versions were
inadmissible.  *See supra* p. 7, n. 4.  He did not, however, re-attach any exhibits to the amended
First Klayman Affidavit.  Nonetheless, the Court shall overlook this administrative oversight and
refer back to the exhibits attached to the original version of the First Klayman Affidavit.

Cobas Aff. ¶ 8. Labeling information as "personal knowledge," however, does not make it so.

Rather, it is clear that the above-quoted statement consists solely of impermissible hearsay, as

Ms. Cobas is merely repeating information that she was told by Klayman and Mr. Johnson, who

themselves appear to have received that information from other individuals.

Similarly, the documents attached to the First Klayman Affidavit provide no assistance on

this issue. Klayman proffers copies of two letters from him to counsel for JW, dated April 26,

2004 and April 29, 2004 respectively, in which he repeats his allegation that Fitton told CNN and

C-SPAN not to permit him to appear as a guest. *See* Docket No. [275-4] at 21-27. Klayman's

own letters repeating this allegation are not, however, evidence that such conduct occurred.

Klayman also directs the Court to two additional items: (1) a copy of an e-mail dated April 27,

2004, from someone named Leslie Burdick to another individual named David Johnson; and (2)

a copy of a paragraph that appears by itself on a blank page of paper without any identifying

information. *Id.* at 23-24. As to the April 27, 2004 e-mail, although Klayman makes no effort to

clarify who these individuals are, the e-mail appears to identify Mr. Burdick as someone with C-

SPAN, and it appears from Ms. Cobas' affidavit that Mr. Johnson was Klayman's Senate

campaign manager. The e-mail states, in relevant part:

> Tom Fitton of Judicial Watch is going to be on C-SPAN for 45 minutes talking about
> the case. He asked that *we* don't schedule Larry on anything related to the case. So
> we won't need to talk with Larry Klayman on Washington Journal too.

*Id.* at 23 (emphasis added). Notably, Mr. Burdick, the author of the e-mail, does not indicate

whether he himself was purportedly told this by Fitton or whether he heard this information from

another unnamed individual, so the statement cannot be admitted as an admission against Fitton.

Rather, it is plainly impermissible hearsay. As to the second document—the undated

paragraph—it is entirely unclear who authored the paragraph; whether the paragraph was originally part of an e-mail, letter, etc.; and when the paragraph was written.  The Court easily finds, then, that this document is inadmissable.

Rule 56(e) requires that supporting affidavits and evidence "set out facts that would be admissible in evidence."  Fed. R. Civ. P. 56(e); *see also Greer v. Paulson*, 505 F.3d 1306, 1315 (D.C. Cir.2007) ("sheer hearsay . . . counts for nothing on summary judgment") (internal quotations omitted).  These documents submitted by Klayman contain only impermissible hearsay and, as such, do not create a material issue of disputed fact.  Accordingly, the Court finds that Klayman has failed to present any admissible evidence supporting his claim that JW interfered with various media outlets by instructing them that they could not speak with Klayman about JW's cases or public events, and that Klayman could not be referred to as the "Founder and former Chairman of Judicial Watch.[20]  The Court therefore GRANTS JW's motion for summary insofar as it relates to this claim.

In summary, the Court GRANTS-IN-PART and DENIES-IN-PART JW's motion for partial summary judgment as to Count Seven of Klayman's Second Amended Complaint. Specifically, the Court: (a) grants as to Klayman's allegation that JW breached the Severance Agreement by failing to take affirmative steps to purchase the headquarters building, but denies as to Klayman's allegation that JW breached the Severance Agreement by failing to make a good faith effort to remove Klayman as guarantor of the building's lease; (b) grants as to Klayman's

---

[20]  In an abundance of caution, the Court has reviewed Klayman's stricken opposition to JW's motion for summary judgment, and notes that it advances no new arguments or factual claims in support of his allegation that JW interfered with various media outlets.  *See generally* Pl.'s Opp'n.

allegation that JW breached the Severance Agreement by failing to forward Klayman's telephone

messages and mail; (c) grants as to Klayman's allegation that JW breached the Severance

Agreement by tortiously interfering with Freedom Watch; (d) grants as to Klayman's allegation

that JW breached the Severance Agreement by interfering with Klayman's Senate campaign; (e)

grants as to Klayman's allegation that JW breached the Severance Agreement by failing to return

property belonging to Klayman and his law firm, K&A; (f) grants as to Klayman's allegation that

JW breached the Severance Agreement by failing to pay Klayman's health insurance premiums,

but denies as to Klayman's allegation that JW breached the Severance Agreement by failing to

pay health insurance for Klayman's children; (g) denies as to Klayman's allegation that JW

breached the Severance Agreement by allegedly filing a false and frivolous legal pleading in

Florida litigation; (h) grants JW's motion as to Klayman's allegation that JW breached the

Severance Agreement by interfering with media outlets; (i) grants as to Klayman's allegation that

JW breached the Severance Agreement by failing to remove him as guarantor for all corporate

credit card accounts; and (j) denies as to Klayman's allegation that JW breached the Severance

Agreement by failing to provide him with access to documents regarding Mr. Paul, but grants as

to Klayman's allegation that JW breached the Severance Agreement by failing to provide him

back-up documentation regarding claimed expenses.

      3.     JW's Motion as to Count Eight of the Second Amended Complaint -
             Breach of Contract (Specific Performance)

      The Court now turns to JW's motion for summary judgment as to Count Eight of

Klayman's Second Amended Complaint, in which he seeks specific performance based upon

JW's alleged breach of the Severance Agreement.  In addition to the many breaches of the

Severance Agreement that Klayman asserted under Count Seven—which Klayman incorporates by reference into Count Eight—Klayman asserts two additional breaches of the Severance Agreement under Count Eight: (1) that JW breached the Severance Agreement by failing to provide Klayman access to documents, *id.* ¶ 146; and (2) that JW breached the Severance Agreement by failing to remove Klayman as guarantor for all JW credit card accounts, *id.* ¶ 144. As to those allegations asserted under Count Eight that are identical to the allegations asserted under Count Seven, the Court finds that JW is entitled to summary judgment on Count Eight to the same extent as it is entitled to summary judgment on Count Seven, for the reasons discussed above.  The only remaining allegations at issue, then, are Klayman's claims that JW breached the Severance Agreement by denying him access to certain documents and by failing to remove him as guarantor of the corporate credit cards, which the Court now turns to.

> a.    JW's alleged failure to remove Klayman as guarantor for all corporate credit card accounts.

JW moves for summary judgment as to Klayman's allegation that the organization breached the Severance Agreement by failing to remove him as guarantor for all credit card accounts.  SAC ¶ 144.  Pursuant to paragraph 9.A of the Severance Agreement, JW agreed to "remove Klayman as guarantor of all credit cards issued to Judicial Watch, including, without limitation Judicial Watch's American Express card, within thirty (30) days of the Separation Date."  Severance Agreement, ¶ 9.A.  JW argues that it has removed Klayman as guarantor, as required, and that it therefore is not in breach of the Severance Agreement.  JW's SAC-MSJ at 24-25.  The Court agrees.

As JW demonstrates, and as Klayman does not dispute, at the time of Klayman's

departure from JW, he was the guarantor of only one corporate credit card—JW's American

Express card.  Defs.' Stmt. ¶¶ 76-77; First Prytherch Decl. ¶ 26.  On October 15, 2003—that is,

within 30 days of Klayman's September 19, 2009 departure date—JW replaced Klayman as

guarantor of the organization's American Express card with JW's current President, Fitton.

Defs.' Stmt. ¶ 78; First Prytherch Decl. ¶ 26.  Shortly thereafter, on October 17, 2003, JW sent a

letter and confirming document to this effect to Klayman via his then-counsel.  Defs.' Stmt. ¶ 79;

First Prytherch Decl. ¶ 26 & Ex. G (copy of the October 17, 2003 Letter).  Klayman has not

proffered any evidence to the contrary.  He has not shown that he was (or remains) the guarantor

of any JW credit card, besides the American Express, and he has not disputed JW's evidence

demonstrating that it removed him as guarantor from the American Express card.  Indeed,

Klayman has failed to even address this issue in any of the materials now before the Court.  *See*

*generally* Second Klayman Aff.[21]  He has therefore conceded that this claim is without merit.

*See Franklin*, 600 F. Supp. 2d at 60 (treating defendant's argument in motion for summary

judgment as conceded where plaintiff failed to address in his response); *Hopkins*, 284 F. Supp.

2d at 25 ("It is well understood in this Circuit that when a plaintiff files an opposition to a

dispositive motion and addresses only certain arguments raised by the defendant, a court may

treat those arguments that the plaintiff failed to address as conceded."), *aff'd* 98 Fed. Appx. 8

(D.C. Cir. 2004).  Accordingly, the Court GRANTS JW's motion for summary judgment insofar

as Klayman alleges that JW breached the Severance Agreement by failing to remove him as

---

[21]  In an abundance of caution, the Court has reviewed Klayman's stricken opposition to
JW's motion for summary judgment, and notes that it also fails to address JW's argument that it
has satisfied its obligation to remove Klayman as guarantor of the organization's corporate credit
cards.  *See generally* Pl.'s Opp'n.

guarantor of JW's credit cards.

>    b.    JW's alleged failure to provide Klayman access to documents.

JW next moves for summary judgment as to Klayman's allegation that the organization breached the Severance Agreement by failing to "provide Klayman access to documents as required under the Severance Agreement." SAC ¶ 146. Paragraph 4.F of the Severance Agreement provides that:

> [S]ubject to Judicial Watch's consent, which consent shall not be unreasonably withheld, Klayman shall be afforded access to such Confidential Information as he may reasonably require in order to defend or respond to any accusation, action or threat of action against him arising out of or relating to his tenure at Judicial Watch. Such access shall include an opportunity on reasonable notice to examine and copy, at his cost, Confidential Information related to such accusation, action or threat, provided that such Confidential Information shall be used or disclosed by him solely in connection with such defense or response and provided, further, that he shall take reasonable steps to protect such Confidential Information from any use or disclosure by others than in connection with such defense or response (e.g. by Protective Order or Confidentiality Agreement).

Severance Agreement, ¶ 4.F.  On the record now before the Court, the parties have identified two categories of documents at issue: (1) documents relating to a former JW client, Peter F. Paul; and (2) back-up documentation relating to expenses JW claims Klayman owes the organization.

