UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LARRY KLAYMAN et al., )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>JUDICIAL WATCH, INC. et al, )<br>)<br>Defendants. )<br>) | Civil Action No. 06-CV-00670 (CKK) |
| ELHAM SATAKI, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>BROADCASTING BOARD OF )<br>GOVERNORS, *et al.* )<br>)<br>Defendants. )<br>) | Civil Action No. 10-0534 (CKK) |
| ELHAM SATAKI, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>MEHDI FALAHATI, et al., )<br>)<br>Defendants. )<br>) | Civil Action No. 10-CV-00466 (CKK) |

1

## 28 U.S.C. 144 AFFIDAVIT OF LARRY KLAYMAN

I, LARRY KLAYMAN, being over eighteen years of age, hereby swear on personal knowledge or belief as follows:

1. I am a member in good standing of the District of Columbia Bar and the bar of this court. I have been a practicing lawyer for 33 years.

2. In 1994, after 17 years as a practicing trial lawyer, and a former U.S. Department of Justice prosecutor and defense attorney, I founded Judicial Watch, because, over my years of practice, I had come to see that federal judges in particular sometimes act and think as if they are "above the law." I had represented many foreign clients as an international lawyer, and observed that they were not often treated equally before the bench. My goal was to create an organization that would police both the judiciary, the legal profession as a whole, and the other two branches of government. With regard to judges, I saw this as a necessity as judges, almost without exception, will not stand in judgment of other judges. They will not police their own misconduct and in fact I learned sadly work hard to cover it up.

3. In this regard, during my 33 years of legal practice, I have never experienced a jurist more prone to wear her politics on her sleeve, so to speak, than Judge Colleen Kollar-Kotelly. Regrettably, federal judges are chosen by the sitting President usually on the basis of their politics and political connections; patronage so to speak. And, because once confirmed they are judges for life, some regrettably act and think as if they are "above the law."

4. Judge Kollar-Kotelly has acted in this way toward me over the years, but recently the situation has become much more acute and prejudicial in the above cases. As

2

set forth below, I firmly believe that her decision making in the above three cases in particular has been colored, that is prejudiced, by her extreme political dislike if not hatred of me.

5. I am not the ordinary trial lawyer; far from it. During the 1990's I filed over eighty cases against Bill and Hillary Clinton and their administration, and helped to and was instrumental in uncovering the famous Chinagate or campaign finance scandal, and represented nearly all of the women who claimed to have been harassed and sexually abused by Bill Clinton, among other cases, such as the equally famous Filegate case and scandal. During this time, I developed a reputation, I feel undeservedly, of being anti-Democratic Party; however, I was and am fierce thorn in the side of the liberal political establishment and all establishments, which seek to protect and further their own interests at the expense of the people. This partisan reputation was undeserved because when George W. Bush became president, I treated his administration similarly in attempting to hold him and his vice president, Dick Cheney, to the rule of law. Nevertheless, I was demonized by the left in this country, particularly in Washington, D.C. I am a mix between conservative and libertarian in my political philosophy.

6. It is a known fact that when Colleen Kollar-Kotelly was nominated by President Clinton for a seat on this court that her nomination was bitterly opposed by conservatives and their public interest groups, such as Paul Weyrich's Free Congress Foundation, because of her extreme left-wing views and decisions on the bench. It is also a known fact that Judge Kollar-kotelly's husband, himself a lawyer, played a role which was useful to President Clinton during the infamous Monica Lewinsky scandal, which resulted in the impeachment of Bill Clinton, only the second time in American history that

3

impeachment had occurred. I not only worked with Congressman Bob Barr to introduce articles of impeachment against Bill Clinton, and assisted the House of Representatives in its subsequent impeachment proceedings, I was very active during the Monica Lewinsky scandal representing many of the women – Jennifer Flowers, Paula Jones, Kathleen Willey, Juanita Broadrick, Dolly Kyle Browning – who corroborated Bill Clinton's sexual predilections, infidelity toward, and abuse of women, including breakins by private investigators into their homes, death threats, and IRS audits, to name just a few of the tactics employed by the Clintons to intimidate and scare these women from coming forward to testify. I appeared frequently on television to discuss my legal cases in this regard. My family and I were also threatened during this period in American history, so much so that I had to retain security guards for my children, my then wife and myself. By the end of the Clinton presidency, although the nation is quick to forget given the poor leadership in the White House since then, Bill and Hillary Clinton had racked up over 40 scandals, been accused of even murdering witnesses and White House Deputy Counsel Vince Foster, and left office in near total disgrace. Hillary Clinton even attempted to steal White House furniture as she left, but had to bring it back after a public outcry. In short, there was no crime that was beneath the Clintons. Bill Clinton was disbarred for 5 years by the Arkansas Bar, and the independent counsel, Robert Ray, stated publicly that he did not pursue criminal charges against Hillary Clinton for lying before a grand jury because it was unlikely that a District of Columbia jury, given its racial and political makeup, would convict her. During this period, I was the only lawyer to have obtained a court ruling, which occurred in the Filegate case before this court, that Bill Clinton had committed a crime when he released publicly the Privacy Act protected files of Kathleen Willey, a woman he

