# Exhibit B

# JUDICIAL COUNCIL OF THE DISTRICT OF COLUMBIA CIRCUIT
## COMPLAINT OF JUDICIAL MISCONDUCT OR DISABILITY

E. Barrett Prettyman U.S. Courthouse
333 Constitution Avenue, N.W.
Washington, D.C. 20001-2866
202-216-7340

This form should be completed and mailed to the above address to the attention of the "Circuit Executive". The envelope should be marked "JUDICIAL MISCONDUCT COMPLAINT" or "JUDICIAL DISABILITY COMPLAINT". Do not put the name of the judge or magistrate judge on the envelope.

The "Rules for Judicial-Conduct and Judicial-Disability Proceedings", adopted by the Judicial Conference of the United States, contain information on what to include in a complaint (Rule 6), where to file a complaint (Rule 7), and other important matters. Your complaint (this form and the statement of facts) should be typewritten and must be legible.

**Number of copies.** If the complaint is about a single judge of the court of appeals, submit three copies of this form, the statement of facts, and any documents. If it is about a single district court judge, magistrate judge, or bankruptcy judge, four copies must be filed. If the complaint is about more than one judge, enough copies must be filed to provide one for the clerk of the court, one for the chief judge of the circuit, one for each judge complained about, and one for the Chief Judge of the District Court if the subject judge is a district judge.

1.  Complainant's Name:   Larry Klayman

    Address:   2020 Pennsylvania Ave. NW, Suite 800, Washington, D.C. 20006

    Telephone:   (310) 595 - 0800

2.  Judge or Magistrate Judge complained about:

    Name:   Hon. Colleen Kollar-Kotelly

    Court:   U.S. District Court for the District of Columbia

3.  Does this complaint concern the behavior of the judge(s) or magistrate judge(s) in a particular lawsuit or lawsuits?   ⊙ Yes   ○ No

    If "yes" give the following information about each lawsuit (use reverse side if more than one):

    Court:   Please see "Attachment A," which is hereby incorporated by reference.

    Case number:   Please see "Attachment A," which is hereby incorporated by reference.

    Are (were) you a party or lawyer in the lawsuit?
    ⊙ Party       ⊙ Lawyer       ○ Neither

If a party, give the following information:

Lawyer's Name:     Larry Klayman, Pro Se

Address:     2020 Pennsylvania Ave. NW, Suite 800, Washington, D.C. 20006

Telephone:     (310)   595  – 0800

Docket number(s) of any appeals of above case(s) to the Court of Appeals, D.C. Circuit:

Tooley v. Napolitano, No. 07-5080 (D.C. Cir.)

4.     Have you filed any lawsuits against the judge or magistrate judge?

⦿ Yes     ◯ No

If "yes" give the following information about each lawsuit (use the reverse side if more than one)

Court:     Please see "Attachment A," which is hereby incorporated by reference.

Case number:     Please see "Attachment A," which is hereby incorporated by reference.

Present status of lawsuit:     Please see "Attachment A," which is hereby incorporated by reference.

Your lawyer's name:     Larry Klayman, Pro Se

Address:     2020 Pennsylvania Ave. NW, Suite 800, Washington, D.C. 20006

Telephone:     (310)   595  – 0800

Court to which any appeal has been taken in the lawsuit against the judge:   Please see "Attachment A"

Docket number of the appeal:   Please see "Attachment A," which is hereby incorporated by reference.

Present status of the appeal:   Please see "Attachment A," which is hereby incorporated by reference.

5.     **Brief Statement of Facts**.  Using the next page of this form and up to four additional double-sided pages (8.5 x 11") as necessary, submit a brief statement of the specific facts on which the claim of judicial misconduct or disability is based.  Include what happened, when and where it happened, and any information that would help an investigator check the facts.  If the complaint alleges judicial disability, also include any additional facts that form the basis of that allegation.  See Rule 6 (a) for further information on what to include in your statement of facts.

**Declaration and Signature:**

☒     I declare under penalty of perjury that the statements made in this complaint are true and correct to the best of my knowledge.

Signature: _____          Date:  4/6/15

ATTACHMENT A

Question 3: Does this complaint concern the behavior of the judge(s) or magistrate judge(s) in a particular lawsuit or lawsuits?

- *Tooley v. Bush, et al.,* No. 06-00306 (D.D.C)

- *Klayman v. Judicial Watch*, No. 15-214 (D.D.C.)

- *Klayman v. Judicial Watch*, No. 06-670 (D.D.C.)

- *Strange v. Islamic Republic of Iran*, No. 14-435 (D.D.C)

- *Sataki v. Broadcasting Board of Governors*, *et. al.*, No. 10-0534 (D.D.C.)


Question 4: Have you filed any lawsuits against the judge or magistrate judge?

- *Klayman v. Kotelly*: U.S. District Court for the District of Columbia (No. 1:11-cv-01775). Case was dismissed.

- *Klayman v. Kotelly*: Appeal to D.C. Circuit of District Court decision (No. 12-5340). Appeal was affirmed.

- *In Re: Larry Klayman*: Pet. for Writ of Mandamus before the before D.C. Circuit (13-5258). Petition for writ of mandamus was denied.

- *In Re: Larry Klayman*: Pet. for Writ of Mandamus before the U.S. Supreme Court (No. 14-444). Petition for writ of mandamus was denied.

ATTACHMENT B

Dear Ladies and Gentlemen:

I am filing this complaint against the Honorable Colleen Kollar-Kotelly of the U.S. District Court for the District of Columbia.  Judge Kollar-Kotelly has engaged in serious unethical conduct unbecoming of a federal judge, including but not limited to her actions in suppressing evidence of illegal and unconstitutional actions by U.S. intelligence agencies and failing to take required judicial action. This complaint arises out of newly discovered evidence of wrongdoing that exposes the extent of Judge Kollar-Kotelly's unethical conduct, based on her actions toward a former client of mine, Scott Tooley. Because of this new evidence against Judge Kollar-Kotelly, my previous complaints against her have also been validated and must respectfully be reexamined by this Council.  One such judicial complaint arose out of her conduct against my former client, Elham Sataki, and her prejudicial treatment of me in a lawsuit that I am involved with against the group I founded and my former employer, Judicial Watch.  I was also regrettably forced to file another judicial complaint against Judge Kollar-Kotelly just last year, when she refused to recuse herself from a case despite a clear conflict of interest that existed based on the fact that I am counsel for plaintiffs at the same time that I had a pending lawsuit against Judge Kollar-Kotelly.

The new evidence against Judge Kollar-Kotelly is shocking. James Risen, a reporter for The New York Times, published a recent book entitled *Pay Any Price: Greed, Power, and Endless War*.  Risen, James, *Pay Any Price: Greed, Power, and Endless War*, Houghton Mifflin, 2014.  Within this book, Risen tells of how Judge Kollar-Kotelly severely harmed and in effect destroyed the lives of whistleblowers who had come forward because of the vastly unconstitutional actions of U.S. intelligence agencies.  Judge Kollar-Kotelly served on the Foreign Intelligence Surveillance Court ("FISC") from 2002-2009, and, while acting as chief judge, was directly responsible for overseeing the judicial branch's involvement with these agencies in ensuring that they were following the law.  Judge Kollar-Kotelly repeatedly suppressed evidence and denied justice to my client, Mr. Tooley, as well as many other whistleblowers. This evidence validates Mr. Tooley's allegations in his lawsuit.

Specifically, Mr. Tooley was a plaintiff in a lawsuit against the Secretary of the Department of Homeland Security and other agencies of the United States. *See Tooley v. Bush*, et al., No. 06-cv-00306 (D.D.C).  This case was assigned to Judge Kollar-Kotelly in 2006, four years after she had begun her tenure with the FISC.  Tooley had filed suit against the federal government because they (a) unlawfully wiretapped his home; (b) conducted unlawful surveillance of him in violation of the First and Fourth Amendments; (c) improperly placed him on a terrorist watch list; (d) placed a Radio Frequency Identification Tag ("RFIT") on his vehicle; and (f) unlawfully refused to provide information properly requested by him pursuant to the Freedom of Information Act, 5 U.S.C. § 552.

Judge Kollar-Kotelly, the chief judge of the FISC at the time of this lawsuit, was well aware of the illegal surveillance that the National Security Agency ("NSA") and other agencies were carrying out. Illegal wiretapping of U.S. citizens was clearly going on, and it was going on against Tooley. However, Judge Kollar-Kotelly, without bases, incredibly ruled that this illegal surveillance and other actions against Tooley were not believable.  Despite her in-depth knowledge of the practices of U.S. intelligence agencies, Judge Kollar-Kotelly dismissed this lawsuit, ruling that Tooley's allegations were "hypothetical and conjectural." (*See* Exhibit 1).  In her memorandum opinion, Judge Kollar-Kotelly falsely claimed that none of these allegations were real, even though she had intimate knowledge of the intelligence programs and their illegal actions that were occurring at the very same time. *Id.*  The D.C. Circuit at first reversed the District Court's decision, finding that based on the law of the time, Tooley had properly pled several causes of action.  Indeed, Judge Kollar-Kotelly had no reason to dismiss Tooley's complaint at the time that she did.  Judge Kollar-Kotelly simply wanted to sweep the complaint under the rug in order to get rid of it because I was Tooley's attorney.  It was only on rehearing, after the U.S. Supreme Court released its decision in *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), that the D.C. Circuit affirmed the District Court's decision, en banc. *See Tooley v. Napolotano*, 586 F.3d 1006, 1010 (D.C. Cir. 2009).

As we now know, the allegations made by Tooley have been confirmed by whistleblowers such as Edward Snowden and others. It was clear from her conduct that Judge Kollar-Kotelly was biased against

Tooley because she had an under the table deal of some sort with the intelligence agencies and I was his counsel. She was no longer there to uphold the law but was just working with the intelligence agencies and The White House to perpetuate illegal and unconstitutional actions against U.S. citizens.  This action by Judge Kollar-Kotelly violates Canon 1 of the Code of Conduct for United States Judges, which states: "A judge should uphold the integrity and independence of the judiciary." It further states, "An independent and honorable judiciary is indispensable to justice in our society. A judge should maintain and enforce high standards of conduct and should personally observe those standards, so that the integrity and independence of the judiciary may be preserved. The provisions of this Code should be construed and applied to further that objective." Judge Kotelly was not upholding the independence of the judiciary but was instead simply "rubber stamping" the actions of the intelligence agencies and The White House to the detriment of Tooley and the whistleblowers, and retaliating against me.

One such whistleblower who confirmed these unconstitutional actions was Diane Roark, who served on the House Intelligence Committee from 1985 to 2002, and was assigned to handle oversight of the NSA.  Roark uncovered the NSA's illegal domestic surveillance practices and was shocked to learn it was not a "rogue operation" but was instead an authorized program.  Roark approached Judge Kollar-Kotelly to inform her about the illegal programs.  Risen discloses the illegal conduct as follows:

> Since the purpose of the Bush administration's warrantless wiretapping program was to avoid the legal process established by the Foreign Intelligence Surveillance Act of 1978 – and to skirt the secret court established by that law-Roark assumed that Kollar-Kotelly would be outraged when she learned about the secret program. So Roark called Kollar-Kotelly's Washington office and left a message with her secretary, identifying herself and asking for a meeting to discuss "an illegal NSA program." The judge's secretary called Roark back to tell her that the judge could not meet her or discuss the matter with her. Chillingly, the secretary added that the judge had called the Justice Department to inform officials there that Roark was asking questions, and that Roark should expect a call from a Justice Department lawyer. Roark was horrified and believed that Judge Kollar- Kotelly had betrayed her. Later, a Justice Department lawyer did call Roark, but, suspecting a trap, she refused to talk to him. What Roark did not realize was that Kollar-Kotelly had been told about the program by The White House, and she had agreed to keep the fact that the NSA was going around her own court a secret, even from the other judges on the court. When the NSA program later became public, one of the other FISA court judges, James Robertson, resigned in protest.

(*See* Exhibit 2). Judge Kollar-Kotelly, instead of aiding a whistleblower in upholding the rule of law, decided instead to inform the Justice Department in an attempt to silence Roark's revelations about these illegal activities. This is a violation of the Code of Judicial Conduct of Canon 3 which states, "A judge should perform the duties of the office fairly, impartially and diligently . . . A judge should be faithful to, and maintain professional competence in, the law and should not be swayed by partisan interests, public clamor, or fear of criticism . . . A judge should accord to every person who has a legal interest in a proceeding, and that person's lawyer, the full right to be heard according to the law. Canon 3(C)(1)(e) states that a judge should recuse herself if "the judge has served in a governmental employment and in that capacity participated as a judge (in a previous judicial position), counsel, advisor, or material witness concerning the proceeding or has expressed an opinion concerning the merits of the particular case in controversy." As head of the FISC, Judge Kollar-Kotelly had an official duty to protect the interests upon which the FISC was created. This official duty, in large part, was to prevent illegal surveillance against American citizens. It was clear that Judge Kollar-Kotelly was not there to uphold the U.S. Constitution, as she had sworn to do, but was rather simply doing the bidding of the intelligence agencies, as instructed by The White House.  Roark later was interrogated by the FBI, who had accused her of leaking information to Risen for his previous book, *State of War*.  Having now been turned in by Judge Kollar-Kotelly and accused of leaking national security secrets, Roark's house was raided by the FBI in 2007.  Risen at p. 258. For over five hours Roark's home was "picked apart" and her computer and other information were seized. Risen at p. 259.  As Risen stated, "[t]hey took fifteen boxes filled with Roark's belongings, made her sign

for it, and then left." *Id.* These actions had a devastating effect on her.  Roark was diagnosed with breast cancer at the same time that she was being targeted by the FBI and the DOJ.  *Id.* Due to the actions of Judge Kollar-Kotelly Roark's life was left in shambles.  She was battling breast cancer at the same time that she was battling charges of wronging by the federal government that could have sent her to prison. *Id.*

Roark was not the only whistleblower who had her life ruined. Others who had a connection with Roark were also targeted.  Bill Binney and Ed Loomis were programmers who were working in the NSA to "bring the NSA kicking and screaming into the digital age." Risen at p. 237.  Binney had become familiar with Roark through her role as a member of the House Intelligence Committee, and had informed her about the NSA's unconstitutional, warrantless, wiretapping program. Roark arranged a meeting with Binney, Loomis, and Richard Burr, a member of the House Intelligence Committee wherein they told Burr everything they had known about the illegal wiretapping. Risen at p. 245. Thomas Drake was employed by the NSA and had, like Roark, realized that the NSA was illegally conducting warrantless wiretapping of U.S. citizens. Risen at p. 252-524.  Drake met privately with House intelligence subcommittees and explained about the illegal actions that were occurring but was disappointed when the subcommittees did not act on his information. *Id.* Judge Kollar-Kotelly's betrayal of Roark and the American citizenry directly caused a chain reaction which led to severe harm on these individuals.

Binney, Loomis, and Drake, following the FBI's interrogation of Roark, were all targeted by the federal government because "the FBI believed that they had conspired together to reveal all that they knew about the NSA domestic surveillance program to the <u>New York Times.</u>" Risen at p. 259.  They all had their homes raided and were faced with criminal prosecution. This had a devastating effect on these individuals. After Loomis' home was raided he felt so betrayed and was so traumatized that his wife left him.  He withdrew from his friends and family out of shame and embarrassment.  Drake's wife was pressured by the NSA to cooperate and talked to the FBI about her husband.  Because of the effects of the investigation Drake and his wife became separated.

These actions by Judge Kollar-Kotelly and the FISC were so unethical and illegal that a federal judge, the Honorable James Robertson, felt ethically bound to resign from the FISC out of protest. Risen at p. 246.  Judge Robertson recognized the unconstitutional nature of the FISC and could not actively participate in its actions.  His actions demonstrate the extent of the wrongdoing by Judge Kollar-Kotelly of the FISC that she was presiding over and indicate the serious nature of the illegal and unethical conduct that was occurring.

As was true with the prior ethics complaints, for example see 14-M-352, Judge Kollar-Kotelly's negative treatment of Tooley was also because I was representing him.  Judge Kollar-Kotelly's actions have demonstrated a pattern of conduct that is continuing from the time when she presided over two lawsuits involving me. Given the newly discovered evidence of Judge Kollar-Kotelly's wrongdoing, this conduct, and the judicial complaints that arose out of it, must respectfully be reexamined.

The first lawsuit involved an action wherein I was representing Elham Sataki, a Persian television broadcaster for Voice of America ("VOA"), who had been subjected to incessant harassment and retaliation in the workplace. As a result of the unremitting abuse, Ms. Sataki took a short leave from the VOA offices in the District of Columbia to visit her family and friends in Los Angeles ("LA"). While on leave, VOA management continued to retaliate against Ms. Sataki through threatening, intimidating, and offensive emails, which ultimately caused Ms. Sataki to suffer a severe nervous breakdown, forcing her to seek immediate urgent medical care.  Thereafter, I filed suit on behalf of Ms. Sataki (*Sataki v. Broadcasting Board of Governors, et. al.*, Civil Action No. 10-0534 (D.D.C.))

Since Ms. Sataki required ongoing medical treatment, I sought a temporary restraining order ("TRO") requesting that Ms. Sataki be detailed to the LA office of VOA so that she could continue to seek treatment in LA without losing her job. Without any legal basis or reason, Judge Kollar-Kotelly denied the TRO and a subsequent preliminary injunction, directly causing Ms. Sataki to lose her job while continuing to suffer from the emotional trauma of having been sexually harassed and retaliated against in the workplace.

Judge Kollar-Kotelly not only denied this TRO and preliminary injunction, but also completely disregarded binding constitutional provisions by blatantly violating Ms. Sataki's due process rights

throughout the case. Specifically, Judge Kollar-Kotelly, again unreasonably and without justification, refused to hold an evidentiary hearing, denied Ms. Sataki the ability to adequately conduct discovery through depositions and, instead, summarily accepted the government's affidavits while rejecting every affidavit submitted by Ms. Sataki. I moved for reconsideration setting forth in excruciating detail, fourteen pages of all the jurist's factual and legal errors, to no avail as Judge Kollar-Kotelly denied the motion without any consideration of the merits. (*See* Exhibit 3). The number and extent of errors was so numerous and significantly, negatively impacting that, clearly, they were not unintentional, but rather, calculated to harm Ms. Sataki, an innocent victim of Judge Kollar-Kotelly's animus and, unfortunately, me.

For an experienced jurist, like Judge Kollar-Kotelly, to refuse to hold an evidentiary hearing, deny a party's right to conduct discovery, and then prevent Ms. Sataki from working at the VOA offices in LA so she could obtain necessary medical treatment, underscores the extreme prejudice involved here. An unbiased jurist would have undoubtedly maintained the status quo in order to avoid the damaging consequences that resulted, causing Ms. Sataki to fall into emotional, physical, psychological, and financial ruin, prolonging what her doctors diagnosed as a "Major Depressive Disorder" that could ultimately result in suicide.

The second lawsuit involving Judge Kollar-Kotelly involved a lawsuit I had brought against my former employer, Judicial Watch, based on a breach of a severance agreement. *See Klayman v. Judicial Watch*, No. 06-670 (D.D.C.). As provided by the severance agreement, I left Judicial Watch in a manner that "shall be treated for all purposes as a voluntary resignation," to "pursue other endeavors." In fact, I was praised and paid a considerable sum in "recognition of [his] leadership and contribution to the founding and development of Judicial Watch." Subsequently, in an effort to prevent me from returning to Judicial Watch, it initiated a public smear campaign against me by accusing me of infidelity with a married woman with children during my marriage and falsely asserted that the infidelity was the reason I left Judicial Watch.

Given the private and confidential nature of my divorce proceeding, particularly since children were involved, I requested a protective order to prevent disclosure of personal and business proprietary information. Judge Kollar-Kotelly denied my request without any reason and instead ordered the release of this information, as well as a deposition of my ex-wife, which were not only irrelevant but was also barred by the Parol Evidence Rule. In addition, Judge Kollar-Kotelly unwarrantedly dismissed a great deal of my case after precluding me from presenting crucial and convincing evidence. As a result of Judge Kollar-Kotelly's unwarranted fishing expedition into my personal and private life, which was intended to publicly smear me, the release of this information also caused unnecessary and great harm to an innocent woman and her children, as well as my own children and family, who were needlessly made part of the smear campaign.

The malicious and outrageous actions against me were intended for the sole purpose of destroying me while significantly tarnishing and damaging my credibility, reputation and legal rights. Judge Kollar-Kotelly had facilitated, encouraged, and perpetuated these acts and was complicit in the collective character assassination against me as a result of her own personal vendetta.

I subsequently filed a Motion to Disqualify Judge Kollar-Kotelly, along with a fourteen page affidavit setting forth, in excruciating detail, Judge Kollar-Kotelly's legal and factual errors and apparent bias and prejudice. Exhibit 3. Pursuant to 28 U.S.C. § 144, Judge Kollar-Kotelly was required to accept the allegations on the affidavit as true, and was to "proceed no further within." 28 U.S.C. § 144. Rather than disqualifying herself, however, Judge Kollar-Kotelly defiantly denied the motion, and unjustly and prejudicially proceeded with the action.

On April 15, 2014, I was once again forced to file a judicial complaint on behalf of my clients, whom are plaintiffs in the case *Strange v. Islamic Republic of Iran*, No. 14-435 (D.D.C 2014), against the Judge Kollar-Kotelly. Given her bias and prejudice towards me, and the fact I had a lawsuit pending which had named her as a defendant, *See Klayman v. Kotelly*, No. 13-7017 (D.C. Circuit)*,* I asked Judge Kollar-Kotelly to recuse herself from the case. Despite a conflict of interest that she had created by remaining on the case, Judge Kollar-Kotelly refused to recuse herself again. We attached the affidavit of renowned ethics expert Ronald Rotunda, which set forth clearly the reasons why Judge Kollar-Kotelly's unethical conduct amounts to a conflict of interest, in which she must immediately recuse herself. (*See* Exhibit 4). However,

as she has done in the past, Judge Kollar-Kotelly refused to recuse herself. This conduct violates Canon 2 of Conduct for United States Judges, which states: "A judge should avoid impropriety and the appearance of impropriety in all activities." It further states, "A judge should respect and comply with the law and should act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary . . . A judge should not allow family, social, political, financial, or other relationships to influence judicial conduct or judgment. A judge should neither lend the prestige of the judicial office to advance the private interests of the judge or others nor convey or permit others to convey the impression that they are in a special position to influence the judge. A just should not testify voluntarily as a character witness." The commentary for Canon 2A states, "An appearance of impropriety occurs when reasonable minds, with knowledge of all the relevant circumstances disclosed by a reasonable inquiry, would conclude that the judge's honesty, integrity, impartiality, temperament, or fitness to serve as a judge is impaired. Public confidence in the judiciary is eroded by irresponsible or improper conduct by judges. A judge must avoid all impropriety and appearance of impropriety. This prohibition applies to both professional and personal conduct. A judge must expect to be the subject of constant public scrutiny and accept freely and willingly restrictions that might be waived as burdensome by the ordinary citizen." Here, there can be no greater appearance of impropriety. Judge Kollar-Kotelly has flat out refused to recuse herself from all lawsuits I have been involved with and at the same time has been punishing my clients and me every chance she gets.

Since that time, I recently filed a new lawsuit against Judicial Watch, stemming from its tortious conduct against me. This lawsuit was filed in the District of Columbia Superior Court, as there were no grounds for jurisdiction in federal court. Judicial Watch immediately filed a notice of removal and is attempting to remove this case to federal court so that it will be before Judge Kollar-Kotelly. *See Klayman v. Judicial Watch*, No. 15-cv-214 (D.D.C.). Judicial Watch has seen that Judge Kollar-Kotelly is friendly toward it and biased against me and is doing whatever it can to keep the new lawsuit in front of her. Removal was improper and frivolous under the "forum defendant rule," 28 U.S.C. § 1441 (b)(2). Under 28 U.S.C. § 1441 (b)(2), "[a] civil action otherwise removable solely on the basis of ... [diversity of citizenship jurisdiction] may not be removed if any of the parties in interest properly joined and  served as defendants is a citizen of the State in which such action is brought." 28 U.S.C. § 1441 (b)(2). (*See Exhibit* 5). Judicial Watch was a District of Columbia corporation, and was thus a "forum defendant," making removal clearly improper. Nevertheless, despite having fully briefed this motion over a month ago, Judge Kollar-Kotelly has refused to rule on the motion for remand that I filed, yet another violation of Judicial Conduct of Canon 3 which states, "A judge should perform the duties of the office fairly, impartially and diligently." It is clear she is once again attempting to hold on to this case so that she may impose further harm on me.

Given the extensive ethical violations, I am regrettably once again forced to file a judicial complaint against Judge Kollar-Kotelly. It has been made abundantly clear, on many occasions, that Judge Kollar-Kotelly is not acting in a manner consistent with that of a federal judge. She has committed a continuing pattern of very serious ethical violations and this conduct must be stopped and remedied. For this reason, I ask this Judicial Council to once again investigate the conduct of Judge Kollar-Kotelly. Further, because of the newly discovered evidence I am once again asking this Judicial Council to reexamine the prior complaints against Judge Kollar-Kotelly, as they have now been validated by the evidence brought forth by James Risen and whistleblowers such as Diane Roark, Edward Snowden, and others.

Thank you for your time. Please do not hesitate to call me if you have any further questions regarding this matter. I request a meeting with this Council concerning this complaint and I respectfully reserve the right to supplement this record.

Sincerely,

Larry Klayman
(310) 595-0800

Dated: April 6, 2015

Exhibit 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SCOTT TOOLEY,

    Plaintiff,

    v.

PRESIDENT GEORGE W. BUSH, *et al.*,

    Defendants.

Civil Action No. 06-306 (CKK)

**MEMORANDUM OPINION**
(December 21, 2006)

    Plaintiff Scott Tooley has brought a somewhat opaque four-count Complaint before this

Court. As initially brought, Plaintiff's Complaint appeared to assert three claims, Count I

(Constitutional Tort - Fourth Amendment Violation); Count II (Constitutional Tort - Right to

Privacy Violation); and Count III (First Amendment Violations), against a total of six defendants

– President George W. Bush, Vice President Richard B. Cheney, Attorney General Alberto

Gonzales, Secretary of the Department of Homeland Security Michael Chertoff, Administrator of

the Transportation Security Administration Edmund ("Kip") Hawley, and former head of the

National Security Agency, General Michael Hayden. Counts I, II and III of Plaintiff's Complaint

are asserted against President Bush, Vice President Cheney, and General Hayden solely in their

individual capacities, while the same claims are asserted against Attorney General Gonzales,

Secretary Chertoff, and Administrator Hawley in both their individual and official capacities. In

addition, Count IV of Plaintiff's Complaint (Declaratory Judgment: FOIA Requests) seeks

declaratory judgment against Attorney General Gonzales, Secretary Chertoff, and Administrator

Hawley in their official capacities, based on Freedom of Information Act ("FOIA") requests filed

with these defendants' respective agencies.

On November 30, 2006, the Court issued an Order pursuant to Federal Rule of Civil Procedure 4(m) requiring Plaintiff to inform the Court as to whether he had served any of the six named defendants in their individual capacities. In response, on December 15, 2006, Plaintiff filed a Notice of Voluntary Dismissal Without Prejudice, indicating that he had decided not to proceed with claims against any defendants in their individual capacities at this time, and was instead voluntarily dismissing this action against all defendants in their individual capacities. *See* Pl.'s Resp. to Rule 4(m) Order and Notice of Voluntary Dismissal Without Prejudice as to Individual Defendants. As such, the only remaining defendants to this action are Attorney General Gonzales, Secretary Chertoff, and Administrator Hawley (collectively "Defendants"), who are sued, solely in their official capacities, on all four Counts of Plaintiff's Complaint.[1] Presently before the Court is Defendants' motion for summary judgment as to Plaintiff's FOIA Count, and to dismiss Plaintiff's other three Counts pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of jurisdiction. Upon a searching review of the pleadings filed by Defendants and Plaintiff, the attached memoranda, declarations, and exhibits, and the relevant case law, the Court shall grant Defendants' motion for summary judgment as to Count IV of Plaintiff's Complaint, and shall grant the Defendants' motion to dismiss as to Counts I, II, and III of Plaintiff's Complaint.

---

[1] The Court notes that Defendants' Motion and supporting Memoranda indicate that they are brought on behalf of Attorney General Gonzales, Secretary Chertoff, and Administrator Hawley, solely in their official capacities, and as such describe them as the "Official Capacity Defendants." However, in light of Plaintiff's December 15, 2006 voluntary dismissal as to all individual capacity defendants, the Court shall refer to Attorney General Gonzales, Secretary Chertoff, and Administrator Hawley collectively as "Defendants."

# I: BACKGROUND

A.    *Events Leading Up to Plaintiff's Filing of His FOIA Request*

Plaintiff, Scott Tooley, was born in Nebraska and currently resides in Louisville, Kentucky.  Tooley Aff. ¶¶ 1-2.  Plaintiff holds a Bachelor of Science degree, as well as a Juris Doctor degree, and was previously employed on Capitol Hill as the Systems Administrator for former Congressman and current Chairman of the Securities and Exchange Commission, Christopher Cox.  *Id.* ¶ 2.  During the Spring of 2002, Plaintiff telephoned Southwest Airlines ("Southwest") to purchase airline tickets.  Compl. ¶ 18.  After providing his name, address, and credit card number, Plaintiff was asked whether he had any "comments, questions, or suggestions for Southwest Airlines."  *Id.*  In response to this question, Plaintiff stated that as a member of the traveling public, he would like "100 percent of everything that goes into the airplane, including cargo, to be fully screened."  Tooley Aff. ¶ 4; Compl. ¶ 19.  Plaintiff was asked why such a course of action was necessary and responded that the traveling public, including Plaintiff himself, "was less safe due to the potential that those who wish to harm American citizens could put a bomb on a plane."  Tooley Aff. ¶ 5; Compl. ¶ 20.

Plaintiff alleges that thereafter – specifically in the Fall of 2003 – he began to notice what he describes as problematic phone connections, including "telltale" intermittent clicking noises, which continued through the filing of his Complaint.  Compl. ¶ 21.  Plaintiff alleges "upon information and belief" that his telephone problems are caused by illegal wiretaps, which were placed in response to the comments Plaintiff made while booking his flight with Southwest Airlines.  *Id.*  Indeed, Plaintiff alleges (also upon information and belief) roving wiretaps were

placed on "his residential landline phone; his landline phone at his former Virginia Beach residence; his cellular phone; his wife's cellular phone; his father's phone; his brother's phone; his sister's phone; his in-laws' phone; and his family's phone in Lincoln, Nebraska where relatives from France made calls from France to the home, where [Plaintiff] was visiting his mother for the week." *Id.* ¶ 22.

Plaintiff's Complaint states that "Defendant Bush has admitted that, on numerous occasions since 2001, he ordered wiretaps and other domestic surveillance on American citizens . . . " and alleges upon "information and belief [that] Defendant Cheney also ordered the wiretaps and other domestic surveillance on American Citizens." *Id.* ¶ 38. Plaintiff states that "[u]pon information and belief, those wiretaps have been ordered without the issuance of a warrant by a court of appropriate jurisdiction . . . ," *id.* ¶ 39, and that "Defendant Bush's eavesdropping order also did not fall within any legislative exception to established legal procedure," *id.* ¶ 42. Plaintiff alleges that "Defendants jointly and severally conceived, ordered, and implemented the illegal wiretapping scheme," Compl. ¶ 45, and that "[u]pon information and belief, [Plaintiff] is one of the victims of Defendants' highly secret and illegal wiretapping scheme," *id.* ¶ 47.

In addition to alleging that he has been the subject of wiretaps, upon information and belief, Plaintiff further alleges that his vehicle and his wife's vehicle have both been "illegally subjected to permanent Radio Frequency Identification Tags ("RFIT") that monitor their vehicle movements." *Id.* ¶ 23. Plaintiff's Complaint alleges that when Plaintiff travels by airplane, he is improperly detained and subject to a strict search "without any probable cause." *Id.* ¶ 24. In his Affidavit, submitted in support of his Opposition to Defendant's motion to dismiss and for summary judgment, Plaintiff provides further detail, averring that in July 2004 he was subjected

to a "degrading and unreasonable search" at Omaha, Nebraska's Eppley Airfield, in which his name was broadcast over the PA system as someone who needed further screening, and a TSA officer thereafter pulled him aside and, in full view of Plaintiff's fellow passengers, asked Plaintiff to expose the area above his groin and subjected Plaintiff to a backhanded pat-down. Tooley Aff. ¶ 14. Plaintiff states that these detentions and strict searches have occurred every time he traveled prior to filing this suit. *Id.* ¶ 15.

Plaintiff's Affidavit adds further allegations not included in Plaintiff's Complaint, specifically that in March 2005, during the week preceding and the week of a visit by President Bush to Louisville, Kentucky, "an officer in a Ford Crown Victoria sat out in front of [Plaintiff's] home for approximately six (6) hours a day. *Id.* ¶ 19. Plaintiff also alleges in his Affidavit that in March 2006, he was subjected to physical monitoring and roving wiretaps during a trip to Fort Worth, Texas for his brother's wedding. *Id.* ¶ 16. Moreover, Plaintiff's Complaint and Affidavit state that he believes that "he has been placed on one or more terrorist watch lists and is being illegally monitored by Defendants" as a result of his comments to the Southwest ticketing agent. Compl. ¶ 25; Tooley Aff. ¶ 13.

   B.    *Plaintiff Files His FOIA Request*

In an effort to obtain information concerning what he perceives as improper governmental surveillance, on October 3, 2005, Plaintiff submitted requests under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 522, to the Department of Justice ("DOJ"), the Department of Homeland Security ("DHS"), and the Transportation Security Administration ("TSA"). Compl. ¶¶ 26-27; Off. Capacity Defs.' Stmt. of Mat. Facts as to Which There is No Genuine Issue (hereinafter "Defs.' Stmt. of Mat. Facts") ¶ 1. Plaintiff's FOIA requests sought "all filings,

correspondence, memoranda, documents, reports, records, statements, audits, lists of names,

applications, diskettes, letters, expense logs and receipts, calendar or diary logs, facsimile logs,

telephone records, call sheets, tape records [sic], video recordings, notes, examinations, and/or

referenced opinions, folders, files, books, manuals, pamphlets, forms, drawings, charts,

photographs, electronic mail, and any other documents or things that refer to . . . Scott Tooley."

Defs.' Stmt. of Mat. Facts ¶ 2 (citing Hardy Decl., Ex. A at 2-3 (10/3/05 FOIA Request to DOJ);

Kendrick Decl., Att. 1 at 1-2 (10/3/05 FOIA Request to DHS); and Pavlick Decl., Ex. A at 2-3

(10/3/05 FOIA Request to TSA)).

### 1. Plaintiff's FOIA Request to DOJ

Plaintiff addressed his FOIA request to DOJ to the FOIA/PA Referral Unit of the Justice

Management Division ("JMD"), Defs.' Stmt. of Mat. Facts; Defs.' Mot. to Dismiss/Summ. J.,

Ex. A (5/1/06 Decl. of David M. Hardy) (hereinafter "Hardy Decl."), Ex. A at 2-3 (10/3/05 FOIA

Request to DOJ), which routed Plaintiff's FOIA request to three components of DOJ: the Federal

Bureau of Investigation ("FBI"); the Executive Office of United States Attorneys ("EOUSA");

and DOJ's Criminal Division, *see id.* at 1 (JMD Routing Slip).

### a. The FBI

The FBI received Plaintiff's FOIA request from JMD on October 25, 2005.  Hardy Decl.

¶ 5.  Thereafter, the FBI searched for records potentially responsive to Plaintiff's FOIA request

by searching its Central Records System ("CRS").  Defs.' Stmt. of Mat. Facts ¶ 8 ; Hardy Decl. ¶

19.  The CRS is the system by which the FBI maintains all information acquired in the course of

fulfilling its law enforcement responsibilities, including "administration, applicant, criminal,

personnel, and other files compiled for law enforcement purposes, arranged by subject matter."

6

Defs.' Stmt. of Mat. Facts ¶ 9; Hardy Decl. ¶ 8.  The CRS is accessed through the General

Indices, which includes entries, arranged in alphabetical order, that fall into two categories: (a)

"main" entries, which carry names corresponding with a subject of a file contained in the CRS;

and (b) "reference" entries, which are mentions or references to an individual or organization

contained in documents located in another "main" entry.  Defs.' Stmt. of Mat. Facts ¶¶ 10-11;

Hardy Decl. ¶¶ 9-10, 14.  The FBI searched the CRS General Indices for Plaintiff's name, using

fifteen different combinations of his first, middle, and last names, as well as his date of birth and

Social Security number.  Defs.' Stmt. of Mat. Facts ¶ 15; Hardy Decl. ¶ 19.  This search failed to

locate any main investigatory files responsive to Plaintiff's FOIA request at FBI headquarters.

Defs.' Stmt. of Mat. Facts ¶ 16; Hardy Decl. ¶ 19.

       In a letter dated October 28, 2005, the FBI notified Plaintiff that its search of the CRS at

FBI headquarters had located no documents responsive to Plaintiff's FOIA request, and that

Plaintiff could appeal the FBI's "no records" response in writing to the DOJ's Office of

Information and Privacy within sixty (60) days.  Defs.' Stmt. of Mat. Facts ¶¶ 17-18; Hardy Decl.

¶ 6; Hardy Decl., Ex. B (10/28/05 letter from D. Hardy to L. Klayman).  As of March 15, 2006,

DOJ had no record of receiving an administrative appeal from Plaintiff with regard to the FBI's

October 28, 2005 "no records" response.  Defs.' Stmt. of Mat. Facts ¶ 24; Hardy Decl. ¶ 7.

Nevertheless, upon receiving Plaintiff's Complaint in this litigation, the FBI opted to a conduct a

second search, this time searching the CRS for cross-references.  Defs.' Stmt. of Mat. Facts ¶ 19;

Hardy Decl. ¶ 20.  This second search also failed to locate any main files or cross-references

responsive to Plaintiff's FOIA request at FBI headquarters.  Defs.' Stmt. of Mat. Facts ¶ 20;

Hardy Decl. ¶ 20.  In addition, after receiving Plaintiff's Complaint, the FBI conducted a search

of its Electronic Surveillance ("ELSUR") indices, which are a separate system of records from

the CRS containing information on individuals who are or were (1) targets of direct surveillance;

(2) participants in monitored conversations; or (3) owners, leasers, or licensors of premises where

the FBI conducted electronic surveillance.  Defs.' Stmt. of Mat. Facts ¶¶ 21-22; Hardy Decl. ¶¶

16, 20.  The FBI's search of the ELSUR indices also failed to locate any records responsive to

Plaintiff's FOIA request.  Defs.' Stmt. of Mat. Facts ¶ 23; Hardy Decl. ¶ 20.

