**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| LARRY KLAYMAN, | |
| Plaintiff, | |
| v. | Civil Action No. 06-670 (CKK) |
| JUDICIAL WATCH, INC., *et al.*, | |
| Defendants. | |

**MEMORANDUM OPINION[1]**
(March 18, 2019)

After a thirteen-day trial, a jury returned a verdict in favor of Defendant Judicial Watch, Inc. ("Judicial Watch") on each of Plaintiff Larry Klayman's remaining claims. Moreover, the jury found liability and awarded a total of $2.8 million in damages to Counter-Plaintiffs Judicial Watch and Thomas J. Fitton on their extant counterclaims against Counter-Defendant Klayman.

Klayman now renews his motion for judgment as a matter of law, moves for a new trial, and moves in the alternative for remittitur of the jury's verdict. ECF No. 571 ("Post-Trial Motions"). Also pending are Klayman's motion for sanctions and entry of judgment, as well as his post-trial "renewal" of that motion and Judicial Watch's and Fitton's motion to strike the renewed version. ECF Nos. 489, 572, 573.

Klayman asks the Court's indulgence of one or more excess pages in both the opening and reply briefs of his Post-Trial Motions. ECF No. 571, at ii; ECF No. 577. In each instance he attempted to confer with Judicial Watch's and Fitton's counsel, who either opposed a penultimate version of his request or did not respond in time. Because the corresponding briefs were timely

---

[1] Although the case caption suggests that this case involves multiple defendants, only one, Judicial Watch, Inc., remained in this action by the time of trial. In addition, the case caption does not reflect Judicial Watch, Inc.'s and Thomas J. Fitton's counterclaims. However, because the Court has used this caption for most of the proceedings in this long case, the Court shall not do otherwise at this late hour.

filed, and they assist in the Court's review of Klayman's Post-Trial Motions, the Court shall **GRANT** both requests and consider the briefs in their entirety.

Upon consideration of the briefing,[2] the relevant legal authorities, and the record as a whole, the Court **DENIES** Klayman's Post-Trial Motions, **DENIES** Klayman's Motion for Sanctions and Entry of Judgment, **DENIES** Klayman's Renewed Motion for Sanctions and Entry of Judgment, and **DENIES** Judicial Watch's and Fitton's Motion to Strike Plaintiff's Renewed Motion for Sanctions and Entry of Judgment.

---

[2] The Court's consideration has focused on the following pleadings:

- Pl.'s Mot. for J. as a Matter of Law, for a New Trial, or in the Alternative, for Remittitur of the Jury Verdict and Leave to Exceed Page Limit by One Page, ECF No. 571 ("Klayman's Post-Trial Mots."); Defs.' Opp'n to Pl.'s Mot. for J. as a Matter of Law, for a New Trial, or in the Alternative, for Remittitur of the Jury Verdict [ECF 571], ECF No. 576 ("JW's Post-Trial Opp'n"); Pl.'s Reply to Defs.' Opp'n to Pl.'s Mot. for J. as a Matter of Law, for a New Trial, or in the Alternative, for Remittitur of the Jury Verdict, ECF No. 578 ("Klayman's Post-Trial Reply"); Pl.'s Mot. for Leave to File Reply in Excess of Two (2) Pages and Three (3) Lines, ECF No. 577;

- Pl.'s Mot. for Sanctions and Entry of J., ECF No. 489 ("Klayman's 1st Sanctions Mot."); Defs.' Opp'n to Pl.'s Mot. for Sanctions and Entry of J. and Request for Award of Sanctions, ECF No. 506 ("JW's 1st Sanctions Opp'n"); Pl.'s Reply to Opp'n to Mot. for Entry of J., ECF No. 527 ("Klayman's 1st Sanctions Reply");

- Pl./Counter-Def.'s Renewed Mot. for Sanctions and Entry of J., ECF No. 572 ("Klayman's 2nd Sanctions Mot."); Defs.' Mot. to Strike Pl.'s Renewed Mot. for Sanctions and Entry of J., ECF No. 573 ("JW's Mot. to Strike 2nd Sanctions Mot."); Pl.'s Opp'n to Defs.' Mot. to Strike Pl.'s Renewed Mot. for Sanctions and Entry of J., ECF No. 574 ("Klayman's Opp'n to Mot. to Strike"); and Defs.' Reply in Supp. of Mot. to Strike Pl.'s Renewed Mot. for Sanctions and Entry of J., ECF No. 575 ("JW's Reply in Supp. of Mot. to Strike").

For purposes of the foregoing abbreviations, the Court refers to briefing by Judicial Watch and Fitton as being submitted collectively by "JW."  In an exercise of its discretion, the Court finds that holding oral argument in this action would not be of assistance in rendering a decision. *See* LCvR 7(f).

## I. BACKGROUND

The Court need not revisit the factual background summarized in earlier opinions in this nearly thirteen-year litigation.  *See, e.g.*, Mem. Op. (June 25, 2009), *Klayman v. Judicial Watch, Inc.*, 628 F. Supp. 2d 112, 118-19 (D.D.C. 2009) ("*Klayman I*"), ECF No. 319, at 3-4.[3]  Similarly, the many twists and turns in this case are amply recounted elsewhere.  *See, e.g.*, *Klayman I*, 628 F. Supp. 2d at 119-23.[4]  The Court shall focus on those proceedings specifically pertinent to the pending motions.

---

[3] Although, for convenience in this Memorandum Opinion, the Court shall denominate certain prior opinions in this case, those are by no means the Court's only prior opinions.  *See infra* note 3.

[4] *Substantive* Memorandum Opinions, Orders, and combinations thereof that were issued by this Court or by Magistrate Judge Alan Kay in this case consist of the following:  Order (Apr. 12, 2018), ECF No. 565; Order (Mar. 13, 2018), ECF No. 544; Order (Mar. 13, 2018), ECF No. 543; Order (Mar. 13, 2018), ECF No. 542; Order (Mar. 12, 2018), ECF No. 541; Order (Mar. 12, 2018), ECF No. 540; Order (Mar. 11, 2018), ECF No. 535; Order (Mar. 9, 2018), ECF No. 528; Mem. Op. and Order (Mar. 9, 2018), ECF No. 526; Mem. Op. and Order (Mar. 9, 2018), ECF No. 525; Mem. Op. and Order (Mar. 8, 2018), ECF No. 516; Mem. Op. and Order (Mar. 7, 2018), ECF No. 513; Mem. Op. and Order (Mar. 6, 2018), ECF No. 511; Order (Mar. 5, 2018), ECF No. 509; Mem. Op. and Order (Mar. 5, 2018); ECF No. 508; Order (Mar. 2, 2018), ECF No. 500; Order (Mar. 2, 2018), ECF No. 499; Order (Feb. 28, 2018), ECF No. 496; Order (Feb. 28, 2018), ECF No. 495; Order (Feb. 24, 2018), ECF No. 488; Order (Feb. 23, 2018), ECF No. 487; Order (Feb. 23, 2018), ECF No. 486; Order (Feb. 23, 2018), ECF No. 485; Order (Feb. 22, 2018), ECF No. 484; Order (Feb. 20, 2018), ECF No. 465; Mem. Op. (Feb. 20, 2018), ECF No. 464; Order (Feb. 15, 2018), ECF No. 455; Order (Feb. 2, 2018), ECF No. 442; Order (Jan. 23, 2018), ECF No. 436; Mem. Op. (Jan. 19, 2018), ECF No. 434; Order (Oct. 6, 2017), ECF No. 426; Mem. Op. and Order (Oct. 5, 2017), ECF No. 425; Order (June 19, 2017), ECF No. 402; Mem. Op. and Order (June 14, 2017), ECF No. 401; Mem. Op. (Aug. 10, 2011), ECF No. 362; Mem. Op. (Oct. 13, 2010), ECF No. 356; Order (June 16, 2010), ECF No. 338; Order (Apr. 30, 2010), ECF No. 334; Mem. Op. (Oct. 14, 2009), ECF No. 327; Order (Oct. 13, 2009), ECF No. 325; Mem. Op. (June 25, 2009), ECF No. 319; Mem. Op. (June 25, 2009), ECF No. 317; Mem. Op. (June 25, 2009), ECF No. 315; Mem. Op. (Mar. 24, 2009), ECF No. 301; Order (Dec. 30, 2008), ECF No. 293; Order (Dec. 1, 2008), ECF No. 274; Order (Nov. 6, 2008), ECF No. 262; Order (Nov. 6, 2008), ECF No. 261; Order (Sept. 30, 2008), ECF No. 252; Mem. Order (Sept. 23, 2008), ECF No. 250; Mem. Order (Sept. 23, 2008), ECF No. 249; Mem. Order (Aug. 26, 2008), ECF No. 233; Order (Aug. 26, 2008), ECF No. 231; Order (Aug. 25, 2008), ECF No. 227; Order (Mem. Order (July 18, 2008), ECF No. 206; Order (July 9, 2008), ECF No. 200; Mem. Order (July 1, 2008), ECF No. 199; Order (June 24, 2008), ECF No. 196; Order (June 10, 2008), ECF No. 189; Order (May 28, 2008), ECF No. 185; Order (May 28, 2008), ECF No. 184; Order (May 28, 2008), ECF No. 183; Order (May 19, 2008),

Relatively early in this litigation, the Court granted summary judgment for Judicial Watch as to the breach of contract claim in Count I of its Amended Counterclaim, awarded damages of $69,358.48, and reserved Judicial Watch's request for prejudgment interest "until after liability has been resolved as to all remaining claims and counterclaims."  Mem. Op. (Oct. 14, 2009), *Klayman v. Judicial Watch, Inc.*, 661 F. Supp. 2d 2, 4-6 (D.D.C. 2009) ("*Klayman II*"), ECF No. 327; *see also Klayman I*, 628 F. Supp. 2d at 157-60.  The Court's treatment of claims and other counterclaims in prior proceedings is beyond the scope of this Memorandum Opinion.

A few days before trial in February 2018, the Court issued an Order laying out the claims and counterclaims that had survived to that point.  *See* Order (Feb. 23, 2018), ECF No. 487, at 8-10.[5]  Klayman's remaining claims consisted of five allegations of breach of contract asserted in Counts Seven and Eight of his Second Amended Complaint.  *Id.* at 8.  Because those allegations are somewhat specific and are not directly at issue in the pending motions, the Court shall not repeat them here.  Ten of Judicial Watch's and Fitton's counterclaims in their Amended Counterclaim remained viable: Counts I, II, and III for breaches of contract associated with unpaid expenses; Count IV for trademark infringement under the Lanham Act, 15 U.S.C. § 1114(1)(a); Counts V and VI for unfair competition under the Lanham Act, 15 U.S.C. § 1125(a)(1); Counts VIII and IX for breaches of contract regarding disparagement of Judicial Watch and Fitton,

---

ECF No. 178; Order (May 12, 2008), ECF No. 167; Order (May 12, 2008), ECF No. 166; Mem. Order (May 9, 2008), ECF No. 165; Mem. Order (May 5, 2008), ECF No. 153; Order (Apr. 21, 2008), ECF No. 138; Order (Apr. 21, 2008), ECF No. 137; Order (Apr. 2, 2008), ECF No. 134; Mem. Order (Mar. 12, 2008), ECF No. 117; Mem. Order (Jan. 16, 2008), ECF No. 98; Mem. Order (Jan. 8, 2008), ECF No. 97; Mem. Op. (Dec. 3, 2007), ECF No. 84; Mem. Op. (Dec. 3, 2007), ECF No. 82; Mem. Op. (Apr. 3, 2007), ECF No. 52; Mem. Op. (Apr. 3, 2007), ECF No. 50; Order (Feb. 2, 2007), ECF No. 39; Mem. Op. (Jan. 17, 2007), ECF No. 36.  In the interest of avoiding duplication, the foregoing list excludes Orders issued to implement accompanying Memorandum Opinions.

[5] Judicial Watch and Fitton had shortly beforehand withdrawn Count VII of their Amended Counterclaim for cybersquatting under the Lanham Act.  ECF No. 467.

respectively; Count X for breach of contract regarding certain Judicial Watch information; and Count XI for breach of contract regarding a non-competition period.  *Id.* at 9-10; *see also* Am. Countercl., ECF No. 86 (clarifying that Count IX was asserted only by Fitton).  The only further pre-trial update to the claims or counterclaims was Judicial Watch's withdrawal of Count XI of its Amended Counterclaim.  ECF No. 492.

On the day before trial, Klayman filed his Motion for Sanctions and Entry of Judgment, which dealt with the parties' differing characterizations of Klayman's discovery responses earlier in the case.  The parties briefed the motion during trial, and the Court reserved a decision until the present Memorandum Opinion.

On February 26, 2018, the trial commenced and continued through March 14, 2018, when the jury returned its verdict.  Klayman introduced evidence as to his claims against Judicial Watch. Again, the Court need not address proceedings as to Klayman's claims.  After Judicial Watch and Fitton presented and rested their case as to their counterclaims, Klayman moved for judgment as a matter of law as to those counterclaims.  *See* Trial Tr. 3191:6-7, 10-11; 3196:7-11.[6]  Rather than rule on the motion, the Court took the issues raised by Klayman under advisement.  *Id.* 3191-3198. The Court instructed the jury orally and provided the jury with a copy of the prepared instructions.

On March 14, 2018, the jury delivered its verdict against Klayman on each of his extant claims and in favor of Judicial Watch and Fitton on each of their extant counterclaims.  Jury Verdict, ECF No. 560.  Although damages were allocated by counterclaim, the total awards were $2,300,000 for Judicial Watch and $500,000 for Fitton.  *See id.* at 4-8.  The Court allowed the

---

[6] Although Klayman used the prior terminology of directed verdict, that is not held against him. *Cf.* Order (Apr. 12, 2018), ECF No. 565, at 1-2 & n.1 (noting that Klayman's invocation of the term, "judgment notwithstanding the verdict," later in the proceedings is likewise treated as equivalent to a renewed motion for judgment as a matter of law).

parties to wait until after the court reporter's completion of the full trial transcript to brief Klayman's renewed motion for judgment as a matter of law and any other post-trial motions. *See, e.g.*, Order (Apr. 12, 2018), ECF No. 565, at 3; Min. Order of Mar. 14, 2018.

