IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LARRY KLAYMAN,<br><br>                      Plaintiff,<br>     v.<br><br>JUDICIAL WATCH, INC.,<br><br>                      Defendant. | Civil Action No. 1:06-cv-00670<br>(CKK) |

**PLAINTIFF'S REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR SANCTIONS [ECF 592]**

Plaintiff Larry Klayman ("Plaintiff") hereby respectfully submits this reply to Defendant Judicial Watch, Inc.'s ("Defendant Judicial Watch") and Defendant Thomas J. Fitton's ("Defendant Fitton") (hereinafter referred to as "Defendants") opposition to Plaintiff's motion for sanctions [Dkt. # 592].

**INTRODUCTION**

Defendants yet again regurgitate the tired and false argument that Plaintiff provided "no authority[,]" this time with respect to his motion for reconsideration. Defendants and their counsel even try to prejudice this Court again by presenting false and misleading information *in the introductory sentence* of their opposition. Plaintiff's sanctions motion [Dkt. # 592] is not "a cynical attempt to prolong this litigation." Defs. Opp at p. 1. Rather, Plaintiff's motion is an attempt to have this Court finally see through Defendants' lies and intentional misrepresentations and instead of accepting Defendants' misrepresentations to Plaintiff's detriment, roll up its sleeves and make an honest review of Plaintiff's motion for reconsideration [Dkt. # 587], where Plaintiff definitively pointed out where the Court committed grave error that severely prejudiced Plaintiff.

1

In their opposition, Defendants go to great lengths to further attempt to evade the consequences of past conduct which they cavalierly categorize as Plaintiff's failure to "present exhibits, testimony or legal authority to meet the high burden necessary to justify reconsideration." Defs. Opp. at p. 4. Defendants cannot contest that the linchpin of their characterization has been complete misrepresentations throughout the trial – which were and are – totally contradicted by documentation that Plaintiff provided the Court during trial and after. *This* is the conduct that has unnecessarily prolonged this litigation and increased Plaintiff's costs of pursuing his motions for reconsideration and for sanctions, not Plaintiff's conduct.

During the trial, Defendants found no problem whatsoever in forcing Plaintiff, exposed and defenseless – representing himself, unarmed with exhibits, witnesses, testimony or a chance to prove his case or defend Defendants' case because of the Court's overly harsh discovery sanctions – to sift through old documentation and other discovery responses throughout the twelve-year-old case so he could demonstrate to the Court that their representations about what was produced by Plaintiff were false and misleading. *See* [Dkts. #489, 527]. But Defendants' abuse did not stop there. Plaintiff was forced to file more motions with the Court demonstrating Defendants' outright falsities after the trial concluded. *See* [Dkt. # 572, 574, 587, 592]. And now, even in their opposition to a reconsideration motion, Defendants simply believe they can get away with more misrepresentations because, respectfully, this Court has blessed their bad behavior at every turn. It accepts Defendants' misrepresentations hook, line, and sinker. The time is now for Defendants and this Court to play it straight.

## ARGUMENT

It is well established in the U.S. Court of Appeals for the District of Columbia Circuit that if "rules alone do not provide courts with sufficient authority to protect their integrity and

prevent abuses of the judicial process" courts have an inherent authority to impose sanctions for abusive litigation practices. *Shepherd v. America Broad. Cos.*, 62 F.3d 1469, 1474 (D.C. Cir. 1995). Courts also have inherent authority to sanction litigation misconduct when a party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Alyeska Pipelines Service Co. v. Wilderness Society*, 421 U.S. 240, 258-59 (1975). Such power is governed "by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 42 (1991). A court's inherent authority is most commonly invoked when there is no court order in place regarding the conduct at issue. *See, e.g., Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 106-07 (2d Cir. 2002) ("[e]ven in the absence of a discovery order, a court may impose sanctions on a party for misconduct in discovery under its inherent power to manage its own affairs"). Bad faith "may be found, not only in the actions that led to the lawsuit, but in the conduct of the litigation." *Hall v. Cole*, 412 U.S. 1, 4 (1973); *see also Am. Hosp. Ass'n v. Sullivan*, 938 F.2d 216, 219-20 (D.C. Cir. 1991).

