**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **LARRY KLAYMAN**, | |
| **Plaintiff**, | |
| **v.** | Civil Action No. 06-cv-670 (CKK/GMH) |
| **JUDICIAL WATCH, INC.**, *et al.*, | |
| **Defendants**. | |

## <u>MAGISTRATE JUDGE'S</u>
## <u>REPORT AND RECOMMENDATION</u>

Before the undersigned is Defendants' Judicial Watch, Inc. ("Judicial Watch") and Thomas

J. Fitton's ("Fitton") motion for attorneys' fees and costs, which comes after over 15 years of hard-

fought litigation.[1]  This case centers on Plaintiff Larry Klayman's ("Plaintiff" or "Klayman") claim

---

[1] The motion was referred to the undersigned for Report & Recommendation by Judge Colleen Kollar-Kotelly under Local Civil Rule 72.3(a)(7).  *See* ECF No. 647.
    After the motion was referred to the undersigned but before the undersigned took any action in this matter, Klayman filed a federal complaint which named Judge Kollar-Kotelly and the undersigned as defendants and sought relief from the Court's latest denial of Klayman's serial attempts to disqualify Judge Kollar-Kotelly from this case. *See* Complaint, *Klayman v. Kollar-Kotelly*, 22-cv-2074 (D.D.C. July 14, 2022), ECF No. 1. While that case has since been dismissed, *see* Minute Order, *Klayman v. Kollar-Kotelly*, 22-cv-2074 (D.D.C. Oct. 25, 2022), even if it were still pending, it would not preclude the undersigned from rendering a Report & Recommendation on Defendants' fee application. *See, e.g.*, Committee on Codes of Conduct, *Disqualification Based on Harassing Claims Against Judge*, Advisory Opinion No. 103 (June 2009) (explaining that, in cases where "a litigant with a case pending before a judge . . . initiat[es] a complaint against the judge," the judge "is not automatically disqualified from participating in other, unrelated cases involving the same litigant, whether they are filed before or after the complaint in which the judge is a defendant.  Judicial immunity usually will be a complete defense against a new complaint of this nature, and the court in which the complaint is filed likely will dismiss it as frivolous.  In such circumstances, the mere fact that a litigant has filed a new frivolous complaint against a judge based on the judge's official actions will not disqualify the judge from continuing to preside over the earlier, unrelated matter brought by the same litigant."), *available at* https://www.uscourts.gov/sites/default/files/guide-vol02b-ch02-2019_final.pdf.  His latest suit appears, like the others, frivolous on its face and subject to dismissal on judicial immunity grounds. *See, e.g., Klayman v. Rao*, No. 21-cv-2473, 2021 WL 4948025, at *4 (D.D.C. Oct. 25, 2021) (dismissing *sua sponte* related claims filed by Klayman against jurists on this Court and the D.C. Circuit on judicial immunity grounds), *aff'd*, No. 21-5269, 2022 WL 4114077 (D.C. Cir. Sept. 9, 2022).  The undersigned sees nothing in the record that could work to vitiate the referral of Defendants' motion for fees for a Report and Recommendation, or to require recusal in this matter.  *See, e.g., United States v. Mitchell*, No. 99-cv-69, 2002 WL 35649475, at *2 (M.D. Fla. May 10, 2002) ("[A] judge is not automatically required to recuse herself simply because a litigant sues or threaten to sues her."); *cf. Boyd v. Angelica Textile Servs., Inc.*, No. 12-cv-334, 2012 WL 2237167, at *1 (D.S.C. June 15, 2012) (overruling objection to Magistrate Judge's Report & Recommendation where litigant argued that "that because the plaintiff has sued

that Defendants breached a severance agreement (the "Severance Agreement") they signed in 2003

by, among other things, failing to pay him amounts owed under that agreement and publicly

disparaging him.  Klayman also alleged that Defendants defamed him and misappropriated his

name and likeness in violation of state and federal intellectual property laws.  Having successfully

defended those claims and prevailed on their own counterclaims against Klayman on motions to

dismiss and for summary judgment, at trial, and on appeal, Defendants now ask the Court for an

award of fees and costs pursuant to the contract that spawned this case—the Severance Agreement.

The agreement, which was intended to make peace between the parties yet did anything but,

contains a fee-shifting provision entitling "[t]he prevailing party in any legal proceeding instituted

on account of a Party's breach of [the Severance] Agreement . . . to an award of the costs incurred

in connection with such action, including reasonable attorneys' fees and suit costs."  Defendants

assert that they are the prevailing party in this case and demand $1,638,357 in fees and $24,866.61

in costs.  Klayman opposes the motion on multiple grounds, arguing that Defendants have not been

conclusively found to be the prevailing party, that they seek fees beyond the scope of the fee-

shifting provision, and, in any event, that the fees sought are "hyperinflated" and "likely

fraudulent."  Upon consideration of the parties' briefing and the record as a whole, the undersigned

recommends granting Defendants' motion in part and awarding them $682,265.30 in fees and

$24,866.61 in costs.[2]

---

the undersigned district judge, along with the Magistrate Judge who made the Report and Recommendation, that these
judicial officers must recuse themselves"), *aff'd*, 491 F. App'x 425 (4th Cir. 2012).  To conclude otherwise would
allow judges to be "held hostage" and would turn the federal recusal statutes into "vehicle[s] to engage in judge-
shopping, and to manipulate the identity of the decision maker" by "merely filing a complaint against the judge hearing
the case."  *Jones v. City of Buffalo*, 867 F. Supp. 1155, 1163 (W.D.N.Y. 1994) (internal quotation marks omitted).
Accordingly, the undersigned will proceed with issuing this Report & Recommendation.

[2] The relevant docket entries for purposes of this Report and Recommendation are:  (1) Defendants' Motion for
Attorney Fees and Costs (ECF No. 585 and its attachments); (2) Supplemental Memorandum in Support of
Defendants' Motion for Attorney Fees and Costs (ECF No. 588 and its attachments); (3) Supplemental Memorandum
of Points and Authorities in Support of Defendants' Motion for Attorney Fees and Costs (ECF No. 638 and its

## I.       BACKGROUND

It is unnecessary to recount in full the epic saga of this case to resolve Defendants' fee application, and so only the relevant points will be mentioned before turning to the motion at hand.

### A.       Plaintiff's Complaint and Defendants' Counterclaims

At this point in the proceedings, the undersigned assumes general familiarity with the parties' claims and counterclaims.  That said, a brief overview is appropriate here.

Klayman founded Judicial Watch, "a conservative watchdog group," in 1994 "and served as its Chairman and General Counsel until his departure in 2003." *Klayman v. Jud. Watch, Inc.*, 6 F.4th 1301, 1307 (D.C. Cir. 2021), *cert. denied*, 142 S. Ct. 2731 (2022), *reh'g denied*, No. 21-1264, 2022 WL 3021506 (U.S. Aug. 1, 2022).  Klayman claims he departed "voluntarily to run for the U.S. Senate," while Judicial Watch says "it forced Klayman to resign due to his misconduct" involving alleged domestic violence.  *Id.*  Klayman informed Judicial Watch of the allegations levied by his then-wife against him in May 2003; at that point, Fitton—a member of Judicial Watch's leadership—told Klayman to resign, and "[n]egotiations over Klayman's departure ensued over the next several months."  *Id.*  Those negotiations culminated with the Severance Agreement.  In it, Klayman "agreed to resign effective September 19, 2003," and Judicial Watch agreed to pay (and did pay) Klayman $600,000.  *Id.* at 1308.  Importantly, the Severance Agreement "contains detailed provisions restricting the parties' conduct going forward.  For example, it prohibits the parties from disparaging each other," and "also prohibits Klayman from having access to Judicial Watch donor lists and requires him to pay personal expenses he owed to

---

attachments); (4) Plaintiff's Opposition to Defendants' Motion for Attorney Fees and Costs (ECF No. 642 at 28–33); and (5) Reply Memorandum in Support of Defendants' Motion for Attorney Fees and Costs (ECF No. 644).  The page numbers cited herein are those assigned by the Court's CM/ECF system.

the organization." *Id.* And, of course, the Severance Agreement contains the fee-shifting provision now at issue. *See* ECF No. 585-3 at 11.

It is undisputed that Klayman left Judicial Watch in 2003 and sought the Republican Party's nomination for the 2004 U.S. Senate election in Florida but was defeated in the primary. *Klayman*, 6 F.4th at 1308.While seeking the nomination, however, Klayman's "campaign obtained the names of Judicial Watch's donors to use for campaign solicitations" through an organization called "American Target Advertising ('ATA'), the third-party vendor that Judicial Watch used for its mailings to donors." *Id.* In the wake of his primary loss, Klayman created an organization called "Saving Judicial Watch," the website for which was savingjudicialwatch.org. *Id.* Thereafter, Saving Judicial Watch launched fundraising campaigns "directed at Judicial Watch donors using the names obtained from ATA for [Klayman's] Senate run." *Id.* At that time, "Klayman asserted that he left Judicial Watch to run for Senate" and that Judicial Watch's current leaders, including Fitton, "had mismanaged and corrupted the organization[.]" *Id.* Klayman advocated his reinstatement to Judicial Watch's management, and a feud between the parties simmered over the next several years. *Id.*

Things came to a boil in 2006, when Klayman and Judicial Watch donor Louise Benson brought this case against Judicial Watch and various members of its leadership team, including Fitton. *Id.*; *see* ECF No. 1. The Second Amended Complaint—the operative pleading document— contains nine claims, three asserted by Benson and six by Klayman. *See* ECF No. 12. Benson's claims for fraudulent misrepresentation, breach of contract, and unjust enrichment were contained in Counts One, Two, and Three. *Id.* at 19–23. She alleged that "she pledged $50,000 to Judicial Watch, $15,000 of which she donated up front, in reliance on representations made by Judicial Watch while Klayman was still Chairman and General Counsel that the money she contributed

would be used to purchase the building housing Judicial Watch's headquarters," and that, "as consideration for her pledge and contribution, she would receive naming rights to the President's Office in the headquarters building." *Klayman v. Jud. Watch, Inc.*, No. 06-cv-670, 2007 WL 140978, at *7 (D.D.C. Jan. 17, 2007). But the building was never purchased, Benson claimed, and therefore there was no president's office to name. ECF No. 12 at 19–23. On Defendants' motion to dismiss, the Court found it lacked subject matter jurisdiction over Benson's claims, declined to exercise supplemental jurisdiction over them, and dismissed them. *Klayman*, 2007 WL 140978, at *10–11.

Klayman's claims populated Counts Four to Nine of the Second Amended Complaint. ECF No. 12 at 23–31. Counts Four and Five

> relate[d] to the fund-raising mailing sent by Judicial Watch a month after Klayman's departure which allegedly misrepresented that Klayman was still Chairman and General Counsel of Judicial Watch. Count Four allege[d] that the mailing constituted false designation of origin, false and misleading descriptions, false and misleading representations, false and misleading advertising, and other acts of unfair competition, in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A) and (B). Count Five allege[d] that the mailing constituted an unauthorized use of Klayman's name and likeness, in violation of Florida Statute § 540.08.

*Klayman*, 2007 WL 140978, at *4. Counts Six, Seven, and Eight sought

> three separate remedies for Breach of Contract—rescission, damages, and specific performance. Count Six allege[d] that Judicial Watch willfully breached the Severance Agreement by (1) defaming, disparaging and casting Klayman in a false light to the public and the media; (2) failing to pay Klayman the full amount due under the Severance Agreement; (3) failing to return all of Klayman's property; (4) failing to take affirmative steps to purchase the Judicial Watch headquarters building and remove Klayman as guarantor for the Judicial Watch lease; and (5) failing to find a suitable successor for Klayman as Chairman of Judicial Watch. Klayman allege[d] that these 'deliberate misrepresentations materially induced [him] to enter into the Severance Agreement,' and further claims that in light of Judicial Watch's pervasive breaches of the Severance Agreement, monetary damages would be inadequate. As a result, Klayman claim[ed] that the Severance Agreement must be rescinded, with Klayman restored to his position as Chairman of Judicial Watch. Count Seven incorporate[d] by reference Klayman's previous

allegations and [sought] damages for Judicial Watch's alleged breach of the Severance Agreement. Count Eight [sought] specific performance as a remedy for Judicial Watch's alleged breach of the Severance Agreement, incorporating by reference Klayman's previous allegations, and further alleging that Judicial Watch has breached the Severance Agreement by: (1) failing to remove Klayman as guarantor for all credit card accounts; and (2) failing to provide Klayman access to documents.

*Id.* at *4–5 (citations omitted). In Count Nine, Klayman alleged that Judicial Watch and its leaders had defamed him on numerous occasions. ECF No. 12 at 30–31. The Court denied Defendants' motion to dismiss Counts Four, Five, and Six (they did not move to dismiss Counts Seven or Eight) but granted the motion in part as to certain allegedly defamatory statements alleged in Count Nine. *Klayman*, 2007 WL 140978, at *24. Count Five, however, was later dismissed as time-barred. *Klayman v. Jud. Watch, Inc.*, No. 06-cv-670, 2007 WL 1034936, at *4 (D.D.C. Apr. 3, 2007).

Over the years, the Court granted some of Defendants' various motions for summary judgment as to Klayman's claims, including on Count Four, Count Six, portions of Counts Seven and Eight, and the remainder of Count Nine. *See Klayman v. Jud. Watch, Inc.*, 628 F. Supp. 2d 112, 164–66 (D.D.C. 2009) (granting in full Defendants' motion for summary judgment on Count Four and the remainder of Counts Six and Nine, and granting in part Defendants' motion for summary judgment on Counts Seven and Eight of Klayman's operative complaint); *Klayman v. Jud. Watch, Inc.*, No. 06-cv-670, 2007 WL 1034937, at *10 (D.D.C. Apr. 3, 2007) (granting in part Defendants' motion for summary judgment on Count Six of Klayman's operative complaint). Ultimately, Klayman's claims that made it to trial were: Part of Counts 7 and 8, namely, whether Judicial Watch breached the Severance Agreement by failing to make a good faith effort to remove Klayman as the guarantor of a lease for Judicial Watch's headquarters; part of Count 7, namely, whether Judicial Watch breached the Severance Agreement by failing to pay health insurance for Klayman's children; part of Count 7, namely, whether Judicial Watch breached the Severance

Agreement by filing a motion to strike Klayman's appearance in a Florida suit after Klayman left Judicial Watch; part of Counts 7 and 8, namely, whether Judicial Watch breached the Severance Agreement by failing to provide Klayman with access to documents regarding his client Peter Paul; and part of Count 7, namely, whether Judicial Watch breached the Severance Agreement by disparaging him and misrepresenting the reasons for his departure from Judicial Watch. *Klayman*, 628 F. Supp. 2d at 118; *see also* ECF No. 12 at 17–19, 28–30; ECF No. 560 at 1–3.

