IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

LARRY KLAYMAN,

               Plaintiff,

v.

JUDICIAL WATCH, INC.,

               Defendant.

Civil Action No. 1:06-cv-00670

## OBJECTIONS TO REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE MICHAEL HARVEY, MOTION TO REFER TO ANOTHER INDEPENDENT COURT OUTSIDE OF THE DISTRICT OF COLUMBIA CIRCUIT, CROSS MOTION FOR SANCTIONS AND REFERRAL OF ATTEMPTED FRAUD TO THE COMMITTEE ON GRIEVANCES

      Plaintiff Larry Klayman ("Mr. Klayman") hereby submits the following objections to the October 25, 2022, Report and Recommendation of Magistrate Judge G. Michael Harvey (the "Report"). ECF No. 657. Mr. Klayman also moves for severe sanctions against the Defendants for making false and fraudulent claims in their motion for fees as well as referring this matter to the Committee on Grievances, as this attempted fraud has already been confirmed through the fact that Magistrate Harvey's Report found that Defendants attempted to obtain fees for causes of action which were voluntarily dismissed. This led Magistrate Harvey to recommend a reduction of $956,091.70 – almost 1 million USD - in fees from the $,1638,357 that Defendants had previously sought. In any event, the Report and Recommendation must not be adopted, as it is patently fatally factually and legally flawed on numerous bases, as set forth below.

**I. BEFORE ANY FURTHER ACTION IS TAKEN ON THIS MATTER, MR. KLAYMAN MUST BE ALLOWED TO EXHAUST HIS LEGAL REMEDIES AND IN ANY EVENT THIS MATTER MUST BE TRANSFERRED TO ANOTHER JURIST IN THIS COURT**

1

Prior to even considering the validity with regard to the near 1 million USD fraud which as attempted as set forth in the Report, it is abundantly clear that Mr. Klayman must be permitted to exhaust his legal remedies, including the right to litigate fully *Klayman v. Rao et al*, 21-cv-2473 (D.D.C.). In *Rao*, Mr. Klayman sought injunctive relief against the judges on the U.S. Court of Appeals for the District of Columbia Circuit requiring them to undertake a bona fide review of the record in this instant case, instead of simply rubber stamping, to protect the Honorable Colleen Kollar-Kotelly ("Judge Kotelly"), the fatally flawed jury and judgment and verdict in this case and subsequent appeal, who among other outrages that "shock the conscience," allowed highly inflammatory false defamatory statements that Mr. Klayman had sexually harassed Judicial Watch's office manager and beat his ex-wife being put before the jury on Defendants behalf to prejudice Mr. Klayman. Indeed, as the three judge Panel effectively recommended, Mr. Klayman will be timely filing a Petition for Writ of Certiorari and/or Mandamus with the Supreme Court on or before the deadline of January 9, 2023. It is clear that the Report cannot be acted upon until this is resolved, because of the gross, egregious, and severe misconduct, that is fraud, by the Defendants that Judge Kotelly allowed, ratified, and condoned during this going on seventeen (17) year fiasco and injustice. Given the observations and statements of the appellate court Panel, Mr. Klayman has reason to believe that there is a likelihood that the Supreme Court will rule in his favor, which would obviate any further consideration on Defendants' request for fees and costs, much more negate the underlying judgment and jury verdict as a whole. Exhibit 1.

Mr. Klayman's confidence that the Supreme Court will reverse the *Rao* case is predicated on not only the strong merits of the case, but the fact that at the August 24, 2022 oral argument in this matter, the three-judge Panel more than appeared to agree with many of Mr. Klayman's

arguments but indicated that they were hesitant to find that they were the proper vehicle to seek the relief sought by Mr. Klayman, suggesting that a Petition for Writ of Certiorari and/or Mandamus to the Supreme Court would be appropriate. As stated by Judge Erickson "You know, because, you know, kind of the ordinary course is, you know, you have a three-judge panel, you petition for rehearing en banc, you file your petition for cert and if they grant it, fine; if they don't, it dies, right?" Exhibit 1 at 10:4-10. Then, the Panel suggested that a standard could be implemented to permit these types of cases – namely those that "shock the conscience." "Is that the standard - shocks the conscience? Is that what we're talking about? We're looking for a standard, a rule." Exhibit 1 at 32:9-11. Mr. Klayman concurred, saying, "[y]eah, I would say, I would say he hit the nail on the head, this shocks the conscience." Exhibit 1 at 32:12-14. The Panel was obviously shocked about the conduct of Judge Kotelly, the Appellees and their counsel, Richard Driscoll.