As to the first category of documents, Klayman, in a January 12, 2006 e-mail to counsel for JW, stated that he had "learned recently that Peter Paul wrote and published [a] false and defamatory article," and that Klayman was therefore "entitled to receive any and all documents to and from Paul" under the Severance Agreement. Fitton Decl. ¶ 7 & Ex. 3.  JW admits that it denied this request, but contends that its consent was "reasonably" withheld and therefore not in violation of the Severance Agreement. *See* JW's MSJ at 20-24.  First, JW argues that, consistent with "the usual and customary interpretation of such provisions," paragraph 4.F of the Severance

agreement should be read to provide only limited access to documents and therefore does not require JW to provide Klayman with documents for "casual or obscure threats or to pursue defamation actions against its former clients." *Id.* at 22.  JW, however, provides no case law or legal authority to support its claim that such provisions are generally interpreted to provide a limited access to documents only.  *See id.*  Second, JW argues that Klayman's request was overbroad and included material covered by the attorney-client privilege, and that it was therefore "entirely reasonable and entirely within Judicial Watch's rights under the Severance Agreement . . . to reject Klayman's demand." *Id.* at 23.  The Court concludes, however, that whether JW acted reasonably in these circumstances is a question of fact that is not appropriate for resolution at the summary judgment stage.  Finally, JW argues that Klayman has failed to produce any evidence of actual damages stemming from JW's alleged breach.  *Id.* at 24.  As explained previously, under District of Columbia law, "where a plaintiff proves a breach of a contractual duty . . . [but] offers no proof of actual damages or when the proof is vague and speculative, he is entitled to . . . nominal damages." *Cahn*, 482 A.2d at 130.  Accordingly, the Court DENIES JW's motion for summary judgment insofar as it relates to JW's alleged breach of the Severance Agreement based on its refusal to provide Klayman with documents relating to Mr. Paul.

The Court turns next to Klayman's allegation that JW denied him access to expense back-up documentation in violation of paragraph 4.E of the Severance Agreement.  *See* Pl.'s MSJ ¶ 4; *see also* First Klayman Aff. ¶ 4.  As JW demonstrates, however, it has in fact provided Klayman with copies of all back-up documentation relevant to the claimed expenses.  Defs.' Stmt. ¶¶ 101, 107.  JW provides the Court with copies of the expense invoices sent to Klayman relating to each of the expenses JW claims Klayman owes the organization.  *See id.*, Ex. 3 (Second Declaration

of Susan Prytherch) ("Second Prytherch Decl."), ¶¶ 28-47 & Ex. 13 (invoices).  Attached to these

invoices are the relevant supporting expense documentation, which were originally provided to

Klayman and which were re-produced to him during the course of this litigation.  *See id.*

Klayman has not disputed that he received copies of these invoices and back-up documentation.

Rather, he argues only that these invoices are "fraudulent documents manufactured after the

fact."  Pl.'s Resp. to Request for Admissions, Docket No. [110], Request No. 17; *see also*

Second Klayman Aff. ¶ 10.[22]  Klayman has provided absolutely no support for his claim that the

documents were fraudulently created, and the Court therefore finds it entirely without merit.

Accordingly, as Klayman fails to identify any specific expense documentation that he believes he

is entitled to, other than that provided already by JW, the Court easily concludes that Klayman

has not provided any evidence from which a reasonable jury could conclude that JW failed to

provide him with the requested back-up expense documentation in violation of the Severance

Agreement.[23]  The Court therefore GRANTS JW's motion for summary judgment insofar as it

relates to JW's alleged breach of the Severance Agreement based on its alleged failure to provide

---

[22] Despite previously admitting in his Responses to Defendants' Request for Admission that he received the invoices in question, Klayman directs the Court to an affidavit by Sandra Cobas, in which she states that "I know that Mr. Klayman asked for backup documentation from Judicial Watch so he could fully analyze the claimed expenses but was refused by Judicial Watch."  Pl.'s Reply, Ex. 3 (Affidavit of Sandra Cobas) (hereinafter "Cobas Aff.") ¶ 6.  Ms. Cobas, however, does not explain how she has personal knowledge to testify that Klayman never received any expense documentation, particularly given his admission to the contrary.  *See* Fed. R. Civ. P. 56(e) (an opposing affidavit "must be made on personal knowledge" and must "show that the affiant is competent to testify on the matters stated").

[23] In an abundance of caution, the Court has reviewed Klayman's stricken opposition to JW's motion for summary judgment, and notes that it advances no new arguments or factual claims in support of his allegation that JW failed to provide him with expense documentation as required under the Severance Agreement.  *See generally* Pl.'s Opp'n.

Klayman with requested back-up documentation.

In summary, the Court GRANTS-IN-PART and DENIES-IN-PART JW's motion for partial summary judgment as to Count Eight of Klayman's Second Amended Complaint. Specifically, as to the eight breach of contract allegations asserted in Count Eight that are identical to those asserted in Count Seven, the Court grants-in-part and denies-in-part JW's motion for the same reasons as discussed above.  In addition, the Court grants JW's motion as to allegations that JW breached the Severance Agreement by failing to remove Klayman as guarantor of the corporation's credit cards and by failing to provide Klayman with requested back-up expense documentation, but denies JW's motion insofar as it relates to allegations that JW breached the Severance Agreement by refusing to provide Klayman with documents relating to Mr. Paul.

Having now resolved the parties' motions as to Klayman's breach of contract claims, the Court moves next to consider Defendants' motions for summary judgment as to the remaining claims asserted in Klayman's Second Amended Complaint.

>    B.    *Defendants' Motions for Summary Judgment as to Count Four of the Second Amended Complaint (Lanham Act Claims)*

Defendants have each moved for summary judgment as to Count Four of Klayman's Second Amended Complaint, which sets forth a claim for false advertisement and a claim for false endorsement under Section 43(a) of the Lanham Act, 15 U.S.C. §1125(a)(1)(A) and (B). *Id.* ¶¶ 97-106.  Specifically, Klayman alleges that, more than a month after he stepped down as Chairman and General Counsel of JW, Fitton caused the organization to send a fund-raising letter which falsely represented that Klayman was still Chairman and General Counsel of Judicial

Watch and used Klayman's name and image without permission in violation of the Lanham Act. *Id.* ¶ 48; Ex. A (10/03 Judicial Watch Verdict mailing).  Defendants counter that Klayman's claims must fail because he was the Chairman and General Counsel for JW at the time the statements were made and he himself authorized and approved the fund-raising letter at issue. *See* JW's SAC-MSJ at 5-9.[24]  Ultimately, the Court agrees with Defendants, for the reasons set forth below.

### 1.    Factual Background Relevant to Klayman's Lanham Act Claims

At issue in Count Four of Klayman's Second Amended Complaint are statements included in JW's October 2003 newsletter.  As Defendants demonstrate, JW has, since at least 2000, mailed its regular supporters, on a monthly basis, a copy of the organization's monthly newsletter, *The Verdict*.  Defs.' Stmt. ¶ 12; Fitton Decl. ¶ 8.  The newsletter is accompanied by a cover letter and a reply device for supporters to use if they wish to make a donation to the organization.  Defs.' Stmt. ¶ 12; Fitton Decl. ¶ 13.  Drafting JW's monthly newsletter usually begins at least four to six weeks before the newsletter is to be mailed, while drafting and preparation of the cover letter and reply device usually begins only a few weeks before the mailing date.  Defs.' Stmt. ¶ 14; Fitton Decl. ¶¶ 9-10.

As shown by the undisputed evidence in the record, prior to his resignation, Klayman, as Chairman and General Counsel of JW, participated in the development and publication of the organization's monthly newsletter.  Defs.' Stmt. ¶ 18; Fitton Decl. ¶ 8.  Klayman confirmed during his deposition that it was his practice during his tenure with JW to review the mailings

---

[24] The Court notes that the Individual Defendants have incorporated by reference the arguments set forth in JW's motion for summary judgment.  *See* Farrell's MSJ at 2, n.2; Fitton's MSJ at 2,n.2; Orfanedes MSJ at 2, n.2.

before they went out and to sign the cover letters for the newsletters:

> Q. [W]ith regard to the standard procedure for preparation of the monthly mailings, was it your practice to review the mailings before they were sent out?
>
> A. Yes.
>
> Q. And did you, under the normal course of business, were you the individual who signed the cover letters for the newsletters?
>
> A. Yes, at that time . . . when I was actively involved with Judicial Watch."

Defs.' Stmt., Ex. 10 (Transcript of 4/8/08 Klayman Dep., Vol. I.) ("Klayman Dep. Tr. I") at

117:3-13.

Furthermore, as Defendants explain, JW does not print or mail its monthly newsletter and accompanying materials itself, but rather outsources those tasks to an outside vendor, Communications Corporation of America ("CCA").  Defs.' Stmt. ¶¶ 20-21; Fitton Decl. ¶¶ 13-14.  In 2003, JW's mail schedule required the monthly newsletters to be drafted, edited, and approved for printing to ensure delivery to the United States Postal Service ("USPS") for mailing by the third week of the preceding month (for example, the January 2003 newsletter was scheduled to be delivered to the USPS by no later than December 18, 2002).  Defs.' Stmt. ¶¶ 16-17; Fitton Decl. ¶ 10.

Pursuant to JW's general practice, the October 2003 newsletter and accompanying materials were scheduled to be delivered to the USPS for mailing by no later than September 18, 2003.  Defs.' Stmt. ¶ 18; Fitton Decl. ¶ 10.  As demonstrated by JW's business records, Klayman, per his usual practice, edited the October 2003 newsletter and accompanying cover letter on or about September 5, 2003.  Defs.' Stmt. ¶ 19; Fitton Decl. ¶ 12 & Ex. 4 (draft of October 2003 cover letter and portion of newsletter with Klayman's handwritten edits and

notations).  Reference to the draft cover letter and newsletter edited by Klayman makes clear that

the materials contained the complained of language identifying Klayman as "Chairman and

General Counsel" at the time of Klayman's review.  *See* Fitton Decl., Ex. 4.[25]  On that same day,

September 5, 2003, JW gave CCA final authorization to print the October 2003 newsletter, and

shortly thereafter, on September 12, 2003, provided CCA with final authorization to print the

remaining portions of the October 2003 newsletter, including the cover letter signed by Klayman

as "Chairman and General Counsel."  Defs.' Stmt. ¶¶ 21-22; Fitton Decl. ¶¶ 14-15 & Exs. 5 &

6.[26]  The October 2003 newsletter and accompanying material was thereafter delivered to the

USPS for mailing on September 18, 2003.  Defs.' Stmt. ¶ 23; Fitton Decl. ¶ 16 & Ex. 7.