4

has been accused of sexually harassing in the Oval Office after Ms. Willey's then husband had died. So for all of these reasons, I am not a typical trial lawyer, but a very controversial one who was and is seen as a threat to Democrats and persons associated with Bill and Hillary Clinton. I recently had published a book, "Whores: Why and How I Came to Fight the Establishment," which is my auto-biography of sorts. In this book, which was released in October 2009, I am critical of Judge Kollar-Kotelly, among other jurists and politicians and media figures.

7. The Clinton era was a dark period in this nation's history and the country became very polarized. I was and still am seen as a polarizing figure, because I challenge the legal and political establishment in court and in the media, and hold them accountable in other legal ways. Some judges, like Judge Kollar-Kotelly react to this and have a hard time dealing with me.

8. Federal district courts have held that, in theory, a jurist can be disqualified by imputing extra-judicial bias and prejudice toward an attorney to the client. For instance, in one of a series of cases where federal courts have strained not to find the requisite extra-judicial bias and prejudice – in obvious efforts to protect their fellow judges – the Seventh Circuit ruled: "Souder (Souder v. Owens-Corning Fiberglas Corp. 939 F. 2d 647, 653 (8th Cir. 1991) acknowledged, however, that in some circumstances, 'bias against an attorney can reasonably be imputed to a party' (939 F. 2d at 653), and we agree." United States v. Sykes, 7 F. 3d 1331 (7th Cir. 1993). See also United States v. Jacobs, 855 F. 2d 652, 656 (9th Cir. 1988); In re Beard, 811 F. 2d 818, 830 (4th Cir. 1987); United States v. Ritter, 540 F. 2d 459, 462 (10th Cir. 1976); Davis v. Board of Sch. Comm'rs, 517 F. 2d 1044, 1050-51 (5th Cir. 1975).

5

9.   Importantly, in United States v. Jacobs, 855 F. 2d 652 (9th Cir. 1988), while the Ninth Circuit, recognizing that reassignment can be made by the chief judge in the lower tribunal or on its own at the appellate level, ordered reassignment on the case to another trial judge based on a series of legal errors by the tranferor judge and his antipathy toward the appellee counsel. The Ninth Circuit ruled: "…we hold that we must order reassignment to preserve the appearance of justice. Here, the trial judge has (1) dismissed an indictment summarily and erroneously; (2) refused to reassemble the jury when just two minutes later the mistake was discovered; (3) denied the motion for reconsideration after the government had proven no misconduct; (4) allowed the defendants to file an untimely motion  to dismiss; (5) criticized the government's handling of the case in the jury's presence; and(6) offered strategic advice to one of defendant's counsel on how to win his case. On these facts, the gains made for the appearance of justice by reassignment to another judge will outweigh the duplication of time and effort." This reassignment was a way to try to avoid disqualification of this fellow judge, which clearly was warranted, but which his colleagues refused to order to protect him.

10.   In one of the cases at issue here, Sataki v. BBG et. al, Plaintiff and her counsel, me,  requested reassignment of the case, in order to try to avoid having to file this motion under 28 U.S.C. 144, since it regrettably clear that disqualification is rarely if ever ordered given the realities of our court system. Reassignment was requested from Judge Kollar-Kotelly herself, or if she would not order reassignment, then through the chief judge of this court, the Honorable Royce C. Lamberth. However, rather than timely entertaining the motion, Judge Kollar-Kotelly "hung back" and denied the motion on the same day that she refused and failed to grant Plaintiff's motion for preliminary injunctive relief. Given that