       *b.*    *EOUSA*

     EOUSA received Plaintiff's FOIA request from JMD on October 26, 2005.  Defs.' Stmt.

of Mat. Facts ¶ 25; Mot. of the Off. Capacity Defs. to Dismiss and for Summ. J. (hereinafter

"Defs.' Mot. to Dismiss/Summ. J."), Ex. B (4/25/06 Decl. of Anthony J. Ciccone) (hereinafter

"Ciccone Decl.") ¶ 4; Ciccone Decl., Ex. 1 (10/25/05 JMD Routing Slip).  By letter dated

November 8, 2005, EOUSA informed Plaintiff that it had received his FOIA request, and advised

Plaintiff that "[s]ince the files . . . of United States Attorneys are located in more than 100

separate offices throughout the country, we ask that you identify the specific U.S. Attorney's

office(s) where you believe the requested records exist.  This would primarily be the district(s) in

which prosecution or litigation occurred . . . .  Once you have corrected the above deficiencies,

please submit a new request for the documents."  Defs.' Stmt. of Mat. Facts ¶ 28; Ciccone Decl.

¶ 12 & Ex.3 (11/8/05 letter from M. O'Rourke to L. Klayman) (emphasis in original).  EOUSA's

request for clarification was made pursuant to DOJ regulation, 28 C.F.R. § 16.3(b), which states

that "[i]f a component determines that your request does not reasonably describe records, it shall

tell you . . . so that you may modify it to meet the requirements of this section."  Defs.' Stmt. of

Mat. Facts ¶ 26; Ciccone Decl. ¶ 10.  EOUSA's November 8, 2005 letter also informed Plaintiff

that EOUSA considered the letter to be a final determination and that Plaintiff could appeal

EOUSA's determination in writing within sixty (60) days to the DOJ's Office of Information and

Privacy.  Defs.' Stmt. of Mat. Facts ¶ 29; Ciccone Decl., Ex. 3 (11/8/05 letter from M. O'Rourke

to L. Klayman).  EOUSA has not received either a response to its deficiency notice or a

superseding request from Plaintiff, nor does EOUSA have a record that Plaintiff filed an

administrative appeal within 60 days of the November 8, 2005 deficiency notice.  Defs.' Stmt of

Mat. Facts ¶¶ 30-31; Ciccone Decl. ¶¶ 13-14.

c.    <em>DOJ Criminal Division</em>

JMD referred Plaintiff's FOIA request to the DOJ Criminal Division on October 25,

2005.  Defs.' Stmt. of Mat. Facts ¶ 32; Defs.' Mot. to Dismiss/Summ. J., Ex. C (4/20/06 Decl. of

Kathy Hsu) (hereinafter "Hsu Decl.") ¶ 4 n.1; Hsu Decl., Ex. 1 (10/25/05 JMD Routing Slip).  By

letter dated November 22, 2005, the Criminal Division acknowledged receipt of Plaintiff's FOIA

request and informed Plaintiff that the Criminal Division was unable to search for the records

Plaintiff requested because Plaintiff had not furnished, as required by 28 C.F.R. § 16.41, a

Privacy Act Identification and Request Form or a current descriptive list of the systems of

records that Plaintiff wished searched.  Defs.' Stmt. of Mat. Facts ¶¶ 33-34; Hsu Decl. ¶ 5; Hsu

Decl., Ex. 2 (11/22/05 letter from T. McIntyre to L. Klayman).  The Criminal Division enclosed

the forms necessary to remedy these deficiencies with its November 22, 2005 letter, and

informed Plaintiff that his request would be closed.  Hsu Decl. ¶ 5; Hsu Decl., Ex. 2 (11/22/05

letter from T. McIntyre to L. Klayman).  The Criminal Division's November 22, 2005 letter

further informed Plaintiff that when the Criminal Division received Plaintiff's completed forms

his request would be reopened under a different number, and that if Plaintiff chose to treat the

9

November 22, 2005 letter as a denial of his FOIA request he could appeal the denial in writing

within sixty (60) days to the DOJ Office of Information and Privacy.  *Id.*

By letter dated December 21, 2005, Plaintiff returned the forms to the Criminal Division,

indicating that he wanted the Criminal Division to search four systems of records for records

responsive to his FOIA request.  Defs.' Stmt. of Mat. Facts ¶¶ 35-36; Hsu Decl. ¶¶ 6, 10; Hsu

Decl., Ex. 3 (12/21/05 letter from L. Klayman to T. McIntyre).  The Criminal Division

acknowledged receipt of the information provided by Plaintiff in a letter dated January 27, 2006,

Defs.' Stmt. of Mat. Facts ¶ 37; Hsu Decl. ¶ 7; Hsu Decl., Ex. 4 (1/27/06 letter from T. McIntyre

to L. Klayman), and subsequently searched the four systems of records identified by Plaintiff,

Defs.' Stmt. of Mat. Facts ¶ 38; Hsu Decl. ¶ 11.  The Criminal Division also searched an

additional system of records, which is searched as a matter of course when the Criminal Division

receives a request for records relating to any individual requester, and further requested that the

Counterterrorism Section of the Criminal Division conduct a search for records responsive to

Plaintiff's FOIA request.  Defs.' Stmt. of Mat. Facts ¶¶ 39-40; Hsu Decl. ¶¶ 9, 11.  None of these

searches identified any records responsive to Plaintiff's FOIA request, and the Criminal Division

so advised Plaintiff in a letter dated March 21, 2006.  Defs.' Stmt. of Mat. Facts ¶¶ 41-42; Hsu

Decl. ¶¶ 8, 13; Hsu Decl., Ex. 5 (3/21/06 letter from T. McIntyre to L. Klayman).

### 2.    *Plaintiff's FOIA Request to DHS*

DHS responded to Plaintiff's FOIA request on October 5, 2005, advising Plaintiff that

"[DHS] does not maintain a central index of records based on individual names," and that as a

result DHS could not conduct an adequate search based on the information provided by Plaintiff

in his FOIA request.  Defs.' Stmt. of Mat. Facts ¶¶ 45-46; Defs.' Mot. to Dismiss/Summ. J., Ex.

D (4/17/06 Decl. of J. Anthony Kendrick) (hereinafter "Kendrick Decl.") ¶ 8; Kendrick Decl.,

Ex. 2 (10/5/05 letter from C. Papoi to L. Klayman). DHS' October 5, 2005 letter requested that

Plaintiff provide DHS with additional information, including "the DHS component agency you

believe created and/or controls the records, the time period that you believe the records or files

were created and the purpose for which the records were created." Kendrick Decl., Ex. 2

(10/5/05 letter from C. Papoi to L. Klayman). DHS further advised Plaintiff that if he provided

the information described in the October 5, 2005 letter within sixty (60) days, DHS would

undertake a search for responsive records; if, however, Plaintiff did not respond within sixty (60)

days, DHS would administratively close Plaintiff's FOIA request. Defs.' Stmt. of Mat. Facts ¶

47; Kendrick Decl. ¶ 8; Kendrick Decl., Ex. 2 (10/5/05 letter from C. Papoi to L. Klayman).

DHS has no record of receiving any further communication from Plaintiff. Defs.' Stmt. of Mat.

Facts ¶ 48; Kendrick Decl. ¶ 8.

> 3. *Plaintiff's FOIA Request to TSA*

TSA acknowledged Plaintiff's FOIA request by letter dated October 4, 2005. Defs.'

Stmt. of Mat. Facts ¶ 49; Defs.' Mot. to Dismiss/Summ. J., Ex. E (5/1/06 Decl. of Catrina M.

Pavlick) (hereinafter "Pavlick Decl.") ¶ 6; Pavlick Decl., Ex. C (10/4/05 letter from C. Pavlick to

L. Klayman). On October 5, 2005, TSA's FOIA Officer, Catrina M. Pavlick, contacted

Plaintiff's counsel, Larry Klayman, via telephone to discuss the scope of the request and to obtain

more information about Plaintiff's association or contacts with TSA, in order to focus TSA's

search for responsive records. Defs.' Stmt. of Mat. Facts ¶ 50; Pavlick Decl. ¶ 7. Mr. Klayman

told Pavlick that Plaintiff believed himself to be on a TSA watch list as a result of comments he

made to a Southwest Airlines representative and confirmed that Plaintiff sought any TSA record

indicating that Plaintiff was on a TSA watch list. Pavlick Decl. ¶ 7. Based on this conversation,

Pavlick understood that Mr. Klayman had narrowed the scope of Plaintiff's FOIA request, and

TSA accordingly limited its initial search to records concerning the appearance of Plaintiff's

name on a TSA watch list. *Id.* ¶¶ 7, 15; Defs.' Stmt. of Mat. Facts ¶¶ 51-52.

By letter dated November 14, 2005, TSA denied Plaintiff's request for expedited

processing, and further advised Plaintiff that he was required to justify his request for a fee

waiver based on six factors provided in the DHS FOIA regulation within ten days or his fee

waiver would be denied. Pavlick Decl. ¶ 8; Pavlick Decl., Ex. D (11/14/05 letter from C. Pavlick

to L. Klayman). Plaintiff did not provide the requested fee waiver justification, and TSA

therefore denied his fee waiver request. Pavlick Decl. ¶ 8. Plaintiff appealed TSA's denial of his

request for a fee waiver and expedited treatment in a letter dated December 6, 2005, reiterating

that he believed immediate action was necessary regarding his FOIA request. Defs.' Stmt. of

Mat. Facts ¶ 54; Pavlick Decl. ¶ 9; Pavlick Decl., Ex. E (12/6/05 letter from L. Klayman to C.

Pavlick).

On December 7, 2005, TSA contacted Mr. Klayman via telephone, advised him that the

TSA Office of the Ombudsman provides a watch list clearance protocol, and directed him to the

TSA website so that Plaintiff could initiate the clearance process. Defs.' Stmt. of Mat. Facts ¶

55; Pavlick Decl. ¶ 10. TSA subsequently officially responded to Plaintiff's FOIA request by

letter dated December 8, 2005, in which TSA neither confirmed nor denied the existence of any

records pertaining to Plaintiff on any TSA watch list, pursuant to 49 U.S.C. § 114(s) and 49

C.F.R. § 1520.15. Defs.' Stmt. of Mat. Facts ¶ 56; Pavlick Decl. ¶ 11; Pavlick Decl., Ex. F

(12/8/05 letter from C. Pavlick to L. Klayman). TSA's December 8, 2005 letter also advised

12

Plaintiff again of the TSA Office of the Ombudsman watch list clearance protocol and provided

contact information for that office. Defs.' Stmt. of Mat. Facts ¶ 57; Pavlick Decl. ¶ 11; Pavlick

Decl., Ex. F (12/8/05 letter from C. Pavlick to L. Klayman).  By letter dated January 4, 2006,

TSA responded to Plaintiff's appeal of TSA's denial of his requests for fee waiver and expedited

processing by informing Plaintiff that it had responded to Plaintiff's FOIA request on December

8, 2005 and that there was no fee associated with processing his request.  Defs.' Stmt. of Mat.

Facts ¶ 62; Pavlick Decl. ¶ 12; Pavlick Decl., Ex. G (1/4/06 letter from C. Pavlick to L.

Klayman).

Plaintiff appealed TSA's December 8, 2005 response to his FOIA request by letter dated

February 7, 2006.  Defs.' Stmt. of Mat. Facts ¶ 63; Pavlick Decl. ¶ 13; Pavlick Decl., Ex. H

(2/7/06 letter from J. Goodman to D. Callen).  Plaintiff appealed on two grounds: (1) that TSA's

refusal to confirm or deny whether Plaintiff is on a watch list was unresponsive because

Plaintiff's FOIA request was not limited to information concerning watch lists; and (2) that, even

if the request encompassed information concerning TSA watch lists, Plaintiff was entitled to such

information because he believed he was improperly placed on a watch list.  *Id.*  Based on

Plaintiff's appeal, TSA initiated a more extensive search for responsive records by identifying ten

offices that were most likely to have records concerning members of the general public and

requesting that those offices search for responsive documents.  Defs.' Stmt. of Mat. Facts ¶¶ 64-

65; Pavlick Decl. ¶ 16.  These offices included: Executive Secretariat, Office of Chief Counsel,

Legislative Affairs, Office of Transportation Security Intelligence, Operations and Technical

Training Divisions, Internal Affairs, Office of Human Capital, Security Operations, Office of

Threat Assessment and Credentialing ("TTAC"), and the Office of the Ombudsman.  Defs.'

Stmt. of Mat. Facts ¶ 66; Pavlick Decl. ¶ 16.

Eight of these ten offices failed to locate any documents responsive to Plaintiff's FOIA request, while two of the ten offices – the Office of the Ombudsman and TTAC – each located a record that may be responsive to Plaintiff's request. Defs.' Stmt. of Mat. Facts ¶¶ 67-68; Pavlick Decl. ¶¶ 17-18. However, TSA could not determine whether the potentially responsive records pertained to Plaintiff because the personal information provided by Plaintiff on his DOJ Certification of Identity Form did not match the identifying information contained in the potentially responsive records. Defs.' Stmt. of Mat. Facts ¶¶ 68-70; Pavlick Decl. ¶ 18.

On April 24, 2006, TSA responded to Plaintiff's February 7, 2006 letter by affirming TSA's initial determination to neither confirm nor deny the existence of records indicating whether Plaintiff is on a TSA watch list, thus denying Plaintiff's appeal in part. Defs.' Stmt. of Mat. Facts ¶ 71; Pavlick Decl. ¶ 14; Pavlick Decl., Ex. I (4/24/06 letter from T. Miller to L. Klayman). TSA's April 24, 2006 letter also granted in part Plaintiff's appeal as to the scope of the records searched, and informed Plaintiff that TSA's FOIA office had conducted a new search for records responsive to Plaintiff's FOIA request. Defs.' Stmt. of Mat. Facts ¶ 72; Pavlick Decl. ¶ 14; Pavlick Decl., Ex. I (4/24/06 letter from T. Miller to L. Klayman). TSA told Plaintiff that its new search had revealed two potentially responsive documents, but that TSA was unable to ensure that the potentially responsive records pertained to Plaintiff and that to mistakenly release the documents could constitute a violation of the Privacy Act, 5 U.S.C. § 552a(b). *Id.* As such, TSA requested that Plaintiff provide to TSA: (1) any addresses used by Plaintiff during June 2004; and (2) information concerning any contacts Plaintiff had initiated with TSA, including the offices contacted, the general subject matter of the contact, and the approximate date range. *Id.*

14

TSA requested that Plaintiff provide TSA with this information by November 27, 2006, Pavlick

Decl., Ex. I (4/24/06 letter from T. Miller to L. Klayman); however, in connection with its

motion for summary judgment, TSA continued to assert that if Plaintiff provided the additional

requested information to TSA in a timely manner, TSA would ascertain whether the potentially

responsive records relate to Plaintiff and release all reasonably segregable non-exempt portions

of such documents to Plaintiff, Defs.' Stmt. of Mat. Facts ¶ 73.

      C.     *Plaintiff's Filing of His Complaint and Subsequent Events*

      Plaintiff filed his four-count Complaint with this Court on February 21, 2006.  Count IV

of Plaintiff's Complaint alleges that he properly filed FOIA requests with DOJ, DHS and TSA

and that all three agencies have improperly "refused to turn over the requested documents,

refused to grant expedited processing, and refused to consider any fee waivers."  Compl. ¶¶ 77-

81.  The other three Counts of Plaintiff's Complaint relate to his allegations regarding

Defendants' alleged wiretapping and physical surveillance of Plaintiff and Plaintiff's allegedly

improper placement on TSA watch lists.  Count I asserts that Defendants have violated the

Fourth Amendment to the United States Constitution, Compl. ¶¶ 49-57; Count II asserts that

Defendants have deprived Plaintiff of his fundamental right to privacy, Compl. ¶¶ 58-66; and

Count III asserts that Defendants have deprived Plaintiff of his rights under the First Amendment

to the United States Constitution by retaliating against him for comments he made to a Southwest

Airlines employee, Compl. ¶¶ 67-76.

      On May 1, 2006, Defendants filed a motion to dismiss and for summary judgment.

Defendants assert that their respective agencies responded to Plaintiff's FOIA request, that none

of their agencies improperly withheld documents, and that as a result they are entitled to

summary judgment on Count IV of Plaintiff's Complaint. Defs.' Mot. to Dismiss/Summ. J. at 2-20. In addition, Defendants argue that, if this Court concludes that Counts I, II, and III of Plaintiff's Complaint were brought against Defendants, those Counts should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1) because Plaintiff lacks Article III standing with respect to those claims. *Id.* at 21-35. Plaintiff filed his Opposition and Memorandum of Law in Opposition to the Motion of the Official Capacity Defendants – Alberto Gonzales, Michael Chertoff, and Edmund Hawley – to Dismiss Under 12(b)(1) and for Summary Judgment (hereinafter "Pl.'s Opp'n.") on September 1, 2006. Plaintiff's Opposition clarifies that he intended to bring all four Counts of his Complaint against Attorney General Gonzales, Secretary Chertoff, and Administrator Hawley in their official capacities, stating that his "claims against Gonzales, Chertoff, and Hawley properly are construed as claims against their respective agencies . . . for their concerted and coordinated acts in approving, administering, and participating in the monitoring and surveillance of Plaintiff, in violation of his Constitutional rights." Pl.'s Opp'n. at 14. Plaintiff's Opposition further asserts that Defendants are not entitled to summary judgment on Plaintiff's FOIA claim, *id.* at 25-40, and that Plaintiff has met the requirements for Article III standing, *id.* at 11-25. Defendants filed their Reply in Support of Motion of the Official Capacity Defendants to Dismiss and for Summary Judgment (hereinafter "Defs.' Reply") on October 16, 2006.

## II: LEGAL STANDARDS

A.     *Motion for Summary Judgment Under the FOIA*

In reviewing a motion for summary judgment under the FOIA, the Court must conduct a *de novo* review of the record. *See* 5 U.S.C. § 552(a)(4)(B). In the FOIA context, "*de novo*

review requires the court to 'ascertain whether the agency has sustained its burden of demonstrating that the documents requested are not "agency records" or are exempt from disclosure under the FOIA.'"  *Assassination Archives & Research Ctr. v. Cent. Intelligence Agency*, 334 F.3d 55, 57 (D.C. Cir. 2003) (quoting *Summers v. Dep't of Justice*, 140 F.3d 1077, 1080 (D.C. Cir. 1998)).

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A genuine issue of material fact exists only when there is sufficient evidence such that a reasonable juror could find for the party opposing the motion. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 251-42, 106 S. Ct. 2505, 91 L. Ed.2d 202 (1986). Furthermore, entry of summary judgment is mandated against a party if, after adequate time for discovery and upon motion, the party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). FOIA cases are typically and appropriately decided on motions for summary judgment. *Miscavige v. Internal Revenue Serv.*, 2 F.3d 366, 368 (11th Cir. 1993); *Rushford v. Civiletti*, 485 F. Supp. 477, 481 n.13 (D.D.C. 1980).  Under FOIA, all underlying facts and inferences are analyzed in the light most favorable to the FOIA requester; as such, only after an agency seeking it proves that it has fully discharged its FOIA obligations is summary judgment appropriate. *Moore v. Aspin*, 916 F. Supp 32, 35 (D.D.C. 1996) (citing *Weisberg v. Dep't of Justice*, 705 F.2d 1344, 1350 (D.C. Cir. 1983)).  The agency bears the burden of demonstrating that its search was

adequate and in good faith. *Tarullo v. Dep't of Defense*, 170 F. Supp. 2d 271, 274 (D. Conn. 2001). A good faith search effort uses methods that can be reasonably expected to produce the information requested. *See Ogelsby v. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990).

As a general rule, an agency must make its records available to a requester under the FOIA with some exceptions. *See* 5 U.S.C. §§ 552(a)(3) & (b). The FOIA contains nine statutory exemptions under which the Government may properly withhold requested information. *Id.* § 552(a)(4)(B). The agency must demonstrate the validity of any exemption that it asserts. *See id.*; *Beck v. Dep't of Justice*, 997 F.2d 1489, 1491 (D.C. Cir. 1993) ("[c]onsistent with the purpose of the Act, the burden is on the agency to justify withholding requested documents"). An agency seeking to withhold information must provide a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply. *King v. Dep't of Justice*, 830 F.2d 210, 219 (D.C. Cir. 1987). The submission of an agency declaration that describes the withheld material with reasonable specificity as well as the reasons for nondisclosure may satisfy the Government's burden. *See Campbell v. Dep't of Justice*, 164 F.3d 20, 30 (D.C. Cir. 1998). The justifications cannot be conclusory, merely reciting statutory standards, vague, or sweeping. *King*, 830 F.2d at 219. However, "summary judgment may be granted solely on the basis of agency affidavits provided that they are clear, specific, and reasonably detailed, and there is no contradictory evidence of agency bad faith." *W. Ctr. for Journalism v. Internal Revenue Serv.*, 116 F. Supp. 2d 1, 7 (D.D.C. 2000) (citing *Hayden v. Nat'l Sec. Agency*, 608 F.2d 1381, 1387 (D.C. Cir. 1979)); *Miller v. Casey*, 730 F.2d 773, 776 (D.C. Cir. 1984).

      **B.**      *Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(1)*

A court must dismiss a case when it lacks subject matter jurisdiction pursuant to Rule 12(b)(1).  In general, a motion to dismiss under Federal Rule of Civil Procedure 12(b) should not prevail "unless plaintiffs can prove no set of facts in support of their claim that would entitle them to relief."  *Kowal v. MCI Commc'ns. Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994) (citing *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).  A court may appropriately dispose of a case under 12(b)(1) for standing, and may "consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts."  *Coalition for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003) (citations omitted); *see also Artis v. Greenspan*, 223 F. Supp. 2d 139, 152 n.1 (D.D.C. 2002) ("A court may consider material outside of the pleadings in ruling on a motion to dismiss for lack of venue, personal jurisdiction or subject matter jurisdiction."); *Vanover v. Hantman*, 77 F. Supp. 2d 91, 98 (D.D.C. 1999) ("where a document is referred to in the complaint and is central to plaintiff's claim, such a document attached to the motion papers may be considered without converting the motion to one for summary judgment") (citing *Greenberg v. The Life Ins. Co. of Virginia*, 177 F.3d 507, 515 (6th Cir. 1999)).  At the stage in litigation when dismissal is sought, the plaintiff's complaint must be construed liberally, and the plaintiff should receive the benefit of all favorable inferences that can be drawn from the alleged facts. *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).  In spite of the favorable inferences that a plaintiff receives on a motion to dismiss, it remains the plaintiff's burden to prove subject matter jurisdiction by a preponderance of the evidence.  *Am. Farm Bureau v. Envtl. Prot. Agency*, 121 F. Supp. 2d 84, 90 (D.D.C. 2000).

# III: DISCUSSION

Defendants have filed a motion seeking summary judgment as to Plaintiff's FOIA Count as well as dismissal pursuant to Federal Rule of Civil Procedure 12(b)(1) of Plaintiff's Counts alleging Constitutional torts based on defendants' allegedly improper wiretapping, surveillance activities, and placement of Plaintiff on TSA watch lists. Plaintiff opposes both portions of Defendants' motion. In addressing Defendants' motion, the Court shall consider the issues in the order in which they are raised by Defendants – first considering their motion for summary judgment as to Count IV (FOIA), before turning to their motion to dismiss Count I (Fourth Amendment), Count II (Right to Privacy), and Count III (First Amendment).

A.    *Motion for Summary Judgment as to Count IV (FOIA) of Plaintiff's Complaint*

The Freedom of Information Act requires federal agencies, in responding to a request for information, to: (1) conduct an adequate search for that information through reasonable efforts; (2) provide the information to the requester, unless it falls within a FOIA exemption; and (3) provide to a requester any information that can reasonably be segregated from the exempt information. 5 U.S.C. § 552(a)(3); 5 U.S.C. § 552(b). In determining the adequacy of a FOIA search, the Court is guided by principles of reasonableness. *Ogelsby*, 920 F.2d at 68. To obtain summary judgment on the issue of the adequacy of the records search, an agency must show "viewing the facts in the light most favorable to the requester, that . . . [it] has conducted a 'search reasonably calculated to uncover relevant documents.'" *Steinberg v. Dep't. of Justice*, 23 F.3d 548, 551 (D.C. Cir. 1994) (quoting *Weisberg v. Dep't of Justice*, 745 F.2d 1476, 1485 (D.C. Cir. 1984)). To meet its burden, the agency may submit affidavits or declarations that explain both in reasonable detail and in a non-conclusory fashion the scope and method of the agency's

20

search. *Perry v. Block*, 684 F.2d 121, 126 (D.C. Cir. 1982). In the absence of contrary evidence,

such affidavits or declarations are sufficient to demonstrate an agency's compliance with the

FOIA. *Id.* at 127. An agency must show that it made a "good faith effort to conduct a search for

the requested records, using methods which can be reasonably expected to produce the

information requested." *Ogelsby*, 920 F.2d at 68; *see Campbell*, 164 F.3d at 27. An agency's

search need not be exhaustive, merely reasonable. *See W. Ctr. for Journalism*, 116 F. Supp. 2d at

8 (citing *Shaw v. Dep't of State*, 559 F. Supp. 1053, 1057 (D.D.C. 1983)).

Defendants' motion for summary judgment asserts that their respective agencies – DOJ,

DHS, and TSA – have all conducted reasonable searches, have not withheld agency records from

Plaintiff, and have therefore fulfilled their obligations under the FOIA. Defs.' Mot. to

Dismiss/Summ. J. at 1. Plaintiff does not respond to Defendants' arguments regarding DOJ,

other than to assert that the FBI's search may not have been adequate, Pl.'s Opp'n. at 40, but

does argue that summary judgment is inappropriate as to DHS' and TSA's responses to

Plaintiff's FOIA request, *id.* at 25-39.[2] Based primarily on the declarations filed by Defendants

in support of their motion for summary judgment, the Court finds that Defendants have met the

standard for summary judgment by demonstrating that each of their respective agencies

---

[2] Plaintiff also fails to respond to Defendants' assertions that Plaintiff's requests for expedited processing and for a fee waiver are moot in light of their respective agencies' responses to Plaintiff's FOIA request. The Court agrees with Defendants that Plaintiff's request for expedited processing is mooted by the agencies' responses, *see Landmark Legal Found. v. Envtl. Prot. Agency*, 272 F. Supp. 2d 59, 62 (D.D.C. 2003) (finding that challenge regarding expedited processing did not preclude summary judgment because the "only question . . . is whether the agency finally conducted a reasonable search, and whether its withholdings are justified."), and also that Plaintiff's request for a fee waiver is moot because none of the agencies charged Plaintiff any fees, *see Hall v. Cent. Intelligence Agency*, 437 F.3d 94, 99 (D.C. Cir. 2006).

conducted reasonable searches and did not improperly withhold agency records from Plaintiff. The Court shall therefore grant Defendants' motion for summary judgment as to Count IV of Plaintiff's Complaint.

>     1.      *DOJ's Reponse to Plaintiff's FOIA Request*

Upon receiving Plaintiff's FOIA request, DOJ's FOIA/PA Mail Referral Unit of the Justice Management Division ("JMD") routed Plaintiff's request to the FBI, EOUSA, and the Criminal Division.  Hardy Decl., Ex. A (JMD Routing Slip).  Defendants maintain that all three components of DOJ "responded to plaintiff's request in a manner fully compliant with the requirements of FOIA" and that, as a result, "plaintiff can seek no relief against the Attorney General arising from their responses."  Defs.' Mot. to Dismiss/Summ. J. at 4.

>     a.      *The FBI*

Plaintiff's Opposition states that "while the FBI may have been somewhat more thorough than the other agency defendants, an adequate search may not have been conducted."  Pl.'s Opp'n. at 40.  Plaintiff does not explain why he believes the FBI's search "may not have been" adequate, beyond suggesting that "numerous public disclosures and news reports" indicate that the FBI's "database is not 'centralized'" and that "much of the relevant information is likely to be contained within local field offices."  *Id.*  However, as Defendants correctly argue, Plaintiff's failure to exhaust his administrative remedies with respect to the FBI's response to his FOIA request is fatal to his attempt to challenge that response in front of this Court.  Moreover, even if Plaintiff had exhausted his administrative remedies as required, the Declaration of David M. Hardy, which Defendants submitted in support of their motion for summary judgment, demonstrates that the FBI's search in response to Plaintiff's FOIA request was adequate and

reasonable.[3]

Upon receiving Plaintiff's FOIA request, the FBI searched for responsive records via the CRS, by searching for fifteen different combinations of Plaintiff's first, middle, and last names, as well as his date of birth and Social Security number. Defs.' Stmt. of Mat. Facts ¶¶ 8-9; Hardy Decl. ¶¶ 8, 19. The FBI notified Plaintiff that this search failed to locate any responsive records, and alerted Plaintiff to the fact that he could appeal the FBI's "no records" response in writing within sixty (60) days. Defs.' Stmt. of Mat. Facts ¶¶ 17-18; Hardy Decl. ¶ 6; Hardy Decl., Ex. B (10/28/05 letter from D. Hardy to L. Klayman). As of March 15, 2006, Plaintiff had not appealed the FBI's "no records" response. Defs.' Stmt. of Mat. Facts ¶ 24; Hardy Decl. ¶ 7. Although exhaustion of a FOIA request is not jurisdictional, failure to exhaust has repeatedly been held to preclude judicial review of FOIA responses as a prudential matter, and thus to be a "mandatory prerequisite to a lawsuit under the FOIA." *See Wilbur v. Cent. Intelligence Agency*, 355 F.3d 675, 676-77 (D.C. Cir. 2004) (citing *Hidalgo v. Fed. Bureau of Investigation*, 344 F.3d 1256, 1258 (D.C. Cir. 2003) and *Oglesby*, 920 F.2d at 61). Therefore, Plaintiff's failure to appeal the FBI's "no records" response is alone a sufficient grounds on which to grant Defendants' motion for summary judgment as to the FBI's response.

In addition, however, the Declaration of David M. Hardy demonstrates that the FBI's search in this case was reasonable and adequate. The FBI initially searched the main entries of

---

[3] Mr. Hardy has been the Section Chief of the Record/Information Dissemination Section, Records Management Division, at FBI headquarters in Washington, D.C. since August 2002. Hardy Decl. ¶ 1. Prior to joining the FBI, from May 2001 to July 2002, Mr. Hardy was the Assistant Judge Advocate General of the Navy for Civil Law, and in that position had direct oversight of FOIA policy, procedures, appeals, and litigation for the Navy. *Id.* Mr. Hardy also worked on FOIA matters from October 1980 through April 2001 while serving at various commands as a Navy Judge Advocate. *Id.*

the CRS in response to Plaintiff's FOIA request and, upon receiving Plaintiff's Complaint in this litigation, conducted a second search for cross-references in the CRS, Defs.' Stmt. of Mat. Facts ¶¶ 19-20; Hardy Decl. ¶ 20, as well as a search of its ELSUR indices, Defs.' Stmt. of Mat. Facts ¶ 23; Hardy Decl. ¶ 20. That these searches did not reveal responsive records does not make the searches themselves any less reasonable or adequate, especially as Plaintiff has not pointed to any evidence or articulated a basis for challenging the reasonableness of the FBI's search. Indeed, numerous courts have determined that the FBI performed reasonable and adequate searches where the FBI's affidavits established that searches were conducted via the CRS and the ELSUR indices. *See Edmonds v. Fed. Bureau of Investigation*, 272 F. Supp. 2d 35, 57-58 (D.D.C. 2003) (FBI response to FOIA request was reasonable and adequate where FBI searched CRS and ELSUR for responsive records); *Brunetti v. Fed. Bureau of Investigation*, 357 F. Supp. 2d 97, 103 (D.D.C. 2004) (FBI search of CRS was a reasonable and adequate response to FOIA request); *Voinche v. Fed. Bureau of Investigation*, 412 F. Supp. 2d 60, 66 (D.D.C. 2006) (same).

Furthermore, Plaintiff's unsubstantiated suggestion that responsive records may be located in FBI field offices is of no consequence. FOIA's disclosure obligations apply when requests for records are "made in accordance with published rules stating the time, place, fees (if any), and procedures to be followed . . . ." 5 U.S.C. § 552(a)(3)(A). Here, DOJ regulations require that FOIA requesters seeking records held by individual field offices write directly to those field offices. 28 C.F.R. § 16.3(a). Nevertheless, Plaintiff sent his FOIA request to DOJ's JMD and did not include in his request any information from which the FBI could be expected to discern which field offices, if any, might have records responsive to Plaintiff's request. *See* Hardy Decl., Ex. A (10/3/05 FOIA request). Where a requester submits his request only to

24

FBI headquarters and not to individual field offices, the FBI is under no obligation to search all of its field offices. *See Ray v. Fed. Bureau of Investigation*, 441 F. Supp. 2d 27, 31 (D.D.C. 2006) ("the FBI is not required to undertake a search of its field offices' records when a requester submits his request only to its headquarters."); *see also Marks v. United States Dep't of Justice*, 578 F.2d 261, 263 (9th Cir. 1978) (same). As a result, the Court concludes that the FBI has demonstrated that its search was reasonable and adequate and that, in any event, Plaintiff's failure to appeal the FBI's "no records" response precludes him from raising such a challenge before this Court.

### b.    EOUSA

Plaintiff's Opposition to Defendants' motion for summary judgment does not challenge their assertion that summary judgment is appropriate as to EOUSA's response to Plaintiff's FOIA request. Plaintiff has therefore failed to demonstrate that any genuine issue of material fact exists, as the Declaration of Anthony J. Ciccone establishes that Plaintiff failed to respond to EOUSA's reasonable request for specification.[4]

FOIA requires agencies to make their records available in response to requests that "reasonably describe" the records sought, 5 U.S.C. § 552(a)(3)(A), and DOJ regulations provide that where a "component determines that [a] request does not reasonably describe records, it shall tell [the requester] . . . so that [the requester] . . . may modify it to meet the requirements of [FOIA]." 28 C.F.R. § 16.3(b). Records are "reasonably described" when the description would

---

[4] Mr. Ciccone is a DOJ Senior Attorney Advisor assigned to the EOUSA Freedom of Information and Privacy Staff, and has previously served within DOJ as a Trial Attorney/FOIA-Privacy Counsel in the Executive Office for United States Trustees from 1997 to 2004. Ciccone Decl. ¶ 1.

"enable[] a professional employee of the agency who was familiar with the subject area of the request to locate the record with a reasonable amount of effort," *Dale v. Internal Revenue Serv.*, 238 F. Supp. 2d 99, 104 (D.D.C. 2002) (citing *Marks*, 578 F.2d at 263), and "[b]road, sweeping requests lacking specificity are not sufficient, *id.* (citing *American Fed. of Gov't Employees v. Dep't of Commerce*, 632 F. Supp. 1272, 1277 (D.D.C. 1986)). Here, EOUSA informed Plaintiff by letter dated November 8, 2005 that "[s]ince the files . . . of United States Attorneys are located in more than 100 separate offices throughout the country, we ask that you identify the specific U.S. Attorney's office(s) where you believe the requested records exist. . . ." Defs.' Stmt. of Mat. Facts ¶ 28; Ciccone Decl. ¶ 12 & Ex.3 (11/8/05 letter from M. O'Rourke to L. Klayman).

Plaintiff has neither provided the additional information requested by EOUSA nor appealed EOUSA's November 8, 2005 letter, Defs.' Stmt. of Mat. Facts ¶¶ 29-31; Ciccone Decl. ¶¶ 13-14; Ciccone Decl., Ex. 3 (11/8/05 letter from M. O'Rourke to L. Klayman), and as a result has failed to exhaust his administrative remedies. *See Antonelli v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, No. Civ. A. 04-1180, 2006 WL 141732 at *2-3 (D.D.C. Jan. 18, 2006) (Plaintiff failed to exhaust administrative remedies by not responding to Department of Transportation's request for specification); *Dale*, 238 F. Supp. 2d at 103 ("Failure to comply with agency FOIA regulations amounts to a failure to exhaust administrative remedies."). The Court shall therefore grant Defendants' motion for summary judgment as to EOUSA's response to Plaintiff's FOIA request.

        *c.*    *The Criminal Division*

Plaintiff's Opposition to Defendants' motion for summary judgment also does not challenge their assertion that summary judgment is appropriate as to the Criminal Division's

response to Plaintiff's FOIA request. Moreover, the Declaration of Kathy Hsu establishes that the Criminal Division conducted a reasonable and adequate search that uncovered no records responsive to Plaintiff's FOIA request.[5]

Like the EOUSA, the Criminal Division determined that Plaintiff's FOIA request was insufficient, and requested that Plaintiff furnish (as required by 28 C.F.R. § 16.41) a Privacy Act Identification and Request Form and a current descriptive list of the systems of records maintained by the Criminal Division that Plaintiff wished searched. Defs.' Stmt. of Mat. Facts ¶¶ 33-34; Hsu Decl. ¶ 5; Hsu Decl., Ex. 2 (11/22/05 letter from T. McIntyre to L. Klayman). In the case of the Criminal Division, however, Plaintiff provided the requested information, indicating that he wanted the Criminal Division to search four systems of records for responsive records. Defs.' Stmt. of Mat. Facts ¶¶ 35-36; Hsu Decl. ¶¶ 6, 10; Hsu Decl., Ex. 3 (12/21/05 letter from L. Klayman to T. McIntyre). The Criminal Division subsequently searched these four systems of records, Defs.' Stmt. of Mat. Facts ¶ 38; Hsu Decl. ¶ 11, and also searched an additional system of records, as well as requested that the Counterterrorism Section of the Criminal Division conduct a search for responsive records. Defs.' Stmt. of Mat. Facts ¶¶ 39-40; Hsu Decl. ¶¶ 9, 11. None of these searches identified any records responsive to Plaintiff's FOIA request. Defs.' Stmt. of Mat. Facts ¶¶ 41-42; Hsu Decl. ¶¶ 8, 13.

Ms. Hsu's Declaration thus establishes that the Criminal Division made a "good faith effort to conduct a search for the requested records, using methods which [could] reasonably be expected to produce the information requested." *Ogelsby*, 920 F.2d at 68. As Plaintiff does not

---

[5] Ms. Hsu is an attorney in the Criminal Division whose specific assignment within the Office of Enforcement Operations is that of Litigation Attorney for the Division's Freedom of Information Act/Privacy Act Unit. Hsu Decl. ¶ 1.

27

challenge the reasonableness of this search, the Court concludes that the Criminal Division has

met the standard for summary judgment by demonstrating that it fulfilled its obligations under

the FOIA.

2. *DHS' Response to Plaintiff's FOIA Request*

Like DOJ, DHS has established, through the Declaration of J. Anthony Kendrick, that it

fulfilled its obligations under the FOIA and that Plaintiff has failed to exhaust his administrative

remedies.[6] Upon receiving Plaintiff's FOIA request, DHS determined that it was unable to

conduct an adequate search based on the information provided by Plaintiff. Kendrick Decl. ¶ 7.