On March 15, 2018, the Court entered judgments on the jury verdict for Judicial Watch and Fitton. J. on the Verdict for Counterpl. Judicial Watch, Inc., ECF No. 548; J. on the Verdict for Counterpl. Thomas J. Fitton, ECF No. 549. At Klayman's request, the Court later vacated its issuance of these judgments in order to avoid potential issues with a time bar under the Federal Rules. *See* Order (Apr. 12, 2018), ECF No. 565; *see also* 11 Charles Alan Wright et al., *Federal Practice and Procedure Civil* § 2812 (3d ed.) ("The time for seeking a new trial runs from the entry of the judgment, not from the reception of the verdict nor from the date the moving party receives notice of the entry of judgment." (footnotes omitted)).

On July 10, 2018, the court-established deadline for his post-trial motions, Klayman filed a renewed motion for judgment as a matter of law, a motion for new trial, and, in the alternative, a motion for remittitur of the jury's verdict. He followed on July 13, 2018, with a renewed motion for sanctions and entry of judgment, which Judicial Watch and Fitton moved to strike.

Now that briefing of all pending motions has concluded, these motions are ripe for resolution.

## II.  LEGAL STANDARD

### A.  Renewed Motion for Judgment as a Matter of Law

Federal Rule of Civil Procedure 50(b) provides that, once a jury has rendered its verdict, the verdict loser "may file a renewed motion for judgment as a matter of law." Fed. R. Civ. P. 50(b). Relief under Rule 50(b) is "'highly disfavored' because it 'intrudes upon the rightful province of the jury.'" *Breeden v. Novartis Pharm. Corp.*, 646 F.3d 43, 53 (D.C. Cir. 2011)

(quoting *Boodoo v. Cary*, 21 F.3d 1157, 1161 (D.C. Cir. 1994)).  Nevertheless, "if the court finds

that the evidence was legally insufficient to sustain the verdict," *Ortiz v. Jordan*, 562 U.S. 180,

189 (2011), then the court may "direct the entry of judgment as a matter of law" in favor of the

verdict loser or "order a new trial," Fed. R. Civ. P. 50(b)(2), (b)(3).  If, however, the district court

finds that the evidence was legally sufficient to sustain the jury's verdict, then it must "allow

judgment on the verdict."  Fed. R. Civ. P. 50(b)(1).

In this context, the central question "is whether there was sufficient evidence upon which

the jury could base a verdict in [the prevailing party's] favor."  *Scott v. District of Columbia*, 101

F.3d 748, 752 (D.C. Cir. 1996).  The evidence in support of the verdict must "be more than merely

colorable; it must [be] significantly probative."  *Richardson by Richardson v. Richardson–Merrell,

Inc.*, 857 F.2d 823, 828-29 (D.C. Cir. 1988).  However, because the fundamental role of the jury

is "to select, from among conflicting inferences and conclusions, that which it finds most

reasonable," *Primas v. District of Columbia*, 719 F.3d 693, 698 (D.C. Cir. 2013) (quoting

*Metrocare v. Wash. Metro. Area Transit Auth.*, 679 F.2d 922, 925 (D.C. Cir. 1982)) (internal

quotation marks omitted), "the court cannot substitute its view for that of the jury, and can assess

neither the credibility nor weight of the evidence," *Scott*, 101 F.3d at 753.  The jury's verdict must

stand unless "the evidence and all reasonable inferences that can be drawn therefrom are so one-

sided that reasonable men and women could not have reached a verdict in plaintiff['s] favor."

*United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 608 F.3d 871, 899 (D.C. Cir. 2010)

(per curiam) (quoting *McGill v. Muñoz*, 203 F.3d 843, 845 (D.C. Cir. 2000)) (internal quotation

marks omitted).

However, a post-trial motion for judgment as a matter of law may be granted only upon

grounds advanced in a pre-verdict motion; a movant who omits a theory from a pre-verdict Rule

50 motion waives the theory as a basis of its post-verdict renewal.  *See Whelan v. Abell*, 48 F.3d 1247, 1251 (D.C. Cir. 1995); *U.S. Indus., Inc. v. Blake Constr. Co., Inc.*, 671 F.2d 539, 548 (D.C. Cir. 1982).

### B.  Motion for a New Trial

Rule 50(b) expressly permits a party that renews its motion for judgment as a matter of law to "include an alternative or joint request for a new trial under Rule 59."  Fed. R. Civ. P. 50(b). Rule 59(a) provides that "[t]he court may, on motion, grant a new trial on all or some of the issues . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court."  Fed. R. Civ. P. 59(a)(1)(A).

"A trial judge should grant a new trial if the verdict is against the weight of the evidence, damages are excessive, for other reasons the trial was not fair, or substantial errors occurred in the admission or rejection of evidence or the giving or refusal of instructions."  *Nyman v. FDIC*, 967 F. Supp. 1562, 1569 (D.D.C. 1997) (citing 11 Charles Alan Wright et al., *Federal Practice and Procedure* § 2805 (1973)).

But "[t]he decision whether to grant a new trial falls within the discretion of the trial court." *Rice v. District of Columbia*, 818 F. Supp. 2d 47, 60 (D.D.C. 2011) (citing *McNeal v. Hi-Lo Powered Scaffolding, Inc.*, 836 F.2d 637, 646 (D.C. Cir. 1988)).  When assessing a motion for a new trial, "the court should be mindful of the jury's special function in our legal system and hesitate to disturb its finding."  *Nyman*, 967 F. Supp. at 1569 (quoting *Lewis v. Elliott*, 628 F. Supp. 512, 516 (D.D.C. 1986)) (internal quotation marks omitted).  Accordingly, a district court should exercise its discretion "sparingly and cautiously," *Miller v. Pa. R.R. Co.*, 161 F. Supp. 633, 641 (D.D.C. 1958), and it should grant a new trial "only where the court is *convinced* the jury verdict was a 'seriously erroneous result' and where denial of the motion will result in a 'clear miscarriage

of justice,'" *Nyman*, 967 F. Supp. at 1569 (quoting *Sedgwick v. Giant Food, Inc.*, 110 F.R.D. 175, 176 (D.D.C. 1986)) (emphasis added) (internal quotation marks omitted).

"The jury verdict stands 'unless the evidence and all reasonable inferences that can be drawn therefrom are so one-sided that reasonable men and women could not disagree on the verdict.'" *Czekalski v. LaHood*, 589 F.3d 449, 456 (D.C. Cir. 2009) (quoting *Curry v. District of Columbia*, 195 F.3d 654, 658-59 (D.C. Cir. 1999) (opinion of Henderson, J.)).

### C. Motion for Remittitur of the Jury Verdict

The judiciary has developed certain principles to guide a court's evaluation of a jury's damages verdict. "In reviewing the amount of the jury's award, [the court] . . . need not—and indeed cannot—reconstruct the precise mathematical formula that the jury adopted. Nor need [the court] explore every possible quantitative analysis or compute the basis of each penny and dollar in the award. [The court's] inquiry ends once [it is] satisfied that the award is within a reasonable range and that the jury did not engage in speculation or other improper activity." *Nyman*, 967 F. Supp. at 1571 (quoting *Carter v. Duncan-Huggins, Ltd.*, 727 F.2d 1225, 1238-39 (D.C. Cir. 1984)) (alterations in original) (internal quotation marks omitted).

"A court must be especially hesitant to disturb a jury's determination of damages in cases involving intangible and non-economic injuries." *Langevine v. District of Columbia*, 106 F.3d 1018, 1024 (D.C. Cir. 1997) (citing *Ruiz v. Gonzalez Caraballo*, 929 F.2d 31, 34 (1st Cir. 1991) ("Translating legal damage into money damages—especially in cases which involve few significant items of measurable economic loss—is a matter peculiarly within a jury's ken." (internal quotation marks omitted)).

This deference to the jury, based on the fact that "the Seventh Amendment right to a jury trial pervades the realm of jury verdict decisions," *id.*, may only be disturbed if "(1) the verdict is

beyond all reason, so as to shock the conscience, or (2) the verdict is so inordinately large as to obviously exceed the maximum limit of a reasonable range within which the jury may properly operate." *Peyton v. DiMario*, 287 F.3d 1121, 1126-27 (D.C. Cir. 2002) (citing, e.g., *Jeffries v. Potomac Dev. Corp.*, 822 F.2d 87, 96 (D.C. Cir. 1987)).

"Courts may not set aside a jury verdict merely deemed generous; rather, the verdict must be so unreasonably high as to result in a miscarriage of justice." *Langevine*, 106 F.3d at 1024 (citing *Barry v. Edmunds*, 116 U.S. 550, 565 (1886)). In this Circuit, a court may remit a jury verdict "only if the reduction 'permit[s] recovery of the highest amount the jury tolerably could have awarded.'" *Id.* (quoting *Carter v. District of Columbia*, 795 F.2d 116, 135 n.13 (D.C. Cir. 1986)). The moving party has the burden to prove that the jury award is so excessive as to warrant a remittitur. *Carter v. Duncan-Huggins, Ltd.*, 727 F.2d at 1239. "The granting of a motion for remittitur is 'particularly within the discretion of the trial court.'" *Jeffries*, 822 F.2d at 96 (quoting *Doe v. Binker*, 492 A.2d 857, 863 (D.C. 1985)).

### III. DISCUSSION

There is no dispute that the Court has diversity jurisdiction over the remaining breach of contract claims and counterclaims, and federal-question jurisdiction over the remaining federal statutory counterclaims. *See* 28 U.S.C. § 1331; *id.* § 1332(a)(1), (c)(1); 2d Am. Compl., ECF No. 12, ¶¶ 18, 20, 24 (alleging diversity of citizenship and sufficient amount in controversy); Am. Countercl., ECF No. 86, ¶¶ 1-3, 5, 6 (alleging diversity of citizenship, sufficient amount in controversy, and federal question). The Court need not consider other grounds for jurisdiction. As to the breach of contract claims, the parties' Confidential Severance Agreement expressly dictates its interpretation using District of Columbia law, "without regard to its choice of law principles." Confidential Severance Agreement, Klayman's Ex. 1 ("CSA"), ¶ 23.

### A. Klayman's Post-Trial Motions

It is not clear that Klayman raised each aspect of the arguments in his Post-Trial Motions in either his Rule 50(a) motion for judgment as a matter of law, or otherwise at trial. For example, he now objects to a deposition designation to which he largely did not object either before or during trial. *See infra* Part III.A.5.iv.b. (discussing Dep. of Stephanie De Luca [sic] 33:22-36:9 ("DeLuca Dep.")). "Rule 50(b) permits only the 'renewing' of arguments made in prior Rule 50(a) motions." *Campbell v. District of Columbia*, 894 F.3d 281, 286 (D.C. Cir. 2018) (citing Fed. R. Civ. P. 50(b); *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485 n.5 (2008); *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394 (2006)). Nor can "a Rule 59 motion [be used] to raise new issues that could have been raised previously." *Kattan by Thomas v. District of Columbia*, 995 F.2d 274, 276 (D.C. Cir. 1993).

Although such a deficiency could be dispositive of at least parts of the Post-Trial Motions, Judicial Watch and Fitton do not make this argument. Nor is it necessarily easy to parse what Klayman did and did not raise previously for Rule 50 and Rule 59 purposes. Accordingly, in the interest of reaching any necessary issues and conclusively resolving this case, the Court shall assume, *arguendo*, that Klayman either raised each of the issues sufficiently in his Rule 50(a) motion, and/or that he raised issues at an appropriate time so as to support a Rule 59(a) motion now.

Before reaching the merits of the Post-Trial Motions, the Court shall dispose of several extraneous issues that Klayman briefly raises. Submitting an affidavit from Mike Pendleton, he suggests this is additional evidence supporting his claim that Judicial Watch disparaged him. *See* Klayman's Post-Trial Mots. at 3 n.2 & Ex. 1. But this notion is problematic for several reasons. First, Klayman misleadingly implies that this is a new affidavit. *See id.* ("*Upon review of the Court*

*record*, Mike Pendleton filed an affidavit that not only confirms that Fitton testified falsely and indeed disparaged Plaintiff/Counter-Defendant . . . ." (emphasis added)).  But the affidavit is not new; it bears a January 2009 date, and the header shows that it was docketed previously in this case.  Second, Klayman was precluded from introducing documentary evidence at trial, pursuant to the Discovery Sanction that the Court shall review below.  Third, in any case, Klayman does not pursue the argument that the jury erred as to his own claims.  Rather, he attacks the jury's verdict as to Judicial Watch's and Fitton's counterclaims.  The sanctions also dispose of Klayman's other attempted use of this affidavit, namely to claim now that certain testimony was false.  *See id.* He cannot use documentary evidence to do now what he would have been precluded at trial from doing.  No further attention to the affidavit is necessary.

Klayman also briefly mentions the issue of his being the founder of Judicial Watch, but only as an aside attempting to suggest that Judicial Watch witnesses lied.  *See* Klayman's Post-Trial Mots. at 2-3 & n.2.  The jury heard testimony from both sides on this issue, and it was the jury's role to weigh credibility and decide whom to believe.  The Court need not revisit this issue.

The Post-Trial Motions begin with a series of issues that Klayman evidently proposes to deal with through judgment as a matter of law and/or a new trial.  The Court shall walk through those arguments before turning to his separate treatment of the putative grounds for remittitur.

1. Counterclaim for Trademark Infringement

The Post-Trial Motions raise a number of issues with the jury's ruling as to Count IV of Judicial Watch's Amended Counterclaim, which alleges trademark infringement.

i. *Alleged Misattribution of Trademark Infringement*

Klayman argues that the jury confused the actions of Friends of Larry Klayman ("FOLK") and Freedom Watch for actions of Klayman himself.  Klayman's Post-Trial Mots. at 9-10.  His

reasons for thinking that the jury misattributed damages are 1) the size of a verdict for allegedly "minimal, if any, conduct personally conducted" by him, and 2) the fact that the verdict form did not distinguish any damages attributable to FOLK and Freedom Watch.  *Id.* at 10.

But this rationale is a non-sequitur.  Judicial Watch introduced evidence to show that Klayman himself, acting through Saving Judicial Watch, mailed solicitations and issued advertisements that infringed on Judicial Watch's trademarks.  JW's Post-Trial Opp'n at 7-8. While evidence about FOLK demonstrated how Klayman obtained Judicial Watch donor information, that is irrelevant to whether he made use of Judicial Watch trademarks in Saving Judicial Watch solicitations and advertisements.  *Id.*  Judicial Watch does not discuss specific activities of Freedom Watch, but neither does Klayman.  And neither party addresses the status of Saving Judicial Watch, which, in any case, Klayman has not shown is a legal entity distinct from himself.