It is simply another falsity that Plaintiff failed to "present exhibits, testimony or legal authority to meet the high burden necessary to justify reconsideration" and Defendants should be sanctioned for their false submissions to this Court. Defendants repeat this false and misleading narrative throughout their opposition. Specifically, Plaintiff clearly and specifically set forth how this Court erred by (1) failing to "tak[e] the effort to look back and analyze the damage specifically" with regard to the chance that "the jury mistakenly attributed damages to [Friends of Larry Klayman]"; (2) failing to "make an <u>actual inquiry</u> into the basis behind the jury returning an award of $750,000 based on the sending of one letter amongst millions instead of simply guessing at what the jury's rationale was"; (3) failing to address [Plaintiff's] nominative

3

fair use argument; (4) presuming that each member of the jury independently understood and could apply the legal principle of "fair comment" as set forth by the Supreme Court under *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974); (5) mistakenly analyzing whether [Plaintiff's] alleged conduct was an "illegal taking" or "potential breach of his agreement with Judicial Watch" when the actual issue was that ATA, not Judicial Watch[,] owned the donor or client lists or client data at issue" and (6) making a "meaningless distinction" in finding that "Judicial Watch sought to impeach [Plaintiff] with evidence bearing on his own character for truthfulness. [Plaintiff] requested permission to impeach Fitton with evidence bearing on the character for truthfulness principally of another Judicial Watch employee, and only secondarily of Fitton." [Dkt. # 597, pp. 2-14].

Plaintiff discussed and indeed proved that the trademark infringement awards were based on an erroneous argument that was put before the jury. Damages stemming from any alleged trademark infringement by Freedom Watch or Friends of Larry Klayman should not have been considered by the jury because those two separate entities were not parties to the lawsuit. Additionally, there was no specific verdict from specifying what damages are attributable to whom. [Dkt. # 571, p. 10].

Next, concerning any alleged confusion amongst donors, Plaintiff provided this Court with case law that held that 'the likelihood of confusion' is whether a substantial number of ordinary consumers exercising ordinary caution probably will be confused. A substantial number need not be a majority, *but it must be more than a few.*" *Johnson Pub'g Co. v. Etched-In-Ebony, Inc.*, 1981 U.S. Dist. LEXIS 17614, *9-10 (emphasis added). Only *one* mistake was made and Defendants provided no evidence that donors were confused. To the contrary, Defendants' exhibits proved that donors knew that Plaintiff and Judicial Watch were entirely separate, as

4

many exhibits Defendants relied on from donors stated explicitly that they wanted nothing to do with Judicial Watch or Defendant Fitton. [Dkt. # 571, p. 11].

The list of grave error committed by the Court continues. The Court, partly because of Defendants' false representations, as well as its own extrajudicial bias and prejudice toward Plaintiff, allowed the jury to consider improper, outside actions concerning monies raised by Plaintiff's U.S. Senate Campaign. Defendants made no showing that Plaintiff personally authorized or ratified any conduct on behalf of his political campaign that would constitute infringement on Judicial Watch's trademarks. It also allowed unauthenticated, handwritten notes into evidence without a proper foundation and because the Court knew its rulings were not legally justified, the Court instructed that the letters could not be used to show the truth of the matter asserted, but only to show potential or actual damage to Defendants. The damage to Defendants, however, was indeed the truth of the matter. And, as an example of one of the more grave errors committed by the Court was when it completely disregarded Plaintiff's well-crafted argument, supported by case law, that truth is a complete defense for a claim for disparagement. Erroneous jury instructions or omissions of jury instructions raise a likelihood that the jury's verdict was based on improper legal theories, and thus requires reversal. *See United States v. Lemire*, 720 F.2d 1327, 1343 (D.C. Cir. 1983). Finally, of all the confusing arguments presented to the jury, the allegation that Plaintiff somehow took and then used Defendant Judicial Watch's client data or donor list is the easiest to show why the jury found incorrectly. Simply put, Mark Fitzgibbons of ATA testified under oath that *ATA owned the names* which it had acquired while working with Defendant Judicial Watch and therefore attributing Plaintiff with stealing the names or donor client lists is not only unfair but logically impossible.

The next series of fatal mistakes committed by the Court included its bias and prejudicial remarks, behavior and rulings which influenced the jury. The jury never knew why Plaintiff presented no evidence, no witnesses and was cut off by the Court at virtually every turn. The Court failed to provide a fair comment instruction and cumulative breach instruction despite Plaintiff's cited case law to the contrary. How and why the *In re Bundy* opinion came to be in front of the jury underscores the Court's inherent bias and prejudice against Plaintiff. First, Plaintiff did not impeach himself by testifying that "I try to follow the rules of ethics, yes." Official Transcript, Day 3, 877:8-24. Second, the U.S. Court of Appeals for the District of Columbia Circuit has warned that "evidence of prior acts used to discredit a witness' testimony is often highly prejudicial and therefore should be permitted only when clearly probative of credibility." *Hemphill v. Washington Metro. Area Transit Auth.*, 982 F.2d 572, 574 (D.C. Cir. 1993). Third, the Court took it upon itself to do Defendants' research into some assertion that *was never at issue* about whether a court ruled that Plaintiff asserted something "patently false." [Dkt. # 571, pp. 27-31]. Compare the Court's suggestion that Defendants' counsel ask Plaintiff "isn't it true that in a petition for mandamus, you made assertions that the Ninth Circuit, on March 2017, found to be patently false[,] Official Transcript, Day 3, 883:17-21, to the Court's Order of March 2, 2018 concerning the Florida defamation judgment which a jury found Judicial Watch liable for compensatory and punitive damages. "Isn't it true that you knew that an employee of Judicial Watch made a false statement that I had been convicted of failure to pay child support, and you failed to correct it?" *See* Order March 2, 2018 at p. 2. The only possible outcome the jury could glean were: (1) that Plaintiff did not tell the truth to the Ninth Circuit (even though the opinion had been appealed, Plaintiff denies the findings, and Judge Ronald