Meanwhile, Defendants were readying their own arsenal of counterclaims against Klayman. The operative version of Defendants' counterclaims contained eleven counts against Klayman. ECF No. 86 at 29–42; *see also Klayman*, 6 F.4th at 1308 (generally describing the counterclaims). Counts One and Two alleged that Klayman breached the Severance Agreement by failing to reimburse Judicial Watch for certain expenses they fronted him and debts he owed the organization. ECF No. 86 at 29–30. Count Three was an indemnification claim related to Count Two. *Id.* at 30–31. Counts Four through Seven stated various claims relating to Klayman's alleged improper use of Judicial Watch's intellectual property in violation of the Lanham Act, including: his use of the trademarks "Judicial Watch" and "No One is Above the Law" (Count Four), his false and misleading statements (Count Five), his use of the name "Saving Judicial Watch" (Count Six), and his registration and use of the domain name savingjudicialwatch.org, which Defendants alleged constituted cybersquatting (Count Seven). *Id.* at 31–35. Counts Eight through Eleven also alleged breach of the Severance Agreement, including that Klayman: violated the non-disparagement provisions with respect to both Judicial Watch (Count Eight) and Fitton (Count Nine); misappropriated Judicial Watch's confidential information, including donor lists (Count Ten); and violated the non-compete provision (Count Eleven). *Id.* at 36–42. The Court granted Defendants' motion for summary judgment on Count One of their counterclaims, *see*

*Klayman*, 628 F. Supp. 2d at 160 (granting summary judgment on Count One as to liability only); *Klayman v. Judicial Watch, Inc.*, 661 F. Supp. 2d 2, 6 (D.D.C. 2009) (granting summary judgment on Count One as to damages (excluding prejudgment interest) in the amount of $69,358.48), and Defendants withdrew Counts Seven and Eleven before trial, *see* ECF Nos. 467 (withdrawing Count Seven) and 492 (withdrawing Count Eleven).  Thus, Defendants went to trial on Counts Two to Six and Eight to Ten of their counterclaims.

After a dozen years of litigation, the parties went to trial in 2018.  *Klayman*, 6 F.4th at 1309.  The jury returned a verdict for Defendants in March 2018 on both Klayman's claims and their counterclaims, awarding them a total of $2.8 million.[3]  *Id.*; *see also* ECF No. 560.  The D.C. Circuit rejected Klayman's various claims on appeal.  *Klayman*, 6 F.4th at 1321 (holding that "Klayman's multitude of asserted errors fail" and that the District Court "presided over this litigation commendably, without any error that Klayman has identified").  Klayman then sought review by the Supreme Court, but his certiorari petition was rejected.  *See Klayman*, 142 S. Ct. 2731.  In August 2022, the Supreme Court also denied Klayman's request for rehearing.  *See Klayman v. Jud. Watch, Inc.*, No. 21-1264, 2022 WL 3021506, at *1 (U.S. Aug. 1, 2022).

Thus, the underlying litigation on the merits is complete.  Defendants prevailed on all the claims brought by Klayman and nearly all their counterclaims.  Specifically, Counts One, Two, and Three of Klayman's complaint (the claims brought by Benson) were dismissed, as was Count Five and part of Count Nine; Defendants won summary judgment on Counts Four and Six, portions

---

[3] Defendants were awarded the following:  $200,000 on their counterclaim that Klayman failed to repay certain debts in breach of the Severance Agreement; $25,000 on their counterclaim that Klayman failed to pay certain costs and expenses in breach of the Severance Agreement; $750,0000 on their counterclaim that Klayman infringed Judicial Watch's trademarks; $1,000,000 on their counterclaim that Klayman engaged in unfair competition through the use of the savingjudicialwatch.org website; $250,000 on their counterclaim that Klayman made disparaging statements about Judicial Watch in breach of the Severance Agreement; $75,000 on their counterclaim that Klayman used information regarding Judicial Watch's donor and client lists in breach of the Severance Agreement; and $500,000 on their counterclaim that Klayman made disparaging statements about Fitton in breach of the Severance Agreement. *See* ECF No. 560 at 4–8.

of Counts Seven and Eight, and the remainder of Count Nine; and at trial the jury found for Defendants on the remainder of Counts Seven and Eight.  As to their counterclaims, Defendants won summary judgment on Count One, and prevailed at trial on Counts Two to Six and Eight to Ten.  Defendants withdrew Counts Seven and Eleven of their counterclaims prior to trial.

### C.       The Motion for Fees and Costs

Following the Court's entry of judgment in 2019 based on the jury's verdict and awarding Defendants $2.8 million on damages, Defendants— citing the Severance Agreement's fee-shifting provision—moved to recover the attorneys' fees and costs they incurred during the litigation.  ECF No. 585.  Again, that provision entitles "[t]he prevailing party in any legal proceeding instituted on account of a Party's breach of [the Severance] Agreement . . . to an award of the costs incurred in connection with such action, including reasonable attorneys' fees and suit costs."  ECF No. 585-1 at 1; *see also* ECF No. 585-3 at 11.  In their initial motion for fees and costs, filed in April 2019, Defendants asserted that they were the "prevailing party" by virtue of their successful defense against all of Klayman's claims—either on motions to dismiss or summary judgment or at trial— and their victory on their own counterclaims.  ECF No. 585-1 at 5–6.  Defendants also contended that the fees and costs they sought—which at that point numbered $1,379,920 and $24,728.60, respectively—were reasonable because they sought hourly rates commensurate with the USAO Matrix, an attorney's fee matrix maintained by the United States Attorney's Office for the District of Columbia often used as yardstick to determine reasonable hourly rates for attorneys involved in complex federal litigation.  *Id.* at 7–8.  Notably, however, Defendants' counsel acknowledged that they had not actually billed their clients $1,379,920 or been paid that amount.  In fact, counsel had billed and received only $598,030, which was paid by Judicial Watch and its insurer pursuant to an agreement between the insurer and counsel in 2006 under which counsel "agreed to accept

blended rates of $175/hour for partners and $125/hour for associates." *Id.* at 9 n.3; ECF No. 585-9 at 2.  Those rates prevailed until 2016; at that point, and with trial in sight, Defendants' counsel "requested a rate increase commensurate with [their firm's] standard rates at that time." ECF No. 585-9 at 3.  The insurer rebuffed that offer and instead offered to pay counsel at a rate of $275 per hour for partners and $175 per hour for associates.  *Id*.  Defendants do not explain whether they accepted that offer.  However, they do say that they "agreed with Judicial Watch and its [insurer] to invoice Judicial Watch directly for one-half of [the firm's] trial and related time at the rate of $425/hour, which was discounted from then current rates." *Id.*

As to the number of hours expended, Defendants say that their attorneys expended over 3,700 hours not only "defending claims pursued by Klayman," but also "advancing counterclaims on behalf of the client."[4]  *Id.* at 7; ECF No. 638 at 6 (supplementing hours worked).  Defendants contend that "[t]he overwhelming majority of these claims were based on a breach of the Confidential Severance Agreement between the parties."  *Id.*  Again, they admit that the $1,379,920 lodestar figure "is more than the actual dollar amount paid to date," but that "it should not be Klayman who benefits from Judicial Watch's insurance coverage" and he should therefore be required to pay the USAO Matrix rate.  *Id.*

Klayman sought a stay of any determination of fees and costs pending his appeal.  ECF No. 589.  The Court granted the request, and the fee issue remained on the backburner while Klayman's post-trial motions and appeal to the D.C. Circuit were litigated.  Minute Order (April 26, 2019).  Following Klayman's defeat before the court of appeals, Defendants submitted a supplement to their motion for fees and costs in January 2022.  ECF No. 638.  They reiterated their view that they were the prevailing party, having now won both at trial and before the D.C. Circuit.

---

[4] Following their initial motion for attorney's fees and costs, Defendants submitted several hundred pages of billing records to substantiate their requests.  *See* ECF No. 588.

*Id.* at 4–5.  Defendants also tacked on their fees and costs expended in fending off Klayman's appeal to their fee request, bringing their total request to $1,638,357 in fees and $24,866.61 in costs.  *Id.* at 6.  The fees sought between the initial fee application and the supplement were also calculated using USAO Matrix rates.  *Id.*

Klayman opposes Defendants' fee request on multiple grounds.[5]  ECF No. 642 at 28–33. First, he claims it is "premature" to consider the matter of fees and costs because his petition for a writ of certiorari was still pending (at the time of his opposition), and therefore it was yet to be determined whether Defendants were the "prevailing party."  *Id.* at 29.  Klayman then insists that a "full evidentiary hearing and discovery is required" because Defendants' counsel's "pattern and practice of making false statements to the Court" suggests that their bills "are hyper-inflated if not fraudulent."  *Id.* at 30–31.  Tellingly, while Klayman points to allegedly false and misleading statements Defendants made at trial, he does not identify any aspects of Defendants' fee petition that are similarly flawed.  *Id.* at 31 n.2

Klayman also complains that Defendants' counsel seek fees beyond those actually billed to and paid by Judicial Watch and its insurer.  *Id.* at 31–32.  Awarding the higher USAO Matrix fees, Klayman contends, would be the "textbook definition" of a windfall.  *Id.* at 32.  He claims that discovery from the insurer is needed to determine the amounts "actually billed and paid" to counsel.  *Id.*  Additionally, Klayman contends that Defendants seek fees beyond the scope of the Severance Agreement's fee-shifting provision.  *Id.* at 32–33.  He interprets the fee-shifting provision as saying that "claims and defenses not directly related to the breach of the Severance

---

[5] The bulk of the motion Klayman filed in opposition to Defendants' fee application is devoted to his dogged and, to date, totally unsuccessful pursuit to transfer this matter to another District Judge and to recuse and/or disqualify Judge Kollar-Kotelly.  ECF No. 642 at 4–28.  For the reasons stated in footnote 1, *supra*, the undersigned does not further address those arguments here, but notes that Klayman has "sought [Judge Kollar-Kotelly's] voluntary recusal and/or disqualification from this case" at least five times during the pendency of this case, and each has failed.  *See Klayman*, 2021 WL 4948025, at *1; *Klayman v. Jud. Watch, Inc.*, No. 06-cv-670, 2019 WL 3719008, at *6 (D.D.C. Aug. 7, 2019).

Agreement are expressly excluded from the determination of fees." *Id.* at 32. That's significant, Klayman says, because his interpretation would "exclude all attorneys['] fees arising out of the Lanham Act," which he claims "undoubtedly comprised a majority of the fees sought by the Defendants." *Id.* at 33. Finally, Klayman argues that Defendants' fee application is "devoid" of the information necessary to determine the reasonableness of the request, and particularly "evidence of the prevailing community rate for the type of work for which he seeks an award." *Id.* at 33 (quoting *Nat'l Ass'n of Concerned Veterans v. Sec'y of Def.*, 675 F.2d 1319, 1325 (D.C. Cir. 1982)).

In reply, Defendants urge that the fact that Klayman's certiorari petition is pending (or was at the time of Defendants' reply) does not mean a "prevailing party" cannot be determine or that the Court must further postpone the fee issue. ECF No. 644 at 4. They point to the advisory committee notes to Federal Rule of Civil Procedure 54, which state that "[i]f an appeal on the merits of the case is taken, the court may rule on the claim for fees, may defer its ruling on the motion, or may deny the motion without prejudice, directing under subdivision (d)(2)(B) a new period for filing after the appeal has been resolved." *Id.* They also contend that no evidentiary hearing or discovery is necessary because there are "no substantial issue[s] of fact in dispute" and that Klayman forfeited any right to a hearing "[b]y failing to identify and support a factual dispute with some evidence[.]" *Id.* at 3. Defendants also note that their fee submissions have contained several hundred pages "of time entries and multiple affidavits of counsel." *Id.* at 2. As to their billing rates, Defendants dismiss out of hand Klayman's emphasis on the fees they have actually been paid by Judicial Watch's insurer and instead argue that if their rates are unreasonable, it is because they are too low. *Id.* at 2–3. They also contest Klayman's reading of the Severance Agreement's fee-shifting provision. In their telling, "[i]t does not matter whether the fees relate

to the Counterclaims or the claims filed by Klayman" because "both were instituted on account of a breach of the" Severance Agreement. *Id.* at 1–2.

## II.    LEGAL STANDARD

"This Court's 'basic point of reference' when considering the award of attorney's fees is the bedrock principle known as the 'American Rule': Each litigant pays his own attorney's fees, win or lose, unless a statute or contract provides otherwise." *Peter v. Nantkwest, Inc.*, __ U.S. __, __, 140 S. Ct. 365, 370 (2019) (quoting *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 252–53 (2010)).  Where, as here, a contract contains a fee-shifting provision, courts interpret the terms consistent with traditional principles of contractual interpretation.  *See, e.g.*, *U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*, 369 F.3d 34, 77 (2d Cir. 2004) ("We agree . . . that 'normal rules of contract interpretation' should apply in disputes over contractual fee-shifting provisions." (quoting *Bd. of Managers of Mews at N. Hills Condo. v. Farajzadeh*, 2002 WL 171614, at *1 (Dist. Ct. Nassau County Jan. 8, 2002))); *SCI, Inc. v. Engineered Concepts, Inc.*, No. 10-cv-1416, 2013 WL 163665, at *6 (N.D. Ga. Jan. 14, 2013) (finding that an attorney fee-shifting provision is interpreted by the "usual rules of contract interpretation") (citation omitted).  That analysis "must begin with the plain meaning of the language" of the contract."  *Am. Fed. Gov. Employees, Local 2924 v. FLRA*, 470 F.3d 375, 381 (D.C. Cir. 2006); *see also Washington Metro. Area Transit Auth. v. Loc. 2, Off. & Pro. Emps. Int'l Union, AFL-CIO*, 965 F. Supp. 2d 13, 49 (D.D.C. 2013) ("When interpreting a statute or contract, courts first resort to the plain meaning of the text.").  In assessing the text, courts "use objective sources 'to determine what a reasonable person in the position of the parties would have thought the disputed language meant,' including dictionary definitions, previous court interpretations of the[] words, and the like."  *Guttenberg v. Emery*, 68 F. Supp. 3d 184, 190–91 (D.D.C. 2014) (quoting *Travelers Indem. Co. v. United Food & Commercial Workers*

*Int'l Union*, 770 A.2d 978, 986 (D.C. 2001)).  In the event "the parties' intent 'can be determined from the face of the agreement,' the Court's analysis also ends with the text." *United States v. Bolton*, 496 F. Supp. 3d 146, 153 (D.D.C. 2020) (quoting *CITGO Asphalt Refin. Co. v. Frescati Shipping Co., Ltd.*, __ U.S. __, ___, 140 S. Ct. 1081, 1088 (2020)); *see also L&L Constr. Assocs., Inc. v. Slattery Skanska, Inc.*, No. 05-cv-1289, 2006 WL 1102814, at *4 (D.D.C. Mar. 31, 2006) (explaining that when the language of the text is clear, "the [c]ourt need not look beyond the text to interpret the contract").  However, if "the meaning of [a] contract cannot be determined from its text and structure or from the application of canons of contract interpretation"—that is, the terms are found to be ambiguous—courts may consider extrinsic evidence "to discern the meaning that the parties intended to attribute to the ambiguous formulation." *Ohio Power Co. v. F.E.R.C.*, 744 F.2d 162, 168 (D.C. Cir. 1984).  Ultimately, "a contract is unambiguous if it can be given a definite or certain meaning as a matter of law." 11 *Williston on Contracts* § 30:4 (4th ed. 2022 update).