Accordingly, any consideration of the Report must be held in abeyance at least until Mr. Klayman is able to seek relief from the Supreme Court in the *Rao* case. Based on the comments of the Panel about the unethical and legally improper misconduct of this Court, Judicial Watch and its counsel Mr. Driscoll, Mr. Klayman has reason to believe that the Supreme Court will find in his favor, thus saving judicial resources as well as the time and the resources of the parties that would be spent on this matter.

In the unlikely event, however, that the Supreme Court does not rule in Mr. Klayman's favor, this matter must be transferred to another jurist in another Court, in another Circuit, as occurred in *Rao,* where the judges in the D.C. Circuit correctly found that they had a conflict of interest presiding over the appeal, and therefore formed a special three-judge panel comprised of judges in other circuits. Here, it is clear that Judge Kotelly's outrageous and extreme unabated

extrajudicial bias and prejudice against Mr. Klayman renders a fair adjudication impossible. This is notwithstanding the pending complaints filed with the Judicial Council of the District of Columbia Circuit pending against her, making it a clear conflict of interest for her to continue on this case given her demonstrable extra-judicial bias and prejudice. Exhibit 2. And, consistent with this the attempted fraud and other unethical misconduct of Judicial Watch's counsel, Mr. Driscoll, who in the past has assisted Defendant Tom Fitton, a non-lawyer, in filing frivolous ethics complaints against Mr. Klayman before the Office of Disciplinary Counsel of the District of Columbia Bar, this latest attempted fraud and unethical misconduct is being referred to the Committee on Grievances in this Circuit. Put simply, enough is enough!

## II. MR. KLAYMAN SHOULD HAVE BEEN GRANTED DISCOVERY AND AN EVIDENTIARY HEARING, AND SUCH A HEARING IS STILL REQUIRED AT THIS POINT

There was a reason that Mr. Klayman so vociferously sought discovery and an evidentiary hearing on the amount of fees requested by the Defendants, as he knew that Defendants – having been emboldened by Judge Kotelly's refusal to hold them accountable for their dozens of false if not false fraudulent statements and actions during this case – would allow for the continuation of this false and fraudulent pattern and practice with regard to the attorney fees and costs issue. The Defendants and their counsel's, Richard Driscoll's, pattern and practice of committing of committing what constitutes fraud using the mails and wires is so egregious that it could give rise to the RICO Complaint if pursued by Mr. Klayman.

### A. The Defendants' Pattern and Practice of Committing Predicate Fraudulent Acts Over the Last Ten Years in Particular

As set forth above, the Defendants have engaged in a longstanding pattern and practice of committing fraudulent acts against Mr. Klayman, not only in this case but in other cases as well. This should have cautioned Magistrate Harvey that Defendants were very likely to continue this

false and fraudulent pattern and practice in their request for attorneys' fees and costs. These false and fraudulent acts include, but are hardly limited to:

    a.    A fraudulent affidavit signed by Thomas Fitton, president of Judicial Watch, and prepared by Mr. Driscoll dated January 11, 2018 which contained the false statements regarding Jose Basulto. This fraudulent affidavit was transmitted via the mails and/or wires in a case styled *Klayman v. Judicial Watch Inc*, 17-cv-00034 (D.D.C.) from Mr. Driscoll's office in Arlington, Virginia to the U.S. District Court for the District of Columbia.