 Thereafter, on Friday, September 19, 2003, Klayman and JW executed the Severance

Agreement, by which Klayman agreed that he would resign from the organization effective that

day.  Severance Agreement ¶ 1.  On Monday, September 22, 2003, the very next business day

---

[25] Significantly, Klayman does not deny that he reviewed, edited, and approved the October 2003 newsletter nor has he presented any evidence refuting the facts above.  *See generally* Second Klayman Aff.  Nonetheless, Klayman claims that he "never agreed that Defendant could use [his] name and likeness after [he] left."  *Id.* ¶ 13.  The Court is unpersuaded by Klayman's attempt to split hairs—the documentary evidence proves that he edited and approved the mailings at issue with knowledge that the mailings were for the October 2003 newsletter and that he was engaged in severance negotiations.  Klayman has failed to introduce any evidence, other than his own self-serving conclusory statements, to contradict Defendants' documentary evidence, which undisputedly demonstrates that Klayman, while still Chairman and General Counsel for JW, authorized the use of his name and identity in the October 2003 newsletter and mailings and signed the mailings in his role as then-Chairman and General Counsel for JW.

[26] A comparison between the final version of the October 2003 cover letter mailed to JW's supporters, *see* Second Amended Compl., Ex. A, with the draft version edited by Klayman, *see* Fitton Decl., Ex. 4, confirms that Klayman's edits were incorporated into the final version. For example, on the first page of the cover letter, JW's business records demonstrate that Klayman suggested three separate edits, each of which are reflected in the final version of the newsletter.  *Compare* Second Amended Compl., Ex. A at 2, with Fitton Decl., Ex. 4 at 2.

after Klayman's resignation became effective, Fitton contacted JW's Fund-raising Department, which oversees production of the newsletter mailings, to inquire whether the October 2003 newsletter could be stopped.  Defs.' Stmt. ¶ 29; Fitton Decl. ¶ 21.  Fitton avers that he was advised the newsletter "had gone out already and could not be stopped."  Defs.' Stmt. ¶ 29; Fitton Decl. ¶ 21.  Klayman, however, claims that any assertion by JW that the mailing "was in the pipeline to be mailed before [he] left is not truthful," but fails to proffer any evidence contradicting Defendants' sworn statements to the contrary.  *See* Second Klayman Aff. ¶ 13. Rather, he offers only his own speculation that "there was plenty of lead time not to include a cover letter allegedly signed by me as Chairman . . . or put in the mailing a notice informing the donors and supporters that I had left JW and was no longer its Chairman."  *Id.*  Again, however, this claim is utterly unsupported by any record evidence and is based solely on his own speculation.

Finally, Defendants note, and Klayman does not dispute, that all other planned mailing bearing Klayman's signature—totaling 60,000 pieces of mail—were stopped and sent to recycling at a cost to JW of approximately $30,000.  Defs.' Stmt. ¶ 29; Fitton Decl. ¶ 21. Beginning with the November 2003 newsletter, Fitton has signed each monthly cover letter, as well as all other mailings, in his capacity as President of JW.  Defs.' Stmt. ¶ 30; Fitton Decl. ¶ 22.

### 2.    Klayman's False Endorsement Claim

As explained above, Klayman's has asserted a claim for false endorsement under Section 43(a) of the Lanham Act.  SAC ¶ 98.  The "false endorsement" prong of Section 43(a) provides that:

>Any person who, in connection with any goods or services . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof . . . which –

>>(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person,

>shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. §1125(a)(1)(A).

As an initial matter, although Defendants do not raise the issue, the Court notes that this Circuit has not yet addressed whether a celebrity may bring a claim under Section 43(a) of the Lanham Act based on misleading or deceptive use of their name or likeness.[27]  However, several courts both in this jurisdiction and elsewhere have allowed such claims to be brought under Section 43(a)(1)(A), the false endorsement prong of Section 43(a) of the Lanham Act.  *See, e.g.*, *Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 812 (9th Cir. 1997); *Parks v. LaFace Records*, 329 F.3d 437, 445-46 (6th Cir. 2003); *Paul v. Judicial Watch, Inc.*, 543 F. Supp. 2d 1 (D.D.C. 2008); *Albert Fürst von Thurn und Taxis v. Karl Prince von Thurn und Taxis*, No. 04 Civ. 6107 (DAB), 2006 WL 2289847, *10-11 (S.D.N.Y. Aug. 8, 2006).  As the Ninth Circuit reasoned, "[a] false endorsement claim based on the unauthorized use of a celebrity's identity is a type of false association claim, for it alleges the misuse of a trademark, *i.e.*, a symbol or device such as a visual likeness, vocal imitation, or other uniquely distinguishing characteristic, which is likely to confuse consumers as to the plaintiff's sponsorship or approval of the product."  *Waits v. Frito-*

---

[27] Klayman has asserted that he is a "celebrity," *see, e.g.,* Second Amended Complaint ¶¶ 42, 101, and Defendants have not argued to the contrary.  The Court therefore proceeds on the assumption that Klayman is a "celebrity" for purposes of his false endorsement claim.

*Lay, Inc.*, 978 F.2d 1093, 1110 (9th Cir. 1992).  Ultimately, however, the Court need not resolve

this issue because it concludes for the reasons below that, even assuming such a claim is

cognizable, Klayman's false endorsement claim would fail nonetheless.

Specifically, in those decisions recognizing a celebrity's right to bring a claim for false

endorsement, the courts have required that the

> celebrity must show that use of his or her name is likely to cause confusion among
> consumers as to the affiliation, connection or association  between the celebrity and
> the defendant's goods or services or as to the celebrity's  participation in the origin,
> sponsorship, or approval of the defendant's goods or services.  Consumer confusion
> occurs when consumers . . . believe that the products or services offered by the
> parties are affiliated in some way, or when consumers make an incorrect mental
> association between the involved commercial products or their producers.

*Parks*, 329 F.3d at 445-46 (internal quotation marks and citations omitted).  In other words,

"[f]alse endorsement occurs when a celebrity's identity is connected with a product or service in

such a way that consumers are likely to be misled about the celebrity's sponsorship or approval

of the product or service." *ETW Corp. v. Jireh Pub., Inc.,* 332 F.3d 915, 925-26 (6th Cir. 2003).

At a minimum, then, a celebrity must demonstrate that he or she did not endorse the goods or

services at issue.

In this case, however, the record evidence demonstrates that Klayman *authorized* and

*approved* the use of his name and identity as Chairman and General Counsel of JW in the

challenged October 2003 newsletter and associated mailings.  *See supra* pp. 51-54.  As

demonstrated by JW's business records, Klayman, per his usual practice, edited and approved the

October 2003 newsletter and accompanying cover letter on or about September 5, 2003.  Defs.'

Stmt. ¶ 19; Fitton Decl. ¶ 12 & Ex. 4 (draft of October 2003 cover letter and portion of

newsletter with Klayman's handwritten edits and notations).  Klayman has not offered any

evidence to the contrary other than his own self-serving statements, which are insufficient to defeat summary judgment. *See, e.g., Hastie*, 2001 WL 793715, at *1 (finding no genuine issue of material fact where the sole evidence plaintiff provided was "her own self-serving and conclusory statement"); *Hinson*, 579 F. Supp. 2d at 103, n. 5 ("Plaintiff's own unsubstantiated beliefs amount to nothing more than hearsay, self-serving statements and speculation, and are insufficient as such to defeat summary judgment.").[28]

Given that Klayman specifically approved the use of his name and identity in the materials at issue, the Court agrees with Defendants that Klayman cannot succeed on a claim of false endorsement. Rather, the Court is persuaded that "[t]his false endorsement claim fails . . . because the endorsement was not 'false'—[the plaintiff] did give its endorsement and approved the ad." *L.S. Heath & Son, Inc. v. AT & T Information Sys. Inc.,* 9 F.3d 561, 575 (7th Cir. 1993). *Cf. Allen v. Nat'l Video, Inc.*, 610 F. Supp. 612, 626 (S.D.N.Y. 1985) (holding that "the *unauthorized* use of a person's name or photograph in a manner that creates the false impression that the party has endorsed a product or service in interstate commerce violates the Lanham Act") (emphasis added); *Waits*, 978 F.2d at 1110 (recognizing a "false endorsement claim based on the *unauthorized* use of a celebrity's identity") (emphasis added). The Court therefore GRANTS JW's motion for summary judgment insofar as it relates to Klayman's false endorsement claim. For the same reasons, the Court also GRANTS the Individual Defendants' motions for summary judgment insofar as each also relates to Klayman's claim for false endorsement.

---

[28] In an abundance of caution, the Court has reviewed Klayman's stricken opposition to JW's motion for summary judgment, and notes that it advances no additional arguments or factual claims in support of his Lanham Act claims. *See generally* Pl.'s Opp'n at 2-4.

3.  <u>Klayman's False Advertisement Claim</u>

Klayman has also alleged that Defendants violated the false advertising prong of Section

43(a) of the Lanham Act, which section provides that:

> Any person who, in connection with any goods or services . . . uses in commerce any
> word, term, name, symbol, or device, or any combination thereof . . . which –
>
> (B) in commercial advertising or promotion misrepresents the nature,
> characteristics, qualities, or geographic origin of his or another person's goods,
> services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is
> likely to be damaged by such act.

15 U.S.C. §1125(a)(1)(B).

As with a claim of false endorsement, a plaintiff must prove that the defendants'

advertisements were false or misleading in order to prevail on a claim of false advertisement.

*Alpo Petfoods, Inc. v. Ralston Purina Co.,* 913 F.2d 958, 964 (D.C. Cir. 1990) (hereinafter, "*Alpo

Petfoods I*"); *see also Lipton v. Nature Co.*, 71 F.3d 464, 474 (2d Cir. 1995) ("To establish a

false advertising claim pursuant to § 43(a), the plaintiff must demonstrate that the message in the

challenged advertisement is false.").  More particularly, the challenged statements must be "false

or misleading *at the time they are made.*"  *Alpo Petfoods, Inc. v. Ralston Purina Co.*, 720 F.Supp.

194, 205 n. 12 (D.D.C.1989) (emphasis in original) (hereinafter, "*Alpo Petfoods II*"), *rev'd in

part on other grounds*, 913 F.2d 958 (D.C. Cir.1990); *see also Bracco Diagnostics, Inc. v.