6

Plaintiff, Ms. Elham Sataki, had simply requested that the status quo be preserved by allowing her to return to work and be paid during the period of her convalescence from severe sexual harassment by an employee of and retaliation by the defendant agency, and that she was emotionally and physically disabled as a result, this act by Judge Kollar-Kotelly – creating law of the case before Plaintiff and her counsel could even file a motion to disqualify – rises to such a level of legal abuse that it manifests that extra-judicial bias and prejudice against them, particularly when analyzed in the context of the other prejudicial acts of this jurist. As in the Jacobs case, legal errors and apparently antipathy toward counsel can, when taken as a whole, rise to the level of obvious extra-judicial bias and prejudice. Otherwise, the jurist would not have made these rulings, which cumulatively cannot have been the result of mere inadvertent error. Judges, like every one else in the world, can have a prejudicial bias against a party and his or her lawyer. For the courts to routinely deny that judges are above this is simply not reality; but rather stems from a visceral and inherent desire to protect their own, lest a similar fate someday befall them. Indeed, that was the primary reason that I founded Judicial Watch in 1994; the refusal of judges to police their own misconduct. So while the Jacobs court refused to disqualify the trial judge, at least it transferred the case away from him – a face saving gesture to this jurist.

    11.    28 U.S.C. 144 on its face requires disqualification once a party files a timely and sufficient affidavit, as is occurring herein, and certifies that the motion is filed in good faith. However, typically, jurists who were supposed to enforce this clear cut law cleverly "changed" the Congressional letter of the law and have looked for ways to not disqualify judges. Section 144 was meant as a type of "peremptory" challenge to a judge sitting on a

case or cases, as exists in many states, such as California. It thus can only be used once in a case. However, the law Congress enacted and which remains "on the books" has been misapplied by the judiciary itself through rank "judicial activism". Thus, if this court does not honor the letter of the law in granting this motion to disqualify, I will attempt to take this matter to the Supreme Court.

12.    In the Sataki case, Judge Kollar-Kotelly committed several prejudicial acts, which will be set forth in greater detail later in this affidavit. But in sum, this jurist not only ignored the law, she twisted the facts of the case to such an extent that it could not have been accidental. And, most egregiously, she refused to even allow for an evidentiary hearing or discovery, and weighed and accepted the affidavits of the agency over the affidavits of my client, Ms. Sataki, in denying her temporary relief that would save her life, given that she had to remain in Los Angeles after she suffered a nervous and physical breakdown and was forced into a suicidal state and had to consult her physicians, psychologists and psychiatrists there – where she remains under their care. This conduct was so prejudicial to the fair and impartial administration of justice that a concurrent judicial complaint is being filed against Judge Colleen Kollar-Kotelly. Importantly, Judge Kollar-Kotelly set the factual and legal bar so high for Ms. Sataki to obtain a preliminary injunction ordering her back to work during her period of rehabilitation, and the motion for temporary restraining order before that, that is was impossible for her to prevail. Importantly, when one reads Judge Kollar-Kotelly's previous rulings on temporary relief in other cases, which more suited her left wing Democrat ideological bent – in matters concerning gun rights and Vice President Dick Cheney's official records and the Council for

8

American Islamic Relations-- the factual and legal threshold is much lower, in Judge Kollar-Kotelly's own words. This will be set forth later in this affidavit.

13. The misconduct resulting from extra-judicial bias and prejudice of Judge Kollar-Kotelly toward me, counsel in the three above styled cases, is seen most clearly in Klayman v. Judicial Watch, as case brought by me to enforce my severance agreement with Judicial Watch when I left to run for the U.S. Senate in Florida. In this case, which is on-going, Judge Kollar-Kotelly allowed the ethically compromised Defendants to take discovery into my divorce from my ex-wife, in which she falsely accused me of marital infidelity (well before Judge Kollar-Kotelly ordered the discovery, the allegation had long since been previously retracted by my wife in a consent divorce decree) and allowed an innocent woman, who never had an affair with me, and who has two children and is married, to have her name despicably dragged through the mud. As a non-meritorious defense, Defendants had falsely alleged that I left Judicial Watch involuntarily over this "affair," characterizing Judicial Watch is a family oriented organization (ironically, the two principal directors of Judicial Watch, Messrs. Fitton and Orfanedes, are not "typical" family values conservatives in terms of their lifestyle preferences), despite the fact that the severance agreement itself provides that Mr. Klayman had left voluntarily to pursue other endeavors (see Attachment #1 to Docket Item Np. 14, 1:06-cv-00670-CKK), such as running for the U.S. Senate. Defendants signed and agreed that this was so in the severance agreement. Thus, Judge Kollar-Kotelly allowed for an outrageous and irrelevant and not legally justified fishing expedition into my personal life based on the false assertion by Defendants that had no factual or legal basis for consideration, even simply as a matter of the parol evidence rule. Importantly, Judge Kollar-Kottelly's actions, which were cruel, and