Mr. Kendrick states that DHS' inability to respond Plaintiff's FOIA request arose from the fact

that, "[a]lthough [Plaintiff's FOIA] request lists a wide variety of types of documents that are

being requested, there is nothing in the correspondence that indicates why plaintiff believes that

DHS would maintain any of these types of documents about him." *Id.*; Kendrick Decl., Att. 1

(10/3/05 FOIA Request). Mr. Kendrick avers that DHS "does not maintain a central index of

records that are retrieved by name or personal identifier, and so it is important to understand the

nature of the request in context; i.e., why the requester believes that DHS may have records

pertaining to the requester." Kendrick Decl. ¶ 5. Mr. Kendrick further avers that "[i]n the

absence of such file- or event-related information or any details as to why the Department would

maintain records about plaintiff, [his] staff cannot even begin to search for records." Kendrick

Decl. ¶ 7.

As noted above, FOIA requires agencies to process requests for records that "reasonably

---

[6] Mr. Kendrick has been Director of Departmental Disclosure for DHS since May 2004, and has many prior years of experience administering FOIA programs in federal agencies. Kendrick Decl. ¶¶ 1-2.

28

describe" the records sought and are "made in accordance with published rules . . . ." 5 U.S.C. §

552(a)(3)(A). DHS regulations provide that, "whenever possible, [FOIA requests] should

include specific information about each record sought, such as the date, title or name, author,

recipient, and subject matter of the record," 6 C.F.R. § 5.3(b) and explain that "[a]s a general

rule, the more specific you are about the records or type of records that you want, the more likely

the Department will be able to locate those records in response to your request," *id.* Furthermore,

"[i]f a component determines that your request does not reasonably describe records, it shall tell

you either what additional information is needed or why your request is otherwise insufficient."

*Id.*

Here, by letter dated October 5, 2005, DHS advised Plaintiff that "[DHS] does not

maintain a central index of records based on individual names," and that as a result DHS could

not conduct an adequate search based on Plaintiff's FOIA request. Defs.' Stmt. of Mat. Facts ¶¶

45-46; Kendrick Decl. ¶ 8; Kendrick Decl., Ex. 2 (10/5/05 letter from C. Papoi to L. Klayman).

Consistent with DHS regulations, DHS requested that Plaintiff provide DHS with additional

information, specifically "the DHS component agency you believe created and/or controls the

records, the time period that you believe the records or files were created and the purpose for

which the records were created." Kendrick Decl., Ex. 2 (10/5/05 letter from C. Papoi to L.

Klayman). DHS further advised Plaintiff that DHS would undertake a search for responsive

records if he provided the requested information within sixty (60) days; however, if Plaintiff did

not respond within sixty (60) days, DHS would administratively close Plaintiff's FOIA request.

Defs.' Stmt. of Mat. Facts ¶ 47; Kendrick Decl. ¶ 8; Kendrick Decl., Ex. 2 (10/5/05 letter from C.

Papoi to L. Klayman). DHS has no record of receiving any further communication from

Plaintiff.  Defs.' Stmt. of Mat. Facts ¶ 48; Kendrick Decl. ¶ 8.

Plaintiff asserts various arguments in opposition to Defendants' motion for summary judgment as to DHS' response to Plaintiff's FOIA request.  First, Plaintiff argues that the burden is on the government to demonstrate that the agency has met its obligations under the FOIA and that "DHS' explanation that it cannot conduct a search based upon individual names is neither reasonable, nor credible."  Pl.'s Opp'n. at 27.  Plaintiff claims that "[i]t defies logic and imagination, and is simply implausible that the Department of Homeland Security does not maintain a 'database of records based on individual names.'"  *Id.* at 26 n.7.  Plaintiff is correct that the government bears the burden of showing that DHS appropriately responded to Plaintiff's FOIA request.  However, as discussed above, Defendants have submitted Mr. Kendrick's sworn Declaration, in which he avers that DHS does not maintain a centralized system of records based on individual names and that, as a result, DHS requires specific information about the records sought in order to perform adequate searches.  Kendrick Decl. ¶¶ 6-7.  Moreover, Mr. Kendrick's Declaration is consistent with the DHS regulations described above, which advise requesters that DHS is more likely to locate responsive records if provided with detailed information regarding the records sought.  *See* 6 C.F.R. § 5.3(b).  For his part, Plaintiff has offered only his incredulity that DHS is unable to search its records based on individual names, which amounts to mere speculation.  In the face of Mr. Kendrick's "clear, specific, and reasonably detailed" Declaration, Plaintiff's speculation will not preclude summary judgment as to DHS' response to his FOIA request.  *W. Ctr. for Journalism*, 116 F. Supp. 2d at 7 (citing *Hayden v. Nat'l Sec. Agency*, 608 F.2d 1381, 1387 (D.C. Cir. 1979)); *cf. Safecard Sevs. v. Sec. and Exch. Comm'n*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (presumption of good faith accorded to agency affidavits cannot be

rebutted by speculative claims).

Plaintiff further argues that, while DHS would be allowed to request that Plaintiff narrow the scope of his FOIA request, "DHS did not ask Plaintiff to narrow his search, but, instead, DHS arbitrarily instructed Plaintiff to disclose to DHS <u>why he believed</u> that DHS would maintain any of the types of documents about him." Pl.'s Opp'n. at 29-30 (emphasis in original). Despite Plaintiff's argument to the contrary, DHS' request that Plaintiff provide DHS with additional information, including "the DHS component agency you believe created and/or controls the records, the time period that you believe the records or files were created and the purpose for which the records were created," Kendrick Decl., Ex. 2 (10/5/05 letter from C. Papoi to L. Klayman), was an attempt to narrow Plaintiff's search in order to allow DHS to search for records responsive to Plaintiff's FOIA request in a manner consistent with DHS' records system. While Plaintiff claims that DHS' response to his FOIA request was illogical, and "clearly is designed to obfuscate Plaintiff's ability to seek redress under FOIA," Pl.'s Opp'n. at 30, Mr. Kendrick's Declaration demonstrates that DHS' response was appropriate in light of the fact that DHS does not maintain a centralized system of documents organized by individual name, Kendrick Decl. ¶¶ 5, 7-8.

Second, Plaintiff asserts that FOIA requires only a "reasonable description of the requested documents," and that he "provided not only a reasonable description of the requested documents, but a sufficiently detailed list of documents." Pl.'s Opp'n. at 27. Plaintiff is correct that his FOIA request includes thirty-five (35) different types of documents (*e.g.*, "correspondence, memoranda, documents, reports, records"), *see* Kendrick Decl., Att. 1 (10/3/05 FOIA Request); however, as to the substance of the requested records, Plaintiff's FOIA request

31

simply seeks all documents of these thirty-five types "that refer to [Plaintiff]," *id.* As noted

above, FOIA requests "reasonably describe" records when the description would "enable[] a

professional employee of the agency who was familiar with the subject area of the request to

locate the record with a reasonable amount of effort." *Dale*, 238 F. Supp. 2d at 104 (D.D.C.

2002) (citing *Marks*, 578 F.2d at 263). Here, based on Mr. Kendrick's Declaration, it is clear that

Plaintiff's FOIA request failed to meet this standard. Indeed, courts have determined that "FOIA

requests for *all* documents concerning a requester are too broad," *id.* (citation omitted), and that

"[a]gencies are not required to perform searches which are not compatible with their own

document retrieval systems," *Sonds v. Huff*, 391 F. Supp. 2d 152, 160 (D.D.C. 2005) (citation

omitted); *Assassination Archives and Research Ctr., Inc. v. Cent. Intelligence Agency*, 720 F.

Supp. 217, 219 (D.C. Cir. 1989) (citing *Blakely v. Dep't. of Justice*, 549 F.Supp. 362 (D.D.C.

1982), *aff'd* 720 F.2d 215 (D.C. Cir. 1983)).[7] As such, Plaintiff's assertion that he provided a

reasonable description of the requested documents does not demonstrate that DHS was required

to perform a search for documents responsive to Plaintiff's request where Plaintiff's request

sought, in very general descriptive terms, thirty-five different types of documents "that refer to

[Plaintiff]."

Moreover, as noted above, DHS did not flatly refuse to conduct a search based on

Plaintiff's FOIA request. Instead, DHS requested that Plaintiff provide such additional

---

[7] Plaintiff's attempt to distinguish cases requiring FOIA requesters to reasonably describe the records they seek on the grounds that those cases involve requests to the IRS, rather than DHS, s*ee* Pl.'s Opp'n. at 28-29, is unavailing as courts have noted this FOIA requirement in cases involving various federal agencies. *See, e.g.*, *Sonds*, 391 F. Supp. 2d at 160 (case involving Drug Enforcement Agency); *Antonelli*, 2006 WL 141732 at *2-3 (case involving Department of Transportation).

information as was necessary to enable DHS to perform a search for records responsive to

Plaintiff's request, and advised Plaintiff that DHS would undertake such a search if Plaintiff

provided the requested information within sixty (60) days. Defs.' Stmt. of Mat. Facts ¶ 47;

Kendrick Decl. ¶ 8; Kendrick Decl., Ex. 2 (10/5/05 letter from C. Papoi to L. Klayman). Plaintiff

has not provided DHS with the additional information requested, Defs.' Stmt. of Mat. Facts ¶

48; Kendrick Decl. ¶ 8; Pl.'s Opp'n. at 32, and has thus failed to exhaust his administrative

remedies, see *Antonelli*, 2006 WL 141732 at *2-3; *Dale*, 238 F. Supp. 2d at 103. Plaintiff

attempts to justify this failure by asserting that "[i]t would have been futile to require Plaintiff to

exhaust his administrative remedies, because the agency ultimately would have rejected

Plaintiff's requests for records." Pl.'s Opp'n. at 32. In support of this argument, Plaintiff states

that "in the fall of 2001, the NSA, in conjunction with other executive branch agencies, like TSA,

launched a secret surveillance program to intercept, without judicial authorization, telephone and

internet communications of citizens and lawful permanent residents living inside the United

States," and that "[i]n light of the administration's well-documented and unwavering support of

the surveillance program . . . Plaintiff's decision to forego further administrative remedies was

practical." *Id.* However, Plaintiff's argument amounts to pure speculation because, as discussed

below, Plaintiff's Complaint is entirely devoid of a factual predicate demonstrating any

applicability of the National Security Agency's Terrorist Surveillance Program ("TSP") to

Plaintiff himself. Such speculation does not relieve Plaintiff of his duty to exhaust the

administrative remedies available to him before seeking relief in this Court.

    As a result, the Court concludes that Defendants have demonstrated that DHS fulfilled its

FOIA obligations by attempting to conduct a reasonable and adequate search, which was

thwarted by Plaintiff's failure to respond to DHS' request for additional information.

### 3.    TSA's Response to Plaintiff's FOIA Request

Defendants have also met the standard for summary judgment as to TSA's response to Plaintiff's FOIA request, by establishing that TSA conducted a reasonable and adequate search and appropriately refused to confirm or deny the existence of documents relating to Plaintiff's presence on any watch list.

### a.    Adequacy of TSA's Search

As described above, TSA initially limited its search for documents responsive to Plaintiff's FOIA request based on a telephone conversation between TSA's FOIA Officer, Catrina M. Pavlick, and Plaintiff's counsel, Larry Klayman, in which Ms. Pavlick understood Mr. Klayman to seek only records concerning the appearance of Plaintiff's name on a TSA watch list. Defs.' Stmt. of Mat. Facts ¶¶ 50-52; Pavlick Decl. ¶¶ 7, 15.[8]  Based on this limited search, TSA responded to Plaintiff by advising him that it could neither confirm nor deny the existence of any records pertaining to him on any TSA watch list and alerting him to the existence of the TSA Office of the Ombudsman watch list clearance protocol. Defs.' Stmt. of Mat. Facts ¶¶ 55-57; Pavlick Decl. ¶¶ 10-11; Pavlick Decl., Ex. F (12/8/05 letter from C. Pavlick to L. Klayman).

Plaintiff subsequently appealed TSA's response, and Plaintiff's appeal led TSA to initiate a more extensive search for responsive records in the ten TSA offices that Ms. Pavlick's office identified as most likely to have records concerning members of the general public.  Defs.' Stmt. of Mat. Facts ¶¶ 64-65; Pavlick Decl. ¶ 16.  Eight of these offices failed to locate any documents

---

[8] Ms. Pavlick has been the FOIA Officer for the TSA since September 2003 and in this position is responsible for processing all requests made to TSA under the FOIA and the Privacy Act.  Pavlick Decl. ¶ 1.

responsive to Plaintiff's FOIA request, Defs.' Stmt. of Mat. Facts ¶ 67; Pavlick Decl. ¶ 17;

however, two of the TSA offices searched – the Office of the Ombudsman and TTAC – each

located a potentially responsive record. Defs.' Stmt. of Mat. Facts ¶¶ 67-70; Pavlick Decl. ¶¶ 17-

18. In order to verify that the potentially responsive records pertained to Plaintiff, TSA requested

that Plaintiff provide TSA with additional information, which Plaintiff had not provided by the

time of Defendants' motion for summary judgment. *Id.* Nevertheless, in that motion, TSA

continued to offer to "release all reasonably segregable non-exempt portions of [the potentially

responsive records] in an expeditious manner" if Plaintiff provided the requested information,

Defs.' Mot. to Dismiss/Summ. J. at 21.

Plaintiff's Opposition does not provide the information requested by TSA. Instead,

Plaintiff asserts that "TSA's request for additional information to confirm Plaintiff's identity was

disingenuous" because Plaintiff submitted to TSA a DOJ Certification of Identity Form, which

disclosed his full name, social security number, citizenship, current address, date of birth, and

place of birth. Pl.'s Opp'n. at 36. Plaintiff further asserts that "[a]ccording to DOJ" the

Certification ensures that DOJ does not wrongfully disclose records, *id.*, and that TSA's request

for additional information thus constitutes an improper withholding of documents under the

FOIA, *id.* at 38. Plaintiff's argument regarding the DOJ Certification is inapposite, however, as

Ms. Pavlick's Declaration makes clear that TSA has already attempted, and been unable, to

determine whether the potentially responsive records identified in fact pertain to Plaintiff based

on the Certification alone, and further avers that the information requested by TSA would allow

TSA to make such a determination. Pavlick Decl. ¶¶ 14, 18. Indeed, Ms. Pavlick's Declaration

establishes that – based on the combination of its initial search and its search subsequent to

Plaintiff's appeal – TSA has conducted an adequate and reasonable search, which like other agencies' searches in this case, has been thwarted by Plaintiff's refusal to provide additional information upon request.

        b.     *TSA's Glomar Response*

Insofar as TSA construed Plaintiff's FOIA request as a request for TSA watch list records concerning Plaintiff, TSA responded to Plaintiff by advising him that "[t]o ensure transportation security, TSA does not disclose the names and identifying information of individuals on TSA watch lists" and that as a result, under 49 U.S.C. § 114(s) and 49 C.F.R. §§ 1520.5 and 1520.15(a), TSA could "neither confirm nor deny the existence of responsive records." Pavlick Decl. ¶¶ 7-8; Pavlick Decl., Ex. F (12/8/05 letter from C. Pavlick to L. Klayman).[9] TSA argues that this refusal was a proper "*Glomar* response" because to "confirm or deny the existence of records . . . would cause harm cognizable under FOIA Exemption 3." Defs.' Mot. to Dismiss/Summ. J. at 16-17 (citing *Gardels v. Cent. Intelligence Agency*, 689 F.2d 1100, 1103 (D.C. Cir. 1982)).[10] For his part, Plaintiff asserts that TSA's *Glomar* response does not square with FOIA's "dominant objective" of disclosure and that TSA is required to, but has not, described the documents it has withheld from Plaintiff. Pl.'s Opp'n. at 38-39. Plaintiff therefore "requests that the TSA deliver to the Court for an in camera inspection, a "*Vaughn* index" . . . as well as the documents themselves." *Id.* at 39.

---

[9] TSA subsequently affirmed this decision on appeal. *See* Pavlick Decl., Ex. I (4/24/06 letter from T. Miller to L. Klayman).

[10] The term "*Glomar* response" refers to the subject of a FOIA request pertaining to a ship, the Hughes Glomar Explorer, at issue in *Phillippi v. Cent. Intelligence Agency*, 546 F.2d 1009 (D.C. Cir. 1976).

Plaintiff's arguments misunderstand the nature of the *Glomar* response. Insofar as TSA has construed Plaintiff's FOIA request as one seeking TSA watch list records relating to Plaintiff, TSA has refused to either confirm or deny the very <u>existence</u> of responsive records. Pavlick Decl. ¶¶ 7-8; Pavlick Decl., Ex. F (12/8/05 letter from C. Pavlick to L. Klayman). TSA has not asserted that it has withheld particular documents from Plaintiff, such that this Court could order TSA to submit the documents and a *Vaughn* index in camera. As the D.C. Circuit has explained, "[w]hen the Agency's position is that it can neither confirm nor deny the existence of the requested records, there are no relevant documents for the court to examine other than the affidavits which explain the Agency's refusal." *Phillippi v. Cent. Intelligence Agency*, 546 F.2d 1009, 1013 (D.C. Cir. 1976).

As Defendants correctly note, the D.C. Circuit has "agreed that an agency may refuse to confirm or deny the existence of records where to answer the FOIA inquiry would cause harm cognizable under an FOIA exemption." *Gardels*, 689 F.2d at 1103. Here, TSA asserts that FOIA Exemption 3, which provides that FOIA's disclosure requirements do not apply to matters "specifically exempted from disclosure by statute . . . provided that the statute (A) requires that matters be withheld from the public in such a manner as to leave no discretion on the issue, and (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld," 5 U.S.C. § 552(b)(3), applies to TSA's *Glomar* response based on 49 U.S.C. § 114(s) and implementing regulations at 49 C.F.R. §§ 1520.5 and 1520.15. Defs.' Mot. to Dismiss/Summ. J. at 17-20; Pavlick Decl. ¶¶ 19-20.

In order to assess TSA's Exemption 3 claim, the Court must first determine whether 49 U.S.C. § 114(s) is a "statute of exemption as contemplated by exemption 3" and then determine

whether "the withheld material satisf[ies] the criteria of the exemption statute." *Fitzgibbon v. Cent. Intelligence Agency*, 911 F.2d 755, 761 (D.C. Cir. 1990) (citing *Cent. Intelligence Agency v. Sims*, 471 U.S. 159, 167, 105 S. Ct. 1881, 85 L. Ed. 2d 173 (1985)). Pursuant to 49 U.S.C. § 114(s), TSA is authorized "[n]otwithstanding section 552 of title 5" to "prescribe regulations prohibiting the disclosure of information obtained in carrying out security . . . if [TSA] determines that disclosing the information would . . . (C) be detrimental to the security of transportation." 49 U.S.C. § 114(s). The D.C. Circuit has previously determined that an almost verbatim statute vesting the same authority in the Federal Aviation Administration prior to the establishment of TSA "unmistakably" demonstrated "that Congress intended to allow the FAA to withhold from public disclosure information falling within [its terms] whether or not FOIA is invoked." *Public Citizen v. Fed. Aviation Admin.*, 988 F.2d 186, 195 (D.C. Cir. 1993). Moreover, since the creation of TSA, at least one court has found "no dispute" that 49 U.S.C. § 114(s) falls within Exemption 3. *Gordon v. Fed. Bureau of Investigation*, 390 F. Supp. 2d 897, 900 (N.D. Cal. 2004).

The Court is also convinced that TSA's refusal to disclose information concerning TSA watch lists satisfies the criteria of 49 U.S.C. § 114(s) because TSA has determined that the disclosure of such information would be "detrimental to the security of transportation." 49 U.S.C. § 114(s). Specifically, 49 C.F.R. § 1520.5 provides that "[i]n accordance with 49 U.S.C. 114(s) [Sensitive Security Information (SSI)] is information obtained or developed in the conduct of security activities . . . the disclosure of which TSA has determined would . . . (C) Be detrimental to the security of transportation," and further provides that Security Directives issued by TSA constitute SSI. 49 C.F.R. §§ 1520.5(a) and 1520.5(b)(2). In addition, 49 C.F.R. §

1520.15 provides that "notwithstanding the Freedom of Information Act . . . SSI are not available for public inspection or copying, nor does TSA . . . release such records to persons without a need to know."  49 C.F.R. § 1520.15(a).  As Ms. Pavlick's Declaration explains, TSA watch lists are incorporated into Security Directives and Emergency Amendments issued to air carriers, and thus constitute SSI under 49 C.F.R. § 1520.5, which are exempt from disclosure under the FOIA. Pavlick Decl. ¶ 21.

The Court concludes that TSA has thus demonstrated that its *Glomar* response to Plaintiff's FOIA request was entirely proper, insofar as TSA construed that request as one for records concerning Plaintiff's presence on TSA watch lists.  Moreover, Ms. Pavlick's Declaration provides an entirely reasonable justification for TSA's *Glomar* response – if TSA "were to confirm in one case that a particular individual was not on a watch list, but was constrained in another case merely to refuse to confirm or deny whether a second individual was on a watch list, the accumulation of these answers over time would tend to reveal SSI."  *Id.* Indeed, as one court has concluded in addressing a similar refusal by TSA to confirm whether plaintiffs' names appeared on any watch lists, "[r]equiring the government to reveal whether a particular person is on the watch lists would enable criminal organizations to circumvent the purpose of the watch lists by determining in advance which of their members may be questioned."  *Gordon v. Fed. Bureau of Investigation*, 388 F. Supp. 2d 1028, 1037 (N.D. Cal 2005); *cf. Bassiouni v. Cent. Intelligence Agency*, 392 F. 3d 244, 246 (7th Cir. 2004) (upholding CIA refusal to provide plaintiff with a list of documents mentioning him because, *inter alia*, "[w]hen a pattern of responses itself reveals classified information, the only way to keep secrets is to maintain silence uniformly.").

39

Defendants have thus established that TSA properly responded to Plaintiff's FOIA request by performing a reasonable, adequate, and good faith search for responsive records, and by appropriately refusing to confirm or deny the existence of responsive records pursuant to FOIA Exemption 3. As the Court has previously concluded that DOJ and DHS have likewise met the standard for summary judgment, the Court shall grant Defendants' motion for summary judgment as to Count IV of Plaintiff's Complaint.

**B.** *Motion to Dismiss as to Counts I (Fourth Amendment), II (Right to Privacy), and III (First Amendment) of Plaintiff's Complaint*

In addition to seeking summary judgment on Plaintiff's FOIA claim, Defendants have moved, insofar as Counts I, II, and III of Plaintiff's Complaint are deemed pled against them, to dismiss those Counts under Federal Rule of Civil Procedure 12(b)(1) based on Plaintiff's lack of Article III standing.[11] Plaintiff's Opposition to Defendants' motion clarifies that Plaintiff intended to bring all four Counts of his Complaint against Defendants in their official capacities, *see* Pl.'s Opp'n. at 13-14, and argues that, as to Counts I, II, and III of his Complaint, Plaintiff has sufficiently alleged injury-in-fact, causation, and redressability, the three requirements for Article III standing.

As an Article III court, this Court's judicial power is limited to adjudicating actual "cases" and "controversies." *Allen v. Wright*, 468 U.S. 737, 750, 104 S. Ct. 3315, 82 L. Ed. 2d

---

[11] In addition to asserting that this Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331, Plaintiff's Complaint states that jurisdiction is proper pursuant to 28 U.S.C. § 1343, which grants the district courts original jurisdiction over civil actions "[t]o redress the deprivation, under color of any State law . . . of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens . . . ." 28 U.S.C. § 1343(a)(3). As Defendants correctly note, however, Plaintiff's suit is against federal officials and agencies who do not act "under color of any State law," and as a result 28 U.S.C. § 1343 is inapplicable. Defs.' Mot. to Dismiss/Summ. J. at 25 n. 7.

556 (1984). "In an attempt to give meaning to Article III's case-or-controversy requirement, the courts have developed a series of principles termed 'justiciability doctrines,' among which are standing[,] ripeness, mootness, and the political question doctrine." *Nat'l Treasury Employees Union v. United States*, 101 F.3d 1423, 1427 (D.C. Cir. 1996) (citing *Allen*, 468 U.S. at 750, 104 S. Ct. 3315). These doctrines incorporate both the prudential elements, which "Congress is free to override," *id.* (quoting *Fair Employment Council of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1278 (D.C. Cir.1994)) (internal quotations omitted), and "core component[s]" which are "essential and unchanging part[s] of the case-or-controversy requirement of Article III," *id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992) (internal quotations omitted)). In order to satisfy the constitutional standing requirements, a plaintiff must establish that he or she has (1) suffered an injury in fact, which is concrete and particularized and actual or imminent, not conjectural or hypothetical, (2) which is fairly traceable to the challenged act, and (3) is likely to be redressed by a favorable decision. *Id.*

Defendants correctly note that Plaintiff bears the burden of establishing the predicates for standing; however, they incorrectly argue that these predicates must appear "affirmatively and distinctly" in Plaintiff's Complaint. Defs.' Mot. to Dismiss/Summ. J. at 23. Such would be the case on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6); however, on a motion to dismiss under Rule 12(b)(1), the Court may consider matters beyond the pleadings themselves including, specifically, affidavits submitted by the Plaintiff. *See Equal Employment Opportunity Comm'n. v. St. Francis Xavier Parochial School*, 117 F.3d 621, 625 n.3 (D.C. Cir. 1997); *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987). As such, in reviewing

Defendants' motion to dismiss, the Court may consider both Plaintiff's Complaint and his Affidavit submitted in support of his Opposition.  Moreover, "[w]hile the complaint is to be construed liberally, the Court need not accept factual inferences drawn by plaintiff if those inferences are not supported by facts alleged in the complaint, nor must the Court accept plaintiff's legal conclusions." *Primax Recoveries, Inc. v. Lee*, 260 F. Supp. 2d 43, 47 (D.D.C. 2003) (citing *Nat'l Treasury Employees Union*, 101 F.3d at 1430; *see also American Farm Bureau v. Envtl. Prot. Agency*, 121 F. Supp.2d 84, 90 (D.D.C. 2000) (same).  The Court assesses Plaintiff's "specific allegations for their 'logical adequacy' and for 'quantum of proof,' *i.e.*, whether the specific alleged facts support inferences claimed by plaintiff, including an inference of causation." *Jud. Watch, Inc. v. United States Senate, et al.*, 432 F.3d 359, 360 (D.C. Cir. 2005) (citing *Haase*, 835 F.2d at 908, and *United Transp. Union v. ICC*, 891 F.2d 908, 913 n. 9 (D.C. Cir. 1989)).

Plaintiff's Complaint includes a variety of allegations, which can be divided into three categories: (1) Plaintiff's allegations that "Defendants unlawfully wiretapped Plaintiff's home" "in violation of the First and Fourth Amendment," Compl. ¶ 2(a)-(b); (2) Plaintiff's allegations concerning physical surveillance, including his allegation that "Defendants unlawfully placed a Radio Frequency Identification Tag ("RFIT") on Plaintiff's vehicle," Compl. ¶ 2(d); and (3) Plaintiff's allegations that "Defendants have improperly placed Plaintiff on a terrorist watch list," Compl. ¶ 2(c).  The Court shall address each category of allegations in turn in considering whether Plaintiff has met the requirements for Article III standing.

### 1.    *Plaintiff's Allegations Concerning Wiretapping*

Plaintiff's Complaint contains the following factual allegations concerning wiretapping:
First, that during the Spring of 2002, while purchasing airline tickets from Southwest Airlines
over the telephone, Plaintiff was asked whether he had any "comments, questions, or suggestions
for Southwest Airlines, and responded that as a member of the traveling public, he would like
"100 percent of everything that goes into the airplane, including cargo, to be fully screened."
Tooley Aff. ¶ 4; Compl. ¶¶ 18-19. When asked why such a course of action would be necessary,
Plaintiff responded that the traveling public "was less safe due to the potential that those who
wish to harm American citizens could put a bomb on a plane." Tooley Aff. ¶ 5; Compl. ¶ 20.
Second, that in the Fall of 2003, Plaintiff began to notice problematic phone connections,
including "telltale intermittent clicking noises." Compl. ¶ 21. Third, that "Defendant Bush has
admitted that, on numerous occasions since 2001, he ordered wiretaps and other domestic
surveillance on American citizens," Compl. ¶ 38, and "the Department of Justice has recently
acknowledged that Defendant Bush's 2001 eavesdropping order did not comply with the
procedures of law that regulate domestic surveillance," *id.* ¶ 39. In addition, Plaintiff's Affidavit
adds the allegation that Plaintiff's belief that his "communications are being monitored prevents
[him] from freely communicating via telephone and by electronic means with [his] family, [his]
attorneys, and [his] former colleagues." Tooley Aff. ¶ 21.

In addition to these limited factual allegations, Plaintiff's Complaint and Affidavit
contain a bevy of allegations made "upon information and belief," including that Plaintiff's
telephone problems are caused by illegal wiretaps, which were placed in response to the
comments Plaintiff made while booking his flight with Southwest Airlines, Compl. ¶ 21; that
"roving wiretaps" were placed on nine different cellular and landline phones belonging to

43

Plaintiff and his family (on whose behalf Plaintiff clearly cannot ground Article III standing), *id.*

¶ 22; and that Plaintiff "is one of the victims of Defendants' highly secret and illegal wiretapping

scheme," *id.* ¶ 47.  In addition, in his Opposition to Defendants' motion to dismiss, Plaintiff

describes the National Security Agency's Terrorist Surveillance Program as follows:

> It is undisputed that the Bush administration Defendants have admitted publicly to
> the following actions: (1) the Surveillance Program exists; (2) the Surveillance
> Program operates without warrants; and (3) the Surveillance Program targets
> communications where one party to the communication is outside the United
> States, and where the government has a "reasonable basis" from which to
> conclude that one party to the communication is a member of Al Qaeda, is
> affiliated with Al Qaeda, is a member of an organization affiliated with Al Qaeda,
> or is working in support of Al Qaeda.

Pl.'s Opp'n. at 16-17.

Attempting to separate Plaintiff's factual allegations from his speculation and inferences

reveals that Plaintiff has not established any of the required predicates for Article III standing

with respect to his claims regarding wiretapping.  While Defendants focus the majority of their

attention on Plaintiff's failure to demonstrate an injury in fact, Defs.' Mot. to Dismiss/Summ. J.

at 26-30, Plaintiff's Complaint bears equal infirmities with respect to causation and

redressability, all of which stem from the fact that Plaintiff has presented nothing to substantiate

his claim that his alleged wiretapping is in any way connected to the TSP.

Plaintiff's Complaint alleges that he has experienced problematic phone connections and

heard clicking noises on his phone lines, signs which he assumes indicate that wiretaps have been

placed on his phone lines.  Compl. ¶ 21.  As an initial matter, the Court notes that while Plaintiff

alleges "upon information and belief" that wiretaps were placed on his phone lines "in response

to" the comments he made while booking a Southwest Airlines flight, *id.*, Plaintiff did not begin

noticing problematic phone connections and clicking noises until the Fall of 2003, more than a

year after Plaintiff's conversation with Southwest Airlines allegedly occurred, *id.* ¶¶ 18-21.

Moreover, even if the Court accepts Plaintiff's conclusion that the phone problems and clicking

noises are, in fact, caused by wiretapping, Plaintiff has not alleged any factual foundation for his

speculation that wiretaps were placed on his phone as a result of his conversation with Southwest

Airlines.  Nor does Plaintiff's Complaint actually allege that an agent of the federal government

placed wiretaps on Plaintiff's phone.  Most significantly, Plaintiff has offered no basis – other

than his own subjective belief – for his unsubstantiated conclusion that he has been the subject of

warrantless wiretaps as part of the TSP.  Instead, Plaintiff posits simply that, because President

"Bush has admitted that, on numerous occasions since 2001, he ordered wiretaps and other

domestic surveillance on American citizens," *id.* ¶ 38, and the Department of Justice has

"acknowledged that Defendant Bush's 2001 eavesdropping order did not comply with the

procedures of law that regulate domestic surveillance," *id.* ¶ 41, Plaintiff's purported wiretapping

must be part of the TSP.  To the contrary, however, it is altogether possible that rather than being

a subject of the TSP, Plaintiff has been the subject of entirely lawful wiretaps placed by state or

local law enforcement agencies.[12]  As a result, there is an insurmountable disconnect between the

---

[12] Plaintiff's Complaint alleges a "strong presumption or inference existing [sic] that
[Plaintiff] was wiretapped as part of the NSA's illegal activities based on evidence which
includes . . . (a) His inclusion on at least one terrorist watchlist . . . (b) Press sources have
confirmed that people on a terrorist watchlist are likely subject to NSA's illegal surveillance
activities; (c) He has constantly heard intermittent clicking noises on his phone, a classic sign of
wiretapping; (d) He is in possession of evidence of government surveillance; and (e) President
Bush has admitted the existence of the NSA wiretapping activities . . . and reports have
confirmed that the activities include both international and domestic calls."  The Court will
address Plaintiff's conclusion that he is included on a TSA watch list below, but notes at this
juncture that Plaintiff's claim regarding "Press sources" is nothing more than an opinion, albeit
from a source other than Plaintiff himself, and that Plaintiff's unspecified "evidence of

existence of the TSP and Plaintiff's conclusion that he has been part of it.

Article III standing requires that a Plaintiff allege an injury in fact that is "(a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (internal quotes and citations omitted). Moreover, for Article III standing to be proper, Plaintiff's injury must be one that "fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the Court." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42, 96 S. Ct. 1917, 48 L. Ed. 2d 450 (1976). Here, Plaintiff alleges injury to his First and Fourth Amendment rights, his Constitutional right to privacy, Compl. ¶¶ 49-76, and more specifically alleges that his belief "that his communications are being monitored prevents [him] from freely communicating via telephone and by electronic means with [his] family, [his] attorneys, and [his] former colleagues," Tooley Aff. ¶ 21.[13]  Plaintiff's Opposition to Defendant's motion to dismiss further

government surveillance" is entirely hypothetical without further description.

[13] The Court is aware that at least one court has found that plaintiffs had standing to challenge the TSP. *See Amer. Civil Liberties Union v. Nat'l Sec. Agency*, 438 F. Supp. 2d 754 (E.D. Mich. 2006), *appeals docketed*, No. 06-2095 (6th Cir. Aug. 17, 2006) and No. 06-2140 (6th Cir. Aug. 30, 2006). *ACLU v. NSA* is readily distinguishable from the instant case, however, because the plaintiffs in *ACLU v. NSA* are a group of persons and organizations, including journalists, lawyers, and scholars, *id.* at 758, who "contend that the TSP has interfered with their ability to carry out their professional responsibilities in a variety of ways, including that the TSP has had a significant impact on their ability to talk with sources, locate witnesses, conduct scholarship, engage in advocacy and communicate with persons who are outside of the United States, including in the Middle East and Asia." *Id.* at 767 (emphasis added). Furthermore, the *ACLU v. NSA* plaintiffs submitted declarations indicating that they "must communicate with individuals abroad whom the United States government believes to be terrorist suspects or to be associated with terrorist organizations." *Id.* (emphasis added). The *ACLU v. NSA* plaintiffs thus fit squarely within the category of individuals who, based on Plaintiff's allegations regarding the nature of the TSP, would be likely to be subjects of the TSP. *See* Pl.'s Opp'n. at 16-17. In contrast, Plaintiff Tooley does not allege that he has ever communicated with individuals in the Middle East or Asia or that he has communicated with individuals whom the United States

claims that Plaintiff's First Amendment Rights have been "chilled" and that Plaintiff has been

"gagged" by the alleged wiretaps and physical surveillance.  Pl.'s Opp'n. at 21-22.

Even assuming, *arguendo*, that such injuries are sufficiently concrete and particularized

to ground Article III standing, they nevertheless remain entirely hypothetical and conjectural

because Plaintiff has not even provided any factual basis for his conclusion that he has been the

subject of <u>illegal</u> wiretaps.  The Court notes, of course, that if Plaintiff has been the subject of

lawful wiretaps, he has suffered no injury to his First and Fourth Amendment rights or his

Constitutional right to privacy.  Furthermore, as Plaintiff has offered absolutely no factual nexus

between the existence of the TSP and his claims that his phones have been wiretapped, he has

failed to demonstrate that he has suffered an injury fairly traceable to Defendants.  Finally, as

Plaintiff has not offered evidence of a causal connection between Plaintiff's alleged injuries and

Defendants, it is unclear that injunctive relief against Defendants would redress Plaintiff's

alleged injuries.  Such injunctive relief would, of course, be entirely ineffective if, in fact,

Plaintiff is the subject of wiretaps placed by someone other than federal officials or if there are

---

government would have a "reasonable basis" to conclude were affiliated with Al Qaeda.  Indeed,
the only international communications mentioned in Plaintiff's Complaint are phone calls to and
from family members in France, made while Plaintiff was visiting his family's home in Lincoln,
Nebraska.  Compl. ¶¶ 22, 46.  As a result, Plaintiff's allegations that he has been a subject of the
TSP do not square with his own description of the program and his allegations therefore lack the
requisite factual predicate to ground Article III standing.

Moreover, the Court notes that the plaintiffs in *ACLU v. NSA* alleged that the TSP violates their
free speech and associational rights under the First Amendment to the United States Constitution;
their privacy rights under the Fourth Amendment to the United States Constitution; the principle
of Separation of Powers; and the statutory limitations placed on interceptions by Congress in the
Foreign Intelligence Surveillance Act.  *ACLU v. NSA*, 438 F. Supp. 2d at 758.  In the instant case,
however, the Court is not presented with any of these questions and, as such, neither draws
conclusions nor opines in any way about the TSP itself, beyond adopting for the purposes of this
opinion the parties' characterizations of the TSP.

actually no wiretaps.  As a result, the Court concludes that Plaintiff lacks Article III standing with respect to his allegations concerning wiretapping.

2.      *Plaintiff's Allegations Concerning Physical Surveillance*

Plaintiff's Complaint contains a sole allegation regarding physical surveillance – his claim that "[u]pon information and belief, both [his] vehicle and his wife's vehicle have been illegally subjected to permanent Radio Frequency Identification Tags that monitor their vehicle movements."  Compl. ¶ 23.  In addition, in his Affidavit Plaintiff claims that in March 2005, during the week preceding and the week of a visit by President Bush to Louisville, Kentucky, "an officer in a Ford Crown Victoria sat out in front of [Plaintiff's] home for approximately six (6) hours a day," Tooley Aff. ¶ 19, and that in March 2006, Plaintiff was subjected to physical monitoring during a trip to Fort Worth, Texas for his brother's wedding, *id.* ¶ 16.  Plaintiff alleges no facts in support of his claim that Radio Frequency Identification Tags have been placed on his car, nor does Plaintiff offer any factual basis for his allegation that an unidentified "officer" sat in front of his house "as a threat of recrimination or persecution of political speech that serves as a direct injury to the exercise of [Plaintiff's] First Amendment Free Speech rights." *Id.* ¶ 19.  Indeed, even Plaintiff's conclusion that the individual sitting in front of his house was an "officer" of some sort appears to be based solely on the make of car that the individual allegedly sat in.   When Plaintiff's Complaint is stripped of speculation and inferences, which are unsupported by Plaintiff's factual allegations, it is clear Plaintiff has failed to demonstrate a sufficiently concrete and particularized injury in fact stemming from his allegations concerning physical surveillance.