Most importantly, Klayman fails to identify any evidence of alleged trademark infringement by FOLK or Freedom Watch that the jury might have mistakenly attributed to him. Instead, the jury heard sufficient evidence to attribute the alleged infringement to Klayman himself.  Accordingly, it was unnecessary to specifically instruct the jury to distinguish between FOLK's and Freedom Watch's activities and Klayman's own.  Neither judgment as a matter of law nor a new trial is warranted on this basis.

ii.  *Likelihood of Confusion*

Relatedly, Klayman tries to show that the jury did not hear sufficient evidence of alleged trademark infringement by Klayman himself to satisfy the likelihood of confusion element of that counterclaim.  Klayman's Post-Trial Mots. at 10-11.  He urges that his Saving Judicial Watch

campaign adequately distinguished his efforts as separate from Judicial Watch, despite the one reply envelope mailed by Saving Judicial Watch that bore a "Judicial Watch" return address. *Id.*

The Court issued jury instructions as to the likelihood of confusion element. The Court cannot recall seeing any model instructions about this element that are specific to this Circuit. Rather, Judicial Watch had proposed the instructions, which it "derived from" general model instructions, including some specific to the Ninth Circuit. Order (Feb. 23, 2018), ECF No. 485 (citing 3A Kevin F. O'Malley, Jay E. Grenig & William C. Lee, *Federal Jury Practice and Instructions* § 159:25 (6th ed. 2012)). Although the Court made some edits to Judicial Watch's proposed instructions during discussions with the parties, the instructions as delivered closely resembled the model instructions. *See id.*; Trial Tr. 3770:24-3772:21.

Klayman does not expressly argue that those instructions were incorrect. Rather, he attacks a strawman by arguing that the evidence was insufficient to meet a standard that he proposed for those instructions, but which the Court rejected. If the Court had adopted Klayman's standard, the jury would have needed to find that a "substantial" number of people were likely to be confused. Klayman's Post-Trial Mots. at 10-11 (quoting *Johnson Publ'g Co., Inc. v. Etched-in-Ebony, Inc.*, Civil Action No. 80-2933, 1981 WL 48204, at *4 (D.D.C. July 15, 1981), *aff'd*, 675 F.2d 1340 (D.C. Cir. 1982) (Table)) (internal quotation marks omitted). Now Klayman also urges an "'appreciable' number" standard. *Id.* at 10 (quoting *Culliford v. CBS, Inc.*, Civil Action No. 83-1775, 1984 WL 787, at *3 (D.D.C. Jan. 20, 1984)).

While the number of people likely to be confused may be a consideration, it is not the only one. Without adopting a definitive test for likelihood of confusion, the United States Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") recently referred approvingly to other circuits' multi-factor tests, which evaluate such factors as "the strength of the mark, the similarity

of the marks, the proximity of the goods, the similarity of the parties' marketing channels, evidence of actual confusion, the defendant's intent in adopting the mark, the quality of the defendant's product, and the sophistication of the buyers." *Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc.*, 896 F.3d 437, 456 (D.C. Cir. 2018) (citing 4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition §§ 24:31-24:43 (5th ed. 2018)); *see also Appleseed Found. Inc. v. Appleseed Inst., Inc.*, 981 F. Supp. 672, 675 (D.D.C. 1997) (reciting some of these factors).[7] That list does not expressly include the number of people likely to be confused. Whether or not the jury found that an appreciable or substantial number of people could be led astray, there was sufficient evidence for the jury to find that other factors were satisfied. For example, the jury could have found that the Saving Judicial Watch campaign involved similar marks deployed through similar marketing channels, coupled with evidence of actual confusion. Accordingly, Klayman has not met the high threshold to disturb the jury finding that his use of the trademarks was likely to confuse, and consequently this is no basis for granting judgment as a matter of law or a new trial.

### iii. Nominative Fair Use

Klayman next invokes the nominative fair use defense to a trademark infringement claim, arguing that he qualifies because he was "making commentary on the state of affairs at Judicial Watch, and that he never even remotely claimed to be affiliated with Judicial Watch in any way once the Severance Agreement was executed." Klayman's Post-Trial Mots. at 12.

Again, the Court issued instructions on the nominative fair use defense. Trial Tr. 3777:2-

---

[7] Klayman's cases, *Johnson* and *Culliford*, rely to some extent on a similar list of factors, though Klayman does not acknowledge this aspect of those opinions. *See Culliford*, Civil Action No. 83-1775, 1984 WL 787, at *3; *Johnson Publ'g Co., Inc.*, Civil Action No. 80-2933, 1981 WL 48204, at *4.

3778:22.  The prepared instructions provided in hard-copy to the jury closely track the D.C.

Circuit's recently articulated standard:

> In order for a use [of a trademark] to qualify as nominative fair use, courts require that "[1] the product or service in question must be one not readily identifiable without use of the trademark; [2] only so much of the mark or marks may be used as is reasonably necessary to identify the product or service; and [3] the user must do nothing that would, in conjunction with the mark, suggest sponsorship or endorsement by the trademark holder."

*Am. Soc'y for Testing & Materials*, 896 F.3d at 456 (quoting *New Kids on the Block v. News Am.*

*Publ'g, Inc.*, 971 F.2d 302, 308 (9th Cir. 1992)) (all but first alteration in original).  Klayman does

not raise any issue with the instructions.  The jury heard evidence that could support a finding that

Klayman's use of the trademarks exceeded nominative fair use under the applicable standard.  The

Court shall not second-guess the jury's determination, and accordingly, neither judgment as a

matter of law nor a new trial is justified for this reason.

### iv.  Jury Consideration of "Improper, Outside Actions"

Klayman recycles arguments that evidence about FOLK and Freedom Watch contributed

to the large jury verdict.  *See* Klayman's Post-Trial Mots. at 13-15.  The Court disposed of this

argument above and need not revisit it here, except to deal with several new strands.

Klayman erroneously objects to the evidence that the jury was allowed to consider.  *See id.*

at 13 (citing JW's Exs. 64-66, 75; Trial Tr. 3164:15-3165:4).  Exhibits 66 and 75 could not

prejudice the jury because they were not admitted into evidence.  JW's Post-Trial Opp'n at 16;

JW's Ex. List, ECF No. 555, at 6-7.  Moreover, Exhibits 64 and 65 were relevant because they

help show how Klayman obtained "JW" donor names, to whom he then sent materials that

infringed on Judicial Watch's trademarks.  The Court agrees with Judicial Watch that Maureen

Otis' testimony "merely provided an explanation of sample caging reports."  JW's Post-Trial

Opp'n at 16.  The jury was allowed to weigh all of this evidence in reaching its determination.

The Court does not find any of the admitted evidence to be unduly prejudicial.  *See* Fed. R. Evid. 403.

Judicial Watch demonstrates how the jury could have reached its $750,000 verdict on the trademark infringement counterclaim: Maureen Otis and Steve Andersen, respectively, testified that Saving Judicial Watch raised at least $742,141.87 through American Target Advertising's ("ATA") caging operations, and donations to Judicial Watch from multi-year donors fell by more than $1.8 million or $1.9 million during 2006 and 2007.  JW's Post-Trial Opp'n at 7-8 (citing Trial Tr. 3064-3067, 3169:2-8).

In yet another instance of failed recycling, Klayman's reply does not rebut any of the foregoing points, as to either the facts or their implications for the jury verdict.  Accordingly, he has not persuaded the Court that he is entitled to judgment as a matter of law or a new trial due to jury consideration of allegedly "improper" actions of third parties.  Klayman's Post-Trial Mots. at 15.

### v. Authentication of Reply Letters

Klayman argues that the letters contained in Judicial Watch's Exhibits 33, 36, 40, and 42 were not properly authenticated and therefore should not have been admitted for the purpose of showing confusion about the trademarks.  Klayman's Post-Trial Mots. at 15-18; *see also* JW's Ex. List, ECF No. 555, at 3-4 (showing that each was admitted).  He specifically takes issue with the handwriting on each of these exhibits.  Klayman's Post-Trial Mots. at 16.

Prior to their use at trial, the Court considered and issued a contingent ruling on the authenticity of these materials. Mem. Op. and Order (Mar. 6, 2018), ECF No. 511.  At trial, the Court admitted these exhibits after Judicial Watch introduced sufficient evidence to satisfy the contingencies in the Court's [511] Memorandum Opinion and Order.  The Court issued limiting

instructions to ensure that the jury considered the exhibits for the purpose for which they were admitted. Klayman now argues that those instructions were in fact counterproductive, encouraging the jury to consider the materials for the prohibited purpose, that is, the truth of the matter asserted. Klayman's Post-Trial Mots. at 15-18.

Klayman is wrong. To consider the materials for the truth of the matter asserted would be to believe that the authors of the notes meant what they said, for example, that they wanted to be removed from the Judicial Watch mailing list because Fitton was "ruining" the organization; that they feared that this litigation would "siphon off millions" from Judicial Watch coffers; and that they would not donate again until Klayman "takes over" Judicial Watch once more. JW's Exs. 33, 36, 42. Consistent with the Court's instructions, the jury could have properly considered the exhibits as simply an indicator that Klayman's campaign was having an effect. Whether or not these specific (putatively former) donors believed or did as they wrote is immaterial.

Importantly, Klayman does not expressly raise a hearsay objection. He states that his challenge to the letters is only to their authenticity as pieces of evidence, which is a low hurdle to clear. The Court stands by its rulings that these letters are what Judicial Watch says they are. Moreover, the test for judgment as a matter of law is one of legal insufficiency of the verdict. *Ortiz*, 562 U.S. at 189. Klayman fails to prove that the jury had inadequate information—even if, *arguendo*, these letters were excluded—to conclude that the likelihood of confusion test was satisfied. There is no reason to grant a new trial either on these grounds.

      2.   <u>Counterclaims for Unfair Competition</u>

As for Counts V and VI of the Amended Counterclaim, the jury awarded damages to Judicial Watch for Klayman's unfair competition through various means. Klayman addresses these two counterclaims in very summary terms in a single paragraph of five sentences, explaining

that his arguments on this issue are "interweaved throughout" his brief. Klayman's Post-Trial

Mots. at 18-19. The only specific errors he raises are the Court's decisions not to give jury

instructions 1) recognizing a fair comment defense to the disparagement counterclaims, and 2)

identifying truth as a defense to the disparagement counterclaims. *Id.* at 19.

Just as Klayman does, the Court shall address these arguments when it considers the

disparagement counterclaims to which they properly correspond. With respect to the unfair

competition counterclaims themselves, Klayman says virtually nothing. What he does say fails to

discharge his heavy burden to prove that the jury lacked sufficient evidence to reach its verdict.

Nor does the Court find that Klayman's arguments anywhere else in the briefing undermine the

legal sufficiency of the jury verdict or otherwise warrant a new trial on the unfair competition

claims.

### 3.  Counterclaims for Disparagement of Judicial Watch and Fitton

The jury awarded damages to Judicial Watch and Fitton for Counts VIII and IX,

respectively, of the Amended Counterclaim for breaches of a contractual non-disparagement

provision. Klayman argues that it was error not to give a jury instruction about truth as a defense.

*Id.* at 19-21. Tangentially here—and more so in a part of his brief devoted to the Court's allegedly

prejudicial rulings—Klayman also objects to the omission of a fair comment defense from the jury

instructions. *Id.* at 21, 25-26. The Court shall consider both issues now in the context of the

disparagement counterclaims.

#### i.  Fair Comment

Twice during trial, Klayman requested a fair comment jury instruction, and twice the Court

refused to issue such an instruction. Order (Mar. 9, 2018), ECF No. 528; Order (Mar. 12, 2018),

ECF No. 541 (denying motion to reconsider). The Court's denial of the motion to reconsider

rejected, among other things, Klayman's First Amendment argument. Order (Mar. 12, 2018), ECF No. 541, at 1.  The Court refers the reader to those decisions for its reasoning.

Pause is in order simply to add a further reason why the Court correctly rejected Klayman's proposed instruction.  Klayman improperly sought to import a defense from tort law into the specific contractual provision at issue in this breach of contract claim.  That provision includes some language about fair comment.  CSA ¶ 17 ("Nothing in this paragraph is intended to, nor shall be deemed to, limit either party from making fair commentary on the positions or activities of the other following the Separation Date.").  But the jury, not the Court, was responsible for applying that contractual provision to the testimony and other evidence of Klayman's statements.

Accordingly, none of Klayman's arguments alters the Court's decision to withhold an instruction as to a fair comment defense to a tort claim when the claim at issue is a breach of contract claim.

### ii.   Truth as a Defense

The Court previously dealt with the truth-as-a-defense issue in a February 20, 2018, pretrial hearing, when the parties were discussing the definition of disparagement in the draft jury instructions.  *See* Feb. 20, 2018 Hr'g Tr. 21:8-26:25.  For his part, Klayman objected to using the definition in the Confidential Severance Agreement unless "we put something in it that said it's not disparagement if what you are saying is true." *Id.* 23:3-4.  Ultimately, in the face of disagreement about which definition should be used, the parties agreed to remove the definition of disparagement from the instructions entirely. *Id.* 26:10-25.

Klayman referred obliquely to this issue again in his oral Rule 50(a) motion. *See* Trial Tr. 3196:12-3197:12 ("As I was able to show through cross-examination, what I said was true, and it was acknowledged in that testimony . . . . Those facts were true . . . .").  There his argument was

closely intertwined with the fair comment defense, which the Court expressly addressed during trial and again above.  He did not expressly renew his request for an instruction regarding truth as a defense, nor did he argue then—or now—that it was error more generally to exclude an instruction about the definition of disparagement.

Truth may be a defense to the *tort(s)* of disparagement or injurious falsehood, which appear to arise only when "the plaintiff's interest in property, real or personal, tangible or intangible," is at stake.  Robert D. Sack, Sack on Defamation §§ 13:1.1, 13:1.4[D] (5th ed. 2017).  But the Court need not decide whether a tort claim could be sustained.  The only disparagement claims that Klayman faced arose out of his alleged *breach of contract* with Judicial Watch.

The question, then, is whether the contractual non-disparagement provision permits a defense of truth.  Paragraph 17 of the Confidential Severance Agreement provides in pertinent part that:

> Klayman expressly agrees that he will not, directly or indirectly, disseminate or publish, or cause or encourage anyone else to disseminate or publish, in any manner, disparaging, defamatory or negative remarks or comments about Judicial Watch or its present or past directors, officers, or employees. . . . Nothing in this paragraph is intended to, nor shall be deemed to, limit either party from making fair commentary on the positions or activities of the other following the Separation Date.