Gould strongly dissented from the majority) and (2) that Plaintiff failed to pay child support. The dichotomy between the two was far from accidental. Indeed, it is outrageous.

And, perhaps the most egregious errs of them all concerned the rulings for the exclusion of portions of the depositions of Stephanie DeLuca ("DeLuca") and Philip Sheldon ("Sheldon"). First, Plaintiff sought to include testimony from Sheldon which completely shut the door on any allegation that Plaintiff intentionally used Defendants' trademarks.

> MR. KLAYMAN: I am going to ask a few cross-examination questions, but otherwise I am going to reserve the cross for when I have the exhibits available to be able to ask questions, which I cannot. But I just have two questions for right now.
> BY MR. KLAYMAN: **One, at no time did I tell you or anyone else to send anything out with Judicial Watch's name on it; correct?** MS. HALLER-SIMONYI: Objection to the form of the question. Improper form. You can answer the question.
> A Okay. **No, you did not.**

[Dkt. # 478, p. 1]. The Court excluded this highly relevant testimony on the grounds that the "designation does not counter any testimony designated by Defendants[.]" *See* Defendants' Response to the Court's February 21, 2018 Minute Order at pp. 1, 2, 3. But, *Defendants did not even object on that basis.* The Court again prejudicially took the role of an advocate in favor of Defendants and precluded the jury from hearing this evidence that would have exonerated Plaintiff and "saved" him $1,750, 000 from the jury verdict.

Next, the rulings concerning Plaintiff's prior wife were so biased and discriminatory that even if the outrageous and false allegations Plaintiff's ex-wife said in the midst of a heated custody battle were true, the Court still should not have allowed it because the probative value of, for example, whether Plaintiff struck his wife in a parking lot in the context of a breach of contract case, is **substantially** outweighed by the danger of unfair prejudice. Fed. R. Evid. 403. While allowing the jury to hear the false abuse testimony, the Court conveniently and

intentionally excluded *favorable* testimony from DeLuca about her then husband's political aspirations, thereby refuting Defendants' contentions that Plaintiff concocted the idea of running for the U.S. Senate as a last ditch effort to save face after he was essentially thrown out of Judicial Watch.

> Q. Prior to Mr. Klayman's separation from Judicial Watch, did he ever discuss with you an intent to run for the Senate, the U.S. Senate seat in Florida? A. Yes. Q. Tell me about that.
> A. **He told me he always wanted to run for Senate**, and he was going to do it, and after that he was going to run for president.

[Dkt. # 571, p. 43]. The bad language Plaintiff allegedly used towards his wife and the fact that litigation ensued between the two had nothing to do with any claim or counterclaim. It was put in front of the jury simply to punish and prejudice Plaintiff.

## CONCLUSION

This Court is respectfully requested to now carefully read and digest Plaintiff's memorandum of points and authorities in support of his motion for judgment as a matter of law, for a new trial, or in the alternative, for remittitur of the jury verdict [Dkt. # 571] and make a determination based on the arguments presented and the applicable legal standards and law, all of which have been mischaracterized falsely by Defendants and their counsel. Anything short of a fair and thorough review of the post-trial motions would not only prejudice Plaintiff but also result in a manifest injustice. Plaintiff also requests that this Court sanction Defendants for their brazen misconduct and false representations to this Court.

**Dated**: May 29, 2019

                                                Respectfully Submitted,

                                                 /s/ *Larry Klayman*
                                                Larry Klayman, Esq.
                                                D.C. Bar No. 334581

2020 Pennsylvania Ave. NW, Suite 800
Washington, DC 20006
Tel: (310) 595-0800
Email: leklayman@gmail.com

*Plaintiff Pro Se*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 29th day of May 2019, a copy of the foregoing Notice of Compliance was served by the Court's ECF system upon all counsel of record listed on the Notice of Electronic Filing.

   /s/ *Larry Klayman*