If a contract's fee-shifting provision is applicable and the contract does not otherwise require, the court determines the fees to be awarded by multiplying the "number of hours reasonably expended on the litigation" by a "reasonable hourly rate." *Harrison Music Corp. v. Tesfaye,* 293 F. Supp. 2d 80, 85 (D.D.C. 2003).  "Courts examine several attributes of the documentation provided by the requesting party to assess the reasonableness of the number of hours requested, including duplication of time entries, insufficient detail in billing descriptions, block billing, and billing inconsistencies." *Serv. Emps. Int'l Union Nat'l Pension Fund v. Palisades Operations, LLC*, No. 17-cv-166, 2018 WL 6790314, at *4 (D.D.C. Dec. 21, 2018), *report and recommendation adopted*, 2019 WL 211391 (D.D.C. Jan. 16, 2019).  Reasonable rates, on the other hand, are those "in line with those prevailing in the community for similar services

by lawyers of reasonably comparable skill, experience, and reputation." *Covington v. Dist. of Columbia*, 57 F.3d 1101, 1109 (D.C. Cir. 1995) (quoting *Blum v. Stenson*, 465 U.S. 886, 896 n.11 (1984)). "The party seeking fees bears the burden of establishing entitlement to an award." *Serv. Emps. Int'l Union Nat'l Indus. Pension Fund*, 2018 WL 6790314 at *2. "As the Supreme Court has repeatedly emphasized, 'the determination of fees should not result in a second major litigation.'" *Imapizza, LLC v. At Pizza Ltd.*, No. 17-cv-2327, 2021 WL 2410713, at *16 (D.D.C. June 8, 2021) (quoting *Fox v. Vice*, 563 U.S. 826, 838 (2011)), *report and recommendation adopted*, 2021 WL 3168132 (D.D.C. July 27, 2021). "[T]rial courts need not, and indeed should not, become green-eyeshade accountants. The essential goal in shifting fees (to either party) is to do rough justice, not to achieve auditing perfection." *Fox*, 563 U.S. at 838.

## III.   DISCUSSION

There are several issues critical to the resolution of Defendants' fee request. The threshold question is the scope of the Severance Agreement's fee-shifting provision; that is, whether it covers all, some, or none of the claims at issue in this case. While it seems clear that the fee-shifting provision is applicable to the claims involving breach of the Severance Agreement, the parties disagree over its application to the intellectual property claims asserted by both parties. For the reasons explained below, the undersigned finds that a straightforward reading of the fee-shifting provision's plain terms shows that it is broad enough to cover claims in this litigation not directly arising from the Severance Agreement. The second question, on the other hand, is relatively straightforward: Who was the "prevailing party" on those claims. There is no real dispute that Defendants are the prevailing parties here, and are therefore entitled to fees. But the Severance Agreement's fee-shifting provision demands that those fees be reasonable, and the undersigned finds Defendants' request deficient in several respects. Not only have Defendants not justified

their bid for USAO Matrix rates, but they also do not account for the fact that they did not prevail on the two counterclaims they withdrew prior to trial. Accounting for those deficiencies, the undersigned ultimately recommends that Defendants be awarded $682,265.30 in fees and $24,866.61 in costs.

### A.    The Scope of the Fee-Shifting Agreement

As explained, the parties have a fundamental disagreement over the scope of the Severance Agreement's fee-shifting provision. The scope of the Agreement is critical here because many of the claims litigated in this case—namely, the intellectual property and defamation claims—do not arise directly from the Severance Agreement. As relevant here, the Severance Agreement reads:

> Attorneys' Fees. The prevailing party in any legal proceeding instituted on account of a Party's breach of this Agreement shall be entitled to an award of the costs incurred in connection with such action, including reasonable attorneys' fees and suit costs.

ECF No. 585-3 at 11. Defendants contend that the provision is sufficiently broad to cover the fees they expended in litigating the intellectual property claims, including their counterclaims tied to Klayman's improper use of Judicial Watch's intellectual property in violation of the Lanham Act. Those are: Klayman's infringement of the "Judicial Watch" and "No One is Above the Law" trademarks; his false and misleading statements that misrepresented his and Saving Judicial Watch's goods and services, which, in turn, caused a loss of donations to Judicial Watch and led supporters to believe that Saving Judicial Watch was associated with Judicial Watch; and his cybersquatting through use of the savingjudicialwatch.org domain name. ECF No. 86 at 31–35. Defendants' read the fee-shifting provision to mean that because these counterclaims "were instituted on account of a breach of the" Severance Agreement, the fee-shifting provision is applicable. ECF No. 644 at 2. Klayman, on the other hand, contends that "any claims and defenses not directly related to the breach of the Severance Agreement are expressly excluded from the

determination of fees," and so Defendants should take no fees as to the Lanham Act claims—both his[6] and theirs—because "there is nothing in the Severance Agreement pertaining to the Lanham Act." ECF No. 642 at 32–33. And although Klayman does not address the defamation claims in his brief, his argument concerning the scope of the fee-shifting provision would render fees and costs related to those claims non-compensable, as well. Defendants have the better of the argument, and the undersigned concludes that all claims litigated in this case are compensable under the fee-shifting agreement. Each of those claims—Klayman's, Defendants', and Benson's—will be addressed in turn.

　　　　　1.　　　Klayman's Claims

The undersigned turns first to whether Klayman's claims contained in his Second Amended Complaint are covered by the fee-shifting agreement. They are.

The text of the fee-shifting agreement covers "costs incurred in connection with" "any legal proceeding instituted on account of a Party's breach of [the Severance] Agreement." ECF No. 585-3 at 11. To understand what that means, a few definitions are in order. A "proceeding" is defined broadly as "the regular and orderly progression of a lawsuit, including all acts and events between the time of commencement and the entry of judgment." Proceeding, Black's Law Dictionary (11th ed. 2019). A "legal proceeding" is "[a]ny proceeding authorized by law and instituted in a court or tribunal to acquire a right or to enforce a remedy." Legal Proceeding, Black's Law Dictionary (11th ed. 2019). "Institute," where, as here, used a verb, means "to begin or start" or "commence." Institute, Black's Law Dictionary (11th ed. 2019). "On account of"

---

[6] As explained, Klayman's Lanham Act claim alleged that Defendants "misrepresented that [he] was the Chairman and General Counsel of Judicial Watch" following his departure (Count Four). *See* ECF No. 12 at 23–24. He also brought a similar misappropriation claim under Florida law (Count Five). *See id.* at 24–25. Count Five was dismissed, and Defendants won summary judgment on Count Four. *See Klayman*, 628 F. Supp. 2d at 164–66 (granting in full Defendants' motion for summary judgment on Count Four); *Klayman*, 2007 WL 1034936, at *4 (dismissing Count Five).

means "because of" or "for the sake of."  *See on account of*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/account (last visited Oct. 11, 2022) (defining the phrase "on account of" as "for the sake of" or "because of"); *see also O'Gilvie v. United States*, 519 U.S. 79, 83 (1996) (similarly defining the phrase "on account of").  Thus, the "any legal proceeding instituted on account of a Party's breach of [the Severance] Agreement" clause means "any lawsuit commenced because of" a party's breach of the Severance Agreement.

Here, the parties appear to assume that Klayman's suit is a "legal proceeding instituted on account of a Party's breach" of the Severance Agreement.  Indeed, Counts Six, Seven, and Eight of the Second Amended Complaint all expressly allege that Defendants breached the Severance Agreement and seek a remedy for the alleged breach.  ECF No. 12 at 25–29.  Klayman's issue, rather, is with the other claims that do not allege a breach of the Severance Agreement—i.e., his Lanham Act (Counts Four and Five) and defamation (Count Nine) claims, *see id.* at 23–25, 30–31; *see also* ECF No. 642 at 33 (Klayman arguing that the fee-shifting provision "exclude[s] all attorneys['] fees arising out of the Lanham Act . . . as there is nothing in the Severance Agreement pertaining to the Lanham Act").  But the fee-shifting provision does not speak of individual claims, but rather legal proceedings and there is *only one* "legal proceeding" here—Klayman's lawsuit.  The fact that the "legal proceeding" involves both breach and non-breach claims does not transform it into a "legal proceeding" not "instituted on account of a Party's breach of [the Severance] Agreement."  As other courts have held, the phrase "on account of" does not imply singular causation.  *See, e.g.*, *Vumi v. Gonzales*, 502 F.3d 150, 156 (2d Cir. 2007) (interpreting the phrase "persecution on account of the victim's political opinion" in a federal immigration statute to not require that the "sole motive" for the persecution be the victim's political opinion); *Osorio v. I.N.S.*, 18 F.3d 1017, 1028 (2d Cir. 1994) (interpreting the phrase "on account of" in a federal

immigration statute not to mean "*solely* on account of" and that use of the phrase "on account of" "does not necessarily imply that there cannot exist other causes" aside from a primary cause).  As used here, the language in the Severance Agreement does not mean that, for the fee-shifting provision to be triggered, there cannot exist other causes for the "legal proceeding" in addition to a breach of the Severance Agreement.  Again, the provision's operative phrase is "on account of," not "*solely* on account of" a party's breach.  ECF No. 585-3 at 11. Thus, Klayman's assertion that "there is nothing in the Severance Agreement pertaining to the Lanham Act," albeit true, is beside the point.  Simply put, the fee-shifting provision does not require the "legal proceeding" be "solely motived" by a breach of the Severance Agreement.  Indeed, if that was the parties' intent, they could have cabined their exposure to fee awards by inserting the word "solely" or "exclusively" into the fee-shifting provision—for example, "any legal proceeding instituted *solely* on account of a Party's breach of the Severance Agreement."  But they did not.  Or, if their intent was for the fee-shifting provision to cover only the cost of *claims* arising from a breach of the agreement, they could have said that (e.g., "shall be entitled to an award of the costs of *claims arising directly from the breach of the Agreement*").  Again, they did not.

In interpreting contracts, courts must hold the parties to what they wrote if, as here, the language of the contract is "clear and unambiguous."  *Hartford Accident & Indem. Co. v. Pro-Football, Inc.*, 127 F.3d 1111, 1114 (D.C. Cir. 1997) ("[W]hen . . . contracts are clear and unambiguous, they will be enforced by the courts as written.") (citation omitted); *see also Wright v. Eugene & Agnes E. Meyer Found.*, No. 20-cv-2471, 2021 WL 6134592, at *8 (D.D.C. Dec. 29, 2021) ("As a matter of law, the Court cannot adopt a proposed interpretation of the [s]everance [a]greement that is contrary to the contract's clear and unambiguous terms."), *appeal docketed* (D.C. Cir. Jan. 14, 2022).  Here, while the parties advance differing interpretations of the fee-

shifting provision, neither contest that its language is clear.[7]  *See* ECF No. 642 at 33 (Klayman asserting that the fee-shifting provision's language is "clear" and "uncontradicted").  The unambiguous language of the fee-shifting provision demonstrates that Klayman's claims, including the Lanham Act and defamation claims that do not arise directly from the Severance Agreement, are part of the "legal proceeding instituted on account of a Party's breach of [the Severance] Agreement."  ECF No. 585-3 at 11.  And the fees expended to litigate those claims are compensable provided they are—per the parties' agreement—"costs incurred in connection with such action, including reasonable attorneys' fees and suit costs."  *Id.*

The answer to that question is undoubtedly "yes."  The phrase "in connection with" "can bear a 'broad interpretation.'"  *Mont v. United States*, __ U.S. __, __, 139 S. Ct. 1826, 1832 (2019) (quoting *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 85 (2006)); *see also Khimmat v. Weltman, Weinberg & Reis Co., LPA*, 585 F. Supp. 3d 707, 712 (E.D. Pa. 2022) (whereas "'[r]egarding' and 'with respect to' imply a direct link," "'in connection with' means a looser relationship").  In various contexts, many courts have interpreted "in connection with" to mean "related to" or "associated with."  *See, e.g.*, *Morse/Diesel, Inc. v. Provident Life and Acc. Ins. Co.*, 166 F.3d 1214, 1998 WL 739886, at *4 (6th Cir. 1998) ("The district court correctly held that the phrase "in connection with the Work" plainly refers to matters related to erecting the structure."); *Bollinger Marine Fabricators, LLC v. Marine Travelift, Inc.*, No. 14-cv-1743, 2015 WL 13048734, at *6 (E.D. La. Apr. 13, 2015) (noting that "in connection with" means "being related to or associated with, but not the primary or only purpose of" (quoting *Poole v. Ocean Drilling & Exploration Co.*, 439 So. 2d 510, 512 (La. App. 1st Cir. 1983))); *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 2013 WL 1609154, at *9 (S.D.N.Y. Apr. 15, 2013) ("It

---

[7] The Court therefore need not dive into any extrinsic or parol evidence, and, notably, neither side even suggests that there is such evidence that could assist in clarifying the meaning of the fee-shifting provision.

is proper to construe the phrase 'in connection with' broadly to mean 'related to.'" (quoting *Lehman Bros. Holdings Inc. v. JPMorgan Chase Bank, N.A.*, 469 B.R. 415, 442 (Bankr. S.D.N.Y. 2012))); *see also in connection with*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/in%20connection%20with (last visited October 12, 2022) (defining the phrase "in connection with" as "in relation to (something)" or "for reasons that relate to (something)").  Klayman therefore has it right in his opposition when he says that "the only fees recoverable are those *related to* a legal proceeding instituted on account of a Party's breach of the Severance Agreement," but goes too far when, in the very next sentence, he contends that "claims and defenses not *directly related* to the breach of the Severance Agreement are expressly excluded from the determination of fees."  ECF No. 642 at 32 (emphasis added).  As explained, the parties could have written the fee-shifting provision as Klayman attempts to re-cast it, but they did not.

Here, the fees and costs Defendants expended in fending off Klayman's claims were, at minimum, "related to" to his lawsuit.  Indeed, Defendants' fees were not merely "incurred in connection with" Klayman's suit, but as a direct result of it.  Without his lawsuit, there would have been nothing to defend and no legal expenses to pay.  Such expenses are wholly within the contemplation of the fee-shifting provision, which expressly mentions "attorneys' fees" as one aspect of the compensable "costs."  ECF No. 585-3 at 11.

Other courts have reached similar conclusions when interpreting comparable fee-shifting provisions.  In *Eagle Nation, Inc. v. Mkt. Force, Inc.*, 180 F. Supp. 2d 752 (E.D.N.C. 2001), for example, the court considered the following fee-shifting language:

> In the event that any legal proceedings are undertaken by either party against the other for breach of any of the provisions of this agreement, the prevailing party shall be entitled to recover all costs incurred by it in connection with such proceedings, including reasonable attorneys' fees incurred.

*Id.* at 758.  The plaintiff in that case, an automotive parts and supplies industry group, signed a contract with the defendants, a North Carolina-based advertising company and its executives, that contained the above fee-shifting provision.  *Id.* at 753.  Later, the plaintiff brought three breach of contract suits against the defendants.  *Id.* at 759.  As here, however, the suits "included claims other than those premised on defendants' breach of contract."  *Id*.  All three suits were dismissed, and defendants sought recovery of their attorneys' fees as the prevailing parties.  *Id.*  The court found that, notwithstanding the fact that the suits were not based solely on the defendants' alleged breach of contract, defendants were entitled to attorneys' fees, emphasizing the fee-shifting provision's "in connection with" language.  *Id.*  Thus, in *Eagle Nation*, the fact that the suits "included breach of contract claims" was enough to bring them within the fee-shifting provision's ambit, and all the fees and costs incurred to the defend against those suits, including those incurred to defend "claims other than those premised on defendants' breach of contract" were recoverable. The result should be no different here

The undersigned accordingly recommends that Defendants' fees and costs expended in defending against Klayman's claims—including his Lanham Act and defamation claims—be found to fall within the scope of the fee-shifting provision.  The undersigned now addresses whether the same result should hold as to Defendants' counterclaims.