    The *Basulto* case involved Mr, Klayman being retained to enforce a judgment that Mr. Klayman had helped secured for Mr. Basulto against Cuba. Mr. Klayman and Mr. Basulto had entered into an agreement for Mr. Klayman to enforce the Cuba judgment, of which Mr. Klayman would then be entitled to a portion of the recovery. Then, as a result of tortious and illegal conduct by Judicial Watch, Mr. Basulto informed Mr. Klayman that he wanted to have Judicial Watch enforce the Cuba judgment instead, thereby depriving Mr. Klayman of a chance to earn a portion of the recovery and allowing Judicial Watch to profit instead,

    In furtherance of this scheme, Mr. Driscoll prepared a fraudulent affidavit on behalf of Mr. Fitton and Judicial Watch which made the following fraudulent statements: "I do not possess any knowledge or information relevant to this dispute"; (2)"If compelled to appear at a deposition, I will not be able to answer any questions regarding this lawsuit as I do not have any information"; and (3)"I have had no communication (written, oral or otherwise) with Basulto in several

years, except that Judicial Watch did send him a Christmas card each year that I signed[.]"

These statements were proven to be fraudulent when Paul Orfanedes, Judicial Watch's chief legal officer testified that was Fitton who signed the legal representation agreement between Judicial Watch and Mr. Basulto. This fraudulent affidavit allowed Judicial Watch to have the *Basulto* case dismissed, which allowed them to attempt to enforce the Cuba judgment instead of Mr. Klayman.

b.   A fraudulent pleading transmitted by Mr. Driscoll from his office in Arlington, Virginia to the U.S. District Court for the District of Columbia on May 23, 2019 in this instant case titled "Defendants' Opposition to Plaintiff's Motion for Sanctions."

In this pleading, Mr. Driscoll doubles down on the fraudulent lie that "[Mr. Klayman] did not produce any documents [during discovery in this case]." This fraudulent statement caused the Court to severely sanction Mr. Klayman by preventing him from introducing evidence or calling witnesses in this case, leading directly to a $2.8 million jury verdict and judgment against Mr. Klayman in favor of Judicial Watch.

c.   A fraudulent pleading transmitted by Driscoll from his office in Arlington, Virginia to the U.S. Court of Appeals for the District of Columbia Circuit on July 6, 2020 in *Klayman v. Judicial Watch, Inc et al*, 19-7105 titled "*Appellees' Brief*."

In this pleading, Driscoll doubled down on his oral lie at the jury trial about the computation of damages:

> Q: So starting with the year 2005 and looking at the multiyear donors, what types of information would you observe, say, for 2005?
> A: 2005, those donors donated a total of about **$4.8 million** to our organization. The next year that slipped down to about **$4.3 million**.
> Q: What year was that?
> A: And that was 2006.
> Q: Okay.
> A: 2007, it dropped off precipitously to **$3.4 million**, which is very significant. (emphasis added).

Even assuming the numbers testified to were accurate – which Mr. Klayman vehemently disputes -- the following calculation was entirely made-up. If donors donated a total of about $4.8 million in 2005 and the next year it slipped to $4.3, that accounts for the alleged $500,000 loss in 2006. But again, assuming the testimony was accurate, even if in 2007 donations slipped to $3.4 million from $4.3 million, the total loss for 2007 would be $900,000, not $1.4 million. What Judicial Watch craftily and dishonestly attempted to do here was persuade the jury to consider the alleged 2007 losses as a whole and in conjunction with the $500,000 alleged loss in 2006. In other words, the **total** alleged loss is $1.4 million for both years; not just for the year 2007. Therefore, the jury inappropriately considered $500,000 "extra dollars," assuming the testimony was accurate.