Amersham Health, Inc.*, __ F. Supp. 2d __, 2009 WL 806581 * 54 (D. N. J. Mar. 25, 2009) ("The

focus of a Lanham Act inquiry is whether statements 'are false or misleading at the time they are

made.') (quoting *Alpo Petfoods II*, 720 F. Supp. at 205, n. 12).

Here, as explained above, the challenged statements identifying Klayman as JW's

Chairman and General Counsel were true at the time the statements were made by JW,
authorized by Klayman himself, and delivered to the USPS for mailing. *See supra* 51-54.
Klayman does not dispute this, nor could he do so.  Rather, Klayman argues—without case law
or other legal support—that because the statements were no longer true at the time they were
actually received by the recipients, JW is liable for false advertising. *See* Second Klayman Aff.
¶¶ 13-15.  That is, Klayman urges the Court to hold JW liable for making a statement that,
although true at the time made, subsequently became inaccurate due to a change of
circumstances.  Again, however, the statements must be judged at the time made and as the
statements at issue were true at the time they were made, Klayman's claim fails as a matter of
law.

However, even accepting Klayman's argument as correct, his false advertising claim
would fail nonetheless.  To ultimately prevail on this issue, Klayman must prove that the
allegedly false advertisement was "actually or likely injurious to [him]."  *ALPO I*, 913 F.2d at
964; *accord Harper House, Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197, 210 (9th Cir. 1989) ("In a
suit for damages under section 43(a), however, actual evidence of some injury resulting from the
deception is an essential element of the plaintiff's case.").  There is simply no evidence in the
record that Klayman was injured in any way by the statements in the October 2003 newsletter
and mailings identifying him as Chairman and General Counsel of JW.  Klayman vaguely
speculates that he was "den[ied], ipso facto, contributions to [his] Senate campaign" as a result of
the mailings, Second Klayman Aff. ¶ 15, but offers absolutely no evidence to support this claim,
other than his own unsubstantiated  speculation.  It is therefore clear that Klayman has not
proffered any proof of injury resulting from the October 2003 newsletter. *See, e.g., Hastie*, 2001

WL 793715, at *1 (finding no genuine issue of material fact where the sole evidence plaintiff

provided was "her own self-serving and conclusory statement"); *Hinson*, 579 F. Supp. 2d at 103,

n. 5 ("Plaintiff's own unsubstantiated beliefs amount to nothing more than hearsay, self-serving

statements and speculation, and are insufficient as such to defeat summary judgment."").

Accordingly, summary judgment in Defendants' favor is appropriate.[29]  The Court therefore

GRANTS JW's motion for summary judgment insofar as it relates to Klayman's false advertising

claim.  For the same reasons, the Court also GRANTS the Individual Defendants' motions for

summary judgment insofar as each also relates to Klayman's claim for false advertising.

In summary, the Court GRANTS both JW and the Individual Defendant's motions for

summary judgment as to Count Four of the Second Amended Complaint, which alleges

violations of the Lanham Act.

C.    *Defendants' Motions for Summary Judgment as to Count Nine of the Second*
      *Amended Complaint (Defamation)*

Finally, Defendants move for summary judgment as to Count Nine of Klayman's Second

Amended Complaint, in which Klayman alleges that "Judicial Watch, through Fitton, Orfanedes,

Farrell and other agents and representatives . . . have defamed Klayman, by publishing false

---

[29] In light of the Court's conclusion above, it does not reach Defendants' arguments in the
alternative that: (a) Klayman's Section 43(a) claim was released under the terms of the Severance
Agreement; and (b) Klayman's Section 43(a) claim must fail as against the Individual Defendants
because they did not personally participate in and/or provide final authorization for the October
2003 newsletter.  In addition, the Court notes that JW has requested indemnification for its
attorneys fees and costs related to Klayman's claims under the Lanham Act.  JW's SAC-MSJ at
10.  Such requests, however, are more appropriately addressed after the merits of the parties'
claims and cross-claims have been resolved in their entirety, and the Court therefore DENIES
WITHOUT PREJUDICE JW's request.

statements to various persons and entities." SAC ¶ 149.[30] Specifically, Klayman claims: (1) that

Fitton and Judicial Watch knowingly sent a false statement to Judicial Watch employees

claiming that Klayman filed this action because he owed Judicial Watch a significant sum of

money, *id.* ¶ 154; and (2) that Fitton and Judicial Watch published knowingly false statements in

a number of media outlets, including *The Washington Post*, *The Washington Times*, *World*

*NetDaily.com*, and *Slate.com*, because Defendants falsely told reporters that "Klayman filed his

suit as a 'tactical maneuver designed to distract attention away from the fact that Klayman owes

**more than a quarter of a million dollars to Judicial Watch**.'" *Id.* ¶¶ 156-157 (emphasis in

original). The Court turns first to Defendants' arguments concerning allegations that defamatory

statements were made to JW employees before then turning to Defendants' arguments relating to

allegations that defamatory statements were made to the media.[31]

### 1.     Defendants' Alleged Defamatory Statement to JW Employees

First, Defendants move for summary judgment as to Klayman's allegation that Fitton and

JW knowingly sent a false statement to the organization's employees claiming that Klayman filed

this action because he owes JW a significant sum of money. *Id.* ¶ 154. Defendants have denied

that such a statement was ever made or published, averring that "[n]o one at Judicial Watch

---

[30] As explained previously, in a Memorandum Opinion and Order dated January 17, 2007, the Court dismissed Count Nine insofar as it relates to allegedly defamatory statements made in JW's Form 990 tax returns and allegedly doctored press quotations posted on JW's website. *See 1/17/07 Klayman*, 2007 WL 140978, at * 1. Count Nine thus remains viable only as to Klayman's allegations that Defendants made defamatory statements to JW's employees and the media.

[31] The Court notes that the Individual Defendants have incorporated by reference the arguments set forth in JW's motion for summary judgment. *See* Farrell's MSJ at 2, n.2; Fitton's MSJ at 2,n.2; Orfanedes MSJ at 2, n.2.

authorized, approved, published or participated in the publication to Judicial Watch employees of

an allegedly defamatory statement asserting that Klayman filed suit against the organization

'because he owed Judicial Watch a significant sum of money.'"  Defs.' Stmt. ¶ 94; *see also*

Fitton Decl. ¶ 24; Orfanedes Decl. ¶ 4; Farrell Decl. ¶ 4.  Klayman, for his part, has failed to

produce or direct the Court to any evidence that such a statement was ever made.  Rather,

Klayman simply alleges—without any evidentiary or documentary support—that "[c]ontrary to

Defendants' false contentions in their MSJ's, they did publish to JW employees . . . that

Klayman, personally, owed in excess of a quarter million dollars to JW."  Second Klayman Aff. ¶

27.[32]  Klayman's own unsubstantiated and conclusory statements are insufficient to defeat

Defendants' sworn testimony to the contrary.  *See, e.g., Hastie*, 2001 WL 793715, at *1; *Hinson*,

579 F. Supp. 2d at 103, n. 5.

As Plaintiff, it is Klayman's burden to prove the publication of the allegedly defamatory

statement by Defendants.  *See Krakat v. Brooks Range Contract Servs., Inc.*, 570 F. Supp. 2d 90,

95 (D.D.C. 2008) (granting summary judgment to defendants on plaintiff's defamation claim

because "even after discovery plaintiffs simply do not provide any evidence to enable a

reasonable juror to conclude defendant published defamatory remarks about plaintiff"); *see also*

Restatement (2d) of Torts, § 613 (Plaintiff must "show . . . that the defendant spoke or wrote or

otherwise prepared the defamatory matter or made it available to a third person).  Accordingly, as

Klayman will bear the burden of proving publication at trial and as he has failed—despite

---

[32]  In an abundance of caution, the Court has reviewed Klayman's stricken opposition to
JW's motion for summary judgment, and notes that it advances no additional arguments or
factual claims in support of his either of his defamation claims discussed herein.  *See generally*
Pl.'s Opp'n at 2-4.

extensive discovery—to proffer any evidence from which a reasonable jury could conclude that any such statement was made or published by Defendants, the Court GRANTS JW's motion for summary judgment as to Klayman's allegations that Defendants defamed him by publishing a false statement to JW's employees.  For the same reasons, the Court also GRANTS the Individual Defendants' motions for summary judgment insofar as each also relates to Klayman's claim for defamation arising from alleged statements made to JW's employees.

### 2.  Defendants' Alleged Defamatory Statements to the Media

Second, Defendants move for summary judgment as to Klayman's allegation that Fitton and JW misrepresented to the media that Klayman owed JW more than a quarter of a million dollars.  Klayman has alleged that Fitton and JW published knowingly false  statements in a number of media outlets, including *The Washington Post*, *The Washington Times*, *World NetDaily.com*, and *Slate.com*, because Defendants falsely told reporters that "Klayman filed his suit as a 'tactical maneuver designed to distract attention away from the fact that Klayman owes **more than a quarter of a million dollars to Judicial Watch**.'"  SAC ¶¶ 156-57 (emphasis in original).  Defendants have admitted that JW issued a statement to the media that Klayman filed suit against the organization because he owed it in excess of $250,000.  JW's SAC-MSJ at 32. Accordingly, the Court turns to the substance of their arguments regarding Klayman's defamation claim.

As this Court previously held, the "connotation" that Klayman owed JW money "is sufficiently factual to be susceptible of being proved true or false," *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 21 (1990), and as such JW's allegedly defamatory statement to the media may properly form the basis for Klayman's action for defamation.  *1/17/07 Klayman*, 2007 WL

140978, at *20.  In order to succeed on a claim of defamation under District of Columbia law,[33] a plaintiff must show that:  (1) the statement by defendants was false and defamatory; (2) defendants published the statement without privilege to a third party; (3) defendants' fault in publishing the statement amounted to at least negligence; and (4) either the statement was actionable as a matter of law irrespective of special harm or that its publication caused plaintiff special harm.  *Jankovic v. Internat'l Crisis Group*, 494 F.3d 1080, 1088 (D.C. Cir. 2007) (quoting *Croixland Props. L.P. v. Corcoran*, 174 F.3d 213, 215 (D.C. Cir.1999); *Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 858 (D.C. Cir. 2006) (quoting *Beeton v. District of Columbia*, 779 A.2d 918, 923 (D.C. 2001)).