9

vindictive and retaliatory, will someday affect how my young children view their father (and how the innocent woman's children will view her), and serve as a dark reminder of the bridled and arrogant power of some on the federal bench, like Judge Kollar-Kotelly, who choose to use their power for improper ends. This was obvious "payback" for representing the women who had come forward to testify against President Bill Clinton, who had appointed Judge Kollar-Kotelly and to whom she owes her judgeship. As I see it, Judge Kollar-Kotelly, seeing an opportunity to try to harm and smear me, and to hamper me from bringing future lawsuits against her Democratic party and the left wing establishment, seized on the opportunity presented to her. When I asked, at a minimum, that this scurrilous and irrelevant discovery be sealed and kept off the public record, Judge Kollar-Kotelly even denied this reasonable request. So too was the request to enter a protective order to protect from public disclosure confidential business proprietary information, as is the usual course of conduct in cases dealing with business damages. This too was ordered and when I objected and would not put the business proprietary information on the public record, Judge Kollar-Kotelly dismissed most of my case and barred me from presenting evidence on damages. In addition, Judge Kollar-Kotelly also denied a one day or short extension of time during the Christmas holiday season in 2008 and instead proceeding to enter summary judgment against me in part because I could not file the pleadings that were required until a day later after the holiday. In a disingenuous opinion, she then stated falsely that she had reviewed the one day late filing in any event, and still was granting summary judgment – a clever judicial game. After all of this and more, when I asked Judge Kollar-Kotelly to disqualify herself under 28 U.S.C. 455 from further proceedings, this too was denied.

14.     In the Sataki v. BBG case, as set forth in the Memorandum Opinion of July 7, 2010 denying Ms. Sataki's motion for preliminary injunction (See Docket Item No. 63, 1:10-cv-00534-CKK) and her Memorandum Opinion of June 1, 2010 denying Ms. Sataki's motion for temporary restraining order (See Docket Item No. 37, 1:10-cv-00534-CKK), Judge Koller-Kotelly callously stated that government's affidavit testimony is entitled to more weight than the Plaintiff, since it is the government in effect, and then twisted facts to suit her ends. Referenced herein by Docket Item Numbers are the various pleadings of Ms. Sataki and me which set forth the errors of Judge Kollar-Kotelly in not granting the temporary restraining order, which speak for themselves, much as in the Jacobs case.

15.     With regard to the July 7, 2010 Memorandum Opinion (See Docket Item No. 63, 1:10-cv-00534-CKK), Judge Kollar-Kotelly twisted the facts and the law in ways which include but are not limited to:

1.)     ruling falsely at page 3 that Ms. Sataki was attempting to alter the status quo, when she was simply just trying to get the court to order her to be put back to work and be paid for it, as was the case before the sexual harassment and retaliation;

2.)     ruling, in a show of extreme arrogance and legal error toward the American people at page 4, much less employees of the federal government, that "well-established precedent further counsels that this Court should be reluctant to interfere with the personnel decisions of the federal government…" Were this the case, a litigant who is sexually harassed and retaliated against could never prevail as a practical matter, despite established case law in this circuit that a federal district court can step in to prevent harm to the employee as her sexual harassment and related cases go through the administrative process. See Wagner v. Taylor, (836 F.2d 566 (C.A.D.C., 1987)).

11

3.) Manufacturing facts (see page 6) falsely claiming that Ms. Sataki did not contest through affidavits her job duties and capabilities, and thus could not work in the Los Angeles VOA office without supervision and thus an evidentiary hearing is not necessary despite admitted contradictory facts from the parties.

4.) Holding falsely at page 7 that "Importantly, while Plaintiff's job duties occasionally require her to perform her work duties in the field, the record indicates that Plaintiff has always been assigned to the Washington, D.C., duty station; there is no indication that Plaintiff has been detailed to any other office location nor is there any evidence that she has been permitted to work remotely from another location for any extended period of time." This is false and Judge Kollar-Kotelly knew it is false when she based her ruling in large part on this. First, Ms. Sataki's sworn declarations (*See* Sataki v. BBG, et al., Attachment #2 to Docket Item 11, Civil Action No. 10-0534) set forth clearly that she worked out of other locations and did packages from there, including Los Angeles, and that she never asked to be detailed for "an extended period of time." She asked only to be detailed to Los Angeles while she undergoes rehabilitation. Thus, by falsely framing the issue the way the court has, with manufactured facts, Judge Kollar-Kotelly "cooked" the predetermined result she wanted to reach. This is the mark of a dishonest and prejudiced jurist.