Moreover, Plaintiff has entirely failed to demonstrate any causal connection between his

48

alleged physical surveillance and Defendants.  Significantly, Plaintiff does not claim that a

federal agent was responsible for any of the alleged physical surveillance.  Furthermore, the

physical surveillance Plaintiff describes bears absolutely no relationship to the TSP, which

Plaintiff himself has described as involving warrantless wiretaps.  Pl.'s Opp'n. at 16-17.  Plaintiff

has thus failed to provide the Court with evidence of either causation or redressability, and as a

result has not carried his burden of establishing Article III standing with respect to his allegations

of physical surveillance.

### 3.    Plaintiff's Allegations Concerning Watch Lists

As an initial matter, the Court notes that Plaintiff incorrectly asserts that TSA's refusal to

confirm or deny the existence of records relating to Plaintiff's presence on TSA watch lists

constitutes a "tacit admission" that Plaintiff is on at least one such watch list.  Compl. ¶¶ 32-34.

As discussed above, TSA's *Glomar* response relates only to its desire to protect the integrity of

the watch lists, and bears no relation to whether or not Plaintiff is actually on any watch lists.

Pavlick Decl. ¶ 21.  Notwithstanding this incorrect assertion, Plaintiff's Complaint and Affidavit

establish Article III standing with respect to his claim that he was improperly placed on one or

more TSA watch list.  Plaintiff's Complaint alleges that following his conversation with

Southwest Airlines in the Spring of 2002, he has been "improperly detained and subject to a strict

search without any probable cause."  Compl. ¶¶ 24-25.  Plaintiff's Affidavit provides further

details regarding these detentions and strict searches, which he claims occurred every time he

traveled prior to filing this suit.  Tooley Aff. ¶ 15.  Specifically, Plaintiff alleges that in July

2004, he was subjected to a "degrading and unreasonable search" at Omaha's Eppley Airfield in

which his name was broadcast over the PA system as someone who needed further screening,

and a TSA officer thereafter pulled him aside and, in full view of Plaintiff's fellow passengers, asked Plaintiff to expose the area above his groin and subjected Plaintiff to a backhanded pat-down. *Id.* ¶ 14.

Plaintiff's assertion that he has already been subject to detentions and strict searches constitutes a sufficiently concrete and particularized injury in fact, which is actual as opposed to conjectural. Moreover, insofar as Plaintiff alleges he was improperly placed on terrorist watch lists, those watch lists are fairly traceable to Defendants. Defendants argue that Plaintiff's allegations concerning detentions and searches are overly speculative in light of the fact that all Americans are subject to search when they travel by air, Defs.' Mot. to Dismiss/Summ. J. at 32-33; however, at the motion to dismiss stage, "general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Lujan*, 504 U.S. at 560, 112 S. Ct. 2130 (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990)). As such, Plaintiff has sufficiently pled an injury that is fairly traceable to Defendants, and which may be redressed by the relief Plaintiff seeks – an order requiring "Defendants to remove Plaintiff's name from any and all watch lists that may indicate Plaintiff is associated with any terrorist activities or organizations." Compl. at 15.

However, although Plaintiff has established Article III standing with respect to his claims concerning watch lists, this Court cannot review Plaintiff's claims and issue the relief he seeks because it lacks the requisite subject matter jurisdiction. As discussed above, TSA watch lists are incorporated into Security Directives issued by TSA pursuant to 49 U.S.C. § 114(l)(2)(A), *see supra* at 39; Pavlick Decl. ¶ 21, and Congress has vested exclusive jurisdiction to review such

50

directives in the Court of Appeals.  48 U.S.C. §§ 46110(a) and 46110(c).  As two courts have

previously found when faced with this very question, insofar as Security Directives establish

terrorist watch lists, only the Court of Appeals has jurisdiction to "amend, modify, or set aside"

such Directives.  48 U.S.C. § 46110(c); *Ibrahim v. Dep't of Homeland Sec.*, No. C. 06-00545

WHA, 2006 WL 2374645 at *5-8 (N.D. Cal. Aug. 16, 2006); *Green v. Transp. Sec. Admin.*, 351

F. Supp. 2d 1119, 1125 (W.D. Wash. 2005); *see also Gilmore v. Gonzales*, 435 F.3d 1125, 1130

(9th Cir. 2006), *petition for cert. filed*, 75 U.S.L.W. 3074 (Aug. 4, 2006) (affirming District

Court determination that it lacked jurisdiction to hear due process challenge to identification

policy incorporated into Security Directive).  This Court is therefore constrained to find that it

lacks subject matter jurisdiction to review Plaintiff's claims regarding his inclusion on TSA

watch lists.

## IV: CONCLUSION

For the reasons set forth above, the Court shall grant Defendants' motion for summary

judgment as to Count IV of Plaintiff's Complaint.  In addition, the Court shall grant Defendants'

motion to dismiss Counts I, II, and III of Plaintiff's Complaint because Plaintiff lacks Article III

standing to pursue his claims concerning wiretapping and physical surveillance against the

Defendants, and because this Court lacks subject matter jurisdiction to review Plaintiff's claims

regarding TSA watch lists.  An appropriate Order accompanies this Memorandum Opinion.

Date:   December 21, 2006

_____/s/_____
COLLEEN KOLLAR-KOTELLY
United States District Judge

Exhibit 2

# PAY ANY PRICE

*GREED, POWER, AND ENDLESS WAR*

# JAMES RISEN

Author of *STATE OF WAR*

ENDLESS WAR

proved, because it was clearly illegal and unconstitutional. The big thing was that the protections had been removed. NSA had been rigorous on protections before that."

Roark knew she had to do something about it. What she didn't realize was that her efforts would turn her into a pariah in official Washington.

★

Diane Roark had no experience as a whistleblower. During her career conducting congressional oversight, people had always come to her to report problems, rather than the other way around. And so when Binney told her about the NSA's warrantless wiretapping operation, she did what came naturally—she reported it to the House Intelligence Committee. She was certain no one on the committee knew about it.

Roark wrote a memo describing what she knew about the wiretapping program and submitted it to Tim Sample, the Republican staff director of the committee, and his Democratic counterpart, Mike Sheehy. Sample reported directly to the chairman of the committee, Porter Goss, a Florida Republican congressman and former CIA case officer who later became CIA director. Sheehy worked for Nancy Pelosi, a California Democratic congresswoman who later became Speaker of the House but who was then the ranking Democrat on the intelligence committee. Roark wrote that she wanted to warn the committee's leaders from both parties that an illegal operation was under way at the NSA.

Roark was confident that her memo would be met by outrage by the congressional leadership; instead, it was met by stony silence. After reading her memo, Sheehy meekly replied that, while he did not know anything about it, this NSA spying operation must explain why Goss and Pelosi had recently been called to a secret meeting at Vice President Cheney's office. He then dropped the subject and did not talk to Roark any further about it.

Sample's response was even more chilling. He had obviously talked to Goss about Roark's memo. Sample admonished her to drop the matter, and to stop talking about the NSA program. She was not

to tell anyone else what she knew, Sample demanded, not even other staffers on the House committee. Roark now realized that she and Binney had not stumbled upon a rogue operation but rather on an unconstitutional domestic spying program approved at the highest levels of the government and sanctioned by at least some congressional leaders. That knowledge only made her more determined to stop it.

Despite the warning from Sample not to talk with anyone else on the committee about the program, she privately warned Chris Barton, the committee's new general counsel, that "there was an NSA program of questionable legality and that it was going to blow up in their faces." In early 2002, Roark also quietly arranged a meeting between Binney, Loomis, and Wiebe and Rep. Richard Burr, a North Carolina Republican on the House Intelligence Committee. Binney told Burr everything they had learned about the NSA wiretapping program, but Burr hardly said a word in response. Burr never followed up on the matter with Roark, and there is no evidence he ever took any action to investigate the NSA program. He was later elected to the U.S. Senate.

After getting nowhere with Burr and being shut down by Sample and Sheehy, Roark finally began to realize that if she was ever going to stop the illegal operation, she was going to have to go outside of the House committee, her institutional home. That meant that she was going to have to start taking risks. As she reached out to her network of contacts throughout the government, she gradually realized, to her horror, that there was a cover-up under way to protect the NSA's illegal operation, and it involved far more people than she could ever have imagined—including many she knew and trusted.

Roark first met with a former senior NSA executive who had been trying to help her improve her relations with Hayden and the rest of the NSA's top management. When Roark told the former official about the warrantless wiretapping program, he seemed shocked and agreed to talk with NSA officials about it. But Roark never heard from him again.

Roark then tried to set up a meeting with U.S. District Court Judge Colleen Kollar-Kotelly, who was also the chief judge of the so-called FISA court, the secret Washington-based federal court that was supposed to authorize electronic surveillance in national security cases

ENDLESS WAR

inside the United States. Since the purpose of the Bush administration's warrantless wiretapping program was to avoid the legal process established by the Foreign Intelligence Surveillance Act of 1978—and to skirt the secret court established by that law—Roark assumed that Kollar-Kotelly would be outraged when she learned about the secret program. So Roark called Kollar-Kotelly's Washington office and left a message with her secretary, identifying herself and asking for a meeting to discuss "an illegal NSA program." The judge's secretary called Roark back to tell her that the judge could not meet her or discuss the matter with her. Chillingly, the secretary added that the judge had called the Justice Department to inform officials there that Roark was asking questions, and that Roark should expect a call from a Justice Department lawyer. Roark was horrified and believed that Judge Kollar-Kotelly had betrayed her. Later, a Justice Department lawyer did call Roark, but, suspecting a trap, she refused to talk to him. What Roark did not realize was that Kollar-Kotelly had been told about the program by the White House, and she had agreed to keep the fact that the NSA was going around her own court a secret, even from the other judges on the court. When the NSA program later became public, one of the other FISA court judges, James Robertson, resigned in protest.

Next, Roark approached Charles Allen, a legendary figure in the CIA and one of the few top CIA officials who had displayed genuine interest in the NSA and its problems over the years. Over lunch, Roark told Allen about the warrantless wiretapping program, and said that she believed the operation was illegal. Allen said nothing, and by the end of the lunch, Roark realized that Allen already knew about the program and had not objected to it.

In perhaps her most naive move, Roark next called David Addington, an old acquaintance from their days working together on the House Intelligence Committee. Addington had long since left the House committee and become one of Vice President Dick Cheney's most powerful aides. From his post at Cheney's right hand, Addington had become one of the architects of the Bush administration's policies in the war on terror and was a fierce advocate for the NSA domestic spying program.

Roark c
mail messa
important
count for t
something
back.


Frustrated
by discover
cret, Roark
But she wa
On March
to have bre
talk, Roark
Goss that
gram, but
of "questio
forever," sh
to look bad

Halting
lowed by ti
cret briefin
that he had
He said he
and instea
curity grou
remove the
tem. She sa
collection
store them

Goss ag
that it wou
ministratic
House and

Roark could not reach Addington personally, so she left a voice-mail message for him at the White House, telling him that it was very important that they meet, that she had been handling the NSA account for the House committee, and that she was very troubled by something that had happened post-9/11. Addington never called back.

★

Frustrated by her inability to stop the NSA program and depressed by discovering that so many people she knew were protecting the secret, Roark decided to retire from the House committee in April 2002. But she wanted to make one more push to stop the NSA program. On March 20, 2002, just before she left the committee, she arranged to have breakfast with committee chairman Porter Goss. After small talk, Roark brought up the warrantless wiretapping program. She told Goss that she knew that he must have been briefed about the program, but she said she wanted him to know that the operation was of "questionable legality" and was unsustainable. "This cannot go on forever," she told Goss. "It's going to leak and the committee is going to look bad" for not trying to stop it, she warned him.

Haltingly, Goss defended himself, saying that he had not been allowed by the White House to have any staff with him during the secret briefing that he and Pelosi had received on the program, adding that he had also not been able to receive an independent legal review. He said he had accepted the White House's assurances of its legality, and instead had tried to evaluate the program purely on national security grounds. Roark then told him that the NSA had no reason to remove the protections for American citizens from the collection system. She said those protections could even help make the intelligence collection more efficient, and urged him to try to get the NSA to restore them.

Goss agreed that the secret program would eventually leak, and that it would be bad for the committee. He added that the Bush administration's repeated extensions of the NSA program—the White House and Justice Department were reauthorizing it every forty-five

ENDLESS WAR

out who had talked to the *New York Times*. The Justice Department convened a grand jury, and the FBI assigned a task force of agents to hunt down the paper's sources. It did not take long for the Justice Department and the FBI to focus on Diane Roark as a prime suspect.

★

Roark was living quietly in Oregon when she got a call in August 2006 from the general counsel of the House of Representatives. The lawyer told her that the FBI was looking for her, and that the agents wanted to know whether she would be willing to talk to them as part of their NSA investigation. Roark replied that it was about time that someone investigated the program—but the lawyer quickly explained that the FBI was investigating the leak to the *New York Times*, not the program itself. Roark said she would be willing to talk with the FBI, but she was taken aback when the lawyer told her that the House of Representatives would not provide her with a lawyer.

Roark finally met with a prosecutor and two FBI agents in February 2007. With a shock, she realized that she was a target of the investigation. Roark denied that she had been a source for the story in the *Times*—a story that I wrote along with Eric Lichtblau—and also said she had not been a source for my book *State of War,* which also included a chapter revealing the existence of the NSA program. The prosecutor then asked her whether she knew who had talked to me or Lichtblau about the NSA, and she said she had no idea.

★

An incessant pounding woke Diane Roark from a sound sleep. She stumbled out of bed, went down to the front door of her Oregon home, peered out a window, and asked who was there. It was the FBI. It was 6 A.M. on July 26, 2007, and a phalanx of FBI agents, pouring out of a convoy of cars that filled her driveway, had come to raid her house.

As she opened the door, at least a dozen agents filed in. The lead agent quickly asked if she had any guns, and she said no. He then

*The War on Truth*

showed her a search warrant and stood next to her while she called her lawyer in Washington, who told her to ask the FBI agent to let her see a copy of an affidavit in support of the search warrant. The lead agent told her it was under seal and that she couldn't see it. With that, the FBI began to pick apart Roark's house.

While other agents started to carry out her computer and other electronic equipment, one female agent accompanied Roark back upstairs, watched as she got dressed, and then followed her outside when she decided to get out of the house and work in her garden while the FBI rifled through her belongings. The FBI search took five hours—conducted mostly by women wearing hair nets and gloves—and even extended to the apartment of a tenant who was renting rooms in Roark's house. They took fifteen boxes filled with Roark's belongings, made her sign for it, and then left.

On that same day in Maryland, FBI agents raided the homes of Bill Binney, Kirk Wiebe, and Ed Loomis. A few months later, in November 2007, the FBI raided the house of a fifth member of what the government was convinced was a conspiracy of leakers—Thomas Drake, the only one of the group who was still working at the NSA.

A previously sealed FBI affidavit filed in support of the raid on Drake's house shows that he and the others were all targeted because the government believed that they had conspired together to reveal all that they knew about the NSA domestic surveillance program to the *New York Times*. The affidavit is from an FBI agent ironically named Jason Lawless, who stated that he was assigned to a "task force that is conducting an investigation into the unauthorized disclosure, 'leak,' of classified information to two New York Times (NYT) reporters, James Risen and Eric Lichtblau, who work in the NYT's Washington, D.C. Bureau, concerning alleged activities of the National Security Agency (NSA), including the Terrorist Surveillance Program (TSP)."

All five told the FBI that they had not talked to the *Times* about the NSA program, and all said that they did not know who did. One reason they had been targeted as a group was because they had jointly signed a letter to the Defense Department's inspector general calling for an investigation of the waste and abuse in the NSA's Trailblazer contract.

259

ENDLESS WAR

After Drake denied talking to the *New York Times*, he told the FBI that he had only spoken with a reporter from the *Baltimore Sun*, who had written stories about the NSA's contracting problems with Trailblazer, which had been published after the *New York Times* stories about domestic spying. Embarrassed by the fact that they had devoted enormous resources to investigating the wrong people, the Justice Department was forced to grasp at straws. Prosecutors decided to charge Drake in connection with leaking to the *Baltimore Sun*, based on his own statements. Eventually, that case collapsed when the government failed to prove that he had leaked any classified information at all. (In fact, Drake was not even the original source for the *Sun's* stories on Trailblazer. Drake did not talk to the *Sun* reporter until after she had already written her first stories on the subject.)

But while the Drake case collapsed, and the other four were never charged, the investigation had a devastating impact on all of them. Just as she was being targeted by the Justice Department, Diane Roark was diagnosed with breast cancer. She had to begin treatments as prosecutors threatened her with jail for perjury for lying about not being a source for the *Times's* NSA story. When word that she was under investigation began to spread, Roark was ostracized by her former friends and colleagues on the House Intelligence Committee.

Drake's wife, who also worked at the NSA, was furious at her husband for putting their family at risk. Pressured by the NSA to cooperate or else risk losing her job, she talked to the FBI about her husband, despite the marital privilege that gives spouses the right not to testify against each other. They separated for a year but then decided to stay together for the sake of their youngest son.

Bill Binney has been suffering from diabetes that he believes was triggered by a case of hepatitis A he contracted from food he ate in the NSA cafeteria. He has suffered four episodes of MRSA since 2008, and has lost his right foot and left leg below the knee. He now must use a wheelchair. Whether stress from the federal investigation was a factor in his health problems is difficult to determine. "Actually, my medical problems seemed to make the government crap trivial," he now says.

*The War on Truth*

After his home was raided, Ed Loomis felt betrayed by the system that he had been a part of all his life. He became so embittered and traumatized that his wife left him. "Her departure was of my own making along with the able assistance of the U.S. Government," Loomis says now. "My personality metamorphosis was created solely from being dishonored by NSA. . . . It embittered me to the point where I had virtually withdrawn from most friends and family out of utter shame and embarrassment. I morphed into a curmudgeon, purchased a couple of handguns to test whether the Men in Black would allow the purchase to go through."

Today, Thomas Drake has emerged from the wreckage of the government's case against him and is trying to put his life back together again. In a deal to end the case as rapidly as possible, he agreed to plead guilty to a single misdemeanor charge related to the improper handling of a document that the FBI found at his house during its raid. He served no jail time.

★

Drake has since become celebrated and was awarded the Ridenhour Prize for Truth-Telling, given annually to whistleblowers. It is named for the soldier who blew the whistle on the My Lai massacre in Vietnam. Drake works in an Apple store in Bethesda, Maryland, in order to help make ends meet. In October 2013, he traveled to Moscow to meet with Edward Snowden and participated in a small ceremony in which Snowden was presented with an award as an intelligence whistleblower. (Snowden has said that the government's persecution of Drake was one reason he decided to leave the United States before leaking documents to the press.)

Diane Roark, by contrast, has received almost no public recognition for her repeated efforts to try to stop the NSA program. She still lives quietly in Oregon and has been relying on alternative medical treatments to deal with her breast cancer. "I know I did the right thing in challenging the completely unnecessary threat to our liberties and to our very Republic," Roark now says. "It was, after all, what



Exhibit 3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
LARRY KLAYMAN et al.,                    )
                                         )   Civil Action No. 06-CV-00670 (CKK)
          Plaintiff,                     )
                                         )
             v.                          )
                                         )
JUDICIAL WATCH, INC. et al,              )
                                         )
                                         )
          Defendants.                    )
                                         )
_____ )

_____
                                         )
ELHAM SATAKI,                            )
                                         )
          Plaintiff,                     )   Civil Action No. 10-0534 (CKK)
                                         )
             v.                          )
                                         )
BROADCASTING BOARD OF                    )
GOVERNORS, *et al.*                      )
                                         )
          Defendants.                    )
_____ )

_____
ELHAM SATAKI,                            )
                                         )   Civil Action No. 10-CV-00466 (CKK)
          Plaintiff,                     )
                                         )
             v.                          )
                                         )
MEHDI FALAHATI, et al.,                  )
                                         )
          Defendants.                    )
                                         )
_____ )

1

## 28 U.S.C. 144 AFFIDAVIT OF LARRY KLAYMAN

I, LARRY KLAYMAN, being over eighteen years of age, hereby swear on personal knowledge or belief as follows:

1.      I am a member in good standing of the District of Columbia Bar and the bar of this court. I have been a practicing lawyer for 33 years.

2.      In 1994, after 17 years as a practicing trial lawyer, and a former U.S. Department of Justice prosecutor and defense attorney, I founded Judicial Watch, because, over my years of practice, I had come to see that federal judges in particular sometimes act and think as if they are "above the law." I had represented many foreign clients as an international lawyer, and observed that they were not often treated equally before the bench. My goal was to create an organization that would police both the judiciary, the legal profession as a whole, and the other two branches of government. With regard to judges, I saw this as a necessity as judges, almost without exception, will not stand in judgment of other judges. They will not police their own misconduct and in fact I learned sadly work hard to cover it up.

3.      In this regard, during my 33 years of legal practice, I have never experienced a jurist more prone to wear her politics on her sleeve, so to speak, than Judge Colleen Kollar-Kotelly. Regrettably, federal judges are chosen by the sitting President usually on the basis of their politics and political connections; patronage so to speak. And, because once confirmed they are judges for life, some regrettably act and think as if they are "above the law."

4.      Judge Kollar-Kotelly has acted in this way toward me over the years, but recently the situation has become much more acute and prejudicial in the above cases. As

2

set forth below, I firmly believe that her decision making in the above three cases in particular has been colored, that is prejudiced, by her extreme political dislike if not hatred of me.

5.      I am not the ordinary trial lawyer; far from it. During the 1990's I filed over eighty cases against Bill and Hillary Clinton and their administration, and helped to and was instrumental in uncovering the famous Chinagate or campaign finance scandal, and represented nearly all of the women who claimed to have been harassed and sexually abused by Bill Clinton, among other cases, such as the equally famous Filegate case and scandal. During this time, I developed a reputation, I feel undeservedly, of being anti-Democratic Party; however, I was and am fierce thorn in the side of the liberal political establishment and all establishments, which seek to protect and further their own interests at the expense of the people. This partisan reputation was undeserved because when George W. Bush became president, I treated his administration similarly in attempting to hold him and his vice president, Dick Cheney, to the rule of law. Nevertheless, I was demonized by the left in this country, particularly in Washington, D.C. I am a mix between conservative and libertarian in my political philosophy.

6.      It is a known fact that when Colleen Kollar-Kotelly was nominated by President Clinton for a seat on this court that her nomination was bitterly opposed by conservatives and their public interest groups, such as Paul Weyrich's Free Congress Foundation, because of her extreme left-wing views and decisions on the bench. It is also a known fact that Judge Kollar-kotelly's husband, himself a lawyer, played a role which was useful to President Clinton during the infamous Monica Lewinsky scandal, which resulted in the impeachment of Bill Clinton, only the second time in American history that

3

impeachment had occurred. I not only worked with Congressman Bob Barr to introduce articles of impeachment against Bill Clinton, and assisted the House of Representatives in its subsequent impeachment proceedings, I was very active during the Monica Lewinsky scandal representing many of the women – Jennifer Flowers, Paula Jones, Kathleen Willey, Juanita Broadrick, Dolly Kyle Browning – who corroborated Bill Clinton's sexual predilections, infidelity toward, and abuse of women, including breakins by private investigators into their homes, death threats, and IRS audits, to name just a few of the tactics employed by the Clintons to intimidate and scare these women from coming forward to testify. I appeared frequently on television to discuss my legal cases in this regard. My family and I were also threatened during this period in American history, so much so that I had to retain security guards for my children, my then wife and myself. By the end of the Clinton presidency, although the nation is quick to forget given the poor leadership in the White House since then, Bill and Hillary Clinton had racked up over 40 scandals, been accused of even murdering witnesses and White House Deputy Counsel Vince Foster, and left office in near total disgrace. Hillary Clinton even attempted to steal White House furniture as she left, but had to bring it back after a public outcry. In short, there was no crime that was beneath the Clintons. Bill Clinton was disbarred for 5 years by the Arkansas Bar, and the independent counsel, Robert Ray, stated publicly that he did not pursue criminal charges against Hillary Clinton for lying before a grand jury because it was unlikely that a District of Columbia jury, given its racial and political makeup, would convict her. During this period, I was the only lawyer to have obtained a court ruling, which occurred in the Filegate case before this court, that Bill Clinton had committed a crime when he released publicly the Privacy Act protected files of Kathleen Willey, a woman he

has been accused of sexually harassing in the Oval Office after Ms. Willey's then husband had died. So for all of these reasons, I am not a typical trial lawyer, but a very controversial one who was and is seen as a threat to Democrats and persons associated with Bill and Hillary Clinton. I recently had published a book, "Whores: Why and How I Came to Fight the Establishment," which is my auto-biography of sorts. In this book, which was released in October 2009, I am critical of Judge Kollar-Kotelly, among other jurists and politicians and media figures.

7. The Clinton era was a dark period in this nation's history and the country became very polarized. I was and still am seen as a polarizing figure, because I challenge the legal and political establishment in court and in the media, and hold them accountable in other legal ways. Some judges, like Judge Kollar-Kotelly react to this and have a hard time dealing with me.

8. Federal district courts have held that, in theory, a jurist can be disqualified by imputing extra-judicial bias and prejudice toward an attorney to the client. For instance, in one of a series of cases where federal courts have strained not to find the requisite extra-judicial bias and prejudice – in obvious efforts to protect their fellow judges – the Seventh Circuit ruled: "Souder (Souder v. Owens-Corning Fiberglas Corp. 939 F. 2d 647, 653 (8th Cir. 1991) acknowledged, however, that in some circumstances, 'bias against an attorney can reasonably be imputed to a party' (939 F. 2d at 653), and we agree." United States v. Sykes, 7 F. 3d 1331 (7th Cir. 1993). See also United States v. Jacobs, 855 F. 2d 652, 656 (9th Cir. 1988); In re Beard, 811 F. 2d 818, 830 (4th Cir. 1987); United States v. Ritter, 540 F. 2d 459, 462 (10th Cir. 1976); Davis v. Board of Sch. Comm'rs, 517 F. 2d 1044, 1050-51 (5th Cir. 1975).

9.      Importantly, in United States v. Jacobs, 855 F. 2d 652 (9th Cir. 1988), while the Ninth Circuit, recognizing that reassignment can be made by the chief judge in the lower tribunal or on its own at the appellate level, ordered reassignment on the case to another trial judge based on a series of legal errors by the tranferor judge and his antipathy toward the appellee counsel. The Ninth Circuit ruled: "...we hold that we must order reassignment to preserve the appearance of justice. Here, the trial judge has (1) dismissed an indictment summarily and erroneously; (2) refused to reassemble the jury when just two minutes later the mistake was discovered; (3) denied the motion for reconsideration after the government had proven no misconduct; (4) allowed the defendants to file an untimely motion  to dismiss; (5) criticized the government's handling of the case in the jury's presence; and(6) offered strategic advice to one of defendant's counsel on how to win his case. On these facts, the gains made for the appearance of justice by reassignment to another judge will outweigh the duplication of time and effort." This reassignment was a way to try to avoid disqualification of this fellow judge, which clearly was warranted, but which his colleagues refused to order to protect him.

10.      In one of the cases at issue here, Sataki v. BBG et. al, Plaintiff and her counsel, me,  requested reassignment of the case, in order to try to avoid having to file this motion under 28 U.S.C. 144, since it regrettably clear that disqualification is rarely if ever ordered given the realities of our court system. Reassignment was requested from Judge Kollar-Kotelly herself, or if she would not order reassignment, then through the chief judge of this court, the Honorable Royce C. Lamberth. However, rather than timely entertaining the motion, Judge Kollar-Kotelly "hung back" and denied the motion on the same day that she refused and failed to grant Plaintiff's motion for preliminary injunctive relief. Given that

6

Plaintiff, Ms. Elham Sataki, had simply requested that the status quo be preserved by allowing her to return to work and be paid during the period of her convalescence from severe sexual harassment by an employee of and retaliation by the defendant agency, and that she was emotionally and physically disabled as a result, this act by Judge Kollar-Kotelly – creating law of the case before Plaintiff and her counsel could even file a motion to disqualify – rises to such a level of legal abuse that it manifests that extra-judicial bias and prejudice against them, particularly when analyzed in the context of the other prejudicial acts of this jurist. As in the Jacobs case, legal errors and apparently antipathy toward counsel can, when taken as a whole, rise to the level of obvious extra-judicial bias and prejudice. Otherwise, the jurist would not have made these rulings, which cumulatively cannot have been the result of mere inadvertent error. Judges, like every one else in the world, can have a prejudicial bias against a party and his or her lawyer. For the courts to routinely deny that judges are above this is simply not reality; but rather stems from a visceral and inherent desire to protect their own, lest a similar fate someday befall them. Indeed, that was the primary reason that I founded Judicial Watch in 1994; the refusal of judges to police their own misconduct. So while the Jacobs court refused to disqualify the trial judge, at least it transferred the case away from him – a face saving gesture to this jurist.

11.     28 U.S.C. 144 on its face requires disqualification once a party files a timely and sufficient affidavit, as is occurring herein, and certifies that the motion is filed in good faith.  However, typically, jurists who were supposed to enforce this clear cut law cleverly "changed" the Congressional letter of the law and have looked for ways to not disqualify judges. Section 144 was meant as a type of "peremptory" challenge to a judge sitting on a

7

case or cases, as exists in many states, such as California. It thus can only be used once in a case. However, the law Congress enacted and which remains "on the books" has been misapplied by the judiciary itself through rank "judicial activism". Thus, if this court does not honor the letter of the law in granting this motion to disqualify, I will attempt to take this matter to the Supreme Court.

12.     In the Sataki case, Judge Kollar-Kotelly committed several prejudicial acts, which will be set forth in greater detail later in this affidavit. But in sum, this jurist not only ignored the law, she twisted the facts of the case to such an extent that it could not have been accidental. And, most egregiously, she refused to even allow for an evidentiary hearing or discovery, and weighed and accepted the affidavits of the agency over the affidavits of my client, Ms. Sataki, in denying her temporary relief that would save her life, given that she had to remain in Los Angeles after she suffered a nervous and physical breakdown and was forced into a suicidal state and had to consult her physicians, psychologists and psychiatrists there – where she remains under their care. This conduct was so prejudicial to the fair and impartial administration of justice that a concurrent judicial complaint is being filed against Judge Colleen Kollar-Kotelly. Importantly, Judge Kollar-Kotelly set the factual and legal bar so high for Ms. Sataki to obtain a preliminary injunction ordering her back to work during her period of rehabilitation, and the motion for temporary restraining order before that, that is was impossible for her to prevail. Importantly, when one reads Judge Kollar-Kotelly's previous rulings on temporary relief in other cases, which more suited her left wing Democrat ideological bent – in matters concerning gun rights and Vice President Dick Cheney's official records and the Council for

8

American Islamic Relations-- the factual and legal threshold is much lower, in Judge Kollar-Kotelly's own words. This will be set forth later in this affidavit.

13.     The misconduct resulting from extra-judicial bias and prejudice of Judge Kollar-Kotelly toward me, counsel in the three above styled cases, is seen most clearly in Klayman v. Judicial Watch, as case brought by me to enforce my severance agreement with Judicial Watch when I left to run for the U.S. Senate in Florida. In this case, which is on-going, Judge Kollar-Kotelly allowed the ethically compromised Defendants to take discovery into my divorce from my ex-wife, in which she falsely accused me of marital infidelity (well before Judge Kollar-Kotelly ordered the discovery, the allegation had long since been previously retracted by my wife in a consent divorce decree) and allowed an innocent woman, who never had an affair with me, and who has two children and is married, to have her name despicably dragged through the mud. As a non-meritorious defense, Defendants had falsely alleged that I left Judicial Watch involuntarily over this "affair," characterizing Judicial Watch is a family oriented organization (ironically, the two principal directors of Judicial Watch, Messrs. Fitton and Orfanedes, are not "typical" family values conservatives in terms of their lifestyle preferences), despite the fact that the severance agreement itself provides that Mr. Klayman had left voluntarily to pursue other endeavors (see Attachment #1 to Docket Item Np. 14, 1:06-cv-00670-CKK), such as running for the U.S. Senate. Defendants signed and agreed that this was so in the severance agreement. Thus, Judge Kollar-Kotelly allowed for an outrageous and irrelevant and not legally justified fishing expedition into my personal life based on the false assertion by Defendants that had no factual or legal basis for consideration, even simply as a matter of the parol evidence rule. Importantly, Judge Kollar-Kottelly's actions, which were cruel, and

9

vindictive and retaliatory, will someday affect how my young children view their father (and how the innocent woman's children will view her), and serve as a dark reminder of the bridled and arrogant power of some on the federal bench, like Judge Kollar-Kotelly, who choose to use their power for improper ends. This was obvious "payback" for representing the women who had come forward to testify against President Bill Clinton, who had appointed Judge Kollar-Kotelly and to whom she owes her judgeship. As I see it, Judge Kollar-Kotelly, seeing an opportunity to try to harm and smear me, and to hamper me from bringing future lawsuits against her Democratic party and the left wing establishment, seized on the opportunity presented to her. When I asked, at a minimum, that this scurrilous and irrelevant discovery be sealed and kept off the public record, Judge Kollar-Kotelly even denied this reasonable request. So too was the request to enter a protective order to protect from public disclosure confidential business proprietary information, as is the usual course of conduct in cases dealing with business damages. This too was ordered and when I objected and would not put the business proprietary information on the public record, Judge Kollar-Kotelly dismissed most of my case and barred me from presenting evidence on damages. In addition, Judge Kollar-Kotelly also denied a one day or short extension of time during the Christmas holiday season in 2008 and instead proceeding to enter summary judgment against me in part because I could not file the pleadings that were required until a day later after the holiday. In a disingenuous opinion, she then stated falsely that she had reviewed the one day late filing in any event, and still was granting summary judgment – a clever judicial game. After all of this and more, when I asked Judge Kollar-Kotelly to disqualify herself under 28 U.S.C. 455 from further proceedings, this too was denied.

10

14.     In the Sataki v. BBG case, as set forth in the Memorandum Opinion of July 7, 2010 denying Ms. Sataki's motion for preliminary injunction (See Docket Item No. 63, 1:10-cv-00534-CKK) and her Memorandum Opinion of June 1, 2010 denying Ms. Sataki's motion for temporary restraining order (See Docket Item No. 37, 1:10-cv-00534-CKK), Judge Koller-Kotelly  callously stated that government's affidavit testimony is entitled to more weight than the Plaintiff, since it is the government in effect, and then twisted facts to suit her ends. Referenced herein by Docket Item Numbers are the various pleadings of Ms. Sataki and me which set forth the errors of Judge Kollar-Kotelly in not granting the temporary restraining order, which speak for themselves, much as in the Jacobs case.

15.     With regard to the July 7, 2010 Memorandum Opinion (See Docket Item No. 63, 1:10-cv-00534-CKK), Judge Kollar-Kotelly twisted the facts and the law in ways which include but are not limited to:

1.)     ruling falsely at page 3 that Ms. Sataki was attempting to alter the status quo, when she was simply just trying to get the court to order her to be put back to work and be paid for it, as was the case before the sexual harassment and retaliation;

2.)     ruling, in a show of extreme arrogance and legal error toward the American people at page 4, much less employees of the federal government, that "well-established precedent further counsels that this Court should be reluctant to interfere with the personnel decisions of the federal government…" Were this the case,  a litigant who is sexually harassed and retaliated against could never prevail as a practical matter, despite established case law in this circuit that a federal district court can step in to prevent harm to the employee as her sexual harassment and related cases go through the administrative process. See Wagner v. Taylor, (836 F.2d 566 (C.A.D.C., 1987)).

3.) Manufacturing facts (see page 6) falsely claiming that Ms. Sataki did not contest through affidavits her job duties and capabilities, and thus could not work in the Los Angeles VOA office without supervision and thus an evidentiary hearing is not necessary despite admitted contradictory facts from the parties.

4.) Holding falsely at page 7 that "Importantly, while Plaintiff's job duties occasionally require her to perform her work duties in the field, the record indicates that Plaintiff has always been assigned to the Washington, D.C., duty station; there is no indication that Plaintiff has been detailed to any other office location nor is there any evidence that she has been permitted to work remotely from another location for any extended period of time." This is false and Judge Kollar-Kotelly knew it is false when she based her ruling in large part on this. First, Ms. Sataki's sworn declarations (*See* Sataki v. BBG, et al., Attachment #2 to Docket Item 11, Civil Action No. 10-0534) set forth clearly that she worked out of other locations and did packages from there, including Los Angeles, and that she never asked to be detailed for "an extended period of time." She asked only to be detailed to Los Angeles while she undergoes rehabilitation. Thus, by falsely framing the issue the way the court has, with manufactured facts, Judge Kollar-Kotelly "cooked" the predetermined result she wanted to reach. This is the mark of a dishonest and prejudiced jurist.

5.) At footnote 4 on page 7, Judge Kollar-Kotelly, in what is the most blatant of her falsehoods in the Memorandum Opinion of July 7 2010, holds: "While Plaintiff disputes various statements contained in the Jackson Declaration, the Court emphasizes that she has not disputed the accuracy of her job duties provided in Ms. Jackson's declaration nor provided any evidence on the record that would create a material issue of fact as to

12

Plaintiff's present job duties as an International Broadcaster." Not only did Ms. Sataki refute these false statements, made by a Defendant in the case (thus she has an interest in not truthfully testifying), but Ms. Sataki swore that she could perform all job functions as an international broadcaster. See 3rd Declaration of Sataki which states as follows:

> "Contrary to Susan Jackson's false declaration, not only do I NOT need constant supervision for the job functions I normally performed at PNN, during my time at the PNN I performed my work very independently and with very minor supervision from my superiors. In fact, quite often I voluntarily assisted fellow co-workers with the performance of their duties. I previously submitted DVD videos of many of the packages I have done for VOA, in which I wrote the script, edited and produced them. I am also submitting as Exhibit EE with this, my third sworn declaration, DVDs of videos of my live, on air appearances on VOA, in which I was a co-host, anchor and did much more than read emails, as Susan Jackson falsely stated in her declaration. I also am submitting a video of an interview I did in Sweden, when I was live by telephone reporting on an international event." (¶ 17);

> "I am independently capable of and proficient at researching interviewing, recording, editing, producing and submitting my work to the Washington, D.C. office of VOA, as the videos show. In fact, attached to my prior declarations, and this one, as exhibits, and are several of the "packages" I produced independently from Los Angeles and Sweden. I did many of these interviews without the use of a teleprompter or notes. I am capable of interviewing without aids, based on my memory and expertise." (¶18)

> "A simple review of these DVDs of my independent work will evidence that unlike what defendants claim, I am capable of working independently from the Los Angeles office." (¶19)

> "Susan Jackson herself wanted me to do packages from LA, as emails I previously filed with the court show. In these emails, Susan Jackson talks about my getting more training, which although I did not need, I got ...." (¶ 19)

> "As stated in my earlier declarations, prior to the incidents leading to this lawsuit, PNN was in fact considering sending me to Los Angeles to prepare and report back with as many as five interview packages a month." (¶ 24)

See also Tim Shambles Second Declaration  ¶¶ 7-8 stating as follows:

13

"Ms. Sataki's work has been rated by the Agency itself (via the annual performance review process) as satisfactory (we are on a two tier system so satisfactory is the highest rating). If there were problems with her performance there no was no indication of them before she complained about being sexually harassed. In addition, when she first began to work for VOA, a few years ago, she was on a one year probationary period. If her work had not been good, she would neither been hired in the first place nor been approved for continued employment after her one year probationary period." (¶7.)