Unless there is an ambiguity in the contractual provision, such that interpretation requires extrinsic evidence, this is a question of law for the Court to resolve.  *See, e.g.*, *Republican Nat'l Comm. v. Taylor*, 299 F.3d 887, 891 (D.C. Cir. 2002) (citing *Dodek v. CF 16 Corp.*, 537 A.2d 1086, 1092 (D.C. 1988)) (applying D.C. law); *see also* CSA ¶ 23 (specifying D.C. law as rule for decision).  The parties do not invoke extrinsic evidence or otherwise point to any ambiguity in the Confidential Severance Agreement.  Moreover, this is an expressly integrated contract.  *See* CSA ¶ 26.  Accordingly, the Court shall evaluate the contract's meaning as a legal issue.  *See Taylor*,

299 F.3d at 892 (interpreting contract as a matter of law where no issue of extrinsic evidence); *Dodek*, 537 A.2d at 1093 (proceeding likewise with contracts that were "integrated, unambiguous, [and] [spoke] for themselves").

Nothing in the contractual language expressly establishes truth as a defense to a contractual non-disparagement claim. Nor does the contract distinguish between permitted and prohibited language based on truthfulness. Rather, the dividing line is negativity. *See* CSA ¶ 17 (prohibiting Klayman and Judicial Watch's directors and officers from "disseminat[ing] or publish[ing] . . . disparaging, defamatory or negative remarks" about each other). The Court need not deal with the language prohibiting defamatory remarks, as there is no claim of defamation— under contract or tort—at issue here. If a factual statement is disparaging, then the contract prohibits it. And if the import of truth remains uncertain, it is clear that a negative statement is prohibited whether it is true or not.

The jury heard conflicting testimony about Klayman's allegedly disparaging remarks. The jury had the duty to assess credibility and determine whether these statements were disparaging or negative. The jury could find that what Klayman said was disparaging or negative, and even if some of it was true, that would violate the non-disparagement provision. Klayman has not met the high standard necessary to disturb the jury verdict.

Moreover, although the Court did not think it appropriate to give an instruction regarding truth as a defense, as a practical matter in the context of the actual trial, both evidence (i.e., testimony) and the arguments to the jury included conflicting statements as to whether Klayman's allegedly disparaging statements were true. The jury would have made credibility decisions as to what testimony they would credit.

***

22

Accordingly, the Court did not err by withholding jury instructions about fair comment and truth as a defense. The jury had a copy of the Confidential Severance Agreement and could determine for itself whether Klayman's statements violated the non-disparagement provision. And Klayman has not discharged his burden to show that the evidence of disparagement of Judicial Watch and Fitton is legally insufficient. He is not entitled on these grounds to either judgment as a matter of law or a new trial.

### 4. Counterclaim for Improper Access to or Use of Judicial Watch Information

Klayman challenges the jury's finding that he improperly accessed or used certain Judicial Watch information and must pay damages under Count X of the Amended Counterclaim. The jury purportedly misinterpreted the evidence, in particular "some internal documents [that] for convenience designated the donors as Judicial Watch." Klayman's Post-Trial Mots. at 21-23. Rather than taking donor names from Judicial Watch, Klayman argues that he was within his rights to rent them from ATA instead. *Id.*

But Klayman mischaracterizes the Amended Counterclaim, which alleges for example that he "used non-public Confidential Information, including but not limited to, information about direct mail solicitation operations," as well as "Judicial Watch donor lists," without Judicial Watch's permission. Am. Countercl., ECF No. 86, ¶¶ 127, 128. Klayman virtually admits Judicial Watch's allegations, insofar as he indicates that in working with ATA, he used names that originated from ATA's work for Judicial Watch. *See* Klayman's Post-Trial Mots. at 21-22.

Judicial Watch points out that these names remained the property of Judicial Watch under its agreement with ATA, which Klayman had signed. JW's Post-Trial Opp'n at 14-15 (citing JW's Ex. 63, ¶¶ 5(A), 7). And Judicial Watch shows that in Klayman's rebuttal testimony, he himself describes obtaining names for Saving Judicial Watch from his Senate campaign, which got them

from his first list manager, ATA, and later he brought those names to his second list manager.  *Id.* at 15 (citing Trial Tr. 3408:12-25).

It is not a matter of an "illegal taking," as Klayman casts the issue, Klayman's Post-Trial Mots. at 23, but rather a potential breach of his agreement with Judicial Watch.  In the Confidential Severance Agreement, "Klayman expressly agrees and acknowledges that, following the Separation Date, he shall not retain *or have access to* any Judicial Watch donor or client lists or donor or client data."  CSA ¶ 4(D) (emphasis added).  Moreover, in the Agreement, "Klayman agrees that after the Separation Date, he shall not . . . *use* Confidential Information for any purpose without written approval by an officer of Judicial Watch, unless and until such Confidential Information has become public knowledge through no fault or conduct by Klayman."  *Id.* ¶ 4(A) (emphasis added) (defining "Confidential Information" to include "non-public information and materials" about "donors" and "prospective donors").

There was sufficient evidence for the jury to find that Klayman breached his obligations under the Confidential Severance Agreement not to access or use Judicial Watch donor lists and other confidential information.  Accordingly, the Court shall not disturb the jury's verdict by granting judgment as a matter of law or a new trial on this basis.

### 5.  Alleged Bias and Prejudice of the Court

In the following subpart, the Court shall address four of Klayman's five bases for alleging that the Court was biased and prejudiced.  As for the fifth basis, the Court shall defer a discussion of certain letters that the Court excluded until the Court deals with Klayman's pending motions for sanctions regarding related issues.

At the outset, the Court notes that Klayman's motion for a new trial "must meet a heavy burden to prevail on the ground of judicial misconduct."  11 Charles Alan Wright, *supra*, § 2809.

*i.   The Court's Decisions Not to Issue Certain Jury Instructions Pertinent to Klayman's Claims, JW's and Fitton's Counterclaims, or Both*

a.   No Instruction Regarding "Bizarre" Trial Presentation

First, Klayman argues that he was entitled to a jury instruction about "why this case would be tried in such a one-sided manner, without [Klayman] having either witnesses or exhibits." Klayman's Post-Trial Mots. at 23-25 (referring also to the trial presentation as "[b]izarre" (internal quotation marks omitted)).   Of course, Klayman himself was permitted to testify, and Klayman admits that he was permitted to introduce the Confidential Severance Agreement into evidence. *Id.* at 24.   But the Court shall address his argument to the extent that its factual premises are accurate.

Before trial, the Court considered and expressed doubt about giving Klayman's requested instruction.   *See* Order (Jan. 23, 2018), ECF No. 436, at 3.   Ultimately the Court did not give this instruction.   Klayman does not cite any authority for including an instruction about certain of the Court's adverse legal rulings, including the imposition of sanctions, or about a party's allegations that this Court is biased against that party.   Judicial Watch is correct that such an instruction would have been wholly inappropriate.   JW's Post-Trial Opp'n at 21.   By way of justifying the Court's final decision not to give this instruction, the Court stands by its prior reasoning that "adding an instruction to this effect would tend to suggest to the jury that the Court has made factual findings, which it has not."   Order (Jan. 23, 2018), ECF No. 436, at 3.   The effect would have been to stoke prejudice, rather than avoid it.   Accordingly, the exclusion of such an instruction was not improper.

b.   No Instruction Regarding Fair Comment

Klayman raises the fair comment issue again.   Klayman's Post-Trial Mots. at 25-26. Above, the Court discussed its rejection, on the merits, of the argument that it should have issued

a fair comment instruction.  Accordingly, this is not a basis for finding that the Court is biased or that Klayman was unduly prejudiced.

c.   No Instruction Regarding Cumulative Breach

Although the issues raised in Klayman's Post-Trial Motions primarily concern Judicial Watch's and Fitton's counterclaims, this one concerns Klayman's claims.  Klayman argues that it was improper to omit an instruction that the jury could consider the cumulative effect of Judicial Watch's simple breaches, if any, of the Confidential Severance Agreement to decide whether Judicial Watch had materially breached the agreement.  *Id.* at 26-27.

After "[t]he parties raised this issue the day before closing arguments and jury instructions," the Court considered the proposed cumulative breach instruction and rejected it. Order (Mar. 13, 2018), ECF No. 543.  Klayman objects now to the Court's reasoning, but he offers nothing to show that the Court's decision was incorrect.  Rather, he simply regurgitates a single district court opinion, from another circuit, that the Court considered during trial and decided was insufficient for several reasons.  Klayman's Post-Trial Mots. at 27 (citing *Suntrust Mortg. v. United Guar. Residential Ins. Co.*, 806 F. Supp. 2d 872, 902 n.64 (E.D. Va. 2011), *vacated in part on other grounds*, 508 F. App'x 243 (4th Cir. 2013));[8] Order, ECF No. 543, at 2-3.  The Court's decision to move ahead without such a jury instruction did not demonstrate any bias.  Nor did it have any prejudicial effect whatsoever: The jury was given the option to distinguish between simple and material breaches by Judicial Watch and found neither.  *See* Jury Verdict Form, ECF No. 560; JW's Post-Trial Opp'n at 22.

Accordingly, the Court's decision not to give the three aforementioned instructions did not

---

[8] Neither the Court's [543] Order nor Klayman's Post-Trial Motions cited the *Suntrust* proceedings in the Fourth Circuit following the district court's decision.

demonstrate any bias or have any unduly prejudicial effect.

### ii.  Ninth Circuit Ruling and Florida Judgment

Klayman finds further evidence of bias and prejudice in the Court's handling of two decisions by other courts that the parties sought to use for impeachment purposes. Klayman's Post-Trial Mots. at 27-31. But Klayman overlooks the Court's reasoning on the merits in each instance.

At trial, Judicial Watch attempted to impeach Klayman by asking about a Ninth Circuit ruling that was unfavorable to Klayman. *See, e.g.*, Trial Tr. 877:8-879:12 (identifying Judicial Watch's first attempt and the parties' initial discussion with the Court on this topic); *In re Bundy*, 852 F.3d 945, 953 (9th Cir. 2017) (finding, *inter alia*, that pleadings filed by Klayman "contain[ed] patently false assertions"). After examining the ruling, *In re Bundy*, and considering the authorities, the Court issued an Order permitting Judicial Watch to ask about the underlying issue without introducing the Ninth Circuit opinion itself. Order (Feb. 28, 2018), ECF No. 496, at 1-2.

Klayman improperly conflates the Ninth Circuit issue with another issue. The Court also carefully considered whether Klayman should be permitted to use evidence of a Florida judgment against Judicial Watch. Initially, the Court held in abeyance Judicial Watch's and Fitton's motion *in limine* to exclude evidence of the Florida judgment. Order (Feb. 20, 2018), ECF No. 465, at 3. The Order included instructions and guidance for Klayman to follow at trial before he could ask the Court's permission to use this evidence. *Id.* at 3-4. At trial, the Court revisited the Florida judgment in the context of Klayman's cross-examination of Fitton. The Court issued a further Order allowing certain "narrowly focused" questioning about Fitton's role, but expressly prohibiting any reference to the Florida judgment itself. Order (Mar. 2, 2018), ECF No. 500, at 2-3.

Evidently finding the scope to be too narrow—or the risk to be too high that "Fitton would then take the opportunity to explain the circumstances, which would likely not be favorable to Klayman"—Klayman appears not to have pursued this line of questioning.  JW's Post-Trial Opp'n at 24.  Nor does Klayman respond to Judicial Watch's opposition brief by identifying any place in the record where he did in fact ask Fitton about the Florida judgment.  The Court shall not root through the trial transcripts to confirm whether he ever did use the Florida judgment during the lengthy trial.  *See Potter v. District of Columbia*, 558 F.3d 542, 553 (D.C. Cir. 2009) (Williams, J., concurring) (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) (per curiam)) ("Judges 'are not like pigs, hunting for truffles buried in briefs' or the record.").

Now Klayman challenges the limited scope of questioning about the Florida judgment that the Court permitted, by contrast with his characterization of the Court's response to the Ninth Circuit ruling.  But the Court stands by its reasoning in its February 20, 2018, and March 2, 2018, Orders, about the Florida judgment, and its February 28, 2018, Order about the Ninth Circuit ruling.

Klayman's effort to contrast these two decisions ignores the Court's reasoning about the application of the Federal Rules of Evidence and Circuit precedent, which the Court shall not repeat here.  But because Klayman alleges that the purportedly differential treatment is demonstrative of bias, the Court shall add now that the circumstances of the two uses of evidence were distinguishable.  Judicial Watch sought to impeach Klayman with evidence bearing on his own character for truthfulness.  Whereas Klayman requested permission to impeach Fitton with evidence bearing on the character for truthfulness principally of another Judicial Watch employee, and only secondarily of Fitton.  *See, e.g.*, Order (Mar. 2, 2018), ECF No. 500, at 2-3.  These

contexts affected the Court's application of the relevant evidentiary rules, for which, again, the Court refers the reader to the respective Orders themselves.

Some other issues briefly raised by Klayman deserve similarly succinct dispatch. First, Klayman argues that he did not open the door to Judicial Watch's impeachment use of the Ninth Circuit ruling. Klayman's Post-Trial Mots. at 28 (citing Trial Tr. 877:8-24). But Klayman mischaracterizes the record. Judicial Watch ultimately did not bring in the Ninth Circuit ruling after Klayman made the statements that he cites. When Klayman objected to Judicial Watch's attempt to raise the Ninth Circuit ruling at that time on Day 3 of the trial, February 28, 2018, the Court and the parties dealt with the issue initially at sidebar, and then further after the Court dismissed the jury for the day. When trial resumed on Day 4, March 1, 2018, Judicial Watch pursued a different line of cross-examination of Klayman, and only later raised the Ninth Circuit ruling. At that time, Klayman did not object to any lack of foundation. Trial Tr. 992:2-6. In any case, the Court finds that Klayman's cited statements on Day 3 of the trial sufficiently opened the door to an attack on his character for truthfulness. *See, e.g.*, *id.* 877:15 ("I try to follow the rules of ethics, yes."); Fed. R. Evid. 608(b). Nor has he argued that the attack must immediately follow the statement that opens the door.