2.      Defendants' Counterclaims

Like Klayman, Defendants asserted a mix of counterclaims—some directly related to the alleged breach of the Severance Agreement (Counts One to Three and Eight to Eleven), and some not (the intellectual property claims in Counts Four to Seven).  And as with Klayman's claims, the fees and costs incurred in litigating all the counterclaims should be compensable under the fee-shifting provision.

As an initial matter, the counterclaims Defendants launched against Klayman did not constitute a separate or distinct "legal proceeding."  Recall that a "proceeding" "includ[es] *all acts and events* between the time of commencement and the entry of judgment."  Proceeding, Black's Law Dictionary (11th ed. 2019) (emphasis added).  That would include counterclaims, which are necessarily filed after the commencement of a lawsuit but before judgment is entered.  *See* Fed. R. Civ. P. 13.  In this case, Klayman's claims and Defendants' counterclaims proceeded in parallel and, indeed, were tried together.  So, Defendants' counterclaims are part and parcel of the "legal proceeding instituted on account of a Party's breach of [the Severance] Agreement"—that is, Klayman's lawsuit.

The next question is whether the fees and costs expended in pursuing the counterclaims are "costs incurred in connection with" Klayman's suit.  Again, the phrase "in connection with" is broad and implies a "looser" connection than a "direct link," *Khimmat*, 585 F. Supp. 3d at 712, and is commonly understood to mean "related to" or "associated with."  Here, Defendants' counterclaims were either "related to" or "associated with" Klayman's suit.  The breach of contract counterclaims (Counts One to Three and Eight to Eleven) bear a strong connection to Klayman's suit, as they arise out of the same contract—the Severance Agreement—under which Klayman sues.  Further, all Defendants' counterclaims are, at minimum, "associated with" Klayman's suit because they were brought in the same "legal proceeding."  Thus, the costs and fees Defendants expended litigating their counterclaims also fall within the scope of the Severance Agreement's fee-shifting provision.

That same result obtains even if Defendants' counterclaims are considered a distinct "legal proceeding."  In that scenario, the counterclaims would need to independently constitute a "legal proceeding instituted on account of a Party's breach of [the Severance] Agreement."  ECF No.

585-3 at 11.  They do.  As with Klayman's claims, it matters not that the counterclaims contain some allegations directly arising from an alleged breach of the Severance Agreement and some with seemingly little connection to the Severance Agreement.  *Compare* ECF No. 86 at 29–31 (counts alleging breach of contract) *and id.* at 36–42 (same) *with id.* at 31–35 (counts alleging intellectual property claims).  Again, that is because the "on account of" clause means the alleged breach of the Severance Agreement need not have been the sole cause or motivator of the "legal proceeding."  Here, some of the counterclaims (Counts One to Three and Eight to Eleven) directly arose from an alleged breach of the Severance Agreement, and that is enough.  Further, in that scenario, the fees and costs Defendants expended in pursuing their counterclaims are part of the compensable "costs" because they were, at minimum, "related to" that legal proceeding, as explained in the preceding section.  Such expenses plainly fall within the fee-shifting provision, which expressly mentions "attorneys' fees and suit costs" as one aspect of the compensable "costs."  ECF No. 585-3 at 11.  The parties do not argue otherwise.

For these reasons, the undersigned recommends finding that Defendants' counterclaims—all of them—fall within the scope of the fee-shifting provision.

### 3.  Benson's Claims

Finally, the undersigned will assess whether the fees Defendants expended defending the claims filed by Louise Benson are compensable under the fee-shifting provision.  The parties overlook that issue in their briefing, so some additional background is needed.  Benson and Klayman joined their claims against Defendants pursuant to Federal Rule of Civil Procedure 20(a)(1), which provides that "[p]ersons may join in one action as plaintiffs if:  (A) they assert any right to relief jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or

fact common to all plaintiffs will arise in the action." Fed. R. Civ. P. 20(a)(1); *see also* ECF No. 22 at 6–7. Recall that Benson alleged in Counts One, Two, and Three of the Second Amended Complaint that Judicial Watch and its leadership misused her donations that were intended to assist in the purchase of a new building for the organization and secure naming rights for its president's office—neither of which came to pass. ECF No. 12 at 19–23. Defendants moved to sever those claims from Klayman's suit, *see* ECF No. 16—which Klayman opposed, *see* ECF No. 22—but the Court deemed the severance bid moot when it dismissed Benson's claims for lack of subject matter jurisdiction, *see Klayman*, 2007 WL 140978, at *24. Notwithstanding their view articulated some sixteen years ago that Benson's claims should not even be a part of this proceeding, Defendants now assert that they are entitled to the costs and fees occasioned by those claims. Consistent with the analysis set forth in the foregoing sections, the undersigned must agree.

Pursuant to Rule 20, Benson's claims were joined with Klayman's claims in "one action." Fed. R. Civ. P. 20(a)(1). Thus, like Defendants' counterclaims, Benson's claims against Defendants did not constitute a distinct "legal proceeding." Instead, and as explained above, Benson and Klayman's joint "action" was a "legal proceeding instituted on account of a Party's breach of [the Severance] Agreement" because some of Klayman's claims—that is, his breach of contract claims—were directly tied to Defendants' alleged breach of the Severance Agreement. As with Klayman's Lanham Act claims and Defendants' counterclaims, it matters not that Benson's claims did not arise directly from the Severance Agreement, because some of Klayman's claims did, and Benson's claims were joined with them. Again, the unadorned "on account of" phrase means that the "legal proceeding" need not have arisen solely or exclusively from an alleged breach of the Severance Agreement.

Further, and quite logically, the fees Defendants incurred in addressing Benson's claims were also "incurred in connection with" the "legal proceeding" Klayman and Benson launched against Defendants. ECF No. 585-3 at 11. Indeed, and as with the costs and fees Defendants racked up in defending against Klayman's claims, the costs and fees occasioned by Benson's claims were incurred directly as a result of Klayman and Benson's joint suit, and were not merely "related to" or "associated with" their lawsuit. Simply put, Klayman and Benson initiated a "legal proceeding . . . on account of a Party's breach of [the Severance] Agreement," and Defendants "incurred" costs and fees "in connection with" that lawsuit by defending against Benson's claims.

*     *     *     *     *

The Severance Agreement's fee-shifting provision is broad. Not only does the "on account of" clause mean that covered "legal proceedings" need not stem solely from an alleged breach of the Agreement, but the phrase "in connection with" means that compensable claims need not be directly related to the alleged breach. The parties could have bargained for narrower, more circumspect fee-shifting language, but they did not, and the breadth of the language they agreed to is clear and unambiguous. Accordingly, the undersigned recommends finding that all claims at issue in this case—both Klayman and Benson's affirmative claims and Defendants' counterclaims—are covered by the fee-shifting agreement (the "compensable claims"). Having determined which claims are compensable, the undersigned turns next to determining the "prevailing party" on those claims.

### B.      Defendants are the Prevailing Parties

The Severance Agreement's fee-shifting provision entitles only the "prevailing party" to an award of attorneys' fees and costs. ECF No. 585-3 at 11. The undersigned concludes that Defendants were the prevailing party on most but not all of the compensable claims.

Although the fee-shifting provision does not define the term "prevailing party," courts in this Circuit are familiar with that term.   As the undersigned has previously explained, "[a] prevailing party is commonly understood to mean 'one who has been awarded some relief by the court.'"   *Tillman v. District of Columbia*, 123 F. Supp. 3d 49, 55 (D.D.C. 2015) (quoting *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health and Human Res.*, 532 U.S. 598, 603 (2001)); *see also* Prevailing Party, Black's Law Dictionary (11th ed. 2019) (defining "prevailing party" as "a party in whose favor a judgment is rendered, regardless of the amount of damages awarded").   "In the D.C. Circuit, in order for a party to be deemed a prevailing party, '(1) there must be a court-ordered change in the legal relationship of the parties; (2) the judgment must be in favor of the party seeking the fees; and (3) the judicial pronouncement must be accompanied by judicial relief.'"   *Tillman*, 123 F. Supp. 3d at 55 (quoting *Green Aviation Mgmt. Co., LLC v. FAA*, 676 F.3d 200, 203 (D.C. Cir. 2012)).   Of course, obtaining a favorable verdict at trial and final judgment entitles the winner to prevailing party status.   *See Langbord v. United States Dep't of the Treasury*, No. 06-cv-5315, 2017 WL 3953954, at *1 (E.D. Pa. July 10, 2017) ("Because the Government obtained a favorable verdict at trial and final judgment was entered in its favor, the Government is the prevailing party in this action.").   So does prevailing on a motion for summary judgment.   *See, e.g.*, *District of Columbia v. Ijeabuonwu*, No. 09-cv-0249, 2010 WL 11707259, at *2 (D.D.C. Mar. 26, 2010) ("The Court granted summary judgment for the plaintiff; there is no doubt therefore that plaintiff is the prevailing party."); *Summer Hill Nursing Home LLC v. Sebelius*, 677 F. Supp. 2d 181, 186 (D.D.C. 2010) (concluding that the party who sought and was granted summary judgment in its favor was the "prevailing party" under the Equal Access to Justice Act); *GasPlus, L.L.C. v. U.S. Dep't of Interior*, 593 F. Supp. 2d 80, 85 (D.D.C. 2009) (same).   Further, a defendant who prevails on a motion to dismiss for lack of jurisdiction or for

27

failure to state a claim is also a "prevailing party." *See, e.g.*, *Burton v. Vectrus Sys. Corp.*, 834 F. App'x 444, 445–47 (10th Cir. 2020) (holding that the defendant who prevailed on a Rule 12(b)(6) motion to dismiss for failure to state a claim was the "prevailing party"); *Autor v. Blank*, 128 F. Supp. 3d 331, 339 (D.D.C. 2015) ("[W]hen a defendant succeeds in a motion to dismiss for lack of jurisdiction, the case terminates.  Thus, a jurisdictional victory dismissing the case is all the defendant needs to prevail."), *aff'd sub nom. Autor v. Pritzker*, 843 F.3d 994 (D.C. Cir. 2016).  On the other hand, a plaintiff who dismisses or withdraws claims prior to final adjudication is, quite logically, not the prevailing party on those claims, and neither is the defendant.  *See Doran v. Holiday Quality Foods, Inc.*, No. 99 cv-386, 2003 WL 24205917, at *3 (E.D. Cal. Oct. 8, 2003) ("Because plaintiff voluntarily dismissed his . . . claim, as a practical matter, neither party was the prevailing party on that claim."); *see also DeShiro v. Branch*, 183 F.R.D. 281, 286 (M.D. Fla. 1998) (finding that a litigant was not a prevailing party for purposes of a fee-shifting statute because the claims at issue "were voluntarily dismissed pursuant to Fed. R. Civ. P. 41(a)(1); thus the Court did not have the opportunity to address the merits of those claims").  Just as "[a] defendant's voluntary change in conduct . . . lacks the necessary judicial *imprimatur* on the change" to render a plaintiff a prevailing party, *Buckhannon*, 532 U.S. at 605, a plaintiff's voluntary withdrawal of its claims does not bestow upon it (or the defendant) prevailing party status.

With these principles in mind, the undersigned will assess each of the claims at issue in the case and determine whether Defendants were the prevailing party.  First, however, the undersigned will address Klayman's contention that the Court cannot yet determine who the "prevailing party" is because, at the time he filed his opposition, "this matter [was] still pending appeal to the Supreme Court."  ECF No. 642 at 29.  While that was true at the time, the petition has since been denied,

*see Klayman*, 142 S. Ct. 2731, as has Klayman's petition for rehearing, *see Klayman*, 2022 WL 3021506, at *1.   At this juncture, the merits portion of the case is over, and so Defendants are correct that "there is no reason to delay adjudication of" of their requests for fees any longer.[8]   ECF No. 644 at 4.

      1.    Klayman's Claims

Defendants are the prevailing party on Klayman's claims.   The Court granted Defendants' motion to dismiss Count Five and a portion of Count Nine of Klayman's Second Amended Complaint for failure to state a claim.   *See Klayman*, 2007 WL 140978, at *24; *Klayman*, 2007 WL 1034936, at *4.   That is sufficient to confer "prevailing party" status on Defendants.   *See Burton*, 834 F. App'x at 445–47.   Then, Defendants won summary judgment on Count Four, Count Six, portions of Counts Seven and Eight, and the remainder of Count Nine.   *See Klayman*, 628 F. Supp. 2d at 164–66 (granting in full Defendants' motion for summary judgment on Count Four and the remainder of Counts Six and Nine, and granting in part Defendants' motion for summary judgment on Counts Seven and Eight of Klayman's operative complaint); *Klayman*, 2007 WL 1034937, at *10 (granting in part Defendants' motion for summary judgment on Count Six of Klayman's operative complaint).   Again, the grant of summary judgment means Defendants "prevailed" on those claims.   *See Ijeabuonwu*, 2010 WL 11707259, at *2.   So, all that was left for trial were portions of Counts Seven and Eight, and Defendants received favorable jury verdicts on those claims, too.   *See* ECF No. 560 at 1–3.   The Court entered judgment in favor of Defendants, *see* ECF Nos. 582–84, the D.C. Circuit rejected Plaintiff's arguments on appeal, *see Klayman*, 6

---

[8] After Klayman lost before the D.C. Circuit, he proceeded to sue all the judges of that court, as well, claiming that they violated his constitutional rights by not ruling in his favor.   *See Klayman v. Rao*, No. 21-cv-2473, 2021 WL 4948025, at *1 (D.D.C. Oct. 25, 2021).   The District Court dismissed Klayman's claims with prejudice, and the D.C. Circuit (with three alternate judges sitting by designation) affirmed.   *See Klayman*, 2022 WL 4114077, at *3.   Klayman offers no reason why that dismissed collateral attack on the judgment in this case precludes the undersigned from preparing this Report & Recommendation.

F.4th at 1321, and the Supreme Court later rejected Klayman's bid for certiorari and rehearing, *see Klayman*, 142 S. Ct. 2731 (denying certiorari); *Klayman*, 2022 WL 3021506, at *1 (denying rehearing).  The jury's verdict in Defendants' favor, like their wins at the motion to dismiss and summary judgment phases, confers "prevailing party" status.  *See Langbord*, 2017 WL 3953954, at *1.  Given their total victory on all of Klayman's claims at multiple stages of the case, Defendants are unquestionably the "prevailing party" on those claims.

2.      Defendants' Counterclaims

As to their own counterclaims, however, Defendants did not prevail on each and every claim.  As explained, Defendants succeeded in their bid for summary judgment on Count One of their counterclaims.  *Klayman*, 628 F. Supp. 2d at 160; *Klayman*, 661 F. Supp. 2d at 6.  Shortly before trial, however, they withdrew Counts Seven and Eleven of their counterclaims, *see* ECF Nos. 467 and 492, leaving Counts Two to Six and Eight to Ten for trial.  At trial, Defendants prevailed on each of those remaining counterclaims, *see* ECF No. 560 at 4–8, and were awarded $2.8 million in damages, *see* ECF No. 584 at 1; *see also* ECF No. 560 at 4–8.  Consistent with the law of this Circuit, the undersigned finds that Defendants were the "prevailing party" on Counts One to Six and Eight to Ten of their counterclaims, as they either were granted summary judgment or received favorable jury verdicts on those claims.  *See Langbord*, 2017 WL 3953954, at *1; *Ijeabuonwu*, 2010 WL 11707259, at *2.  However, Defendants were not the prevailing party on Counts Seven and Eleven of their counterclaims because they withdrew those claims prior to trial and did not otherwise achieve any sort of relief on them.  As explained, "prevailing party" status requires, among other things, a judgment "in favor of the party seeking the fees" and "judicial relief."  *Tillman*, 123 F. Supp. 3d at 55.  Defendants achieved neither on Counts Seven and Eleven of their counterclaims.  As such, they are not the "prevailing party" on those claims.  *See Doran*,

2003 WL 24205917, at *3 ("Because plaintiff voluntarily dismissed his . . . claim, as a practical matter, neither party was the prevailing party on that claim.").