By doubling down on this lie in *Appellees' Brief,* Mr. Driscoll and Judicial Watch secured an addition $500,000 in damages that were created out of "thin air."

d. On or around January 18, 2019, Judicial Watch and Mr. Driscoll used the mails and/or wires to transmit the false statement that Mr. Klayman had been

7

ousted from Judicial Watch due to a sexual harassment complaint to numerous individuals, including but not limited to Roger Stone in Fort Lauderdale, Florida. Mr. Klayman was not ousted from Judicial Watch due to a sexual harassment complaint. This false statement was also transmitted using the mails and/or wires to Bob McEwen of the Council for National Policy ("CNP") on or around February 19, 2019. As a result of this fraudulent statement transmitted over the mails and wires, Mr. Klayman was excluded from even attending a CNP event. This was extremely harmful to Mr. Klayman, as CNP is primarily comprised of social and religious conservatives and leaders who have financially supported Mr. Klayman in the past. By excluding Mr. Klayman, Judicial Watch and Mr. Driscoll were able to take money from Mr. Klayman's pocket and put it into their own coffers.

e.  On or around February 22, 2017, Judicial Watch entered into a *quid pro quo* illegal agreement with the American Conservative Union ("ACU") in order to exclude Mr. Klayman and his non-profit, Freedom Watch, from the Conservative Political Action Conference ("CPAC"). This illegal agreement in restraint of trade was done using the mails and wires. Judicial Watch used the mails and wires to transmit over $500,000 on information and belief to ACU in order to ensure that Mr. Klayman and Freedom Watch would be excluded from CPAC. CPAC is one of the primary sources of fundraising and networking for conservative public interest groups, such as Judicial Watch and Freedom Watch. Judicial Watch entered into an illegal agreement in restraint of trade to financially harm Mr. Klayman while enriching Judicial Watch.

f. Judicial Watch has, on numerous occasions, tortiously interfered with Mr. Klayman's and Freedom Watch's relationship with the media by attempting to keep Mr. Klayman from appearing on CNN, CSPAN, and MSNBC, Fox News, Brietbart and other networks and media outlets, as part of its pattern and practice of interfering with Mr. Klayman's efforts to increase its reputation, goodwill, and fundraising and its mission to disseminate information to the public.

This was done by Judicial Watch in order to ensure that Mr. Klayman would be excluded as a guest on various networks, thereby financially harming Mr. Klayman and enriching Judicial Watch

g. On or around September of 2003, Judicial Watch used the mails and wires to transmits threats to Mr. Klayman in order to try to prevent Mr. Klayman from correctly referring to himself as the founder and former chairman of Judicial Watch, claiming falsely that this would be an infringement of trademark and copyright law, as part of its pattern and practice of threatening Mr. Klayman, trying to financially harm him, and to try to enrich Judicial Watch.

h. On or around February 14, 2018, Judicial Watch sent a fraudulent bar complaint against Mr. Klayman to the District of Columbia Office of Disciplinary Counsel over Mr. Klayman's *pro hac vice* application in *United States v. Bundy*, 2:16-cr-00046 (D. Nev.), a case that did not even involve them in any way. This fraudulent bar complaint was transmitted using the mails and wires, and has resulted in Mr. Klayman having to expend countless hours and financial resources to defend a frivolous bar complaint.

        i.      On or about February 22, 2012, Constance Ruffley, an office administrator of Judicial Watch, acting at the instruction of, and in furtherance of Judicial Watch published on the internet using the mails and wires the fraudulent statement that Mr. Klayman had been "convicted" of a crime for not paying child support. This fraudulent statement was totally false.

        j.      On or around October 4, 2022, false representation was also made by counsel for Appellee/Defendant Thomas Fitton that a case in the U.S. District Court for the Southern District of Florida before the Honorable Jose E. Martinez had been dismissed on the merits. *Klayman v. Fitton*, 1:19-cv-20544 (S.D. FL.). This is false, as it was only dismissed on the basis of personal jurisdiction and the short deposition of Mr. Fitton was only ordered to address personal jurisdiction. This false statement was sent through the wires in court pleadings.