Where, however, the plaintiff is a public figure, the First Amendment shields a defendant from liability for defamation claim unless the plaintiff can show by clear and convincing evidence that the defendant has published the defamatory falsehood with "actual malice."  *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964); *see also Gertz v. Welch*, 418 U.S. 323, 342 (1974).  Actual malice "should not be confused with the concept of malice as an evil intent or a motive arising from spite or ill will."  *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 510 (1991).  Rather, "it is the making of a statement with knowledge that it is false, or with reckless disregard of whether it is true."  *Liberty Lobby, Inc. v. Rees*, 852 F.2d 595, 601 (D.C. Cir. 1988), *cert. denied*, 489 U.S. 1010 (1989); *see also Gertz*, 418 U.S. at 342 ("public figures . . . may recover for injury to reputation only on clear and convincing proof that the defamatory

_____

[33] As explained in the Court's January 17, 2007 Memorandum Opinion, the Court concluded that Klayman's defamation claims should be properly evaluated under the District of Columbia law of defamation.  *1/17/07 Klayman*, 2007 WL 140978, at *16, n.8.  As none of the parties have challenged that conclusion, the Court shall therefore apply the District of Columbia law of defamation in assessing Count Nine.

falsehood was made with knowledge of its falsity or with reckless disregard for the truth"). "The

test for the reckless disregard of the truth is not whether a reasonably prudent person would have

published the statement, but rather, whether there is 'sufficient evidence to permit the conclusion

that the defendant in fact entertained serious doubts as to the truth of his publication.'" *Liberty*

*Lobby*, 852 F.2d at 601 (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)).

"Furthermore, the first amendment requires that a public figure bear the burden of proving . . .

actual malice." *Id.* at 598. Thus, to "defeat summary judgment," a celebrity is "required to show

that the evidence could support a reasonable jury finding, by clear and convincing evidence, that

the defendants acted with actual malice in publishing" the alleged defamatory statements. *Id.* at

598.

Defendants assert, and Klayman does not contest, that the appropriate standard for

defamation to apply in this case is that of a public person. *See* Defs.' Mot. at 30-32; *see also*

*Klayman v. Judicial Watch, Inc.*, Civ. Action No. 06-670, 2007 WL 140978, *17 (D.D.C. Jan.

17, 2007). Klayman by his own admission is a "regular guest on many television network, cable

and radio programs, SAC ¶ 42; "enjoy[s] celebrity status within the non-profit legal/political

community," *id.*; "is widely recognized, both nationally and internationally as the leading figure

in the world of government and judicial oversight and public 'watchdog' groups," *id.* ¶ 101;and

was a candidate for the United States Senate in Florida in 2004, *id.* ¶ 7. Given Klayman's own

repeated assertions that he is a celebrity and his failure to object to Defendants' position that he is

a public person for purposes of his defamation claim, the Court finds that he has conceded this

point. Accordingly, Klayman must show "not merely that the defamatory publication was false,

but that the defendant either knew the statement to be false or that the defendant 'in fact

entertained serious doubts as to the truth of his publication.'" *Tavoulareas v. Piro*, 817 F.2d 762, 775-76 (D.C. Cir. 1987) (en banc) (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)).

Defendants argue that Klayman's defamation claim must fail because the statement at issue is substantially true and Klayman is unable to show actual malice. According to Defendants, the above-quoted statement that Klayman owed JW "more than a quarter of a million dollars" was made based on the September 19, 2003 Severance Agreement and JW's 2002 and 2003 audited financial statements, the contents of which Defendants were aware of at the time the allegedly defamatory statement was made. Defs.' Stmt. ¶ 96; *see also* Fitton Decl. ¶ 26; Orfanedes Decl. ¶ 6; Farrell Decl. ¶ 6. Based on these documents, Defendants concluded that Klayman owed, both individually and on behalf of his law firm, Klayman & Associates, P.C. ("K&A"), owed approximately $383,429.80 to JW at the time the allegedly defamatory statement was made. *See* Defs.' Stmt. ¶¶ 108, 129, 130. This total includes three general categories: (1) Klayman's personal debt; (2) K&A's debt, for which JW asserts that Klayman agreed to indemnify the organization; and (3) attorney's fees and expenses. Defendants therefore assert that the statement is not only substantially true, but that Klayman cannot show that the statement was made with actual malice because "Judicial Watch had every reason to believe the statement was true." JW's SAC-MSJ at 37 ("The substantial, compelling documentation of the debts at issue, as well as the accounting of the debts in 2002, 2003, and 2004 audited financial statements prepared by Judicial Watch's outside accountants, demonstrate that, instead of any malice or reckless disregard fort the statement's falsity, Judicial Watch had substantial justification for believing the statement was true.").

As an initial matter, the Court notes that the question of whether the statement is

true—*i.e.*, whether Klayman in fact owes JW a quarter of a million dollars or more under the Severance Agreement—is at the heart of JW's Amended Counterclaim, which is discussed in detail below. Ultimately, the Court concludes, for the reasons set forth below, that it is unable to make a determination at this time as to Klayman's liability for ***all*** debts claimed by JW. *See infra* pp. 71-80. Given that conclusion, the Court is not currently in a position to evaluate the truth of JW's statement that Klayman owes the organization more than a quarter million dollars.

Nonetheless, the Court agrees with Defendants that they are entitled to summary judgment because Klayman has failed to set forth sufficient evidence from which a reasonable jury could find, by clear and convincing evidence, that Defendants acted with "actual malice." As explained above, "[t]he standard of actual malice is a daunting one." *Parsi v. Daioleslam*, 595 F. Supp. 2d 99, 106 (D.D.C. 2009) (quoting *McFarlane v. Esquire Magazine*, 74 F.3d 1296, 1308 (D.C. Cir. 1996)). "The actual malice standard is subjective; the plaintiff must prove that the defendants actually entertained a serious doubt." *McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1508 (D.C. Cir. 1996); *see also Tavoulareas*, 817 F.2d at 776 (defendant must have "come close to willfully blinding itself to the falsity of its utterance").

Here, Klayman sets forth two basic arguments in support of his claim that actual malice exists. First, Klayman contends that Defendants' claim is based upon "manufactured false invoices," the import being that Defendants purposefully and with intention created false expense charges against Klayman and therefore knew that he did not owe them the claimed sums. Second Klayman Aff. ¶ 27. Second, Klayman argues that actual malice is evident based generally upon the "totality of Defendants' conduct," and, more specifically, upon the following incidents: (a) Defendants' alleged decision to fire Ms. Cobas and Mr. Pendleton, former JW regional directors,

"because of their loyalty to [Klayman] and for no other reason;" (b) Fitton's alleged statement to

Mr. Pendleton that he was "not to speak to [Klayman] after [he] left;" and (c) "Defendants'

constant threats to sue [Klayman] during [his] Senate campaign." *Id.* at ¶ 28.  Klayman's

arguments, however, are entirely unsupported by any record evidence, let alone the demanding

level of "clear and convincing evidence" that a public figure is required to meet in establishing

actual malice.

Turning first to Klayman's assertion that JW manufactured false expense invoices, the

Court emphasizes that Klayman has provided absolutely no evidence supporting this allegation.

Klayman refers the Court to correspondence included in his Exhibit C filed in opposition to

Defendants' motion for summary judgment,[34] *see id.* at ¶ 27, but a review of Klayman's Exhibit

C shows that it contains only a series of letters between Klayman and/or his counsel and JW that

merely summarized Klayman's belief that he does not owe JW any money.  *See* Docket No.

[288-2] - [288-8].  It is clear, however, that Klayman's own letters repeating his belief that the

claimed expenses are incorrect is not actual evidence that such the claimed invoices are false.[35]

The Court, upon its own independent review of the record, finds no other evidence to support this

---

[34] Klayman also directs the Court to documents that he states are attached as Exhibit 2 to the Second Klayman Affidavit.  *See* Second Klayman Aff. ¶ 10.  Klayman, however, failed to attach any documents to his second affidavit.  *See generally id.*

[35] Klayman also claims that Ms. Prytherch, Chief of Staff of JW, "effectively admitted [in her deposition] to being fired from her previous employment in a financial position because of her unethical or illegal conduct."  Second Klayman Aff. ¶ 9.  As an initial matter, Klayman provides no citation to that deposition nor even attaches the deposition for the Court's review. The Court therefore easily finds that such claims are unsupported by the record evidence. Moreover, it is patently obvious that such a statement, even it true—which the Court does not find it is—would not show, by clear and convincing evidence, that the invoices at issue in this case were manufactured.

claim.

Klayman's second argument fares no better.  In essence, Klayman argues that JW's alleged ill will towards him sufficiently demonstrates actual malice.  However, even if Klayman's allegations are true, "[t]he Supreme Court has emphasized that actual malice is not ill will or personal spite; it is the making of a statement with reckless disregard of whether it is true." *Liberty Lobby*, 852 F.2d at 601.  Rather, Klayman must produce clear and convincing evidence that "the defendant actually entertained a serious doubt" as to the truth of the matter asserted, *McFarlane*, 91 F.3d at 1508, or "wilfully blind[ed] [itself] to the falsity" of the statement, *Tavolulareas*, 817 F.2d at 776.  On this point, Klayman has failed to produce ***any*** evidence from which a reasonable jury could conclude that Defendants' subjectively held a "serious doubt" as to the truth of the statement that Klayman owes JW a quarter million dollars.

Indeed, the evidence in the record is to the contrary.  "[B]ecause the actual malice inquiry is subjective—that is, concerned with the defendant's state of mind when he acted—the inference of actual malice must necessarily be drawn solely upon the basis of the information that was available to and considered by the defendant prior to publication."  *McFarlane*, 91 F.3d at 1508. Here, Defendants based their statement on the September 19, 2003 Severance Agreement as well as JW's audited financial statements by outside financial accountants.  Defs.' Stmt. ¶ 96; *see also* Fitton Decl. ¶ 26; Orfanedes Decl. ¶ 6; Farrell Decl. ¶ 6.  According to these documents, as of the time the allegedly defamatory statement was made: (a) Klayman owed $76,782.68 in unreimbursed personal expenses; (b) K&A owed $160,473.74 in unreimbursed expenses; and (c) Klayman and K&A together owed JW $146,173.38 for the organization's efforts to collect these outstanding debts.  *See* Defs.' Stmt. ¶ 108, 129, 130.  JW asserts that Klayman is liable not only

for his own personal debt but also for K&A's unpaid debt under the Severance Agreement, with the result that Klayman is personally liable for the combined total of debt owed: $383,429.80. *See* JW's SAC-MSJ at 33-35.  As explained above, the question of Klayman's liability for these amounts—*i.e.*, the very question presented by JW's counterclaims—is one that has not yet been resolved.  However, whether or not this Court ultimately finds Klayman liable for this full amount is beside the point.  Rather, the key issue is whether JW believes that Klayman is liable to JW for a quarter million dollars.  The answer is clearly yes, and Klayman has proffered no evidence to the contrary.  Accordingly, the Court GRANTS JW's motion for summary judgment as to Klayman's allegations that Defendants defamed him by publishing false statements to the media.  For the same reasons, the Court also GRANTS the Individual Defendants' motions for summary judgment insofar as each also relates to Klayman's claim for defamation arising from alleged statements made to the media.[36]

In summary, the Court GRANTS both JW and the Individual Defendant's motions for summary judgment as to Count Nine of the Second Amended Complaint, which alleges that Defendants defamed Klayman by making allegedly false statements to JW employees and to the media.