5.) At footnote 4 on page 7, Judge Kollar-Kotelly, in what is the most blatant of her falsehoods in the Memorandum Opinion of July 7 2010, holds: "While Plaintiff disputes various statements contained in the Jackson Declaration, the Court emphasizes that she has not disputed the accuracy of her job duties provided in Ms. Jackson's declaration nor provided any evidence on the record that would create a material issue of fact as to

Plaintiff's present job duties as an International Broadcaster." Not only did Ms. Sataki refute these false statements, made by a Defendant in the case (thus she has an interest in not truthfully testifying), but Ms. Sataki swore that she could perform all job functions as an international broadcaster. See 3rd Declaration of Sataki which states as follows:

> "Contrary to Susan Jackson's false declaration, not only do I NOT need constant supervision for the job functions I normally performed at PNN, during my time at the PNN I performed my work very independently and with very minor supervision from my superiors. In fact, quite often I voluntarily assisted fellow co-workers with the performance of their duties. I previously submitted DVD videos of many of the packages I have done for VOA, in which I wrote the script, edited and produced them. I am also submitting as Exhibit EE with this, my third sworn declaration, DVDs of videos of my live, on air appearances on VOA, in which I was a co-host, anchor and did much more than read emails, as Susan Jackson falsely stated in her declaration. I also am submitting a video of an interview I did in Sweden, when I was live by telephone reporting on an international event." (¶ 17);
>
> "I am independently capable of and proficient at researching interviewing, recording, editing, producing and submitting my work to the Washington, D.C. office of VOA, as the videos show. In fact, attached to my prior declarations, and this one, as exhibits, and are several of the "packages" I produced independently from Los Angeles and Sweden. I did many of these interviews without the use of a teleprompter or notes. I am capable of interviewing without aids, based on my memory and expertise." (¶18)
>
> "A simple review of these DVDs of my independent work will evidence that unlike what defendants claim, I am capable of working independently from the Los Angeles office." (¶19)
>
> "Susan Jackson herself wanted me to do packages from LA, as emails I previously filed with the court show. In these emails, Susan Jackson talks about my getting more training, which although I did not need, I got …." (¶ 19)
>
> "As stated in my earlier declarations, prior to the incidents leading to this lawsuit, PNN was in fact considering sending me to Los Angeles to prepare and report back with as many as five interview packages a month." (¶ 24)

See also Tim Shambles Second Declaration ¶¶ 7-8 stating as follows:

"Ms. Sataki's work has been rated by the Agency itself (via the annual performance review process) as satisfactory (we are on a two tier system so satisfactory is the highest rating).  If there were problems with her performance there no was no indication of them before she complained about being sexually harassed. In addition, when she first began to work for VOA, a few years ago, she was on a one year probationary period. If her work had not been good, she would neither been hired in the first place nor been approved for continued employment after her one year probationary period." (¶7.)

"I have been in close professional contact with Ms. Sataki and he supervisors and I never heard any of these supervisors say, orally or in writing, that she was not able to do packages on her own. This claim is recently manufactured." (¶8.)

In addition, Ms. Sataki submitted DVDs of her international broadcasting with her sworn declarations; and the court makes no mention of having reviewed them, as was requested. In short, Judge Kollar-Kotelly creates the facts that she wants to avoid an evidentiary hearing and to rule summarily against a client of Mr. Klayman who is on her medical and financial knees, and who just wants to work in the Los Angeles VOA office while she convalesces – and is not requesting a permanent position there.

6.) It is false as ruled on page 15 that Plaintiff, Ms. Sataki, did not submit and offer to submit medical documentation about her medical condition. Indeed, the court references the uncontested medical reports of Dr. Arlene Aviera and Dr. James Long, who both set forth her medical disabilities and the reasons why she must remain in Los Angeles under their care during the period of her rehabilitation.