"I have been in close professional contact with Ms. Sataki and he supervisors and I never heard any of these supervisors say, orally or in writing, that she was not able to do packages on her own. This claim is recently manufactured." (¶8.)

In addition, Ms. Sataki submitted DVDs of her international broadcasting with her sworn declarations; and the court makes no mention of having reviewed them, as was requested. In short, Judge Kollar-Kotelly creates the facts that she wants to avoid an evidentiary hearing and to rule summarily against a client of Mr. Klayman who is on her medical and financial knees, and who just wants to work in the Los Angeles VOA office while she convalesces – and is not requesting a permanent position there.

6.)     It is false as ruled on page 15 that Plaintiff, Ms. Sataki, did not submit and offer to submit medical documentation about her medical condition. Indeed, the court references the uncontested medical reports of Dr. Arlene Aviera and Dr. James Long, who both set forth her medical disabilities and the reasons why she must remain in Los Angeles under their care during the period of her rehabilitation.

7.)     At page 18, Judge Kollar-Kotelly falsely states that Ms. Sataki is not receiving treatment from a physician authorized by BBG to handle workplace injuries. This was never a genuine issue in any of the material and so called evidence submitted by BBG to the court. And, Ms. Sataki, using her medical insurance coverage provided by BBG, used

14

authorized physicians such as Dr. Aviera an Dr. Long under this plan, which is Blue Cross/Blue Shield. In any event, this is an issue for an evidentiary hearing on the merits. By twisting and creating facts throughout, Judge Kollar-Kotelly not only denies Ms. Sataki due process, but cooks the result of her factually false and disingenuous decision, which reeks of extra-judicial bias and prejudice.

8.) Attached as Exhibit "1" is a chart setting forth the other mischaracterizations, falsifications and perversion of the facts and the law contained in Judge Kollar-Kotelly's Memorandum Opinion of July 7, 2010. The multitudes of these "errors" could not have been "inadvertent," but the result of extra-judicial bias and prejudice of this jurist toward Ms. Sataki's counsel, which was then imputed to Ms. Sataki herself.

16. Set forth below is how Judge Kollar-Kotelly describes the legal standards for preliminary injunctive relief in cases where her political bent is in favor of the movant, as opposed to in the Sataki case where it is not. See Memorandum Opinion of September 20, 2008, in Citizens for Responsibility and Ethics in Washington, et al. v. Richard B. Cheney (Civil Action No. 08-1548 (CKK)) stating as follows:

> "In assessing whether to grant preliminary injunctive relief, a court must balance four factors: (1) whether the movant is substantially likely to succeed on the merits; (2) whether the movant would suffer irreparable injury if the injunction were not granted; (3) whether an injunction would substantially injure other interested parties; and (4) whether the public interest would be furthered by the injunction. See Mova Pharm. Corp. v. Shalala, 140 F.3d 1060, 1066 (D.C. Cir. 1998) (citing CityFed Fin. Corp. v. Office of Thrift Supervision, 58 F.3d 738, 746 (D.C. Cir. 1995)).
>
> In applying this four-factored standard, district courts employ a sliding scale under which a particularly strong showing in one area can compensate for weakness in another. See City Fed Fin., 58 F.3d at 747. As the Fourth Circuit stated in a case cited approvingly by the D.C. Circuit:

> 'There is a correlation between the likelihood of plaintiff's success and the probability of irreparable injury to him. If the likelihood of success is great, the need for showing the probability of irreparable harm is less. Conversely, if the likelihood of success is remote, there must be a strong showing of the probability of irreparable injury to justify issuance of the injunction.'

Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus. Inc., 889 F.2d 524, 527 (4th Cir. 1989); see Davenport v. Int'l Bhd. of Teamsters, 166 F.3d 356, 366 (D.C. Cir. 1999) (citing Murrow Furniture Galleries with approval).

Further, the D.C. Circuit has explained:

> To justify a temporary injunction it is not necessary that the plaintiff's right to a final decision, after a trial, be absolutely certain, wholly without doubt; if the other elements are present (i.e., the balance of the hardships tips decidedly toward plaintiff) it will ordinarily be enough that the plaintiff has raised substantial questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation.

*Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 81, 844 (D.C. Cir. 1977) (quoting *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir. 1953)). As such, "[o]ne moving for a preliminary injunction assumes the burden of demonstrating either a combination of probable success and the possibility of irreparable injury or that serious questions are raised and the balance of hardships tips sharply in his favor." *Id.* (quoting *Charlie's Girls, Inc. v. Revlon, Inc.*, 483 F.2d 953, 954 (2d Cir. 1973) (per curiam)). Significantly, the D.C. Circuit has concluded that "this approach is entirely consistent with the purpose of granting interim injunctive relief, whether by preliminary injunction or by stay pending appeal" because "such relief is [generally] preventative or protective; it seeks to maintain the status quo pending final determination on the merits of the suit." *Id.*; *see also Ramirez v. U.S. Customs and Border Prot.*, 477 F. Supp. 2d 150, 155, 159 (D.D.C. 2007) (granting preliminary injunction based on balancing of factors as set forth in *Holiday Tours*)."

See also the Memorandum Opinion of March 19, 2009, in Brady Campaign To

Prevent Gun Violence, v. Kenneth L. Salazar Civil Action No. 08-2243 (CKK) wherein Judge

Koller-Kotelly sets forth the legal standard very leniently, as follows:

To obtain preliminary injunctive relief, a moving party must show: (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). In applying this four-factored standard, district courts may employ a sliding scale under which a particularly strong showing in one area can compensate for weakness in another. *Id.* Accordingly, "[i]f the showing in one area is particularly strong, an injunction may issue even if the showings in other areas are rather weak." *Id.* (quoting *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995)). Nevertheless, the D.C. Circuit has advised that a movant must demonstrate "'at least some injury' for a preliminary injunction to issue . . . [because] 'the basis of injunctive relief in federal courts has always been irreparable harm . . . .'" *Id.* (quoting *CityFed*, 58 F.3d at 747; *Sampson v. Murray*, 415 U.S. 61, 88 (1974)).

Defendants raise an argument (albeit in a footnote) that this standard for a preliminary injunction has been circumscribed by the Supreme Court's decision in *Winter v. Natural. Res. Def. Council, Inc.*, __ U.S. __ , 129 S. Ct. 365 (2008). *See* Defs.' Opp'n at 11 n.8. *See also* MSLF Opp'n at 3 (discussing the application of *Winter*). The Court disagrees. In *Winter*, the Supreme Court held that the Court of Appeals for the Ninth Circuit had applied an erroneous legal standard by affirming a district court's preliminary injunction when the plaintiff had only shown a "possibility" of irreparable harm and where the district court had made almost no attempt to analyze the balance of equities and the public interest. *See* 129 S. Ct. at 375, 378.

The Supreme Court found that this standard was too "lenient," and reaffirmed that a preliminary injunction should issue only when "irreparable injury is *likely* in the absence of an injunction." *Id.* (emphasis in original). The Court had no occasion to examine the D.C. Circuit's precedents allowing a plaintiff's strong showing in one area to compensate for weakness in another. *Id.* at 392 (Ginsburg, J., Dissenting) ("courts have evaluated claims for equitable relief on a 'sliding scale,' sometimes awarding relief based on a lower likelihood of harm when the likelihood of success is very high . . . This Court has never rejected that formulation, and I do not believe it does so today."). In any event, because the D.C. Circuit's precedents require a plaintiff to show that "it would suffer irreparable injury if the injunction were not granted," *Chaplaincy*, 454 F.3d. at 297, the Court finds that the D.C. Circuit's sliding-scale standard remains viable even in light of the decision in *Winter*."

In addition in her Memorandum Opinion of November 3, 2009, in Council on

American-Islamic Relations v. Paul David Gaubatz, et al., Civil Action No. 09-2030  Judge

Koller-Kotelly uses a similarly low threshold (which she does not apply to Ms. Sataki) and

issues a Temporary Restraining Order to the Plaintiffs on an ex parte basis. In that case

Judge Koller-Kotelly sets forth the legal standard, as follows:

> The standard for obtaining injunctive relief through either a temporary restraining order or a preliminary injunction is well established. A moving party must show: (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction. Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006); Hall v. Daschle, 599 F. Supp. 2d 1, 6 n. 2 (D.D.C. 2009) ( "[t]he same standard applies to both temporary restraining orders and to preliminary injunctions"). In applying this four-factored standard, district courts may employ a sliding scale as to which a particularly strong showing in one area can compensate for weakness in another. Id. (quoting City Fed Fin. Corp. v. Off. of Thrift Supervision, 58 F.3d 738, 747 (D.C. Cir. 1995)).

In the Sataki case however, Judge Kollar- Kotelly did not apply the same

threshold as applied in the three cases cited above. Rather, in the Sataki case, Judge

Koller-Kotelli applied the following heightened standard:

> "The standard for issuance of the 'extraordinary and drastic remedy' of a temporary restraining order or a preliminary injunction is very high, and by now very well established." *RCM Techs., Inc. v. Beacon Hill Staffing Grp., LLC*, 502 F. Supp. 2d 70, 72-73 (D.D.C. 2007) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)). The moving party must show: (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006); *Hall v. Daschle*, 599 F. Supp. 2d 1, 6 n.2 (D.D.C. 2009) ("[t]he same standard applies to both temporary restraining orders and to preliminary injunctions"). The moving party bears the burden of persuasion and must demonstrate, "by a clear showing," that the requested relief is warranted. *Chaplaincy of Full Gospel Churches*, 454 F.3d at297.

> In applying this four-factored standard, district courts may employ a sliding scale as to which a particularly strong showing in one area can compensate for weakness in another area. *Id.* (quoting *CityFed Fin. Corp. v. Office of Thrift*

*Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995)). Thus, "[a]n injunction may be justified, for example, where there is a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable injury." *CityFed.*, 58 F.3d at 747. Notwithstanding the fluid nature of this familiar four-part inquiry, "[i]t is particularly important for the [movant] to demonstrate a substantial likelihood of success on the merits." *Barton v. District of Columbia,* 131 F. Supp. 2d 236, 242 (D.D.C. 2001) (citing *Benten v. Kessler*, 505 U.S. 1084, 1085 (1992)). If the movant fails to do so, inquiry into the remaining factors is unnecessary, for the injunctive relief must be denied on that ground alone. *See Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d 598, 614 (D.C. Cir.1992) (affirming denial of preliminary injunction where the district court properly concluded that the plaintiff had "no likelihood of success on the merits"); *Katz v. Georgetown Univ.*, 246 F.3d 685, 688 (D.C. Cir. 2001) ("although we apply a four-factor test in weighing a request for a preliminary injunction, such relief never will be granted unless a claimant can demonstrate 'a fair ground for litigation'"); *Taylor v. Resolution Trust Corp.*, 56 F.3d 1497, 1507 (D.C. Cir. 1995) ("Given the inadequacy of [plaintiff]'s prospects for success on the merits, there may be no showing of irreparable injury that would entitle him to injunctive relief."), *amended on other grounds on reh'g*, 66 F.3d 1226 (D.C. Cir. 1995). Applying these standards to the case at hand, the Court finds that Plaintiff has failed to demonstrate that she is entitled to a temporary restraining order on the present record. 12 [Foot Note 12: For this reason, the Court therefore declines to decide whether Plaintiff must meet an even higher burden of proof than outlined above because she is requesting mandatory injunctive relief — i.e., because she seeks to change the status quo through affirmative action rather than to merely preserve the status quo. *See* Defs.' Opp'n at 19 (urging Court to apply higher standard to Plaintiff's request for mandatory relief). This remains an open question in this Circuit. *See Farris v. Rice*, 453 F. Supp. 2d 76, 79 (D.D.C. 2006) (noting that the "D.C. Circuit . . . has not yet adopted or, for that matter, rejected th[e] rule" requiring a movant who seeks a mandatory injunction to meet a higher standard than in the ordinary case). While the Court agrees with Defendants that Plaintiff's request is properly characterized as seeking a mandatory injunction, the Court finds that Plaintiff has failed to show that the requested relief is warranted even under the ordinary standard set forth above. Similarly, although not raised by either party, the Court notes that some courts in this Circuit have also applied a higher standard to motions for preliminary injunctive relief in employment discrimination cases against the federal government. *See, e.g., Jordan v. Evans*, 355 F. Supp. 2d 72, 77 (D.D.C. 2004) (holding that "a plaintiff seeking injunctive relief in a Title VII discrimination action against the federal government must make 'a more stringent showing of irreparable injury' and demonstrate that 'civil rights claims take precedence over the government's interest in making personnel decisions.'") (quoting *Bonds v. Heyman*, 950 F. Supp. 1201, 1212 (D.D.C. 1997), *abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 105 (2002)). It appears, however, that the D.C. Circuit has yet to decisively resolve this issue. Accordingly, because the Court finds — as indicated above —

19

that Plaintiff fails to meet the traditional showing required, it need not determine at this time whether a higher standard should apply for this reason as well.

In one of the cases with a lower threshold, as set forth above in Council on American-Islamic Relations v. Paul David Gaubatz, et al., Civil Action No. 09-2030, Judge Kollar-Kotelly even grants the moving party, CAIR, an ex parte temporary restraining order without sufficient notice to the Defendants, and held a hearing to boot. Importantly, Defendants were two authors who write for WorldNetDaily. Mr. Klayman is a columnist for WorldNetDaily, a conservative internet publication that is seen by the left as an enemy.

17.    For all of the reasons set forth above and in the referenced Dockets and Exhibit, Judge Kollar-Kotelly has demonstrated an extra-judicial bias and prejudice against Mr. Klayman and his clients and must respectfully be disqualified.

FURTHER AFFIANT SAYETH NOT.

Sworn to with my personal knowledge and belief under penalty of perjury.

Respectfully submitted,

Larry Klayman ///
Larry Klayman, Esq. (DC Bar No. 334581)
KLAYMAN LAW FIRM
2000 Pennsylvania Avenue, N.W., Suite 345
Washington, D.C. 20006
Tel: 310-595-0800
Email – leklayman@yahoo.com
Attorney for Plaintiff

| Judge Koller-Kotelly's Facts | Actual Facts |
|---|---|
| Importantly, while Plaintiff's job duties occasionally require her to perform her work duties in the field, the record indicates that Plaintiff has always been assigned to the Washington, D.C. duty station; there is no indication that Plaintiff has been detailed to any other office location nor is there any evidence that she has been permitted to work remotely from another location for any extended period of time. [Opinion p. 7] | See 3rd Declaration of Sataki:<br><br>¶ 17: "Contrary to Susan Jackson's false declaration, not only do I NOT need constant supervision for the job functions I normally performed at PNN, during my time at the PNN I performed my work very independently and with very minor supervision from my superiors. In fact, quite often I voluntarily assisted fellow co-workers with the performance of their duties. I previously submitted DVD videos of many of the packages I have done for VOA, in which I wrote the script, edited and produced them. I am also submitting as Exhibit EE with this, my third sworn declaration, DVDs of videos of my live, on air appearances on VOA, in which I was a co-host, anchor and did much more than read emails, as Susan Jackson falsely stated in her declaration. I also am submitting a video of an interview I did in Sweden, when I was live by telephone reporting on an international event."<br><br>¶ 19: Susan Jackson herself wanted me to do packages from LA, as emails I previously filed with the court show. In these emails, Susan Jackson talks about my getting more training, which although I did not need, I got – so this is not an issue.<br><br>¶ 24 As stated in my earlier declarations, prior to the incidents leading to this lawsuit, PNN was in fact considering sending me to Los Angeles to prepare and report back with as many as five interview packages a month.<br><br>¶ 25 I have been to the VOA office in Los Angeles, and I have talked to the VOA employees and contract workers at that office. I am aware that if permitted to work from the Los Angeles office, I can perform essentially all of my job functions without defendants having to provide any additional equipment for my benefit. The equipment is already there and several other contractors some of whom |

1

| Judge Koller-Kotelly's Facts | Actual Facts |
|---|---|
| | objectively have less experience then I do, use the same equipment to independently record work at the available space at the Los Angeles office of the VOA and report it back to Washington, D.C. |
| While Plaintiff disputes various statements contained in the Jackson Declaration, the Court emphasizes that she has not disputed the accuracy of her job duties description provided in Ms. Jackson's declaration nor provided any evidence on the record that would create a material issue of fact as to Plaintiff's present job duties as an International Broadcaster. Indeed, the Court observed that there was no dispute that Ms. Jackson accurately described Plaintiff's job duties in its prior Memorandum Opinion denying Plaintiff's request for a temporary restraining order, Sataki, 2010 WL 2195799, at *2, n. 4, and Plaintiff has not argued that this particular finding was in error. Moreover, as explained above, Plaintiff's general assertion, made without specific evidentiary support, that Ms. Jackson, like all of Defendants' declarants, has a "reason and motive to lie," Pl.'s Supp. Reply at 4, is insufficient to create a dispute of material fact as to the accuracy of her description of Plaintiff's job duties. [Opinion, P. 7, foot note] | Sataki's 3rd Declaration:

¶ 17 "Contrary to Susan Jackson's false declaration, not only do I NOT need constant supervision for the job functions I normally performed at PNN, during my time at the PNN I performed my work very independently and with very minor supervision from my superiors. In fact, quite often I voluntarily assisted fellow co-workers with the performance of their duties. I previously submitted DVD videos of many of the packages I have done for VOA, in which I wrote the script, edited and produced them. I am also submitting as Exhibit EE with this, my third sworn declaration, DVDs of videos of my live, on air appearances on VOA, in which I was a co-host, anchor and did much more than read emails, as Susan Jackson falsely stated in her declaration."

¶ 19: A simple review of these DVDs of my independent work will evidence that unlike what defendants claim, I am capable of working independently from the Los Angeles office. |
| PNN does not currently have any full-time employees in Los Angeles nor does it perform any on-air work in Los Angeles. Id. ¶ 8. Plaintiff does not dispute this nor has she offered any evidence to contradict Defendants' sworn assertion that PNN does not have any full time employment positions available at VOA's office in Los Angeles. Similarly, there is no evidence in the record indicating that any full-time PNN employee assigned to PNN's Washington, D.C. office has ever been permitted to work remotely from VOA's Los Angeles office for an extended period of time. [ opinion, P. 8] | Sataki's 3rd Declaration:

¶ 21: At the current time there is at least one full time contract worker at the Los Angeles office who does as many as 21 assignments a month for the VOA office in D.C. |

2

| Judge Koller-Kotelly's Facts | Actual Facts |
|---|---|
| Although Plaintiff generally asserts that many of VOA's employees "telecommute to 5 work from all around the nation on a regular basis," Pl.'s Reply at 19-20, Plaintiff has not proffered any evidence that any PNN employee assigned to the Washington, D.C. office has been permitted to work remotely from the VOA's Los Angeles office for an extended period of time. Moreover, Plaintiff's sole support for her assertion that VOA employees regularly telecommute is the testimony of AFGE Local 1812 President Timothy E. Shamble. See Pl.'s Reply at 20 & Ex. B (Second Declaration of Timothy E. Shamble). Importantly, however, Mr. Shamble does not indicate that any PNN employees have previously been permitted to relocate to or work from the VOA office in Los Angeles, see generally id. Indeed, Mr. Shamble now concedes that he "do[es] not personally know of any VOA employees who have been relocated or transferred to the Los Angeles office of the VOA." Pl.'s Supp. Mem. in Support of Mot., Docket No. [44], (hereinafter, "Pl.'s Supp. Mem."), Ex. DD (Third Declaration of Timothy E. Shamble) (hereinafter, "Third Shamble Decl."), ¶ 5. Accordingly, even accepting Mr. Shamble's statements, there is no evidence in the record that PNN employees, like Plaintiff, who are stationed in Washington, D.C., have previously been permitted to work remotely from the VOA office in Los Angeles. [ opinion, Pp. 8-9] | Sataki's 3rd Declaration:<br><br>¶24 As stated in my earlier declarations, prior to the incidents leading to this lawsuit, PNN was in fact considering sending me to Los Angeles to prepare and report back with as many as five interview packages a month.<br><br>¶ 21: At the current time there is at least one full time contract worker at the Los Angeles office who does as many as 21 assignments a month for the VOA office in D.C.<br><br>Tim Shamble's 2nd Declaration:<br><br>¶2 I am aware of several occasions in which the agency has allowed VOA employees to work at locations other than the VOA headquarters in Washington, D.C. The Agency routinely moves positions from one Division to another. I am not aware of there being any bar to Agency doing this. There does not seem to be any bar to moving positions from one location to another other than paying the employee appropriately based on the locality pay.<br><br>¶3: The Persian News Network (PNN) has a physical presence in the Los Angeles office of VOA, where it does broadcasts, packages and other network related work for PNN. Indeed, it has used and is using contractors hired by PNN in this office.<br><br>Shamble recounts several examples of PNN employees at the Washington, D.C. PNN office who have been allowed to relocate to or work from New York, see id. ¶¶ 4-6<br><br>BUT ¶5 "I not personally know of any VOA employees who have been relocated or transferred to the Los Angeles office of the VOA." |

3

| Judge Koller-Kotelly's Facts | Actual Facts |
|---|---|
| Finally, the Court notes that in deciding to place Plaintiff on LWOP, Defendants denied Plaintiff's request to be placed on paid administrative leave. Defendants indicate that Plaintiff's request was denied because she was found to be ineligible for paid administrative leave Pursuant to BBG policy, administrative leave is always paid leave that is not charged to 9 or taken from an employee's balance of annual or sick leave. See Second Grace Decl. ¶ 2. First Grace Decl. ¶ 6. Pursuant to BBG practice and policy, administrative leave is generally only used  for court leave; labor organization activities; physical examinations when ordered by the agency; injury or illness in the performance of duty; civil activities, such as voting; conferences and conventions when attendance is ordered by the head of the agency; civil defense activities; medical examinations for enlistments in the armed forces; and attendance at funerals of relatives killed in the line of duty. Second Grace Decl. ¶ 2. Although there is discretion in granting administrative leave, BBG generally follows its policy and grants administrative leave only in the limited circumstances previously described. Id. BBG explains that, pursuant to this policy, it denied Plaintiff's request for administrative leave because her request "does not fall within any of the[se] appropriate uses of administrative leave" and "[i]t is not the agency's policy or practice . . . to place administrative employees on administrative leave based solely on unproven allegations of sexual harassment." First Grace Decl. ¶ 6; see also Second Grace Decl. ¶ 6 ("Employees who file administrative complaints of sexual harassment and/or retaliation in the workplace typically are not placed on administrative leave."). [Opinion p. 16-17] | Susan Jackson's declaration supports Sataki's position

BBG practice and policy handbook states that: administrative leave is generally only used  for court leave; labor organization activities; physical examinations when ordered by the agency; **injury or illness in the performance of duty**; civil activities, such as voting; conferences and conventions when attendance is ordered by the head of the agency; civil defense activities; medical examinations for enlistments in the armed forces; and attendance at funerals of relatives killed in the line of duty. [See Second Grace Decl. ¶ 2.; see also Sataki's Mot. at 15; see also Pl.'s Supp. Reply at 6.] |
| While Plaintiff does not now seek an order requiring Defendants to place her on administrative leave as part of her request for interim injunctive relief, see Am. Compl. at 18-19, she does repeatedly point to Defendants' decision denying her | 17
Sataki's prayer in the original complaint requests that Defendants "Pay Plaintiff Sataki immediately her paychecks and money that is due to her and which has been" |

4

| Judge Koller-Kotelly's Facts | Actual Facts |
|---|---|
| administrative leave as an example of their allegedly discriminatory and unlawful behavior towards her. [Opinion p. 17] | |
| Plaintiff has not argued, much less shown, that she is presently receiving treatment from a physician authorized by BBG to handle workplace injuries. Moreover, as explained by Defendants, this section is intended to apply to employees who have been injured in the performance of their duties and who intend to seek workers' compensation benefits. Second Grace Decl. ¶ 4. [Opinion p. 17] | The Court accepts Defendants statement though it does not provide any basis or reference for this policy. Plaintiff has been seeing physicians authorized under her Government Blue Cross/Blue Shield insurance and the Court has accepted the medical reports as uncontested by BBG |
| Plaintiff makes much of the fact that Defendants have placed her alleged harasser on administrative leave pending completion of the investigation into Plaintiff's allegations of harassment. BBG asserts that the decision to place Plaintiff's co-worker on administrative leave is consistent with the Office of Personnel Management's guidance indicating that "[a] supervisor may use administrative leave to keep an employee away from the worksite to ensure the safety of employees while conducting further investigation and deciding a course of action." First Grace Decl. ¶ 5. In this case, BBG determined that "[i]n order to ensure the safety of other female employees while the agency investigates the[] extremely serious charges [made by Plaintiff], the agency appropriately used administrative leave." Id. ¶ 6. Plaintiff has not offered any evidence to indicate that Ms. Grace has misstated or mischaracterized the applicable policies on administrative leave. In addition, Defendants recently advised the Court that the agency's Office of Human Resources has completed its investigation into Plaintiff's allegations and has determined that the co-worker at issue is not a safety risk to other employees. Second Grace Decl. ¶ 6. He has therefore returned to the workplace. [Opinion p. 18] | The Grace declaration supports Sataki's position<br><br>BBG practice and policy handbook states that: administrative leave is generally only used for court leave; labor organization activities; physical examinations when ordered by the agency; **injury or illness in the performance of duty**; civil activities, such as voting; conferences and conventions when attendance is ordered by the head of the agency; civil defense activities; medical examinations for enlistments in the armed forces; and attendance at funerals of relatives killed in the line of duty. [See Second Grace Decl. ¶ 2.; see also Sataki's |
| | |

| Judge Koller-Kotelly's Facts | Actual Facts |
|---|---|
| Plaintiff would have reported directly to and been supervised by Central News Division staff. Id. The Central News Division's office does not share space with PNN, and the detail was therefore intended to separate Plaintiff from the PNN co-worker whom she alleges sexually harassed and assaulted her as well as her PNN supervisors whom she claims retaliated against her. Id. [Opinion p. 19] | See Pl.'s Reply at 13, n. 1; see also Third Sataki Decl. ¶¶ 2-10.<br><br>¶7 More importantly, I am intimately familiar with the building and the facilities where the CND and Persian News Network ("PNN") are located.<br><br>¶8. If I were to work at the CND, there is a great likelihood that on a daily basis, likely multiple times a day, I would come into contact with the very defendants who have caused me significant trauma by sexually harassing, discriminating and retaliating against me for my personal and political beliefs as well as for reporting my sexual harasser and for exposing defendant's failure to comply with the mission Congress entrusted them with. Moreover, Mehdi Felahati, my harasser is back at work in this building!<br><br>Sataki's 3rd Declaration:<br><br>¶ 9: The CND is in the same building as the PNN. CND and PNN employees use the same recording studios and facilities to record and report segments of news. The jointly used studio is inside the CND.<br><br>¶10: CND and PNN employees use the same elevators and staircases, rest areas, entrance and exit and cafeteria; also many CND and PNN employees use the same restaurants and facilities near the building around breakfast, lunch and dinner times. |
| Contrary to Plaintiff's concerns, however, the record indicates that the detail to the Central News Division would have permitted Plaintiff to continue reporting on Persian-related issues and would not have limited Plaintiff to reporting only on Arabic news stories. See, e.g., Pl.'s Mot., Ex. 11 (May 12, 2010 Letter from Donna S. Grace to Plaintiff) (indicating that under the detail to the Central News Division, Plaintiff "would continue to work on Iran-related news stories"); Brady Decl. ¶ 3 (indicating that | Sataki's 3rd Declaration:<br><br>¶5 In addition to being an English language position, the position which Defendants proposed for me at the CND relates to general reporting in the Arab world. I am not and was not hired to be an expert in Arabic politics or culture. I was hired for the Persian News Network as a Farsi speaker.<br><br>¶6 Besides there being a language barrier, because I do not speak Arabic at all, Arabs and |

6

| Judge Koller-Kotelly's Facts | Actual Facts |
|---|---|
| packages produced by Plaintiff at the Central News Division would be made available for all of the language services of VOA, including PNN). Although the evidence in the record as to Plaintiff's ability to speak English is less clear, the Court accepts, for purposes of the instant Memorandum Opinion, Plaintiff's present assertion that she cannot fluently speak English. There is also no indication that the assignment to the Central News Division requires a knowledge of Arabic; | Persians each have very strong and conflicting cultures. I am worried that my Persian background will prevent Arab interviewees from successfully opening up to me when I do not understand the culture, do not speak the language, and have a Persian background that may be disliked by Arab interviewees. In addition, at the CND there is limited to no reporting on any Iran related issues. |
| Plaintiff initially raised the issue of her fluency in English in her pleadings filed in support of her request for a temporary restraining order. She failed at that time, however, to provide any evidence in support of her position that she lacked sufficient fluency in English. See Sataki, 2010 WL 2195799, *5 (observing that Plaintiff's assertion that she lacks fluency in English was "made only in Plaintiff's pleadings, and there is no evidence to support this claim"). To the contrary, the only evidence then in the record "indicate[d] that Plaintiff is fluent in English." Id. (citing to Plaintiff's resume, which represents that Plaintiff is able to fluently speak, read and write English). In response, Plaintiff has now supplemented the record with her third declaration, in which she avers for the first time that her level of fluency in English is not sufficient to report or host a television show in that language and that she speaks English with a "distinct accent." Third Sataki Decl. ¶¶ 2, 3. Plaintiff's own evidence on this point is therefore contradictory. | Sataki's 3rd Declaration:<br><br>¶2 Although I speak, read and write in English "fluently," as English is not my first language, my caliber of fluency in the English language is not up to par with that of a native English speaker, and most certainly not even comparable at this time with that of a reporter or journalist who would report or host a TV or Radio production in the English language. My speaking ability in English is good, but my writing needs improvement.<br><br>¶3 Also, when I speak English, I have, what I have been told is a distinct accent. I cannot, and will not be a successful reporter in English at this time. The job I was hired to perform at the Persian News Network ("PNN") is as a Farsi language reporter.<br><br>¶4 Accordingly, if placed at the Central News Division ("CND") I will not able to perform my job as a reporter or journalist. In fact, I am not sure what tasks I will be able to perform at the CND or how I will be able to contribute at all.<br><br>¶ 5 In addition to being an English language position, the position which Defendants proposed for me at the CND relates to general reporting in the Arab world. I am not and was not hired to be an expert in Arabic politics or culture. I was hired for the Persian News Network as a Farsi speaker. |
|  |  |

| Judge Koller-Kotelly's Facts | Actual Facts |
|---|---|
| [A]lthough the Central News Division operates in the same building as PNN, such that a possibility remains that Plaintiff may encounter Defendants in the common areas of the building, BBG informed Plaintiff that access could be coordinated to ensure that there was no contact between Plaintiff and her alleged harasser; BBG also offered to work with Plaintiff, through her counsel, to ensure the arrangement worked efficiently. Brady Decl. ¶ 4. Plaintiff does not dispute this nor does she offer any evidence indicating that she responded to BBG's offer to discuss ways in which the detail to the Central News Division could be modified to respond to Plaintiff's concerns. | Sataki's 3rd Declaration: ¶7 More importantly, I am intimately familiar with the building and the facilities where the CND and Persian News Network ("PNN") are located. ¶8. If I were to work at the CND, there is a great likelihood that on a daily basis, likely multiple times a day, I would come into contact with the very defendants who have caused me significant trauma by sexually harassing, discriminating and retaliating against me for my personal and political beliefs as well as for reporting my sexual harasser and for exposing defendant's failure to comply with the mission Congress entrusted them with. Moreover, Mehdi Felahati, my harasser is back at work in this building! ¶ 9: The CND is in the same building as the PNN. CND and PNN employees use the same recording studios and facilities to record and report segments of news. The jointly used studio is inside the CND. ¶10: CND and PNN employees use the same elevators and staircases, rest areas, entrance and exit and cafeteria; also many CND and PNN employees use the same restaurants and facilities near the building around breakfast, lunch and dinner times |
| Plaintiff insists, however, that she is not asking PNN to create a new position for her in Los Angeles; rather, according to Plaintiff, she is seeking only authorization from BBG to perform her current job functions as an International Broadcaster from the Los Angeles VOA office during the pendency of her administrative and legal proceedings. See Third Sataki Decl. ¶ 22. 12 | As to this point, the Court notes that the exact nature of Plaintiff's requested accommodation has changed throughout the course of this litigation. Plaintiff initially advised the Court that she was "willing to do any work that is available in the Los Angeles office of VOA" and proposed that she be permitted to "do the work of the contractors in Los Angeles." Sataki's Second Declaration: ¶ 9 see also id. ("These contractors, admittedly, are hired on a job by job basis so why not use a full time employee like myself do the work while I recover."). In denying Plaintiff's |

| **Judge Koller-Kotelly's Facts** | **Actual Facts** |
|---|---|
| | request for a temporary restraining order, the Court observed that "BBG [] 'is not obligated to 'bump' another employee in order to create a vacancy for the disabled employee'" nor is it obligated "to create a new position for the disabled employee.'" |
| There is a dispute in the record as to the Plaintiff's capability to perform her current job functions remotely from Los Angeles. [Opinion p. 22] | Tim Shamble 2nd Declaration:<br><br>¶6. With technological advances a lot of the work at VOA is portable. Employees can accomplish most, if not all, of their work by telecommuting – especially reporters who often cover stories "on the scene." There is absolutely no reason why Ms. Sataki cannot do what she would be required to do in Washington, DC, at an alternate worksite such as the VOA's Los Angeles Bureau. Se also Pl.'s Reply, Ex. C (Second Declaration of Jamchid Chalangi) ¶ 3 (stating 14 Plaintiff is capable of editing and producing packages) |
| BBG maintains, however, that Plaintiff is not qualified to produce quality packages independently and without supervision and therefore cannot perform this function of her present job from Los Angeles. See id. ¶ 7 ("There are no packages that [Plaintiff] can do from Los Angeles because [she] is not skilled enough in journalism or production to meet minimum broadcast industry standards."). | Sataki's 3rd Declaration:<br><br>¶17 Contrary to Susan Jackson's false declaration, not only do I NOT need constant supervision for the job functions I normally performed at PNN, during my time at the PNN I performed my work very independently and with very minor supervision from my superiors. In fact, quite often I voluntarily assisted fellow co-workers with the performance of their duties. I previously submitted DVD videos of many of the packages I have done for VOA, in which I wrote the script, edited and produced them. I am also submitting as Exhibit EE with this, my third sworn declaration, DVDs of videos of my live, on air appearances on VOA, in which I was a co-host, anchor and did much more than read emails, as Susan Jackson falsely stated in her declaration. I also am submitting a video of an interview I did in Sweden, when I was live by telephone reporting on an international event. As Union President Tim Shamble has |

| Judge Koller-Kotelly's Facts | Actual Facts |
|---|---|
| | also sworn to under oath in his declarations, I am a skilled broadcaster and always got excellent reviews. Susan Jackson, as a defendant, as I have sued her, has a motive to lie and lie she has. This court should, when all the facts come out, have her prosecuted for these lies under oath. She belongs in jail, not at VOA. |

¶18 I am independently capable of and proficient at researching interviewing, recording, editing, producing and submitting my work to the Washington, D.C. office of VOA, as the videos show. In fact, attached to my prior declarations, and this one, as exhibits, and are several of the "packages" I produced independently from Los Angeles and Sweden. I did many of these interviews without the use of a teleprompter or notes. I am capable of interviewing without aids, based on my memory and expertise.

¶19 A simple review of these DVDs of my independent work will evidence that unlike what defendants claim, I am capable of working independently from the Los Angeles office.

¶20 The fact is that defendants simply wish not to accommodate my medical needs. Otherwise, the Los Angeles office is equipped to allow me to conduct my interviews and production from Los Angeles.

See Pl.'s Reply, Ex. C (Second Declaration of Jamchid Chalangi) ¶ 3 (stating 14 Plaintiff is capable of editing and producing packages);

Second Shamble Decl. ¶¶ 8-9 (same).

¶7. Ms. Sataki's work has been rated by the Agency itself (via the annual performance review process) as satisfactory (we are on a two tier system so satisfactory is the highest rating). If there were problems with her performance there no was no indication of

| Judge Koller-Kotelly's Facts | Actual Facts |
|---|---|
|  | them before she complained about being sexually harassed. In addition, when she first began to work for VOA, a few years ago, she was on a one year probationary period. If her work had not been good, she would neither been hired in the first place nor been approved for continued employment after her one year probationary period.<br><br>¶8. I have been in close professional contact with Ms. Sataki and he supervisors and I never heard any of these supervisors say, orally or in writing, that she was not able to do packages on her own. This claim is recently manufactured.<br><br>See also Sataki's Second Declaration ¶¶ 3-8; and ¶¶ 18-19, 23. |
| [it is] undisputed on the present record that Plaintiff cannot perform her on-air work with respect to these shows from Los Angeles. Plaintiff, however, has emphatically denied Defendants' contention that she is not presently qualified to produce independent packages from Los Angeles. [Opinion p. 24 ] | See Pl.'s Reply, Ex. C (Second Declaration of Jamchid Chalangi) ¶ 3 (stating Plaintiff is capable of editing and producing packages); Second Shamble Declaration ¶¶ 8-9 (same). Second Sataki Decl. ¶¶ 3-8; Third Sataki Decl. ¶¶ 18-19, 23. |
| There is no evidence in the record that she would be able to perform her present job duties as an International Broadcaster for PNN — whether remotely from Los Angeles or elsewhere — without having any contact whatsoever with PNN management in Washington, D.C., as she appears to indicate is necessary. To the extent Plaintiff asserts that she should be permitted to perform her work for PNN from Los Angeles without having any communication or interaction with PNN management, such a requested accommodation is clearly unreasonable. | Sataki's 3rd Declaration:<br><br>¶17 Contrary to Susan Jackson's false declaration, not only do I NOT need constant supervision for the job functions I normally performed at PNN, during my time at the PNN I performed my work very independently and with very minor supervision from my superiors. In fact, quite often I voluntarily assisted fellow co-workers with the performance of their duties. I previously submitted DVD videos of many of the packages I have done for VOA, in which I wrote the script, edited and produced them. I am also submitting as Exhibit EE with this, my third sworn declaration, DVDs of videos of my live, on air appearances on VOA, in which I was a co-host, anchor and did much more than read emails, as Susan Jackson falsely stated in |

11

| Judge Koller-Kotelly's Facts | Actual Facts |
|---|---|
| | her declaration. I also am submitting a video of an interview I did in Sweden, when I was live by telephone reporting on an international event. As Union President Tim Shamble has also sworn to under oath in his declarations, I am a skilled broadcaster and always got excellent reviews. Susan Jackson, as a defendant, as I have sued her, has a motive to lie and lie she has. This court should, when all the facts come out, have her prosecuted for these lies under oath. She belongs in jail, not at VOA.