Second, Klayman objects to the Court's identification of the correct opinion to which Judicial Watch sought to refer in its efforts to impeach Klayman. Klayman's Post-Trial Mots. at 28-30. There had been some confusion as to which of two Ninth Circuit opinions contained the finding of "patently false" representations that Judicial Watch proposed using to impeach him. *See, e.g.*, Trial Tr. 890:18-892:10, 966:23-967:22. Judicial Watch had referred at first to the wrong one. *See id.* But the Court found that Judicial Watch was entitled to ask about the scenario for the evidentiary reasons that the Court discussed in its [496] Order of February 28, 2018, which relied

29

on the correct Ninth Circuit opinion.  The Court did not demonstrate bias in the efforts of Chambers to understand the proposed impeachment and correct a mistaken reference to the wrong one of several opinions for that impeachment.  In any case, the discussion about the correct opinion occurred outside the presence of the jury, and the specific opinion did not come into evidence, so this discrepancy had no effect on the jury.

Lastly, Klayman objects to the Court's prohibition of his attempt to revisit the Ninth Circuit ruling on redirect.  *See* Klayman's Post-Trial Mots. at 30.  The Court sustained an objection to his doing so, indicating that the Court had "considered this," because Klayman had "raised this before, and [the Court] [knew] what the answer is."  Trial Tr. 993:21-994:5.  To elaborate, Klayman's explanation of the context of the Ninth Circuit ruling—in particular his description of the underlying Cliven Bundy matter—exceeded the scope of the impeachment.  And Klayman should have known that the Court would prohibit that.  Shortly beforehand, in response to another objection, the Court had stopped Klayman from going into this context when Judicial Watch asked the impeaching question during cross-examination.  The Court made clear that Klayman could "give an explanation to [Judicial Watch's] question, which relates to what it is that the Ninth Circuit said about [Klayman's] pleadings," but expressly prohibited him from "get[ting] into the whole case that [Klayman] might have been involved with."  *Id.* 993:1-11.  Even though he was prohibited from going into detail about the Ninth Circuit case, Klayman had already said enough to rebut the impeachment.  *See id.* 992:7-14 (stating, e.g., "[t]here was another judge on the panel that made the ruling by the name of Judge Ronald Gould, who actually is very liberal, Democrat, and he found that I hadn't made any false assertions.").[9]

---

[9] Moreover, the Court's review of Judge Gould's dissent suggests that Klayman's explanation is misleading.  Judge Gould wrote that Klayman "has not been disbarred or suspended by another bar association or proven to have engaged in unethical conduct that could justify disbarment."  *In*

The Court did not demonstrate any bias, nor did it unduly prejudice Klayman's case, in deciding how the parties could use the Ninth Circuit ruling and the Florida judgment.

### iii.   The Court's Alleged "Actual Prejudicial Remarks"

Klayman raises a number of the Court's remarks during trial that he alleges demonstrate the Court's bias against him and prejudiced the jury against him.  *See* Klayman's Post-Trial Mots. at 31-36.  The Court disagrees.  In short, none of the Court's comments during trial evidenced any bias against him.  The comments were appropriate in context.  The Court even gave a jury instruction that its comments were not to be taken as indicative of any view of the merits:

> You should not assume from any of my actions during the trial that I have any opinion about the facts in this case. My rulings on objections, my comments to lawyers, my instructions to you, and my questions or comments to witnesses all were concerned with legal matters or with clarifying a question or answer and are not to be taken by you as indicating my view about how you should decide the facts. You are the judges of the facts.

Trial Tr. 3742:24-3743:6.  Nor could any of the Court's comments have had a prejudicial effect so significant as to support a finding of judicial bias.  *See, e.g.*, *Czekalski*, 589 F.3d at 457 (citing, e.g., *Liteky v. United States*, 510 U.S. 540, 555 (1994)).  For example, "[n]ot establishing bias or partiality . . . are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display."  *Id.* (quoting *Liteky*, 510 U.S. at 555-56) (internal quotation marks omitted).

---

*re Bundy*, 852 F.3d at 953 (Gould, J., dissenting).  Judge Gould stops short of finding that Klayman made no false assertions.  Klayman's attempt to further muddy the waters now by dragging in Judge Gould's other dissent, to a previous panel ruling about his lack of candor, does not remedy the likely misleading nature of his testimony.  *See* Klayman's Post-Trial Reply at 23 & n.10 (citing *In re Bundy*, 840 F.3d 1034, 1055 (9th Cir. 2017) (Gould, J., dissenting)).  In any case, the jury was left with Klayman's uncorrected rebuttal, which the jury presumably considered as it weighed all of the evidence.

Nevertheless, the Court has considered Klayman's purported evidence of bias and prejudice and shall address that evidence categorically. First, many of the remarks to which he points were outside of the presence of the jury. *See, e.g.*, Klayman's Post-Trial Mots. at 32-33 (citing Trial Tr. 576:12-13, 577:1-23). By definition, those remarks could have no effect on the jury. To the extent that Klayman refers to *his own* comments about the effect of the Court's statements on the jury, he effectively tries to *bootstrap* his way into demonstrating that the Court prejudicially affected the jury. That is meritless. These remarks do not demonstrate that the Court was biased either.

Second, of the statements that the Court did make in the presence of one or more jurors, none of them demonstrates bias. Nor is any highly prejudicial. The Court shall nevertheless describe some here.

During *voir dire*, Klayman asked for Juror No. 1177's verdict in a prior case, and now he objects to the Court's interruption instructing Klayman not to ask such questions. *Id.* at 31 (citing Trial Tr. 96:3-7). But Klayman omits the Court's almost immediately preceding instruction that the juror not identify the verdict in a different prior case. Trial Tr. 95:20-96:2. The Court had clearly signaled that such questions were off limits, and yet Klayman asked anyway. Later Klayman asked the same prospective juror about the Cliven Bundy matter, and the Court rejected that line of inquiry. *Id.* 97:3-97:13. The Court stands by its explanation that the question was inappropriate because Klayman was "bringing something in that's not part of the case here." *Id.* 97:9-10. The Court explained its reasoning further after Juror No. 1177 left the bench. *Id.* 97:14-98:15. Now the Court elaborates still further that because Klayman was never the attorney of record for Cliven Bundy in his criminal case, there was no valid reason for Klayman to ask a prospective juror about Bundy. Such an inquiry would imply some unfounded connection to this

case.  To conclude, the Court's responses to Klayman's inappropriate *voir dire* questions were neither unduly prejudicial nor highly prejudicial.  Moreover, Klayman can scarcely complain now about prejudice when he did not even object to the seating of this Juror No. 1177.  *See id.* 226:17-18 (identifying objections limited to other prospective jurors).

Klayman also objects to several instances in which the Court commented on the law or referred to a prior legal ruling.  *See* Klayman's Post-Trial Mots. at 35-36 (referring to one of the Court's authenticity rulings and to the Court's view of Klayman's argument that truth is a defense to a disparagement claim).[10]  The Court is permitted to do so.  Klayman has not identified any precedent to the contrary.  The Court finds that any prejudice engendered by its comments does not meet the high standard in this Circuit to establish bias.

Additionally, when Klayman arguably badgered a witness by saying, "So you care to defy court rules?" the Court responded, "Since when have you become the judge, Mr. Klayman?"  *Id.* at 35.  Klayman is not correct to characterize this comment as "scoffing."  *Id.*  Rather, the Court—the enforcer of the rules of the Court—justifiably rebuked Klayman for trying to usurp its role.  Any prejudice that this caused the jury was Klayman's own doing.  Nor, in any case, was the comment so prejudicial as to meet this Circuit's standard.

### iv.  *DeLuca and Sheldon Deposition Rulings*

Klayman also argues that the Court demonstrated bias and prejudicially affected his case through its handling of Stephanie DeLuca's and Philip Sheldon's testimony by deposition, which the Court shall address in the order that Klayman does.  *See id.* at 40-44.

---

[10] As discussed above, Klayman was indeed wrong to argue that truth is a defense to the breach of contract claim at issue.

a.   Sheldon Testimony by Deposition

Klayman argues that he should have been permitted to make certain counter-designations to Philip Sheldon's deposition testimony.  *Id.* at 41-42.  Despite the severe tardiness of Klayman's eve-of-trial submission of counter-designations, the Court carefully considered his proposals on the merits and denied them.  Order (Feb. 23, 2018), ECF No. 486, at 1-3.

Klayman objects now that the Court's reasoning for this denial differed from Judicial Watch's and Fitton's basis for opposing these counter-designations.  Klayman's Post-Trial Mots. at 41-42.  But Klayman does not cite any authority for his apparent notion that the Court's bases for a decision must be limited to those proposed by a party (or its opponents, to be precise).  Nor does Klayman otherwise show that the Court was wrong on the merits.

The Court has reviewed the deposition transcript and stands by the reasoning in its [486] Order.  Moreover, the Court's review of the trial transcript shows that Judicial Watch did not even use the designation within Sheldon's deposition to which Klayman's counter-designation purportedly responded.  Accordingly, the Court finds no evidence of bias or high prejudice suggestive of bias.

b.   DeLuca Testimony by Deposition

Klayman challenges the Court's handling of certain deposition testimony by Stephanie DeLuca.  The Court appropriately exercised its discretion regarding this testimony and does not change its decision now under Federal Rule of Evidence 403(b).

First, Klayman objects to the Court's decision to allow DeLuca's testimony about an incident in a church parking lot.  *Id.* at 42-43 (citing Trial Tr. 3184:23-24).  With one small exception, Klayman did not challenge Judicial Watch's and Fitton's designation of this portion of DeLuca's deposition transcript as part of his filing challenging other designations of that

transcript.[11]  *See* Joint Pretrial Stmt., ECF No. 337-1, at 26 (designating DeLuca Dep. 33:20-36:9);

Pl.'s Resp. to Ct.'s Min. Order Regarding Counter-Designations, ECF No. 478, at 13-14 (expressly

challenging only DeLuca Dep. 34:15-16, but more broadly quoting DeLuca Dep. 34:8-16).  The

Court expressly considered Klayman's challenge to a small portion of this designation—namely,

his challenge to DeLuca Dep. 34:15-16—and denied it.  Order (Feb. 23, 2018), ECF No. 486, at

4.  The Court has reviewed the deposition transcript and trial transcript, and stands by the reasoning

in its [486] Order.  *See* DeLuca Dep. 33:22-36:9; Trial Tr. 3183:18-3185:11 (regarding DeLuca

Dep. 33:22-36:9).  It appears from the transcript that Klayman did not even object to this testimony

when it was read at trial.  Even if he had, the Court finds no evidence of bias or high prejudice

suggestive thereof in allowing this deposition testimony to be read at trial.

Second, Klayman argues that the Court should not have excluded DeLuca's testimony

about Klayman's aspirations for the Senate and Presidency.  Klayman's Post-Trial Mots. at 43

(citing DeLuca Dep. 55:1-9).  The Court expressly considered Klayman's counter-designation of

this portion of DeLuca's testimony and excluded it.  Order (Feb. 23, 2018), ECF No. 486, at 3.

The Court has reviewed the deposition transcript and stands by the reasoning in its [486] Order.

Third, Klayman disagrees with the Court's decision to allow DeLuca's testimony about

vulgar words that Klayman purportedly used.  Klayman's Post-Trial Mots. at 43-44 (citing Trial

Tr. 3185:24-25).  Klayman did not challenge Judicial Watch's and Fitton's designation of this

portion of DeLuca's deposition transcript as part of his filing challenging other designations of

that transcript.  *See* Joint Pretrial Stmt., ECF No. 337-1, at 26 (designating DeLuca Dep. 38:3-10);

---

[11] Klayman proposed counter-designations to part of Judicial Watch's designated portion of the DeLuca deposition, but the Court rejected the counter-designations.  Pl.'s Resp. to Ct.'s Min. Order Regarding Counter-Designations, ECF No. 478, at 7 (proposing DeLuca Dep. 80:20-82:6, 87:7-16, 93:4-14, 97:21-100:12, to counter DeLuca Dep. 36:1-9); Order (Feb. 23, 2018), ECF No. 486, at 3 (rejecting each of these counter-designations).  He does not challenge that decision now.

Pl.'s Resp. to Ct.'s Min. Order Regarding Counter-Designations, ECF No. 478 (no citation of DeLuca Dep. 38:3-10).   Nevertheless, having reviewed the deposition transcript and trial transcript, the Court stands by its reasoning at sidebar in allowing this deposition testimony to be read.  *See* DeLuca Dep. 38:3-10; Trial Tr. 3185:12-3186:15 (regarding DeLuca Dep. 38:3-10).

Finally, the Court allowed DeLuca's testimony about other litigations between her and Klayman, which Klayman now argues was an error.  Klayman's Post-Trial Mots. at 44 (citing Trial Tr. 3187:7-3188:20).  Klayman did not challenge Judicial Watch's and Fitton's designation of this portion of DeLuca's deposition transcript as part of his filing challenging other designations of that transcript.  *See* Joint Pretrial Stmt., ECF No. 337-1, at 26 (designating DeLuca Dep. 52:12-53:16); Pl.'s Resp. to Ct.'s Min. Order Regarding Counter-Designations, ECF No. 478 (no citation of DeLuca Dep. 52:12-53:9).  Nevertheless, having reviewed the deposition transcript and trial transcript, the Court stands by its reasoning at sidebar in allowing this deposition testimony to be read.  *See* DeLuca Dep. 52:12-53:9; Trial Tr. 3187:6-3189:17 (regarding DeLuca Dep. 52:12-53:9).

*** 

Having reviewed Klayman's grounds for judgment as a matter law or a new trial, the Court finds that none warrants either form of relief.  Accordingly, the Court now considers whether Klayman is nevertheless entitled to remittitur of the jury's award.

6.  Remittitur

Klayman objects on two grounds to the jury award to Judicial Watch and Fitton of a total of $2,800,000, claiming that figure is "excessive," and it is "more than what Defendants/Counter-Plaintiffs asked for."  Klayman's Post-Trial Mots. at 45.  His briefing of these arguments is profoundly deficient.

While Klayman cites authorities regarding remittitur of excessive damages awards, including some in the vicinity of this jury award, *see id.* at 45-46 & nn.16-17, he says nothing to explain why the awards in this case are excessive compared with the counterclaims in this case.