###### 3.    Benson's Claims

Finally, Defendants are the prevailing party on Benson's three claims.  Recall that although Defendants attempted to sever Benson's claims from this case, that request was mooted by the Court's dismissal of the claims for want of subject matter jurisdiction.  *Klayman*, 2007 WL 140978, at *10–11, 24.  A defendant's victory on jurisdictional grounds renders it the prevailing party, *see Autor*, 128 F. Supp. 3d at 339, and the result should be no different here.

*          *          *          *          *

So, at this juncture of the analysis, it is evident that the Severance Agreement's fee-shifting provision is applicable to all claims at issue in this case, except Counts Seven and Eleven of Defendants' counterclaims, which were withdrawn before trial.  The next and final issue is the real meat of the matter, which is the quantum of "reasonable" attorneys' fees and costs Defendants are entitled to after prevailing on nearly all claims in this case.

##### C.    Reasonable Fees and Costs

The fee-shifting provision calls for the "prevailing party" to be awarded "the costs incurred in connection with" the "legal proceeding instituted on account of a Party's breach of [the Severance] Agreement," "including reasonable attorneys' fees and suit costs."  ECF No. 585-3 at 11.  While the Agreement does not define the term "reasonable attorneys' fees," both parties cite cases from this Circuit that have construed that term in other fee litigation.  *See* ECF No. 585-1 at 6–8; ECF No. 642 at 29–30.  Here, Defendants say they are entitled to $1,638,357 in fees and $24,866.61 in court costs.  ECF No. 644 at 4.  However, they concede that they have not actually billed or received those sums from Judicial Watch or its insurer.  *See* ECF No. 585-1 at 9 n.3; ECF

No. 585-9 at 7; ECF No. 638-9 at 3.  Instead, Defendants entered into a billing agreement with Judicial Watch and its insurer, and as a result of that agreement had been paid $718,174 in fees (as of January 2022).  *See* ECF No. 585-1 at 9 n.3; ECF No. 585-5 at 2 (stating that Defendants' counsel had been paid $598,030 in fees from 2006–2018); ECF No. 585-9 at 2–3; ECF No. 638-3 at 2 (stating that Defendants' counsel had been paid $120,144 in fees from 2019–2021).  The $1,638,357 figure was reached by multiplying the over 3,700 hours Defendants billed in this case by the rates set forth in the USAO Matrix, which, at the time Defendants filed their initial fee application, was an attorney's fee matrix maintained by the United States Attorney's Office for the District of Columbia and commonly used in fee litigation in this jurisdiction.[9]  ECF No. 585-1 at 8 ("To produce a reasonable and conservative fee, Judicial Watch is using the USAO Matrix calculate the lodestar amount for this case."); ECF No. 585-5 at 2; ECF No. 638-3 at 2.  That is, although Defendants did not actually bill or receive USAO Matrix rates from their clients or their clients' insurer, they now seek to receive USAO Matrix rates as "reasonable attorneys' fees."  *See* ECF No. 585-9 at 7 ("The lodestar amount is more than the actual dollar amount paid to date.").  Try as they may, Defendants have not sufficiently justified their bid for USAO Matrix rates and the undersigned therefore recommends awarding fees at the hourly rates Defendants actually billed

---

[9] At the time Defendants submitted their initial fee application in April 2019 (ECF No. 585) and their supplemental request in January 2022 (ECF No. 638), the USAO Matrix was still in use and being maintained by the United States Attorney's Office for the District of Columbia.  However, following criticism of the USAO Matrix by the D.C. Circuit in *DL v. District of Columbia*, 924 F.3d 585 (D.C. Cir. 2019), the United States Attorney's Office has since ceased updating the USAO Matrix and now utilizes a matrix it refers to as the "Fitzpatrick Matrix," named after the law professor commissioned to create it.  *See* "Attorney's Fees," U.S. Attorney's Office for the District of Columbia, *available at* https://www.justice.gov/usao-dc/civil-division (last visited Oct. 12, 2022).  According to Professor Fitzpatrick, the matrix was created "[b]y assembling data from a substantial number of cases and legal professionals involving a variety of complex litigation contexts, all litigated in the United States District Court for the District of Columbia[.]"  *See* Declaration of Brian T. Fitzpatrick, U.S. Attorney's Office for the District of Columbia, *available at* https://www.justice.gov/usao-dc/page/file/1504381/download (last visited Oct. 12, 2022); *see also Vollmann v. Dep't of Just.*, No. 12-cv-939, 2022 WL 1124814, at *6 n.4 (D.D.C. Apr. 14, 2022) ("The USAO's version of the *Laffey* Matrix—called the Fitzpatrick Matrix—is based on data for all types of lawyers from the entire metropolitan area.").  As with other matrices, the Fitzpatrick Matrix "operates along two axes, one corresponding to the year in which the work was completed and the other corresponding to the experience of the attorney who completed the work."  *Vollmann*, 2022 WL 1124814, at *7 n.5.

to and received from their clients.  As to the hours they say they expended on this litigation, Defendants' fee request does not account for the fact they were not the "prevailing party" on all of their counterclaims.  Accordingly, not all the hours for which Defendants seek payment are compensable.  For these reasons, the undersigned recommends that Defendants be awarded $682,265.30 in fees and $24,866.61 in costs.

Before turning to those issues, however, the undersigned will address Klayman's argument that a "full evidentiary hearing and discovery" are required in order to determine Defendants' "reasonable attorneys' fees."  ECF No. 642 at 29–31.  Neither is necessary in this case.

      1.     No Discovery or Evidentiary Hearing is Necessary to Resolve Defendants' Fee Application

Klayman's request for discovery and an evidentiary hearing is inconsistent with the law of this Circuit and should be denied.  Although Klayman does not explain, exactly, the type of information he wants or he would seek in discovery—and perhaps that is unsurprising, given that has already received Defendants' billing records—he later avers that discovery from Judicial Watch's insurer is necessary "to determine [the] amount actually billed and paid."  *Id.* at 32.  Yet the undersigned observes that Defendants have produced detailed billing records showing the type and amount of work performed (broken down in tenth-of-an-hour increments) and by which attorney and the hourly rate charged for that work.  *See* ECF No. 588-1 at 2–289; ECF No. 638-1 at 2–7; ECF No. 638-2 at 2–55.  Undeterred, Klayman cites heavily from the D.C. Circuit's opinion in *Nat'l Ass'n of Concerned Veterans*.  He highlights that court's pronouncements that "[a]n applicant [for attorneys' fees] is required to provide specific evidence of the prevailing community rate for the type of work for which he seeks an award" and "is only entitled to an award for time reasonably expended."  ECF No. 642 at 29 (quoting *Nat'l Ass'n of Concerned Veterans*, 675 F.2d at 1325).  Klayman then seizes on the passage in *National Association of Concerned Veterans*

stating that "the opponent [of the fee request] is entitled to the information it requires to appraise the reasonableness of the fee requested and in order that it may present any legitimate challenges to the application to the District Court." *Id.* at 30 (quoting *Nat'l Ass'n of Concerned Veterans*, 675 F.2d at 1329). That, he claims, "equates to discovery of the billing documentation submitted by the Defendants." *Id.* He also emphasizes the D.C. Circuit's admonition that "procedural fairness requires that a hearing be held where in the District Court's view material issues of fact that may substantially affect the size of the award remain in well-founded dispute" and argues that such a hearing is necessary here due to what he says is "the Defendants' and their counsel's pattern and practice of making false statements to the Court." *Id.* at 30–31 (quoting *Nat'l Ass'n of Concerned Veterans*, 675 F.2d at 1330). The undersigned concludes that nothing in *National Association of Concerned Veterans* requires the Court to hold a hearing or to permit discovery on Defendants' request for fees.

As to discovery, Defendants have provided the Court (and Klayman) with everything *National Association of Concerned Veterans* found was "essential" to the presentation of "any legitimate challenges to the [fee] application," including "the justification for the claimed billing rate and the nature and extent of the work done by the applicant's counsel on various phases of the case." 675 F.2d at 1329. Here, Defendants have furnished that information by providing hundreds of pages of billing records submitted to their client's insurer detailing "the nature and extent of the work" they performed—with the time entries describing the attorneys' activities down to the tenth of an hour—along with declarations "describ[ing] the work performed and 'the process by which the records were produced.'" *See* ECF No. 585-9 at 1–8; ECF No. 588-1 at 2–289; ECF No. 638-1 at 2–7; ECF No. 638-2 at 2–55; ECF No. 638-9 at 1–3; *Nasreen v. Capitol Petroleum Grp., LLC*, No. 20-cv-1867, 2022 WL 2119672, at *9 (D.D.C. Apr. 11, 2022), *report and recommendation*

*adopted*, 2022 WL 2116199 (D.D.C. June 13, 2022).  Additionally, the billing records show the hourly rates charged for the work performed and the accompanying affidavits go into further detail on the rate structure.  *See* ECF No. 585-9 at 1–8; ECF No. 588-1 at 2–289; ECF No. 638-1 at 2–7; ECF No. 683-9 at 1–3; ECF No. 638-2 at 2–55.  As *National Association of Concerned Veterans* explains, that gives the opponent of the fee petition all the documentation needed to interpose any "legitimate" objections.  *See* 675 F.2d at 1337 (noting that the fee request opponent "does not suggest that the record was inadequate to permit the District Court effectively to scrutinize the hours claimed" where, as here, "[a]ttached to the fee application were detailed schedules for each attorney who worked on the case listing specific tasks . . . and the hours expended on each").  Other courts in this Circuit have found that similar submissions satisfy the *National Association of Concerned Veterans* standard.  *See, e.g.*, *Robertson v. Cartinhour*, 883 F. Supp. 2d 121, 131 (D.D.C. 2012) (noting that the billing records submitted by the party seeking fees "fully satisfy the standard set forth in *Nat'l Ass'n of Concerned Veterans* . . . , since they show," as in this case, "each attorney's time, recorded to the nearest tenth of an hour, and each time entry is accompanied by a description of the work done and the hourly rate charged"), *aff'd*, 554 F. App'x 3 (D.C. Cir. 2014); *Combs v. Manor Mines, Inc.*, No. 83-cv-3642, 1987 WL 11416, at *1 (D.D.C. May 20, 1987) (noting that the opponent of a fee request "had information which could be used to challenge the [] claim for fees" when "bills and attorney time sheets were voluntarily provided to [the opponent] and that the material included 'verbatim transcriptions of the attorney's hand-written notations of the time expended each day on the task described therein'" (quoting the record)); *see also Ideal Elec. Sec. Co. v. Int'l Fid. Ins. Co.*, 129 F.3d 143, 151 (D.C. Cir. 1997) (noting that "billing statements" were "information necessary to" "appraise the reasonableness of the amount of fees requested").  Thus, Defendants have already provided Klayman with the information

necessary to evaluate the "nature and extent of the work done by the applicant's counsel on various phases of the case." *Nat'l Ass'n of Concerned Veterans*, 675 F.2d at 1329.  No further "discovery" is necessary or appropriate.

At bottom, Klayman's request for unspecified "[d]iscovery from Defendants' insurance carrier . . . to determine [the] amount[s] actually billed and paid," ECF No. 642 at 32, appears to be motivated not by an objection to a lack of documentation or the information contained in the billing records—which, again, have been provided to him—but rather by his belief that Defendants' counsel have made false statements in this litigation and are not to be trusted.  *See, e.g.*, ECF No. 642 at 30 (asserting that Defendants' counsel has a "pattern and practice of making false statements to the Court"); *id.* at 32 (claiming that Defendants' lead counsel "has shown a propensity to be dishonest with the Court").  To support those allegations, Plaintiff cites statements and arguments Defendants' counsel made in closing at trial that Plaintiff says vastly overstated their damages. *Id.* at 30 n.2  As an initial matter, the undersigned observes that at no point in this lengthy litigation has the Court ever found that Defendants' counsel made knowing or willful misrepresentations to either it or the jury.  Likewise, there is no indication—and Klayman does not specifically allege—that the billing records Defendants have submitted are not true and correct or are not the records actually submitted to Judicial Watch's insurer for payment.  Indeed, they appear to be just that, and, although Klayman has generally attacked the character of Defendants' counsel and highlighted allegedly false statements made during Defendants' summation at trial, Klayman has not proffered any reason to conclude otherwise.  *See, e.g.*, ECF No. 638-2 at 18 (letterhead showing an "invoice" from Defendants' counsel to Judicial Watch's insurer).

Further, although Klayman says his request for discovery and a hearing is based on what he claims are Defendants' unreasonable rates and their request for fees beyond the scope of the

Severance Agreement (the latter argument the undersigned has already rejected), those are not reasons to permit discovery at this stage of the case.   As *National Association of Concerned Veterans* explained, discovery is appropriate when the opponent of the fee request lacks the "information it requires to appraise the reasonableness of the fee requested and in order that it may present any legitimate challenges."   675 F.2d at 1329.   As outlined above, Defendants have provided that information, and Klayman has had the opportunity to review that extensive documentation and lodge objections (indeed, he has).[10]  Given that, Klayman's personal attacks on counsel's character and allegations of misrepresentations made at trial are, in these circumstances, surely not the type of "legitimate challenge[]" *National Association of Concerned Veterans* envisioned might merit discovery.  *Id.*  At this late hour, Klayman has had the opportunity to raise and litigate issues concerning any false statements made at trial, yet neither this Court nor the D.C. Circuit has ever made such a finding, and the jury's verdict has been affirmed.  The case is effectively over, and the undersigned sees no merit in Klayman's suggestion that allegations of dishonesty during trial be relitigated now.  As Judge Tamm cautioned in his *National Association of Concerned Veterans* concurrence, "courts should examine with care the 'issues' raised by parties opposing fee requests and reject "broadly based, ill-aimed attacks, nor nit-picking claims."

---

[10] Klayman also says that, during discovery, "each and every one of the billing records submitted by the Defendants will be under review."  ECF No. 642 at 31.  Although Klayman does not further expand or elaborate on that argument or its significance here, the undersigned makes a few observations in response.  First, as should be clear by now, "each and every one of the billing records submitted by the Defendants" are "under review" *now* because, again, Defendants have submitted them as part of their fee request.  Further, to the extent Klayman means to say that it is the Court's duty to go line-by-line through Defendants' billing records and identify objectionable entries on his behalf, he is mistaken.  It is assuredly not the undersigned's job to proceed entry-by-entry through the billing records, much less do Klayman's job of resisting the fee petition for him.  *See, e.g.*, *Muldrow v. Re-Direct, Inc.*, 397 F. Supp. 2d 1, 5 (D.D.C. 2005) ("[I]t is not the Court's obligation to perform a line-by-line examination of plaintiff's expenses in the absence of any specific objections.");  *McKenzie v. Kennickell*, 645 F. Supp. 437, 442 (D.D.C. 1986) ("In reviewing this [fee] petition, the Court has endeavored to fairly and equitably assess all reasonable challenges to plaintiffs' claims, but has resisted and will continue to resist the government's invitation to undertake a line by line examination of the fee request.");  *see also Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983) ("A request for attorney's fees should not result in a second major litigation.").  The Court's duty is to ensure that fee request opponents have the information they need to lodge "legitimate challenges," not to manufacture those challenges for them.  *Nat'l Ass'n of Concerned Veterans*, 675 F.2d at 1329.