While there is much more, this representative sample of Mr. Driscoll's pattern and practice of committing fraud using the mails and wires, at a minimum, would subject Judicial Watch and Mr. Driscoll to a RICO Complaint, should Mr. Klayman choose to pursue it. This fraudulent conduct should alert any Court that Defendants would continue their fraudulent pattern and practice herein, as set forth below, but that is not likely to occur before this Court, based on this Court's rank bias and prejudice toward Mr. Klayman, which he writes about in his new book "It Takes a Revolution: Wake Up America!, which chronicles the severe harm done to him, his clients, colleagues, family and the public over the years by Judge Kotelly.

    **B.**    **The Defendants Have Continued This Pattern and Practice of Committing Fraudulent Acts Herein**

As set forth in Mr. Klayman's Opposition to Defendants' Motion for Attorney Fees and Costs, the amount of fees sought by the Defendants were "hyper inflated if not fraudulent" and

therefore discovery and an evidentiary hearing was necessary to determine the actual amount of time spent by counsel for Defendants on this case.

Indeed, "[a]n applicant for attorneys' fees is only entitled to an award for time reasonably expended. Thus the fee application must also contain sufficiently detailed information about the hours logged and the work done. This is essential not only to permit the District Court to make an accurate and equitable award but to place government counsel in a position to make an informed determination as to the merits of the application." *Nat'l Ass'n of Concerned Veterans v. Sec'y of Def.*, 675 F.2d 1319, 1327 (1982). "Accordingly, the opponent is entitled to the information it requires to appraise the reasonableness of the fee requested and in order that it may present any legitimate challenges to the application to the District Court." *Id.* at 1329. This equates to discovery of the billing documentation submitted by the Defendants. Lastly, **"procedural fairness requires that a hearing be held where in the District Court's view material issues of fact that may substantially affect the size of the award remain in well-founded dispute**. If a hearing is held it should, of course, be sharply focused upon those issues which the District Court believes will materially affect the award in light of the submissions of the parties as supplemented by appropriate discovery." *Id.* at 1330 (emphasis added). Other courts have also consistently found that an evidentiary hearing is required under these circumstances:

> **Prior to awarding attorney's fees for services already rendered and for costs already incurred, a trial court must hold an evidentiary hearing to determine the reasonableness and necessity of the fees and costs awarded.** *See Martin v. Martin*, 561 So. 2d 1266 (Fla. 3d DCA 1990). **Moreover, when the record contains some competent substantial evidence supporting the fee order, but fails to include evidentiary support such as testimony from the attorney performing the services, the appellate court will reverse and remand for additional findings or an additional hearing.*" Bateman v. Serv. Ins. Co.*, 836 So. 2d 1109, 1111 (Fla. Dist. Ct. App. 2003) (emphasis added).

*See also Rodriguez v. Campbell*, 720 So. 2d 266 (Fla. Dist. Ct. App. 1998), *Rodriguez v. Campbell*, 720 So. 2d 266 (Fla. Dist. Ct. App. 1998). "…an evidentiary hearing on attorney fees is required…when "'here [a]re disputes of fact, and where the written record [i]s not sufficiently clear to allow the trial court to resolve the disputes'" *Zelaya/Capital Int'l Judgment, LLC v. Zelaya*, 769 F.3d 1296, 1306 (11th Cir. 2014). *See also Gonzalez v. J.C. Penney Corp.*, 209 F. App'x 867 (11th Cir. 2006). "In a…situation…such as attorney fees, requires an evidentiary hearing under O.C.G.A. § 9-11-55 (a), unless the parties stipulate otherwise. During this hearing, the 'plaintiff shall be required to introduce evidence and establish the amount of damages before the court without a jury, with the right of the defendant to introduce evidence as to damages.'" *Oden v. Legacy Ford-Mercury*, 222 Ga. App. 666, 669, 476 S.E.2d 43, 46 (1996).