> D.     *JW's Motion for Summary Judgment as to Counts One, Two, Three and Ten of Defendants' Amended Counterclaim*

JW, as Defendant/Counterclaimant, has also moved for summary judgment as to Counts One through Three and Count Ten of Defendants' Amended Counterclaim.  *See* JW's CC-MSJ.

---

[36] In light of the Court's conclusion above, it does not reach the Individual Defendants arguments in the alternative that they, as corporate officers, cannot be held liable for corporate torts they neither committed or participated in.  *See* Farrell's MSJ at 16, 20; Orfanedes' MSJ at 14, 18; Fitton's MSJ at 13.

In Count One of the Amended Counterclaim, JW alleges that Klayman breached paragraph 10 of

the Severance Agreement by failing to reimburse JW for personal costs and expenses he incurred

during his employment.  Am. Counterclaim, ¶¶ 68-73.  In Count Two, JW alleges that Klayman

breached paragraph 11 of the Severance Agreement by failing to reimburse JW for debts owed to

the organization by Klayman's law firm, K&A.  *Id.* ¶¶ 74-79.  In Count Three, JW seeks

indemnification from Klayman for the amounts owed by K&A pursuant to paragraph 19(B) of

the Severance Agreement.  *Id.* ¶¶ 80-83.  And finally, in Count Ten, JW alleges that Klayman

breached paragraph 4 of the Severance Agreement by using non-public Confidential Information,

without JW's approval.  *Id.* ¶¶ 125-131.  The Court shall address each in turn.

> 1.     Count One of the Amended Counterclaim

First, JW alleges that Klayman breached paragraph 10 of the Severance Agreement by

failing to reimburse JW for personal costs and expenses he incurred during his employment.

Am. Counterclaim, ¶¶ 68-73.  Paragraph 10 provides, in relevant part, that:

> Klayman [] agrees to reimburse Judicial Watch for personal costs or expenses
> incurred by him during his employment, if any, that Judicial Watch may determine
> in good faith were mistakenly charged or allocated as costs of expenses of Judicial
> watch, as well as any additional expenses that Klayman has billed to Judicial Watch
> or charged to a Judicial Watch credit card that Judicial Watch determines in good
> faith are personal expenses of Klayman.  Klayman shall reimburse Judicial watch for
> any such amounts within seven (7) days of being notified by Judicial Watch and
> being presented with supporting documentation of the amount, date and category of
> cost or expense items for which reimbursement is sought.

Severance Agreement ¶ 10.

According to JW, pursuant to this language, Susan Prytherch—Chief of Staff for JW and

the individual responsible for the organization's financial and administrative operations,

including finance, accounting, human resources, systems, facilities, storage and business and

professional insurance—undertook a "comprehensive review of charges made by or for Mr.

Klayman to JW's accounts or credit cards during the period from January 2001 through

September 19, 2003, the date of Mr. Klayman's departure."  Second Prytherch Decl. ¶¶ 2, 4, 29.

Ms. Prytherch also reviewed "statements of JW credit cards held by Mr. Klayman, records from

Mr. Klayman's cash advance account, JW vendor or account statements, and staff reports

identifying time or money spent by or for Mr. Klayman for personal items or services."  *Id.* ¶ 29.

As Ms. Prytherch explains, "[it] was, and is, JW's policy that employees are responsible for

documenting all charges to JW's accounts and credit cards by providing a statement or receipt

and identifying the business purpose for each charge in a timely manner."  *Id.* ¶ 28.  "[A]ny

charge that is not documented or for which a business [purpose] is not provided is considered to

be personal and must be reimbursed by the employee."  *Id.*

Accordingly, Ms. Prytherch avers that she "review[ed] the various source materials, such

as credit card statements, to determine if a charge had been documented and if a business purpose

had been identified.  If a charge had been documented and a business purpose identified, the

charge was not billed to Mr. Klayman."  *Id.* ¶ 29.  If a charge was identified expressly as

personal, then Ms. Prytherch undertook efforts to determine if Klayman had reimbursed JW for

the expense.  "If not, the charge was considered an un-reimbursed personal expense, and [she]

prepared an invoice for the charge to send to Mr. Klayman for reimbursement."  *Id.* ¶ 30.  For

those charges that lacked either documentation or identification of a business expense, but

appeared to be business-related, Ms. Prytherch states that she "researched the charge to try and

find a matching statement or receipt and to establish a business purpose."  *Id.*  If she was

ultimately unable "to determine the nature of the charge or establish a business purpose for the

charge, or if the charge was of an obviously personal nature, [she] prepared an invoice for the charge and billed it to Mr. Klayman." *Id.* ¶ 31.

As a result of this review, Ms. Prytherch sent Klayman 47 invoices in November and December of 2003, and an additional four invoices in August of 2004. *Id.* In total, Klayman received 51 substantive invoices detailing personal expenses billed to Klayman, which included an explanation of the charge and supporting documentation. Defs.' Stmt. ¶¶ 102, 107; *see also* Second Prytherch Decl., Ex. 13 (copies of invoices). In addition, when Klayman failed to timely reimburse JW within seven days of notification, Ms. Prytherch calculated interest on the unreimbursed expenses. Second Prytherch Decl. ¶ 45. According to Ms. Prytherch, as of October 31, 2008, Klayman's outstanding debt to JW for unreimbursed personal expenses, plus the interest accrued thereon, as reflected in the invoices, totaled $85,242.03. Defs.' Stmt. ¶ 109; *see also* Second Prytherch Decl. ¶ 48. This amount reflects a credit for a payment of $4,572.68 made by Klayman to JW on January 15, 2006 for certain personal charges. Defs.' Stmt. ¶¶ 47, 109 & Ex. 15.

As discussed above, Klayman has not disputed that he received these invoices. *See supra* pp. 48-49. He contends, however, that such invoices are "fraudulent documents manufactured after the fact." *See* Pl.'s Resp. to Request for Admissions, Request No. 17; *see also* Second Klayman Aff. ¶¶ 10, 27. As support, Klayman refers the Court to correspondence that he submitted in his Exhibit C, which was filed in opposition to Defendants' motion for summary judgment.[37] *See* Second Klayman Aff. ¶ 27. A review of Klayman's Exhibit C shows that it

---

[37] Klayman also directs the Court to documents that he states are attached as Exhibit 2 to the Second Klayman Affidavit. *See* Second Klayman Aff. ¶ 10. Klayman, however, has not actually attached any documents to his second affidavit. *See generally id.*

contains a series of letters between Klayman and/or his counsel and JW.  *See* Docket No. [288-2] - [288-8].  No receipts or other documentation are attached to these letters, and the letters themselves merely consist of Klayman's representations that the claimed expenses are not accurate for various reasons.  *See id.*  Again, Klayman's own letters summarizing his belief that the claimed expenses are incorrect is not evidence that such expenses are in fact incorrect. Klayman also claims that Ms. Prytherch, in her deposition, "effectively admitted to being fired from her previous employment in a financial position because of her unethical or illegal conduct," the import being, of course, that she is not a credible person who may have engaged in similar conduct in this case—*i.e.*, manufactured the invoices.  *See* Second Klayman Aff. ¶ 9.  As an initial matter, Klayman provides absolutely no support for this allegation—he does not cite to the portion of the deposition that he believes support his claim nor does he even attach a copy of the deposition for the Court's review.  *See id.*  The Court therefore easily finds that such claims are unsupported by the record evidence.[38]  Regardless, even if true, it is readily apparent that such allegations do not demonstrate that the invoices in this case were in fact manufactured by JW.

Ultimately, then, Klayman has failed to provide any evidence whatsoever demonstrating that any of the invoices and relating documentation are "fraudulent" or "manufactured after the fact."  Nor has he produced any evidence demonstrating that any of the claimed expenses were,

---

[38] Klayman also complains again that he was not permitted to complete the deposition of Ms. Prytherch, thus denying him an opportunity to obtain information critical to his defense. Second Klayman Aff. ¶ 9.  Klayman's failure to timely complete Ms. Prytherch's deposition before the close of discovery, despite being given the opportunity to do so, is well documented, and the Court need not reiterate herein its decision upholding Magistrate Judge Alan Kay's order denying Klayman's motion to compel.

in fact, business expenses or that he has previously reimbursed JW for any of the expenses.[39]
Although Klayman indicated in response to JW's request in discovery that he would produce
documents that support his assertion that he does not owe JW any money for unreimbursed
personal expenses, he has to-date failed to so and discovery in this matter is now closed.  *See*
Defs.'s Stmt. ¶ 104.

The Court therefore finds that JW has successfully established that it notified Klayman of
each of the claimed personal expenses and provided him with supporting documentation of the
amount, date and category of cost or expense item, as required under paragraph 10 of the
Severance Agreement.  As Klayman has failed to provide evidence disputing the validity of any
of the claimed expenses or showing that he has, in fact, already reimbursed JW for these
expenses, JW is entitled to summary judgment as to Klayman's liability for the claimed personal
expenses.

However, the Court concludes that it is not in a position at this time to determine the
appropriate amount of monetary damages to which JW is entitled.  A party who proves a breach
of a contractual duty is entitled to damages, including actual damages resulting from the breach.
*Cahn*, 482 A.2d at 130.  Here, JW seeks a monetary award of $85,242.03 in actual damages,

---

[39] In an abundance of caution, the Court has reviewed Klayman's now-stricken opposition
and concludes that, even if the Court were to consider the filing, the arguments and evidence set
forth therein would be insufficient to defeat summary judgment.  First, Klayman asserts that Ms.
Prytherch's declaration is false, but provides no evidence to support this claim.  Pl.'s Opp'n at
15.  Second, Klayman refers the Court to the affidavit of Michael Pendleton, a former regional
director of JW, which states—without support—that JW also "attempted to charge [him] for
phony personal expenses which [he] had not incurred."  *See id.* at 13-14; Pendleton Aff. ¶ 3.
Pendleton's affidavit provides absolutely no support for this broad and conclusory allegation.
Moreover, even if true, it would not demonstrate that the expenses at issue here are fraudulent or
false.

which represents Klayman's outstanding debt to JW for unreimbursed personal expenses, plus

the interest accrued thereon, minus a credit for the payment made by Klayman on January 15,

2006.  Defs.' Stmt. ¶ 109; *see also* Second Prytherch Decl. ¶ 48.  Although the Court agrees that

JW has established that is entitled to recover actual damages in the amount of unreimbursed

personal expenses owed by Klayman, the Court is not persuaded that JW is also legally entitled

to the additional amount calculated as interest on Klayman's outstanding balance for

unreimbursed personal expenses.  As an initial matter, the Court notes that JW has simply

assumed that it is entitled to such interest and provides no argument or support for this position.