7.) At page 18, Judge Kollar-Kotelly falsely states that Ms. Sataki is not receiving treatment from a physician authorized by BBG to handle workplace injuries. This was never a genuine issue in any of the material and so called evidence submitted by BBG to the court. And, Ms. Sataki, using her medical insurance coverage provided by BBG, used

14

authorized physicians such as Dr. Aviera an Dr. Long under this plan, which is Blue Cross/Blue Shield. In any event, this is an issue for an evidentiary hearing on the merits. By twisting and creating facts throughout, Judge Kollar-Kotelly not only denies Ms. Sataki due process, but cooks the result of her factually false and disingenuous decision, which reeks of extra-judicial bias and prejudice.

8.) Attached as Exhibit "1" is a chart setting forth the other mischaracterizations, falsifications and perversion of the facts and the law contained in Judge Kollar-Kotelly's Memorandum Opinion of July 7, 2010. The multitudes of these "errors" could not have been "inadvertent," but the result of extra-judicial bias and prejudice of this jurist toward Ms. Sataki's counsel, which was then imputed to Ms. Sataki herself.

16. Set forth below is how Judge Kollar-Kotelly describes the legal standards for preliminary injunctive relief in cases where her political bent is in favor of the movant, as opposed to in the Sataki case where it is not. See Memorandum Opinion of September 20, 2008, in Citizens for Responsibility and Ethics in Washington, et al. v. Richard B. Cheney (Civil Action No. 08-1548 (CKK)) stating as follows:

> "In assessing whether to grant preliminary injunctive relief, a court must balance four factors: (1) whether the movant is substantially likely to succeed on the merits; (2) whether the movant would suffer irreparable injury if the injunction were not granted; (3) whether an injunction would substantially injure other interested parties; and (4) whether the public interest would be furthered by the injunction. See Mova Pharm. Corp. v. Shalala, 140 F.3d 1060, 1066 (D.C. Cir. 1998) (citing CityFed Fin. Corp. v. Office of Thrift Supervision, 58 F.3d 738, 746 (D.C. Cir. 1995)).
>
> In applying this four-factored standard, district courts employ a sliding scale under which a particularly strong showing in one area can compensate for weakness in another. See City Fed Fin., 58 F.3d at 747. As the Fourth Circuit stated in a case cited approvingly by the D.C. Circuit:

> 'There is a correlation between the likelihood of plaintiff's success and the probability of irreparable injury to him. If the likelihood of success is great, the need for showing the probability of irreparable harm is less. Conversely, if the likelihood of success is remote, there must be a strong showing of the probability of irreparable injury to justify issuance of the injunction.'

Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus. Inc., 889 F.2d 524, 527 (4th Cir. 1989); see Davenport v. Int'l Bhd. of Teamsters, 166 F.3d 356, 366 (D.C. Cir. 1999) (citing Murrow Furniture Galleries with approval).

Further, the D.C. Circuit has explained:

> To justify a temporary injunction it is not necessary that the plaintiff's right to a final decision, after a trial, be absolutely certain, wholly without doubt; if the other elements are present (i.e., the balance of the hardships tips decidedly toward plaintiff) it will ordinarily be enough that the plaintiff has raised substantial questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation.

*Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 81, 844 (D.C. Cir. 1977) (quoting *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir. 1953)). As such, "[o]ne moving for a preliminary injunction assumes the burden of demonstrating either a combination of probable success and the possibility of irreparable injury or that serious questions are raised and the balance of hardships tips sharply in his favor." *Id.* (quoting *Charlie's Girls, Inc. v. Revlon, Inc.*, 483 F.2d 953, 954 (2d Cir. 1973) (per curiam)). Significantly, the D.C. Circuit has concluded that "this approach is entirely consistent with the purpose of granting interim injunctive relief, whether by preliminary injunction or by stay pending appeal" because "such relief is [generally] preventative or protective; it seeks to maintain the status quo pending final determination on the merits of the suit." *Id.*; *see also Ramirez v. U.S. Customs and Border Prot.*, 477 F. Supp. 2d 150, 155, 159 (D.D.C. 2007) (granting preliminary injunction based on balancing of factors as set forth in *Holiday Tours*)."