¶18 I am independently capable of and proficient at researching interviewing, recording, editing, producing and submitting my work to the Washington, D.C. office of VOA, as the videos show. In fact, attached to my prior declarations, and this one, as exhibits, and are several of the "packages" I produced independently from Los Angeles and Sweden. I did many of these interviews without the use of a teleprompter or notes. I am capable of interviewing without aids, based on my memory and expertise.

¶19 A simple review of these DVDs of my independent work will evidence that unlike what defendants claim, I am capable of working independently from the Los Angeles office.

¶20 The fact is that defendants simply wish not to accommodate my medical needs. Otherwise, the Los Angeles office is equipped to allow me to conduct my interviews and production from Los Angeles.

See Pl.'s Reply, Ex. C (Second Declaration of Jamchid Chalangi) ¶ 3 (stating 14 Plaintiff is capable of editing and producing packages);

Second Declaration of Tim Shamble ¶¶ 8-9

¶ 7. Ms. Sataki's work has been rated by the Agency itself (via the annual performance review process) as satisfactory (we are on a |

| Judge Koller-Kotelly's Facts | Actual Facts |
|---|---|
| | two tier system so satisfactory is the highest rating). If there were problems with her performance there no was no indication of them before she complained about being sexually harassed. In addition, when she first began to work for VOA, a few years ago, she was on a one year probationary period. If her work had not been good, she would neither been hired in the first place nor been approved for continued employment after her one year probationary period.<br><br>¶ 8. I have been in close professional contact with Ms. Sataki and he supervisors and I never heard any of these supervisors say, orally or in writing, that she was not able to do packages on her own. This claim is recently manufactured.<br><br>See also Second Sataki Decl. ¶¶ 3-8; Third Sataki Decl. ¶¶ 18-19, 23. |
| With respect to Plaintiff's allegations that Defendants have "threat[ened] Plaintiff with mutilation of her vaginal areas, severe bodily injury and death and smearing her name and reputation on pornographic internet websites," Am. Compl. at 11, Plaintiff has advised that she reported these activities to the Federal Bureau of Investigation ("FBI"), which is currently investigating her complaints. See First Sataki Decl. ¶ 42; Third Sataki Decl. ¶ 13. Such allegations are obviously of a serious and alarming nature. However, there is insufficient evidence on the record for the Court to conclude that Defendants are responsible for this alleged conduct. | See Sataki's 5th Declaration:<br><br>¶1 I am attaching eleven test messages that my sexual harasser Mehdi Falahati sent me during the time that he was continuously harassing me and soliciting me for sexual favors. These eleven text messages are attached hereto as Attachment 1 through Attachment 11. After each page of Attachment there is a true and correct Farsi translation of the text messages that were in Farsi.<br><br>¶2 I showed these text messages to Ms. Susan Jackson when I complained about being sexually harassed by Mehdi Falahati. Ms. Susan Jackson and Ms. Delia Johnson suggested that I save these text messages as evidence of the sexual harassment.<br><br>Sataki's 4th Declaration<br><br>¶3 I have reason to believe that these emails were sent by or on behalf of Mehdi Falahati, the person who sexually harassed me. They use |

13

| **Judge Koller-Kotelly's Facts** | **Actual Facts** |
|---|---|
| | language similar to what Falahati used with Jamschid Chalangi (see Declaration of Jamschid Chalangi, Attachment 3 to Docket Item 32) which language referred to my private parts and how, in vulgar terms, he wanted to "f" me.<br><br>¶ 4 I am also attaching printouts of the internet pages which smeared me with pornographic material. A photo of me wearing a red blouse was a photo taken by Voice of America for promotional purposes and never used by it. The photo is contained in VOA's photo library and only a VOA employee could access it. The photo which appears on the fraudulent pornographic website also originally contained an image of Mehdi Falahati, my sexual harasser, but it was cut out for use on the pornographic website. [See Attachment 3.]<br><br>¶ 5 I have reason to believe that at a minimum Falahati is responsible for the above pornographic website and that and/or his friend Ali Sajjadi, Senior Managing Editor, who also has retaliated against me, accessed this non-public VOA photo to use to smear me. |

# Exhibit 4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STRANGE, *et. al* | |
| Plaintiffs, | |
| v. | |
| ISLAMIC REPUBLIC OF IRAN, *et al* | |
| Defendants. | Civil Action No. 1:14-cv-00435 |

**AFFIDAVIT OF PROFESSOR RONALD D. ROTUNDA IN SUPPORT OF MOTION**
**FOR DISQUALIFICATION PURSUANT TO 28 U.S.C. § 144**

## I.   INTRODUCTION

1. My name is Ronald D. Rotunda.  I am over 18 years old. I am an adult citizen of the United States. I am knowledgeable about the parties and the substance of the above litigation.

2. I am the Doy & Dee Henley Chair and Distinguished Professor of Jurisprudence at Chapman University, The Dale E. Fowler School of Law, located in Orange, California, where I teach Professional Responsibility and Constitutional Law.

3. I have attached Exhibit 1, which includes a copy of my current resume.

## II.   QUALIFICATIONS

4. Before I joined Chapman U. in August 2008, I was the George Mason University Foundation Professor of Law from August 2002 (when I started teaching at George Mason University School of Law), until August 2006, when I became University Professor and Professor of

1

Law at George Mason University School of Law.  Please see my resume, Exhibit 1, for more information, including a list of my publications.

5.  Prior to that (from 1993 until 2002), I was the Albert E. Jenner, Jr. Professor of Law at the University of Illinois.  I retired from the University of Illinois in 2002, and then began working full-time at George Mason University.

6.  I am a magna cum laude graduate of Harvard Law School, where I served as a member of the Harvard Law Review.  I later clerked for Judge Walter R. Mansfield of the United States Court of Appeals for the Second Circuit.  During the course of my legal career, I have practiced law in Washington, D.C., and served as assistant majority counsel for the Senate Watergate Committee.

7.  I am the co-author of PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y., 11th ed. 2011), the most widely used legal ethics course book in the United States.  It has been the most widely used since I coauthored the first edition in 1976.  In addition, I have authored or coauthored several other books on legal ethics, including ROTUNDA & DZIENKOWSKI, LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA/Thompson, 11th ed. 2013).

8.  In addition to these books, I have written numerous articles on legal ethics, as well as several books and articles on Constitutional Law, as indicated in the attached resume.  State and federal courts at every level have cited my treatises and articles over 1000 times.  From 1980 to 1987, I was a member of the Multistate Professional Examination Committee of the National Conference of Bar Examiners.

9.  In 2000, the University of Chicago Press published a lengthy study that sought to determine the influence, productivity, and reputations of law professors over the last several decades.

That study ranked me as the 17th highest in the nation.  *See Interpreting Legal Citations*, 29 JOURNAL OF LEGAL STUDIES (part 2) (U. Chicago Press, Jan. 2000).

10. The 2002-2003 New Educational Quality Ranking of U.S. Law Schools (EQR) ranked me the eleventh most cited of all law faculty in the United States.  *See* http://www.leiterrankings.com/faculty/2002faculty_impact_cites.shtml .

11. I am a member of the bars of New York, Illinois, Washington, D.C., the Seventh Circuit, the D.C. Circuit, the Fourth Circuit, the Central District of Illinois, and the U.S. Supreme Court.

12.  On June 17, 2009, he became a Commissioner of the Fair Political Practices Commission, a state regulatory agency and California's independent political watchdog.  He served until January 31, 2013, when his term expired.

13. Over the years, I have spoken at various ABA conferences on legal ethics and was a featured speaker on an ABA videotape series on legal ethics. I am a former —

- Member of the Bar Admissions Committee of the Association of American Law Schools;

- Chair of the Section on Professional Responsibility of the Association of American Law Schools;

- Member of the ABA Standing Committee on Professional Discipline (1991-1997);

- Chair of the ABA Subcommittee on Model Rules Review (1992-1997); member of the Consultant Group of the American Law Institute's Restatement of the Law Governing Lawyers.

- Member of the Advisory Council to Ethics 2000, the ABA Commission that proposed revisions to the ABA Model Rules of Professional Conduct (1998-2000).

- Liaison to the ABA Standing Committee on Ethics and Professional Responsibility (1994-1997).

14. Since 1994, I have been a member of the Publications Board of the A.B.A. Center for Professional Responsibility.  I am a Life Fellow of the American Bar Foundation and the Illinois Bar Foundation, and a former consultant to the Administrative Conference of the United States on various issues relating to legal ethics.

15. During May 1996, I was the Consultant to the Chamber of Advocates of the Czech Republic: under the auspices of the United States Agency for International Development, I spent the month of May 1996, in Prague, drafting Rules of Professional Responsibility for lawyers in the Czech Republic.  I also wrote the original draft of the first Czech Bar Examination on Professional Responsibility, and consulted with the Czech Supreme Court in connection with the Court's proposed Rules of Judicial Ethics and the efforts of that Court to create an independent judiciary.

16. During November-December, 2002, I was Visiting Scholar, Katholieke Universiteit Leuven, Faculty of Law in, Leuven, Belgium.

17. In May 2004, and December 2005, I was visiting lecturer at the Institute of Law and Economics, Institut für Recht und Ökonomik, at the University of Hamburg.

18. During July 2007, I was in Latvia where I conferred with various judges from the Baltic States on judicial ethics, under the auspices of the U.S. Embassy, the Supreme Court of Latvia, and the Latvian Ministry of Justice.

## III.   DISCUSSION

19. I have been made aware that the attorney for the plaintiffs in this lawsuit, Larry Klayman, has

    been in long-running litigation with the judge currently assigned to this case, the Honorable

    Colleen Kollar-Kotelly.

20. I have also been made aware that the appellate process is still active and ongoing, and that a

    petition for writ of certiorari and a petition for writ of mandamus will be filed before the U.S.

    Supreme Court on May 12, 2014.

21.  It is my expert opinion as a professor of legal ethics, based on my 44 years of experience in

    the legal profession, that a judge who is merely presiding in a case but is engaged in ongoing

    litigation against the counsel for a party who is appearing before him or her has a conflict of

    interest that, at a minimum, creates the appearance of a conflict of interest and must therefore

    recuse herself from the case.

22. The judge at issue here, the Honorable Colleen Kollar-Kotelly, has a clear conflict of interest

    and must recuse herself because she is a defendant in on-going litigation with Larry Klayman

    in *Klayman v. Kotelly,* 2013 U.S. App. LEXIS 26059 (D.C. Cir. Oct. 22, 2013) and *Klayman

    v. Kollar-Kotelly*, 892 F. Supp. 2d 261 (D.D.C. 2012).


    I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct. Executed on <u>8</u> May 2014.


Prof. Ronald D. Rotunda

## CALIFORNIA JURAT WITH AFFIANT STATEMENT

☒ See Attached Document (Notary to cross out lines 1–6 below)
☐ See Statement Below (Lines 1–5 to be completed only by document signer[s], *not* Notary)

_____     _____
Signature of Document Signer No. 1                Signature of Document Signer No. 2 (if any)

State of California

County of _Orange_____

Subscribed and sworn to (or affirmed) before me on this
_8th_ day of _May_____, 20_14_, by
Date                    Month                                    Year
(1)_Ronld D. Rotunda_____,
Name of Signer

proved to me on the basis of satisfactory evidence
to be the person who appeared before me (.) (,)

(and

(2)_____,
Name of Signer

proved to me on the basis of satisfactory evidence
to be the person who appeared before me.)

Signature _Barbara N Babcock_____
Signature of Notary Public

BARBARA N. BABCOCK
Commission # 2051242
Notary Public - California
Orange County
My Comm. Expires Jan 5, 2018

Place Notary Seal Above

── *OPTIONAL* ──

*Though the information below is not required by law, it may prove
valuable to persons relying on the document and could prevent
fraudulent removal and reattachment of this form to another document.*

**Further Description of Any Attached Document**

Title or Type of Document:_____

Document Date: _____ Number of Pages: _____

Signer(s) Other Than Named Above: _____

RIGHT THUMBPRINT
OF SIGNER #1
Top of thumb here

RIGHT THUMBPRINT
OF SIGNER #2
Top of thumb here

©2007 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA 91313-2402 • www.NationalNotary.org   Item #5910   Reorder: Call Toll-Free 1-800-876-6827

# Exhibit 1
## (To Rotunda Affidavit)

**RONALD D. ROTUNDA**                                                    May 2, 2014
Email: rrotunda@chapman.edu              Home Page ☙ http://www1.chapman.edu/~rrotunda

**Office Address:**

> Chapman University
> Dale E. Fowler School of Law
> Room 406
> One University Drive
> Orange, CA  92866-1005
> ☎:      (714) 228-2698
> Fax:    (714) 228-2576

**Experience:**

| | |
|---|---|
| Since August, 2008 | DOY & DEE HENLEY CHAIR AND DISTINGUISHED PROFESSOR OF JURISPRUDENCE, CHAPMAN UNIVERSITY |
| June 17, 2009 – Jan. 31, 2013 | COMMISSIONER, Fair Political Practices Commission a regulatory body of the State of California, |
| 2006- August 2008 | UNIVERSITY PROFESSOR AND PROFESSOR OF LAW, George Mason University |
| 2002-2006 | THE GEORGE MASON UNIVERSITY FOUNDATION PROFESSOR OF LAW, George Mason University School of Law |
| Nov. to Dec. 2002 | Visiting Scholar, Katholieke Universiteit Leuven, Faculty of Law, Leuven, Belgium |
| May 2004 | Visiting Lecturer, The Institute for Law and Economics, Institut für Recht und Ökonomik, The University of Hamburg, Germany |
| June 2004-May 2005 | Special Counsel to Department of Defense, The Pentagon |
| December 2005 | Visiting Lecturer, The Institute for Law and Economics, Institut für Recht und Ökonomik, The University of Hamburg, Germany |
| 1993 - 2002 | THE ALBERT E. JENNER, JR. PROFESSOR OF LAW, University of Illinois College of Law |
| Since 2002 | THE ALBERT E. JENNER, JR. PROFESSOR OF LAW, EMERITUS, University of Illinois College of Law |
| Fall, 2001 | Visiting Professor, George Mason University School of Law |

Ronald D. Rotunda

| | |
|---|---|
| Spring & Fall 2000 | Cato Institute, Washington, D.C.; Senior Fellow in Constitutional Studies [Senior Fellow in Constitutional Studies, 2001-2009] |
| Spring, 1999 | Visiting Professor, holding the JOHN S. STONE ENDOWED CHAIR OF LAW, University of Alabama School of Law |
| August 1980 - 1992 | Professor of Law, University of Illinois College of Law |
| March 1986 | Fulbright Professor, Maracaibo and Caracas, Venezuela, under the auspices of the Embassy of the United States and the Catholic University Andres Bello |
| January – June, 1981 | Fulbright Research Scholar, Italy |
| Spring 1981 | Visiting Professor of Law, European University Institute, Florence, Italy |
| August 1977 – August, 1980 | Associate Professor of Law, University of Illinois College of Law |
| August 1974 – August 1977 | Assistant Professor of Law, University of Illinois College of Law |
| April 1973 - July 1974 | Assistant Counsel, U.S. Senate Select Committee on Presidential Campaign Activities |
| July 1971 - April, 1973 | Associate, Wilmer, Cutler & Pickering Washington, DC |
| August 1970 – July 1971 | Law Clerk to Judge Walter R. Mansfield, Second Circuit, New York, N.Y. |

## Education:

| | | |
|---|---|---|
| **Legal:** | HARVARD LAW SCHOOL | (1967- 1970) |
| | Harvard Law Review, volumes 82 & 83 | |
| | J.D., 1970 Magna Cum Laude | |
| | | |
| **College:** | HARVARD COLLEGE | (1963- 1967) |
| | A.B., 1967 Magna Cum Laude in Government | |

## Member:

American Law Institute (since 1977); Life Fellow of the American Bar Foundation (since 1989); Life Fellow of the Illinois Bar Foundation (since 1991); The Board of Editors, The Corporation Law Review (1978-1985); New York Bar (since 1971); Washington, D.C. Bar and D.C. District Court Bar (since 1971); Illinois Bar (since 1975); 2nd Circuit Bar (since 1971); Central District of Illinois (since 1990); 7th Circuit (since 1990); U.S. Supreme Court Bar (since 1974); 4th Circuit, since 2009. Member: American Bar Association, Washington, D.C. Bar Association, Illinois State Bar

- 3 -

Ronald D. Rotunda

Association, Seventh Circuit Bar Association; The Multistate Professional Responsibility Examination Committee of the National Conference of Bar Examiners (1980-1987); AALS, Section on Professional Responsibility, Chairman Elect (1984-85), Chairman (1985-86); Who's Who In America (since 44th Ed.) and various other Who's Who; American Lawyer Media, L.P., National Board of Contributors (1990-2000).

**Scholarly Influence and Honors:**

Symposium, *Interpreting Legal Citations*, 29 JOURNAL OF LEGAL STUDIES (part 2) (U. Chicago Press, Jan. 2000), sought to determine the influence, productivity, and reputation of law professors. Under various measures, Professor Rotunda scored among the highest in the nation. *E.g.*, scholarly impact, most-cited law faculty in the United States, 17th (p. 470); reputation of judges, legal scholars, etc. on Internet, 34th (p. 331); scholar's non-scholarly reputation, 27th (p. 334); most influential legal treatises since 1978, 7th (p. 405).

In May 2000, *American Law Media*, publisher of *The American Lawyer*, the *National Law Journal*, and the *Legal Times,* picked Professor Rotunda as one of the ten most influential Illinois Lawyers. He was the only academic on the list. He was rated, in 2014, as one of "The 30 Most Influential Constitutional Law Professors" in the United States.

- 2012, Honored with, THE CHAPMAN UNIVERSITY EXCELLENCE IN SCHOLARLY/CREATIVE WORK AWARD, 2011-2012.
- Appointed UNIVERSITY PROFESSOR, 2006, George Mason University; Appointed 2008, DOY & DEE HENLEY CHAIR AND DISTINGUISHED PROFESSOR OF JURISPRUDENCE, Chapman University.
- The 2002-2003 *New Educational Quality Ranking* of U.S. Law Schools (EQR) ranks Professor Rotunda as the eleventh most cited of all law faculty in the United States. *See* http://www.leiterrankings.com/faculty/2002faculty_impact_cites.shtml
- Selected UNIVERSITY SCHOLAR for 1996-1999, University of Illinois.
- 1989, Ross and Helen Workman Research Award.
- 1984, David C. Baum Memorial Research Award.
- 1984, National Institute for Dispute Resolution Award.
- Fall, 1980, appointed Associate, in the Center for Advanced Study, University of Illinois.

Ronald D. Rotunda

LIST OF PUBLICATIONS:

BOOKS:

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1976) (with Thomas D. Morgan).

> CALIFORNIA SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1976) (with Thomas D. Morgan).

> 1978 SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1978) (with Thomas D. Morgan).

> 1979 PROBLEMS, CASES AND READINGS SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1979) (with Thomas D. Morgan).

> 1979 CALIFORNIA RULES SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1979) (with Thomas D. Morgan).

> 1979 STANDARDS SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1979) (with Thomas D. Morgan).

> 1980 CALIFORNIA RULES SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1980) (with Thomas D. Morgan).

> 1980 STANDARDS SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1980) (with Thomas D. Morgan).

CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1978) (a one volume treatise on Constitutional Law) (with John E. Nowak and J. Nelson Young).

> 1978 SUPPLEMENT TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1978) (with John E. Nowak and J. Nelson Young).

> 1979-1980 SUPPLEMENT TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1979) (with John E. Nowak and J. Nelson Young).

> 1982 SUPPLEMENT TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1982) (with John E. Nowak and J. Nelson Young).

MODERN CONSTITUTIONAL LAW:  CASES & NOTES (West Publishing Co., St. Paul, Minnesota, 1981).

1981 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1981).

1982 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1982).

1983 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1983).

1984 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, MINNESOTA, 1984).

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 2d ed. 1981) (with Thomas D. Morgan).

1981 STANDARDS SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1981) (with Thomas D. Morgan).

1983 STANDARDS SUPPLEMENT TO PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 1983) (with Thomas D. Morgan).

THE UNITED STATES FEDERAL SYSTEM:  LEGAL INTEGRATION IN THE AMERICAN EXPERIENCE (Giuffrè, Milan, 1982) (with Peter Hay).

SIX JUSTICES ON CIVIL RIGHTS (Oceana Publications, Inc., Dobbs Ferry, N.Y., 1983) (edited and with introduction).

CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 2d ed. 1983) (with John E. Nowak and J. Nelson Young) (a one volume treatise on Constitutional Law).

PROFESSIONAL RESPONSIBILITY (West Publishing Co., 1984, Black Letter Series).

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y., 3d ed. 1984) (with Thomas D. Morgan).

1984 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y. 1984) (with Thomas D. Morgan).

1985 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y. 1985) (with Thomas D. Morgan).

1986 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y. 1986) (with Thomas D. Morgan).

1987 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y. 1987) (with Thomas D. Morgan).

**MODERN CONSTITUTIONAL LAW:  CASES & NOTES** (West Publishing Co., St. Paul, Minnesota, 2d ed. 1985).

1985 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1985).

1986 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, MINNESOTA, 1986).

1987 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1987).

1988 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1988).

**THE POLITICS OF LANGUAGE:  LIBERALISM AS WORD AND SYMBOL** (University of Iowa Press, 1986) (with an Introduction by Daniel Schorr).

**TREATISE ON CONSTITUTIONAL LAW:  SUBSTANCE AND PROCEDURE** (West Publishing Co., St. Paul, Minnesota, 1986) (*three volume treatise*) (with John E. Nowak and J. Nelson Young).

1987 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW (West Publishing Co., 1987) (with John E. Nowak).

1988 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW (West Publishing Co., 1988) (with John E. Nowak).

1989 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW (West Publishing Co., 1989) (with John E. Nowak).

1990 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW (West Publishing Co., 1990) (with John E. Nowak).

1991 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW (West Publishing Co., 1991) (with John E. Nowak).

**CONSTITUTIONAL LAW** (West Publishing Co., St. Paul, Minnesota, 3d ed. 1986) (a one volume treatise on Constitutional Law) (with John E. Nowak and J. Nelson Young).

1988 POCKET PART TO CONSTITUTIONAL LAW (West Publishing Co., 1988) (with John E. Nowak).

**JOSEPH STORY'S COMMENTARIES ON THE CONSTITUTION** (Carolina Academic Press, Durham, N.C. 1987) (with introduction) (with John E. Nowak).

**CONSTITUTIONAL LAW: PRINCIPLES AND CASES** (West Publishing Co., St. Paul, Minnesota, 1987).

**PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY** (Foundation Press, Mineola, N.Y., 4th ed. 1987) (with Thomas D. Morgan).

1988 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Mineola, N.Y. 1988) (with Thomas D. Morgan).

1989 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1989) (with Thomas D. Morgan).

1990 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1990) (with Thomas D. Morgan).

**PROFESSIONAL RESPONSIBILITY** (West Publishing Co., St. Paul, Minnesota, 2d ed. 1988, Black Letter Series).

**MODERN CONSTITUTIONAL LAW: CASES AND NOTES** (West Publishing Co., St. Paul, Minnesota, 3d ed. 1989).

1989 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1989).

1990 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1990).

1991 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1991).

1992 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1992).

**PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY** (Foundation Press, Westbury, N.Y., 5th ed. 1991) (with Thomas D. Morgan).

1991 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1991) (with Thomas D. Morgan).

1992 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1992) (with Thomas D. Morgan).

1993 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1993) (with Thomas D. Morgan).

1994 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1994) (with Thomas D. Morgan).

1995 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1995) (with Thomas D. Morgan).

**CONSTITUTIONAL LAW** (West Publishing Co., St. Paul, Minnesota, 4th ed. 1991) (a one volume treatise on Constitutional Law) (with John E. Nowak).

**PROFESSIONAL RESPONSIBILITY** (West Publishing Co., St. Paul, Minnesota, 3d ed. 1992, Black Letter Series).

**TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE** (West Publishing Co., St. Paul, Minnesota, 2d ed. 1992) (*four volume treatise*) (with John E. Nowak).

1993 POCKET PART TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1993) (with John E. Nowak).

1994 POCKET PART TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1994) (with John E. Nowak).

1995 POCKET PART TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1995) (with John E. Nowak).

1996 POCKET PART TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1996) (with John E. Nowak).

1997 POCKET PART TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1997) (with John E. Nowak).

1998 POCKET PART TO CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1998) (with John E. Nowak).

1999 POCKET PART TO CONSTITUTIONAL LAW (West Group, St. Paul, Minnesota, 1999) (with John E. Nowak).

**MODERN CONSTITUTIONAL LAW: CASES AND NOTES** (West Publishing Co., St. Paul, Minnesota, 4th ed. 1993).

1993 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1993).

1994 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1994).

1995 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1995).

1996 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1996).

CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 5th ed. 1995) (a one volume treatise on Constitutional Law) (with John E. Nowak).

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y., 6th ed. 1995) (with Thomas D. Morgan).

1996 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1996) (with Thomas D. Morgan).

1997 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1997) (with Thomas D. Morgan).

1998 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, Westbury, N.Y. 1998) (with Thomas D. Morgan).

1999 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 1999) (with Thomas D. Morgan).

2000 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2000) (with Thomas D. Morgan).

PROFESSIONAL RESPONSIBILITY (West Publishing Co., St. Paul, Minnesota, 4th ed. 1995, Black Letter Series) (with computer disk).

Treatise on Constitutional Law:  Substance and Procedure — EXPANDED CD ROM EDITION (West Publishing Co., St. Paul, Minnesota, 1995) (with John E. Nowak).

MODERN CONSTITUTIONAL LAW: CASES AND NOTES (West Publishing Co., St. Paul, Minnesota, 5th ed. 1997).

1997 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1997).

Ronald D. Rotunda

1998 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1998).

1999 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Publishing Co., St. Paul, Minnesota, 1999).

**TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE** (West Group, St. Paul, Minnesota, 3d ed. 1999) (*five volume treatise*) (with John E. Nowak).

2000 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (West Group, St. Paul, Minnesota, 2000) (with John E. Nowak).

2001 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (West Group, St. Paul, Minnesota, 2001) (with John E. Nowak).

2002 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (West Group, St. Paul, Minnesota, 2002) (with John E. Nowak).

2003 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (West Group, St. Paul, Minnesota, 2003) (with John E. Nowak).

2004 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (West Group, St. Paul, Minnesota, 2004) (with John E. Nowak).

2005 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (West Group, St. Paul, Minnesota, 2005) (with John E. Nowak).

2006 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (West Group, St. Paul, Minnesota, 2006) (with John E. Nowak).

**헌법: 개인의 자유와 절차를** [AMERICAN CONSTITUTIONAL LAW: INDIVIDUAL LIBERTIES AND PROCEDURE; published in Korean] (Korean Constitutional Court, 1999) (with John E. Nowak).

**PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY** (Foundation Press, Westbury, NY, 7th ed. 2000) (with Thomas D. Morgan).

2001 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2001) (with Thomas D. Morgan).

2002 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2002) (with Thomas D. Morgan).

2003 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2003) (with Thomas D. Morgan).

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-West Group, St. Paul, Minn. 2000) (a Treatise on legal ethics, jointly published by the ABA and West Group, a division of Thomson Publishing).

MODERN CONSTITUTIONAL LAW: CASES AND NOTES (West Group, St. Paul, Minnesota, 6th ed. 2000).

   2000 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Group, St. Paul, Minnesota, 6th ed. 2000).

   2001 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Group, St. Paul, Minnesota, 6th ed. 2001).

   2002 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (West Group, St. Paul, Minnesota, 6th ed. 2002).

CONSTITUTIONAL LAW (West Group, St. Paul, Minnesota, 6th ed. 2000) (a one volume treatise on Constitutional Law) (with John E. Nowak).

PROFESSIONAL RESPONSIBILITY (West Group, St. Paul, Minnesota, 5th ed. 2001, Black Letter Series).

PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE (ABA-West Group, St. Paul, Minnesota, 2001).

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-West Group, St. Paul, Minn., 2nd ed. 2002) (a Treatise on legal ethics, jointly published by the ABA and West Group, a division of Thomson Publishing).

PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE (ABA-West Group, St. Paul, Minnesota, 2nd ed. 2002).

PROFESSIONAL RESPONSIBILITY (West Group, St. Paul, Minnesota, 6th ed. 2002, Black Letter Series).

LEGAL ETHICS IN A NUTSHELL (West Group, St. Paul, Minnesota, 1st ed. 2003, Nutshell Series) (with Michael I. Krauss).

MODERN CONSTITUTIONAL LAW: CASES AND NOTES (Thomson/West, St. Paul, Minnesota, 7th ed. 2003).

   2003 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2003).

   2004 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2004).

2005 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2005).

2006 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2006).

**PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY** (Foundation Press, New York, N.Y., 8th ed. 2003) (with Thomas D. Morgan).

2004 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2004) (with Thomas D. Morgan).

2005 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2005) (with Thomas D. Morgan).

**CONSTITUTIONAL LAW** (Thomson/West, St. Paul, Minnesota, 7th ed. 2004) (a one volume treatise on Constitutional Law) (with John E. Nowak).

**PROFESSIONAL RESPONSIBILITY** (Thomson/West, St. Paul, Minnesota, 7th ed. 2004, Black Letter Series).

**PRINCIPLES OF CONSTITUTIONAL LAW** (Thomson/West, St. Paul, Minnesota, 1st ed. 2004) (with John E. Nowak).

**LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY** (ABA-Thomson/West, St. Paul, Minn., 3rd ed. 2005) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

**PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE** (ABA-Thomson/West, St. Paul, Minn., 3rd ed. 2005) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

**PRINCIPLES OF CONSTITUTIONAL LAW** (Thomson/West, St. Paul, Minnesota, 2nd ed. 2005) (with John E. Nowak).

**LEGAL ETHICS IN A NUTSHELL** (Thomson/West, St. Paul, Minnesota, 2nd ed. 2006, Nutshell Series) (with Michael I. Krauss).

**PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY** (Foundation Press, New York, N.Y., 9th ed. 2006) (with Thomas D. Morgan).

2006 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2006) (with Thomas D. Morgan).

2007 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2007) (with Thomas D. Morgan).

2008 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2008) (with Thomas D. Morgan).

**LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY** (ABA-Thomson/West, St. Paul, Minn., 4th ed. 2006) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

**PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE** (ABA-Thomson/West, St. Paul, Minn., 4th ed. 2006) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

**MODERN CONSTITUTIONAL LAW: CASES AND NOTES** (Thomson/West, St. Paul, Minnesota, 8th ed. 2007).

2007 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2007).

2008 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2008).

**TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE** (Thomson/West, St. Paul, Minnesota, 4th ed. 2007) *(first two volumes of six volume treatise)* (with John E. Nowak).

2007 Pocket PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2007) (with John E. Nowak).

**LEGAL ETHICS IN A NUTSHELL** (Thomson/West, St. Paul, Minnesota, 3rd ed. 2007, Nutshell Series).

**LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY** (ABA-Thomson/West, St. Paul, Minn., 5th ed. 2007) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

**PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE** (ABA-Thomson/West, St. Paul, Minn., 5th ed. 2007) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

언론의 자유와 미국 헌법, **FREEDOM OF SPEECH AND THE AMERICAN CONSTITUTION** (Korean Studies Information Co. Ltd. Publishers, Korea, 2007) (translated into Korean by Professor Lee Boo-Ha, Yeungnam University College of Law and Political Science), coauthored with Professor John E. Nowak.

**PRINCIPLES OF CONSTITUTIONAL LAW** (Thomson/West, St. Paul, Minnesota, 3rd ed. 2007) (with John E. Nowak).

- 14 -                                                Ronald D. Rotunda

TREATISE ON CONSTITUTIONAL LAW:  SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 4th ed. 2008) *(last four volumes of six volume treatise)* (with John E. Nowak).

    2008 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW:  SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2008) (with John E. Nowak).

    2009 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW:  SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2009) (with John E. Nowak).

    2010 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW:  SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2010) (with John E. Nowak).

    2011 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW:  SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2011) (with John E. Nowak).

    2012 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW:  SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2012) (with John E. Nowak).

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y., 10th ed. 2008) (with Thomas D. Morgan).

    2009 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2009) (with Thomas D. Morgan).

    2010 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2010) (with Thomas D. Morgan).

    2011 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2011) (with Thomas D. Morgan).

PROFESSIONAL RESPONSIBILITY (Thomson/West, St. Paul, Minnesota, 8th ed. 2008, Black Letter Series).

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-Thomson/West, St. Paul, Minn., 6th ed. 2008) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE (ABA-Thomson/West, St. Paul, Minn., 6th ed. 2008) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

MODERN CONSTITUTIONAL LAW: CASES AND NOTES (West Thomson Reuters, St. Paul, Minnesota, 9th ed. 2009).

    2009 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul,

Minnesota, 2009).

2010 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2010).

2011 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2011).

**LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY** (ABA-Thomson/West, St. Paul, Minn., 7th ed. 2009) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

**PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE** (ABA-Thomson/West, St. Paul, Minn., 7th ed. 2009) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

**CONSTITUTIONAL LAW** (Thomson/West, St. Paul, Minnesota, 7th ed. 2010) (a one volume treatise on Constitutional Law) (with John E. Nowak).

**LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY** (ABA-Thomson/West, St. Paul, Minn., 8th ed. 2010) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

**PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE** (ABA-Thomson/West, St. Paul, Minn., 8th ed. 2010) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

**PRINCIPLES OF CONSTITUTIONAL LAW** (West-Thomson/Reuters, St. Paul, Minnesota, 4th ed. 2010) (with John E. Nowak).

**PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY** (Foundation Press, New York, N.Y., 11th ed. 2011) (with Thomas D. Morgan & John S. Dzienkowski).

2012 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2012) (with Thomas D. Morgan).

2013 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, New York, N.Y. 2013) (with Thomas D. Morgan).

2014 SELECTED STANDARDS ON PROFESSIONAL RESPONSIBILITY (Foundation Press, West Academic, St. Paul, MN 2014) (with Thomas D. Morgan).

**LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY** (ABA-Thomson/West, St. Paul, Minn., 9th ed. 2011) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE (ABA-Thomson/West, St. Paul, Minn., 9th ed. 2011) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PROFESSIONAL RESPONSIBILITY (West: A Thomson-Reuters Co., St. Paul, Minnesota, 9th ed. 2011, Black Letter Series).

PROBLEMS AND MATERIALS ON PROFESSIONAL RESPONSIBILITY: CONCISE EDITION (Foundation Press, New York, N.Y., 11th ed. 2012) (with Thomas D. Morgan & John S. Dzienkowski).

MODERN CONSTITUTIONAL LAW: CASES AND NOTES (West Thomson Reuters, St. Paul, Minnesota, 10th ed. 2012).

2012 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2012).

2013 SUPPLEMENT TO MODERN CONSTITUTIONAL LAW (Thomson/West, St. Paul, Minnesota, 2013).

概論 アメリカの法曹倫理 第3版——事例解説 [INTRODUCTION TO AMERICAN LEGAL ETHICS] (translated by Naoyuki Toyama) (Thomson Reuters, Japan UNI Agency, Inc. Tokyo, 2012).

LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY (ABA-Thomson/West, St. Paul, Minn., 10th ed. 2012) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE (ABA-Thomson/West, St. Paul, Minn., 10th ed. 2012) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

TREATISE ON CONSTITUTIONAL LAW:  SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 5th ed. 2012) *(first three volumes of six volume treatise)* (with John E. Nowak).

LEGAL ETHICS IN A NUTSHELL (Thomson/West, St. Paul, Minnesota, 4th ed. 2013, Nutshell Series).

TREATISE ON CONSTITUTIONAL LAW:  SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 5th ed. 2013) *(last three volumes of six volume treatise)* (with John E. Nowak).

2013 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW:  SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2013) (with John E. Nowak).

2014 POCKET PART TO TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE (Thomson/West, St. Paul, Minnesota, 2014) (with John E. Nowak).

**LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY** (ABA-Thomson/West, St. Paul, Minn., 11th ed. 2013) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

**PROFESSIONAL RESPONSIBILITY: A STUDENT'S GUIDE** (ABA-Thomson/West, St. Paul, Minn., 11th ed. 2013) (a Treatise on legal ethics, jointly published by the ABA and Thomson/West) (with John S. Dzienkowski).

**ARTICLES:**

*The "Liberal" Label:   Roosevelt's Capture of a Symbol*, 17 PUBLIC POLICY 377 (Harvard University Press, 1968).

*Reform of the Presidential Nominating Conventions*, 56 VIRGINIA LAW REVIEW 179 (1970) (with Reid Chambers).

*The Public Interest Appellant:  Limitations on the Right of Competent Parties to Settle Litigation Out of Court*, 66 NORTHWESTERN UNIVERSITY LAW REVIEW 199 (1971).

*The Combination of Functions in Administrative Actions:   An Examination of European Alternatives*, 40 FORDHAM LAW REVIEW 101 (1971).

*Star Gallery '74, 2* ASTRONOMY MAGAZINE 57 (Feb. 1974) (Photographs of Mercury Transit of the Sun).

*Presidents and Ex-Presidents as Witnesses:  A Brief Historical Footnote*, 1975 UNIVERSITY OF ILLINOIS LAW FORUM 1 (1975).

*Constitutional and Statutory Restrictions on Political Parties in the Wake of Cousins v. Wigoda*, 53 TEXAS LAW REVIEW 935 (1975).

*Sponsors of Real Estate Partnerships as Brokers and Investment Advisors*, 23 UNIVERSITY OF CALIFORNIA-LOS ANGELES LAW REVIEW 322 (1975) (with Robert C. Hacker).

*Book Review of Freedman's "Lawyers' Ethics in An Adversary System,"* 89 HARVARD LAW REVIEW 622 (1976).

*Congressional Power to Restrict the Jurisdiction of the Lower Federal Courts and the Problem of School Busing*, 64 GEORGETOWN UNIVERSITY LAW JOURNAL 839 (1976).

*Comment*, 27 HARVARD LAW BULLETIN 4 (No. 3, 1976).

*Conforming Stock Ownership Plans with the Securities Acts*, 45 GEORGE WASHINGTON UNIVERSITY LAW REVIEW 34 (1976) (with Robert C. Hacker).

*The Commercial Speech Doctrine in the Supreme Court*, 1976 UNIVERSITY OF ILLINOIS LAW FORUM 1080 (1976).

*Commercial Speech and the First Amendment*, 1 THE COLLEGIATE FORUM 8 (Fall 1977) (published by Dow Jones & Co., Inc.).

*The First Amendment Now Protects Commercial Speech*, 10 THE CENTER MAGAZINE:   A PUBLICATION OF THE CENTER FOR THE STUDY OF DEMOCRATIC INSTITUTIONS 32 (May/June 1977).