Above, the Court rejected Klayman's argument, now reiterated, that the jury wrongly attributed damages caused by FOLK and Freedom Watch to Klayman himself. *See id.* at 46. Nor did the Court find merit in Klayman's other argument, namely that the Court prejudiced the jury against him. *Id.* Moreover, Klayman has not walked the Court through the calculations necessary to support his argument that the verdict was excessive as to specific counterclaims, or as to the counterclaims as a whole.

The contentious relationship between the parties was reflected in the trial. At nearly every turn, Klayman, on the one hand, and Judicial Watch and Fitton, on the other, disputed the evidence, whether it was exhibits or testimony. These disputes produced contradictory evidence, which it was the jury's role to evaluate and credit. The verdict form prompted the jury to apply this evidence claim-by-claim and counterclaim-by-counterclaim. *See* Jury Verdict Form, ECF No. 560. Ultimately the jury awarded damages in seven different categories of counterclaims.

It was not as if the jury generated a lump sum figure for which the allocation to specific claims and counterclaims was unclear. The jury never even produced a total figure. Rather, when the jury returned with awards on the counterclaims, the Court had to tally the awards on particular counterclaims to identify the total judgment for Judicial Watch and for Fitton. *See* J. on the Verdict for Counterpl. Judicial Watch, Inc., ECF No. 548; J. on the Verdict for Counterpl. Thomas J. Fitton, ECF No. 549.[12]

---

[12] As a reminder, the Court vacated these judgments on the verdict so that Klayman would have time to prepare his post-trial motions. Order (Apr. 12, 2018), ECF No. 565, at 3. As a result of today's decision, however, the Court shall reissue judgments on the verdict.

Although the total $2,800,000 award between Judicial Watch and Fitton is significant, the Court has no reason to believe that the jury ever conceived of the award in that fashion. Rather, the jury heard evidence as to all of the issues raised by the counterclaims and should have credited the witnesses and other evidence accordingly. For some counterclaims, the jury received evidence as to specific amounts, and for others the jury was left to make its own determination. In each instance, the jury appears to have complied with the verdict form by assigning separate damages for each counterclaim. The Court finds that none of those individual determinations "shock[s] the conscience," or is "so inordinately large as to obviously exceed the maximum limit of a reasonable range within which the jury may properly operate," in light of the counterclaims in this case. *Peyton*, 287 F.3d at 1126-27.

Nor does Klayman explain how this verdict is more than what Judicial Watch and Fitton requested. Again, the Court is not obliged to track down the numbers of its own accord. But even if and where a specific award is greater than Judicial Watch's and Fitton's request, the Court is unpersuaded that such fact alone warrants remittitur. The Court is unpersuaded by Klayman's authorities for this proposition. Klayman relies on D.C. Circuit precedent suggesting that "in the absence of punitive damages a plaintiff can recover no more than the loss actually suffered." *Kassman v. Am. Univ.*, 546 F.2d 1029, 1033 (D.C. Cir. 1979) (per curiam) (quoting *Snowden v. D. C. Transit Sys., Inc.*, 454 F.2d 1047, 1048 (D.C. Cir. 1971)) (internal quotation marks omitted); Klayman's Post-Trial Mots. at 45. But, as he acknowledges, this case line concerns double recovery—the rule generally prohibiting recovery a second time for the same injury. *See Kassman*, 546 F.2d at 1033-34 ("Where there has been only one injury, the law confers only one recovery, irrespective of the multiplicity of parties whom or theories which the plaintiff pursues."); *see also Medina v. District of Columbia*, 643 F.3d 323, 326 (D.C. Cir. 2011) (related issue of double

recovery).   The language that Klayman cherrypicks is broader than the holding, and it is unsupported by the case law when extracted from its proper context.   That context, double recovery, is not at issue here.   Accordingly, the applicable standard remains the excessiveness of the award, which the Court has found is not satisfied here.

The Court also rejects Klayman's argument, in his reply, that the verdict was a result of "passion, prejudice, or mistake" by the jury.   Klayman's Post-Trial Reply at 26 (quoting *Capitol Hill Hosp. v. Jones*, 532 A.2d 89, 93 (D.C. 1987)) (internal quotation marks omitted).   Elsewhere in this Memorandum Opinion, the Court has rejected Klayman's several brief arguments in support of that notion.   Klayman does not supply any further basis for revisiting those assessments here. Moreover, the jury's "award[s] [were] within a reasonable range," and the Court has no reason to second-guess them.   *Nyman*, 967 F. Supp. at 1571.

Klayman has not satisfied the high standard necessary to disturb the jury's assignment of damages to the counterclaims.

*\*\*\**

The Court has found that the jury had sufficient evidence on which to base its verdict for Judicial Watch and Fitton on their counterclaims.   *Scott*, 101 F.3d at 752.   Nor are there any grounds to grant a new trial or remittitur.   Accordingly, Klayman is unable to prevail on his Post-Trial Motions.   Although the Court offers these conclusions here, the Court factors in its analysis below of Klayman's argument in the Post-Trial Motions that certain letters should not have been excluded from evidence; that argument does not affect the outcome.

**B.  Sanctions Motions & Related Issues**

The Court addresses here Klayman's pending sanctions motions against Judicial Watch and, with respect to the second motion, Fitton, as well as Klayman's argument in the Post-Trial Motions about certain evidence excluded by the Discovery Sanction against Klayman.

The Court shall begin with Klayman's first pending sanctions motion, filed the day before trial, in which he seeks entry of judgment in his favor.  Further below the Court shall address his "renewed" motion filed after trial and seeking that relief too.  From considering this post-trial sanctions motion, the Court shall naturally turn to Judicial Watch's and Fitton's motion to strike that post-trial sanctions motion.

1.  <u>Klayman's Pretrial Motion for Sanctions and Entry of Judgment</u>

The issue in this first motion is whether Judicial Watch's and Fitton's counsel misrepresented Klayman's prior compliance (or lack thereof) with discovery.  Upon consultation with his own prior counsel in this matter, Klayman recalled that he did make certain productions earlier in this case, and now argues that those productions demonstrate Judicial Watch's and Fitton's false representations to the Court.  Klayman's 1st Sanctions Mot. at 1, 5.  Judicial Watch and Fitton respond in pertinent part that Klayman did *not* make productions in response to "the bulk" of the relevant set of discovery requests; the productions he did make were of limited utility; and in any case, the sanction for noncompliance in discovery was imposed *before* their counsel made the statements about Klayman's noncompliance.  JW's 1st Sanctions Opp'n.  In reply, Klayman urges that the opposition conceded his production and now inappropriately pivots to argue relevance instead.  Klayman's 1st Sanctions Reply at 1-2.

It is true that Klayman responded to some discovery requests.  *See* Klayman's 1st Sanctions Mot. at 5 & Exs. 3-4; JW's 1st Sanctions Opp'n at 3.  But Judicial Watch's opposition to the Post-

Trial Motions makes clear that those were *initial* discovery requests.  JW's Post-Trial Opp'n at 26.

Whatever the merits of Klayman's response to those initial discovery requests, it was his repeated

failure to produce documents in response to Judicial Watch's and then co-defendants'

*Supplemental* Requests for Production of Documents that prompted Magistrate Judge Alan Kay to

impose the sanction prohibiting Klayman from "testifying to or introducing into evidence any

documents in support of his damage claims or in support of his defenses to Defendants'

counterclaims."  Order (Feb. 23, 2018), ECF No. 487 ("Testimony and Other Evidence Order"),

at 1-2 (quoting Order (Mar. 24, 2009), ECF No. 302; citing Mem. Op. (Mar. 24, 2009), ECF No.

301, at 5-6) (internal quotation marks omitted).  The Court has referred to this as the "Discovery

Sanction."

In a 2009 decision, this Court upheld the Discovery Sanction, as the Court recalled in its

Testimony and Other Evidence Order on the eve of trial.  *Id.* (citing Mem. Op. (Aug. 10, 2011),

ECF No. 362, at 6-7 (citing *Klayman v. Judicial Watch, Inc.*, 628 F. Supp. 2d 84 (D.D.C. 2009)

(Kollar-Kotelly, J.))).   Klayman points now to documents that were produced prior to the

imposition of sanctions.  But he does not claim that they were responsive to the Supplemental

Requests.  Accordingly, there is no basis to challenge the Discovery Sanction.  And Judicial Watch

and Fitton did not materially misrepresent the noncompliance that prompted that sanction.

Although Judicial Watch and Fitton prevail on Klayman's first sanctions motion, they do

not furnish any authority for requesting sanctions against Klayman in the form of attorney's fees

for their opposing brief.  *See* JW's 1st Sanctions Opp'n at 5-6.  Even if the Court assumes,

*arguendo*, that sanctions could be awarded under Federal Rule of Civil Procedure 11, in an exercise

of its discretion the Court shall not grant such award.  The Court presumes that Judicial Watch's

and Fitton's failure to mention Klayman's original production was unintentional—simply another

casualty of this long-running litigation.  The foregoing analysis makes clear enough that Klayman is not entitled to his requested sanction.  But this issue could have been headed off in entirety if Judicial Watch and Fitton had recalled the prior production sooner and been more precise in their representations.  Accordingly, the Court shall not award attorney's fees for responding to this motion.  Nor, of course, is Klayman entitled to any of the relief he requests.  *See, e.g.*, Klayman's 1st Sanctions Reply at 4.

The Court's prior decisions conclusively resolve this issue and dictate that Klayman's first motion for sanctions be denied.

     2.   <u>Portion of Post-Trial Motions Dealing with Alleged Prejudice from Exclusion of Klayman's Letters</u>

The Court's Testimony and Other Evidence Order summarizing the evidence that Klayman could use at trial was issued two days prior to Klayman's first motion for sanctions.  As of that Order, the Court was unaware of any documents produced by Klayman at any point during discovery.  Testimony and Other Evidence Order at 4.  Nor had Klayman raised any such documents "during the series of pretrial conferences in January and February 2018, or in response to the Court's subsequent orders."  *Id.*  But for the avoidance of doubt, the Court made clear that the "sanctions [did] not prohibit Klayman from introducing any documents that he *did* produce to Defendants during discovery," which at that point appeared to be a null set.  *Id.* (emphasis added).

In his Post-Trial Motions, Klayman claims that he produced certain "letters at issue (or at least the operative letter spelling out the various breaches committed by Judicial Watch)" that the Court improperly excluded.  Klayman's Post-Trial Mots. at 36-37 (citing Order (Feb. 28, 2018), ECF No. 495, at 1).  But the Court already dealt with these letters when Klayman indicated at trial that he wanted to use them.  In a February 28, 2018, Order, the Court expressly considered letters from Klayman to David Barmak, who served as outside counsel to Judicial Watch in certain

matters other than this litigation itself.  Order (Feb. 28, 2018), ECF No. 495, at 1.  The Court found that because Klayman had not produced these documents, he was prohibited from introducing them into evidence.  *Id.*  Nevertheless, the Court carefully delineated the ways in which Klayman could discuss the letters at trial.  *Id.*

There are at least two problems with Klayman's post-trial attempt to raise these letters again.  First, although Klayman does claim that he produced these letters, he does not claim that he produced the letters *during discovery*, which is the only basis under the Court's Testimony and Other Evidence Order for permitting him to introduce evidence at trial.[13]  Rather, Klayman refers the Court to his opposition to motions for summary judgment.  Klayman's Post-Trial Mots. at 37 & n.15 (citing ECF No. 285-3).  That opposition consists in entirety of a copy of Fitton's deposition transcript.  Pl.'s Opp'n to Defs.', [sic] Judicial Watch's, Thomas J. Fitton's; [sic] Christopher Farrell's and Paul Orfanede's [sic] Mots. for Summ. J., ECF No. 285.  The transcript attaches what is evidently the "operative" letter of interest to Klayman.  Klayman's Post-Trial Mots. at 37 (citing ECF No. 285-3, at ECF pages 13-26).  He does not show that he ever submitted any other letters.  Review of the docket confirms that discovery had concluded prior to summary judgment briefing.  Min. Order of Sept. 15, 2008.  Accordingly, he was not permitted to use at trial a document that he did not produce during discovery.  Klayman has not shown that the Court erred in excluding the operative letter or any others.

The Court also addresses an alternative grounds for prohibiting these letters.  Judicial Watch and Fitton argue in effect that it would be unfairly prejudicial to admit one or more of these letters when Klayman did not produce them during discovery.  *See* JW's Post-Trial Opp'n at 26-

---

[13] The sole exception to this blanket rule is the Confidential Severance Agreement, which the Court did permit Klayman to use at trial. Testimony and Other Evidence Order at 5.

27.  Only during discovery would Judicial Watch and Fitton have had the opportunity "to test the claims, damages and defenses" raised in a letter written by Klayman himself.  *Id.* at 27 ("Klayman's argument that there would be no surprise occasioned by his attempt to introduce and admit letters *written to advocate his claims against JW* is disingenuous." (emphasis added)). Although Judicial Watch and Fitton do not cite Federal Rule of Evidence 403, the Court finds that this rule supplies the authority for their objection.  Because the operative letter consists solely of Klayman's own allegations and arguments, the danger of "unfair prejudice" from Judicial Watch's and Fitton's inability to conduct discovery in response "substantially outweigh[s]" the letter's "probative value."  Fed. R. Evid. 403.  Even if the sanctions had not applied, the Court could have excluded the letter in an exercise of its discretion under Rule 403.

In short, Klayman was sanctioned for his failure to respond to certain discovery requests. The Discovery Sanction prohibited Klayman from introducing any evidence at trial to advance his damage claims or respond to the counterclaims.  The Testimony and Other Evidence Order made clear that Klayman would not be prohibited from using any documents that he had produced *during discovery*.  Although Klayman subsequently identified a tranche of documents that he in fact produced during discovery, he has not argued or otherwise shown that he produced *the operative letter or any others* during discovery.  Nor has he argued that he would have used at trial any documents in the tranche that he produced.  And, even if there were no Discovery Sanction, the Court could have excluded the letter(s) because Judicial Watch and Fitton did not have any opportunity to conduct discovery on the basis thereof.  Accordingly, Klayman has not identified any error in the Court's decision to exclude this letter, as well as others to which he only obliquely refers.

Klayman also objects to the Court's response to his attempt to raise the letters during trial.

Klayman's Post-Trial Mots. at 39-40.   As previously discussed, the Court issued precise instructions for what Klayman was able to do with the letters, despite being prohibited from introducing them into evidence.   Order (Feb. 28, 2018), ECF No. 495, at 1.   Those instructions pertained to Klayman's attempt to discuss the letters in his own testimony.   *See id.*   Klayman now objects to two instances in which those letters were at issue.