675 F.2d at 1338. Klayman's broadsides against Defendants' counsel are, as Judge Tamm warned, "more in the nature of a blunderbuss attack than a precise and well-founded challenge" and do not support his request for discovery. *Id.*

Klayman's request for an evidentiary hearing is also without merit. *National Association of Concerned Veterans* indicated that hearings to adjudicate fee applications are appropriate when "in the District Court's view material issues of fact that may substantially affect the size of the award remain in well-founded dispute." 675 F.2d at 1330. Here, Klayman has raised no legitimate *factual* issues, and the undersigned cannot perceive any that would merit a full-blown evidentiary hearing. Notably, Klayman has provided no reason to disbelieve the veracity of the billing records Defendants have submitted. Of course, there are a bevy of *legal* issues implicated in Defendants' fee request, such as the scope of the fee-shifting provision and what a "reasonable" fee is. But, and as already demonstrated with the former issue, those are questions the Court can adjudicate without turning the fee request into a highly disfavored "second major litigation." *Hensley*, 461 U.S. at 437. Thus, Klayman's contention that a hearing is needed to, among other things, "determine the amount of fees that were improperly claimed by Defendants that fall outside the scope of the Severance Agreement," ECF No. 642 at 33, is misguided and incorrect. And it is far from surprising that no hearing is needed in this case. Indeed, the D.C. Circuit suggested in *National Association of Concerned Veterans* that such situations would be anomalous because "[d]isputed issues of fact frequently can be adequately resolved by the documentation accompanying the fee application." 675 F.2d at 1330. That is the case here.

Thus, the undersigned recommends that the Court find that Klayman is entitled neither to discovery nor to an evidentiary hearing on Defendants' fee request. Defendants have already provided all the information and documentation the D.C. Circuit has said is necessary for Klayman

to interpose any legitimate objections, and Klayman has not identified any material factual issues that would require testimony before or fact-finding by the Court.  The undersigned will now address the reasonableness of Defendants' fee request.

        2.      Reasonable Hourly Rate

The component parts of "reasonable attorneys' fees" are reasonable hourly rates and a reasonable number of hours.  *See Nasreen*, 2022 WL 2119672, at *3.  As explained, Defendants seeks fees in line with the USAO Matrix rates for their work in this case, which dates back to 2006.  ECF No. 585-1 at 8; ECF No. 585-5 at 2; ECF No. 638-3 at 2.  They candidly admit, however, that they have not been paid at USAO Matrix rates during these proceedings but have instead received lower rates pursuant to agreements with Judicial Watch and its insurer.  ECF No. 585-1 at 9 n.3; ECF No. 585-9 at 2–3.  The undersigned finds that Defendants have not adequately justified their request for USAO Matrix rates and concludes that the rates Defendants actually negotiated and received from Judicial Watch and its insurer best reflect the "reasonable rate" in this case.

        *a.*      *Defendants Have Not Properly Substantiated Their Request for USAO Matrix Rates*

Although they admittedly bore the "burden of establishing the reasonableness of the[ir] hourly rates," Defendants have not appropriately justified their request for fees at USAO Matrix rates.  ECF No. 585-1 at 7.

        i.      Legal Standard

"The party seeking fees bears the burden of establishing entitlement to an award."  *Serv. Emps. Int'l Union Nat'l Pension Fund*, 2018 WL 6790314, at *2 (citation omitted); *see also WP Co. LLC v. U.S. Small Bus. Admin.*, 514 F. Supp. 3d 267, 275 (D.D.C. 2021) (noting "the well-established principle that fee-seekers bear the 'burden of justifying their requested rates'")

(quoting *Salazar ex rel. Salazar v. District of Columbia*, 809 F.3d 58, 64 (D.C. Cir. 2015))); *Cobell v. Jewell*, 234 F. Supp. 3d 126, 168 (D.D.C. 2017) (noting that the party seeking attorney fee award bears the burden of proof on issue of reasonable rate), *aff'd sub nom. Cobell v. Zinke*, 741 F. App'x 811 (D.C. Cir. 2018).  While "[t]he initial burden to establish an hourly rate lies with the fee applicant," the counterparty can certainly rebut the applicant's showing "with other evidence." *Lewis v. D.C. Gov't*, No. 15-cv-521, 2018 WL 6308722, at *6 (D.D.C. Dec. 3, 2018).

Reasonable rates are "in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Covington v. District of Columbia*, 57 F.3d 1101, 1109 (D.C. Cir. 1995) (quoting *Blum*, 465 U.S. at 896 n.11).  In this Circuit, "fee petitioners may use 'two separate, but inter-related, approaches to providing evidence of prevailing market rate.'" *Pugh v. District of Columbia*, No. 18-cv-820, 2018 WL 6790170, at *5 (D.D.C. Sept. 28, 2018) (quoting *Reed v. District of Columbia*, 843 F.3d 517, 521 (D.C. Cir. 2016)); *see also 12 Percent Logistics, Inc. v. Unified Carrier Registration Plan Bd.*, No. 17-cv-2000, 2020 WL 1429904, at *6 (D.D.C. Mar. 23, 2020) (describing a similar, two-pronged approach).  First, a fee applicant may "show that [the litigation] generally 'fall[s] within the bounds' of 'complex federal litigation' and therefore that some version of a *Laffey* matrix presumptively applies." *Pugh*, 2018 WL 6790170, at *5 (quoting *Reed*, 843 F.3d at 521).  Second, "a petitioner may demonstrate the prevailing market rate based on 'the fees charged, and received, by'" attorneys who litigate in that subject matter field.  *Id.* (quoting *Reed*, 843 F.3d at 521). "[L]itigators taking [the] second approach may still argue that their rates are equivalent to *Laffey* Matrix rates," but the "second approach to establishing the prevailing market rate is 'not conceptually linked to the *Laffey* Matrix.'"  *12 Percent Logistics*, 2020 WL 1429904, at *6 (quoting *Reed*, 843 F.3d at 521).

As to the first approach, it "requires more than a conclusory declaration by counsel but an actual explanation of why the case deserves the label 'complex.'" *12 Percent Logistics*, 2020 WL 1429904, at *7 (quoting *Reed*, 843 F.3d at 525).  Factors that can inform the determination of whether a case is "complex" include the scope of the claims and their procedural history, the nature—including the novelty and difficulty—of the legal issues implicated, the extensiveness of the motion practice and discovery, the overall length of the litigation, and the adversarial nature of the litigants.  *See, e.g.*, *Thomas v. Moreland*, No. 18-cv-800, 2022 WL 2671272, at *4 (D.D.C. Mar. 4, 2022) ("The history of this case demonstrates its complexity.  This litigation has been highly adversarial, involving extensive motion practice, including motions to dismiss, to compel, and for a protective order.  The parties have conducted discovery and the case has been pending for more than two years.  This breadth of motion practice and discovery comports with other cases that courts have deemed complex."), *report and recommendation adopted as modified*, 2022 WL 2168109 (D.D.C. June 16, 2022); *Spanski Enters. v. Telewizja Polska S.A.*, 278 F. Supp. 3d 210, 219 (D.D.C. 2017) (finding the litigation complex because it involved complicated and extensive discovery and multiple filings "over a period of years"); *see also Reed*, 843 F.3d at 525 (noting that litigation without extensive discovery is not complex); *Snead v. District of Columbia*, 139 F. Supp. 3d 375, 380 (D.D.C. 2015) (noting that cases without formal discovery, lengthy argument, extended motion practice, and multiple hearings are not complex); *cf. 12 Percent Logistics*, 2020 WL 1429904, at *7 (noting that a party's "decision to file a bevy of motions—most ending unsuccessfully—cannot, without more, qualify [a] case as 'complex federal litigation,' especially where the case required no discovery nor any specialized non-legal knowledge").[11]

---

[11] The fee applicant in *12 Percent Logistics* articulated the following factors it says the original *Laffey* court considered in determining whether a case was "complex":

Further, once a court finds that a case "qualifies as complex federal litigation to which one of the fee matrices presumptively applies, the [c]ourt must determine" which of the matrices is most appropriate to apply. *DL v. District of Columbia*, 267 F. Supp. 3d 55, 69 (D.D.C. 2017), *vacated and remanded on other grounds*, 924 F.3d 585 (D.C. Cir. 2019); *see also Gatore v. United States Dep't of Homeland Sec.*, 286 F. Supp. 3d 25, 36 (D.D.C. 2017) ("[O]nce a plaintiff has made [the] threshold showing" that a case is "complex federal litigation," "the issue then becomes which version of the *Laffey* Matrix applies, and a plaintiff must show that its desired version properly reflects the prevailing rates for complex federal litigation."), *abrogated on other grounds by DL*, 924 F.3d 585. To be clear, it is the fee applicant's burden to justify one matrix over another. *Lewis*, 2018 WL 6308722, at *6. "Implicit but firmly rooted in" the question of which matrix to apply "is an inquiry into the soundness of the methodology used to develop each rate schedule. A more methodologically sound matrix is more likely to reflect the prevailing market rate in the relevant community." *Id.* Factors informing the soundness of a fee matrix for "complex federal litigation" in Washington, D.C. include, but are not limited to, the geographical scope of the practitioners surveyed, the type and number of practitioners surveyed, and the multiplier used to calculate the change (i.e., increase) in rates from year to year. *DL*, 924 F.3d at 592. How the fees reflected in the matrix compare to "various commercially-available rate surveys" can also be relevant. *Id.* at 590. Additionally, experts can be called upon to explain why one matrix "is a

---

(1)  its posture as a class action on behalf of over 3,300 plaintiffs; (2) the implication of almost all of the defendant's employment practices; (3) the large number of factual and legal issues; (4) the need for the plaintiffs to conduct extensive investigation and discovery; (5) the lack of significant binding precedent defining the controlling legal standards; (6) the presence of a well-financed corporate defendant; and (7) the protracted length of the litigation.

*12 Percent Logistics, Inc. v. Unified Carrier Registration Plan Bd.*, No. 17-cv-2000, 2020 WL 7248347, at *4 (D.D.C. Dec. 9, 2020). .

better measure of the change in prices for legal services in Washington, D.C." than another matrix. *Salazar*, 809 F.3d at 64.

One of the primary ways for the opponent of a fee application to rebut the application of a fee matrix is to identify "a submarket in which attorneys' hourly fees are generally lower than the rates in . . . the *Laffey* Matrices.'" *Id*. When a submarket is identified, the fee applicant's evidentiary burden to justify their rates ratchets up. In *Eley v. District of Columbia*, 793 F.3d 97 (D.C. Cir. 2015), the D.C. Circuit held that because the opponent of a fee application in an IDEA matter "had shown that hourly fees were generally lower in the IDEA litigation context" than LSI *Laffey* Matrix rates, the fee applicant could not show the reasonableness of her requested rates merely by citing to an applicable matrix. *Reyes v. Kimuell*, 270 F. Supp. 3d 30, 38 n.9 (D.D.C. 2017) (explaining that "[t]he decision in *Eley* required the fee applicant to do more than point to the applicable *Laffey* matrix," but that "the D.C. Circuit later clarified in *Salazar* that the applicants in *Eley* faced a higher burden because defendants had shown that hourly fees were generally lower in the IDEA litigation context"). Thus, if a submarket is identified, "[a] fee applicant does not meet its burden merely by submitting" a matrix "with a fee application. Rather, the applicant is obliged to demonstrate that the suggested rates in the matrix are 'in line with those prevailing in the community for similar services.'" *Serrano v. Chicken-Out Inc.*, 209 F. Supp. 3d 179, 195 (D.D.C. 2016) (quoting *Eley*, 793 F.3d at 104). To do that, parties can "supplement [the matrices] with other evidence such as 'surveys to update the[m]; affidavits reciting the precise fees that attorneys with similar qualifications have received from fee-paying clients in comparable cases; and evidence of recent fees awarded by the courts or through settlement to attorneys with comparable qualifications handling similar cases.'" *Id.* (quoting *Eley*, 793 F.3d at 101). On the other hand, if a fee opponent does not identify a submarket and instead argues that another fee

matrix should apply, then it may be found to have "acquiesce[d] in the notion that the litigation at issue qualifies as complex federal litigation (as to which the *Laffey* Matrices apply)." *Salazar*, 809 F.3d at 64. Thus, "the holding in *Salazar* puts at least some of the onus on the fee opponent to challenge the use of *Laffey* rates." *Martinez v. Asian 328, LLC*, No. 15-cv-1071, 2016 WL 1698261, at *7 (D.D.C. Apr. 27, 2016).

*     *     *     *     *

To recap, and for clarity, the fee applicant bears the burden of establishing the reasonableness of the requested rates. One method by which reasonableness can be established is by reference to fee matrices. A party seeking to rely on a fee matrix must first show that the case is "complex federal litigation." If a case qualifies as "complex federal litigation," one of the various fee matrices in use in this Circuit is presumptively applicable. But the fee applicant must then justify their request for a *particular* fee matrix through evidence supporting "the soundness of the methodology used to develop" their requested matrix. *Lewis*, 2018 WL 6308722, at *6. An opponent of a fee application may rebut the presumptive application of a fee matrix through a showing that there exists "a submarket in which attorneys' hourly fees are generally lower than the rates" in the matrices. *Salazar*, 809 F.3d at 64. The fee applicant must then marshal evidence showing that the rates in their desired fee matrix are nevertheless "in line with those prevailing in the community for similar services." *Eley*, 793 F.3d at 104.

With these principles in mind, the undersigned addresses Defendants' fee application.

        ii.     Defendants' Have Not Shown Entitlement to USAO Matrix Rates.

The undersigned concludes that Defendants have not justified their request for hourly rates as set by the USAO Matrix. At the outset, the undersigned notes that Klayman has not identified a "submarket" for this type of litigation, which involves intellectual property, defamation, and

contract claims.  But neither does he "acquiesce" in the notion that the case qualifies as complex federal litigation.  *See* ECF No. 642 at 31–32.  Indeed, Klayman seems to argue—his briefs are not clear on this point—that Defendants' rates should not be determined by reference to any fee matrix, but rather by what they actually billed to and received from their clients' insurer.  *See id.* (arguing that "[d]iscovery from Defendants' insurance carrier is needed to determine amount actually billed and paid").  On the other hand, although Defendants assert that they are entitled to the hourly rates set in the USAO Matrix, they have not even attempted to explain why this case qualifies as complex federal litigation.[12]  *See* ECF No. 585-1 at 7–9; ECF No. 638 at 5–6; ECF No. 644 at 3.