      Despite rejecting any request for discovery and an evidentiary hearing, Magistrate Harvey refused to comb through the record and the pleadings filed by the Defendants one-by-one to determine if the amount of time and fees sought by counsel for Defendants correlated with the amount of work actually done. This was absolutely necessary, given the history, pattern and practice of the Defendants lying and making fraudulent statements, but it appears that Magistrate Harvey simply did not want to undertake such a monumental task – given the going on seventeen (17) year record – so he simply took the Defendants at their word that the requested fees were accurate. Mr. Klayman feared, if not anticipated, that any Magistrate would loathe to undertake such a large task, which is exactly why he requested discovery and an evidentiary hearing in the first place. This would have alleviated the burden from the Magistrate and placed it on Mr. Klayman – something that Mr. Klayman was more than willing to do, given the nearly $1.7 million dollars fraudulent sought by the Defendants. Yet, Magistrate Harvey not only denied Mr.

Klayman the ability to get to the truth, he himself failed to attempt to do so. This was particularly egregious given the fact that Magistrate Harvey, without even making an effort to do so, uncovered patently obvious fraud by the Defendants that even he could not ignore, as the Defendants attempted to recoup fees for causes of action that were withdrawn and they therefore clearly did not prevail on.

Had Magistrate Harvey simply looked through the billing records submitted by the Defendants, he would have easily been able to spot out instances of fraud. As just a few examples, counsel for Defendants, Richard Driscoll ("Mr. Driscoll") allegedly billed at least 2.3 hours on work related to Defendants' October 27, 2021 Motion to Lift Stay, which consisted of just 2 pages of substance, and not a single piece of legal authority. Then, on September 3, 2019, Mr. Driscoll allegedly billed a whopping minimum of 4.5 hours of work related to Defendants' Response to Plaintiff's Motion to Stay Enforcement of Judgment Pending Appeal Without Bond, which consisted of just 3.5 pages of substance. Then, lastly, Mr. Driscoll allegedly billed at least 13.7 hours of work related to Defendants' April 26, 2019 Opposition to Plaintiff's Motion for Reconsideration and Renewed Motion for Voluntary Recusal or Disqualification – which largely recycled old legal research and only totaled approximately 9 pages of substance. These are just a few examples that Mr. Klayman was able to identify with minimal effort, as they are patently inflated and fraudulent billing records. This is just the "tip of the iceberg," however, and this conclusively shows why discovery and a full evidentiary hearing was so essential if Magistrate Harvey was not going to take the time and effort to comb over each and every billing record.

If the Defendants were so emboldened by Judge Kotelly's inaction and bias and prejudice toward Mr. Klayman that they would even attempt such patently obvious fraud, then it more than follows that there would be countless other fraudulent statements in their motion for attorney

fees and costs that required discovery and an evidentiary hearing to uncover. The odds of Defendants stopping at fraudulently trying to recoup about 1 million USD in fraudulently claimed fees for withdrawn causes of action are slim to none, yet despite this, Magistrate Harvey refused to allow for discovery and an evidentiary hearing. This was a clear, egregious error that mandates the entire Report be rejected in its entirety and this matter restarted with full discovery and an evidentiary hearing.

Indeed, this level of blatant fraud mandates that the entirety of the Defendants' motion for fees be denied and dismissed, and that the Defendants be sanctioned severely. "The trial court has inherent power to sanction parties for intentionally abusing the litigation process." *Breezevale Ltd. v. Dickinson*, 879 A.2d 957, 961 (D.C. 2005). Here there is more than simple abuse, but the attempted commission of a crime. In *Breezevale*, the Court imposed sanctions in the for of dismissal of all claims for fraudulent conduct – namely knowingly using and relying on forged documents. *Id.* at 961. The Court reasoned "we have recognized that dismissal is an appropriate sanction where a party 'engages in conduct utterly inconsistent with the orderly administration of justice.'" *Id.* at 967. Similarly, the Defendants here have engaged in fraud that is "utterly inconsistent with the orderly administration of justice." They have already been caught "red handed" by the Magistrate trying to recoup fees for causes of action they did not prevail on. This is fraud. As the old adage goes, one "cannot be a little pregnant" and similarly, Defendants cannot be "a little fraudulent." Fraud is fraud and fraud is criminal in nature. Defendants have committed fraud as they repeatedly have in the past. Their request for fees must be thrown out in its entirety, and Mr. Klayman's cross-motion for sanctions must be granted in this regard.