Paragraph 10 of the Severance Agreement, however, does not provide for the payment of interest

in the event Klayman fails to timely reimburse JW.  *See* Severance Agreement ¶ 10.  As JW has

not pointed to any other provision of the Severance Agreement that would entitle it to interest,

the Court concludes that JW has not shown that it is contractually entitled to prejudgment interest

on the unpaid personal expenses.

Nonetheless, although JW may not be contractually entitled to such interest, under

District of Columbia law, prejudgment interest may be awarded if necessary to fully compensate

the plaintiff—here, the counterplaintiff.  *Winder v. District of Columbia*, 555 F. Supp. 2d 103,

112 (D.D.C. 2008) (citing D.C. Code § 15-109).  The award of such interest is within the broad

discretion of the fact finder (for purposes of summary judgment, the trial court), but must

comport with statutory limits.  *See id.*; *see also Fudali v. Pivotal Corp.*, Civ. Act. No. 03-1460,

2009 WL 1617096, *6-8 (D.D.C. June 9, 2009); *see also* D.C. Code § 28-3302(c).  However, JW

has not briefed this issue nor demonstrated that the organization is entitled to the full amount of

requested interest under District of Columbia law.  Accordingly, the Court is not in a position at

this time to determine whether JW is entitled to the amount of requested prejudgment interest. Moreover, because JW has not provided the Court with a break-down of the $85,242.03 request, the Court cannot determine what amount of that request is attributable solely to the unreimbursed personal expenses versus accrued interest.  Without further supplemental briefing, the Court is therefore unable to determine the specific amounts that should be awarded to JW at this time.

The Court therefore shall GRANT JW summary judgment on Count One of its Amended Counterclaim, insofar as it relates to Klayman's liability for breach of contract based on unpaid expenses, but shall HOLD IN ABEYANCE JW's motion, insofar as it relates to its request for damages.  Accordingly, on or before July 17, 2009, JW shall submit a detailed accounting, with supporting documentation, of the amount of unpaid expenses owed by Klayman—*without* interest—so that the Court can determine the appropriate amount of actual damages to award. The Court shall defer consideration of JW's request for prejudgment interest until after all liability issues have been resolved.

### 2. Count Two of the Amended Counterclaim

In Count Two of JW's Amended Counterclaim, JW alleges that Klayman breached paragraph 11 of the Severance Agreement by failing to reimburse JW for debt owed to the organization by Klayman's law firm, K&A.  Am. Counterclaim ¶¶ 74-79.  Paragraph 11.A of the Severance Agreement provides that:

> Klayman, and by its signature below, Klayman & Associates, P.C. ("K&A"), reaffirm and acknowledge the debt of K&A to Judicial Watch, which was in the amount of $78,810 as of December 31, 2002, and agree that K&A shall pay the then full outstanding balance of the debt (including additional amounts allocated to K&A by Judicial Watch's accountants in accordance with their customary practice regarding this debt), without offset or deduction, together with accrued interest of 8% per annum, on or before May 15, 2004, per the terms of the Minutes of the May 15, 2002

Meeting of the Board of Directors of Judicial Watch. Klayman and K&A expressly
acknowledge that Judicial Watch is not indebted to K&A.

Severance Agreement ¶ 11.A.

Pursuant to paragraph 11.A., Klayman and K&A "agree[d] that K&A shall pay" its then-
outstanding balance of debt to JW by May 15, 2004.  *Id.*  From this language, JW concludes that
"Plaintiff owes Judicial Watch $197,178.84 as of October 31, 2008 for K&A's debt."  JW's CC-
MSJ at 17.  This argument, however, conflates Klayman and K&A into a single entity.  This
error is particularly glaring, given the fact that the Individual Defendants in this case, whose
briefing was prepared by the same counsel in this matter, have each argued—correctly, as the
Court determined above—that corporate officers and agents are not personally liable on a
contract he or she executes on behalf of a principal, so long as the principal is identified and the
agency relationship is disclosed.  *See* Farrell MSJ at 27-28; Fitton MSJ at 23-24; Orfanedes MSJ
at 25-26.  JW nonetheless makes no effort to distinguish between Klayman and K&A, a non-
party to this lawsuit.  For example, JW has not explained what type of legal entity K&A is—or
was, given JW's claim in its Amended Counterclaim that, "upon information and belief, K&A is
no longer in business anywhere," *see* Am. Counterclaim ¶ 3.[40]  Nor has JW provided any legal
support or case law for its argument that Klayman made be held personally liable for K&A's
breach of contract where it appears that he signed the Severance Agreement, as to K&A, in his
official capacity as President of the law firm.  *See id.* at p. 12.  Still yet, JW has not addressed
what effect, if any, the alleged dissolution of K&A has on its claim for breach of contract.

---

[40] It appears that K&A may be (or may have been) a professional corporation, given that
its full title is Klayman & Associates, P.C., *see, e.g.,* Severance Agreement  ¶ 11, but the Court is
without sufficient information to definitively determine K&A's legal status.

Without this information, the Court cannot determine whether and under what circumstances

Klayman may be held personally liable for K&A's alleged breach of contract.  The Court

therefore DENIES JW's motion for summary judgment as to Count Two of its Amended

Counterclaim.

　　　　　3.　　　Count Three of the Amended Counterclaim

　　　　In Count Three, JW seeks indemnification from Klayman for amounts owed by K&A

under paragraph 11.A of the Severance Agreement, discussed above.  *Id.* ¶¶ 80-83.  Specifically,

JW seeks indemnification pursuant to paragraph 19.B. of the Severance Agreement, which

provides:

> Klayman  agrees to defend, indemnify and hold harmless Judicial Watch and each
> and all of the Judicial Watch Releasees from any and all claims, liabilities, costs,
> damages or judgments of any and every kind (including, without limitation,
> attorneys' fees and costs) which Judicial Watch or any of the Judicial Watch
> Releasees may incur or be threatened with that arise out of any intentional
> wrongdoing by Klayman, or breach of his obligations and responsibilities under this
> Agreement, or out of K&A's breach of its obligations under this Agreement.
> Klayman expressly acknowledges that, pursuant to this paragraph, he shall be
> obligated to defend, indemnify and hold harmless Judicial Watch from any and all
> attorneys' fees, court costs or other expenses Judicial Watch may incur on account
> of Klayman's or K&A's failure to make prompt payment to Judicial Watch in
> accordance with paragraphs 10 and 11 of this Agreement.

Severance Agreement ¶ 19.B.  JW seeks indemnification from Klayman for (a) the amount of

debt owed by K&A to JW under paragraph 10 of the Severance Agreement, and (b) costs

incurred by JW in their efforts to collect the debts owed from K&A and also, it appears, from

Klayman personally.  JW's CC-MSJ at 18-21.

　　　　JW's claim for indemnification, however, is not as straightforward as the organization

would make it seem.  As explained above, K&A is not a party to this action nor has JW yet

established that Klayman may be held personally liable for K&A's alleged breach of the Severance Agreement.  Moreover, it appears that JW has not previously secured a judgment against K&A for the amounts claimed.  This raises the question of the Court's ability to order Klayman to indemnify JW for K&A's alleged breach of contract where JW has not yet secured a judgment against K&A (or Klayman himself) for the alleged breach of contract under paragraph 10 of the Severance Agreement.  *Cf. Casanova v. Marathon Corp.*, 256 F.R.D. 11, 13-14 (D.D.C. 2009) (dismissing claim for indemnity as premature where no judgment as to liability of indemnitee had yet been entered).  This is of particular concern given that JW seeks indemnification for amounts over and above the sum specified in paragraph 11.A of the Severance Agreement.  Although K&A's liability for the $78,810 agreed to in the Severance Agreement appears plain on the face of the contract, JW also seeks indemnification for additional sums allocated to K&A by JW's accountants and for additional costs associated with JW's efforts to collect K&A's debt,[41] amounts which are neither specified in the Severance Agreement nor the subject of a judgment in JW's favor.  JW, however, has neither addressed this issue nor otherwise provided the Court with any case law or legal authority in support of its claim for indemnification.  Consequently, the Court is not persuaded that JW has sufficiently demonstrated at this time that it is entitled to indemnification against Klayman for K&A's breach of contract as a matter of law.  The Court therefore shall DENY JW's motion for summary judgment as to Count Three of its Amended Counterclaim.

---

[41] The Court notes that JW has not provided the Court with a break-down of the costs associated with its efforts to collect the debts owed by Klayman himself versus the costs associated with its efforts to collect the debts owed by K&A.  The Court is therefore unable to determine what portion of those costs is due to efforts associated with collecting Klayman's personal debt, which appears to be a more straightforward issue.

4.     Counterclaim 10 of the Amended Counterclaim

In Count 10 of JW's Amended Counterclaim, the organization alleges that Klayman used

non-public Confidential Information in breach of the Severance Agreement.  Am. Counterclaim

¶¶ 125-131.  Specifically, JW alleges that Klayman used "information about direct mail

solicitation operations, the identity of third-parties who assisted with direct mail solicitation

operations and the terms on which such programs and operations were conducted . . . without

seeking or obtaining written approval of an officer of Judicial Watch."  *Id.* ¶ 127.  Paragraph 4.A

of the Severance Agreement provides, in relevant part, that

> Klayman agrees that all non-public information and materials, whether or not in
> writing concerning Judicial Watch, its operations, programs, plans, relationships,
> donors, prospective donors, . . . contracts, . . . (collectively, "Confidential
> Information") are confidential and shall be the exclusive property of Judicial Watch
> to which Klayman has no right, title or interest.  By way of illustration, but not
> limitation, Confidential Information includes matters not generally known outside
> Judicial Watch, such as . . . contracts, . . . donor lists, donor data, fund-raising
> strategies and methods, . . . client lists, client data, contacts at or knowledge of clients
> or donors or prospective clients or donors, . . . supplier and vendor lists, . . . services
> or products offered, marketed or used by Judicial Watch . . . .  Klayman agrees that
> after the Separation Date, he shall not . . . use Confidential Information for any
> purpose without written approval by an officer of Judicial Watch, unless and until
> such Confidential Information has become public knowledge through no fault or
> conduct by Klayman.