See also the Memorandum Opinion of March 19, 2009, in Brady Campaign To Prevent Gun Violence, v. Kenneth L. Salazar Civil Action No. 08-2243 (CKK) wherein Judge Koller-Kotelly sets forth the legal standard very leniently, as follows:

16

To obtain preliminary injunctive relief, a moving party must show: (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). In applying this four-factored standard, district courts may employ a sliding scale under which a particularly strong showing in one area can compensate for weakness in another. *Id.* Accordingly, "[i]f the showing in one area is particularly strong, an injunction may issue even if the showings in other areas are rather weak." *Id.* (quoting *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995)). Nevertheless, the D.C. Circuit has advised that a movant must demonstrate "'at least some injury' for a preliminary injunction to issue . . . [because] 'the basis of injunctive relief in federal courts has always been irreparable harm . . . .'" *Id.* (quoting *CityFed*, 58 F.3d at 747; *Sampson v. Murray*, 415 U.S. 61, 88 (1974)).

Defendants raise an argument (albeit in a footnote) that this standard for a preliminary injunction has been circumscribed by the Supreme Court's decision in *Winter v. Natural. Res. Def. Council, Inc.*, __ U.S. __ , 129 S. Ct. 365 (2008). *See* Defs.' Opp'n at 11 n.8. *See also* MSLF Opp'n at 3 (discussing the application of *Winter*). The Court disagrees. In *Winter*, the Supreme Court held that the Court of Appeals for the Ninth Circuit had applied an erroneous legal standard by affirming a district court's preliminary injunction when the plaintiff had only shown a "possibility" of irreparable harm and where the district court had made almost no attempt to analyze the balance of equities and the public interest. *See* 129 S. Ct. at 375, 378.

The Supreme Court found that this standard was too "lenient," and reaffirmed that a preliminary injunction should issue only when "irreparable injury is *likely* in the absence of an injunction." *Id.* (emphasis in original). The Court had no occasion to examine the D.C. Circuit's precedents allowing a plaintiff's strong showing in one area to compensate for weakness in another. *Id.* at 392 (Ginsburg, J., Dissenting) ("courts have evaluated claims for equitable relief on a 'sliding scale,' sometimes awarding relief based on a lower likelihood of harm when the likelihood of success is very high . . . This Court has never rejected that formulation, and I do not believe it does so today."). In any event, because the D.C. Circuit's precedents require a plaintiff to show that "it would suffer irreparable injury if the injunction were not granted," *Chaplaincy*, 454 F.3d. at 297, the Court finds that the D.C. Circuit's sliding-scale standard remains viable even in light of the decision in *Winter*."

In addition in her Memorandum Opinion of November 3, 2009, in Council on

American-Islamic Relations v. Paul David Gaubatz, et al., Civil Action No. 09-2030  Judge

Koller-Kotelly uses a similarly low threshold (which she does not apply to Ms. Sataki) and issues a Temporary Restraining Order to the Plaintiffs on an ex parte basis. In that case Judge Koller-Kotelly sets forth the legal standard, as follows:

> The standard for obtaining injunctive relief through either a temporary restraining order or a preliminary injunction is well established. A moving party must show: (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction. Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006); Hall v. Daschle, 599 F. Supp. 2d 1, 6 n. 2 (D.D.C. 2009) ( "[t]he same standard applies to both temporary restraining orders and to preliminary injunctions"). In applying this four-factored standard, district courts may employ a sliding scale as to which a particularly strong showing in one area can compensate for weakness in another. Id. (quoting City Fed Fin. Corp. v. Off. of Thrift Supervision, 58 F.3d 738, 747 (D.C. Cir. 1995)).

In the Sataki case however, Judge Kollar- Kotelly did not apply the same threshold as applied in the three cases cited above. Rather, in the Sataki case, Judge Koller-Kotelli applied the following heightened standard:

> "The standard for issuance of the 'extraordinary and drastic remedy' of a temporary restraining order or a preliminary injunction is very high, and by now very well established." *RCM Techs., Inc. v. Beacon Hill Staffing Grp., LLC*, 502 F. Supp. 2d 70, 72-73 (D.D.C. 2007) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)). The moving party must show: (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006); *Hall v. Daschle*, 599 F. Supp. 2d 1, 6 n.2 (D.D.C. 2009) ("[t]he same standard applies to both temporary restraining orders and to preliminary injunctions"). The moving party bears the burden of persuasion and must demonstrate, "by a clear showing," that the requested relief is warranted. *Chaplaincy of Full Gospel Churches*, 454 F.3d at297.
>
> In applying this four-factored standard, district courts may employ a sliding scale as to which a particularly strong showing in one area can compensate for weakness in another area. *Id.* (quoting *CityFed Fin. Corp. v. Office of Thrift*