*The Word "Profession" is Only a Label — And Not a Very Useful One*, 4 LEARNING AND THE LAW 16 (Summer 1977) (publication of the American Bar Association Section of Legal Education and Admissions to the Bar).

*The SEC's Ectoplasmic Theory of an Issuer as Applied to Educational and Charitable Institutions, Bank Trustees, and Other Exempt Issuers*, 65 CALIFORNIA LAW REVIEW 1181 (1977) (with Robert C. Hacker) (published by University of California-Berkeley Law School).

*Law, Lawyers and Managers*, in, THE ETHICS OF CORPORATE CONDUCT, pp. 127-45 (Clarence Walton, ed. 1977) (published by Prentice-Hall, Inc., Englewood Cliffs, N.J., for the American Assembly of Columbia University).

*When the Client Lies:  Unhelpful Guidelines from the ABA*, 1 CORPORATION LAW REVIEW 34 (1978).

*SEC Registration of Private Investment Partnerships after Abrahamson v. Fleschner*, 78 COLUMBIA LAW REVIEW 1471 (1978) (with Robert C. Hacker).

*The Reliance of Counsel Defense in Securities Cases:  Damage Actions versus Injunctive Actions*, 1 CORPORATION LAW REVIEW 159 (1978) (with Robert C. Hacker).

*Liability for the Misuse of Nonpublic, Material Inside Information:  The Duty to Convey and the Duty to Inquire*, 1 CORPORATION LAW REVIEW 376 (1978) (with Robert C. Hacker).

*Running Out of Time:  Can the E.R.A. Be Saved,* 64 AMERICAN BAR ASSOCIATION JOURNAL 1507 (1978).

*The Duty to Take Remedial Action*, 2 CORPORATION LAW REVIEW 159 (1979) (with Robert C. Hacker).

*Waiver of Attorney Client Privilege*, 2 CORPORATION LAW REVIEW 250 (1979) (with Robert C. Hacker).

*Attorney Conflicts of Interest*, 2 CORPORATION LAW REVIEW 345 (1979) (with Robert C. Hacker).

*Standing, Waiver, Laches, and Appealability in Attorney Disqualification Cases*, 3 CORPORATION LAW REVIEW 82 (1980) (with Robert C. Hacker).

*Short-Swing Profits, Section 16(b), and Nonstatutory Insiders*, 3 CORPORATION LAW REVIEW 252 (1980) (with Robert C. Hacker).

*Restrictions on Agency and Congressional Subpoenas Issued for an Improper Purpose*, 4 CORPORATION LAW REVIEW 74 (1981) (with Robert C. Hacker).

Ronald D. Rotunda

*The Extraterritorial Regulation of Foreign Business under the U.S. Securities Laws*, 59 NORTH CAROLINA LAW REVIEW 643 (1981) (with Robert C. Hacker), reprinted in 24 CORPORATE PRACTICE COMMENTATOR 233 (1982).

*Ethical Restraints on Communications with Adverse Expert Witnesses*, 5 CORPORATION LAW REVIEW 348 (1982) (with Robert C. Hacker).

*A Comment on the Creation and Resolution of a "Nonproblem": Dames & Moore v. Regan, the Foreign Affairs Power, and the Role of the Court*, 29 UNIVERSITY OF CALIFORNIA - LOS ANGELES LAW REVIEW 1129 (1982) (with John E. Nowak).

*Corporate Confidences and the Duty to Refrain from Insider Trading*, 6 CORPORATION LAW REVIEW 53 (1983) (with Robert C. Hacker).

*Representing the Corporate Client and the Proposed Rules of Professional Conduct*, 6 CORPORATION LAW REVIEW 269 (1983) (with Robert C. Hacker).

*Ethics*, USA Today, Feb. 15, 1983, at p. 10A.

*Teaching Ethics under the New Model Rules*, 14 SYLLABUS 1 (No. 3, Sept. 1983) (a publication of the American Bar Association Section on Legal Education and Admissions to the Bar).

*Usery in the Wake of Federal Energy Regulatory Commission v. Mississippi*, 1 CONSTITUTIONAL COMMENTARY 43 (1984).

*The Doctrine of Conditional Preemption and Other Limitations on Tenth Amendment Restrictions*, 132 UNIVERSITY OF PENNSYLVANIA LAW REVIEW 289 (1984).

*Ethics*, 12 STUDENT LAWYER 14 (May 1984).

*Debate Over Model Rules Moves to the States*, 130 CHICAGO LAW BULLETIN 3, 8 (June 12, 1984).

*The Notice of Withdrawal and the New Model Rules of Professional Conduct: Blowing the Whistle and Waiving the Red Flag*, 63 OREGON LAW REVIEW 455 (1984), reprinted in, 1985 CRIMINAL LAW REVIEW 533, and excerpted in 34 LAW REVIEW DIGEST 14 (Mar./Apr. 1985).

*Instruments for Legal Integration in the European Community — A Review* (with Peter Hay and Giorgio Gaja), in 1 INTEGRATION THROUGH LAW: EUROPE AND THE AMERICAN FEDERAL EXPERIENCE 113 (Mauro Cappelletti, Monica Seccombe & Joseph Weiler, Eds.) (Walter de Gruyter, Berlin, 1986).

*Conflict of Laws as a Technique for Legal Integration* (with Peter Hay and Ole Lando) in 1 INTEGRATION THROUGH LAW: EUROPE AND THE AMERICAN FEDERAL EXPERIENCE 161 (M. Cappelletti, M. Seccombe, & J. Weiler, eds.) (Walter de Gruyter, Berlin, 1986).

*The Doctrine of the Inner Political Check, the Dormant Commerce Clause, and Federal Preemption*, 53 TRANSPORTATION PRACTITIONERS JOURNAL 263 (1986).

*The Role of Law Reviews:  The Extreme Centrist Position*, 62 INDIANA LAW JOURNAL 1 (1986).

*Intergovernmental Tax Immunity and Tax Free Municipals After Garcia*, 57 U. COLORADO LAW REVIEW 849 (1986).

*Sales and Use Tax Credits, Discrimination against Interstate Commerce, and the Useless Multiple Taxation Concept*, 20 UNIVERSITY OF CALIFORNIA-DAVIS LAW REVIEW 273 (1987) (with John E. Nowak).

*Ethical Problems in Federal Agency Hiring of Private Attorneys*, 1 GEORGETOWN JOURNAL OF LEGAL ETHICS 85 (1987).

*Bicentennial Lessons from the Constitutional Convention of 1787*, 21 SUFFOLK UNIVERSITY LAW REVIEW 589 (1987) (the Twentieth Donahue Lecture).

*Remembering Judge Walter R. Mansfield*, 45 BROOKLYN LAW REVIEW 1 (1987).

*Professionals, Pragmatists or Predators,* Part I, 75 ILLINOIS BAR JOURNAL 420, Part II, 482, Part III, 540 (1987).

*Life Under the Articles of Confederation*, 75 ILLINOIS BAR JOURNAL 544 (1987).

*Lawyers and Professionalism:  A Commentary on the Report of the American Bar Association Commission on Professionalism*, 18 LOYOLA UNIVERSITY OF CHICAGO LAW JOURNAL 1149 (1987) (the Baker-McKenzie Foundation Lecture).

*The Constitutional Future of the Bill of Rights:  A Closer Look at Commercial Speech and State Aid to Religiously Affiliated Schools*, 65 NORTH CAROLINA LAW REVIEW 917 (1987).

*Bork's Firing of Cox:  What Really Happened*, WALL STREET JOURNAL, Sept. 9, 1987, p. 32.

*An Essay on the Constitutional Parameters of Federal Impeachment*, 76 KENTUCKY LAW REVIEW 707 (1988).

*Contract Rights, Property Rights and Constitutional Restrictions on Federal Limitations of Private Claims Against Foreign Governments*, in, LEGAL ESSAYS IN HONOR OF JOHN E. CRIBBET, pp 151-68 (Peter Hay & Michael Hoeflich, eds., U. of Ill. Press, 1988).

*Learning the Law of Lawyering,* 136 UNIVERSITY OF PENNSYLVANIA LAW REVIEW 1761 (1988).

*Original Intent, The View of the Framers, and the Role of the Ratifiers*, 41 VANDERBILT LAW REVIEW 507 (1988).

*The Confirmation Process for Supreme Court Justices in the Modern Era*, 37 EMORY LAW JOURNAL 559 (1988).

*Sheathing the Sword of Federal Preemption*, 5 CONSTITUTIONAL COMMENTARY 311 (1988).

*Is Lawyer Professionalism Declining or Advancing* (3-Part Series) 134 CHICAGO DAILY LAW BULLETIN, Mar. 5, 1988 at 2, 14 (*Part I*); Mar. 16, 1988 at 2, 14 (*Part II*); Mar. 17, 1988 at 2, 10 (*Part III*).

*Challenging the Ethics Myths*, 10 LEGAL TIMES (OF WASHINGTON, D.C.) 16-17 (Mar. 21, 1988), reprinted in, 99 FULTON COUNTY DAILY REPORT 4 (Apr. 13, 1988) (Georgia), 4 TEXAS LAWYER 20-21 (April 18, 1988), 1 MANHATTAN LAWYER, 12, 33 (Mar. 29 - Apr. 4, 1988), 14 CONNECTICUT LAW TRIBUNE 10-11 (Aug. 15, 1988).

*The Litigator's Professional Responsibility*, 77 ILLINOIS BAR JOURNAL 192 (1988), reprinted in, 25 TRIAL MAGAZINE 98 (March 1989), and in, 30 LAW OFFICE ECONOMICS AND MANAGEMENT 61 (1989).

*Race to Courthouse — Or Walk?*, 11 LEGAL TIMES (OF WASHINGTON, D.C.) 14 (Aug. 15, 1988), reprinted in, 99 FULTON COUNTY DAILY REPORT 2 (Aug. 11, 1988) (Georgia), 1 MANHATTAN LAWYER 12 (Aug. 16-22, 1988).

*State Bars Reluctant to Hear Any Evil*, 11 LEGAL TIMES (OF WASHINGTON, D.C.) 14 (Dec. 12, 1988), reprinted in, 99 FULTON COUNTY DAILY REPORT 8 (Dec. 12, 1988) (Georgia), THE RECORDER OF SAN FRANCISCO 4 (Dec. 22, 1988).

*The Court:  A Decade of Stability and Change*, 11 NATIONAL LAW JOURNAL 34-36 (Sept. 26, 1988).

*Client Fraud:  Blowing the Whistle, Other Options*, 24 TRIAL MAGAZINE 92 (Nov. 1988).

*The Lawyer's Duty To Report Another Lawyer's Unethical Violations in the Wake of Himmel*, 1988 UNIVERSITY OF ILLINOIS LAW REVIEW 977 (1988).

*Runyon v. McCrary and the Mosaic of State Action*, 67 WASHINGTON UNIVERSITY LAW QUARTERLY 47 (1989).

*Interpreting an Unwritten Constitution*, 12 HARVARD JOURNAL OF LAW & PUBLIC POLICY 15 (1989).

*Line-Item Veto: Best Budget Fix?*, 11 LEGAL TIMES (OF WASHINGTON, D.C.) 15 (Mar. 27, 1989), reprinted in, *e.g.*, 100 FULTON COUNTY (ATLANTA) DAILY REPORT 8 (Mar. 23, 1989) (Georgia), 2 MANHATTAN LAWYER 12 (Apr. 4 - Apr. 10, 1989).

*Impeaching Federal Judges: Where Are We and Where Are We Going?*, 72 JUDICATURE: THE JOURNAL OF THE AMERICAN JUDICATURE SOCIETY 359 (1989) (transcript of edited remarks).

*Cautionary Lessons from American Securities Arbitration: Litigation versus Arbitration*, 5 ARBITRATION INTERNATIONAL 199 (London Court of International Arbitration, Issue 2, 1989).

*The Impairments Clause and the Corporation: A Comment on Professors Butler's and Ribstein's Thesis*, 55 BROOKLYN LAW REVIEW 809 (1989) (Symposium).

*Eschewing Bright Lines*, 25 TRIAL MAGAZINE 52 (Dec. 1989).

*Meanwhile, Back in Mother Russia*, LEGAL TIMES (OF WASHINGTON, D.C.), Oct. 2, 1989, at 35 (with Peter B. Maggs).

*A Tribute to Eugene F. Scoles*, 1989 ILLINOIS LAW REVIEW 835 (1989).

*The Case Against Special Prosecutors*, WALL STREET JOURNAL, Jan. 15, 1990, at p. A8.

*Jurisprudent: ABA Model Rules on Client Secrets No Help*, 13 CHICAGO LAWYER 12, 56 (Feb. 1990).

*The New Illinois Rules of Professional Conduct: A Brief Introduction and Criticism*, 78 ILLINOIS BAR JOURNAL 386 (1990).

*Beholden to None, Justices Often Cut Their Own Paths*, LOS ANGELES TIMES, July 27, 1990, at p. B7.

*Predicting the Views of Supreme Court Nominees*, 26 TRIAL MAGAZINE 42 (Nov. 1990).

*Judicial Conference — Second Circuit: RICO and the Proposed Restatement of the Law Governing Lawyers* (Sept. 7, 1990), 136 FEDERAL RULES DECISIONS 233, 266-71 (1991).

*War Dissenters Reflect Freedom's Power*, 13 LEGAL TIMES (OF WASHINGTON, D.C.) 24 (Feb. 4, 1991).

*Joseph Story: A Man for All Seasons*, 1990 JOURNAL OF SUPREME COURT HISTORY: YEARBOOK OF THE SUPREME COURT HISTORICAL SOCIETY 17 (1990) (with John E. Nowak).

*When Rough Justice Rides Roughshod*, 13 LEGAL TIMES (of Washington, D.C.) 26 (April 1, 1991), reprinted in, 102 FULTON COUNTY (ATLANTA) DAILY REPORT 8 (Mar. 29, 1991), 32 BROWARD REVIEW (Fort Lauderdale, Florida) 11 (April 1, 1991), 37 PALM BEACH (FLORIDA) REVIEW 11 (April 1, 1991), 65 MIAMI REVIEW 11 (April 1, 1991), 77 NEW JERSEY LAW JOURNAL 9, 24 (April 4, 1991), 65 THE RECORDER 4, 5 (April 4, 1991).

*Nici o constitutie . . .*, 18 LUMEA AZI 4 (May 2, 1991) (published in Romanian).

*Public Executions: Should the Imposition of the Death Sentence Be Televised*?, 4 ILLINOIS
QUARTERLY 36 (July 1991) (panel discussion).

*One Potato, Two Potato, Three Potato, Four*, 14 LEGAL TIMES (OF WASHINGTON, D.C.) 23 (Aug.
12, 1991) (reprinted in various legal newspapers).

*Abuse of Ethics Rule Hinders Prosecutors*, CHICAGO SUN-TIMES, Aug. 24, 1991, at p. 12, col. 1-
2.

*Commercial Speech and the Platonic Ideal: Libre expression et libre enterprise*, in, FREEDOM OF
EXPRESSION AND THE CHARTER 319   (David Schneiderman, ed. Carswell, Canada 1991),
a collection of papers presented at the Edmonton, Alberta Conference on the Canadian
Constitution, of the Centre for Constitutional Studies/Centre d'études constitutionnelles.

*Thomas' Ethics and the Court*, 13 LEGAL TIMES (OF WASHINGTON, D.C.) 20 (Aug. 26, 1991).

*A Red Herring Confirmation Issue*, THE INDIANAPOLIS STAR, Sept. 10, 1991, at p. A7, col. 1-3.

*Celebrating the Bicentennial of the Bill of Rights,* 79 ILLINOIS BAR JOURNAL 608 (1991).

*Exporting the American Bill of Rights: The Lesson from Romania*, 1991 UNIVERSITY OF ILLINOIS
LAW REVIEW 1065 (1991).

*The Welfare State and the Constitution*, in THE ENCYCLOPEDIA OF THE AMERICAN CONSTITUTION
571 (Macmillan Pub. Co., Inc., K. Karst & L. Levy, Eds., Supplement I, 1992).

*The Veto Power*, in THE OXFORD COMPANION TO THE SUPREME COURT OF THE UNITED STATES
896 (Oxford University Press, Kermit L. Hall, ed. 1992).

*Legal Ethics*, 45 SOUTHWESTERN LAW JOURNAL [Southern Methodist University] 2035 (1992).

*The Best Response to Speech We Don't Like Is More Speech*, CHICAGO SUN-TIMES, May 16,
1992, at p.14, col. 1-6.

*Foreword: The Role of the Modern Supreme Court*, 26 U. RICHMOND LAW REVIEW 433 (1992).

*Simon Greenleaf on Desuetude and Judge-Made Law:  An Unpublished Letter to Francis Lieber*,
10 CONSTITUTIONAL COMMENTARY 93 (1993) (with Michael H. Hoeflich).

*Roe v. Wade: Reading It Right,* 15 LEGAL TIMES [OF WASHINGTON, D.C.] 36, 40 (Jan. 25, 1993)
(reprinted in various publications, *e.g.*, TEXAS LAWYER. Feb. 8, 1993, at 16-17).

*No Impediment to Term Limits*, THE WASHINGTON POST, Feb. 13, 1993, at A31, col. 1.

*The Civil Rights Act of 1991: A Brief Introductory Analysis of the Congressional Response to Judicial Interpretation*, 68 NOTRE DAME LAW REVIEW 923 (1993) (Symposium).

*A Brief Comment on Politically Incorrect Speech in the Wake of R.A.V.*, 47 SOUTHERN METHODIST UNIVERSITY LAW REVIEW 9 (1993).

*Juggling for Power Over NAFTA: A Simple Cure for a Big Problem*, 16 LEGAL TIMES (OF WASHINGTON, D.C.) 23 (July 19, 1993).

*Free Trade's Political Alchemy,* 9 TEXAS LAWYER 10 (July 26, 1993).

*Roadblock to Mexico,* THE WASHINGTON POST, Sept. 21, 1993, at A19, col. 6.

*Impeachment Showdown: Congress vs. Judges,* 16 LEGAL TIMES (OF WASHINGTON, D.C.) 37 (Nov. 1, 1993) (reprinted, *e.g.,* in 19 THE CONNECTICUT LAW TRIBUNE 24, Nov. 8, 1993).

*The Case Against Permanent Disbarment,* 5 THE PROFESSIONAL LAWYER 22 (A.B.A., No. 2, Feb. 1994).

*Paula Jones Day in Court,* 17 LEGAL TIMES (OF WASHINGTON, D.C.) 24, 27 (May 30, 1994), *reprinted, e.g.,* 10 TEXAS LAWYER 24, 27 (June 13, 1994).

*Is the President Above the Law?*, CHICAGO TRIBUNE, June 1, 1994, § 1, at 21, col. 3 - 4.

*"Richard" Case Defies the Law As Well As the Logic,* CHICAGO TRIBUNE, July 17, 1994, § 4, at 3, col. 4.

*Setting Timer on Congressional Terms,* 17 LEGAL TIMES (OF WASHINGTON, D.C.) S31, S33 (Oct. 3, 1994).

*A Commentary on the Constitutionality of Term Limits*, in THE POLITICS AND LAW OF TERM LIMITS 141 (Edward H. Crane & Roger Pilon, eds., Cato Institute 1994).

*The Constitution Lets States Impose Term Limits,* WALL STREET JOURNAL, Nov. 30, 1994, at A21, col. 3-6 (Midwest ed.).

*Can You Say That?,* 30 TRIAL MAGAZINE 18 (December 1994).

*Rolls Royce and the Case Law,* LAKE MICHIGAN LADY, at 34-36 (Issue No. 37, 1994).

*Rethinking Term Limits for Federal Legislators in Light of the Structure of the Constitution*, 73 OREGON LAW REVIEW 561 (1994).

*Racist Speech and Attorney Discipline,* 6 THE PROFESSIONAL LAWYER 1 (A.B.A., No. 6, 1995).

*Returning Art to the People: No Subsidies and No Strings*, 17 LEGAL TIMES (OF WASHINGTON, D.C.) 43 (Mar. 6, 1995).

*Term Limits and Lessons from Our Past,* HEARTLAND POLICY STUDY, No. 66 (HEARTLAND INSTITUTE, June 28, 1995).

*Cases Refine Definition of Federal Powers,* 17 NATIONAL LAW JOURNAL C9, C12 (July 31, 1995).

*Computerized Highways and the Search for Privacy in the Case Law: A Comment,* 11 SANTA CLARA COMPUTER AND HIGH TECHNOLOGY LAW JOURNAL 119 (1995) (part of a Conference and Symposium on Intelligent Vehicle Highway Systems).

*Fixing the War Powers Act,* THE HERITAGE LECTURES, No. 529 (The Heritage Foundation, 1995).

*What Next? Outlawing Lawyer Jokes?,* WALL STREET JOURNAL, Aug. 8, 1995, at A12, col. 3-5 (Midwest ed.).

*Innovations Disguised as Traditions:  An Historical Review of the Supreme Court Nominations Process*, 1995 UNIVERSITY OF ILLINOIS LAW REVIEW 123 (1995).

*Flat Taxes: A Progressive Way to Go*, 17 LEGAL TIMES (OF WASHINGTON, D.C.) 20 (Nov. 27, 1995).

*Embattled Clintons Should Note Watergate Lessons*, NEWSDAY, Feb. 28, 1996, A32.

*Rotunda on Travel: A Wet Toast to Limp Bacon, Loose Clothing*, 36 ILLINOIS STATE BAR NEWS 4 (No. 16, Mar 1, 1996).

*The Aftermath of Thornton*, 13 CONSTITUTIONAL COMMENTARY 201 (1996).

*A Czech Window on Ethics*, 18 NATIONAL LAW JOURNAL, at A15 (July 22, 1996).

*Legal Ethics, the Czech Republic, and the Rule of Law*, 7 THE PROFESSIONAL LAWYER 1 (A.B.A., No. 8, 1996).

*Sister Act*: *Conflicts of Interest with Sister Corporations*, in, LEGAL ETHICS: THE CORE ISSUES (1996) (Hofstra University School of Law Conference on Legal Ethics), 1 JOURNAL OF THE INSTITUTE FOR THE STUDY OF LEGAL ETHICS 215 (1996).

*The Warren Court and Freedom of the Press,* in THE WARREN COURT: A 25 YEAR RETROSPECTIVE 85 (Bernard Schwartz, ed. Oxford University Press 1996).

*Judgeships Trapped in a Political Snare?*, WASHINGTON TIMES, Oct. 29, 1996, at A15, col. 1-6.

*Nová pravidla profesního jednání advokátu v Ceské republice (v komparaci s kodexy USA a EU)* [The New Rules of Professional Conduct for Advocates in the Czech Republic], 5 EMP: EVROPSKÉ A MEZINÁRODNÍ PRÁVO 58 (Císlo 3-4, 1996) (published in Czech and English).

*Dealing with the Media: Ethical, Constitutional, and Practical Parameters*, 84 ILLINOIS BAR JOURNAL 614 (December 1996).

*An Essay on Term Limits and a Call for a Constitutional Convention*, 80 MARQUETTE UNIVERSITY LAW REVIEW 227 (1996) (with Stephen J. Safranek).

*Heiple's Burdens*, CHICAGO TRIBUNE, January 29, 1997, at § 1, p. 11, col.  4 [reprinted in, BELLEVILLE NEWS-DEMOCRAT, February 2, 1997, at § A, p. 4A, col.  4-6].

*When Duty Calls, Courts Can Be Flexible,* WASHINGTON POST, January 29, 1997, at p. A21, col. 2-3.

*Professionalism, Legal Advertising, and Free Speech In the Wake of Florida Bar v. Went For It, Inc.*, 49 ARKANSAS LAW REVIEW 703 (1997) (Symposium), reprinted in, 12 LAWYERS' LIABILITY REVIEW 2 (No. 10, Oct. 1998) (part I), 12 LAWYERS' LIABILITY REVIEW 2 (No. 11, Nov. 1998) (part II), 12 LAWYERS' LIABILITY REVIEW 2 (No. 12, Oct. 1998) (part III).

*Conflict Problems When Representing Members of Corporate Families*, 72 NOTRE DAME LAW REVIEW 655 (1997).

*Judges as Ambulance Chasers*, 8 THE PROFESSIONAL LAWYER 14 (A.B.A., No. 8, 1997).

*West Virginia Provides Model for Legal Discipline Across State Lines*, 7 LEGAL OPINION LETTER 1 (Washington Legal Foundation, No. 15, May 16, 1997).

*The Influence of the American Law Institute's Proposed Restatement of the Law Governing Lawyers*, 1 PROFESSIONAL RESPONSIBILITY, LEGAL ETHICS, AND LEGAL EDUCATION NEWS 1, 4 (Federalist Society, No. 2, 1997).

*Handed a Lesser Veto*, 20 LEGAL TIMES (OF WASHINGTON, D.C.) 27, 28 (May 26, 1997).

*Lips Unlocked: Attorney-Client Privilege and the Government Lawyer*, 20 LEGAL TIMES (OF WASHINGTON, D.C.) 21-22, 28 (June 30, 1997).

*The War Powers Act in Perspective*, 2 MICHIGAN LAW & POLICY REVIEW 1 (1997).

*The True Significance of Clinton vs. Jones*, CHICAGO TRIBUNE, July 8, 1997, at 12, col. 1-6.

*Can a President Be Imprisoned?*, 20 LEGAL TIMES (OF WASHINGTON, D.C.) 22-23, 28 (July 21, 1997).

*The Americans with Disabilities Act, Bar Examinations, and the Constitution: A Balancing Act*, 66 THE BAR EXAMINER 6 (No. 3, August, 1997).

*Permanent Disbarment: A Market Oriented Proposal*, 9 THE PROFESSIONAL LAWYER 2 (ABA, No. 9, Nov. 1997) (with Mary Devlin).

*White House Counsel and the Attorney Client Privilege*, 1 PROFESSIONAL RESPONSIBILITY, LEGAL ETHICS, AND LEGAL EDUCATION NEWS 1  (Federalist Society, No. 3, 1997).

*When Witnesses Are Told What to Say,* WASHINGTON POST, January 13, 1998, at A15, col. 2-4 (with Lester Brickman).

*Eastern European Diary: Constitution-Building in the Former Soviet Union*, 1 THE GREEN BAG, 2d SERIES 163 (Winter 1998).

*The Chemical Weapons Convention: Political and Constitutional Issues*, 15 CONSTITUTIONAL COMMENTARY 131 (1998).

*Reporting Sensational Trials: Free Press, a Responsible Press, and Cameras in the Courts*, 3 COMMUNICATIONS LAW AND POLICY 295 (No. 2, Spring, 1998).

*Gauging the Impact of the Proposed Restatement of the Law Governing Lawyers*, 9 THE PROFESSIONAL LAWYER 2 (ABA, No.2, 1998).

*Is the Flat Tax Dead?,* CHICAGO TRIBUNE, April 15, 1998, at § 1, p. 17, col. 1-3.

*Epilogue,* in PRIME TIME LAW: FICTIONAL TV LAWYERS AND THEIR IMPACT ON AMERICA — FROM *PERRY MASON* AND *L.A. LAW* TO *LAW & ORDER* AND *ALLY MCBEAL* 265 (Robert M. Jarvis & Paul R. Joseph, eds., Carolina Academic Press, 1998).

*New Respectability, New Freedom*, 144 CHICAGO DAILY LAW BULLETIN 25, 35 (April 25, 1998).

*Resurrecting Federalism Under the New Tenth and Fourteenth Amendments*, 29 TEXAS TECH LAW REVIEW 953 (1998).

*Competitive Bidding Would End 'Pay-to-Play,'* 20 NATIONAL LAW JOURNAL A23 (June 29, 1998).

*Remarks on School Choice*, in Marshall J. Breger & David M. Gordis, eds., VOUCHERS FOR SCHOOL CHOICE: CHALLENGE OR OPPORTUNITY? — AN AMERICAN JEWISH REAPPRAISAL 82 (Wilstein Institute of Jewish Policy Studies, 1998).

*The Power of Congress Under Section 5 of the Fourteenth Amendment after City of Boerne v. Flores*, 32 INDIANA LAW REVIEW 163 (1998).

*Innovative Legal Billing, Alternatives to Billable Hours, and Ethical Hurdles,* published in, LEGAL ETHICS: ACCESS TO JUSTICE (1998) (Hofstra University School of Law Conference on Legal Ethics), 2 JOURNAL OF THE INSTITUTE FOR THE STUDY OF LEGAL ETHICS 1701 (1999).

*The Legal Profession and the Public Image of Lawyers*, 23 THE JOURNAL OF THE LEGAL PROFESSION 51 (1999).

*Moving from Billable Hours to Fixed Fees: Task-Based Billing and Legal Ethics*, 47 UNIVERSITY OF KANSAS LAW REVIEW 819 (1999).

*Multidisciplinary Practice: An Idea Whose Time Has Come,* 3 PROFESSIONAL RESPONSIBILITY, LEGAL ETHICS, AND LEGAL EDUCATION NEWS 1 (Federalist Society, No. 2, 1999).

*Subsidized Speech for the Rich*, CHICAGO TRIBUNE, Dec. 12, 1999, at § 1, p.23.

*Presidential Pardon for Elian?*, WASHINGTON TIMES, Dec. 28, 1999, at A17.

*Independent Counsel and the Charges of Leaking:  A Brief Case Study*, 68 FORDHAM LAW REVIEW 869 (1999).

*Let Nothing You Display: Making Room for Religion in Public Forums*, LEGAL TIMES (OF WASHINGTON, D.C.), Jan. 3, 2000, at pp. 43, 45.

*Another Clinton Victim: The Integrity of the Federal Courts*, WALL STREET JOURNAL, March 20, 2000, at p. A35, reprinted in, volume 6, WHITEWATER: IMPEACHMENT AFTERMATH, ELECTION 2000 (Dow Jones & Co., 2001), at 145.

*Teaching Legal Ethics a Quarter of a Century After Watergate*, 51 HASTINGS LAW JOURNAL 661 (2000).

*The Long Gavel: In Class Actions, State Judges Are Trumping Other Jurisdictions' Laws*, LEGAL TIMES (of Washington, D.C.), May 15, 2000, at 67, 69.

*Making Work for Lawyers*, THE SCRIPPS HOWARD NEWS SERVICE (distributed to over 400 subscriber newspapers), Friday, July 7, 2000.

*Rated V for Violence*, LEGAL TIMES (of Washington, D.C.), August 14, 2000, at p. 68.

*The FTC Report on Hollywood Entertainment*, 1 FREE SPEECH & ELECTION LAW GROUP NEWS (Federalist Society, Sept. 15, 2000), http://www.fed-soc.org/Publications/practicegroupnewsletters/PG%20Links/rotunda.htm

*Constitutional Problems with Enforcing the Biological Weapons Convention*, CATO FOREIGN POLICY BRIEFING (No. 61, September 28, 2000), http://www.cato.org/pubs/fpbriefs/fpb-061es.html .

*The Bar and the Legal Academy*, in THE RULE OF LAW IN THE WAKE OF CLINTON 207-29 (Roger Pilon, ed. Cato Institute 2000).

*Should States Sue the Entertainment Industry as They Did Big Tobacco?*, 16 INSIGHT ON THE NEWS 41, 43 (Oct. 30, 2000) (debate with Charlie Condon, the Attorney General of South Carolina).

*The Benefits of School Vouchers*, NATIONAL LAW JOURNAL, Oct. 23, 2000, at A17.

*How the Electoral College Works, and Why It Works Well*, KNIGHT-RIDDER NEWSPAPER CHAIN (distributed to over 400 subscriber newspapers), Friday, Nov. 15, 2000; *e.g.*, *Electoral College Works Well*, THE PRESS OF ATLANTIC CITY, Nov. 15, 2000, at p. A13, 2000 (Westlaw) WLNR 7545816.

*The Equal-Protection Clause: A Field Day for Misleading Statistics,* in NATIONAL REVIEW ON LINE, Nov. 15, 2000,  http://www.nationalreview.com/comment/comment111500f.shtml .

*Simply Unconstitutional: How Hand Counting Violates Due Process*, in NATIONAL REVIEW ON LINE, Nov. 16, 2000,  http://www.nationalreview.com/comment/comment111600f.shtml

*Let Legislature Decide*, USA TODAY, November 21, 2000, at 16A.

*What it Takes to Win: Using the Psychic Hotline to Decide Contested Races*, CHICAGO TRIBUNE, November 26, 2000, at § 1, p. 19.

*Don't Blame Movies*, WASHINGTON POST, Dec. 1, 2000, at A35.

*From the Supremes to Seminole*, in NATIONAL REVIEW ON LINE, Dec. 5, 2000, http://www.nationalreview.com/comment/comment120500a.shtml

*Changing the Election Law, Again*, in NATIONAL REVIEW ON LINE, Dec. 9, 2000, http://www.nationalreview.com/comment/comment120800c.shtml

*Rubbish about Recusal*, WALL STREET JOURNAL, December 13, 2000, at A26.

*The Partisanship Myth*, THE CHRISTIAN SCIENCE MONITOR, December 15, 2000, at 11.

*Court Correctly Overrules Granholm*, DETROIT NEWS, Jan. 30, 2001, at p. 11A.

*A Few Modest Proposals to Reform the Law Governing Federal Judicial Salaries*, 12 THE PROFESSIONAL LAWYER 1 (A.B.A., Fall 2000).

*The New States' Rights, the New Federalism, the New Commerce Clause, and the Proposed New Abdication*, 25 OKLAHOMA CITY UNIVERSITY LAW REVIEW 869 (2000).

*Judicial Comments on Pending Cases: The Ethical Restrictions and the Sanctions – A Case Study of the Microsoft Litigation*, 2001 UNIVERSITY OF ILLINOIS LAW REVIEW 611 (2001).

*Lawyer Advertising and the Philosophical Origins of the Commercial Speech Doctrine,* 36 UNIVERSITY OF RICHMOND LAW REVIEW 91 (2002) (Allen Chair Symposium of 2001).

*No POWs: Unlawful Combatants, American Law, and the Geneva Convention*, NATIONAL REVIEW ONLINE, Jan. 29, 2002, http://www.nationalreview.com/comment/comment-rotunda012902.shtml .

*The Role of Ideology in Confirming Federal Court Judges*, 15 GEORGETOWN JOURNAL OF LEGAL ETHICS 127 (2001).

*The Commerce Clause, the Political Question Doctrine, and Morrison*, 18 CONSTITUTIONAL COMMENTARY 319 (2001).

*ABA-Recommended Nominees Deserve Hearings*, CHICAGO SUN-TIMES, May 5, 2002, at 37.

*Monitoring the Conversations of Prisoners*, 13 THE PROFESSIONAL LAWYER 1 (ABA, No. 3, 2002).

*City's O'Hare Strategy Flouts Constitution,* CHICAGO DAILY LAW BULLETIN, June 14, 2002, at p. 5.

*Federalizing the Windy City,* NATIONAL REVIEW ONLINE, June 18, 2002, http://www.nationalreview.com/comment/comment-rotunda061802.asp

*The Eleventh Amendment, Garrett, and Protection for Civil Rights*, 53 ALABAMA LAW REVIEW 1183 (2002).

*Statement before the Senate Committee Hearings on the Judicial Nomination Process*, 50 DRAKE LAW REVIEW 523 (2002).

*Judicial Campaigns in the Shadow of Republican Party v. White*, 14 THE PROFESSIONAL LAWYER 2 (ABA, No. 1, 2002).

*Judicial Elections, Campaign Financing, and Free Speech*, 2 ELECTION LAW JOURNAL 79 (No.1, 2003).

*The Implications of the New Commerce Clause Jurisprudence: An Evolutionary or Revolutionary Court?,* 55 ARKANSAS LAW REVIEW 795 (2003).

*Pravo na svobody slova v voennoe vremiz v knostitutsii SShA: istoki i evoliutsiia*, PRAVO I ZAKONODATEL'STVO, 2003, No. 2, c. 63-65; *The Right of Freedom of Speech in Wartime*

Ronald D. Rotunda

*in the Constitution of the USA: Sources And Evolution*, LAW AND LEGISLATION, 2003, No. 2, pp. 63-65.

*Before Changing the Law, Look at SBC's Record and Credibility*, CHAMPAIGN NEWS-GAZETTE, April 13, 2003, at B1, B4.

*Yet Another Article on Bush v. Gore*, 64 OHIO STATE LAW JOURNAL 283 (2003).

*SBC's Secessionist Gambit Deserved to Fail*, CHICAGO TRIBUNE, June 15, 2003, at p. C9.

*A Preliminary Empirical Inquiry into the Connection between Judicial Decision Making and Campaign Contributions to Judicial Candidates*, 14 THE PROFESSIONAL LAWYER 16 (ABA, No. 2, 2003).

*Senate Rules to Keep Filibusters*, CHICAGO SUN-TIMES, July 4, 2003, at p. 29.

*The Perceived Connection between Judicial Decision Making and Judicial Campaign Contributions*: *Some Preliminary Data*, THE REPUBLICAN LAWYER (July, 2003), http://www.rnla.org/rotunda.doc

*Book Review: Democracy by Decree*, 23 CATO JOURNAL: AN INTERDISCIPLINARY JOURNAL OF PUBLIC POLICY ANALYSIS 155 (No. 1, Spring-Summer 2003).

*Appearances Can Be Deceiving: Should the Law Worry About Campaign Money Looking Dirty When the Facts Show That the System's Clean?*, THE LEGAL TIMES, Sept. 15, 2003, at p. 84.

*Found Money*: *IOLTA, Brown v. Legal Foundation of Washington, and the Taking of Property without the Payment of Compensation*, 2002-2003 CATO SUPREME COURT REVIEW 245 (2003).

*SBC Tries Time-Worn Corporate Power Grab*, CHICAGO SUN-TIMES, Nov. 22, 2003, p. 16.

*Media Accountability in Light of the First Amendment*, 21 SOCIAL PHILOSOPHY & POLICY 269 (Cambridge University Press, No. 2, 2004), *reprinted in*, ELLEN FRANKEL PAUL, FRED D. MILLER JR., & JEFFREY PAUL, eds., FREEDOM OF SPEECH (Cambridge U. Press 2004).

*Duck Hunting Benchmarks*, THE WASHINGTON TIMES, March 28, 2004, at B4.

*Election-Year Hunting: Should Scalia Recuse Himself from Cheney-Related Cases?*, NATIONAL REVIEW ONLINE, March 30, 2004, http://nationalreview.com/comment/rotunda200403300900.asp

*To Hasten Iraq Democracy, Put Wells in People's Hands*, ATLANTA JOURNAL-CONSTITUTION, May 14, 2004, at A19.

*Judicial Impartiality and Judicial Campaign Contributions: Evaluating the Data*, 5 ENGAGE: THE JOURNAL OF THE FEDERALIST SOCIETY'S PRACTICE GROUPS 122 (Issue 1, April 2004).

*Due Process and the Role of Legal Counsel in the War on Terror*, 5 ENGAGE: THE JOURNAL OF THE FEDERALIST SOCIETY'S PRACTICE GROUPS 131 (Issue 2, October 2004).