His first objection concerns his attempt to use these letters in his cross-examination of another witness.   *See* Klayman's Post-Trial Mots. at 39 (citing Trial Tr. 2094:4-17).   Misleadingly, however, he does not acknowledge the context, i.e., that this is *not* his own testimony.   Klayman tried to raise the letters in this cross-examination at least twice.   The first time he attempted to do so, the Court expressly considered the issue and upheld an objection.   *See* Trial Tr. 2071:20-2073:21.   Klayman does not argue that the Court erred in this first instance.   He now refers to the *second* time that he raised these letters with that witness, when the Court again upheld an objection after discussion mostly at sidebar.   *See id.* 2093:23-2096:24.   There is no valid basis for objecting to the Court's disposition of Klayman's second attempt to raise with the same witness certain letters that the Court prohibited from entering into evidence.   The one basis that could be valid is if Klayman was referring to a different set of letters in this second instance.   Klayman initially made that argument, but when the Court carefully addressed the possibility at sidebar, and heard Judicial Watch's clarification to the contrary, Klayman did not renew the argument that this was a distinct set of letters.   *See id.*[14]   If he is trying to do so now, his argument lacks sufficient clarity.

---

[14] It appears that, all along, the grouping of letters at issue included both letters from Klayman himself to David Barmak, as well as letters from Joe Kalunas, Klayman's counsel outside of this litigation, to David Barmak.   *See* Trial Tr. 2093:23-2096:24.   The Court properly excluded both types of letters consistent with its Discovery Sanction and the Testimony and Other Evidence Order.

Nor has he shown that he produced any such letters during discovery; absent that showing, the letters are once again barred by the Discovery Sanction.

Second, Klayman critiques the Court's limiting instruction when he discussed the letters during his own testimony. *See* Klayman's Post-Trial Mots. at 39 (citing Trial Tr. 749:2-10). The Court had already issued an Order identifying what its limiting instruction would be—an Order that Klayman did not request reconsideration of. *See* Order (Feb. 28, 2018), ECF No. 495, at 1. If the Court had to issue this instruction multiple times—neither party has identified the spots in the record, nor will the Court hunt through the record for this—then it was because Klayman violated the Court's instructions in that Order. *See* Trial Tr. 749:2-12 (reading in part as follows, outside the presence of the jury: "MR. KLAYMAN: You gave the instruction already, Your Honor. THE COURT: Yes, but you went ahead and --[.]  MR. KLAYMAN: More than once.  THE COURT: You continued to do it.  You continue to do it."). This is not an instance of bias nor, in any case, is it highly prejudicial.

Klayman raises various and sundry other issues in a succession of single-sentence arguments, without any citation to the record or authorities. The Court shall dispose of them briefly.

Klayman maintains that the exclusion of the letters resulted in a "one-sided" presentation of the evidence. Klayman's Post-Trial Mots. at 40. The Court stands by its rationale, reiterated above, for excluding these letters. *See* Order (Feb. 28, 2018), ECF No. 495, at 1.

Klayman argues that "Defendants," presumably Judicial Watch, produced these letters during discovery and accordingly would not have experienced "undue surprise" if they were introduced at trial. Klayman's Post-Trial Mots. at 40. The Court cannot clearly recall whether Klayman ever made this argument previously. At the least, he supplies neither a date of

production, nor a record citation for this argument, nor other identifying details now.  Even if Judicial Watch *was* aware of these letters, that is not a legitimate reason to water down the Discovery Sanction or the Pretrial Sanction, each of which responded to Klayman's conduct.  *See* Order (Feb. 23, 2018), ECF No. 487, at 2 (discussing each sanction).

In another seemingly novel twist, Klayman attributes his refusal to produce documents regarding damages to the denial of a confidential protective order.  Klayman's Post-Trial Mots. at 40.  Without any citations or further elaboration, the Court lacks any basis short of a hunt through the record as to whether or not Klayman has ever raised this argument.  Regardless, it is inapposite, for he raises the issue in a further challenge to the sanctions imposed upon him.  *See id.*  Those sanctions were well warranted, for the reasons that the Court has recited elsewhere.

None of these issues reflects bias or high prejudice suggestive thereof.  And accordingly, the Court's handling of the letters is not a reason to grant judgment as a matter of law or a new trial.

3.  Klayman's "Renewed" Motion for Sanctions and Judicial Watch's and Fitton's Motion to Strike

After Klayman filed his Post-Trial Motions, and while his pretrial Motion for Sanctions and Entry of Judgment was still pending, he filed his Renewed Motion for Sanctions and Entry of Judgment, which Judicial Watch promptly moved to strike.  There is a series of problems with Klayman's "renewed" motion.

First, this motion was filed after Klayman's [571] pleading containing his Post-Trial Motions.  In light of Klayman's consistently dilatory and otherwise non-compliant behavior in this litigation, the Court had made it clear beyond cavil that this additional motion would not be tolerated: "**The Court shall not consider any post-trial motion that is not contained within [the] single pleading filed by the aforementioned deadline [of July 10, 2018] and shall not**

**grant any extension of this deadline for any reason.**"  Min. Order of May 15, 2018 (citing Order (Apr. 12, 2018), ECF No. 565, at 3)).

Klayman's argument that this motion "is not a post-trial motion" lacks any authority. Klayman's 2nd Sanctions Reply at 1.  He simply explains that the information contained therein "supplements" the pending motion filed before trial.  *Id.*  But the plain language of the Court's orders prohibits this post-trial motion that was not filed together with the other post-trial motions. Nor is it necessary to file a "renewed" motion for sanctions when one remains pending.  Even if the Court had not limited the post-trial motions to a single pleading, this post-trial pleading filed July 13, 2018, was filed late, without any justification for its tardiness.

Moreover, even if the Court were to consider the merits of this motion, the grounds lack merit, exceed the scope of this case, are raised belatedly after trial, are inaccurate and/or misleading, are duplicative of the Post-Trial Motions, and/or are duplicative of the pending Motion for Sanctions.

Only one point deserves further attention.  Klayman suggests that defense counsel tacitly admitted having access to the material that Klayman produced during discovery in December 2007 and January 2008.  Klayman's 2nd Sanctions Mot. at 10 n.3.  Even if that is true, the fact would not help Klayman's case.  It does not support Klayman's argument that he should have been allowed to use the letter(s) discussed above, for he still never claims that such letters are among the documents in that production.  Nor does he claim that he should have been allowed to use the documents that were in that production.  At the most, Klayman's point suggests that Judicial Watch and Fitton have documents about this case in storage, and that hauling them out for trial was not necessary because Klayman 1) had not recalled their existence until the eve of trial, and 2) even after recalling their existence, had not attempted to use them at trial.

These reasons warrant denial of Klayman's post-trial motion for sanctions. Judicial Watch's and Fitton's motion to strike does not cite any authority for the specific relief they seek, namely that Klayman's entire post-trial sanctions motion be stricken. The most likely authority is Federal Rule of Civil Procedure 12(f), which contemplates a motion to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Judicial Watch and Fitton likely hoped to avoid filing an opposition on the merits. But because the Court has found that Klayman is not procedurally or substantively entitled to the relief of dismissal of this case under his renewed motion, and accordingly denies that motion, this motion shall be denied as well. The Court therefore does not reach the issue of Judicial Watch's and Fitton's entitlement to attorney's fees for filing the motion to strike.[15]

## C. Remaining Damages Issues

The Court submitted the issues of liability and damages to the jury in nearly all respects. However, several loose ends remain. *See* Order (Apr. 12, 2018), ECF No. 565.

### 1. Liability and Damages (Excluding Interest) on Count I of Amended Counterclaim

Count I of the Amended Counterclaim alleged a breach of Paragraph 10 of the Confidential Severance Agreement. That paragraph provides in pertinent part that:

> Klayman further agrees to reimburse Judicial Watch for personal costs or expenses incurred by him during his employment, if any, that Judicial Watch may determine in good faith were mistakenly charged or allocated as costs or expenses of Judicial Watch, as well as any additional expenses that Klayman has billed to Judicial Watch or charged to a Judicial Watch credit card that Judicial Watch determines in good faith are personal expenses of Klayman. Klayman shall reimburse Judicial Watch for any such amounts within seven (7) days of being notified by Judicial Watch and being presented with supporting documentation of the amount, date and category of cost or expense items for which reimbursement is sought.

---

[15] The Court also does not reach Klayman's argument that sanctions against Judicial Watch and Fitton are warranted because they failed to confer with him before filing the motion to strike. Klayman's Opp'n to Mot. to Strike at 2.

CSA ¶ 10.  Upon review of evidence that Klayman had not paid personal expenses for which Judicial Watch billed him pursuant to Paragraph 10, the Court granted summary judgment to Judicial Watch and awarded $69,358.48 in damages.  *See Klayman I*, 628 F. Supp. 2d at 157-60 (finding liability); *Klayman II*, 661 F. Supp. 2d at 5 (specifying damages).  The Court reserved the issue of any prejudgment interest on this sum until "all remaining liability issues have been resolved."  *Klayman II*, 661 F. Supp. 2d at 6.

      2.  <u>Interest on Counts I, II, and III of Amended Counterclaim</u>

On the eve of trial, the Court returned to the issue of prejudgment interest to determine whether it needed to submit this issue to the jury.  *See* Min. Order of Feb. 15, 2018.  In its February 20, 2018, pretrial conference, the Court discussed with the parties whether Count I—as well as Counts II and/or III—of the Amended Counterclaim concerned unliquidated damages, such that the jury would be required under D.C. Code § 15-109 to decide any entitlement to prejudgment interest.[16]  *See, e.g., id.*; Feb. 20, 2018 Hr'g Tr. 39:19-43:15, 50:23-53:6; *District of Columbia v. Pierce Assocs., Inc.*, 527 A.2d 306, 310 (D.C. 1987) (contrasting "general rule" that only *post*-judgment interest is available under Section 15-109, with exception for *pre*-judgment interest awarded by "the factfinder, in the exercise of its discretion, . . . if necessary to fully compensate the plaintiff").

The Court ultimately determined that Counts I and II sought liquidated damages, and therefore, the issue of prejudgment interest on those counterclaims did not need to be decided by

---

[16] Section 15-109 provides that,

> In an action to recover damages for breach of contract the judgment shall allow interest on the amount for which it is rendered from the date of the judgment only. This section does not preclude the jury . . . from including interest as an element in the damages awarded, if necessary to fully compensate the plaintiff. . . .

the jury.  Having determined, by contrast, that Count III sought unliquidated damages, the Court did refer that issue to the jury.  The jury awarded damages to Judicial Watch on Count III but decided not to award prejudgment interest.  Jury Verdict Form, ECF No. 560, at 4-5.[17]

Neither Klayman nor Judicial Watch nor Fitton now challenges the Court's decisions to withhold from the jury the issue of prejudgment interest on Counts I and II of the Amended Counterclaim, or to put that issue to the jury with respect to Count III.  Accordingly, the Court shall not revisit those determinations, except insofar as necessary to consider lingering issues with Counts I and II.

Now the Court must confirm whether Judicial Watch is entitled to prejudgment interest as to Count I and/or Count II.  Judicial Watch appears to address that issue with respect to Count II, but not Count I, while Klayman says nothing at all about prejudgment interest.  Nevertheless, the Court shall examine this issue now as to both counts, for the Court has reiterated on several occasions that it would return to the issue of prejudgment interest on Count I.  *See* Order (Apr. 12, 2018), ECF No. 565, at 1-2.

Under local law, which governs the Confidential Severance Agreement,

In an action in the United States District Court for the District of Columbia . . . to recover a liquidated debt on which interest is payable by contract or by law or usage the judgment for the plaintiff shall include interest on the principal debt from the time when it was due and payable, at the rate fixed by the contract, if any, until paid.

---

[17] Although the jury instructions and verdict form refer to Counterclaims 1 and 2, these are actually Counts II and III, respectively, of the Amended Counterclaim.  The counterclaims were renumbered for the jury to exclude Count I, as to which the Court had already determined liability and damages, and did not need to put the issue of prejudgment interest to the jury.  Judicial Watch and Fitton use the numbering scheme that was put to the jury, and appear not to address prejudgment interest on Count I at all.  *See* JW's Post-Trial Opp'n at 30-31.

D.C. Code § 15-108.  "A liquidated debt is one which at the time it arose . . . was an easily

ascertainable sum certain."  *Aon Risk Servs., Inc. of Wash., D.C. v. Estate of Coyne*, 915 A.2d 370,

379 (D.C. 2007) (quoting *Pierce Assocs., Inc.*, 527 A.2d at 311) (internal quotation marks omitted).

If a debt is liquidated, then the court evaluates whether "interest is payable by contract or by law

or usage."  D.C. Code § 15-108; *see also Steuart Inv. Co. v. Meyer Grp., Ltd.*, 61 A.3d 1227, 1239-

41 (D.C. 2013); *Riggs Nat'l Bank of Wash., D.C. v. District of Columbia*, 581 A.2d 1229, 1254-

55 (D.C. 1990).  Because Section 15-108 is "remedial," the statute's criteria for awarding interest

"should be generously construed so that the wronged party can be made whole."  *Bragdon v.*

*Twenty-Five Twelve Assocs. Ltd. P'ship*, 856 A.2d 1165, 1171 (D.C. 2004) (quoting *Riggs Nat'l*

*Bank of Wash., D.C.*, 581 A.2d at 1255)) (internal quotation marks omitted).  "'[T]he court has

ample discretion to include prejudgment interest . . . if necessary to fully compensate the plaintiff'

and '[t]he court usually should award [prejudgment interest] in such cases absent some justification

for withholding such an award.'"  *Wash. Inv. Partners of Delaware, LLC v. Sec. House, K.S.C.C.*,

28 A.3d 566, 581 (D.C. 2011) (quoting *Fed. Mktg. Co. v. Va. Impression Prods. Co., Inc.*, 823

A.2d 513, 531-32 (D.C. 2003)) (first alteration added).[18]

### i.  Prejudgment Interest on Count I

Long before the Court granted summary judgment on Count I—indeed, up to several years

before Klayman even filed this case—Judicial Watch had apprised Klayman of his debts to the

organization pursuant to Paragraph 10 of the Confidential Severance Agreement.  *See* Suppl. Br.

of Counterpl., Judicial Watch, Inc., Regarding Damages on Count 1 of the Am. Countercl., ECF

No. 321, at 3, 6-7 (citing 3d Decl. of Susan E. Prytherch, ECF No. 321-10, and attached Excel

---

[18] Although *Federal Marketing Co.* makes this observation while interpreting Section 15-109,
*Washington Investment Partners* transposes the observation, without comment, to the Section 15-
108 context.

spreadsheet).  Judicial Watch's invoices and accounting identified an easily ascertainable sum certain, *Aon Risk Servs. Inc. of Wash., D.C.*, 915 A.2d at 379, and on that basis, the Court concluded that the debt was liquidated.  As the D.C. Court of Appeals observed in another case involving damages owed under contract, "[i]t would be somewhat artificial to find the debt unliquidated where [Klayman], the defaulting party, knew the exact amount and terms of the contractual debt."  *Giant Food, Inc. v. Jack I. Bender & Sons*, 399 A.2d 1293, 1302 (D.C. 1979). That Klayman disputed Judicial Watch's documentation did not undermine the basis for finding the debt to be liquidated; "[e]ven where a bona fide dispute exists as to a debt, courts generally find the liquidated nature of the debt unaffected."  *Id.*; *see also, e.g.*, Feb. 20, 2018 Hr'g Tr. 43:9-15 (reiterating Klayman's challenge to Judicial Watch's invoices).