Yet even assuming this case is, in fact, complex federal litigation and there is no submarket for the type of claims litigated here, Defendants did not meet their burden to adequately support their request for USAO Matrix rates as opposed the rates proffered in a competing matrix, the LSI *Laffey* Matrix.  Along with submitting the USAO Matrix for the years in which they seek fees, Defendants' justification for USAO Matrix rates goes something like this:  Courts in this Circuit have applied the USAO Matrix in other cases, and the USAO Matrix produces rates that are lower (and therefore more "reasonable") than the LSI *Laffey* Matrix.  *See* ECF No. 585-1 at 7–8; ECF No. 585-9 at 2.  That is all they offer, but here, where the non-prevailing party is challenging the application of any fee matrix, that is not enough.  Critically, Defendants totally failed to analyze "the soundness of the methodology used to develop" the USAO Matrix.  *Lewis*, 2018 WL 6308722,

---

[12] That said, under the factors courts in this Circuit have identified as relevant in determining whether a case is "complex federal litigation," the undersigned believes such a showing could be made here given the length of the case (sixteen years), the variety of claims brought and legal issues raised (intellectual property, contract, and defamation), the extensive nature of the briefing (numerous motions to dismiss and for summary judgment), a contentious and lengthy discovery process (numerous discovery motions and appeals therefrom), the fact that the case was tried by a jury (which is increasingly uncommon in federal civil cases), and the adversarial nature of the parties, making the proceedings all the more protracted.

at *6.  That is, Defendants never addressed the core inputs of that matrix—the billing information and rate data that was used to construct the matrix—and whether those inputs are appropriate.  In fact, since Defendants sought hourly rates at USAO Matrix levels in their initial fee petition, the D.C. Circuit has held that that matrix is deeply flawed due to its inadequate inputs.  *See DL*, 924 F.3d 585.[13]  Specifically, *DL* faulted the USAO Matrix for "incorporat[ing] rates from *all* types of lawyers," rather than lawyers practicing complex federal litigation, or even from litigators alone.  *Id.* at 592.  "Compounding this first error" was the fact that the USAO Matrix relied on rates charged by attorneys from a broad geographical swathe, "from rural Madison County, Virginia, to the eastern shore of Maryland, back to the foothills of Jefferson County, West Virginia."  *Id.*  So biting was *DL*'s critique of the USAO Matrix that the United States Attorney's Office for the District of Columbia—the architect and keeper of that matrix—subsequently interred it and instead commissioned the creation of a new fee matrix that was published in early 2022.  *See* Fitzpatrick Matrix—2013–2022, *available at* https://www.justice.gov/usao-dc/page/file/1504361/download (last visited Oct. 12, 2022); *see also* USAO Attorney's Fee Matrix—2015–2021, *available at* https://www.justice.gov/file/1461316/download (noting that the development of a revised fee matrix was "motivated in part by" *DL*) (last visited Oct. 12, 2022).  The propriety of that new matrix, referred to as the Fitzpatrick Matrix, is yet to be determined, and Defendants do not invoke it here.  Likewise, Defendants neither request nor meaningfully attempt to justify receiving the hourly rates set forth in the LSI *Laffey* Matrix, whose rates are higher than both the discredited USAO Matrix and its successor, the Fitzpatrick Matrix.  *Compare* Laffey Matrix,

---

[13] To be clear, the D.C. Circuit decided *DL* a nearly two months after Defendants submitted their initial fee request which sought hourly rates at USAO Matrix levels.  *Compare* ECF No. 585 (filed April 1, 2019) *with DL*, 924 F.3d 585 (decided May 21, 2019).  Still, Defendants were provided an opportunity earlier this year to supplement their fee application, *see* ECF No. 642, yet in that submission they still seek USAO Matrix rates and do not acknowledge *DL* or address its impact here.

www.laffeymatrix.com/see.html (last visited Oct. 12, 2022) *with* Fitzpatrick Matrix, *available at* https://www.justice.gov/usao-dc/page/file/1504361/download and USAO Attorney's Fee Matrix—2015–2021, *available at* https://www.justice.gov/file/1461316/download.

For these reasons, and in this case where the non-prevailing party is objecting to the use of any fee matrix, the undersigned recommends against awarding Defendants fees based on hourly rates set in the USAO Matrix.  Defendants did not make the necessary evidentiary showing to justify those hourly rates and, in any event, the USAO Matrix has been repudiated by the D.C. Circuit and abandoned by the United States Attorney's Office.

> b.  *The Rates Defendants Actually Billed and Received Represent a "Reasonable Rate"*

The undersigned instead recommends that the Court award Defendants the fees they actually billed to and received from Judicial Watch and its insurer.  Indeed, the Court may "begin with the premise that, in the ordinary case, a fee based on the actual rates an attorney charges would be prima facie reasonable.  There is no better indication of what the market will bear than what the lawyer in fact charges for his services and what his clients pay."  *Griffin v. Washington Convention Ctr.*, 172 F. Supp. 2d 193, 197 (D.D.C. 2001); *see also Baylor v. Mitchell Rubenstein & Assocs., P.C.*, 735 F. App'x 733, 735 (D.C. Cir. 2018) ("[A]n attorney's usual billing rate is presumptively the reasonable rate." (internal quotation marks omitted) (quoting *Baylor v. Mitchell Rubenstein & Assocs., P.C.*, 282 F. Supp. 3d 203, 210 (D.D.C. 2017))); *Cobell*, 234 F. Supp. 3d at 167 (similar, and therefore "bas[ing] its award of fees under [counsel's] engagement letter on the hourly rate for him included in that contract with the [p]laintiffs"); *Save Our Cumberland Mountains, Inc. v. Hodel*, 651 F. Supp. 1528, 1537 (D.D.C. 1986) ("If an attorney is involved in private practice the hourly rate charged for his or her services is presumptively a reasonable rate."). Indeed, "[i]n an efficient market, a 'reasonable' rate set by the court should mirror the attorney's

actual rate because no attorney will charge less than that rate if he can get it and no client will pay more." *Griffin*, 172 F. Supp. 2d at 197.  Unsurprisingly, then, "[t]here is considerable precedent holding that 'negotiation and payment of fees by sophisticated clients are solid evidence of their reasonableness.'" *United States Equal Emp. Opportunity Comm'n v. George Washington Univ.*, No. 17-cv-1978, 2020 WL 3489478, at *12 (D.D.C. June 26, 2020) (quoting *Bleecker Charles Co. v. 350 Bleecker St. Apartment Corp.*, 212 F. Supp. 2d 226, 230 (S.D.N.Y. 2002)).  Indeed, Klayman appears to concede that—or, at the very least, he does not object to the notion that—Defendants should be compensated based on the actual rates they billed to and received from their insurer. *See, e.g.*, ECF No. 642 at 32 (arguing the need to "to determine amount actually billed and paid" to Defendants' counsel).  Here, Defendants' counsel "was initially retained in April 2006 and agreed to accept blended rates of $175/hour for partners and $125/hour for associates through Judicial Watch's insurance carrier."  ECF No. 585-9 at 2.  Those rates were below the USAO Matrix rates in that year.  *See* Laffey Matrix, 2003-2014, U.S. Attorney's Office for the District of Columbia, *available at* https://www.justice.gov/sites/default/files/usao-dc/legacy/2013/09/09/ Laffey_Matrix%202014.pdf.  Still, there is nothing to suggest that the agreement between Defendants' counsel and Judicial Watch and its insurer was not the product of an arm's-length negotiation between sophisticated parties.  Defendants' lead counsel—who, at the time his firm was retained, had been practicing law for 15 years—took on the representation freely and, ostensibly, with full understanding that the rates negotiated were lower than the USAO Matrix rates.  ECF No. 585-9 at 8.  Notably, counsel admits that his firm's model "capitalize[s] on operating efficiency and establish[es] legal service rates that are somewhat less than prevailing market rates."  *Id.* at 3.  In such circumstances, the agreed-upon rates "'are solid evidence of their

reasonableness.'" *United States Equal Emp. Opportunity Comm'n*, 2020 WL 3489478, at *12 (quoting *Bleecker Charles Co.*, 212 F. Supp. 2d at 230).

Indeed, and as many courts in this Circuit have recognized, there is nothing inherently unreasonable about awarding fees in the amount the lawyer agreed to receive from the client. *See, e.g.*, *Nasreen*, 2022 WL 2119672, at *9 (finding that rate counsel actually charged the client was a reasonable rate); *Cobell*, 234 F. Supp. 3d at 167 (concluding that a "reasonable rate" was the "hourly rate . . . included in" the attorney's engagement letter with the client); *see also Pryor v. District of Columbia*, No. 18-cv-921, 2018 WL 4782324, at *10 (D.D.C. Sept. 18, 2018) (granting prevailing party's request for the fees they expended on an expert witness in the amount of the fees actually paid to the witness because the witness's "rate reflects 'what the market will bear'—that is, the prevailing rate—for the services of the kind and quality she offers"), *report and recommendation adopted*, 2018 WL 4778929 (D.D.C. Oct. 3, 2018); *Norden v. Clough*, 674 F. Supp. 2d 126, 130 (D.D.C. 2009) (awarding fees consistent with the fees the attorney actually received from their client). That is so even if the agreed-upon rate is lower than the USAO Matrix rates. *See, e.g.*, *Nasreen*, 2022 WL 2119672, at *9 (finding that rate hundreds of dollars lower than the USAO Matrix rate was reasonable); *Crabtree v. Overcash Pipeline LLC*, No. 20-cv-1506, 2021 WL 6753416, at *7 (D.D.C. June 7, 2021) (same), *report and recommendation adopted*, 2021 WL 6753415 (D.D.C. Sept. 29, 2021); *Palisades Operations*, 2018 WL 6790314, at *3 (same). The fee-shifting provision entitles Defendants' counsel to "reasonable attorneys' fees," and the rates they actually received from Judicial Watch's insurer over the course of more than 10 years certainly fall within the realm of reasonableness.[14]

---

[14] It is true that courts in this Circuit have allowed attorneys to recover from their opponents a greater sum in fees than actually paid by their clients where "the fees actually paid by the client were discounted for public spirited reasons." *Flynn v. Dick Corp.*, 624 F. Supp. 2d 125, 130 (D.D.C. 2009); *see also Krodel v. Young*, 576 F. Supp. 390, 397 n.9 (D.D.C. 1983), *aff'd*, 748 F.2d 701 (D.C. Cir. 1984). In *Cumberland Mountains, Inc. v. Hodel*, 857 F.2d 1516 (D.C.

Notably, other courts have reached similar conclusions in cases also involving third-party insurers paying litigation costs. *See, e.g.*, *Medifast, Inc. v. Minkow*, No. 10-cv-382, 2015 WL 13827934, at *2 (S.D. Cal. Mar. 24, 2015) (concluding that, "in light of the very large amount of hours billed," it was "reasonable to award fees at the rates [defendant's] counsel billed her insurance carrier, rather than the higher rates counsel request"); *Senior Home Health Care, Inc. v. Sunrise Med. HHG, Inc.*, No. 08-cv-10064, 2009 WL 2444463, at *8–*9 (E.D. Mich. Aug. 7, 2009) (awarding fees actually charged to and received from client's insurer instead of higher rates fee applicant later sought where, similar to here, the opponent of the fee application "concede[d] that '[t]he hourly rates actually charged to [the insurer] are an acceptable reasonable rate'" (quoting the record)).  And even when insurers are not involved, some courts have been wary of awarding fees at rates higher than those the parties actually negotiated. *See, e.g.*, *Fla. Int'l Univ. Bd. of Trustees v. Fla. Nat'l Univ., Inc.*, No. 13-cv-21604, 2019 WL 3412159, at *4 (S.D. Fla. June 17, 2019) (awarding a fee applicant "the hourly rates actually paid by [the party] to its counsel" where, as here, "the difference between the agreed-upon rates and the requested rates [was] hundreds of thousands of dollars"), *report and recommendation adopted*, 2019 WL 5260154 (S.D. Fla. Aug. 28, 2019); *Hines v. Plane Paint, Inc.*, 430 F. Supp. 2d 598, 608 (S.D. Miss. 2005) (concluding that a fee opponent "should not be assessed fees based upon a higher rate than that actually charged to the" opposing party, which negotiated a lower rate with their attorneys "in order to keep the litigation economically feasible").  Here, the rates Defendants' counsel actually billed to Judicial

---

Cir. 1988), for example, the D.C. Circuit held that "attorneys who practice 'privately and for profit but at reduced rates reflecting noneconomic goals' must be compensated at the prevailing market rates rather than the actual and reduced rates they charge clients deemed worthy of those reduced rates."  *Griffin*, 172 F. Supp. at 198 (quoting *Hodel*, 857 F.2d at 1524)).  That is not the case here.  Even assuming Judicial Watch is a "public interest group," there is no evidence to support a finding—and Defendants' counsel does not claim—that counsel discounted the rates it agreed to receive from Judicial Watch's insurer because they "believ[ed] that the firm ha[d] a public responsibility" to act as Judicial Watch's counsel.  *Id.* at 198.  Thus, this is not a scenario in which the Court should boost rates that were "discounted for public spirited reasons."  *Flynn*, 624 F. Supp. 2d at 130.

Watch and its insurer were, at the very least, reasonable (albeit below Defendants' counsel's normal rates) in that they were the product of an arm's length negotiation and were in fact paid and accepted as payment over the course of more than ten years. Defendants have provided no legitimate basis on which to ignore those negotiated fees and instead award now-discredited USAO Matrix rates. The undersigned recommends that the Court decline to do so, and instead award Defendants' the attorneys' fees and costs billed to and paid by Judicial Watch and its insurer.[15]

3.    Reasonable Hours

The other component of "reasonable attorneys' fees" is calculating the reasonable number of hours worked. *See Tequila Centinela, S.A. de C.V. v. Bacardi & Co.*, 248 F.R.D. 64, 68 (D.D.C. 2008). Defendants seek payment on all of the 3,753.1 hours they say they have expended over the life of this lengthy litigation. Although the undersigned finds that figure not unreasonable for a case of this length and complexity, the undersigned finds that some of Defendants' time is non-compensable.