### III. THE REPORT EGREGIOUSLY ERRS BY AWARDING FEES TO DEFENDANTS OUTSIDE OF THE EXPRESS LANGUAGE OF THE SEVERANCE AGREEMENT

In addition to the amount of fees and costs sought be the Defendants being hyper-inflated and fraudulent, it is clear that the amount sought by the Defendants includes fees outside the scope of the Severance Agreement. the sole basis for Defendants' claimed attorneys' fees and costs is found in section 19(c) of the Severance Agreement, which states:

> <u>Attorneys' Fees</u>. The prevailing party in **any legal proceeding instituted on account of a Party's breach of this Agreement** shall be entitled to an award of the costs incurred in connection with such action, including reasonable attorneys' fees and suit costs. (emphasis added).

Thus, as per the clear, uncontradicted language of the Severance Agreement, the only fees recoverable are those related to a legal proceeding instituted **on account of a Party's breach of the Severance Agreement**. Thus, any claims and defenses not directly related to the breach of the Severance Agreement are expressly excluded from the determination of fees. Mr. Driscoll has essentially conceded that this was the nature of the agreement between the parties, as he made it very clear in his affidavit that "[t]he overwhelming majority of these claims were based on a breach of the Confidential Severance Agreement between the parties." ECF No 585-9 at 7. Mr. Driscoll clearly wrote this with the express limiting language of the Severance Agreement in mind.

This would, notably, exclude all attorneys fees arising out of the Lanham Act, which undoubtedly comprised a majority of the fees sought by the Defendants, as there is nothing in the Severance Agreement pertaining to the Lanham Act.

Here, Magistrate Harvey egregiously erred by failing to abide by the express language of the Severance Agreement, which again limits the fees recoverable to those related to a legal proceeding instituted "on account of" a Party's breach of the Severance Agreement. "On account of" is clearly limiting language that was carefully included by Mr. Klayman to ensure that only fees for legal actions brought for breach of the Severance Agreement would be compensable.

Magistrate Harvey argues that in order for this to be a valid interpretation, the parties must have included further, redundant language such as "solely" "on account of." This is not true. "On account of" is already limiting language. It was unnecessary and redundant for the parties to include further limiting language like "solely." Of course, parties to a contract can always include more and more redundant adjectives, but this defeats the purpose of a plain and simple contract that adequately captures the intent of the parties.

For instance, a contract that states "Alan agrees to purchase one (1) PlayStation 5 from Bill" would clearly be a valid, enforceable contract. Magistrate Harvey, however, appears to suggest that under this scenario, Alan would be forced to purchase one (1) PlayStation 5, and anything else that Bill wishes to sell because the contract did not say "Alan agrees to purchase only one (1) PlayStation 5 from Bill." This clearly exceeds the scope of the contract between the parties, and Magistrate Harvey committed a clear, egregious error in his interpretation.

Lastly, Magistrate Harvey makes the completely unsupportable finding that the Defendants are entitled to fees for a case brought by Louise Benson. Ms. Benson was not a signatory to the Severance Agreement, and therefore is not bound by the fee-shifting provision of the Severance Agreement. This egregious error must be reversed.

## IV.   JUDGE KOTELLY STILL MUST TRANSFER THIS MATTER TO ANOTHER JURIST A COURT OUTSIDE OF THIS CIRCUIT.

As set forth previously, Judge Kotelly has a strong conflict of interest due to the pending complaints before the Judicial Council of the District of Columbia Circuit for her openly biased and prejudiced conduct against Mr. Klayman in administering this case. This includes as only the latest unprofessional and vindictive outrage for absolutely no reason other than vengeful animus, refusing to allow Mr. Klayman the ability to file electronically in this case. Over the past year, since he has lost the ability to file electronically in this case, he has had to hire legal services

fourteen (14) times (including this pleading) to deliver hard copies to the clerk of the court in order to file in this case. This has cost Mr. Klayman a minimum of $2,800 dollars, plus additional costs for printing, just to participate in litigating this action. This simple request has not been denied by any other judge in this Court, since clearly there is no rational basis to deny a litigant to file electronically. Indeed, allowing Mr. Klayman to file electronically benefits everyone—the overburdened clerks of the court would not be forced to waste their time scanning and uploading every single hard copy filing, the Court and the Defendants would receive Mr. Klayman's filings in real time and therefore without undue delay, and Mr. Klayman would not be forced to spend $200 dollars every time he needs to file even one page. But Judge Kotelly's bias and prejudice and petty hateful vindictiveness knows no bounds and in her order denying electronic filing she admits that her actions are the result of her own so called "discretion."

And, in this instance, Mr. Klayman filed his Motion for Extension of Time to File Objections to Report and Recommendation with the clerk of the Court on November 3, 2022, and for whatever reason, it was not docketed until November 8, 2022 – the same day that Mr. Klayman's objections were due. This delay, caused solely by Judge Kotelly's refusal to allow Mr. Klayman to file electronically, forced Mr. Klayman to file a rushed "Interim Objections" in order to preserve his rights and in an abundance of caution. This is just the latest example of the severe prejudice caused by Judge Kotelly.

However, for absolutely no reason other than to harm Mr. Klayman's ability to defend himself against Defendants' fraudulent request for fees and to force Mr. Klayman to expend his limited resources, Judge Kotelly still will not allow this simple request. This can only be explained by extrajudicial bias, prejudice, and animus that has no place on the bench. This is clearly contrary to the administration of justice, and to Judge Kotelly's oath of office:

Each justice or judge of the United States shall take the following oath or affirmation before performing the duties of his office: "I, ___ ___, do solemnly swear (or affirm) that I will administer justice without respect to persons, and do equal right to the poor and to the rich, and that I will faithfully and impartially discharge and perform all the duties incumbent upon me as ___ under the Constitution and laws of the United States. So help me God. 28 U.S. Code § 453 - Oaths of justices and judges.

Thus, Judge Kotelly must take herself off of this case and transfer it to neutral arbiter in this case in another Circuit, as she has shown time and time again that she simply cannot be neutral and unbiased when it comes to adjudicating Mr. Klayman's cases. Similar to the D.C. Circuit in *Rao*, this matter must be transferred to an outside court in another Circuit, as this Court as well as the D.C. Circuit has shown a propensity to simply "circle the wagons" and shamelessly protect their colleagues, and thus themselves, from scrutiny. Indeed, the D.C. Circuit, in the appeal of this case, went out of their way to state that Judge Kotelly had acted "commendably" in presiding over this case, despite the fact that it had begun ins 2006, and which was then going on sixteen (16) years. There is nothing "commendable" about this, alone, by any standard of judicial conduct!

## V. CONCLUSION

Based on the foregoing, it is clear that there is still litigation pending with regard to the underlying case, and therefore the issue of fees should be held in abeyance until Mr. Klayman is able to exhaust his remedies. In any event, the Report is fatally flawed in numerous respects, as it again, as it has throughout the last many years, wholesale adopts the patently fraudulent statements of the Defendants without scrutiny much less any question. This is a gross and stark miscarriage of justice that must be remedied before a neutral Court other than this lower court and appellate court in the District of Columbia, which has shown themselves unwilling to hold a

fellow jurist, and thus themselves, accountable for anything, much more the severe injustice that occurred and continues to occur here.

Dated: November 22, 2022                    Respectfully submitted,

                                            /s/ Larry Klayman
                                            Larry Klayman, Esq.
                                            2020 Pennsylvania Ave NW, #800
                                            Washington, DC, 20006
                                            Tel: 561-558-5336
                                            Email: leklayman@gmail.com

                                            *Pro Se*

## CERTIFICATE OF SERVICE

I, Larry Klayman, hereby certify that on this day, November 22, 2022 a copy of the foregoing filed in person with the clerk of the Court and served via email to counsel of record at: rdriscoll@driscollseltzer.com

                                            /s/ Larry Klayman
                                            Larry Klayman