Severance Agreement ¶ 4.A

According to JW, during Klayman's tenure with the organization, Klayman signed an

agreement with a consultant, American Target Advertising ("ATA"), on behalf of JW

designating ATA as a nonexclusive consultant for direct marketing and educational efforts to the

general public.  Defs.' Stmt. ¶ 133.  Specifically, ATA helped JW find donors and identify

people who supported JW's cause.  *Id.* ¶ 134.  Pursuant to the parties' agreement, ATA would

provide the funding upfront for JW's direct mailings and in exchange would "obtain[] ownership independent of Judicial Watch in names which were acquired in the course of the prospecting or donor acquisition." *Id.* (quoting Ex. 10 (Klayman Depo. Exc.) at 267:8-269:21).  That is, ATA would have a proprietary interest in the names of potential JW donors that ATA acquired through direct mailings on JW's behalf and would retain those names in its own mailing lists.  *Id.*

JW asserts, and Klayman does not dispute, that after Klayman separated from JW, he used ATA to send out direct mailings on behalf of his Senate campaign and/or Friends of Larry Klayman.  *Id.* ¶¶ 142-143.  Furthermore, Klayman admitted in his deposition testimony that he selected ATA to conduct direct mailings for his organization, Friends of Larry Klayman, "because he had used him before while at Judicial Watch." *Id.* ¶ 141 (quoting Ex. 10 (Klayman Depo.) at 133:13-20).  Moreover, JW demonstrates, and Klayman does not dispute, that Klayman's agreement with ATA specifically instructed ATA to use the donor names it had obtained from JW for the mailings made on behalf of Friends of Larry Klayman.  *Id.* ¶ 139; *see also id.*, Ex. 10 (Klayman Depo.) at 285:20-22; Pl.'s Mot. to Quash Mem., Docket [76-2] at 2 (containing admission by Klayman that "lists . . . rented by Klayman from . . . ATA [were] tailored pursuant to Klayman's direction).  Accordingly, JW concludes that Klayman breached the Severance Agreement by using Confidential Information—here, the knowledge that ATA had previously worked as a direct mailing consultant for JW and therefore retained JW's donor information—without authorization or approval by JW.  JW's CC-MSJ at 9-12.

JW, however, has not shown that the information at issue is, in fact, Confidential Information that would fall under the protections of paragraph 4.A of the Severance Agreement. Although the Agreement provides, "[b]y way of illustration," that "Confidential Information

includes matters not generally known outside Judicial Watch, such as . . . contracts, . . . fund-raising strategies and methods,. . . vendor lists, and . . . services or products . . used by Judicial Watch," such information is—by the plain language of the agreement—confidential only to the extent it is "not generally known outside Judicial Watch."   Severance Agreement ¶ 4.A.  JW has not proffered sufficient evidence demonstrating that either its relationship with ATA or the knowledge that lists of JW's donors could be accessed through ATA was "not generally known outside of Judicial Watch."  JW has, to its credit, provided evidence that its relationship with ATA was not generally known to its *donors*.  Defs.' Stmt. 135 (quoting Ex. 10 (Klayman Dep.) at 278:18-20) (admitting that "the donors of Judicial Watch really never knew that [ATA] was the one that was doing the mail[ing]").  But JW has not provided any evidence that its relationship with ATA was not generally known to others in the public—for example, JW's peers and competitors.  Rather, JW simply asserts that "[i]t is undisputed that this information was non-public and, therefore, confidential information," without any citation to the record in support of its claim.  *See* JW's CC-MSJ at 10; Defs.' Stmt. ¶ 143 (stating, without citation to the record, that the information was "non-public").  The absence of demonstrable evidence on this issue is of particular concern given that ATA itself has an ownership right in the names of JW donors obtained through its direct mailing efforts, and JW has not addressed whether ATA may, for example, advertise or make public its possession of JW's donor names.

In addition, the Court notes that JW has not provided any record evidence to support its contention that Klayman did not obtain JW's approval or authorization to use ATA for his campaign's direct mailings.  Pursuant to the plain terms of the Severance Agreement, "Klayman agrees that after the Separation Date, he shall not . . . use Confidential Information for any

purpose without written approval by an officer of Judicial Watch."  Severance Agreement ¶ 4.A.

Again, although JW alleges that "Klayman used this non public information . . . without

obtaining written approval or authorization of an officer of Judicial Watch," JW provides no

record citation in support of this claim.  Defs.' Stmt. ¶ 143.  This is particularly significant given

that the date of Klayman's contract with ATA is September 4, 2003—*i.e.*, prior to Klayman's

separation from JW.  *See id.* ¶ 138.

Admittedly, Klayman, in opposition to JW's motion, has not pointed the Court to any

evidence demonstrating that the information was in fact publicly known or that he had

authorization from JW to use ATA for his campaign's direct mailing efforts.  On summary

judgment, however, it is the movant's burden—here, JW's—to prove that there is no disputed

issue of material fact and that it is entitled to judgment as a matter of law.  The burden is thus on

JW to prove a breach of contract, which in turn requires evidence that Klayman's used

Confidential Information that is not generally known to the public without JW's approval in

violation of the Severance Agreement.  As JW has not provided sufficient evidence on those

points, the Court shall DENY JW summary judgment as to Count Ten of its Amended

Counterclaim.

In summary, the Court grants-in-part and denies-in-part JW's motion for partial summary

judgment as to its Amended Counterclaims.  Specifically, the Court grants JW's motion as to

Count One of its Amended Counterclaim insofar as it relates to Klayman's liability for breach of

contract based on unpaid expenses, but holds in abeyance JW's motion insofar as it relates to its

request for damages pending supplemental briefing by JW.

# IV: CONCLUSION

For the reasons set forth above, the Court orders as follows.  ***First***, with respect to Klayman's Second Amended Complaint, the Court hereby:

(1) GRANTS Defendants' motions for summary judgment as to Count Four of Klayman's Second Amended Complaint, which alleges false advertising and false endorsement in violation of the Lanham Act;

(2) DENIES Klayman's partial motion for summary judgment and GRANTS Defendants' cross-motions for partial summary judgment as to Count Six (breach of contract- rescission);

(3) DENIES-IN-PART and GRANTS-IN-PART JW's motion for partial summary judgment as to Count Seven (breach of contract - damages) and Eight (breach of contract - specific performance).  More specifically, the Court :

> (a)      GRANTS JW's motion as to Klayman's allegation that JW breached the Severance Agreement by failing to take affirmative steps to purchase the headquarters building, but DENIES JW's motion as to Klayman's allegation that JW breached the Severance Agreement by failing to make a good faith effort to remove Klayman as guarantor of the building's lease;

> (b)      GRANTS JW's motion as to Klayman's allegation that JW breached the Severance Agreement by failing to forward Klayman's telephone messages and mail;

> (c)      GRANTS JW's motion as to Klayman's allegation that JW breached the Severance Agreement by tortiously interfering with Freedom Watch;

> (d)      GRANTS JW's motion as to Klayman's allegation that JW breached the

Severance Agreement by interfering with Klayman's Senate campaign;

(e)     GRANTS JW's motion as to Klayman's allegation that JW breached the

Severance Agreement by failing to return property belonging to Klayman and

his law firm, K&A;

(f)     GRANTS JW's motion as to Klayman's allegation that JW breached the

Severance Agreement by failing to pay Klayman's health insurance premiums,

but DENIES JW's motion as to Klayman's allegation that JW breached the

Severance Agreement by failing to pay health insurance for Klayman's

children;

(g)     DENIES JW's motion as to Klayman's allegation that JW breached the

Severance Agreement by allegedly filing a false and frivolous legal pleading

in Florida litigation;

(h)     GRANTS JW's motion as to Klayman's allegation that JW breached the

Severance Agreement by interfering with media outlets;

(i)     GRANTS JW's motion as to Klayman's allegation that JW breached the

Severance Agreement by failing to remove him as guarantor for all corporate

credit card accounts; and

(j)     DENIES JW's motion as to Klayman's allegation that JW breached the

Severance Agreement by failing to provide him with access to documents

regarding Mr. Paul, but GRANTS as to Klayman's allegation that JW

breached the Severance Agreement by failing to provide him back-up

documentation regarding claimed expenses; and

(4) GRANTS Defendants' motions for partial summary judgment as to Count Nine, which alleges that Defendants made defamatory statements to JW's employees and the media.

**Second**, with respect to the Amended Counterclaims, the Court (1) GRANTS-IN-PART and HOLDS-IN-ABEYANCE-IN-PART JW's motion for partial summary judgment.  More specifically, the Court:

(1) GRANTS JW's motion as to Count One, finding Klayman liable for breach of the Severance Agreement based upon his failure to reimburse JW for personal costs and expenses incurred during his employment, but HOLDS IN ABEYANCE JW's motion as to its request for damages;

(2) DENIES JW's motion as to Count Two, which alleges that Klayman breached the Severance Agreement by failing to reimburse JW for debt owed to the organization by Klayman's law firm, K&A;

(3) DENIES JW's motion as to Count Three, which seeks indemnification from Klayman for amounts owed by K&A; and

(4) DENIES JW's motion as to Count Ten, which alleges that Klayman used non-public Confidential Information in breach of the Severance Agreement.

Finally, the Court requires JW to submit, on or before **July 17, 2009**, a detailed accounting, with supporting documentation, of the amount of unpaid expenses owed by Klayman so that the Court can determine the appropriate amount of actual damages to award.  The Court shall hold a status hearing in this matter on Wednesday, September 16, 2009 at 9:00 A.M. in Courtroom 28A, at which time the Court shall discuss the manner in which to proceed with resolution of this case.  The Court encourages the parties to engage in settlement discussions

87

prior to the status hearing and before a pre-trial schedule is set.  To that end, the parties may

contact the Court to request a referral to the Alternative Dispute Resolution Program (not a

magistrate judge).  An appropriate Order accompanies this Memorandum Opinion.

Date:   June 25, 2009

                                                  */s/*

                                                  COLLEEN KOLLAR-KOTELLY
                                                  United States District Judge