18

*Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995)). Thus, "[a]n injunction may be justified, for example, where there is a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable injury." *CityFed.*, 58 F.3d at 747. Notwithstanding the fluid nature of this familiar four-part inquiry, "[i]t is particularly important for the [movant] to demonstrate a substantial likelihood of success on the merits." *Barton v. District of Columbia*, 131 F. Supp. 2d 236, 242 (D.D.C. 2001) (citing *Benten v. Kessler*, 505 U.S. 1084, 1085 (1992)). If the movant fails to do so, inquiry into the remaining factors is unnecessary, for the injunctive relief must be denied on that ground alone. *See Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d 598, 614 (D.C. Cir.1992) (affirming denial of preliminary injunction where the district court properly concluded that the plaintiff had "no likelihood of success on the merits"); *Katz v. Georgetown Univ.*, 246 F.3d 685, 688 (D.C. Cir. 2001) ("although we apply a four-factor test in weighing a request for a preliminary injunction, such relief never will be granted unless a claimant can demonstrate 'a fair ground for litigation'"); *Taylor v. Resolution Trust Corp.*, 56 F.3d 1497, 1507 (D.C. Cir. 1995) ("Given the inadequacy of [plaintiff]'s prospects for success on the merits, there may be no showing of irreparable injury that would entitle him to injunctive relief."), *amended on other grounds on reh'g*, 66 F.3d 1226 (D.C. Cir. 1995). Applying these standards to the case at hand, the Court finds that Plaintiff has failed to demonstrate that she is entitled to a temporary restraining order on the present record. 12   [Foot Note 12: For this reason, the Court therefore declines to decide whether Plaintiff must meet an even higher burden of proof than outlined above because she is requesting mandatory injunctive relief — i.e., because she seeks to change the status quo through affirmative action rather than to merely preserve the status quo. *See* Defs.' Opp'n at 19 (urging Court to apply higher standard to Plaintiff's request for mandatory relief). This remains an open question in this Circuit. *See Farris v. Rice*, 453 F. Supp. 2d 76, 79 (D.D.C. 2006) (noting that the "D.C. Circuit . . . has not yet adopted or, for that matter, rejected th[e] rule" requiring a movant who seeks a mandatory injunction to meet a higher standard than in the ordinary case). While the Court agrees with Defendants that Plaintiff's request is properly characterized as seeking a mandatory injunction, the Court finds that Plaintiff has failed to show that the requested relief is warranted even under the ordinary standard set forth above. Similarly, although not raised by either party, the Court notes that some courts in this Circuit have also applied a higher standard to motions for preliminary injunctive relief in employment discrimination cases against the federal government. *See, e.g., Jordan v. Evans*, 355 F. Supp. 2d 72, 77 (D.D.C. 2004) (holding that "a plaintiff seeking injunctive relief in a Title VII discrimination action against the federal government must make 'a more stringent showing of irreparable injury' and demonstrate that 'civil rights claims take precedence over the government's interest in making personnel decisions.'") (quoting *Bonds v. Heyman*, 950 F. Supp. 1201, 1212 (D.D.C. 1997), *abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 105 (2002)). It appears, however, that the D.C. Circuit has yet to decisively resolve this issue. Accordingly, because the Court finds — as indicated above —

19

that Plaintiff fails to meet the traditional showing required, it need not determine at this time whether a higher standard should apply for this reason as well.

In one of the cases with a lower threshold, as set forth above in Council on American-Islamic Relations v. Paul David Gaubatz, et al., Civil Action No. 09-2030, Judge Kollar-Kotelly even grants the moving party, CAIR, an ex parte temporary restraining order without sufficient notice to the Defendants, and held a hearing to boot. Importantly, Defendants were two authors who write for WorldNetDaily. Mr. Klayman is a columnist for WorldNetDaily, a conservative internet publication that is seen by the left as an enemy.

17.   For all of the reasons set forth above and in the referenced Dockets and Exhibit, Judge Kollar-Kotelly has demonstrated an extra-judicial bias and prejudice against Mr. Klayman and his clients and must respectfully be disqualified.

FURTHER AFFIANT SAYETH NOT.

Sworn to with my personal knowledge and belief under penalty of perjury.

            Respectfully submitted,

            Larry Klayman ///
            Larry Klayman, Esq. (DC Bar No. 334581)
            KLAYMAN LAW FIRM
            2000 Pennsylvania Avenue, N.W., Suite 345
            Washington, D.C. 20006
            Tel: 310-595-0800
            Email – leklayman@yahoo.com
            Attorney for Plaintiff