*The Political Question Doctrine in the United States,* in GRENZEN AAN DE RECHTSPRAAK? POLITICAL QUESTION, ACTE DE GOUVERNEMENT EN RECHTERLIJK INTERVENTIONISME 1-38, vol. 9, Publikaties Van De Staatsrechtkring Staatsrechtsconferenties (P.P.P. Bouvend'Eert, P.M. van den Eijndem, & C.A.J.M. Kortmann, eds.) (Kluwer, 2004).

*Is There Hope for Iraq's Post-Occupation Government?*, 13 COSMOS: JOURNAL OF THE COSMOS CLUB OF WASHINGTON, D.C. 65 (2004).

*Iraq on the Way to Its New Constitution*, 8 THE GREEN BAG, 2D SERIES 163 (Autumn 2004).

*Symposium*, IRAQ AND ITS NEW CONSTITUTION 23, 53, 76 (Bilkent University & Foreign Policy Institute, Ankara, 2004).

*Veto Power*, in THE OXFORD COMPANION TO THE SUPREME COURT OF THE UNITED STATES 1047 (Oxford U. Press, 2nd ed. 2005).

*A Shaky Ethics Charge*, WASHINGTON POST, September 6, 2005, at p. A25.

*The Privileges and Immunities Clause*, in THE HERITAGE GUIDE TO THE CONSTITUTION, p. 269 (Regnery Publishing, Inc. Washington, DC 2005) (member of Editorial Advisory Board).

*Opinion Letter on Judicial Ethics*, 6 ENGAGE: THE JOURNAL OF THE FEDERALIST SOCIETY'S PRACTICE GROUPS 122 (Issue 2, October 2005).

*Alleged Conflicts of Interest Because of the "Appearance of Impropriety,"* 33 HOFSTRA L. REV. 1141 (2005).

*Frische Datteln für die Häftlinge*, SUEDDEUTSCHE ZEITUNG (Germany), January 2, 2006, at p. 2.

*Guantanamo, Another Story*, The Republican Lawyer (January 15, 2006), http://www.rnla.org/Newsletter/ViewArticle.asp?ArticleID=179

*Click for Collected Wisdom*, THE LEGAL TIMES, May 8, 2006, at 46.

*The Propriety of a Judge's Failure to Recuse When Being Considered for Another Position*, 19 GEORGETOWN JOURNAL OF LEGAL ETHICS 1187 (2006).

*There's No Future in the Past of Campaign Finance: The Latest Decision Displays A Badly Fractured Court*, NATIONAL REVIEW ONLINE, June 28, 2006,

Ronald D. Rotunda

http://article.nationalreview.com/?q=NDE1MjZhZWNiMWIyNDhlMzI5MzE4YjFkYm
QxNzc4ZGY .

*CMS Information Policy Under Medicare "Part D" Creates 1st Amendment Problems*, 21
    LEGAL BACKGROUNDER (Washington Legal Foundation, No. 21, July 7, 2006).

*Judicial Ethics, the Appearance of Impropriety, and the Proposed New ABA Judicial Code* (The
    Howard Lichtenstein Lecture in Legal Ethics), 34 HOFSTRA LAW REVIEW 1337 (2006).

*The Courts Need This Watchdog*, WASHINGTON POST, Dec. 21, 2006, at A29.

*The Detainee Cases of 2004 and 2006 and their Aftermath*, 57 SYRACUSE LAW REVIEW 1 (2006).

*The Case for a Libby Pardon*, WALL STREET JOURNAL, March 7, 2007, at A17.

*Income Mobility and Income Tax Revenue Since the Tax Cuts*, THE REPUBLICAN LAWYER (April
    2007), http://www.rnla.org/Newsletter/ViewArticle.asp?ArticleID=232 .

*Remembering Father Robert F. Drinan, S.J.,* 20 GEORGETOWN JOURNAL OF LEGAL ETHICS 203
    (2007).

*Holding Enemy Combatants in the Wake of Hamdan*, 8 ENGAGE: THE JOURNAL OF THE
    FEDERALIST SOCIETY'S PRACTICE GROUPS 52 (Issue 3, June 2007).

*Teaching Professional Responsibility and Ethics*, 51 ST. LOUIS UNIVERSITY LAW JOURNAL 1223
    (2007).

*Rudy Thinks FAST*, THE AMERICAN SPECTATOR, January 25, 2008,
    http://www.spectator.org/dsp_article.asp?art_id=12633

*Age Has Not Withered Him*, THE LEGAL TIMES, July 7, 2008, at 46.

*Teaching Professional Responsibility and Ethics*, in P. L. Jayanthi Reddy, ed., BENCH AND BAR
    ETHICS 3 (Amicus Books, Icfai University Press, Hyderabad, India 2007-2008).

*Foreword*, in Paul Benjamin Linton, ABORTION UNDER STATE CONSTITUTIONS: A STATE-BY-
    STATE ANALYSIS xix –xxi (Carolina Academic Press, Durham, N.C., 2008).

*Impact*, in Sandarshi Gunawardena & Karen Rosenblum, DIVERSITY AT MASON 14 (George
    Mason U. 2008).

*Simplify, Simply: A Mantra for Transcendentalists and Tax Reformers Alike*, LOS ANGELES
    DAILY JOURNAL, Oct. 1, 2008, at p. 6.

*Dormant Commerce Clause*, 2 ENCYCLOPEDIA OF THE SUPREME COURT OF THE UNITED STATES
    (Ed., David S. Tanenhaus) (Detroit: Macmillan Reference USA, 2009), at pp. 52-54.

*A Modern Day Bleak House: The Legal Inheritance of Anna Nicole Smith*, THE AMERICAN
    SPECTATOR, March 2009, at 32-36.

*Some Strings Attached: Is the Stimulus Law Constitutional?*, CHICAGO TRIBUNE, March 15,
    2009, at 29.

*The Right of Free Speech, Regardless Of What Is Spoken*, THE PANTHER (Chapman University
    Newspaper), at p. 13 (March 23, 2009).

*Was Madoff Good for the Economy?*, CHICAGO TRIBUNE, April 3, 2009, at 49.

 *The Orange Grove: U.S. Imports of Lawsuits Rising*, ORANGE COUNTY REGISTER, June 30,
    2009.

*Kenneth W. Starr: A Biography*, THE YALE BIOGRAPHICAL DICTIONARY OF AMERICAN LAW 510
    (Roger K. Newman, ed., Yale U. Press, 2009).

*An Unconstitutional Nobel*, THE WASHINGTON POST, Oct. 16, 2009, at A23 (with J. Peter Pham).

*Judicial Transparency, Judicial Ethics, and a Judicial Solution: An Inspector General for the
    Courts*, 41 LOYOLA U. CHICAGO L.J. 301 (2010).

*Judicial Disqualification in the Aftermath of Caperton v. A.T. Massey Coal Co.*, 60 SYRACUSE
    LAW REVIEW 247 (2010).

*Campaign Disclosure Can Go too Far*, SACRAMENTO BEE, February 6, 2010, at p. 11A.

*The Efforts to Disbar Bush Lawyers*, in NATIONAL REVIEW ON LINE, March 4, 2010,
    http://bench.nationalreview.com/post/?q=ZjhiMTk2MGY0ZjFiOTczZjg4ODhhODI5MD
    QwMzczYWU=

*Repealing the First Amendment*, WASHINGTON EXAMINER, April 14, 2010,
    http://www.washingtonexaminer.com/opinion/columns/OpEd-Contributor/Repealing-the-
    First-Amendment-90851704.html#ixzz0l6TO2qIK

*What Can Congress Make You Do?*, ORANGE COUNTY REGISTER, May 23, 2010, at p. C2,
    http://www.ocregister.com/articles/congress-75386-ocprint-buy-insurance.html

*Birthright Citizenship Benefits the Country*, CHICAGO TRIBUNE, Sept. 16, 2010, at p. 21,
    http://www.chicagotribune.com/news/opinion/ct-oped-0916-birthright-
    20100916,0,4594378.story

*What Are D.C. Police Doing Enforcing Shariah Law*?, PAJAMAS MEDIA, Sept. 16, 2010,
    http://pajamasmedia.com/blog/what-are-d-c-police-doing-enforcing-sharia-
    law/?singlepage=true

*A New Look at the Federal Suit against Arizona's Immigration Law*, PAJAMAS MEDIA, Oct. 5, 2010,   http://pajamasmedia.com/blog/a-new-look-at-the-federal-suit-against-arizonas-immigration-law/?singlepage=true

*The Point of No Return*, WASHINGTON TIMES, Oct. 10, 2010, at p. B3.

*Can Congress Ban People from Threatening to Burn The Quran*?, ATLANTA JOURNAL-CONSTITUTION, Oct. 14, 2010, at p. 21A.

*Congressional Silence Hurts Immigrants*, THE PANTHER (Chapman University Newspaper), at p. 11 (October 25, 2010).

*Justice O'Connor's Robo Call Apology*, AOL NEWS, Oct. 28, 2010, http://www.aolnews.com/discuss/opinion-justice-oconnors-robo-call-apology-isnt-enough/19693741#gcpDiscussPageUrlAnchor .

*What's Wrong with Oklahoma's Shariah Amendment*?, AOL NEWS, Nov. 30, 2010, http://www.aolnews.com/opinion/article/opinion-whats-wrong-with-oklahomas-shariah-amendment/19737155

*Judicial Disqualification When a Solicitor General Moves to the Bench*, 11 ENGAGE: THE JOURNAL OF THE FEDERALIST SOCIETY'S PRACTICE GROUPS 94 (Issue 3, Nov. 2010), http://www.fed-soc.org/publications/pubid.2067/pub_detail.asp

*Eat Your Spinach, Says Nanny State*, 33 NATIONAL LAW JOURNAL 39 (#19, Jan. 10, 2011), http://www.law.com/jsp/nlj/PubArticleNLJ.jsp?id=1202477337422&Each_your_spinach_says_nanny_state

*Trying to Codify Caperton*, 42 MCGEORGE LAW REVIEW 95 (2010)(Judicial Ethics Symposium).

*Equal Employment Opportunities for Female Prison Guards*, NATIONAL LAW JOURNAL, Feb. 7, 2011, http://www.law.com/jsp/nlj/PubArticleNLJ.jsp?id=1202480379005&rss=nlj&slreturn=1&hbxlogin=1

*Stern v. Marshall, and the Power of Bankruptcy Courts to Issue Final Orders on All Compulsory Counterclaims*, 23 BNA BANKRUPTCY LAW REPORTER 230 (Feb. 24, 2011)

*Resolving Client Conflicts by Hiring "Conflicts Counsel,"* 62 HASTINGS LAW JOURNAL 677 (2011).

*We Do Declare: Libya and the United States Constitution,* NATIONAL REVIEW ONLINE, March 24, 2011,   http://www.nationalreview.com/articles/262940/we-do-declare-kathryn-jean-lopez?page=7 .

*Constitutionalizing Judicial Ethics: Judicial Elections after Republican Party v. White, Caperton, and Citizens United*, 64 U. ARKANSAS LAW REV. 1 (2011)(Hartman-Hotz Distinguished Lecture).

*Transparenţa Judiciară, Etica Judiciară şi o Soluţie Judiciară,* REVISTA FORUMUL JUDECĂTORILOR 16 (No. 2, 2011).

*The Intellectual Forebears of Citizens United*, 16 NEXUS 113 ((2010-2011).

*Are Capitalists Happier?*, REUTERS, Aug. 12, 2011, http://blogs.reuters.com/great-debate/2011/08/12/are-capitalists-happier/ (co-authored with Vernon Smith, 2002 Nobel Laureate in Economics, & Bart Wilson), *reprinted in, e.g.,* THE DAILY STAR (Dhaka, Bangladesh), Aug. 15, 2011; ETHIOPIAN REVIEW, Aug. 12, 2011.

*Lawyers: Why We Are Different and Why We Are the Same*: *Creating Structural Incentives in Large Law Firms to Promote Ethical Behavior – In-House Ethics Counsel, Bill Padding, and In-House Ethics Training,* 44 AKRON LAW REV. 679 (2011)(Miller-Becker Professional Responsibility Distinguished Lecture Series), reprinted in, 61 DEFENSE LAW JOURNAL (Aug. 2012).

*Does ObamaCare, As Written, Prevent Congress From Repealing It?*, FOXNEWS.COM (Oct. 28, 2011, http://www.foxnews.com/opinion/2011/10/27/does-obamacare-prevent-congress-from-repealing-it/

*Perry Is Right on Immigration*, NATIONAL REVIEW ONLINE, http://www.nationalreview.com/corner/281735/perry-right-immigration-ronald-d-rotunda (Oct. 31, 2011).

*Kagan's Recusal from ObamaCare,* WASHINGTON TIMES, Dec. 15, 2011, http://www.washingtontimes.com/news/2011/dec/15/kagan-must-recuse-from-obamacare-case/ .

*Evidence Mounts against Justice Kagan for Recusal in ObamaCare Suit*, FOXNEWS.COM (Jan. 26, 2012), http://www.foxnews.com/opinion/2012/01/26/evidence-mounts-against-justice-kagan-for-recusal-in-obamacare-suit/

*Kagan Should Recuse from ObamaCare Case*, WASHINGTON EXAMINER, Feb. 14, 2012, http://washingtonexaminer.com/kagan-should-recuse-from-obamacare-case/article/269386

*Supreme Court Justice Elena Kagan and the Obamacare Constitutional Challenge*, JUDICIAL WATCH SPECIAL REPORT, March 2012.

*Obamacare vs. Conscientious Beliefs*, ORANGE COUNTY REGISTER, March 28, 2012, http://www.ocregister.com/opinion/government-346533-religious-federal.html

*Lessons of Watergate*, 54 ORANGE COUNTY LAWYER 19 (April 2012).

*Prosecutorial and Judicial Misconduct*, NATIONAL LAW JOURNAL, p. 42 (April 30, 2012)(with Alan Dershowitz), *reprinted in*, THE JERUSALEM POST, May 13, 2012.

*The Wrong Legal "Help" for NY's Poor*, NEW YORK POST, June 1, 2012.

*ObamaCare Legal Battles Not Over*, ORANGE COUNTY REGISTER, Sept. 27, 2012, at p. 9, http://www.ocregister.com/opinion/ipab-372820-congress-proposal.html

*Obama Tax-raising Against JFK precedent: Hiking Rates Will Lose Money*, WASHINGTON TIMES, Dec. 13, 2012, http://www.washingtontimes.com/news/2012/dec/12/obama-tax-raising-against-jfk-precedent/

*Geithner's "Story of Inflation,"* ORANGE COUNTY REGISTER, Jan. 5, 2013, http://www.ocregister.com/opinion/inflation-382532-comic-geithner.html

*Blaming Hollywood for Gun Violence Doesn't Work*, WASHINGTON TIMES, Feb. 20, 2013, http://www.washingtontimes.com/news/2013/feb/20/blaming-hollywood-for-gun-violence-doesnt-work/

*Exporting American Freedoms*, in MODEL, RESOURCE, OR OUTLIER? WHAT EFFECT HAS THE U.S. CONSTITUTION HAD ON THE RECENTLY ADOPTED CONSTITUTIONS OF OTHER NATIONS?, at 12 (Heritage Foundation, May 17, 2013), http://www.heritage.org/research/lecture/2013/05/model-resource-or-outlier-what-effect-has-the-us-constitution-had-on-the-recently-adopted-constitutions-of-other-nations

'*What* did he know, and when did he know it?', WASHINGTON TIMES, June 5, 2013, http://www.washingtontimes.com/news/2013/jun/5/what-did-he-know-and-when-did-he-know-it/?utm_source=RSS_Feed&utm_medium=RSS

*Egypt's Constitutional Do-Over*: *This Time Around, Take a Closer Look at America's Bill of Rights*, WALL STREET JOURNAL, JULY 17, 2013, at p. A13, http://online.wsj.com/article/SB10001424127887323740804578601383340547860.html?mod=WSJ_Opinion_LEFTTopOpinion#articleTabs%3Darticle

*On the Health-Care Mandate, Obama Reaches Beyond the Law*, WASHINGTON POST, July 18, 2013, http://www.washingtonpost.com/opinions/on-the-health-care-mandate-obama-reaches-beyond-the-law/2013/07/18/d442aefc-efb4-11e2-a1f9-ea873b7e0424_story.html

*The Boston Strangler, the Classroom and Me*, WALL STREET JOURNAL, JULY 26, 2013, http://online.wsj.com/article/SB10001424127887324783204578623714232084132.html?KEYWORDS=rotunda

*Generous Pensions Give New Meaning to 'If It's too Good to Be True,'* Forbes Magazine, Sept. 27, 2013, http://www.forbes.com/sites/realspin/2013/09/27/generous-pensions-give-new-meaning-to-if-its-too-good-to-be-true/

*Applying the Revised ABA Model Rules in the Age of the Internet: The Problem of Metadata*, 52 Hofstra Law Review 175 (2013).

*On Deep Background 41 Years Later*: *Roe v. Wade*, Chicago Tribune, Jan. 22, 2014.

*Congress Cannot Stop the Exporting of American Oil*, The Hill: the Hill's Forum for Lawmakers and Policy Professionals, Jan. 27, 2014.

*Congress and Lois Lerner in Contempt,* Daily Caller, April 10, 2014.

*Using the State to Bully Dissidents*, Verdict: Legal Analysis and Commentary from Justia, April 24, 2014.

*Endangering Jurors in a Terror Trial*, Wall Street Journal, May 2, 2014, at p. A13.

**Other Activities:**

March-April, 1984, Expert Witness for State of Nebraska on Legal Ethics at the Impeachment Trial of Nebraska Attorney General Paul L. Douglas (tried before the State Supreme Court; the first impeachment trial in nearly a century).

July 1985, Assistant Chief Counsel, State of Alaska, Senate Impeachment Inquiry of Governor William Sheffield, (presented before the Alaskan Senate).

Speaker at various ABA sponsored conferences on Legal Ethics; Speaker at AALS workshop on Legal Ethics; Speaker on ABA videotape series, "Dilemmas in Legal Ethics."

Interviewed at various times on Radio and Television shows, such as MacNeil/Lehrer News Hour, Firing Line, CNN News, CNN Burden of Proof, ABC's Nightline, National Public Radio, News Hour with Jim Lehrer, Fox News, etc.

1985--1986, Reporter for Illinois Judicial Conference, Committee on Judicial Ethics.

1981-1986, Radio commentator (weekly comments on legal issues in the news), WILL-AM Public Radio.

1986-87, Reporter of Illinois State Bar Association Committee on Professionalism.

1987-2000, Member of Consultant Group of American Law Institute's RESTATEMENT OF THE LAW GOVERNING LAWYERS.

1986-1994, Consultant, Administrative Conference of the United States (on various issues relating to conflicts of interest and legal ethics).

1989-1992, Member, Bar Admissions Committee of the Association of American Law Schools.

1990-1991, Member, Joint Illinois State Bar Association & Chicago Bar Association Committee on Professional Conduct.

1991-1997, Member, American Bar Association Standing Committee on Professional Discipline.
    CHAIR, Subcommittee on Model Rules Review (1992-1997). [The subcommittee that I chaired drafted the MODEL RULES FOR LAWYER DISCIPLINARY ENFORCEMENT that the ABA House of Delegates approved on August 11, 1993.]

1992, Member, Illinois State Bar Association [ISBA] Special Committee on Professionalism; CHAIR, Subcommittee on Celebration of the Legal Profession.

Spring 1993, Constitutional Law Adviser, SUPREME NATIONAL COUNCIL OF CAMBODIA.  I traveled to Cambodia and worked with officials of UNTAC (the United Nations Transitional Authority in Cambodia) and Cambodian political leaders, who were

charged with drafting a new Constitution to govern that nation after the United Nations troop withdrawal.

1994-1997, LIAISON, ABA Standing Committee on Ethics and Professional Responsibility.

1994-1996, Member, Illinois State Bar Association [ISBA] Standing Committee on the Attorney Registration and Disciplinary Commission.

Winter 1996, Constitutional Law Adviser, SUPREME CONSTITUTIONAL COURT OF MOLDOVA.

> Under the auspices of the United States Agency for International Development, I consulted with the six-member Supreme Constitutional Court of Moldova in connection with that Court's efforts to create an independent judiciary.  The Court came into existence on January 1, 1996.

Spring 1996, Consultant, CHAMBER OF ADVOCATES, of the CZECH REPUBLIC.

> Under the auspices of the United States Agency for International Development, I spent the month of May 1996, in Prague, drafting Rules of Professional Responsibility for all lawyers in the Czech Republic.  I also drafted the first Bar Examination on Professional Responsibility, and consulted with the Czech Supreme Court in connection with the Court's proposed Rules of Judicial Ethics and the efforts of the Court to create an independent judiciary.

Consulted with (and traveled to) various counties on constitutional and judicial issues (*e.g.*, Romania, Moldova, Ukraine, Cambodia) in connection with their move to democracy.

1997-1999, Special Counsel, Office of Independent Counsel (Whitewater Investigation).

Lecturer on issues relating to Constitutional Law, Federalism, Nation-Building, and the Legal Profession, throughout the United States as well as Canada, Cambodia, Czech Republic, England, Italy, Mexico, Moldova, Romania, Scotland, Turkey, Ukraine, and Venezuela.

1998-2002, Member, ADVISORY COUNCIL TO ETHICS 2000, the ABA Commission considering revisions to the ABA Model Rules of Professional Conduct.

2000-2002, Member, ADVISORY BOARD TO THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS (This Board was charged with removing any remaining vestiges of organized crime to influence the Union, its officers, or its members.)  This Board was part of "Project RISE" ("Respect, Integrity, Strength, Ethics").

2001-2008, Member, Editorial Board, CATO SUPREME COURT REVIEW.

2005-2006, Member of the Task Force on Judicial Functions of the Commission on Virginia Courts in the 21st Century: To Benefit All, to Exclude None

July, 2007, Riga, Latvia, International Judicial Conference hosted by the United States Embassy, the Supreme Court of Latvia, and the Latvian Ministry of Justice. I was one of the main speakers along with Justice Samuel Alito, the President of Latvia, the Prime Minister of Latvia, the Chief Justice of Latvia, and the Minister of Justice of Latvia

Since 1994, Member, Publications Board of the ABA Center for Professional Responsibility; vice chair, 1997-2001.

Since 1996, Member, Executive Committee of the Professional Responsibility, Legal Ethics & Legal Education Practice Group of the Federalist Society; Chair-elect, 1999; Chair, 2000

Since 2003, Member, Advisory Board, the Center for Judicial Process, an interdisciplinary research center (an interdisciplinary research center connected to Albany Law School studying courts and judges)

Since 2012, *Distinguished International Research Fellow* at the World Engagement Institute, a non-profit, multidisciplinary and academically-based non-governmental organization with the mission to facilitate professional global engagement for international development and poverty reduction, http://www.weinstitute.org/fellows.html

Since 2014, *Associate Editor* of the Editorial Board, THE INTERNATIONAL JOURNAL OF SUSTAINABLE HUMAN SECURITY (IJSHS), a peer-reviewed publication of the World Engagement Institute (WEI)

Since 2014, Member, Board of Directors of the Harvard Law School Association of Orange County

Since 2014, Member, Editorial Board of THE JOURNAL OF LEGAL EDUCATION (2014 to 2016).

Exhibit 5

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

**LARRY KLAYMAN,**

                        Plaintiff,

            v.

**JUDICIAL WATCH, INC.,**

                        Defendant.

Civil Action No. 1:15-cv-00214

## MOTION FOR REMAND

Pursuant to 28 U.S. Code § 1447(c), Plaintiff Larry Klayman ("Plaintiff") hereby respectfully moves this Court as of right to remand this lawsuit back to the Superior Court of the District of Columbia ("Superior Court").

## INTRODUCTION

This lawsuit arises out of the willful, malicious, and defamatory statements made by Defendant Judicial Watch ("Defendant") against Plaintiff. Plaintiff founded and was formerly employed by Defendant until Plaintiff voluntarily left to run for the U.S. Senate seat for the state of Florida.[1] At the time of Plaintiff's departure, the parties entered into a Severance Agreement that would govern their future relationship. *See* Exhibit 1 – Severance Agreement. Included within this Severance Agreement was a clause preventing Defendants from making "disparaging, defamatory or negative remarks or comments" about Plaintiff. *Id*. at p. 9. Defendant materially

_____

[1] Despite the false claims made by Defendant in this case and in other cases, the U.S. Court of Appeals for the Eleventh Circuit has recently confirmed that Plaintiff is a citizen of the state of Florida. *See Klayman v. Judicial Watch*, No. 14-13855 (11th Cir. January 29, 2015)(Exhibit 2).

1

and egregiously violated the Severance Agreement on or about February 22, 2012, when it published that Plaintiff had been convicted of a crime for not paying child support and stating that "donors should know" about the conviction. On June 10, 2014, Defendant was found liable for the defamatory statements after a jury trial was held in the U.S. District Court for the Southern District of Florida.[2] *See* Exhibit 3 – Final Judgment. The jury found malicious defamation by clear and convincing evidence and thus awarded Plaintiff punitive damages. Having been found by a court of law to have materially defamed Plaintiff, Defendants are in clear violation of the parties' Severance Agreement.  Plaintiff filed suit in the appropriate forum, the Superior Court on January 13, 2015.

Defendant has now sought to improperly remove this lawsuit to this Court, the U.S. District Court for the District of Columbia ("District Court").  As discussed below, removal to District Court was improper as the threshold for diversity jurisdiction, citizens of different states and a controversy in access of $75,000, was not met.  **Importantly, removal is also frivolous under 28 U.S.C. § 1441 (b)(2) as Defendant is a citizen of the forum state, the District of Columbia.**  Further, Defendant waived its right to remove to District Court by consenting to venue in *any* court within the District of Columbia pursuant to the Severance Agreement. Plaintiff has a right to choose the proper forum and as such this lawsuit should have remained in the Superior Court, especially given the fact that Defendant has now improperly removed this case to District Court.  Finally, this Court should respectfully award attorney's fees and costs to Plaintiff for having to file this motion as sanctioned by 28 U.S.C. § 1447(c).

---

[2] *Klayman v. Judicial Watch*, No. 13-20610(S.D.F.L. June 11, 2014)

## THE LAW

Federal courts exercise limited subject-matter jurisdiction.  A case must be remanded "[i]f at any time before final judgment it appears that the District Court lacks subject matter jurisdiction." 28 U.S.C. § 1447(c); *see J.S.R. ex rel. Rojas Polanco v. Washington Hosp. Ctr. Corp.*, 667 F. Supp. 2d 83, 85 (D.D.C. 2009). The law presumes that "a cause lies outside [the court's] limited jurisdiction" (*Kokkonen v. Guardian Life Ins. Co. of Am.,* 511 U.S. 375, 377(1994)), particularly when a case is removed from a state court (*see, e.g.*, *Williams v. Howard Univ.*, 984 F. Supp. 27, 29 (D.D.C. 1997)). "The court must resolve any ambiguities concerning the propriety of removal in favor of remand." *US Airways Master Exec., Council, Air Line Pilots Assoc., Int'l v. Am. W. Master Exec., Council, Air Line Pilots Assoc., Int'l*, 525 F. Supp. 2d 127, 132 (D.D.C. 2007).

The removal statutes are strictly interpreted in favor of state court jurisdiction. *See Russell Corp. v. American Home Assurance Co.,* 264 F.3d 1040, 1050 (11th Cir. 2001) ("There are several . . . bright line limitations on federal removal jurisdiction . . . that some might regard as arbitrary and unfair. Such limitations, however, are an inevitable feature of a court system of limited jurisdiction that strictly construes the right to remove.").

A.  This Lawsuit Does Not Meet the Threshold for Diversity

For a federal court to have diversity jurisdiction 28 U.S.C. § 1332(a) requires that the parties be citizens of different states and for the amount in controversy exceeding $75,000. Without these requirements this Court lacks subject-matter jurisdiction.  Here, diversity does not exist because Plaintiff is seeking equitable relief: the rescission of a contract and not damages of any kind.  It is settled, black-letter law that rescission of a contract is equitable relief. *See, e.g., Solin v. Domino*, 501 Fed. Appx. 19, 22 (2d Cir. 2012) (Plaintiff sought "equitable relief,

specifically, rescission and reformation based on negligent misrepresentation, unilateral mistake, and mutual mistake"); *Palace Exploration Co. v. Petroleum Dev. Co.*, 316 F.3d 1110, 1116 (10th Cir. 2003) (Plaintiff "asserted only equitable claims for rescission, based on fraud in the inducement and failure of consideration.").

Plaintiff has not sought any monetary damages, nor requested any sort of legal remedy. Rescission is the only relief being sought in this action, and as such the threshold amount of $75,000 has not been met. For this reason alone this Court should respectfully rule that it does not have subject-matter jurisdiction to hear this lawsuit and remand this case back to the Superior Court.

B. Removal is Improper under the Forum Defendant Rule, 28 U.S.C. § 1441 (b)(2)

Of paramount importance, removal here is also improper and frivolous under the "forum defendant rule," 28 U.S.C. § 1441 (b)(2). Under 28 U.S.C. § 1441 (b)(2), "[a] civil action otherwise removable solely on the basis of ... [diversity of citizenship jurisdiction] may not be removed if any of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought." 28 U.S.C. § 1441 (b)(2).

As the U.S. Supreme Court held, "[w]hen federal-court jurisdiction is predicated on the parties' diversity of citizenship, see § 1332, removal is permissible **only if none of the parties in interest properly joined and served as defendants is a citizen of the State in which [the] action [was] brought**." § 1441(b). *Lincoln Prop. Co. v. Roche*, 546 U.S. 81, 83-84 (2005)(emphasis added). Diversity jurisdiction is rooted in the historical concept that "out-of-state defendants feared that local courts would be biased against them, and a federal forum was viewed as a solution to the possible bias." The need for such protection [from local bias] is absent, however, in cases where the defendant is a citizen of the state in which the case is brought." *Allen v. GlaxoSmithKline PLC*, No. 07-5045, 2008 WL 2247067, at *4 (E.D. Pa.

May 30, 2008) (quoting *Lively v. Wild Oats Mkts., Inc* .. 456 F.3d 933,939 (9th Cir. 2006) (internal citation omitted).

Under 28 U.S.C. § 1332(c)(1), a corporation "shall be deemed to be a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business..." 28 U.S.C. § 1332(c)(1). Here, Defendant Judicial Watch admits it is a citizen of the District of Columbia. Defendant admits that it is both "a corporation organized and existing under the laws of the District of Columbia" and that is has "its principal place of business in the District of Columbia." *See* Notice of Removal at p. 3. Since Defendant is a citizen of the District of Columbia, it is subject to the "forum defendant rule" under 28 U.S.C. § 1441(b)(2) and it may not remove this case from the Superior Court.

Thus, removal of this action was clearly improper and frivolous under 28 U.S.C. § 1441(b)(2) and this case must respectfully be summarily remanded to the Superior Court.

C. Defendant Consented to Jurisdiction In the Superior Court

Defendant has consented to jurisdiction in the Superior Court. Plaintiff founded and was previously employed by Defendant, and upon leaving employment with Defendant, the parties entered into a Severance Agreement wherein they agreed: "[t]he Parties consent to the jurisdiction and venue of any state or federal court located within the District of Columbia in any action or judicial proceeding brought to enforce, construe or interpret this Agreement or otherwise arising out of or relating to Klayman's employment." *See* Exhibit 1 – Severance Agreement at p. 11.

Since Defendant has already consented to jurisdiction in *any* District of Columbia Court, it must now be precluded from any claims that the Superior Court is not a proper venue to hear this matter.

D. Plaintiff Determines Forum

There is a strong presumption in favor of the plaintiff's choice of forum. *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947) (plaintiff's choice should "rarely be disturbed"). Plaintiff filed this case within the proper forum, the Superior Court, and as such deference should be given to Plaintiff's selection of the forum. *See, e.g.*, *Doe v. Allied-Signal Inc.*, 985 F.2d 908, 911 (7th Cir. 1993) ("Courts should interpret the removal statute narrowly and presume that the plaintiff may choose his or her forum."); *Burns v. Windsor Ins. Co.*, 31 F.3d 1092, 1095 (11th Cir. 1994) ("While a defendant does have a right, given by statute, to remove in certain situations, plaintiff is still the master of his own claim. Defendant's right to remove and plaintiff's right to choose his forum are not on equal footing ...." (internal citations omitted)).

Since Plaintiff chose the Superior Court, and since there are no reasons why Defendant should remove this case to District Court, this Court should respectfully rule that Plaintiff choice of forum was proper and remand this case to the Superior Court.

E. This Case Is Not Related to Any Previous Action

In its Notice of Removal, Defendant makes the claim that this lawsuit is related to a suit filed by Plaintiff and against Defendants in 2006. *See* Notice of Removal at p.3. However, this case is not related to the previous lawsuit. "[V]irtually all federal courts" have adopted the transactional approach to determine whether two suits involve the same cause of action. Wright & Miller, Federal Practice and Procedure, Definition of Claim or Cause of Action, 18 F.P.P. § 407 (2008) (transactional approach is "the predominant federal rule"). *See Waldman v. Village Kiryas Joel*, 207 F.3d 105 (2nd Cir. 2000); *U.S. ex rel. Barajas v. Northrop Corp.*, 147 F. 3d 905, 910-911 (9th Cir. 1998).

The "transactional" approach examines whether a claim arises from the "same nucleus of facts" as a previous claim. *Page v. United States*, 729 F.2d 818, 820 (D.C. Cir. 1984). Even Defendant concedes in its Motion to Dismiss that "[i]t is the factual nucleus . . . which operates to constitute the cause of action for claim preclusion purposes." *Stutsman v. Kaiser Found. Health Plan of Mid-Atlantic States, Inc.*, 546 A.2d 367, 369-70 (D.C. Cir. 1988). Defendant's Motion to Dismiss (filed in the Superior Court) at p. 10. "Federal law is clear that post-judgment events give rise to new claims, so that claim preclusion is no bar." *Stanton v. District of Columbia Court of Appeals*, 127 F.3d 72, 78 (D.C. Cir. 1997). And "[claim preclusion] does not bar parties from bringing claims based on material facts that were not in existence when they brought the original suit." *Apotex, Inc. v. Food & Drug Admin. et al.*, 393 F.3d 210, 218 (D.C. Cir. 2004).

The complaint filed in the original *Klayman v. Judicial Watch* case on April 12, 2006, many years ago, involved nine (9) counts ranging from fraudulent misrepresentation to specific performance. The thrust of the complaint prayed for the court to enter judgment against Judicial Watch to specifically perform the terms of the Severance Agreement by: paying Klayman the remaining amounts due under the Severance Agreement, including reimbursing Klayman for business expenses; returning Klayman's personal items, property and artwork; returning the property of Klayman & Associates, P.C.; removing Klayman as a guarantor of all credit card accounts; removing Klayman as a guarantor for the Building; providing Klayman access to documents; and otherwise complying with the Severance Agreement. In all counts but two, Klayman requested damages against the defendants.

By contrast, the events underlying the instant complaint took place eight (8) years after the first action had been filed and are therefore are not legally related to the instant suit before

this Court. See *Drake*, 291 F.3d at 66. Specifically, the instant complaint alleges that Judicial Watch materially defamed Plaintiff Klayman with malice arising from an event that took place on or about February 22, 2012, six (6) years *after* the original complaint was filed. On June 10, 2014, a jury awarded Plaintiff compensatory and punitive damages because of Defendant's malicious defamatory actions.

Defendant thus mistakenly characterizes the two lawsuits here as arising out of the same operative facts. On the contrary, the instant complaint focuses on the Defendant's actions on or about February 22, 2012, facts that did not even exist at the time of the original action challenging Defendant's behavior for other violations of the Severance Agreement. As such, there are no prior cases related to this case.

F. <u>This Court Should Respectfully Award Plaintiff For The Costs Incurred As A Result Of The Removal</u>

"An order remanding the case may require payment of just costs and actual expenses, including attorney fees, incurred as a result of the removal." 28 U.S.C. § 1447(c). *See Morris v. Bridgestone/Firestone, Inc.*, 985 F.2d 238 (6th Cir. 1993) (Removal followed by remand warrants an award of attorney's fees); *Gray v. New York Life Ins. Co.*, 906 F.Supp. 628 (N.D. Ala.)(good faith is no defense to a 28 U.S.C. § 1447(c) fee claim). Plaintiff was forced to respond to Defendant's defective -- if not frivolous under 28 U.S.C. § 1441 (b)(2) -- Notice of Removal and is entitled to reasonable attorney's fees and costs associated with this Motion.

Defendant was so anxious to have this case heard before the Honorable Colleen Kollar-Kotelly that it attempted to mislead this Court by flouting much less failing to mention the "forum defendant rule," 28 U.S.C. § 1441 (b)(2). This rule is so basic to the understanding of diversity jurisdiction that it is taught to first year law students. That Defendant failed to mention or even follow 28 U.S.C. § 1441 (b)(2) is a sign of bad faith on the part of Defendant. For this

reason, this Court should respectfully award attorney's fees and costs for having to file this motion for remand. Yet even if Defendant's attempt to remove this case was done in good faith, which it is not clear that it was, Plaintiff should still be awarded attorney's fees and costs for having to file this unnecessary motion.

## CONCLUSION

For the foregoing reasons, it is clear that Defendant wrongly and inappropriately filed a notice of removal in this Court. Plaintiff sought only equitable relief – the rescission of a contract – and as such the threshold for diversity jurisdiction, a controversy exceeding $75,000, has not been met. **Further, even if this threshold was met, which it was not, removal to federal court was frivolous pursuant to the "forum defendant rule," 28 U.S.C. § 1441 (b)(2).** Further, even if diversity jurisdiction was proper, which it is not, Defendant waived its right to remove this case when it consented to the Severance Agreement with Plaintiff stating that venue would be proper in any District of Columbia Court. As such, this Court must respectfully give deference to Plaintiff's choice of venue and remand this case to the District of Columbia Superior Court. Finally, this Court must respectfully grant attorney's fees and costs to Plaintiff pursuant to 28 U.S.C. § 1447(c).

Dated: February 12, 2015

Respectfully Submitted,

 /s/ *Larry Klayman*
Larry Klayman, Esq.
D.C. Bar No. 334581
2020 Pennsylvania Ave. NW, Suite 800
Washington, DC 20006
Tel: (310) 595-0800
Email: leklayman@gmail.com

9

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 12th day of January, 2015 a true and correct copy of the foregoing Motion for Remand (Civil Action No. 1:15-cv-00214) was filed electronically using CM/ECF to the U.S. District Court for the District of Columbia and served upon the following:

Via CM/ECF:

Richard W. Driscoll, Esq. (436471)
300 N. Washington Street, Suite 610
Alexandria, VA 22314
Telephone: 703-822-5001
Facsimile: 703-997-4892
Email: rdriscoll@driscollseltzer.com

*Counsel for Defendant Judicial Watch*

  /s/ *Larry Klayman*
Larry Klayman, Esq.
D.C. Bar No. 334581
2020 Pennsylvania Ave. NW, Suite 800
Washington, DC 20006
Tel: (310) 595-0800
Email: leklayman@gmail.com