The Court must now determine whether the liquidated damages under Count I warrant recovery of interest under Section 15-108.  The parties' Confidential Severance Agreement does not provide for interest on Klayman's personal expenses, unlike Klayman & Associates, P.C.'s ("K&A") debt in Count II.  *See* CSA ¶¶ 10-11.  The Court turns to whether "law or usage" support payment of prejudgment interest.  D.C. Code § 15-108.  That clause "might be viewed as somewhat opaque or even inscrutable." *Riggs Nat'l Bank of Wash., D.C.*, 581 A.2d at 1255.  But on the basis of its independent research, the Court shall assume, *arguendo*, that "law" does not expressly require an award of interest under these circumstances.

That leaves "usage," a grounds for interest that is somewhat less opaque now in light of D.C. Court of Appeals precedent in *Riggs* and later opinions.

> A usage is not a legal rule but a practice in fact. *Electrical Research Products, Inc. v. Gross*, 120 F.2d 301, 305 (9th Cir. 1941). It is "a habitual or customary practice, more or less widespread, which prevails within a geographical or sociological area," *Sam Levitz Furniture Co. v. Safeway Stores, Inc.*, 10 Ariz. App. 225, 228, 457 P.2d 938, 941 (1969), *vacated on other grounds*, 105 Ariz. 329, 464 P.2d 612 (1970), or, in this case, a legal area. Given these cases and the common meaning of

"usage," we think that the term as used in Section 15–108 refers to what is customary or usual under similar or comparable circumstances.

*Riggs Nat'l Bank of Wash., D.C.*, 581 A.2d at 1255.  Picking up the thread, that court has more recently reiterated that "'[p]ayable by usage' refers to 'what is customary or usual under similar or comparable circumstances,' such as 'where such interest had been held to be recoverable in a case which was viewed as analogous in principle.'"  *Wash. Inv. Partners of Delaware, LLC*, 28 A.3d at 581 (quoting *Riggs Nat'l Bank of Wash., D.C.*, 581 A.2d at 1255).  Several D.C. Court of Appeals precedents contain circumstances analogous to this case.

In *District Cablevision Ltd. Partnership v. Bassin*, a jury determined that a cable company had charged unjustifiably high late fees to customers who failed to timely pay their bills.  828 A.2d 714, 718-21 (D.C. 2003).  While there was some dispute as to how much of the plaintiffs' damages was liquidated, the D.C. Court of Appeals observed that the entitlement to interest on the liquidated damages *by usage* was undisputed, "presumably because it is indeed customary to pay interest on funds that are withheld and not paid when due (as the late fees charged by [the cable company] might be said to illustrate)."  *Id.* at 731-32 (citing *Nolen v. District of Columbia*, 726 A.2d 182, 184-85 (D.C. 1999)).

In *Washington Investment Partners*, a party received certain fees under a contract, but a jury later decided that the party breached that contract and must return the fees.  *See* 28 A.3d at 571-72 (identifying jury award of damages on claim "seeking the amount of fees").  In light of *Bassin* and other precedents, the D.C. Court of Appeals affirmed the trial court's award of prejudgment interest on the fees, for they were equivalent to an "overpayment" by the non-breaching party.  *Id.* at 572, 581-82.

The principle is now well established in this jurisdiction that "[p]rejudgment interest operates in part to compensate prevailing plaintiffs for the loss of the use of money that was

wrongfully withheld by the defendant." *Mazor v. Farrell*, 186 A.3d 829, 832 (D.C. 2018) (citing *Bassin*, 828 A.2d at 732). And when plaintiffs had overpaid defendants in *Bassin* and *Washington Investment Partners*, those plaintiffs were entitled to recover prejudgment interest on the wrongly withheld funds. *See also Bragdon*, 856 A.2d at 1172 (finding prejudgment interest warranted in case of overcharged residential rent).

Here too Judicial Watch is entitled to interest on wrongly withheld funds that are tantamount to an "overpayment" to Klayman. The Court determined that Klayman is liable for damages under Paragraph 10 for failure to pay certain personal expenses. When Judicial Watch, rather than Klayman, bore the burden of Klayman's personal expenses, those expenses arguably represented an overpayment of compensation or benefits to Klayman for which Judicial Watch was contractually entitled to reimbursement. Nevertheless, Klayman did not deliver that reimbursement. Consequently, Judicial Watch is entitled to interest on the wrongfully withheld reimbursement. In an exercise of the Court's discretion, the Court finds that "usage" in this jurisdiction supports an award of interest on the liquidated damages that Klayman must pay Judicial Watch under Count I.

Unless a rate is specified by contract, interest under Section 15-108 accumulates at the rate of 6% per year. D.C. Code § 28-3302(a); *Pierce Assocs., Inc.*, 527 A.2d at 311. That interest accrues "on the principal debt," D.C. Code § 15-108, and is "ordinarily not compounded in the absence of contract provision," *Giant Food, Inc. v. Jack I. Bender & Sons*, 399 A.2d at 1304. The period over which interest is calculated runs "from the time when it was due and payable . . . until paid." D.C. Code § 15-108.

Because there is no interest rate specified by Paragraph 10 of the Confidential Severance Agreement, Judicial Watch is entitled to interest at the statutory rate of 6% on its liquidated

damages of $69,358.48.  There is similarly no indication that the parties intended any interest to be compounded; the Court shall not step further.  For purposes of calculating interest accrual, the date(s) that this principal debt was "due and payable," *id.*, are sufficiently defined in the Confidential Severance Agreement:  The underlying payments were due "within seven (7) days of being notified by Judicial Watch and presented with supporting documentation of the amount, date and category of cost or expense items for which reimbursement is sought."  CSA ¶ 10.  Earlier in this case, Judicial Watch submitted a declaration from Susan E. Prytherch—together with a spreadsheet she prepared—that identified the dates that the payments were invoiced; consequently, under the seven-day rule those payments were due on the following dates: November 19, 2003, December 1, 2003, December 22, 2003, and August 11, 2004.  Suppl. Br. of Counterpl., Judicial Watch, Inc., Regarding Damages on Count 1 of the Am. Countercl., ECF No. 321, at 6-7 (citing 3d Decl. of Susan E. Prytherch, ECF No. 321-10, and attached Excel spreadsheet).

The Court has reviewed the interest-calculation method described by Prytherch in her Third Declaration and finds that it is reasonable and consistent with the statutory scheme.  For instance,

> Interest was calculated by determining a daily interest rate (6% per year divided by 365 days per year) and multiplying the amount outstanding (AMT O/S) by the number of days in the period [from the date that the payment was due until July 31, 2009] and the daily interest rate.

> To simplify the calculation, for those invoices for which Mr. Klayman made partial payments, no interest was calculated on the partially repaid amount before the partial payment was made, *i.e.* the period of time seven (7) days from the date of the invoice to the date of the partial payment.  Interest was calculated only on that portion of the invoice for which no payment was ever made.  By way of example, Invoice No. 5 in the amount of $5,292.12 became due on November 19, 2003, but Mr. Klayman made a partial payment of $3,168.75 on December 30, 2005.  No interest was calculated on the $3,168.75 for the period from November 19, 2003 through December 30, 2005.  Rather, interest was only calculated on the amount that remained unpaid, $2,123.37, for the period from November 19, 2003 through July 31, 2009.

56

3d Decl. of Susan E. Prytherch, ECF No. 321-10, ¶ 11.e., 11.f.  This conservative method inures

to Klayman's benefit by understating interest for which he otherwise would be responsible.

Accordingly, Prytherch's method shall be used to calculate the interest to which Judicial Watch is

entitled as of the date of this Memorandum Opinion.

Following that method, the Court has determined as of March 18, 2019, that Judicial Watch

is entitled to prejudgment interest of $63,611.68 on its Count I damages of $69,358.48, for a total

recovery under Count I of $132,970.16.  To cross-check the Court's calculation of prejudgment

interest, the Court has also calculated the interest to which Judicial Watch was entitled as of July

31, 2009, the date that Prytherch used for her calculations, and found that its calculations for each

invoice and for the total sum are consistent with those of Prytherch.

*ii.   Prejudgment Interest on Count II*

In Count II, Judicial Watch alleged a breach of Paragraph 11(A) of the Confidential

Severance Agreement, which the Court excerpts as follows:

> Klayman, and by its signature below, Klayman & Associates, P.C. ("K&A")
> reaffirm and acknowledge the debt of K&A to Judicial Watch, which was in the
> amount of $78,810 as of December 31, 2002, and agree that K&A shall pay the
> then full outstanding balance of the debt (including additional amounts allocated to
> K & A [sic] by Judicial Watch's accountants in accordance with their customary
> practice regarding this debt), without offset or deduction, together with accrued
> interest of 8% per annum, on or before May 15, 2004, per the terms of the Minutes
> of the May 15, 2002 Meeting of the Board of Directors of Judicial Watch. . . .

CSA ¶ 11(A).  The Court easily found that these too were liquidated damages, in this instance

because the Confidential Severance Agreement specifies the amount for which K&A was

responsible.  Moreover, Klayman and K&A are deemed in the agreement to "reaffirm and

acknowledge" the specific amount of this debt.  *Id.*  And in contrast with Count I, here the

agreement expressly provides for prejudgment interest at an 8% rate, thereby exempting this count

from the statutory default.  *Id.*; *see also* D.C. Code § 28-3302 (providing for 6% rate "in the

absence of expressed contract"). Consequently, the Court did not need to ask the jury to determine whether Klayman was entitled to prejudgment interest as to Count II.

At trial, Judicial Watch submitted evidence of compensatory damages for this count in the amount of $125,722, and evidence of damages including interest totaling $197,178.84 as of October 2008. JW's Post-Trial Opp'n at 31 (citing JW's Exs. 115, 123). Judicial Watch proposes two alternatives for handling prejudgment interest on the jury's finding of liability and award of $200,000 in damages. *See* Jury Verdict Form, ECF No. 560, at 4.

First, the Court could find that the jury already included prejudgment interest in its award, despite being unprompted by the Court to do so. *See* JW's Post-Trial Opp'n at 31. Following that logic, the evidence of damages including interest could explain the jury's award of $200,000 on this counterclaim. Alternatively, the Court could shave the jury's damages award to $125,722— on the theory that any more is unsupported by the evidence exclusive of interest—and award prejudgment interest on top of that amount. *See id.*

The Court is disinclined to disturb the jury's damages award absent Klayman's ability to prove that remittitur is warranted. Even though Judicial Watch here elucidates a possible basis for the jury finding—a basis that would suggest the jury included interest on the underlying liquidated debt—the total amount awarded still does not reach the exceedingly high level that could justify remittitur. *See Peyton*, 287 F.3d at 1126-27.

In an exercise of its discretion regarding prejudgment interest, the Court shall find that Judicial Watch is entitled to $200,000 for Count II, inclusive of prejudgment interest.

### iii. *Post-Judgment Interest*

In its Amended Counterclaim, Judicial Watch also seeks post-judgment interest as to Counts I and II, as well as Count III. Judicial Watch has not raised the issue of post-judgment

interest in its briefing, which makes sense because the Court has not yet re-entered judgment. Absent briefing on this issue, however, the Court is not prepared to determine whether D.C. Code §§ 15-108 and 15-109, 28 U.S.C. § 1961, or perhaps some other authority would control the award of such interest.

*** 

Although the Court has attempted to address all of Klayman's material arguments, any that the Court has not addressed do not affect the disposition of these motions.

## IV.  CONCLUSION

For the foregoing reasons, the Court **DENIES** Klayman's [571] Motion for Judgment as a Matter of Law, for a New Trial, or in the Alternative, for Remittitur of the Jury Verdict, **DENIES** Klayman's [489] Motion for Sanctions and Entry of Judgment, **DENIES** Klayman's [572] Renewed Motion for Sanctions and Entry of Judgment, and **DENIES** Judicial Watch's and Fitton's [573] Motion to Strike Plaintiff's Renewed Motion for Sanctions and Entry of Judgment.

The Court **GRANTS** that portion of Klayman's [571] filing containing his Motion for Leave to Exceed Page Limit by One Page and **GRANTS** Klayman's [577] Motion for Leave to File Reply in Excess of Two (2) Pages and Three (3) Lines.

As of March 18, 2019, Judicial Watch is entitled to prejudgment interest of $63,611.68 on its Count I damages of $69,358.48, for a total recovery under Count I of $132,970.16.  Judicial Watch is entitled to $200,000 for Count II, inclusive of prejudgment interest.

Having found that Klayman is not entitled to judgment as a matter of law, a new trial, or remittitur, the Court shall reissue judgments on the verdict that the Court vacated to permit an enlarged timeline for Klayman's post-trial motions.  *See* Order (Apr. 12, 2018), ECF No. 565, at 2-3.  In an accompanying Order, the Court shall enter a final judgment that incorporates those judgments on the verdict; the Court's liability, damages, and prejudgment interest findings as to

Count I of the Amended Counterclaim; and the Court's determination that the jury verdict as to Count II includes prejudgment interest.  *See id.* at 3.

      Appropriate Orders accompany this Memorandum Opinion.

Dated: March 18, 2019

                                           /s/
                                         COLLEEN KOLLAR-KOTELLY
                                         United States District Judge