---

[15] The undersigned is cognizant that the Severance Agreement's fee-shifting provision calls for an award of "reasonable attorneys' fees," ECF No. 585-3 at 11, and that "reasonable" and "actual" attorneys' fees are not necessarily synonymous, *see, e.g.*, *Sierra Club v. Jackson*, 926 F. Supp. 2d 341, 349 (D.D.C. 2013) ("Where an attorney seeks fees pursuant to an attorney fee provision in a statute, evidence of actual rates paid by paying clients is probative of the reasonable rate, but is not determinative."); *see also Nat'l Ass'n of Concerned Veterans*, 675 F.2d at 1326 (explaining that a reasonable rate is "not what [an attorney] would have liked to receive, or what the client *paid* in a single fortunate case, but what on average counsel has in fact *received*." (emphasis added)). But the critical difference between *Sierra Club* and cases like it, and the one at hand is that, in the former, litigants are attempting to recover fees under fee-shifting provisions in civil rights statutes and other laws permitting redress against the government. Those "fee-shifting provisions are intended to encourage private individuals and their attorneys to bring lawbreakers to account and thus secure broad compliance with this nation's civil rights laws." *Buljina v. Astrue*, 828 F. Supp. 2d 109, 112 (D.D.C. 2011). On the other hand, contractual fee-shifting provisions are intended primarily to make the non-breaching party whole, thereby "securing the benefit of the parties' bargain." *TruGreen Companies, L.L.C. v. Mower Bros., Inc.*, 953 F. Supp. 2d 1223, 1239 n.58 (D. Utah 2013), *aff'd*, 570 F. App'x 775 (10th Cir. 2014); *see also Hetronic Int'l, Inc. v. Rempe*, 697 F. App'x 589, 590–91 (10th Cir. 2017) (noting that "the purpose of an award of attorneys' fees under the federal civil rights acts or other statutes is fundamentally different from the purpose of a contract for fees between parties in a commercial agreement" (quoting *U.S. ex rel. C.J.C., Inc. v. W. States Mech. Contractors, Inc.*, 834 F.2d 1533, 1547 (10th Cir. 1987))). Awarding Defendants the fees they (through their insurer) actually paid in this matter suffices to make them whole. More, in this Circuit, courts have repeatedly said that the fees counsel actually receives from their client is a prime indicator of reasonableness, *see, e.g.*, *Griffin*, 172 F. Supp. 2d at 197; *Cobell*, 231 F. Supp. 2d at 302–03, and Defendants have not justified their request for higher rates. Thus, in this case, "actual" and "reasonable" rate paid for Defendants' fees are one and the same.

a. *Legal Standards*

The party seeking fees "bears the burden of establishing that the hours billed and sought for reimbursement are reasonable." *Lima Lucero v. Parkinson Constr. Co., Inc.*, No. 18-cv-515, 2019 WL 2745068, at *2 (D.D.C. July 1, 2019) (citation omitted); *Beck v. Test Masters Educ. Servs., Inc.*, 289 F.R.D. 374, 382–83 (D.D.C. 2013) ("The moving party bears the burden to prove that the request is reasonable, and the Court has discretion to adjust the fee award in light of the opposing party's objections."). To support the reasonableness of the hours for which a party seeks reimbursement, the party must "maintain contemporaneous, complete and standardized time records which accurately reflect the work done by each attorney." *Weisberg v. Webster*, 749 F.2d 864, 873 (D.C. Cir. 1984) (internal quotation marks omitted) (quoting *Nat'l Ass'n of Concerned Veterans*, 675 F.2d at 1327). The party must submit "[a] log of the hours for which they request compensation, supported by a sworn declaration from the supervising attorney." *Beck*, 289 F.R.D. at 384; *see also Wilcox v. Sisson*, No. 02-cv-1455, 2006 WL 1443981, at *3 (D.D.C. May 25, 2006) ("A fee applicant may satisfy its burden of demonstrating that its time was reasonably spent by submitting 'sufficiently detailed information about the hours logged and the work done' that permits the district court to 'make an independent determination whether or not the hours claimed are justified.'" (quoting *Cobell*, 231 F. Supp. 2d at 306)). The attorney's declaration should describe the work performed and "the process by which the records were produced[.]" *Beck*, 289 F.R.D. at 384. Additionally, "[i]n determining whether billed hours are reasonable, courts should exclude hours that were not reasonably expended." *Lima Lucero*, 2019 WL 2745068, at *2. Hours that are "duplicative, excessive, or otherwise unnecessary" are also not compensable. *Ventura v. Bebo Foods, Inc.*, 738 F. Supp. 2d 8, 33–34 (D.D.C. 2010). And, as might be expected, time spent briefing issues on which the moving party ultimately did not prevail is not compensable. *DL v.*

*District of Columbia*, 256 F.R.D. 239, 245 (D.D.C. 2009) ("[T]he Court must subtract the fees for time spent on issues on which the [party seeking fees] did not ultimately prevail."); *see also Lima Lucero*, 2019 WL 2745068, at *2 ("[A] court determining the reasonableness of hours billed may exclude time expended on motions that ultimately fail.").

Ultimately, courts must make an independent assessment of whether the hours claimed are justified. *Beck*, 289 F.R.D. at 384. However, because "[t]he district court cannot inquire into the reasonableness of every action taken and every hour spent by counsel, and it will consider objections to filed hours only where it has been presented with a reasonable basis for believing the filing is excessive." *Donnell v. United States*, 682 F.2d 240, 250 (D.C. Cir. 1982). That is, "unless its analysis of [the opponent's] objections clearly points to uncited time entries as non-compensable, the Court will evaluate *only* those time entries which [the opponents] have specifically challenged." *Miller v. Holzmann*, 575 F. Supp. 2d 2, 22 n.33 (D.D.C. 2008), *amended in part, vacated in part sub nom. U.S. ex rel. Miller v. Bill Harbert Int'l Const., Inc.*, 786 F. Supp. 2d 110 (D.D.C. 2011); *see also Hodel*, 651 F. Supp. at 1532 ("The Court is reluctant to engage in a detailed line-by-line analysis of the fee petition and the voluminous file in this case to determine, like a quasi-management consultant, if plaintiffs' counsel could have accomplished particular tasks or pleadings more efficiently.").

### b.  A Minor Reduction in Defendants' Hours is Appropriate

Here, other than his sweeping claim that Defendants' requested fees are "hyper-inflated" and the time expended in litigating the intellectual property claims not compensable—and he is wrong on the latter point, *see* Section III.A, *supra*—Klayman does not otherwise challenge any particular billing entries or tasks on which Defendants spent an unreasonable amount of time. ECF No. 642 at 32–33. However, the undersigned has surveyed the billing records Defendants have

produced and concludes that the 3,753.1 hours they say they expended litigating this case from complaint to trial and through appeal over the last 15-plus years are reasonable.

For instance, Defendants say they spent 37.3 hours preparing their initial fee petition, *see* ECF No. 585-1 at 9, which is far lower than the D.C. Circuit has found excessive, *see, e.g.*, *Fabi Constr. Co. v. Sec'y of Labor*, 541 F.3d 407, 414 (D.C. Cir. 2008) (reducing 236.8 hours of attorney time on fee application by 50% because nearly six 40–hour weeks of attorney time is unreasonable); *American Wrecking Corp. v. Sec'y of Labor*, 364 F.3d 321, 331 (D.C. Cir. 2004) (stating that 118 hours spent compiling the fee application was excessive and reducing fees by 50%).   Additionally, Klayman "filed numerous discovery and pretrial motions, including five motions for Judge Kollar-Kotelly's recusal."   *Klayman*, 2021 WL 4948025, at *1.   By the undersigned's count, and on top of his numerous attempts to recuse the Court, Klayman filed:  five motions to quash (ECF Nos. 76, 120, 126, 142, 156), numerous other discovery-related motions (ECF Nos. 146, 148, 159, 209, 211, 217, 219, 226, 241, 311), and a partial motion for summary judgment (ECF No. 275).   Many of Klayman's discovery motions, which were decided by Magistrate Judge Kay, were denied, and Klayman then appealed them to the Court, further compounding the briefing and the parties' legal costs.   *See* ECF Nos. 99, 103, 123, 125, 154, 162, 172, 173, 175, 176, 203, 215, 254, 255.   Additionally, Defendants filed three motions to compel Klayman during the discovery period, two of which were granted and the third of which was granted in part.   *See* ECF Nos. 88 (granted), 89 (granted), 106 (granted in part and denied in part). The parties then spent 11 days in trial, and later litigated an appeal before the D.C. Circuit.   It is hardly a surprise, then, that the docket in this case stretches over 650 entries.   Given this record, the undersigned finds that the over 3,700 hours Defendants spent shepherding this case from start to finish—including through a "contentious and difficult" discovery phase—is well-within the

realm of reasonableness, and Klayman has provided no reason to conclude otherwise.  ECF No. 585-9 at 5; *see, e.g.*, *Seijas v. Republic of Argentina*, No. 04-cv-1085, 2017 WL 1511352, at *10 (S.D.N.Y. Apr. 27, 2017) (finding that expending 3,000 hours over ten years of litigation was reasonable); *Martin v. FedEx Ground Package Sys., Inc.*, No. 06-cv-6883, 2008 WL 5478576, at *8 (N.D. Cal. Dec. 31, 2008) (finding that 4,473 hours of work devoted to two cases—which, collectively, had been litigated for approximately eight years—was reasonable in part because of, as here, "the extensive discovery conducted in [the] case"); *see also Wells v. Allstate Ins. Co.*, 557 F. Supp. 2d 1, 7 (D.D.C. 2008) (approving settlement agreement granting counsel attorneys' fees for approximately 3,100 hours of work conducted over eight years of litigation).

Klayman can hardly contest that he litigated this case to the hilt; in fact, other than alleging (unsuccessfully) that certain claims are outside the scope of the fee-shifting provision, he does not meaningfully contest the hours Defendants expended in this matter.  *See, e.g.*, ECF No. 585-9 at 5 (noting that one of Defendants' attorneys "draft[ed] responses to the at least 15 appeals" Klayman launched against "decisions of Magistrate [Judge] Kay").  Indeed, Klayman litigated his claims vigorously through trial and when he lost, brought his case to the D.C. Circuit, which uniformly rejected his appeal.  While there is nothing inherently objectionable about vigorous litigation, losing such a hard-fought case is not without repercussion.  "When [a party] chooses to take on litigation such as this kind, [it] may be forced to pay the consequences."  *Guantanamera Cigar Co. v. Corporacion Habanos, S.A.*, 263 F.R.D. 1, 13 (D.D.C. 2009).  That principle is certainly borne out here.

That said, and as explained above, certain hours that Defendants' counsel expended in this case are non-compensable.  Specifically, the time that was expended litigating Counts Seven and Eleven of Defendants' counterclaims is not covered by the fee-shifting provision because

Defendants withdrew those claims prior to trial and therefore did not "prevail" on them.  As is often the case, however, Defendants' time entries are not so granularly detailed to tell exactly how much time was spent on those particular claims.  *See* ECF No. 588-1 at 2–289; ECF No. 638-2 at 2–55; *see also Nasreen*, 2022 WL 2119672, at \*10 (noting the same issue).  Thus, the time expended on those claims cannot be surgically excised from the fee request.  In these circumstances where "time for compensable work must be separated from time for non-compensable work," it "has long been a practice in this district" to utilize the blunter tool of "reduc[ing] the lodestar amount by a certain percentage, rather than engaging in a line-by-line analysis of the charged fees." *LeFande v. Mische-Hoeges*, No. 10-cv-1857, 2018 WL 6620129, at \*4 (D.D.C. Dec. 10, 2018), *report and recommendation adopted*, 2019 WL 8331599 (D.D.C. Jan. 29, 2019), *aff'd*, 806 F. App'x 1 (D.C. Cir. 2020); *see also Goodyear Tire & Rubber Co. v. Haeger*, 580 U.S.101, ___, 137 S. Ct. 1178, 1187 (2017) (explaining that in allocating an attorney's time, the court may decide to reduce the amount of fees due by a certain percentage to reflect time spent on non-compensable tasks); *Mazloum v. District of Columbia*, 654 F. Supp. 2d 1, 4 (D.D.C. 2009) ("Courts routinely reduce the fee request by a percentage representing plaintiff's perceived success.").[16]  The undersigned adopts that approach here.

In this case, the undersigned believes a five percent reduction in the lodestar best accounts for the withdrawal of two of Defendants' counterclaims in a case comprising twenty total counts (nine from Klayman and Benson and eleven from Defendants) on which they achieved near-total victory.  On the one hand, Defendants scrapped those counterclaims within a week of the trial

---

[16] And even if it were technically possible to separate the time spent litigating Counts Seven and Eleven from the remainder of Defendants' work in this case, there simply "is no requirement—particularly in a substantial and far-ranging dispute such as this—that the Court undertake the burdensome task of going line-by-line through counsel's billing statements to pinpoint the specific tasks that were related only to" those claims.  *Miller*, 786 F. Supp. 2d at 121; *see also David v. District of Columbia*, 489 F. Supp. 2d 45, 51 (D.D.C. 2007) (reducing lodestar amount by a percentage "in lieu of a line-by-line analysis of each entry in [p]laintiff's counsel's billing records"), *report and recommendation adopted*, 674 F. Supp. 2d 34 (D.D.C. 2009).

commencing—in fact, they withdrew Count Eleven of their counterclaims on the eve of trial. *See*

ECF Nos. 467 & 492.   Thus, and without conducting an unnecessary line-by-line evaluation of

Defendants' bills (or argument from Defendants to the contrary), it is reasonable to assume that

they spent a good deal of time litigating those claims through discovery and summary judgment

and marshaling evidence to support them at trial.   On the other hand, though, Count Seven of the

counterclaims—the cybersquatting claim concerning Klayman's use of the domain

"savingjudicialwatch.org"—is intertwined with Count Six, which alleged that Klayman engaged

in unfair competition through use of the "Saving Judicial Watch" moniker. *See* ECF No. 86 at 33–

36.   And that is significant because Judicial Watch won $1 million in damages on Count Six, their

greatest single recovery in the case. *See* ECF No. 560 at 5.   More, and as was clear in the jury's

verdict, the withdrawal of Counts Seven and Eleven did not preclude Defendants from prevailing

on the claims they ultimately brought to trial.   Thus, even though the two counterclaims Defendants

withdrew represented ten percent (two of twenty) of the claims at issue in this matter, undersigned

believes a five percent reduction in the lodestar better accounts for the withdrawal of those claims

given those considerations and the overall success Defendants achieved here.   Other courts in this

Circuit have ordered similar reductions in like circumstances. *See, e.g.*, *Joaquin v. Friendship*

*Pub. Charter Sch.*, 188 F. Supp. 3d 1, 12 (D.D.C. 2016) (reducing fees by fifty percent where the

plaintiff prevailed on only one of four claims); *West v. Potter*, No. 05-cv-1339, 2009 WL

10659210, at *9–10 (D.D.C. Oct. 13, 2009) (reducing fees by twenty-five percent where the

plaintiff secured a favorable jury verdict on two of four claims)); *see also Thompson v. Int'l Ass'n*

*of Machinists & Aerospace Workers*, 664 F. Supp. 578, 583 (D.D.C. 1987) (finding that attorney

fees requested by plaintiff who prevailed on only one of four claims had to be reduced by three-

fourths, which "corresponds to plaintiff's success ratio on her various claims").

4.      Reasonable Fees and Costs

As explained in the foregoing sections, the undersigned concludes that the most appropriate "reasonable" fee in this case are the fees Defendants actually billed to and received from Judicial Watch and its insurer.  As of the filing of the initial fee petition in April 2019, those fees were $598,030.  ECF No. 585-1 at 9.  Between that time and Defendants' supplemental fee petition filed in January 2022, counsel had been paid another $120,144, for a total of $718,174.  ECF No. 638-3 at 2.  To account for the fact that Defendants did not prevail on all claims at issue in this litigation, the undersigned recommends that the lodestar be reduced by five percent to $682,265.30.

Finally, there is the matter of "suit costs."  ECF No. 585-3 at 11.  Again, the Severance Agreement does not define that term, but Defendants count as "suits costs" items such as "trial exhibits," "trial transcripts," "out-of-town travel," "copying," and "deposition transcripts."  ECF No. 585-8 at 3.  Those appear to be reasonable items a litigant would pay for in the normal course of litigating, and Klayman has not argued otherwise.  So, the undersigned recommends that Defendants be awarded, as they request, $24,866.61 in costs.  That brings the total award of "reasonable attorneys' fees and suit costs" to $707,131.91.

## CONCLUSION

Litigating has consequences, especially when the parties have contracted around the American Rule and engineered a high-stakes, winner-take-all contest.  Defendants undoubtedly prevailed in this case, and the Severance Agreement demands that Klayman now pay up.  Thus, and for the foregoing reasons, the undersigned recommends that the Court award Defendants $682,265.30 in attorneys' fees and $24,866.61 in costs—for a total of $707,131.91—pursuant to the Severance Agreement's fee-shifting provision.

*       *       *       *       *

The parties are hereby advised that under the provisions of Local Rule 72.3(b) of the United States District Court for the District of Columbia, any party who objects to a Report and Recommendation must file a written objection thereto with the Clerk of this Court within 14 days of the party's receipt of the Report and Recommendation. The written objections must specifically identify the portion of the report and/or recommendation to which objection is made and the basis for such objections. The parties are further advised that failure to file timely objections to the findings and recommendations set forth in this report may waive their right of appeal from an order of the District Court that adopts such findings and recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985).

Date: October 25, 2022

_____
G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE